UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

OMAR HURLOCK, on behalf of himself and all
others similarly situated,

    Plaintiff,

-against-                                                      Case No. 25 CV 03891 (JLR)

KELSIER VENTURES, KIP PROTOCOL,
HAYDEN DAVIS, GIDEON DAVIS,
METEORA, THOMAS DAVIS, JULIAN PEH,
And BENJAMIN CHOW,

    Defendants.

_____/

## DECLARATION OF TIMOTHY J. TREANOR

    Pursuant to 28 U.S.C. § 1746, I, TIMOTHY J. TREANOR, declare under penalty of perjury that the following is true and correct:

    1.   I am an attorney duly admitted to practice law in the State of New York and am one of the attorneys of record for the Plaintiff, Omar Hurlock, in the above-captioned matter.

    2.   I submit this affidavit in support of the Plaintiff's emergency motion, pursuant to Fed. R. Civ. P. 64 and 65 and New York Rules of Civil Practice ("CPLR") § 6201, for a Temporary Restraining Order and a Preliminary Injunction barring Defendants from transferring any of the proceeds of the sale of $LIBRA, including at least $110 million controlled by defendant Hayden Davis, of which a substantial amount is held in two cryptocurrency wallets ("LIBRA Wallet 1") and ("LIBRA Wallet 2"), specifically 13,060,482 USDC in LIBRA Wallet 1 and 44,593,888 USDC in LIBRA Wallet 2.  The Plaintiff also seeks to include in the Court's Order specific directions to Circle Internet Group, Inc. and its subsidiary Circle Internet Financial, LLC (collectively, "Circle"), to freeze the USDC (which Circle issues) in these wallets. Any proceeds of the sale of $LIBRA controlled by the Defendants represents proceeds of a fraudulent cryptocurrency scheme (the "$LIBRA Coin Scheme") that involved the President of Argentina and was carried out by the defendants on February 14-15, 2025.  The Plaintiff Omar Hurlock and others similarly situated are the victims of this scheme, which is the subject of the Complaint in this matter.

    3.   As shown by the specific facts alleged herein and in the accompanying Declaration of Justin Ehrenhofer, Senior Director, NAXO Labs LLC, the Defendants obtained more than US$280 million from Hurlock and the other victims of the $LIBRA Coin Scheme.  Of that

amount, at least US$110 million in cryptocurrencies that are proceeds of the Defendants' scheme is in the custody, and under the control, of the Defendant Hayden Davis. The Plaintiff has reason to believe that Davis and others will transfer or dissipate the assets he controls before judgment can be obtained against him.

4.  Hurlock is prepared to post the bond required by FRCP 65(c) if the Court grants this motion. Unless the requested Temporary Restraining Order is issued immediately securing these assets, the Plaintiff believes that the Defendants, including Hayden Davis, will unlawfully dispose of the proceeds of his fraudulent activity and destroy the ability of Hurlock and other victims to recover the judgment he ultimately expects to obtain.

5.  In connection with this matter, I have reviewed numerous documents, media reports, social media posts, published statements, and videos that describe or demonstrate facts relevant to the launch of the $LIBRA cryptocurrency token. I provide below a summary of key facts and information that I learned from that review, and I provide citations and links to where true and correct copies of relevant sources can be found:

## The $LIBRA Coin Scheme

6.  The $LIBRA Cryptocurrency Token. On February 14, 2025, at approximately 4:37 p.m. Eastern Standard Time, the Defendants minted the $LIBRA meme coin on the Solana blockchain. *See* Solscan Transaction Details (located at https://solscan.io/tx/3vtogCe5Q52iUYbY6CLRTV3RUf2ggSDoAkPtCYpJrvpvdoqx71mJbS5zgwvze7CDHTBzNohbg4eJiFPw5kUnu5Dh) (minting time February 14, 2025, 21:37:49 +UTC (4:37:49 p.m. EST)); Nansen Research, "*LIBRA - The Aftermath*," Feb. 18, 2025 (located at https://research.nansen.ai/articles/libra-the-aftermath) ($LIBRA minting at 4:38 p.m. EST). $LIBRA has been described by some as a "meme coin," which refers to a type of crypto asset inspired by internet memes, characters, current events, or trends for which the promoter seeks to attract an enthusiastic online community to purchase the meme coin and engage in its trading. *See* U.S. Securities and Exchange Commission, Division of Corporate Finance, "*Staff Statement on Meme Coins*," Feb. 27, 2025 (located at https://www.sec.gov/newsroom/speeches-statements/staff-statement-meme-coins).

7.  Promoting the Argentine Economy. To promote the $LIBRA coin, the Defendants created an investment project they dubbed "Viva La Libertad," reflecting a slogan widely used in speeches by the Javier Milei, the President of Argentina. *See* Vera Bergengruen, "*Javier Milei's Radical Plan to Transform Argentina*," Time Magazine, May 23, 2024 ("'*Viva la libertad, carajo!*' became Milei's famous rallying cry: 'Long live freedom, damn it!'") (located at https://time.com/6980600/javier-milei-argentina-interview/). The Defendants also created a website—at vivalalibertadproject.com—which described the purpose of the project: to "boost the Argentine economy by funding small projects and local businesses." S*ee* https://www.vivalalibertadproject.com/. The web domain was purchased earlier on the same day that the $LIBRA token was minted. *See* https://lookup.icann.org/en/lookup (vivalalibertadproject.com domain created on Feb., 14, 2025 at 03:37 UTC (10:37 p.m. EST, Feb. 13, 2025)). The site touted $LIBRA as a "token with a purpose" that was issued "in honor of Javier Milei's libertarian ideas" and was "designed to strengthen the Argentine economy from

2

the ground up by supporting entrepreneurship and innovation." https://www.vivalalibertadproject.com/. The website further claimed that the $LIBRA coin would be issued to "channel funding efficiently and in a decentralized manner" so that "investors" could "take part in Argentina's growth." *Id.* And it indicated that the "Token Distribution" would be as follows: 50% Argentina Growth; 30% Liquidity; 20% Treasury. *Id.* The website provided a link for anyone who has "a small business, a startup, or an educational initiative that needs a boost" to "apply for funding." *Id.* Finally, the website indicated that it was developed by KIP Network Inc., which is the business of the Defendant, Julien Peh. *Id.;* Compl. ¶¶ 20, 25.

