P5R1HURC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    OMAR HURLOCK, *on behalf of*
3   *himself and all others*
    *similarly situated*,
4
                   Plaintiff,
5
              v.                          25 Civ. 3891 (JLR)
6
    KELSIER VENTURES, *et al.*,
7
                   Defendants.            Ex Parte Conference
8                                         (Remote)
    ------------------------------x
9                                         New York, N.Y.
                                          May 27, 2025
10                                        2:04 p.m.

11  Before:

12                  HON. JENNIFER L. ROCHON,

13                                        District Judge

14                       APPEARANCES

15  TREANOR LAW PLLC
         Attorneys for Plaintiff
16  BY:  TIMOTHY J. TREANOR, ESQ.

17  BURWICK LAW
         Attorneys for Plaintiff
18  BY:  MAX BURWICK, ESQ.

19

20

21

22

23

24                    EXHIBIT

25                       A

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5R1HURC

 1          (Case called)

 2          THE COURT:  Good afternoon, everyone.  Before we get

 3     started, let me just put a few things on the record.

 4          We're proceeding here via Microsoft Teams through

 5     videoconference for the convenience of the parties so that I

 6     could get you on as soon as possible.  I have on the line my

 7     deputy and my clerk.  We also have a court reporter on the line

 8     who is transcribing these proceedings, and no one other than

 9     court personnel should record or rebroadcast these proceedings.

10          We are here on a request for a TRO from plaintiffs.

11     This is an *ex parte* hearing.  There was a request for an

12     *ex parte* TRO.  It was filed late last week, and I put you on

13     for the first day after the holiday that I could get you on,

14     today.  And so I've read your papers.  I have some questions,

15     but I'm here to listen to whatever you'd like to present,

16     Mr. Treanor, but let me take appearances first.

17          Who do I have on behalf of Mr. Hurlock?

18          MR. BURWICK:  Max Burwick of Burwick Law, your Honor.

19          THE COURT:  Thank you.  And?

20          MR. TREANOR:  And Tim Treanor from Treanor Law.

21          THE COURT:  Okay.  So I have both of you.

22          All right.  Who would like to take lead on this?

23          MR. TREANOR:  Sure, your Honor.  I'm happy to address

24     our motion.  And I want to start by thanking your Honor for

25     giving us your time.  I know we asked for it to be heard on

P5R1HURC

1    short notice, and we appreciate that you're giving us the

2    attention.

3         Hopefully it's apparent to you why it is that we asked

4    to be heard *ex parte*, and that we're seeking a TRO and a

5    preliminary injunction.  You know, I can touch on the

6    background of the case a little bit.

7         This is based on a series of events that have gotten

8    quite a lot of publicity, and we've provided to you, in the

9    form of my declaration, links to some of the newspaper articles

10   and some of the videos and statements that were posted, but

11   essentially it's based on the release of a meme coin.  Back in

12   February 14th of this year——so only three months ago——a meme

13   coin named $LIBRA was released by the defendants in this case,

14   and meme coins were for a short while a bit of a craze and were

15   getting a lot of attention from investors, and in this

16   particular case, the meme coin release was really an elaborate

17   fraud scheme.  It had a number of different parts, some related

18   to grabbing attention and drawing people into the investments,

19   and other parts of it were directed at manipulating the

20   investments and extracting value in a way that was deceitful to

21   the investors.  And it started out with the creation of a

22   website project called Viva La Libertad, which was purportedly

23   a project to help develop the Argentine economy by raising

24   funds for small businesses, a website was created.  And the

25   effort was a sham.  There was no real effort to develop the

P5R1HURC

1    Argentine economy through this project.  That was the first

2    step.

3              The second step was really lining up touters.  And

4    this is common in the meme coin space, to get prominent people

5    to basically draw attention by claiming support for your

6    project.  And in this case they enlisted the support of the

7    president of Argentina, through a number of meetings, enlisted

8    his support for the coin, the $LIBRA coin, and he in fact did

9    tweet, right, in coordination with the release time in support

10   of the coin and provided a contact address for investors to

11   find the coin and to purchase it.

12             There were other touters who were lined up who didn't

13   ultimately make statements on behalf of the coin.  One of them

14   was an individual named David Portnoy, who is significant

15   because he has a real following.  He's somebody who conceivably

16   could have helped to pump this coin up more had he said

17   something.  He was lined up.

18             THE COURT:  But he didn't say anything.

19             MR. TREANOR:  He didn't.  In his own acknowledgment,

20   he was a moment away from basically stating his support, and he

21   decided against it.

22             So Milei himself also tweeted support, and after about

23   six hours or five hours, he retracted that support, but during

24   that period of time, the trading activity was truly frenzied.

25   There were many, many individuals who invested in the $LIBRA

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5R1HURC

```
 1    coin.  The totals, you know, are hard to calculate because a
 2    lot of folks have done analysis on the blockchain to see how
 3    many wallets lost money, but the numbers that we've seen that
 4    are sort of most of all, they're about 75,000 wallets lost a
 5    total of over $280 million, perhaps more than that.  There's
 6    still counting going on by some folks out there publicly.  And
 7    the price of the coin went to a height that, you know, would
 8    have translated into a market capitalization of about
 9    $4.5 billion.  Now that's not real money.  That's if, at the
10    highest price a coin sold, if every other coin could have been
11    sold at that amount, it would have equaled that.  But the
12    individual coin price went very high.  And behind the scenes,
13    there were really four steps that the developers were——I think
14    we lost somebody.
15            THE COURT:  I'm just going to make sure it's not our
16    court reporter.  Give me a moment.
17            (Discussion off the record)
18            THE COURT:  You may continue, Mr. Treanor.
19            MR. TREANOR:  Okay.  Thanks.
20            So behind the scenes, an elaborate scheme had been
21    lined up to once, you know, interested investors had
22    started——there we go.
23            THE COURT:  Can you pause for one moment, please.
24            MR. TREANOR:  Sure.
25            THE COURT:  Okay.  Go ahead.  Thank you.  That's just
```

P5R1HURC

1    my deputy, by the way.  Nobody else has joined.

