UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **OMAR HURLOCK, on behalf of himself and all others similarly situated,** | |
| *Plaintiff,* | |
| **vs.** | **Case No. 1:25-cv-03891 (JLR)** |
| **KELSIER VENTURES, KIP PROTOCOL, HAYDEN DAVIS, GIDEON DAVIS, METEORA, THOMAS DAVIS, JULIAN PEH, and BENJAMIN CHOW,** | |
| *Defendants.* | |

**DEFENDANT HAYDEN DAVIS'S MEMORANDUM OF LAW
IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

**SBAITI & COMPANY PLLC**
Mazin A. Sbaiti, Esq.
New York Bar No. 4339057
George M. Padis
Texas Bar No. 24088173
Admitted *Pro Hac Vice*
2200 Ross Avenue – Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367
E: mas@sbaitilaw.com
george.padis@sbaitilaw.com


**M. CRIS ARMENTA, P.C.**
M. Cris Armenta
*Pro Hac Vice forthcoming*
217 Clancy Way
Bozeman, MT 59718
T:: (310) 488-2080
F: (310) 421-1021
E: cris@crisarmenta.com


*COUNSEL FOR HAYDEN DAVIS*

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................i

TABLE OF AUTHORITIES ....................................................................................... iii

I.     INTRODUCTION AND PRELIMINARY STATEMENT...............................................1

II.    BACKGROUND ................................................................................................2

     A.    Hurlock Primarily Seeks Damages as Compensation for
His Alleged Financial Losses.............................................................................3

     B.    The Complaint Does Not Describe the Specifics of
Hurlock's $LIBRA Purchase ............................................................................4

     C.    Hurlock Acknowledges That Meme Coins' Prices are
Highly Volatile and Not Driven by Fundamentals,
as the SEC Has Affirmed ..................................................................................4

     D.    After Hurlock Filed This Lawsuit, He Waited to Seek a TRO ............................5

     E.    Hurlock's Statements and Evidence in Support of the TRO
Motion Do Not Support His Claims of Irreparable Harm or
Dissipation ........................................................................................................6

     F.    Before the Supreme Court's Decision in *CASA*,
The Court Entered a TRO ..................................................................................6

III.    LEGAL STANDARD.........................................................................................7

IV.    ARGUMENT AND AUTHORITIES.......................................................................8

     A.    The Court Lacks Equitable Authority to Award Injunctive
Relief to Benefit Nonparties Under *Trump v. CASA, Inc.* ...................................9

     B.    The Court Lacks Equitable Authority to Freeze Assets to
Satisfy a Future Potential Judgment for Hurlock's
Claim for Damages Under *Grupo Mexicano* ......................................................10

         1.   Hurlock's cited cases reinforce that separate statutory
authority is required to freeze assets prejudgment.........................................11

         2.   Hurlock's cited cryptocurrency cases demonstrate this
case does not fit within the exception recognized in
*Grupo Mexicano* for equity claims .............................................................12

i

3.   Cryptocurrency claims do not warrant special treatment under *Grupo Mexicano* ...................................................................14

C.   Hurlock's Conclusory and Circular Assertions Do Not Demonstrate He Is Likely to Prevail on the Merits ............................14

1.   Hurlock is not likely to succeed on his New York consumer-deception claim ..........................................................15

2.   Hurlock's negligent-misrepresentation claim cannot serve as a basis for a prejudgment asset freeze and is unlikely to succeed anyway...............................................17

3.   Hurlock's duplicative unjust-enrichment claim fails as well ...................................................................................18

D.   Hurlock Has Not Provided This Court with a Showing of Irreparable Harm or Even of Asset Dissipation.................................19

E.   Plaintiff Has Not Satisfied the Elements for Attachment Under New York Law ......................................................20

F.   The Freeze Injunction Sought Is Not Narrowly Tailored to the Sole Plaintiff ...................................................................22

V.   CONCLUSION...................................................................................23

CERTIFICATE OF COMPLIANCE .......................................................................24

## TABLE OF AUTHORITIES

### **Cases**

*Allstate Ins. Co. v. Harvey Family Chiropractic*,
   677 F. App'x 716 (2d Cir. 2017) ........................................................................20

*Ally Bank v. Reimer*,
   No. 09-CV-2795, 2010 WL 446025 (E.D.N.Y. Jan. 29, 2010) ............................................21

*Anderson Bey v. Roc Nation LLC*,
   No. 24-CV-02295, 2025 WL 560751 (S.D.N.Y. Feb. 20, 2025)....................................19, 20

*Bullock v. Doe*,
   2023 WL 9503380 (N.D. Iowa Nov. 3, 2023) ....................................................................12

*Citibank, N.A. v. Citytrust*,
   756 F.2d 273 (2d Cir. 1985)........................................................................8, 20

*Colon v. Cole Bros. Circus, Inc.*,
   Nos. 03-CV-3606, et al., 2007 WL 3014706  (E.D.N.Y. Oct. 12, 2007) ............................21

*Colpitts v. Blue Diamond Growers*,
   527 F. Supp. 3d 562 (S.D.N.Y. 2021) .................................................................15

*Coscarelli v. ESquared Hosp. LLC*,
   364 F. Supp. 3d 207 (S.D.N.Y. 2019).  ..................................................................8

*DLJ Mortg. Capital, Inc. v. Kontogiannis*,
   594 F. Supp. 2d 308  (E.D.N.Y. 2009) ..................................................................21

*Dong v. Miller*,
   No. 16-CV-5836, 2018 WL 1445573 (E.D.N.Y. Mar. 23, 2018)....................................11, 12

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)........................................................................23

*E.J. Brooks Co. v. Cambridge Sec. Seals*,
   31 N.Y.3d 441 (N.Y. 2018) ........................................................................18

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
   559 F.3d 110 (2d Cir. 2009)........................................................................7

*Fink v. Time Warner Cable*,
   714 F.3d 739 (2d Cir. 2013)........................................................................15, 17

*Foukas v. Foukas,*
   No. 20-cv-05516, 2024 WL 4315026 (E.D.N.Y. Sept. 27, 2024) .........................................21

*Gaponyuk v. Alferov,*
    No. 2:23-cv-01317, 2023 WL 4670043 (E.D. Cal. July 20, 2023).....................................12

*Ger-Nis Int'l, LLC v. FJB, Inc.,*
   No. 07-CV-898, 2007 WL 656851 (S.D.N.Y. Mar. 1, 2007) ...............................................11

*Grecia v. Brass Loin Entertainment, Inc.*,
   2025 WL 1626453 (Mar. 3, 2025) .......................................................................................19

*Greene v. Clean Rite Ctrs., LLC,*
   714 F. Supp. 3d 134 (E.D.N.Y. 2024) .......................................................................16, 18, 19

*Grossman v. Simply Nourish Pet Food Co. LLC,*
   516 F. Supp. 3d 261 (E.D.N.Y. 2021) .................................................................................19

*Grupo Mexicano De Desarrollo S.A. v. All. Bond Fund*,
   527 U.S. 308 (1999)................................................................................................... Passim

*Helio Logistics, Inc. v. Mehta,*
   No. 22-CV-10047, 2023 WL 1517687 (S.D.N.Y. Feb. 3, 2023)...........................................7

*In re Rationis Enters., Inc. of Panama*,
   261 F.3d 264 (2d Cir. 2001)................................................................................................14

*Jacobo v. Doe*,
   No. 1:22-CV-00672, 2022 WL 2052637 (E.D. Cal. June 7, 2022) ......................................14

*Jayaraj v. Scappini*,
   66 F.3d 36 (2d Cir. 1995)......................................................................................................8

*JSG Trading Corp. v. Tray-Wrap, Inc.*,
   917 F.2d 75 (2d Cir. 1990).................................................................................................20

*JTH Tax, LLC* v. Agnant,
   62 F.4th 658 (2D Cir. 2023)................................................................................................19

*JustM2J LLC v. Brewer*,
   No. 2:25-CV-00380, 2025 WL 435827 ...............................................................................14

*Kamerling v. Massanari*,
   295 F.3d 206 (2d Cir. 2002)................................................................................................19