8. <u>President Javier Milei's Support</u>. The Defendants secured the assistance of Argentine President Javier Milei in promoting the $LIBRA coin. Twenty three minutes after the Defendants launched the $LIBRA coin—at 5:01 p.m. EST—Milei posted on social media in support of the coin as an investment, writing that the coin was aimed at stimulating economic growth in Argentina by funding small businesses and startups. *See* Jack Nicas and David Yaffe-Bellany, "*Milei, $Melania and Memecoins: Unraveling Argentina's Crypto Fiasco*," NY Times, Feb. 28, 2025 (located at https://www.nytimes.com/2025/02/28/world/americas/argentina-crypto-scandal-president.html). Specifically, he wrote (as translated from Spanish) "Liberal Argentina is growing!!! This private project will be dedicated to encouraging the growth of the Argentine economy by funding small Argentine businesses and startups. The world wants to invest in Argentina." *See* TRM Labs, Feb. 17, 2025, "*The LIBRA Affair: Tracking the Memecoin that Launched a Scandal in Argentina*," (located at https://www.trmlabs.com/resources/blog/the-libra-affair-tracking-the-memecoin-that-launched-a-scandal-in-argentina). The post also provided a link to vivalalibertadproject.com, as well as the blockchain contract address for the coin and a link labelled "$LIBRA" to purchase the coin that was not yet otherwise available. *Id.* (noting that Milei's post included the token contract on Solana). Milei signed the post in his familiar fashion, writing "VIVA LA LIBERTAD CARAJO…!!!" (Long Live Liberty Damn It…!!!). *Id.*

9. <u>Enlisting Milei's Support</u>. The Defendants secured Milei's support through a series of meetings. Defendant Hayden Davis met in person with representatives of President Milei on July 16, 2024, at the Argentine Presidential residence, having been introduced by one of Milei's advisors. *See* Ignacio Grimaldi, "Karina Milei, the gateway to the Casa Rosada for the characters behind the cryptocurrency scandal," La Nacion, Feb. 16, 2025 (located at *https://www.lanacion.com.ar/politica/karina-milei-la-puerta-de-entrada-a-la-casa-rosada-para-los-personajes-detras-de-la-criptomoneda-nid16022025/);* Jack Nicas and David Yaffe-Bellany, "*Milei, $Melania and Memecoins: Unraveling Argentina's Crypto Fiasco*," NY Times, Feb. 28, 2025 (located at https://www.nytimes.com/2025/02/28/world/americas/argentina-crypto-scandal-president.html). In October 2024, the same Milei advisor arranged for the Defendant Julian Peh of KIP Network (also known as "KIP Protocol") to pay $50,000 to sponsor a TechForum conference event in Argentina, which Davis, Peh, and Milei attended. *Id.* Peh met with Milei at the conference, and they took a photo together. *See* https://x.com/KIPprotocol/status/1849767686554910985 (KIP Protocol post on X regarding conference with photo of Milei and Peh). Later, the Office of the President of Argentina issued an announcement (as translated from Spanish) that, on October 19, 2024, President Milei "held a meeting with representatives of KIP Protocol in Argentina in which [Milei] was informed of the

3

company's intention to develop a project called 'Viva la Libertad' to finance private ventures in the Argentine Republic using blockchain technology." *See* Office of the President of Argentina X account post, Feb. 15, 2025 (located at https://x.com/OPRArgentina/status/1890937875677495542); Binance Square, "*Aftershocks from the Argentine President's LIBRA Memecoin Pump Dump and KIP Protocol*," Feb. 16, 2025 (located at https://www.binance.com/en-IN/square/post/20379300006866). In November 2024, Davis again visited Milei at the presidential offices and afterwards toasted with champagne at the Four Seasons in Buenos Aires, telling others that he had just signed a deal with the President. *See* Nicas and Yaffe-Bellany, "*Milei, $Melania and Memecoins: Unraveling Argentina's Crypto Fiasco*," NY Times, Feb. 28, 2025 (located at https://www.nytimes.com/2025/02/28/world/americas/argentina-crypto-scandal-president.html). On January 30, 2025, Davis again met with Milei, this time at the Presidential residence, after which Milei posted a photo with Davis on social media, proclaiming (as translated from Spanish):

> TECHNOLOGY IS AN ALLY OF FREEDOM  Today we had a very interesting conversation with entrepreneur Hayden Mark Davis, who advised me on the impact and applications of blockchain technology and artificial intelligence in the country.  We continue working to accelerate Argentine technological development and make Argentina a global technological powerhouse.  VIVA LA LIBERTAD CARAJO…!!!"

*See* https://x.com/JMilei/status/1885068460268363889/photo/1. The Defendant Kelsier Ventures, which is Hayden Davis' company, reposted the message on its X account, stating "A big step in our vision to ensure the next generation of technology and finance reach the masses. We are proud to advise @JMilei on executing this goal in Argentina and continue changing the world for the better.  VIVA LA LIBERTAD." *See* https://x.com/kelsierventures?lang=en; Compl.  ¶¶ 19, 22-24 (Kelsier and the Davis Defendants). Defendant Ben Chow, CEO of Defendant Meteora, commented on Milei's post: "What changing the world looks like," and added a fire emoji. *See* https://x.com/hellochow/status/1885089698768449939.