2              MR. TREANOR:  Okay.  Great.

3              So behind the scenes there are really four phases of

4    an elaborate market manipulation scheme going on, beyond just

5    the pump, you know, aspect of having the website and getting

6    the touters.

7              First of all, the developers were doing what was

8    called sniping their coin.  Essentially, a certain amount of

9    coins are released, and the public is informed of the certain

10   amount of coins being released.  But since the developers know

11   exactly when the coins are going to be released, they can jump

12   in and be the first ones to buy the coins at the lowest amount

13   and essentially control a greater amount of the coins, restrict

14   the supply that is circulating publicly.  The value of doing

15   that is a couple: (1) it can show purchasing activity on the

16   blockchain, shows the coin is selling; and the other is, it

17   restricts the supply, and if you can restrict liquidity, you're

18   more effective at manipulating price, so that if there are less

19   coins out there, it's easier to push the price north.

20             THE COURT:  Mr. Treanor, let me just move you to a

21   couple of topics that I want to hear about.

22             One is, so this action was filed in state court and

23   then removed to federal court on May 9, 2025, and no request

24   for expedited relief, or *ex parte* relief was sought until you

25   came to me just a few days ago.  Why the delay?

P5R1HURC

1              MR. TREANOR:  So, your Honor, so first of all, this

2       matter is fairly complicated, and the blockchain analysis is

3       time-intensive and it's also expensive, and so actually

4       identifying some of the coins and where they currently exist

5       and understanding that we could actually freeze the ones that

6       are USDC was a difficult process.  The case was——I don't think

7       that there was any view that there wasn't urgency at any point

8       in this.  I think it just was a matter of bringing together the

9       resources to be able to put this motion before your Honor.  I

10      was not a part of the case in state court.  It was removed

11      federally.  I just put in a notice of appearance last week.

12      But these matters have been subject to scrutiny and being

13      looked at, and I think, you know, we——I was very involved in

14      putting the papers together, and that was not something, you

15      know——I was not on the matter previously.  And so, you know, I

16      think that——we don't want to understate the urgency.  We don't

17      really think that there was a lack of urgency in the state.  It

18      was a matter of getting together the ability to actually put

19      these papers before your Honor in a way that we thought was

20      well thought through, would give you everything that you need

21      to actually issue the order, including the blockchain-tracing

22      analysis, finding the funds to invest and actually getting that

23      accomplished.  And so we do recognize that it would have been

24      ideal had we been able to act sooner, but practically speaking,

25      you know, things are always possible, but it was not really

P5R1HURC

1    practical.

2            THE COURT:  And so when was the tracing finalized by

3    Mr. Ehrenhofer?

4            MR. TREANOR:  He finalized the tracing I think on

5    Monday or Tuesday of last week, and——

6            THE COURT:  Okay.

7            MR. TREANOR:  Yeah.  We——

8            THE COURT:  Thank you.

9            All right.  My next question deals with the other case

10   that I have that is a federal securities action governed by the

11   PSLRA.  And so why are you not sort of skipping the line here

12   to an entire class action that's been filed with respect to the

13   fraud that has allegedly taken place here?

14           MR. BURWICK:  Tim, I can handle this, or do you want

15   to take it?

16           MR. TREANOR:  Sure, yeah.

17           MR. BURWICK:  Your Honor, these cases, while there is

18   a nexus here, they're largely unrelated in that, when looking

19   at the $M3M3 matter, that is a token that has a completely

20   different historical background, marketing efforts were

21   different, the way in which it was sold to clients, promises,

22   and because of that, it falls into the securities regime,

23   whereas this matter here, as Tim has described, the nexus here

24   of damages for the clients is fairly unrelated and deals more

25   with the fraud issues as well as the touters that Mr. Treanor

P5R1HURC

1    has described.

2              THE COURT:  Well, so then Mr. Burwick, I have here a

3    letter that was filed on May 13th from Cahill Gordon that

4    represents that they had discussions with all parties,

5    including I presume you, who represented the plaintiff in the

6    Hurlock action, and that there was agreement that because of

7    the——and I'm reading from the letter—— "because of the

8    similarities among the underlying factual and legal issues,

9    everyone requests that discovery be stayed in *Hurlock* pending

10   resolution of the motion to dismiss in the PSLRA case."  That

11   doesn't sound urgent to me in this case then.

12             MR. BURWICK:  Well, your Honor, I think——

13             MR. TREANOR:  Your Honor, I think——

14             THE COURT:  Let me just ask a different question.  It

15   doesn't sound like there's a sense of urgency in this case if

16   you're not going to move forward in discovery in this case.

17   And Mr. Burwick, why don't you tell me.

18             MR. BURWICK:  Yes, your Honor.  The main difference

19   here is the location of the assets, and what is distinct here

20   is that the USDC in question that's the subject of the TRO, in

21   relation to $LIBRA, is the direct by-product of the $LIBRA

22   fraud, and given that and given that the USDC has the——it can

23   be immediately removed, and then once it is removed from its

24   current wallet, it can become almost untraceable.  One of the

25   common fallacies in blockchains is that because everything is

P5R1HURC

1    on chain, there's somewhat of a simplicity in being able to

2    identify those assets after they've been removed in the

3    recovery process.  This is largely untrue, given whether it's a

4    centralized exchange or any types of mix of technologies, it

5    becomes very difficult to actually trace those assets.

6          Additionally, the USDC involved in this action is

7    unique, particularly just to $LIBRA.  These funds are the

8    direct by-product of only the $LIBRA scam.  They have not

9    touched on anything that is related to the $M3M3 operations

10   other than the common usage of the Meteora platform.

11         THE COURT:  Okay.  I'll ask the question again,

12   though.  Why are you not proceeding with discovery in this

13   action?

14         MR. TREANOR:  Your Honor, there's just a distinction

15   between the urgency of freezing these assets.  I think once we

16   have these assets frozen and the confidence that we've put the

17   plaintiff and the class in a position to actually have some

18   assets to recover from, if we get to that stage, at that point

19   discovery is——I wouldn't say not urgent, but I would say

20   there's a little bit more of an ability to entertain some

21   additional time.