*Kane v. De Blasio,*
    19 F.4th 152 (2d Cir. 2021) ..........................................................................19, 22

*Lewis v. Gov't of England & United Kingdom,*
    No. 1:22-CV-10792 (JLR), 2023 WL 2664081 (S.D.N.Y. Mar. 28, 2023),
    *aff'd*, No. 23-500-CV, 2023 WL 8664492 (2d Cir. Dec. 15, 2023) ......................7

*Mandarin Trading Ltd. v. Wildenstein,*
    919 N.Y.S.2d 465 (N.Y. 2011) ................................................................... 17-18

*Morrissey v. Nextel Partners, Inc.,*
    72 A.D.3d 209 (3d Dep't 2010) ...................................................................15, 16

*Nat'l Coalition on Black Civic Participation v. Wohl,*
    498 F. Supp. 3d 457 (S.D.N.Y. 2020) .................................................................7

*Nelson v. MillerCoors, LLC,*
    246 F. Supp. 3d 666 (E.D.N.Y. 2017) ...............................................................18

*Oliver v. N.Y. State Police,*
    812 F. App'x 61 (2d Cir. 2020) ...........................................................................8

*Pall Corp. v. CleanSpace Modular, LLC,*
    No. 1:23-CV-02082, 2023 WL 7412096 (S.D.N.Y. Nov. 9, 2023).....................17

*Paradigm BioDevices, Inc. v. Centinel Spine, Inc.,*
    No. 11-CV-3489, 2013 WL 1915330 (S.D.N.Y. May 9, 2013) .............................7

*Purgess v. Parauda,*
    No. 20-CV-2984, 2021 WL 2269540 (S.D.N.Y. June 3, 2021) ............................8

*Rodriguez by Rodriguez v. DeBuono,*
    175 F.3d 227 (2d Cir. 1999).............................................................................7, 8

*Schiermeyer on Behalf of Blockchain Game Partners, Inc. v. Thurston,*
    697 F. Supp. 3d 1265, 1272 (D. Utah 2023)......................................................14

*Smith v. City of New York,*
    754 F. Supp. 3d 581 (S.D.N.Y. 2024) ...............................................................19

*Societe Generale Alsacienne De Banque, Zurich v. Flemingdon Dev. Corp.,*
    118 A.D.2d 769 (2d Dep't 1986).......................................................................21

*St. John's Capital Corp. v. 1365-1369 St. John's Place LLC,*
    184 N.Y.S.3d 592 (Sup. Ct. Kings County March 20, 2023)..............................21

*Sterling v. Deutsche Bank Nat'l Tr. Co.*,
    368 F. Supp. 3d 723 (S.D.N.Y. 2019) ...................................................................8

*Trump v. CASA, Inc.*,
    No. 24A884, 2025 WL 1773631 (U.S. June 27, 2025) ...................................1, 6, 9

*Wedra v. Cree, Inc.*,
    No. 19-CV-3162, 2020 WL 1322887 (S.D.N.Y. Mar. 20, 2020) .........................18

*Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.*,
    No. 00 CIV. 8051, 2000 WL 1610790 (S.D.N.Y. Oct. 26, 2000) .........................11

*Yogaratnam v. Dubois*,
    No. CV 24-393, 2024 WL 758387 (E.D. La. Feb. 23, 2024) ................................12

## **Rules**

NY CPLR. §§ 6201(3) .............................................................................................21

NY CPLR. §§ 6212(a) ............................................................................................21

## **Statutes**

NY GBL § 349.............................................................................................2, 15, 19

NY GBL § 350.............................................................................................2, 15, 19

## **Other Authorities**

F. Wait, *Fraudulent Conveyances and Creditors' Bills* § 73 ...................................13

Lorna Wallace, *The History—and Value—of the Princess Diana Beanie Baby:
Unfortunately, you won't get as much cash for Princess as you probably hoped*,
Mental Floss.com (Aug. 21, 2024), *available at*
https://www.mentalfloss.com/posts/princess-diana-beanie-baby ...............................17

Private Securities Litigation Reform Act of 1995 ....................................................13

## I.     INTRODUCTION AND PRELIMINARY STATEMENT

Plaintiff Omar Hurlock's demand for a prejudgment injunction freezing hundreds-of-millions-of-dollars' worth of assets until a final damages judgment for the benefit of *non*parties—a non-ascertainable, international, uncertified class of indirect purchasers of $LIBRA—far exceeds this Courts' equitable authority.  In *Trump v. CASA, Inc.*, the Supreme Court recently held that a "universal injunction" cannot used to award relief to non-parties absent strict compliance with Federal Rule of Civil Procedure 23.  *Grupo Mexicano* held that Rule 65 injunctions cannot be used to freeze assets in damages actions.  Setting aside artful pleading mentioning equitable remedies, the Complaint[1] and the PI Motion[2] indicate Hurlock in truth seeks damages as compensation for economic losses.  For instance, Hurlock's PI Motion contains no competent evidence to show that he is a direct purchaser of $LIBRA from Davis to justify equitable relief.

Hurlock's PI Motion also fails to meet the basic requirements for preliminary injunctive relief.  Hurlock's Motion seeks class-wide relief, which is unavailable in the Second Circuit before a class is certified.  Hurlock did not even allege (much less supply evidence of) any material statements upon which he reasonably relied on—especially in the context of memecoins, which even Hurlock's Complaint acknowledges are not investments and have no intrinsic value, but are unsecured and uncollateralized affinity and collectible products, the market for which is marked by extreme volatility.

Nor can Hurlock satisfy the high bar of imminent and irreparable harm.  Hurlock's delay in filing the PI Motion and his own evidence in support thereof undercut any assertion of imminent asset dissipation: as Hurlock's retained expert admits, "[t]here have been no incoming or outgoing transactions" involving the subject LIBRA wallets "since February 16, 2025."  Decl. of Justin Ehrenhofer ¶ 36, ECF No. 17.  Hurlock's statements that there is "no great mystery" as to the location of the $LIBRA proceeds (PI Mot. 9) and claims that he has "substantial visibility into transactions

---

[1] References to the "Complaint" and citations to "Compl." refer to the Class Action Complaint, ECF No. 1-1.

[2] References to "PI Motion" and citations to "PI Mot." refer to the Memorandum of Law in Support of Motion for a Temporary Restraining Order and Preliminary Injunction, ECF No. 15.

related to $LIBRA," which are "publicly recorded on a 'blockchain'" (*id.* at 10), further doom Hurlock's purported irreparable-harm and dissipation arguments. Hurlock cannot establish irreparable harm or even asset dissipation, understandably so because the essence of his Complaint is his alleged economic losses ascertainable and compensable through damages. Nor has he adequately briefed attachment under New York law and Rule 64—let alone met his heavy burden to establish his right to prejudgment attachment.

For a movant who did not so much as sign an affidavit averring that he bought $LIBRA from *anyone*—or that he is even injured, or is even a member of the class he purports to represent—it would appear that the PI Motion already achieved its intended splash and was never intended to succeed otherwise. That jibes with the genesis of this putative class action, which appears to have taken root during the middle of the $LIBRA launch, when Hurlock's counsel sprang into the melee and encouraged people to sue after $LIBRA's price collapse—actions that may have contributed to the very losses Hurlock now seeks to recover. In the *middle of the launch*, attorney Max Burwick, the self-styled "ambulance chaser of crypto," had already decided that fraud had been committed and, without further investigation or due diligence, began seeking $LIBRA purchasers as clients.[3]

Because Hurlock's requested prejudgment "universal freeze injunction" would circumvent Rules 23 and 64 and because his motion fails to meet the basic requirements for injunctive relief under Rule 65, the motion should be denied, and the TRO should be immediately vacated.

## II.    BACKGROUND

According to the Complaint, Hurlock sues "Defendants Kelsier Ventures, Meteora, and KIP Protocol arising from the [allegedly] deceptive, manipulative, and fundamentally unfair launch of the cryptocurrency known as the $LIBRA token." Compl. ¶¶1, 22–26. The Complaint asserts three causes of action: (1) consumer deception in violation of New York General Business Law §§ 349 and 350,

---

[3]. *See* https://x.com/BurwickLaw/status/1897329753667035568 ("Meet lawyer Max Burwick – 'The ambulance chaser of crypto'); https://x.com/burwicklaw/status/1890588160658206965?s=46&t=ZUN3JJTgrEwNx2vnqNNE5g ("If you lost money on $LIBRA, contact Burwick law to learn about your legal rights. Our firm represents thousands of clients that want to get their money back on crypto losses").