10. <u>Touters</u>.  To further promote the $LIBRA coin as an investment, the Defendants enlisted the support of other prominent individuals to tout the coin in hopes that such support would create interest. *See* Interview of Hayden Davis by Coffeezilla, Feb. 16. 2025 (hereinafter "Coffeezilla-Davis Interview") (located at https://www.youtube.com/watch?v=EqizJTbxAEM) at 4:50-5:00 ("Milei was going to do another video and then there was some other, I won't name them, but there were some other high level people that were going to interact post, et cetera, market the video."); Interview of Hayden Davis by David Portnoy, Feb. 17, 2025 ("hereinafter Portnoy-Davis Interview") at 2:45-3:00 (located at https://www.youtube.com/watch?v=N5XqQlGSq0M. ("And then there was supposed to be a third wave of a bunch of extremely influential people—I'm not going to name all of them because I don't think that's super helpful—that were going to rip it.").  These planned touters included David Portnoy, the owner of media company Barstool Sports, who has more than 3 million followers on social media and routinely provides updates about his investments, including in cryptocurrencies. *See* https://x.com/stoolpresidente (Portnoy homepage on X showing 3.7 million followers).  According to Davis, "the Milei team wanted Dave to be involved so that they could do some cross promotion" such that if Portnoy "had a [token] project at some point, there would be, like, some ability for their holders to benefit from their holder." *See* Coffeezilla-Davis Interview at 23:30-23:50; *see also* Portnoy Video on X, dated Feb. 17,

2025 (located at https://x.com/JustAC4t/status/1891693825648742540) at 2:30-4:00 (Portnoy describing how Milei wanting him to support $LIBRA). As it happens, Portnoy was considering issuing his own token at that time and wanted Davis to advise on the launch so Davis flew to Portnoy's home for a meeting, and the two remained in touch over the next several weeks. *See Id.* at 00:50-1:30 (Portnoy describing meetings with Hayden Davis). At some time during this period, Davis asked Portnoy to promote $LIBRA on his social media platforms when it was ready to launch. Portnoy initially agreed. Portnoy-Davis Interview at 28:15-28:20 ("I was one second away from giving the biggest endorsement to that.").

      11.  <u>Trading Frenzy</u>. After President Milei posted in support of the $LIBRA coin, investor interest surged with more than $1.5 billion of trading volume within the first hour. *See* "Rapid Decline in $LIBRA: A Record-Breaking Memecoin Collapse," Blockchain News, Feb. 15, 2025 (located at https://blockchain.news/flashnews/rapid-decline-in-libra-a-record-breaking-memecoin-collapse) ("The trading volume surged to $1.5 billion $LIBRA tokens in the first hour."). The price of the coin also surged: within 45 minutes, the price of a $LIBRA coin ballooned, rising from US$0.216 per coin and peaking at 5:40 p.m. EST at over US$4.50 per coin. *See* Estefania Pozzo, "*$LIBRA: the timeline of a crypto scandal that's rocking the Milei government*," Buenos Aires Herald, Feb. 17, 2025 (located at https://buenosairesherald.com/politics/libra-the-timeline-of-a-crypto-scandal-thats-rocking-the-milei-government.). At the peak, the market capitalization of $LIBRA reached US$4.5 billion. *See* https://x.com/KobeissiLetter/status/1890741467632505040 (The Kobeissi Letter) (Feb. 15, 2025) (showing $LIBRA rising to a market cap of $4.5 billion within one hour and then crashing rapidly).

      12.  <u>Price Crash and Milei Withdrawal</u>. Shortly after the peak, those who bought early started to sell. The first $LIBRA buyer, who had purchased at the same moment Milei posted on X, paid US$0.216 per token. *See* Estefania Pozzo, "*$LIBRA: the timeline of a crypto scandal that's rocking the Milei government*," Buenos Aires Herald, Feb. 17, 2025 (located at https://buenosairesherald.com/politics/libra-the-timeline-of-a-crypto-scandal-thats-rocking-the-milei-government). Around 37 minutes later, that user sold most of its tokens, making a net profit of US$6.5 million. *Id.* Other early purchasers sold too, prompting a 70% collapse in its price over the next hour as the price dropped from US$4.74 to US$1.44. *Id.* Social media reports started appearing suggesting that $LIBRA was a scam. *See, e.g.*, Crypto Briefing post on X, Feb. 14, 2025, https://x.com/Crypto_Briefing/status/1890543322613338441 (indications of potential manipulation); Bubblemaps post on X, Feb. 14, 2025, https://x.com/bubblemaps/status/1890531084221182326 ("trade with caution"). A little more than five hours after his initial tweet, at 10:38 p.m. EST, President Milei—apparently spooked by negative attention—deleted his earlier post on X promoting the project. *See* Estefania Pozzo, "*$LIBRA: the timeline of a crypto scandal that's rocking the Milei government*," Buenos Aires Herald, Feb. 17, 2025 (located at https://buenosairesherald.com/politics/libra-the-timeline-of-a-crypto-scandal-thats-rocking-the-milei-government). At the time, he stated, he "was not aware of the details of the project and after having become aware of it I decided not to continue spreading the word." *See* Patrick Gillespie and Ignacio Olivera Doll, "*Milei pushes crypto token, then deletes post amid fears of scam*," Buenos Aires Times, Feb. 15, 2025 (located at https://www.batimes.com.ar/news/economy/milei-pushes-crypto-token-then-deletes-post-amid-fears-of-scam.phtml); Ola Amujo, "*Argentina's President Endorses $LIBRA Memecoin—Back*

*Off After 95% Crash,*" Bankless Times, February 15, 2025, (located at https://www.banklesstimes.com/articles/2025/02/15/argentinas-president-endorses-libra-memecoin-back-off-after-95-crash/). The price collapsed still further. *See* Estefania Pozzo, "*$LIBRA: the timeline of a crypto scandal that's rocking the Milei government,*" Buenos Aires Herald, Feb. 17, 2025 (located at https://buenosairesherald.com/politics/libra-the-timeline-of-a-crypto-scandal-thats-rocking-the-milei-government.).