22         I also think, your Honor, you know, there is some

23   thought——I shouldn't be surprised reading the declaration, but

24   there is some thought to superseding with other, more

25   appropriate claims, and I think the team needs time to do that.

P5R1HURC

1    But the assets are just a separate consideration from that.  We

2    believe the basis for freezing the assets is present, and so we

3    ask the Court to do that.  If we wait until we get into

4    discovery——yeah, if the assets were hanging out there, I think

5    we would probably be pushing very hard for discovery and to

6    move this case, but we don't think that we have to be in that

7    position.

8          THE COURT:  And can you address the topic that you

9    give fairly short shrift to, *Grupo Mexicano* and others, that

10   talk about how an injunction under Rule 65 is not really

11   appropriate to freeze assets to make sure that they're

12   available for an ultimate judgment, or in an action brought

13   solely under law.  So can you talk to me a little bit about

14   that.  I mean, every case that I have, somebody comes before me

15   and says, you know, I brought this case, and I'm afraid that

16   the defendants are not going to have money at the end of this

17   case to pay it, and let's move things faster.  So tell me why

18   this is different.

19         MR. TREANOR:  Yeah.  Your Honor, it's different

20   because what we're asking to freeze is clearly straight-line,

21   you know, proceeds of the fraud.  We're not asking for any of

22   the defendants——for their general assets that they may have

23   obtained from other sources to be frozen.  We're asking for

24   only those things that derive straight from the $LIBRA scheme.

25   And the $LIBRA scheme, we've identified it really in three

P5R1HURC

```
 1    buckets——setting aside the issue with regards to Circle,

 2    but——in three buckets, because there are sort of discernible

 3    groups and sort of concentric groups.  The first is the most

 4    broad one, which is anything that is the proceeds of $LIBRA.

 5    You know, all these defendants were involved in trading $LIBRA,

 6    and they will know what they have.  Over $280 million was

 7    pulled from investors.  They'll know if they have any of it,

 8    and they need to freeze it.  If it's not $LIBRA proceeds, then

 9    it would not be subject to the proposed order.  So it would

10    only be things that——

11              THE COURT:  One moment, Mr. Treanor.

12              When you say $LIBRA proceeds, do you mean the actual

13    traced proceeds that Mr. Ehrenhofer has traced, which you can

14    actually show come from $LIBRA, or are you just talking about

15    that they——and I'm using the wrong word, I'm sure——traded or

16    were somehow involved in $LIBRA and made some money on it and

17    put it in their bank account and you're asking me to freeze

18    that?

19              MR. TREANOR:  Yes, your Honor.  Most broadly, we think

20    that each of the defendants, that it's appropriate for them to

21    be ordered, to the extent they have anything that came out of

22    this fraud scheme, that they're not to move it, or dissipate

23    it.

24              THE COURT:  You have to tell me what you mean by

25    "anything that came out of the fraud scheme."
```

P5R1HURC

1        MR. TREANOR:  Any of the $280 million that was the

2    proceeds, all of those funds were extracted from what's known

3    as a liquidity pool.  They were pulled out of the trading pools

4    that were made available to people buying the $LIBRA coins.  So

5    any of that money.  And Hayden Davis speaks very clearly about

6    $110 million of it, in which he says that he pulled together

7    all the proceeds, all the fees, and it amounts to——he's

8    currently holding onto what amounts to $110 million that he

9    controls.  And so that is the second sort of level of the order

10   is the 110 that he specifically identified.  Now we think we

11   have identified almost 58 million of it, of the assets that are

12   in USDC that Circle can freeze, but there's more of it,

13   according to Hayden Davis's own admissions.  There's more that

14   he has in other wallets that we have not yet been able to

15   identify, but we do think it's appropriate to issue an order to

16   him at this point, telling him that he needs to freeze the full

17   110.  And then separately, we think that, because there is not

18   a penny that came out of the $LIBRA scheme that is legitimate,

19   not a single penny, so we think it's appropriate to step back

20   and have an even broader order to these defendants that says,

21   to the extent you extracted anything from $LIBRA, it needs to

22   be frozen.

23        THE COURT:  All right.  Anything further that you want

24   to present before I give you my thoughts?

25        MR. TREANOR:  No, your Honor.  I mean, I think we

P5R1HURC

1  have——well, I think the Circle issue——and I don't know that

2  your Honor has questions on that.  But that's really the most

3  important aspect of this motion, because, you know, the orders

4  to the defendants are one thing, and we presume that they're

5  going to follow the orders of the Court.  If we can serve them

6  properly on them and they get notice of them, at least

7  presumably they would follow them.  That's not, you know, a

8  certainty, because they can do as they will, and we'll be

9  counting on them to basically self-execute the Court's order.

10  But the Circle assets, we know Circle can actually freeze, and

11  it's in their own documents.  It's been done in other cases.

12  And so that is a critical part of this order.  That will

13  guarantee that, you know, $57½ million are available to victims

14  in this case if we get to a place where a recovery by the

15  victims is appropriate.  But we do think, that said, I don't

16  want to diminish the importance of the broader orders that

17  we've asked for.

18          THE COURT:  And so you're asking for a TRO, which is

19  by its nature a temporary and brief restraint, and you've put

20  in your papers why you think that needs to be *ex parte*, and I

21  for the most part accept that.  But when you get to the

22  preliminary injunction phase, a mere 14 days from now, or less,

23  how are you going to make sure that everybody has the

24  appropriate notice?  Even if I let you serve this TRO by email

25  in some instances, through a hyperlink to all the ways that

P5R1HURC

1    you've presented it in your papers, how are you going to get to

2    everyone for a preliminary injunction hearing in 14 days?

3         MR. TREANOR:  So, your Honor, we've set forth for the

4    Court the various ways in which Mr. Burwick and his team have

5    tried to serve the complaint against the defendants in this

6    matter.  Ben Chow has appeared, so we have one defendant who

7    actually has appeared.  We've had some discussions with

8    Meteora.  And so the efforts to serve the Davis defendants, who

9    are, you know, Americans and, our information is, have been in

10   the United States, have been very difficult and frustrated.