(2) negligent misrepresentation, and (3) unjust enrichment. *See id.* ¶¶ 180–211.

$LIBRA is a memecoin that was marketed by the Viva La Libertad Project "[a]s a symbol" and "in honor of Javier Milei's libertarian ideas." *Id.* ¶ 48; *see also* https://www.vivalalibertadproject.com/. Proceeds from the $LIBRA token were intended to "boost the Argentine economy by funding small projects and local businesses" in Argentina. Compl. ¶ 44. A tokenomics graph on the project's website indicated that 50% of the token proceeds would be used to support "Argentina Growth," 30% would provide "Liquidity," and the remaining 20% would be retained as "Treasury." *Id.* ¶¶ 55–57. As Hurlock's PI Motion acknowledges, Defendants "did not promote" the $LIBRA Token "in advance." PI Mot. 8. Defendants did not provide "plans, details, or infrastructure" to would-be memecoin purchasers, nor did Defendants provide detailed disclosures "or detailed tokenomic distribution information regarding how raised funds would be allocated to fulfill the [supposedly] promised economic initiatives." Compl. ¶ 168.

At 4:38 pm on February 24, 2025, the $LIBRA Token was launched. *Id.* ¶ 110; *see also* PI Mot. 8. Bolstered by a social media post from Argentina's President Javier Milei posted shortly after the launch, the price of the $LIBRA Token surged to an alleged market capitalization of "$4.5 billion within hours of its market debut." *See id.*; Compl. ¶¶ 2, 51, 77, 166. When investors started to sell, the price fell. *See* PI Mot. 9.

At 10:38 pm, President Milei deleted his post, indicating he "was not aware of the details of the project and after having become aware of it I decided not to continue spreading the word." *Id.*

Hurlock's chief complaint appears to be the use of "one-sided liquidity pools on the Meteora decentralized exchange platform," Compl. ¶ 3, which he alleges allowed certain insiders including Davis to remove "approximately $107 million" worth of cryptocurrency assets "from the liquidity pools, causing an immediate 94% collapse in the token's market valuation," *id.* ¶ 6; *see also id.* ¶¶ 66–76.

## A.   HURLOCK PRIMARILY SEEKS DAMAGES AS COMPENSATION FOR HIS ALLEGED FINANCIAL LOSSES.

Hurlock "seeks to redress the substantial economic harm caused by Defendants' manipulative

scheme and hold them accountable for their unjust enrichment at the expense of unsuspecting retail purchasers." *Id.* ¶ 9. Hurlock alleges that he and the putative class "suffered substantial financial losses due to Defendants' deceptive and fraudulent conduct." *Id.* ¶ 8. Hurlock seeks, among other things, "compensatory and punitive damages." *Id.* The Complaint asserts that Hurlock's claims are typical of the class "because Plaintiff purchased the $LIBRA Tokens, and sustained damages from Defendants' wrongful conduct complained of herein." *Id.* ¶ 174. Under his primary consumer-deception claim, Hurlock alleges that he and the "proposed Class suffered substantial monetary damages" and "are entitled to" (among other forms or relief) "recover damages in an amount to be determined at trial." *Id.* ¶ 192. For negligent-misrepresentation, Hurlock only seeks "compensatory damages in an amount to be determined at trial." *See id.* ¶¶ 202–03. And through his unjust-enrichment claim, Hurlock also seeks "damages in an amount to be proven at trial." *Id.* ¶ 211. The term "damages" appears in the Complaint twenty times; by contrast, the terms "equitable" and "equity" appear in the Complaint ten times collectively.

**B.    THE COMPLAINT DOES NOT DESCRIBE THE SPECIFICS OF HURLOCK'S $LIBRA PURCHASE.**

Hurlock (a New York resident) alleges he "purchased the $LIBRA Token and suffered damages as a result." *Id.* ¶ 18. The Complaint and the PI Motion do not indicate how many $LIBRA tokens were purchased by Hurlock. The Complaint and the PI Motion do not state from whom Hurlock purchased $LIBRA tokens. Nor do the Complaint or the PI Motion indicate what day and what time Hurlock made his alleged purchase. Hurlock's retained expert did not trace any cryptocurrency, funds, or other property that once belonged to Hurlock that is now in Davis's control (or in the control of any other Defendant). *See generally* Ehrenhofer Decl.

**C.    HURLOCK ACKNOWLEDGES THAT MEME COINS' PRICES ARE HIGHLY VOLATILE AND NOT DRIVEN BY FUNDAMENTALS, AS THE SEC HAS AFFIRMED.**

According to the Complaint, memecoins "are a subset of cryptocurrencies that are primarily driven by social media influencer paid or unpaid marketing, internet culture, market making, liquidity management, and inside price management techniques rather than inherent technological innovation or utility." Compl. ¶ 35. Hurlock acknowledges that memecoins are "unlike established cryptocurrencies

4

such as Bitcoin or Ethereum, which have established ecosystems." *Id.* ¶ 36.  Instead, "memecoins often emerge as viral sensations, gaining popularity through online communities, paid or unpaid celebrity endorsement, and promotional campaigns." *Id.*  Hurlock also admits that the "valuation of meme coins is highly volatile, influenced by liquidity management, novel market making technologies, online sentiment, and coordinated marketing efforts rather than fundamental or technological principles." *Id.*; *see also id.* ¶ 37 (alleging that memecoins success "largely depends on the purpose of the token, influencer engagement, and continued market enthusiasm that attract new investor participation").

In the SEC's Division of Corporate Finance Staff Statement on Meme Coins, the SEC declared: "It is the Division's view that transactions in the types of meme coins described in this statement, do not involve the offer and sale of securities under the federal securities laws."[4]  The Division explained, "Meme coins typically are purchased for entertainment, social interaction, and cultural purposes, and their value is driven primarily by market demand and speculation.  In this regard, meme coins are akin to collectibles."[5]  "Meme coins also typically have limited or no use or functionality.  Given the speculative nature of meme coins, they tend to experience significant market price volatility, and often are accompanied by statements regarding their risks and lack of utility, other than for entertainment or other non-functional purposes."[6]

## D.    AFTER HURLOCK FILED THIS LAWSUIT, HE WAITED TO SEEK A TRO.

Hurlock filed this lawsuit on March 17, 2025.  Compl. ¶ 44.  Two months later, on May 21, 2025, Hurlock finally filed an ex parte motion for a TRO and a preliminary injunction.  *See* Tr. 2:12–14 (indicating the TRO was filed "late last week")[7]; *see also* PI Mot. 24 (dated May 21).  Before seeking the TRO, Hurlock filed a joint letter indicating that there existed substantial "similarities among the

---

[4] https://www.sec.gov/newsroom/speeches-statements/staff-statement-meme-coins (Feb. 27, 2025).

[5] *Id.*

[6] *Id.*

[7] Citations to "Tr." refer to the transcript of the Ex Parte Conference (Remote) (May 27, 2025), ECF No. 24.

underlying factual and legal issues" in this civil action and in a pending related securities case subject to the PSLRA, such that discovery should be stayed in this case.  Letter (May 13, 2025), ECF No. 9. Thus, the Court noted at the May 27 *ex parte* hearing that Hurlock's TRO motion "doesn't sound urgent to me."  Tr. 9:11.

**E.    HURLOCK'S STATEMENTS AND EVIDENCE IN SUPPORT OF THE TRO MOTION DO NOT SUPPORT HIS CLAIMS OF IRREPARABLE HARM OR DISSIPATION.**

Hurlock's PI Motion acknowledges "[t]here is no great mystery where" the $LIBRA proceeds are located.  PI Mot. 9.  Through Hurlock's expert's tracing report, Hurlock represented he has "substantial visibility into transactions relating to LIBRA," which are "publicly recorded on a 'blockchain, a distributed public ledger containing an immutable record of every historical transaction of that asset."  *Id.* at 10.  Thus, Hurlock acknowledged that his expert is able "to track the movement of [the subject] cryptocurrency tokens through various addresses over time."  *Id.*

As noted above, Hurlock's retained expert admits "[t]here have been no incoming or outgoing transactions" involving the subject LIBRA wallets "since February 16, 2025."  Ehrenhofer Decl. ¶ 36.