    13. <u>Extensive Losses</u>. The losses suffered by consumers in New York and elsewhere were enormous. A total of approximately 75,000 investors lost more than $280 million they invested in $LIBRA. *See* YK Pek, blockchain analysis, Feb. 17, 2025 6 (located at https://x.com/wassielawyer/status/1891431425435738368) (74,698 wallets lost $286,256,569.96); "A Presidential Guide to Token Launches," DWF Labs, March 14, 2025 (located at https://www.dwf-labs.com/research/527-a-presidential-guide-to-token-launches) (noting that the $LIBRA scandal wiped out over $280 million from nearly 75,000 investors). One analysis of the blockchain found that 86% of all wallets it reviewed that traded $LIBRA— over 13,000 of them—lost at least $1,000, and approximately 2,800 wallets lost between $10,000 and $100,000. Nicolai Sondergaard, "Libra–The Aftermath," Nansen Research, Feb. 18, 2025 (located at https://research.nansen.ai/articles/libra-the-aftermath). Another 392 wallets lost between $100K and $1M. *Id.*

    14. <u>The Fraud Scheme</u>. As supported through the sources below, the launch of the $LIBRA token was a well-planned, well-executed, and extremely lucrative fraud scheme. Not only were there no plans or project to support the Argentine economy, but behind the scenes, the Defendants had carefully developed and executed an intricate "pump and dump" scheme that involved the "sniping" of coins at launch to restrict the token supply; the manipulation of token prices to force them higher; and the extraction of the proceeds of the fraud in a manner that was not immediately evident to the public.

    15. <u>Sniping</u>. From the start, the Defendants used their inside knowledge of the timing of the $LIBRA launch to buy—or "snipe"—a large number of the tokens that were supposed to be available for sale to the public. *See* Coffeezilla-Davis Interview at 18:30-25:00 (discussion of sniping $LIBRA and other meme coins); *see also* Oliver Knight, "*Creator of Controversial LIBRA Memecoin Introduced MELANIA, Says He Sniped Both Tokens,*" CoinDesk, Feb. 18, 2025 (located at https://www.coindesk.com/business/2025/02/17/javier-milei-memecoin-creator-also-launched melania-admits-to-sniping-tokens) (discussing sniping on $LIBRA). Sniping a meme coin at launch has the effect of restricting the coin supply and reducing liquidity, making it easier for the Defendants to manipulate the price. *See* Landon Manning, "How Solana Meme Coin Snipers on Pump.fun Manipulate Markets," BeinCrypto, April 21, 2025 (located at https://beincrypto.com/pump-fun-meme-coin-snipers-systematic-problem/?utm_source=chatgpt.com). By sniping, the Defendants were essentially dealing with themselves since they had minted $LIBRA and seeded the liquidity pools they were transacting through. *See* TRM Labs, Feb. 17, 2025, "*The LIBRA Affair: Tracking the Memecoin that Launched a Scandal in Argentina,*" (located at https://www.trmlabs.com/resources/blog/the-libra-affair-tracking-the-memecoin-that-launched-a-scandal-in-argentina); Ankish Jain, "*LIBRA's collapse becomes Solana's biggest scandal since FTX: How Jupiter and Meteora left retail rekt,*" crypto.news, Feb. 20, 2025 (located at https://crypto.news/libra-solana-jupiter-

meteora-scandal/) (wallets associated with Kelsier were among the earliest accumulators of $LIBRA tokens).

16. <u>Meteora</u>.  The Defendants then manipulated the price of $LIBRA upward by utilizing the unique functionality of the Defendant, Meteora, a cryptocurrency platform on the Solana blockchain. Compl. ¶¶ 71-84; s*ee* Meteora website documents (located at https://docs.meteora.ag/) (Meteora webpages describing platform features). The Defendants used Meteora to provide purported liquidity to facilitate trading in the $LIBRA token. Compl. ¶¶ 63-70.  There is no inherent market for a new token at the time of launch so developers often seek to create a liquid market by funding "liquidity pools" where investors can buy and sell their meme coins in exchange for other cryptocurrencies. Compl. ¶¶ 63-65.  These Defendants, however, did not use Meteora to create a liquid market for $LIBRA.  Rather, as described below, they used the functionality of Meteora to deceive thousands of retail investors into purchasing $LIBRA thereby surrendering their valuable cryptocurrencies to the Defendants. Compl. ¶¶ 71-84.  In the words of the Defendant Hayden Davis, "there's an unfair advantage if you're a genius on the chain and you know how to game the system on Meteora, and there's 30 guys in the world that know how to do that better than anybody." *See* Coffeezilla-Davis Interview at 12:55-13:10.