11   There have been multiple attempts.  But we believe they have

12   active email addresses, and we're, you know, within reason,

13   willing to take whatever steps the Court thinks is necessary.

14   We don't think that, because they've been successful in evading

15   service of the complaint, that, you know, we shouldn't be able

16   to get a TRO or set a preliminary injunction hearing.  We'll

17   try what we can.  We've had various avenues we've gone down.

18   We heard that one defendant maybe was represented by counsel on

19   the West Coast.  That didn't pan out.  At least that person

20   didn't accept service.  We have addresses, we have email

21   addresses, we've tried a lot of different things, and we have

22   some other avenues that we've proposed that we—things like

23   bringing NFTs into the wallets at issue or—known wallets, but

24   that are within reason, we're happy to do.  I think in this

25   type of a situation, where you have folks who are very

P5R1HURC

1    international and their conduct is on the blockchain and they

2    have resources in cryptocurrency, creativity is important.

3        THE COURT:  All right.  Well, at this point we're only

4    talking about the TRO, which requires actual notice as opposed

5    to service of process, formal service of process.  So let me

6    give you my thoughts then.  And I'll be clear, because I will

7    give you my overarching reasoning, but my bottom line is I will

8    enter the TRO.  However, I will say now and probably at the end

9    of my remarks that my views on this may change once I have

10   briefing from the defendants.  So this is based on my review of

11   an *ex parte* filing.  It is of a very brief nature, and I am,

12   for the reasons that I will state, convinced that it needed to

13   be *ex parte*.  However, my findings, again, may change once I

14   hear from the defendants, in lots of different respects.

15       So for example, I have some concerns about freezing

16   the proceeds that are just proceeds from $LIBRA in the first

17   bucket on any long-term basis because, unlike freezing the

18   actual USDC that was traced from the account, the proceeds are

19   more akin, it seems to me, as to holding assets just to ensure

20   that you have somebody who can pay a judgment.  And maybe

21   that's not the case, and I'll hear more from the defendants,

22   but that's one thing that struck me.

23       Another thing that struck me, obviously, will be

24   anything anyone has to say about the merits once they have an

25   opportunity to come forth and talk about the merits.

P5R1HURC

```
1          But all of that being said, I think you meet the

2     standard for a brief TRO at this point and so I will enter it.

3     But I'm going to give you a more fulsome reasoning for the TRO

4     because I think that's important, because once it gets

5     unsealed, I want to make sure that whoever comes in and looks

6     at my reasoning has my full reasoning on the record and so we

7     can go from there.  But again, I will just highlight that this

8     is, for purposes of a TRO, temporary, and I will be revisiting,

9     if necessary, any of the holdings once I get any opposition on

10    a PI or otherwise.

11          But if I could ask for your patience.  It's going to

12    be rather lengthy.  If I could just read that into the record.

13    I think that's the fastest way to do it, so that I can then

14    sign the order today.  But let me put that on the record.

15          MR. TREANOR:  Sure.

16          THE COURT:  Okay.

17          I'm not going to provide an extensive factual

18    recitation given the lengthy record that I have in this

19    expedited time frame.  But to summarize, I'm going to refer to

20    the plaintiff, Omar Hurlock, as plaintiff, and he brings this

21    putative class action against Kelsier Ventures, KIP Protocol,

22    Hayden Davis, Gideon Davis, Meteora, Thomas Davis, Julian Peh,

23    and Benjamin Chow, and I'll refer to all of them as the

24    defendants.  The complaint asserts various state law claims

25    arising from an allegedly fraudulent cryptocurrency scheme
```

P5R1HURC

1    around the public launch of the $LIBRA token.  Specifically,

2    the complaint was filed in state court and removed to federal

3    court on May 9, 2025, and it sets forth three causes of action

4    against all defendants:

5           (1) violation of the New York General Business Law

6    (GBL) §§349 and 350;

7           (2) negligent misrepresentation; and

8           (3) unjust enrichment.

9           Plaintiff seeks relief in the form of compensatory and

10   punitive damages, disgorgement and restitution, the appointment

11   of a receiver, and other injunctive and equitable relief.

12   Plaintiff now moves pursuant to federal rule of six procedure

13   65 for an *ex parte* temporary restraining order freezing

14   cryptocurrency assets held or controlled by defendants, and for

15   an order to show cause why a preliminary injunction should not

16   issue against defendants that extends the TRO through the

17   pendency of this action.

18          Specifically, plaintiff here seeks a TRO and

19   ultimately a PI barring defendants from accessing (1) any

20   $LIBRA cryptocurrency, or proceeds obtained through trading

21   $LIBRA cryptocurrency, held or controlled by the defendants,

22   and (2) approximately $110 million in $LIBRA proceeds held or

23   controlled by defendant Hayden Davis, and (3) in connection

24   with that request, defendants seek an order directing Circle

25   Internet Group and its subsidiary, Circle Internet Financial,

P5R1HURC

1  LLC——I'll refer to it all as Circle——to freeze and deny access

2  to approximately $58 million worth of USD coin (USDC) held in

3  two cryptocurrency wallets that plaintiff's expert has traced

4  to the defendants.

5       The Court received plaintiff's *ex parte* application by

6  email to chambers last week, late last week, on May 21, 2025.

7  The application included plaintiff's motion; a proposed order;

8  a memorandum of law; a declaration from plaintiff's counsel,

9  Tim Treanor; a declaration from plaintiff's retained

10 cryptocurrency tracing expert, Justin Ehrenhofer.  And I

11 believe that's it.  And I'll call that the expert declaration.

12      On Thursday, May 22, 2025, the Court scheduled the

13 instant hearing to take place today, on May 26, via Microsoft

14 Teams, and confirmed with plaintiff that this conference date

15 was appropriate given the relief sought and counsel's

16 availability.

17      The Court has reviewed and considered all of the

18 plaintiff's materials.  And for the reasons that I will now go

19 over, I will grant the motion.

20      "The standards for granting a temporary restraining

21 order and a preliminary injunction pursuant to Rule 65 . . .