**F.    BEFORE THE SUPREME COURT'S DECISION IN *CASA*, THE COURT ENTERED A TRO.**

At the ex parte hearing on May 27, the Court issued a TRO, explaining its reasons on the record. About three weeks later, on June 27, the Supreme Court issued its decision in *Trump v. CASA, Inc.*, reaffirming the rule articulated in *Grupo Mexicano* that federal courts' authority to issue equitable relief is limited to those "remedies traditionally accorded by courts of equity at our country's inception."  No. 24A884, 2025 WL 1773631, at *5 (U.S. June 27, 2025).  As such, the Court in *CASA* held federal courts lack the power to "award . . . relief to nonparties," absent compliance with Rule 23.  *Id.* at *14–15.

The TRO, which has been in place since May 29, 2025, and will presumably remain in place until August 18, 2025 (nearly three months), has brought the $LIBRA project to a standstill.  By its terms, the TRO prohibits Davis from using any $LIBRA proceeds as intended: to support the project and then, when regulatory compliance is certain and bona fide applications received and vetted, award $LIBRA proceeds to worthy small businesses, startups, and educational initiatives.

### III.    LEGAL STANDARD[8]

A plaintiff requesting a preliminary injunction "must show (1) irreparable harm; (2) either likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that [the requested relief] is in the public interest." *Nat'l Coalition on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 469 (S.D.N.Y. 2020).  In deciding a preliminary injunction, the Court may consider the entire record, including affidavits and even hearsay.  *Helio Logistics, Inc. v. Mehta*, No. 22-CV-10047, 2023 WL 1517687, at *2 (S.D.N.Y. Feb. 3, 2023).

Under *Grupo Mexicano*, "Rule 65 does not empower a district court to enter a preliminary injunction freezing assets pending the adjudication of an action brought solely at law."  *Paradigm BioDevices, Inc. v. Centinel Spine, Inc.*, No. 11-CV-3489, 2013 WL 1915330, at *2 (S.D.N.Y. May 9, 2013) (citing *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 310, 333 (1999)).  However, where the moving party asserts an equitable interest in the opposing party's assets, "a court may in the interim invoke equity to preserve the status quo pending judgment . . . and, as many courts have held, where plaintiffs seek both equitable and legal relief in relation to specific funds, a court retains its equitable power to freeze assets."  *Id.* (collecting cases).

Demonstrating irreparable harm requires that a party show "they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm."  *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009).  Preliminary injunctions should generally not be granted when a loss can be compensated with monetary damages.  *See Rodriguez ex rel. Rodriguez v. DeBuono,* 175 F.3d 227, 234 (2d Cir. 1999).

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary

---

[8] The below legal standard is drawn from the Court's TRO ruling on the record at the May 27 hearing, *see* Tr. 19:20–22:25, and from this Court's order in *Lewis v. Gov't of England & United Kingdom*, No. 1:22-CV-10792 (JLR), 2023 WL 2664081, at *2 (S.D.N.Y. Mar. 28, 2023), *aff'd*, No. 23-500-CV, 2023 WL 8664492 (2d Cir. Dec. 15, 2023).

injunction." *Sterling v. Deutsche Bank Nat'l Tr. Co. as Trustees for Femit Tr. 2006-FF6*, 368 F. Supp. 3d 723, 727 (S.D.N.Y. 2019). Therefore, a court need not address the remaining elements if a plaintiff has failed to show irreparable harm. *See Coscarelli v. ESquared Hosp. LLC*, 364 F. Supp. 3d 207, 221 (S.D.N.Y. 2019). "To show irreparable harm, the movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Oliver v. N.Y. State Police*, 812 F. App'x 61, 62 (2d Cir. 2020) (quoting *Rodriguez*, 175 F.3d at 234). Importantly, "[p]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs['s] rights[,]" and so a "[d]elay in seeking enforcement of those rights . . . tends to indicate . . . a reduced need for such drastic, speedy action." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985). "Irreparable harm is measured in terms of the harm arising during the interim between the request for an injunction and final disposition of the case on the merits." *Purgess v. Parauda*, No. 20-CV-2984, 2021 WL 2269540, at *3 (S.D.N.Y. June 3, 2021) (quoting *Jayaraj v. Scappini*, 66 F.3d 36, 40 (2d Cir. 1995)).

## IV.    ARGUMENT AND AUTHORITIES

The PI Motion should be denied for at least six reasons.

*First*, the Court lacks equitable authority to award preliminary injunctive relief to nonparties under the Supreme Court's recent decision in *CASA, Inc.*

*Second*, the Court lacks equitable authority to freeze assets prejudgment to secure a claim for money damages under *Grupo Mexicano*.

*Third*, Hurlock's circular and evidence-free assertions do not establish that he is likely to prevail on the merits.

*Fourth*, Hurlock has not demonstrated the existence of irreparable harm that cannot be remedied by damages.

*Fifth*, Hurlock has not satisfied the standard for an attachment under New York law because he presents no evidence of any history or intent to conceal, remove, or secrete assets, nor is he likely to prevail on the merits.

And finally *sixth,* the injunction sought by Hurlock is not narrowly tailored and is impossibly

overbroad.

**A.    THE COURT LACKS EQUITABLE AUTHORITY TO AWARD INJUNCTIVE RELIEF TO BENEFIT NONPARTIES UNDER *Trump v. CASA, Inc.***

Under the Supreme Court's recent decision in *Trump v. CASA, Inc.*, an injunction "can be justified only as an exercise of equitable authority" granted by Congress.  No. 24A884, 2025 WL 1773631, at *6 (U.S. June 27, 2025).  Under the English common law in existence when the Judiciary Act was passed, "suits in equity were brought by and against individual parties."  *Id.*  Applying *Grupo Mexicano*, the Supreme Court in *CASA* explained that although equity is "flexible," its "flexibility is confined within the broad boundaries of traditional equitable relief."  *Id.* at *10–11.  Awarding injunctive relief to expressly benefit nonparties "falls outside the bounds of a federal court's equitable authority under the Judiciary Act."  *Id.* at *11.  The Supreme Court repeatedly reified *Grupo Mexicano*'s historical test, *see id.* at *10–12, and explained that to hold otherwise would create a "shortcut to relief" that would "circumvent Rule 23's procedural protections" that place limits on class actions, *id.* at *14.

So too here.  Hurlock seeks class-wide relief for an international class of persons the vast majority of whom are not subject to U.S. law—and seeks it without having satisfied Rule 23 or showing how he could satisfy Rule 23.  A preliminary injunction must be justified by the irreparable harm that will be suffered by Hurlock alone.  *See id.*  And yet through his Motion that relies on an unverified Complaint and declarations that lack personal knowledge and evidentiary value, Hurlock seeks to freeze more than $168 million in assets.  *See* PI Mot. 13 (seeking the freezing of more than $168 million in assets to secure the "over $280 million" in damages).  Yet, the record before this Court is devoid of any evidence of even Hurlock's individual losses—and provides no basis for a sole plaintiff to halt the LIBRA project on hasty speculation alone.

Therefore, the Court lacks the equitable authority under *CASA* to freeze any more assets than necessary to secure a recovery for the only party before the Court (Hurlock), assuming the other elements for an injunction to secure money damages are met (which they are not).

**B.    THE COURT LACKS EQUITABLE AUTHORITY TO FREEZE ASSETS TO SATISFY A FUTURE POTENTIAL JUDGMENT FOR HURLOCK'S CLAIM FOR DAMAGES UNDER *GRUPO MEXICANO*.**

Reading *CASA* together with *Grupo Mexicano*, federal district courts lack equitable authority under the Judiciary Act of 1789 to issue a preliminary injunction freezing assets to secure a judgment for money damages, especially for the benefit of nonparties. *See Grupo Mexicano*, 527 U.S. at 333.