17. <u>False Liquidity</u>. In a traditional token issuance, like a meme coin launch, liquidity pools are typically funded with both the newly minted meme coins and another cryptocurrency, like USDC or SOL, so that investors can both buy and sell tokens through balanced liquidity pools. Compl. ¶ 73.  Deviating from traditional initial offerings, however, Meteora utilizes what it calls "single-sided liquidity"—the ability for a liquidity provider to fund a liquidity pool solely with one cryptocurrency. Compl. ¶¶ 67, 140-41; *see also* Meteora website documents (located at https://docs.meteora.ag/user-faq/differences-between-dlmm-and-dynamic-pools (explaining option of single-sided liquidity pools); *see also* Joshua Ng, Melvin Zhang, and Meow, Studio Racoons, March 15, 2024, Intuitive Launchpad Model (located at https://github.com/TeamRaccoons/Intuitive-Launchpool-Model-Paper/blob/main/ILM.pdf) (original white paper on Meteora's Dynamic Liquidity Market Maker program). Where "single-sided liquidity" is used, the liquidity provider takes no risk because it is not funding the pool with a cryptocurrency of established value and must rely upon other investors to create a market for the token by funding liquidity pools with other cryptocurrencies. Compl. ¶ 74.  In this case, the Defendants used Meteora's single-sided liquidity functionality and funded the liquidity pools with only $LIBRA tokens. Compl. ¶¶ 73, 140-41, 153-54. At the same time, as described below, the Defendants removed from the Meteora liquidity pools the currency provided by investors as soon as they provided it. Compl. ¶¶ 74, 91-97. Consequently, when retail investors attempted to sell their meme coins, there were limited if any counterparties or liquidity available to sell the $LIBRA assets.

18. <u>Price Manipulation</u>.  As retail investors began purchasing $LIBRA, the Defendants used the pricing features of the Meteora platform to aggressively step up the price of $LIBRA using the token's restricted supply. Compl. ¶¶ 69, 73, 92.  Meteora's features allow token issuers to release fixed numbers of tokens at ascending price points. *See* https://docs.meteora.ag/ (documents explaining the features of Meteora).  This price step up had the benefit of giving retail investors who were observing the trading activity the impression of a successful launch as there was substantial buying of $LIBRA and a rapidly increasing price.  This investor optimism

7

encouraged additional purchasing of $LIBRA. Compl. ¶ 73.

19. <u>Extracting the Fraud Proceeds</u>. Meanwhile, the Defendants extracted from the liquidity pools the cryptocurrencies—USDC and SOL—that investors were providing when they purchased $LIBRA. Compl. ¶ 79 (extraction of USDC and SOL); *see also* TRM Labs, Feb. 17, 2025, "*The LIBRA Affair: Tracking the Memecoin that Launched a Scandal in Argentina*," (located at https://www.trmlabs.com/resources/blog/the-libra-affair-tracking-the-memecoin-that-launched-a-scandal-in-argentina) (extraction of SOL). In this way, the Defendants both secured the proceeds of their fraud and deprived retail investors of any ability to sell their $LIBRA back through the liquidity pools because there was no other currency left but $LIBRA to exchange for $LIBRA. Compl. ¶¶ 93-97. The Defendants transferred the cryptocurrencies they extracted to wallets that they controlled. Compl. ¶¶ 100-105.

20. <u>Collapse</u>. Without the asset backing of traditional cryptocurrency trading pairs, the $LIBRA token lacked liquidity. Compl. ¶¶ 73, 97, 140-41, 153-54. When the frenzy moderated and investors tried to sell their $LIBRA back through the liquidity pools, the price collapsed. Compl. ¶¶ 97, 165, 169-70. The collapse was not the result of traditional market sell pressure, but was caused by the defendants' carefully calculated scheme to extract liquidity and ensure the nascent $LIBRA token had no asset backing. ¶¶ 132-48, 165. The scheme was supported by the calibrated deployment of the capabilities of Meteora's platform, the single-sided liquidity pools, sniping, token supply management, and a well-constructed strategy to pump up the token. The result was that most retail investors were left with worthless $LIBRA, losing more than $280 million, and the Defendants had secured from investors at least $110 million in cryptocurrencies. Compl. ¶¶ 97, 170.

21. <u>Ben Chow Resignation</u>. On February 15, 2025, in the aftermath of the $LIBRA scandal, Defendant Ben Chow publicly resigned from his position as CEO of Meteora. *See* Tom Mitchelhill, "*LIBRA, Solana drama: Meteora co-founder resigns, Jupiter begins probe*," CoinTelegraph, Feb. 19, 2025 (located at https://cointelegraph.com/news/libra-solana-meltdown-meteora-jupiter); Ankish Jain, "*LIBRA's collapse becomes Solana's biggest scandal since FTX: How Jupiter and Meteora left retail rekt,*" crypto.news, Feb. 20, 2025 (located at https://crypto.news/libra-solana-jupiter-meteora-scandal/); *see also* Moty Povolotski-Ben Chow conversation, Feb. 17, 2025 (located at https://x.com/SolanaFloor/status/1891634661748527554 (founder of DefiTuna posts on X audio recording of his conversation with Ben Chow about $LIBRA and Kelsier) (Chow describes involvement with Hayden Davis and Kelsier and states "I fucked up because I enabled a guy I should not have enabled. I'm gonna have to step down. I'm gonna have to quit.").

**Davis Post-Scheme Admissions**

22. <u>Davis Post-Scheme Statements</u>. In the days following the launch, Hayden Davis made a number of public statements about his role in $LIBRA and his access to the $LIBRA proceeds, which are described below in more detail. In general, Davis acknowledged that he had played a role in the launch of $LIBRA and repeatedly stated he was holding approximately $100 million in $LIBRA proceeds, as detailed in ¶ 27 of this Declaration. While Davis defended the token launch and blamed the price collapse on President Milei's failure to make further

8

statements promoting the token, he also made a number of admissions.

23.  The February 15 Video Statement.  On February 15, 2025—the day after the launch—Hayden Davis released an approximately three minute video statement on X. https://x.com/KelsierVentures/status/1890914579493863532. In the video, Davis admitted to being "a part of what's happened with Libra," *id.* at 00:12, and identified himself as "Javier Milei's advisor." *Id.* at 00:40. Davis admitted that he played a role in the coin launch but said that "there's only certain elements that I could control of the launch." *Id.* at 00:59. Davis avoided discussing why the $LIBRA token collapsed and instead spoke mostly of his plan to reinvest the $LIBRA Proceeds into purchasing more shares of $LIBRA. *Id.*  He also said he controlled these funds: "My intention here is every single dollar I've managed to round up, *which I believe is every single dollar that's been collected* or from fees or farming or liquidate, anything, I've managed to get back" and would "inject back" into purchases of $LIBRA. *Id.* at 1:19.  He indicated his plan was to do so in the "next 24, 48 hours, unless someone has a better idea." *Id.* at 1:39.