22 are identical."  I'm going to cite to *Sterling v. Deutsche Bank*

23 *Nat'l Tr. Co.,* 368 F.Supp.3d 723, 726 (S.D.N.Y 2019).  A

24 plaintiff requesting a TRO "must show (1) irreparable harm; (2)

25 either likelihood of success on the merits or both serious

P5R1HURC

questions on the merits and a balance of hardships decidedly

favoring the moving party; and (3) that [the requested relief]

is in the public interest."  That is *Nat'l Coalition on Black*

*Civic Participation v. Wohl,* 498 F.Supp.3d 457, 469 (S.D.N.Y.

2020).

In deciding a motion requesting an injunction, the

Court may consider the entire record, including affidavits, and

even if there is hearsay.  *Helio Logistics, Inc. v. Mehta*, 2023

WL 1517687, at *2 (S.D.N.Y. Feb. 3, 2023).  Because plaintiff

seeks *ex parte* relief——that is, the issuance of a TRO without

notice to the defendants——he must also satisfy the requirements

of Rule 65(f)(1), which requires: (A) "specific facts in an

affidavit or a verified complaint clearly show that immediate

and irreparable injury, loss, or damage will result to the

movant before the adverse party can be heard in opposition; and

(B) the movant's attorney certifies in writing any efforts made

to give notice and the reasons why it should not be required."

As a threshold matter, the Court recognizes that under

*Grupo Mexicano*, "Rule 65 does not empower a district court to

enter a preliminary injunction freezing assets pending the

adjudication of an action brought solely at law."  *Paradigm*

*BioDevices, Inc. v. Centinel Spine, Inc.,* 2013 WL 1915330, at

*2 (S.D.N.Y. May 9, 2013).  And that case cited to *Grupo*

*Mexicano*.  However, where the moving party asserts an equitable

interest in the opposing party's assets, "a court may in the

P5R1HURC

interim invoke equity to preserve the status quo pending
judgment . . . and, as many courts have held, where plaintiffs
seek both equitable and legal relief in relation to specific
funds, a court retains its equitable power to freeze assets."
*Id.* And in that case, Judge Furman collected the cases.

        "Here, plaintiff has asserted a claim for unjust
enrichment," which is "equitable in nature, and courts in this
district have found that such a claim can serve as the basis
for a preliminary injunction freezing assets." *Shaoxing Bon
Textiles Co. v. 4-U Performance Group LLC,* 2017 WL 737315, at
*2 (S.D.N.Y. Feb. 6, 2017).  Plaintiff also seeks equitable
relief on its GBL claim in the form of a permanent injunction,
restitution, and disgorgement of profits from defendants'
alleged scheme, which are the very assets sought to be frozen
here. *See* Treanor Decl. ¶ 3; Compl. at 35, 39-40.  As the
Second Circuit observed in *Gucci America, Inc. v. Weixing Li,*
the "ancient remed[y] of. . . restitution ha[s] compelled
wrongdoers to disgorge their ill-gotten gains for industries."
768 F.3d 122, 132 (2d Cir. 2014).  Accordingly, where, as here,
the "preliminary injunction sought [is] 'ancillary' to the
plaintiff's claims for 'final equitable relief,' *Grupo Mexicano*
provide[s] no impediment" to ordering an asset freeze to
preserve the status quo. *Shamrock Power Sales, LLC v. Scherer,*
2016 WL 6102370, at *4 (S.D.N.Y. Oct. 18, 2016).  The Court
makes this finding, again, for purposes of an *ex parte* TRO

P5R1HURC

1    where there is a risk of dissipation of assets that I will

2    discuss in a moment, but without prejudice to revisiting it if,

3    on briefing by the defendants for purposes of the PI or

4    otherwise, a different conclusion is warranted.

5        The Court will now turn to the preliminary injunction

6    factors, starting first with irreparable harm.

7        Demonstrating irreparable harm requires that a party

8    show "they will suffer an injury that is neither remote nor

9    speculative, but actual and imminent, and one that cannot be

10   remedied if a court waits until the end of trial to resolve the

11   harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d

12   110, 118 (2d Cir. 2009).

13       Temporary restraining orders should generally not be

14   granted when a loss can be compensated with monetary damages,

15   as well as a PI that has that same standard.  *See Rodriguez ex*

16   *rel. Rodriguez v. DeBuono,* 175 F.3d 227, 234 (2d Cir. 1999).

17   In such cases, however, "Courts in this circuit have granted

18   preliminary injunctions . . ." if the nonmovant's assets may be

19   dissipated before final relief can be granted, or where the

20   nonmovant threatens to remove its assets from the Court's

21   jurisdiction." *Westchester Fire Ins. Co. v. DeNovo*

22   *Constructors*, 177 F.Supp.3d 810, 814 (S.D.N.Y. 2016).  Under

23   these circumstances, "injunctive relief is appropriate because

24   'assets [the plaintiff] seeks are likely to disappear unless

25   the application is granted." *Id.*

P5R1HURC

1            Here, plaintiff asserts that he and the class will

2     suffer irreparable harm absent a TRO because there is a high

3     risk of dissipation of the funds at issue.  Specifically,

4     plaintiff emphasizes that cryptocurrency is "much more easily

5     dissipated than assets maintained in the traditional financial

6     system."  Mem. at 14.  Plaintiff also points to public

7     statements made by defendant Hayden Davis, the purported

8     custodian of the funds at issue, or at least some of the funds

9     at issue, indicating that he is unwilling to refund the assets,

10    has distributed the assets to at least one third party, and has

11    considered entirely disposing the assets to third parties.

12    Treanor Decl. ¶¶ 23-26.  Moreover, Davis has evaded attempts at

13    service, according to plaintiff, has recently traveled

14    internationally to use the assets and evade purported threats

15    from victims, and has moved his company (defendant Kelsier

16    Ventures) to Dubai.  Treanor Decl. ¶¶ 33-35.  More broadly,

17    plaintiff expresses concern that the ongoing service attempts,

18    combined with the recent removal of this case to federal court,

19    could "trigger movement of funds."  Treanor Decl., ¶ 33.  For

20    similar reasons, plaintiff has not yet tried to serve the

21    instant request on defendants out of concern that alerting them

22    of "plaintiff's desire to freeze these assets" would trigger

23    their dissipation, as they "are all held in cryptocurrencies"

24    and "very easy to transfer out of the court's jurisdiction."