In *Grupo Mexicano*, the Supreme Court held that the "well-established" rule is that "a judgment" is necessary "before a court of equity [may] interfere with the [defendant's] use of his property." *Id.* at 321. The majority rejected the dissent's contention that the historical limits on equity power should give way to the "increasing complexities of modern business relations," reasoning that no matter the differences in the means and modes of commercial exchange, "there is absolutely nothing new about debtors' trying to avoid paying their debts, or seeking to favor some creditors over others." *Id.* at 323. "The law of fraudulent conveyances and bankruptcy was developed to prevent such conduct; an equitable power to restrict a debtor's use of his unencumbered property before judgment was not." *Id.* The Court ultimately decided to leave "any substantial expansion" of federal equitable powers "to Congress." *Id.* at 329.

As the Supreme Court emphasized, Rule 64 "authorizes [the] use of state prejudgment remedies" such as those found in "local attachment and garnishment statutes." *Id.* at 330–31. Authorizing district courts to "craft a 'nuclear weapon' of the law" (a prejudgment injunction to freeze a defendant's assets) would (among other things) "render Federal Rule of Civil Procedure 64 . . . a virtual irrelevance. Why go through the trouble of complying with local attachment and garnishment statutes," the Court reasoned, "when this all-purpose prejudgment injunction is available?" *Id.*

*Grupo Mexicano* precludes the Court from granting Hurlock's requested relief, as the cases cited in Hurlock's own brief demonstrate. What Hurlock seeks is a way to "guarantee that close to $58 million" of USDC and "$110 million of [allegedly] Davis Held Proceeds" will "be available" for the victims of the alleged meme coin scheme should Hurlock and the putative class one day prevail at trial on their damages claims, to ensure that there will be sufficient "assets available to enforce [a] judgment against the Defendants." PI Mot. 13. This is precisely the kind of relief sought in *Grupo Mexicano*

10

and obtained from the district court as well as the Second Circuit that the Supreme Court reversed. *See* 527 U.S. at 331–33. As courts applying *Grupo Mexicano* have held, federal district courts "may not enter a preliminary injunction simply to safeguard Defendants' assets in the event that Defendants are ultimately held liable on [a plaintiff's] claims." *Dong v. Miller*, No. 16-CV-5836, 2018 WL 1445573, at *9 (E.D.N.Y. Mar. 23, 2018).

### 1. Hurlock's cited cases reinforce that separate statutory authority is required to freeze assets prejudgment.

Hurlock's brief's references to *Ger-Nis International, LLC v. FJB, Inc.*[9] and *Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.*[10] illustrate that prejudgment relief freezing assets should be granted only if authorized by a separate statute. *See* PI Mot. 13. Both cases arose under the  Perishable Agricultural Commodities Act (PACA), 7 U.S.C. § 499(a) *et seq.*, which federal courts have interpreted to authorize a preliminary injunction based on the statutory trust imposed for the benefit of the perishable produce seller. *Ger-Nis*, 2007 WL 656851, at *1–2; *Wishnatzki & Nathel*, 2000 WL 1610790, at *1–2 ("Under PACA, a statutory trust is created on sale proceeds of perishable agricultural products in order to protect the security interests of sellers. This has the effect of elevating unsecured general creditors to the status of trust beneficiaries who have rights superior to secured creditors in the trust funds.").

Thus, *Ger-Nis* and *Wishnatzki & Nathel* together stand for the proposition that *Grupo Mexicano* precludes a prejudgment injunction freezing assets, unless otherwise authorized by a specific statute. *See also Grupo Mexicano*, 527 U.S. at 325–26 (reasoning that a prejudgment freeze in a prior case was authorized by the court's "powers under the statute authorizing issuance of tax injunctions"). Because Hurlock can point to no federal statute authorizing a prejudgment asset freeze here, the PACA cases support Davis's contention that the Court lacks equitable authority to grant Hurlock's requested relief.

[9] No. 07-CV-898, 2007 WL 656851 (S.D.N.Y. Mar. 1, 2007).

[10] No. 00 CIV. 8051, 2000 WL 1610790 (S.D.N.Y. Oct. 27, 2000).

**2.    Hurlock's cited cryptocurrency cases demonstrate this case does not fit within the exception recognized in *Grupo Mexicano* for equity claims.**

Moreover, as the other cryptocurrency-related cases cited in Hurlock's brief demonstrate, to fall within the narrow exception recognized in *Grupo Mexicano* for claims truly seeking equitable relief (*see* 527 U.S. at 325), the plaintiff must establish that the defendant converted or was unjustly enriched by and thereby exerted exclusive control over *plaintiff's specific property*. For example, in *Yogaratnam v. Dubois*, a defendant tricked the plaintiff into downloading an illegitimate smartphone application called "CTRL-FX," which enabled defendant to steal $294,215 worth of plaintiff's cryptocurrency. No. CV 24-393, 2024 WL 758387, at *1 (E.D. La. Feb. 23, 2024). For an equitable constructive trust claim under Nevada law, the plaintiff's expert traced the plaintiff's specific stolen assets to wallet addresses controlled by the defendant and her cohorts. *Id.* at *4. Similarly in *Gaponyuk v. Alferov*, a defendant tricked the plaintiff into depositing money and cryptocurrency into a fake exchange called "CryptoKG," which then refused to allow him to withdraw his funds. 2023 WL 4670043, at *1–2. And in *Bullock v. Doe*, the plaintiff appears to have been the victim of a romance scam whereby an individual who called himself or herself "Jessica" befriended the plaintiff and persuaded him to transfer USDC to an illegitimate platform called "Zaif INT," which then refused to release plaintiff's funds. 2023 WL 9503380, at *2. Because the plaintiff had traced the property to a place where defendants "had control of it," the plaintiff had stated a claim for equitable conversion under Iowa law, justifying a prejudgment injunction. *See id.* at *5–6.

These three cases do *not* stand for the premise that an unspecific risk of dissipation combined with the presence of cryptocurrency somehow automatically entitles a plaintiff to a prejudgment freeze of a defendant's assets—notwithstanding *Grupo Mexicano*. Rather, these cases stand for the unremarkable proposition that victims of a straightforward theft or conversion (whether it's cryptocurrency or a bicycle) who can trace their specific property to the control of another may obtain an injunction freezing that specific property. *See Dong*, 2018 WL 1445573, at *10 ("where the plaintiff can demonstrate an equitable interest in *particular property*, the court may in certain circumstances enter an injunction freezing those assets for the pendency of the litigation." (emphasis in original)).

12

In this case, unlike in the three cases mentioned above, Hurlock presents neither allegations nor evidence that he traded with Davis and therefore, his money is in Davis's hands and subject to restitutionary disgorgement.  Instead, Hurlock's expert appears to have traced transfers of people *other than Hurlock*—he notes various transfers of $LIBRA and USDC among four cryptocurrency wallets, none of which expressly contain Hurlock's specific property or funds.  Ehrenhofer Decl. ¶¶ 15–36.

To the extent Hurlock's retained expert is unable to trace specific property allegedly belonging to Hurlock to wallets controlled by Davis, as with a drop of water in an ocean, that only demonstrates that the cryptocurrency at issue here is *fungible*.  And fungible losses are economic losses that can be readily determined and adequately compensated by money damages—rendering injunctive relief inappropriate.  *See Alpha Cap. Anstalt v. Shiftpixy, Inc.*, 432 F. Supp. 3d 326, 340 (S.D.N.Y. 2020).  Indeed, Hurlock's PI Motion repeatedly describes the putative class's alleged losses in U.S. dollar terms.  PI Mot. 1, 2, 3, 9–10, 13–15, 22.