24.  The February 15 Written Statement.  In his video statement, Davis referenced a written statement, which he appears in the same X post as the video. https://x.com/KelsierVentures/status/1890914579493863532.  In the statement, Hayden Davis described himself as the "launch advisor for the Libra Token project" and said he was "responsible for ensuring liquidity for the project." *Id.* He blamed the collapse in $LIBRA on President Milei's decision to withdraw his support (though the token price had fallen dramatically hours before Milei retracted it). *Id.* He said "I still maintain control over all associated fees and treasury funds" and said he would "reinvest 100% of the funds under my control, as much as $100 million, back into the Libra token." *Id.*

25.  The February 16 Coffeezilla Interview.  On February 16, 2025—two days after the launch—YouTube journalist Stephen Findeisen, who is also known as Coffeezilla, posted a more than hour-long interview of Davis on YouTube. https://www.youtube.com/watch?v=EqizJTbxAEM. Davis again blamed the fall in $LIBRA value on Milei's alleged failure to make further statements supporting the project. *Id.*  He also made a number of admissions in the interview.

- Role. Davis called himself a "launch strategist" for $LIBRA and a "facilitator" but claimed that defendant KIP Protocol was "supposed to manage the project." *Id*. at 49:42.

- Amount of $LIBRA Proceeds Under His Control.  Davis said he had "$100 million sitting in an account that I'm custodian of," *id.* at 6:05, later estimating the account was "like 110" million, once he factored in "11 million or so in tokens, and like 13 in fees." *Id.* at 39:48.

- Planned Use of Funds.  Davis described "options" as to what he should do with the $LIBRA Proceeds. *Id.* at 38:43-43:05. One option was "There's no refund, and just, you know, and give all the money to an Argentine nonprofit and tell everybody to fuck off." *Id.*  A second option "is a refund, but a refund is going to

9

be based on, again, a bunch of different metrics, and people are still going to be pissed, and people are still going to come for me…. I've been advised that's terrible idea by a bunch of people." *Id.* In dismissing the refund option he added "meme coins are completely speculative and its and its horseshit that people would throw their life savings into these." *Id.* A third option was to "inject the money back into the chart," meaning purchasing more $LIBRA. *Id.* After Coffeezilla told Davis "I feel very strongly this would be a mistake" Davis responded "whether I refund people they're still going to be fucking pissed, right? Refund people on a meme coin, which sounds insane, or I inject back, people are going to be mad either way." *Id.*

- <u>Keeping Funds As "Leverage</u>." Davis also rejected giving up control of the funds, saying [I]f I'm being extremely transparent, honest, that's also my leverage with certain groups and parties, right? The fact that I have control is also what's making me a target and also protecting me, because this is an international incident, this isn't like some random fucking scam. . . . If I custody it with somebody else, even if it's a trusted third party, I lose my leverage. I'm a target of one government, potentially more, and my only leverage point is that I have all this money." *Id.* at 43:40.

- <u>Considering other token launches</u>. Davis said: "I've gotten very good at being a launch strategist. I mean, even today, as the how much hate there was, there's like 20 people that asked, hey, when do you want to do this one? It's just like, it's crazy, but it's a game. It's an unregulated game." *Id.* at 56:45.

26. <u>February 17 David Portnoy Interview</u>. On February 17, 2025—three days after the launch—David Portnoy posted on his YouTube channel an approximately 32 minute video conversation that he had with Hayden Davis, presumably from earlier that same day. https://www.youtube.com/watch?v=N5XqQlGSq0M. Davis again blamed the collapse of $LIBRA on Milei allegedly backing out of an agreement to further promote the token, including through a video. *Id.* Davis made several other admissions.

- <u>Funds do not belong to him</u>. Davis agreed with Portnoy that he was "sitting on $100 million" (*Id.* at 25:22) but admitted it did not belong to him, saying "It's, I think it's still one of the biggest right now, the question is, what to do with money that's not mine. I'm not, I'm not, never claiming it's my money…. Whose money is it? It's, I mean, I mean, that's what I don't that. I mean, it's the, I mean, it's the, I don't know. I mean, it's definitely not my it's, it's the Argentina's, I don't know what, what, what association you give with that." *Id.* at 4:02.

- <u>Threats</u>. Davis spoke of threats he was facing, claiming "I got people, like, coming from my life, like, heavy like, I mean, not only are all the trolls and jackasses all over, like, just crushing me, but I also have, like, real danger." *Id.* at 13:40. Later Davis said "I have had so many threats blackmail people trying to come after me, going nuts. Ran trying to bring stuff up from like, years ago, of some random like situation. It's insane. So everybody and their dog wants this

10

refund." *Id.* at 28:44.

- Refund to Portnoy. Davis admitted to sending Portnoy funds to cover his $LIBRA losses. *Id.* at 25:00. On this Portnoy said: "Of course, I kept the refund… I feel like everybody else, like the money was basically stolen, and then I got an opportunity to get the property back. Of course, I kept it. There's no human who wouldn't keep it. Now, whether he did the right thing giving it to me, you can argue that." *Id.* at 25:47.