25    Treanor Decl. ¶ 34.

P5R1HURC

1          With this in mind, the Court agrees, for purposes of a

2   TRO, "[t]he cryptocurrency at issue here 'poses a heightened

3   risk of asset dissipation,'" which warrants a temporary

4   prejudgment and preservice asset freeze.  I'm also looking to

5   cases that have done the same: *Jacobo v. Doe*, 2022 WL 2052637,

6   at *3 (E.D. Cal. June 7, 2022).  Other courts across the

7   country have found that "the speed and anonymous nature of

8   cryptocurrency transactions" increase the likelihood that the

9   assets at issue may be rendered untraceable before final relief

10  could be granted.  *Id.*  And cases are collected from the *Jacobo*

11  case.  "[C]ryptocurrencies are circulated through a

12  decentralized computer network, without relying on traditional

13  banking institutions or other clearinghouses.  This

14  independence from traditional custodians makes it difficult for

15  law enforcement to trace or freeze cryptocurrencies in the

16  event of fraud or theft."  *Fed. Trade Comm'n v. Dluca,* 2018 WL

17  1830800, at *2 (S.D. Fla. Feb. 28, 2018).  *See also Heissenberg*

18  *v. Doe,* 2021 WL 8154531, at *2 (S.D. Fla. Apr. 23, 2021).  And

19  in that case, the court found that plaintiff had good reason to

20  believe that the defendant would hide or transfer his

21  ill-gotten gains beyond the jurisdiction of th[e] court unless

22  the assets are restrained" in light of "the speed with which

23  cryptocurrency transactions are made as well as the anonymous

24  nature of those transactions."

25          The risk of harm posed by the transient and

P5R1HURC

1    untraceable nature of the cryptocurrency is heightened in light

2    of Davis's public statements, the evasion of service attempts,

3    and alleged offshoring of his company's operations.  *See*, for

4    example, *Gaponyuk v. Alferov*, 2023 WL 4670043, at *2 (E.D. Cal.

5    July 20, 2023).  And in that court, in that case, the court

6    found a likelihood of irreparable harm where the plaintiff

7    "argued that. . . there [was] a significant risk [that] the

8    defendants [would] transfer his assets to 'untraceable

9    cryptocurrency accounts or to offshore entities organized in

10   unknown locations."  In *Jacobo*, 2022 WL 2052637, at *3, the

11   court also found a likelihood of irreparable harm where 'it

12   would be a simple matter for [the defendant] to transfer. . .

13   cryptocurrency to unidentified recipients outside the

14   traditional banking system' and effectively place the assets at

15   issue in this matter beyond the reach of the court."

16       For these reasons, the Court finds that plaintiff has

17   sufficiently demonstrated a likelihood of irreparable harm

18   given the risk of asset dissipation, in light of the unique

19   considerations posed by cryptocurrency.

20       The next factor is whether plaintiff has demonstrated

21   sufficiently serious questions going to the merits of his

22   claim.  That standard allows courts to assess, at a preliminary

23   injunction stage, in a flexible manner, the varying factual

24   scenarios and uncertainties that are inherent at the outset of

25   a particularly complex litigation and, instead of showing

P5R1HURC

likelihood of success on the merits, can show that there are

sufficiently serious questions going to the merits.  "The

significance of this flexibility is that courts... have the

discretion to rely on the pleadings and accompanying

affidavits, . . . provided that the movant has raised

'questions going to the merits so serious, substantial,

difficult and doubtful, as to make them a fair ground for

litigation and thus for more deliberate investigation.'"  *State

Farm Mut. Automobile Ins. Co. v. Tri-Borough NY Med. Prac.

P.C.*, 120 F.4th 59, 83 (2d Cir. 2024).

        Turning to Count One, plaintiff alleges that

defendants violated New York's GBL §§ 349 and 350, which are

intended to "protect all consumers, New Yorkers and non-New

Yorkers alike, from deceptive acts or practices or false

advertising that originates or occurs at least in part in New

York."  *Goshen v. Mut. Life Ins. Co. of N.Y.*, 774 N.E.2d 1190

(N.Y. 2002).  "These two statutes require a claimant to show

that the defendant engaged in (1) consumer-oriented conduct

that is (2) materially misleading and that (3) plaintiff

suffered injury as a result of the allegedly deceptive act or

practice."  *MacNaughton v. Young Living Essential Oils, LC,* 67

F.4th 89, 96 (2d Cir. 2023).

        As to the first element, the New York Court of Appeals

has found that the "extensive marketing" of investment

instruments with a "broad[] impact on consumers" falls within

P5R1HURC

1    the ambit of "consumer-oriented conduct." *Gaidon v. Guardian*

2    *Life Ins. Co.*, 725 N.E.2d 598 (N.Y. 1999).  Here, plaintiff

3    analogously alleges that defendants engaged in a public

4    marketing campaign for $LIBRA to several million consumers on

5    social media.

6         Second, a "defendant's actions are materially

7    misleading when they are 'likely to mislead a reasonable

8    consumer acting reasonably under the circumstances.'"

9    *Himmelstein, McConnell, Gribben, Donoghue & Joseph v. Matthew*

10   *Bender & Co.*, 171 N.E.3d 1192, 1198 (N.Y. 2021).  For example,

11   the New York Court of Appeals has found that encouraging

12   consumers to purchase financial products by knowingly making

13   unrealistic statements about future returns satisfies this

14   prong.  Here, plaintiff claims that defendants made similarly

15   unrealistic and misleading statements to encourage consumers to

16   purchase $LIBRA, only to "quickly extract the funds" after "the

17   public started buying."  Mem. at 3.  Plaintiff alleges, among

18   other things, that defendants falsely advertised the token "as

19   an opportunity to invest in Argentine small businesses when

20   there [was] no real plan" to do so, and incrementally presented

21   artificially inflated prices for the token to "give retail

22   buyers the appearance of a successful launch."  Mem. at 7-8,

23   19.