As for the supposed risk of dissipation, Hurlock's own expert acknowledges that, "[t]here have been no incoming or outgoing transactions since February 16, 2025."  *Id.* ¶ 36. And of course, Hurlock's complaint does not allege a romance scam or some other overt fraud through which Hurlock was duped into downloading an illegitimate application or tricked into depositing funds or property into a fake exchange.  Instead, Hurlock's claims here are premised on more diffuse allegations of essentially a securities fraud perpetrated using memecoins, as confirmed by his initial stipulation to stay discovery until a motion to dismiss in a previously filed civil action subject to the Private Securities Litigation Reform Act of 1995 has been resolved.  *See generally* Letter (May 13, 2025), ECF No. 9. Weaponizing a prejudgment freeze of hundreds-of-millions-of-dollars' worth of assets before an answer deadline would collide with the Supreme Court's warning in *Grupo Mexicano*: "A rule of procedure which allowed [a plaintiff], before his claim was definitely established by judgment, . . . to discover assets, or to impeach transfers . . . would manifestly be susceptible of the grossest abuse.  A more powerful weapon of oppression could not be placed at the disposal of unscrupulous litigants." *See* 527 U.S. at 330 (quoting F. Wait, *Fraudulent Conveyances and Creditors' Bills* § 73, pp. 110–111 (1884)).

3.    **Cryptocurrency claims do not warrant special treatment under *Grupo Mexicano*.**

To be sure, the out-of-circuit district court decisions mentioned in Hurlock's brief and in the Court's TRO ruling could be interpreted to suggest that the technological advancements of cryptocurrency warrant special treatment by federal courts due to the "speed and anonymous nature of cryptocurrency transactions." Tr. 24:1–24 (citing among other sources *Jacobo v. Doe*, No. 1:22-CV-672, 2022 WL 2052637, at *3 (E.D. Cal. June 7, 2022)). This anomaly is precisely the line of reasoning the Supreme Court expressly rejected in *Grupo Mexicano*, 527 U.S. at 323. No matter how swift, anonymous, or complex modern transactions may become, the Supreme Court held in *Grupo Mexicano* and reiterated recently in *CASA* that (1) federal courts' equitable authority under the Judiciary Act remains constrained by those remedies historically available at our country's inception and (2) "any substantial expansion" of equitable powers is left "to Congress." 527 U.S. at 329; *see also CASA*, 2025 WL 1773631 at *6 ("[T]he statutory grant [of the authority to issue equitable remedies] encompasses only those sorts of equitable remedies 'traditionally accorded by courts of equity; at our country's inception.'" (quoting *Grupo Mexicano*, 527 U.S. at 319)). Indeed, since those three cases have been decided, many federal courts have declined to follow these "smattering" of decisions as "unpersuasive," reasoning that simply because cryptocurrency may make it "*easy* for a defendant to dissipate assets does not make it *likely* that he will do so." *Schiermeyer on Behalf of Blockchain Game Partners, Inc. v. Thurston*, 697 F. Supp. 3d 1265, 1272 (D. Utah 2023).[11]

C.    **Hurlock's Conclusory and Circular Assertions Do Not Demonstrate He Is Likely to Prevail on the Merits.**

As an initial matter, the Second Circuit has held that a district court "may not grant" a preliminary injunction "over a party over whom it does not have personal jurisdiction." *In re Rationis Enters., Inc. of Panama*, 261 F.3d 264, 270 (2d Cir. 2001). Thus, for the reasons explained in Davis's

---

[11] *See also JustM2J LLC v. Brewer*, No. 2:25-CV-00380, 2025 WL 435827, at *8 (E.D. Cal. Feb. 7, 2025) ("Based on [the plaintiff's (also represented by Hoppin Grinsell, LLP)] delay in filing . . . the pending motion for emergency relief as well as their failure to show that monetary damages are likely to be unavailable or otherwise insufficient, . . . plaintiff has not at this time met its burden of demonstrating a likelihood of irreparable harm . . . . ." (collecting cases)).

motion to dismiss under Rule 12(b)(2) (ECF Nos. 86, 87), the Court should deny Hurlock's requested preliminary injunction for lack of personal jurisdiction over Davis.

Hurlock contends he has shown a likelihood of success, arguing in a conclusory manner that $LIBRA "was a scam." PI Mot. 17. In arguing reliance, Plaintiff's counsel concludes that "[h]e *could* not have bought $LIBRA for any reason other than deceptive marketing." *Id.* at 19. This speculative conclusion by counsel falls short of supporting a likelihood of prevail on the claims: (1) consumer deception in violation of New York General Business Law §§ 349 and 350, (2) negligent misrepresentation, and (3) unjust enrichment. *See* Compl. ¶¶ 180–211.

### 1.    Hurlock is not likely to succeed on his New York consumer-deception claim.

Hurlock sues under New York General Business Law, alleging that "all Defendants . . . engaged in unfair, deceptive, and misleading practices in connection with the marketing, launch, and sale of the $LIBRA token." Compl. ¶¶ 181–83. Sections 349 and 350 of the New York General Business Law declare unlawful "[d]eceptive acts or practices" and "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state." Federal courts applying New York law analyze claims under sections 349 and 350 together. *E.g.*, *Colpitts v. Blue Diamond Growers*, 527 F. Supp. 3d 562, 577 (S.D.N.Y. 2021).

To prevail on a claim under sections 349 and 350, New York courts require the plaintiff to establish (among other things) (1) "the deceptive transaction to have occurred in New York," (2) "proof of reliance," *Morrissey v. Nextel Partners, Inc.*, 72 A.D.3d 209, 217 (3d Dept 2010),[12] and (3) the alleged misrepresentations or advertisements "were likely to mislead a reasonable consumer acting reasonably under the circumstances," *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013). On element three, "[i]t is well settled that a court may determine as a matter of law" that an allegedly deceptive advertisement or representation "would not have misled a reasonable consumer." *Id.*

---

[12] Although "reliance is not an element" of a section 349 claim per se, a plaintiff "must show that the 'material deceptive act' caused the injury." *Morrissey*, 72 A.D.3d at 213. Because Hurlock has not established when he purchased $LIBRA relative to any alleged deceptive act by Davis, he is unlikely to be able to establish some unspecified material deceptive act caused his injuries.

Hurlock has not sufficiently pleaded nor established through evidence "that a deceptive transaction, or part of a deceptive transaction, took place in New York." *Greene v. Clean Rite Centers, LLC*, 714 F. Supp. 3d 134, 148 (E.D.N.Y. 2024). The touchstone of a consumer-fraud claim is misleading or deceptive statements or marketing, and the only connection to New York is that "Chow, who managed, Meteora, was based in New York." PI Mot. 19. There is not even competent evidence that Hurlock himself ever purchased any $LIBRA tokens in New York—as would be required for him to have statutory standing to bring a consumer-deception claim. *See id.* Thus, Hurlock has not established even the most basic elements of a consumer-deception claim.

Second, Hurlock's only "proof of reliance," *see Morrissey*, 72 A.D.3d at 217, is at best circular: in Hurlock's own words, "[a]s for [reliance], there was nothing other than misrepresentations that plaintiff or putative class members could have relied on." PI Mot. 20; *see also id.* at 19 ("He could not have bought $LIBRA for any reason other than deceptive marketing . . . ."). Hurlock's circular suppositions—unverified and unsupported by evidence—fall woefully short of the "individualized proof" that New York courts require establishing that Hurlock relied on or was even *aware of* the allegedly misleading statements and advertising. *See Morrissey*, 72 A.D.3d at 217.

Hurlock's counsel's conjecture (about his own client no less) that Hurlock "must have" relied on the website is evidence of nothing—a lawyer speculating about what his own client was thinking is simply not evidence at all. It is also a leap too far. There are a myriad of reasons one might purchase a $LIBRA token: at the more charitable end, Hurlock claims he was supporting the effort in Argentina, which means he had no expectation of a financial return; or at the other end of the spectrum, perhaps Hurlock is like most other meme coin purchasers—he was purchasing as a speculator hoping to sell for a profit before the coin's price collapsed, as the overwhelming majority of meme coins do.

Fatally, the Court is provided with zero evidence of any reliance on any purportedly misleading statement. Moreover, the timing of Hurlock's purchase (if any) is critical to assess reliance, particularly given that he acknowledges that "Defendants launched $LIBRA . . . but did not promote it in advance." PI Mot. 8.