### Assets at Issue

27. $110 Million. In the aftermath of the $LIBRA launch, the Defendant Hayden Davis controlled the equivalent of at least US$110 million in fraud proceeds from the $LIBRA launch. *See* Coffeezilla-Davis Interview, Feb., 16, 2025 (located at https://www.youtube.com/watch?v=EqizJTbxAEM) at 39:45-40:25 (Coffeezilla asked, "How much money do you all have sitting on the sidelines?" and Davis responded, "No, no, no, it's, it's it's like more or less one hundred mill I'm like, like, like right around there. Ummmm. And, and, and I guess there's pro, there's fees too. So there's probably ahhhh I don't, I don't know the number, but it's probably like eleven million or so in tokens, and like 13 in fees. Ummm so let's say like 110ish million, right, of cash, because tokens you can't inject back into a chart."); *see also* Davis Written Statement, dated Feb. 15, 2025 (located at https://x.com/KelsierVentures/status/1890914583910449505/photo/1) ("I was responsible for ensuring liquidity for the project and still maintain control over all associated fees and treasury fund." "[This amounts to] as much as $100 million."); Coffeezilla-Davis Interview, Feb. 16, 2025 (located at https://www.youtube.com/watch?v=EqizJTbxAEM) at 5:55-6:05 ("It's, it's, it's a plan gone miserably wrong, with $100 million sitting in an account that I'm the custodian of.").

28. Blockchain. Co-counsel to the Plaintiff in this matter retained a blockchain tracing expert to examine the flow of funds to two wallets that, based on an initial review of blockchain transactional activity, appear to have been involved in the $LIBRA launch and currently hold significant crypto assets—LIBRA Wallet 1 and LIBRA Wallet 2. *See* Declaration of Justin Ehrenhofer, Senior Director, NAXO Labs LLC, dated May 19, 2025, Exhibit B to Motion (hereinafter "Ehrenhofer Declaration"). The expert was asked to provide an analysis and opinions about the flow of funds from the blockchain address which first issued (or "minted") the "$LIBRA" token to LIBRA Wallet 1 and LIBRA Wallet 2 and to determine what assets these wallets currently hold. *See* Ehrenhofer Declaration at ¶ 2. According to Ehrenhofer, records available on the blockchain establish that these wallets contain funds from the $LIBRA launch, and in particular, funds that were extracted from a liquidity pool on Meteora used in the $LIBRA launch. *See* Ehrenhofer Declaration at 3.

29. Circle/USDC. LIBRA Wallet 1 and LIBRA Wallet 2 do not hold the full $280 million or more taken from $LIBRA purchasers or even the $110 million controlled by the Defendant Hayden Davis, but they each currently hold a substantial amount of USDC, specifically 13,060,482 USDC in LIBRA Wallet 1 and 44,593,888 USDC in LIBRA Wallet 2. *See* Ehrenhofer Declaration at 3. USDC is one of the two cryptocurrencies (in addition to SOL) that retail investors could use to purchase $LIBRA through the Meteora liquidity pools. Compl. ¶ 73. USDC is a cryptocurrency stablecoin. *See* https://www.circle.com/usdc (Circle website). A

11

stablecoin is a cryptocurrency that is designed to have a relatively stable price and is often pegged to a fiat currency. *See* Adam Hayes, "Stablecoins: Definition, How They Work, and Types," Investopedia, June 13, 2024 (located at https://www.investopedia.com/terms/s/stablecoin.asp). USDC is pegged to the U.S. dollar and is issued by Circle. *See* https://www.circle.com/usdc (describing Circle's USDC stablecoin product). Circle's legal name is Circle Internet Group, Inc. *See* https://www.sec.gov/edgar/browse/?CIK=1876042&owner=exclude (SEC filings of Circle Internet Group, Inc.). Circle is a Delaware corporation headquartered at One World Trade Center in Manhattan in the Southern District of New York. *See* NASD Company Overview for Circle Internet Group, Inc. (located at https://www.nasdaq.com/market-activity/ipos/overview?dealId=1172229-113504) (listing Circle corporate headquarters at One World Trade Center); *see also* "Circle Plants a Flag in the Heart of Wall Street—Announces New Global Headquarters in New York City," Circle Press release, dated Sept. 13, 2024 (located at https://www.circle.com/pressroom/circle-plants-a-flag-in-the-heart-of-wall-street-announces-new-global-headquarters-in-new-york-city). Circle's subsidiary Circle Internal Financial, LLC issues USDC and is regulated by the New York Department of Financial Services. See NYDFS, Virtual Currency Business Licensing (located at https://www.dfs.ny.gov/virtual_currency_businesses) (listing Circle Internet Financial, LLC).

30. <u>Circle's Ability to Freeze USDC</u>. Circle has the ability to freeze USDC on any blockchain including the Solana blockchain. *See* Circle Stablecoin Access Denial Policy (also known as Circle's "Blacklisting Policy,") ("Circle has the ability to block individual addresses from sending and receiving Circle Stablecoin on every blockchain to which Circle Stablecoin is issued.") (located at https://6778953.fs1.hubspotusercontent-na1.net/hubfs/6778953/Circle%20Stablecoin%20Access%20Denial%20Policy_pdf.pdf (Circle Stablecoin Access Denial Policy) (linked to by Circle at https://www.circle.com/legal/usdc-terms#:~:text=Blocked%20Addresses%20&%20Forfeited%20Funds,requiring%20it%20to%20do%20so.). On its website, Circle puts investors on notice that it will freeze USDC or surrender associated U.S. dollars if ordered to do so by a valid government authority. See USDC Terms, Blocked Assets and Forfeited Funds (located at https://www.circle.com/legal/usdc-terms#:~:text=Blocked%20Addresses%20&%20Forfeited%20Funds,requiring%20it%20to%20do%20so.) ("Circle may also be required to freeze USDC and/or surrender associated USD held in Segregated Accounts in the event it receives a legal order from a valid government authority requiring it to do so.").