24        Lastly, plaintiff alleges that he and similarly

25   situated individuals suffered an injury as a result of

P5R1HURC

1    purchasing the tokens: the complaint pleads that plaintiff

2    incurred losses after purchasing the token, and the TRO

3    declaration includes an analysis showing that 86 percent of

4    reviewed cryptocurrency wallets that traded the token lost at

5    least $1,000.  *See* Compl. at 32-35; Treanor Decl. ¶ 13.

6         Together, the Court finds that plaintiff's allegations

7    and supporting materials sufficiently raise serious questions

8    going to the merits of his GBL claim at least at this juncture.

9    Again, the Court may revisit this finding after reviewing

10   briefing by the parties at the PI stage, or any earlier stage

11   in which this order is sought to be lifted, but for purposes of

12   an expedited TRO, this standard is satisfied.

13        Because a plaintiff must only show that there are

14   serious questions with respect to one of the claims to obtain

15   preliminary relief, the Court need not reach plaintiff's other

16   equitable claim for unjust enrichment.  *L.V.M. v. Lloyd*, 318

17   F.Supp.3d 601, 618 (S.D.N.Y. 2018).  The Court also does not

18   reach plaintiff's negligent misrepresentation claim, which

19   appears to seek only monetary damages for relief and may not

20   serve as the basis for an asset freeze under Rule 65.

21        Lastly, the Court considers the balance of hardships

22   and public interest.

23        To start, the Court does find that the balance of

24   hardships decidedly tips in plaintiff's favor.  "A delay in

25   defendant's ability to transfer the assets only minimally

P5R1HURC

1    prejudice defendant, whereas withholding injunctive relief

2    would severely prejudice plaintiff by providing defendant time

3    to transfer the allegedly purloined assets into other accounts

4    beyond the reach of this court." *Jacobo*, 2022 WL 2052637, at

5    *6; *see also Martinangeli v. Akerman,* 2018 WL 6308705, at *2

6    (S.D. Fla. Sept. 14, 2018).  And in that case, the court

7    ordered prejudgment freeze of cryptocurrency assets because it

8    would "preserve the status quo ante and prevent irreparable

9    harm until such time as the Court may hold a hearing."  I also

10   looked at *Heissenberg*, 2021 WL 8154531, at *2, which supports

11   this finding.  Moreover, Davis has publicly stated that the

12   funds in question do not belong to him.  *See* Treanor Decl.

13   ¶ 26, which indicates that he has a minimal interest in

14   maintaining access to those funds while the Court takes more

15   time to adjudicate the matter with briefing from all parties.

16   At bottom, "[t]he [C]ourt finds. . . that a short-term freeze

17   is unlikely to present any great harms," and it "can lift this

18   order if the defendants appear and show a continuing injunction

19   would cause them prejudice." *Gaponyuk*, 2023 WL 4670043, at *3.

20         Next, the Court finds that the public interest would

21   be served by an injunction.  "[A] temporary asset freeze will

22   serve the public's interest in stopping, investigating and

23   remedying frauds." *Id.*  It would also "provid[e] assurance

24   that courts will protect investors' assets from theft and will

25   aid investors in their recovery of stolen assets when they can

P5R1HURC

1    be readily located and traced to specific locations, like the

2    purloined assets in this action." *Heissenberg*, 2021 WL

3    8154531, at *2; *accord Jacobo*, 2022 WL 252637, at *6.

4         Therefore, the Court finds that plaintiff has

5    satisfied the TRO relief factors, warranting a temporary asset

6    freeze pending further briefing from the parties.

7         Before addressing next steps, the Court will address

8    the appropriate bond to be posted.

9         "Rule 65(c)'s bond requirement serves a number of

10   functions.  It assures the enjoined party that it may readily

11   collect damages from the funds posted in the event that it was

12   wrongfully enjoined, and that it may do so without further

13   litigation and without regard to the possible insolvency of the

14   plaintiff." *Donohue v. Mangano,* 886 F.Supp.2d 126, 163

15   (E.D.N.Y. 2012).  "District courts are 'vested with wide

16   discretion' to determine the appropriate amount of the bond,

17   and. . . a district court in its discretion may deny a bond

18   altogether if there is no proof of likelihood of harm to the

19   non-movant." *IME Watchdog, Inc. v. Gelardi,* 732 F.Supp.3d 224,

20   243 (E.D.N.Y. 2024).

21        The Court agrees with the plaintiff that a nominal

22   bond of $100 is adequate here.  There is no indication from the

23   current record that a short-term asset freeze will result in

24   any harm to the nonmovants.  Defendant Davis has publicly

25   disclaimed ownership of the assets, referring to himself as

P5R1HURC

1    only their "custodian."  Treanor Decl. ¶¶ 26-27.  And

2    plaintiff's expert represents that there have been no incoming

3    or outgoing transactions through the wallets sought to be

4    frozen since February.  *See* Expert Decl. ¶ 3.  This further

5    underscores defendants' minimal interest in retaining access to

6    the assets over the next two weeks while the Court maintains

7    the status quo.  *Cf. FloodBreak, LLC v. Diego Tr.,* 2024 WL

8    897932 (D. Conn. Mar. 1, 2024).  And in that case, the Court

9    declined to require a bond where asset freeze served to

10   maintain the status quo, and the defendants had little interest

11   in the assets.  *See also Gaponyuk,* 2023 WL 4670043, at *3,

12   where the Court declined to require a bond where the

13   "short-term freeze" of cryptocurrency accounts was "unlikely to

14   present any great harms."

15           Again, this is a preliminary holding, and it may well

16   be that, especially for the injunction regarding the first

17   bucket, meaning any $LIBRA cryptocurrency or proceeds, obtained

18   through trading $LIBRA cryptocurrency, that may well create a

19   hardship for the defendants and therefore the Court may

20   determine that the bond should be revisited, should the

21   defendants request that, or should the injunction be extended

22   any longer than the 14 days.