Neither the Complaint nor the PI Motion explains how any such statements made "were likely

to mislead a reasonable consumer acting reasonably under the circumstances"—especially in the specific context of a meme coin. *See Fink*, 714 F.3d at 741. After all, a reasonable consumer would not be materially misled by the general statements that $LIBRA proceeds would help support Argentina's economy. As the SEC recognizes, "[m]eme coins typically are purchased for entertainment, social interaction, and cultural purposes, and their value is driven primarily by market demand and speculation. In this regard, meme coins are akin to collectibles."[13]

If the price of a collectible Princess Diana Beanie Baby in the secondary market collapses, an executive of the toy company Ty cannot be held responsible for having supposedly misled consumers— merely by having expressed that proceeds will support the Diana Princess of Wales Memorial Fund.[14] Because meme coins are collectibles, not investments undertaken with a reasonable expectation of profits, Hurlock cannot establish that any of Davis's alleged statements promoting the $LIBRA meme coin were likely to mislead a reasonable consumer acting reasonably under the circumstances as a matter of law. *See Fink*, 714 F.3d at 741.

> **2.    Hurlock's negligent-misrepresentation claim cannot serve as a basis for a prejudgment asset freeze and is unlikely to succeed anyway.**

As the Court noted, Hurlock's negligent-misrepresentation claim seeks monetary damages only (*see* Compl. ¶ 203 ("Plaintiff and the Class have suffered damages in an amount to be proven at trial")) "and may not serve as a basis for an asset freeze under Rule 65." Tr. 28:17–20. Even so, that claim will probably fail. "Under New York law, 'a claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information.'" *Pall Corp. v. CleanSpace Modular, LLC*, No. 1:23-CV-02082, 2023 WL 7412096, at *3 (S.D.N.Y. Nov. 9, 2023) (Rochon, J.) (quoting *Mandarin Trading Ltd.*

---

[13] *See supra* note 4.

[14] *See generally* Lorna Wallace, *The History—and Value—of the Princess Diana Beanie Baby: Unfortunately, you won't get as much cash for Princess as you probably hoped*, Mental Floss.com (Aug. 21, 2024), *available at* https://www.mentalfloss.com/posts/princess-diana-beanie-baby.

*v. Wildenstein*, 919 N.Y.S.2d 465, 470 (N.Y. 2011)).  Hurlock has neither alleged fraud with the requisite particularity under Rule 9(b) nor established through competent evidence *any* relationship—let alone a "special or privity-like" one—between Hurlock and Davis.  And for the reasons stated above (*see supra* Part IV.C.1), Hurlock's circular assertions (PI Mot. 19, 20) cannot establish reasonable reliance.  Thus, Hurlock's negligent-misrepresentation claim cannot justify a prejudgment asset freeze either.

### 3.    Hurlock's duplicative unjust-enrichment claim fails as well.

Federal courts applying New York law have held that an unjust-enrichment claim is unavailable where, as here, it "simply duplicates" a consumer-deception or tort claim.  *See, e.g.*, *Greene*, 714 F. Supp. 3d at 150–51 (collecting cases).  Hurlock acknowledges this caselaw and argues that his unjust-enrichment claim is pleaded "in the alternative" "[s]hould the evidence ultimately fail to support that a particular Defendant acted with the culpability required in Count One or Count Two."  PI Mot. 20.

But those same federal courts applying New York law have rejected this very tactic: "[E]ven pleaded in the alternative, claims for unjust enrichment will not survive a motion to dismiss where plaintiffs fail to explain how their unjust enrichment claim is not merely duplicative of their other causes of action."  *Greene*, 714 F. Supp. 3d at 151 (quoting *Nelson v. MillerCoors, LLC*, 246 F. Supp. 3d 666, 679 (E.D.N.Y. 2017)).  "The critical inquiry is whether the *factual allegations* supporting each claim are the same . . . ."  *Id.* (emphasis in original) (citing *Wedra v. Cree, Inc.*, No. 19-CV-3162, 2020 WL 1322887, at *11 (S.D.N.Y. Mar. 20, 2020)).

Hurlock's PI Motion and Complaint make clear "the conduct" that Hurlock alleges constitutes unjust enrichment (PI Mot. 20; Compl. ¶¶ 204–211), i.e., the "factual allegations supporting each claim are the same," *see Greene*, 714 F. Supp. 3d at 151, for counts one, two, and three.  Thus, Hurlock's unjust-enrichment claim would be subject to dismissal and would fail on the merits.  Indeed, the New York Court of Appeals has specifically rejected Hurlock's theory that unjust enrichment is pleaded "[s]hould" his other claims "ultimately fail" (PI Mot. 20): the court has held that unjust enrichment is "not a catchall cause of action to be used *when others fail*."  *E.J. Brooks Co. v. Cambridge Sec. Seals*,

31 N.Y.3d 441, 455 (N.Y. 2018) (emphasis added).

Moreover, because Hurlock's section 349 and 350 claims fail for the reasons stated above, his unjust-enrichment claim under New York law premised on the same allegations also necessarily fails. *See Greene*, 714 F. Supp. 3d at 151 ("Because plaintiff's unjust enrichment claim under New York law is based on the same allegations as her claims of violations of  349 and 350 . . . , and because plaintiff has not shown how her unjust enrichment claim differs from her other New York claims, the Court dismisses plaintiff's unjust enrichment claim . . . ." (quoting *Grossman v. Simply Nourish Pet Food Co. LLC*, 516 F. Supp. 3d 261, 285 (E.D.N.Y. 2021)).

Even so, Hurlock's expert has not traced any property or funds belonging to Hurlock directly to any wallet controlled by Davis. Thus, he cannot establish the essential elements of an unjust-enrichment claim either. *See id.* at 149–150.

### D.    HURLOCK HAS NOT PROVIDED THIS COURT WITH A SHOWING OF IRREPARABLE HARM OR EVEN OF ASSET DISSIPATION.

To obtain an injunction, Hurlock must demonstrate the existence of *future* imminent harm; an injunction cannot be issued to simply address *past* conduct. *See Smith v. City of New York*, 754 F. Supp. 3d 581, 585 (S.D.N.Y. 2024) (Rochon, J.) ("Preliminary injunctions are appropriate only to prevent prospective harm until the trial court can decide the case on the merits" (quoting *Kane v. De Blasio*, 19 F.4th 152, 172 n.20 (2d Cir. 2021))).  A plaintiff "must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 672 (2d Cir. 2023) (cleaned up).

Where the principal alleged harms "can be boiled down to the loss of money," the irreparable harm requirement is not satisfied. *See, e.g.*, *Grecia v. Brass Lion Ent., Inc.*, No. 25-CV-1484, 2025 WL 1626453, at *4 (S.D.N.Y. Mar. 3, 2025) (citing *Anderson Bey v. Roc Nation LLC*, No. 24-CV-2295, 2025 WL 560751, at *5 (S.D.N.Y. Feb. 20, 2025)).  A party cannot show the irreparable harm required to obtain a preliminary injunction where "money damages" can provide redress. *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002).  "Irreparable injury is one that cannot be redressed

through a monetary award.  Where money damages are adequate compensation a preliminary injunction should not issue."  *Anderson Bey*, 2025 WL 560751, at \*5 (quoting *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990)).  In *Allstate Ins. Co. v. Harvey Family Chiropractic*, the Second Circuit summarily affirmed the district court's denial of a preliminary injunction and noted that there was "no evidence in the record that" the plaintiffs could not "be fully compensated through money for the alleged harm suffered from the defendants' fraudulent claims."  677 F. App'x 716, 718 (2d Cir. 2017).

Hurlock's alleged harms boil down to the loss of money.[15]  Moreover, Hurlock's delay in seeking preliminary relief and his own evidence undercut his argument that he urgently needs relief to avoid imminent and irreparable harm.  For three months after the lawsuit was initially filed, Hurlock dithered before moving for a TRO.[16]  *See Citibank*, 756 F.2d at 276 ("[D]elay in seeking enforcement of those rights . . . tends to indicate . . . a reduced need for such drastic, speedy action.").  By then, Hurlock's retained expert admitted in late May 2025 that "[t]here have been no incoming or outgoing transactions" involving the subject LIBRA wallets "since February 16, 2025."  Ehrenhofer Decl. ¶ 36.  Thus, for more than three months between February 16 and May 27, no dissipation occurred.  It, therefore, defies logic and commonsense to believe that Hurlock faces some risk of irreparable harm from asset dissipation that did not occur for the more than three months before the Court issued the TRO in this matter.