## **Asset Freeze Request**

31. <u>Application as to Defendants</u>. Our application and proposed order are directed at freezing three concentric categories of assets:

> a) any $LIBRA cryptocurrency, or proceeds obtained through the trading of $LIBRA cryptocurrency, (the "$LIBRA Proceeds") held or controlled by the Defendants;
>
> b) approximately $110 million in $LIBRA Proceeds that Defendant Hayden Davis controls (the "Davis Held Proceeds");

  c) a total of approximately 57,654,371 USDC, and any other $LIBRA Proceeds, held in LIBRA Wallet 1 and LIBRA Wallet 2 (the "Subject Wallets"); and

 32. <u>Application as to Circle</u>.  Our application and proposed order would also instruct Circle Internet Group, Inc. and its subsidiary Circle Internet Financial, LLC, to freeze the USDC in LIBRA Wallet 1 and LIBRA Wallet 2.

 33. <u>Immediate and Irreparable Harm</u>.  The Plaintiff, Omar Hurlock, believes that he will suffer immediate and irreparable harm if the Court does not freeze the assets that are subject of this application.  In addition to facts and information provide above that establish immediate and irreparable harm, the following information is relevant:

  a) Hayden Davis is believed to travel often internationally, including to Buenos Aires, Barcelona, and Dubai so could use the assets at issue to fund flight from a judgement in this matter. See Protos.com, "Influencer accused of LIBRA insider trading flees country over death threats," (located at https://cryptonews.net/news/altcoins/30580301/) (noting Hayden Davis travel to Istanbul and Barcelona); Acerix "Libra Token Co-Creator Hayden Davis Linked to Yet Another Crypto Scandal: Details," Binance Square, March 16, 2025 (located https://www.binance.com/en/square/post/21670169760993) (noting that Kelsier Ventures has moved to Dubai).

  b) The removal of the Complaint in this matter from NY State to federal court and the concurrent perception of an increase in seriousness of this action could trigger movement of the funds.

  c) Our efforts to serve Davis, his family members, and Kelsier with the Complaint in this matter could trigger movement of the funds; and

  d) Davis's involvement in numerous cryptocurrency scams involving the laundering of fraud proceeds, including his involvement in a meme coin scheme after the launch of $LIBRA. *See, e.g.*, *Clarke v. Chow*, 25 CV 03268 (JLR) (related case regarding $3M3M); "Hayden Davis: The Wanted Scammer Still Launching New Meme Coins," Link Crypto, March 17, 2025 (located at https://www.binance.com/en/square/post/21661075044634?utm_source=chatgpt.com ) (discussing Davis' involvement in $WOLF after $LIBRA which rose to $40 million market cap before crashing).

## Notice and Service Issues

 34. <u>Notice</u>.  Plaintiff and his counsel have not yet tried to serve any of the Defendants with a request to freeze the proceeds of their fraud.  The concern is that, if alerted to the Plaintiff's desire to freeze these assets, one or all of the Defendants will move the assets out of the reach of this Court where they will forever be unavailable to the Plaintiff and the putative class he represents.  The assets are all held in cryptocurrencies, which are very easy to transfer out of the Court's jurisdiction.  And the Defendant Hayden Davis, who controls $110 million of the $LIBRA Proceeds, has publicly said that the assets don't belong to him; that he is under threats to pay the assets over to others; that he is contemplating moving or disposing of the

assets, and has rejected the idea of using the funds to compensate victims. As a result, I believe that notice of the request would raise a substantial risk that the assets would then be moved and frustrate the request.

35. <u>Service</u>. Based on my conversations with co-counsel at Burwick Law, I understand that there have been substantial difficulties serving Hayden Davis, Gideon Davis, Thomas Davis, and their company, Kelsier Ventures (the "Davis Family Defendants"). The operative complaint in this case was originally filed in New York Supreme Court before being removed to federal court by Defendant Benjamin Chow (who has accepted service). While the matter was pending there, Burwick Law made multiple unsuccessful efforts to serve the Davis Family Defendants, including nine attempts to serve Thomas and Hayden Davis at their residence in Irving, Texas. On some occasions, security guards and others encountered by the process service have told the servers to go away and not return. Co-counsel at Burwick Law has conducted research to identify the most viable ways to reach each of the Defendants to provide prompt notice of any order entered by the Court. For the Davis Family Defendants, this consists of home addresses and known email addresses. For Julian Peh, who is believed to reside in Singapore, we have identified email addresses and an X profile. For Peh's Hong Kong company, KIP Protocol Ltd., we propose to send service documents by Federal Express or equivalent to the company's Hong Kong address[1] while also providing a link to service documents through the "contact us" page on the Kip Protocol website and providing e-mail notice to Peh. For Meteora, which does not have a corporate entity, we have identified a support e-mail address and an active X account. We propose service through these channels in the Proposed Order accompanying this Motion. Defendant Chow has already appeared in this action and can be served through his attorney.

Dated:  May 21, 2025                               /s/ Timothy J. Treanor
                                                      Timothy J. Treanor

---

[1] We are aware of this Court's ruling in *Square One Choices, Inc.* v. *Yiwu Bingwen Trading Co., Ltd.,* 2024 WL 4275548 (S.D.N.Y. Sept. 24, 2024) holding that service through traditional postal channels as well as e-mail is insufficient based on objections China has lodged under the Hague Convention. There is precedent, however, permitting such service in Hong Kong, which is a separate signatory to the Hague Convention and has not lodged these objections. *See, e.g., In re Coudert Brothers LLP,* No. 16-cv-8237, 2017 WL 1944162 (S.D.N.Y. 2017). Whether such service is still permitted requires further analysis, which we will provide to the Court should there be any issue in connection with service of the Complaint. But given the importance of notifying all parties of any asset freeze as soon as possible we propose using Federal Express, the web page contact, and outreach to Peh via e-mail to provide maximum timely notice of any restraint ordered by the Court.