23           Pursuant to Rule 65(d), the TRO will be binding upon

24   all parties who receive *actual notice* of the order, by personal

25   service or otherwise, in addition to their officers, agents,

P5R1HURC

1 employees, and attorneys, and all other persons who are in

2 active concert or participation with those individuals or

3 entities.

4    I will also compel Circle, who is a nonparty, to

5 freeze the portion of the assets held in two cryptocurrency

6 wallets.  "While jurisdiction over a defendant is all that a

7 court needs to issue an injunction freezing that party's

8 assets, a district court can enforce an injunction against a

9 nonparty," such as Circle, "if it has personal jurisdiction

10 over that nonparty." *Tiffany (NJ) LLC, Tiffany and Co. v.*

11 *China Merchants Bank,* 589 Fed. App'x. 550, 553 (2d Cir. 2014).

12 And the Court has general personal jurisdiction over Circle

13 because it is headquartered in this district.  *See* Treanor

14 Decl. ¶ 29, *Enigma Software Group USA v. Malwarebytes,* 260

15 F.Supp.3d 401, 409 (S.D.N.Y. 2017); *Parker v. Bursor,* 2024 WL

16 4850815, at *2 n.2 (S.D.N.Y. Nov. 21, 2024).

17    The Court finds that plaintiff's proposed methods of

18 alternative service are sufficient to ensure that defendants

19 and Circle receive actual notice of the TRO as required under

20 Rule 65.  But the Court will not permit service of the summons

21 and complaint on the defendants by these alternative service

22 methods.  Plaintiff has not formally moved for alternative

23 service of the summons and complaint, and the Court does not

24 have sufficient information to determine whether such service

25 would conform with Rule 4.  Plaintiff may file such a motion at

P5R1HURC

1  a later time if he believes that the applicable legal

2  requirements have been satisfied.

3         After this hearing, the Court will sign a TRO that's

4  revised from the proposed TRO submitted by the plaintiff.

5  Plaintiff shall serve the signed order, all supporting papers,

6  and a transcript of these proceedings, once they are made

7  available, on Circle and defendants by the methods provided in

8  the order.

9         And how soon will you be able to serve the order and

10  your supporting papers, Mr. Treanor?

11         MR. TREANOR:  How soon.  Well, I think the methods

12  that are set forth, we can seek to execute on as quickly as

13  possible.

14         Max, you might have a little more to say about that.

15         THE COURT:  I believe you're starting tomorrow, right?

16         MR. BURWICK:  Yes, your Honor, they've been set up and

17  briefed, and they're ready to move after we complete this.

18         THE COURT:  Okay.  That's good.  And just work with

19  the court reporter to order an expedited transcript so that

20  that is available to anybody who wishes to read that.

21         I'm going to put in the order that service shall be

22  done by tomorrow.  That gives you enough time, I think.  And

23  you'll tell me, please, when we can make the filing, when you

24  can publicly file the filings.  You're going to refile those, I

25  assume.  Well, you've sent them to me by email, but once they

P5R1HURC

1     are served, you'll file them publicly on the docket; is that

2     right, Mr. Treanor?

3                 MR. TREANOR:  I think so, your Honor.  I think once

4     we've gone through the steps that are in the order, we will

5     then consider service of this motion and your order as being

6     completed and we'll file the paperwork.

7                 THE COURT:  Okay.  That's good.

8                 Let's talk about the schedule then.  So this TRO will

9     be in place for 14 days, maximum of 14 days.  So if you serve

10    it today and tomorrow and it's in place for 14 days, I think

11    that means that the hearing needs to take place, a PI hearing,

12    on June 9th.  How about June 9th at 10 a.m.?  Mr. Treanor, will

13    that work?

14                MR. TREANOR:  Your Honor, I'm consulting my calendar.

15    I think that is fine.  That's a Monday.

16                Yes, your Honor, that works for me.  Max?

17                MR. BURWICK:  That works for me, your Honor.

18                THE COURT:  So I'll put the PI hearing on for June 9th

19    at 10 a.m.  I'll also make any opposition due June 2nd and your

20    reply due June 5th so I have the time to look it over before

21    the PI hearing.

22                I assume that what's going to happen here is that

23    everyone's going to come forth and ask for some sort of an

24    extension, and so that day may or may not hold, but I expect

25    that once people appear, you can have the discussions, the

P5R1HURC

 1    appropriate discussions if anybody needs a reasonable

 2    extension, etc.  And if there's agreement, I generally do that.

 3    If somebody appears and says, listen, I want to move to lift

 4    the TRO, then we'll be moving even more quickly than the

 5    June 9th date.  But we'll at least have a placeholder.  I think

 6    it's 13 days out, but it falls within the maximum that's

 7    permitted for a TRO.

 8            Okay.  Is there anything further that we need to do

 9    here today, Mr. Treanor?

10            MR. TREANOR:  No, your Honor.  I think you've covered

11    it all.  And we thank you for your thoughtfulness.

12            THE COURT:  Thank you.

13            Mr. Burwick, anything further here today?

14            MR. BURWICK:  No, your Honor.  Thank you.

15            THE COURT:  Okay.  I'll put that order out.  Actually,

16    what I will do is I will sign the order and send it to you so

17    that you have the order.  I won't file it on the docket yet.

18    It will be filed then when all the papers get filed on the

19    docket.  So when you file them, we'll file the order as well,

20    and then everybody can have appropriate notice.  Let's make

21    sure that happens as soon as possible.

22            And I think that covers everything.  Okay.  Well,

23    thank you very much.  As I said before and I'll say again at

24    the conclusion, these are temporary findings based on the

25    exigency of the present circumstances.  They are all subject to

P5R1HURC

1    revision if I get further information from the defendants or

2    otherwise reconsider based on the information that's presented

3    with everything before me, but for now, I will put in the

4    restraint on a temporary basis for the limited time period

5    permitted under the rule.

6            Okay.  Thank you all very much, and court is

7    adjourned.

8            MR. TREANOR:  Thank you, your Honor.

9            MR. BURWICK:  Thank you.

10                            oOo

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25