E.    **HURLOCK HAS NOT SATISFIED THE ELEMENTS FOR ATTACHMENT UNDER NEW YORK LAW.**

Even if Hurlock had attempted to meet the requirements to attach assets under New York law made applicable by Rule 64 (*see* PI Mot. 12 (mentioning without analyzing Rule 64 and NY CPLR § 6201(1))), he could not do so.  An asset freeze under New York state law requires the plaintiff to demonstrate (among other elements) that:  "(1) it has stated a claim for a money judgment; (2) it has a probability of success on the merits; [and] (3) the defendant, 'with the intent to defraud his creditors or

---

[15] *See supra* Part II.A.

[16] *See supra* Part II.D.

frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered, or secreted property, or removed it from the state or is about to do any of these acts.'" *DLJ Mortg. Cap., Inc. v. Kontogiannis*, 594 F. Supp. 2d 308, 318–19 (E.D.N.Y. 2009) (quoting N.Y. C.P.L.R. §§ 6212(a), 6201(3)).   The plaintiff seeking an attachment "bears a heavy burden in attempting to establish [their] right to an attachment, because New York attachment statutes are construed strictly against those who seek to invoke the remedy." *Ally Bank v. Reimer*, No. 09-CV-2795, 2010 WL 446025, at *2 (E.D.N.Y. Jan. 29, 2010).   The moving papers must contain the requisite "evidentiary facts—as opposed to conclusions—proving the fraud." *Colon v. Cole Bros. Circus, Inc.*, Nos. 03-CV-3606 et al., 2007 WL 3014706, at *2 (E.D.N.Y. Oct. 12, 2007).

A plaintiff seeking an attachment pursuant to C.P.L.R. 6201(3) must demonstrate that the defendant has concealed or is about to conceal assets, or has acted to frustrate a potential judgment. *St. John's Capital Corp. v. 1365-1369 St. John's Place LLC*, 184 N.Y.S.3d 592 (Sup. Ct. Kings County Mar. 20, 2023).   "Affidavits containing allegations raising a mere suspicion" to do these things are insufficient. *Id.* (denying attachment because plaintiff's assertions did not establish that the defendant intended to defraud, frustrate judgment enforcement or "assign, dispose of, secret, or remove property" (citing *Societe Generale Alsacienne De Banque, Zurich v. Flemingdon Dev. Corp.*, 118 A.D.2d 769 (2d Dept 1986))); *but cf. Foukas v. Foukas*, No. 20-CV-05516, 2024 WL 3813253, at *6–7 (E.D.N.Y. July 26, 2024) (inferring intentional fraud through "the existence or cumulative effect of a pattern or series of transactions" disposing of property for less than fair value after litigation began), *R&R adopted*, 2024 WL 4315026 (E.D.N.Y. Sept. 27, 2024).

Hurlock provides no evidence that Davis holds or ever held any intent to dissipate or use the $LIBRA assets other than for the purposes for which they were originally intended, let alone a series of transactions disposing of or hiding assets evincing fraudulent intent.   Rather, Hurlock's own expert establishes that the $LIBRA assets have remained untouched since mid-February. There is no evidence that Davis intends to flee the country.   Mr. Treanor's wild speculation that Davis *might* flee or take assets as a response to a federal civil action or to service of process concerning the same is unfounded.

Indeed, Hurlock's prior representation that "Davis has evaded attempts at service" (PI Mot. 15)

is contradicted by the docket, which reflects *no specific evidence of evasion* (otherwise, one would have expected a motion for substituted service), and is undone by the fact that Davis appeared *prior to being served*; ultimately, undersigned counsel of record accepted service on his behalf.  ECF No. 85.  None of the events that Mr. Treanor wildly projected, and on which the TRO was based, have come to pass.  There is no evidence that Davis intends or ever intended to take the $LIBRA assets to "enrich himself" as claimed by Hurlock.  In short, other than broad conclusions, Hurlock has not provided the Court with any *evidence* that Defendant Davis *will* transfer or secrete any of the $LIBRA assets.

An  attachment cannot be issued as an alternative to an injunction.  Hurlock has not shown a probability of success on the merits.  *See supra* Part IV.C.  Hurlock has not shown the intent to defraud creditors or frustrate any future enforcement efforts.  And Hurlock has provided no evidence that Davis has concealed, taken, or removed assets or intends to do so.

## F.    THE FREEZE INJUNCTION SOUGHT IS NOT NARROWLY TAILORED TO THE SOLE PLAINTIFF.

The Second Circuit instructs that "[i]njunctive relief should be narrowly tailored to fit specific legal violations."  *Davis v. Shah*, 821 F.3d 231, 265 (2d Cir. 2016) (affirming district court's decision but vacating and remanding its injunction "to allow the district court to craft a remedy more appropriately tailored").  "And the rule that injunctive relief should be narrowly tailored to prevent harm *to the parties before the court* 'applies with special force where,' as here, 'there is no class certification.'"  *Kane*, 19 F.4th at 174 (emphasis added).  For instance, in *Kane*, even though the case was styled as a class action, because plaintiffs had not yet "*moved for class certification*, so no class has been certified," the Second Circuit "decline[d] to expand the relief ordered . . . to cover nonparties to this litigation."  *Id.* at 173–74.

Thus, any injunctive relief should be tailored to freeze no more assets than necessary to provide complete relief to Hurlock.  *See id.* at 174 ("injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs").  Unfortunately, Hurlock did not even provide this Court with an affidavit or other evidence of his purchase, nor explained how he "lost" his $LIBRA asset.  The Court has no information as to whether Hurlock purchased $1 worth of $LIBRA

or $1,000 worth of $LIBRA. The Court has no information as to the price Hurlock paid for the $LIBRA. The Court has been provided with no information as to whether Hurlock purchased a freshly minted $LIBRA coin directly or whether he purchased $LIBRA from a seller on the secondary market, or at what point he purchased the $LIBRA.  Nor has the Court been provided with evidence that Hurlock sold his $LIBRA at a loss, the traditional means of showing loss causation. *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).

Typically, even if a plaintiff surmounted the obstacles to an injunction, any injunction would be narrowly tailored in favor of the only party before this Court, Hurlock.  Unfortunately, the Court has not even been provided with the amount of his investment, and therefore, no proper injunction can be fashioned on this record.  Finally, a bond of $100 to secure more than $100 million in assets and essentially block a significant project is insufficient to protect Davis's interests—the risk here is that the injunction will completely shut down the $LIBRA market (as the TRO already has) and cause serious harm to $LIBRA holders, and to the small Argentina businesses who await the review and decisions on their funding applications.  A single New York plaintiff should not be granted so much power, particularly on this woefully deficient evidentiary record.  Because the Court has not even been provided with this basic information, an appropriate injunction cannot be fashioned on this record.

## V.    <u>CONCLUSION</u>

Hurlock's motion for a preliminary injunction should be denied, and the TRO should be vacated.

*Signature and date on next page*

Dated: July 16, 2025

**SBAITI & COMPANY PLLC**

*/s/ Mazin A. Sbaiti*
**Mazin A. Sbaiti**
New York Bar No. 4339057
**George M. Padis**
Admitted *Pro Hac Vice*
2200 Ross Avenue – Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367
E: mas@sbaitilaw.com

**M. CRIS ARMENTA, P.C.**
M. Cris Armenta
*Pro Hav Vice forthcoming*
217 Clancy Way
Bozeman, Montana 59718
T: (310) 488-2080
F: (310) 421-1021
E: cris@crisarmenta.com

***COUNSEL FOR HAYDEN DAVIS***

<u>**CERTIFICATE OF COMPLIANCE**</u>

In compliance with Local Civil Rule 7.1 of the United States District Courts for the Southern District of New York, I hereby certify that this brief contains 8,650 words, excluding the portions of the brief exempted by Local Civil Rule 7.1.

*/s/ Mazin A. Sbaiti*
Mazin A. Sbaiti