## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OMAR HURLOCK and ANUJ MEHTA, on behalf of themselves and all others similarly situated,<br><br>    *Plaintiffs*,<br><br>v.<br><br>KELSIER LABS, LLC, d/b/a KELSIER VENTURES, HAYDEN MARK DAVIS, GIDEON DAVIS, CHARLES THOMAS DAVIS, METEORA, *an unincorporated association*, and BENJAMIN CHOW,<br><br>    *Defendants*. | Case No. 1:25-cv-03891-JLR<br><br>Rel: 1:25-cv-03268<br><br><br>JURY TRIAL DEMANDED |

## AMENDED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 4

JURISDICTION AND VENUE........................................................................................... 8

PARTIES ............................................................................................................................... 9

      A.     PLAINTIFFS......................................................................................... 9

      B.     DEFENDANTS..................................................................................... 10

      C.     RELEVANT NON-PARTIES ............................................................. 12

      D.     JURISDICTIONAL ALLEGATIONS.................................................. 15

BACKGROUND ALLEGATIONS ..................................................................................... 16

  I.  THE SOLANA BLOCKCHAIN....................................................................... 16

  II. DECENTRALIZED FINANCE ("DEFI") ON SOLANA ............................. 19

      A.     TRADING INFRASTRUCTURE...................................................... 19

      B.     MEMECOIN LAUNCHES ............................................................... 21

  III. RETAIL INVESTING ................................................................................... 24

  IV. THE "METEORA DEFENDANTS" ............................................................. 27

      A.     MERCURIAL FINANCE ................................................................ 28

      B.     JUPITER ........................................................................................... 29

      C.     METEORA....................................................................................... 31

          1.   The Dynamic AMM Program................................................... 34

          2.   The DLMM ............................................................................. 36

          3.   M3M3 "Stake2Earn" ............................................................... 40

      D.     CONTROL RELATIONSHIPS ........................................................ 41

DEFENDANTS' MISCONDUCT........................................................................................ 41

  I.  DEFENDANTS SECRETLY CONSPIRE TO CREATE A FALSE APPEARANCE OF TRUSTWORTHINESS IN METEORA MEMECOIN LAUNCHES AND THEN EXTRACT EXORBITANT PROFITS FROM RETAIL INVESTORS IN MEMECOINS LAUNCHED ON METEORA PROTOCOLS ............................................................... 41

  II. THE M3M3 PLATFORM FRAUD ................................................................ 43

  III. THE $M3M3 FRAUD.................................................................................... 51

      A.     DEFENDANT CHOW LEADS AN INTRICATE PLANNING PROCESS TO ILLICITLY EXTRACT PROFITS FROM THE $M3M3 TOKEN LAUNCH .......... 53

      B.     DEFENDANTS EXECUTE THE FRAUDULENT $M3M3 LAUNCH ON DECEMBER 4, 2024................................................................................ 56

C.    DEFENDANTS SERIALLY ARTIFICIALLY REINFLATE $M3M3 TOKEN PRICE AND TOUT THE M3M3 PLATFORM TO EXTRACT ADDITIONAL CAPITAL FROM RETAIL INVESTORS ................................................................. 60

IV. THE $LIBRA FRAUD ........................................................................................ 63

A.    DEFENDANT HAYDEN DAVIS LAYS THE GROUNDWORK FOR AN "ARGENTINA COIN" .......................................................................................... 63

B.    DEFENDANTS LAUNCH $LIBRA ON VALENTINE'S DAY .................... 70

C.    DISSECTING THE $LIBRA FRAUD ............................................................ 73

D.    THE CAPITAL EXTRACTION SCHEME ..................................................... 74

V. IN THE WAKE OF THE $LIBRA SCANDAL, DEFENDANTS ARE WIDELY PUBLICLY ACCUSED OF SERIAL FRAUD ................................................. 77

VI. CONTINUING FRAUD ..................................................................................... 83

VII.    CLASS ACTION ALLEGATIONS .............................................................. 85

A.    Numerosity ...................................................................................................... 86

B.    Typicality ........................................................................................................ 86

C.    Adequacy ......................................................................................................... 87

D.    Predominance and Superiority ....................................................................... 87

CAUSES OF ACTION ............................................................................................... 89

COUNT I.  Fraud - $M3M3 ............................................................................... 89

COUNT II.  Fraud - $LIBRA ............................................................................. 92

COUNT III.  Conspiracy to Defraud ................................................................. 93

COUNT IV.  RICO Section 1962(c) .................................................................. 94

COUNT V.  RICO Section 1962(d) ................................................................... 99

COUNT VI.  N.Y. G.B.L. §§ 349 and 350 - $M3M3 ..................................... 100

COUNT VII.  N.Y. G.B.L. §§ 349 and 350 - $LIBRA ................................... 102

COUNT VIII.  Unjust Enrichment - $M3M3 .................................................. 104

COUNT IX.  Unjust Enrichment - $LIBRA .................................................... 104

PRAYER FOR RELIEF ............................................................................................ 105

DEMAND FOR JURY TRIAL ................................................................................. 109

Plaintiffs Omar Hurlock and Anuj Mehta, on behalf of themselves and all others similarly situated, bring this class action lawsuit against Defendants Kelsier Labs LLC d/b/a Kelsier Ventures ("Kelsier"), Hayden Davis, Gideon Davis, and Charles Thomas Davis (together with Kelsier, the "Kelsier Defendants") and Defendants Benjamin Chow and Meteora (together, the "Meteora Defendants").  Plaintiffs' allegations are based on personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiffs' undersigned counsel, which included, without limitation: review and analysis of publicly available information concerning Defendants and the digital assets at issue herein.

## **INTRODUCTION**

1.     This is a civil RICO action in which coordinated enterprise of digital asset insiders engineered and operated predatory infrastructure to defraud investors in decentralized finance ("DeFi") markets otherwise known as "internet capital markets" on the Solana blockchain.

2.     At the core of this enterprise are two lead actors: Benjamin Chow, the CEO of the Meteora, and Hayden Mark Davis, the public face of Kelsier Ventures. Together, they forged a partnership that combined technical sophistication with mass-market promotional reach to execute a series of calculated frauds.

3.     This enterprise is not merely a collection of dishonest transactions or isolated bad actors. It is a purpose-built system designed for the sole purpose of simulating legitimacy while enabling extraction of retail capital through insider control, false narratives, and technical obfuscation.

4.     Unlike traditional investment frauds, this enterprise developed and manipulated the financial infrastructure itself: controlling the price, spoofing asset liquidity, engineering the launch flow, and exploiting the transactional environment in which value was exchanged.

5.    The central technique Defendants employed was deceptively simple: simulate fairness, induce investment, and control the backend.

6.    On Meteora, every transaction is run through smart contracts that could be arbitrarily reconfigured or changed post-deployment. Defendants falsely suggested these systems were "decentralized," while retaining hidden upgrade authority via multisig wallets under their exclusive control.

7.    That meant liquidity could be frozen or unfrozen; pools could be configured with false parameters; fees could be routed to insiders; and wallets could be pre-approved for trading advantages.

8.    These capabilities weren't bugs. They were the features. They were deliberately preserved, and in many cases, customized, to enable Defendants to control token launches and manipulate markets in ways the public could not detect.

9.    Through token launches like $M3M3 and $LIBRA, Defendants built out a playbook for price manipulation and capital extraction that can now be described with forensic clarity.

10.    $M3M3 was marketed as the "debut token" of a revolutionary stake-to-earn system, promising retail holders access to passive income through transaction fees. The token was hyped as a tool for ending "player-versus-player" trading in DeFi—turning speculation into sustainable growth.

11.    But behind the scenes, Chow and Davis coordinated to freeze trading at launch, allowing insider wallets—funded by Kelsier—to secretly snipe the supply at artificially low prices. Once their wallets held over 95% of the token supply, they unthawed trading, inflated the price through artificial volume, and began dumping.

12.     The result was predictable: a catastrophic collapse in price for outside investors, who had no idea they were entering a rigged market that had already been conquered before the first trade.

13.     $LIBRA followed the same blueprint, but with even greater audacity. This time, Davis and Chow claimed to be launching Argentina's official memecoin—with supposed endorsement from President Javier Milei.

14.     Using custom tools in Meteora's Dynamic Liquidity Market Maker ("DLMM"), Defendants built single-sided liquidity pools that created false price curves. Surge pricing and bin manipulation allowed them to extract tens of millions in USDC and SOL from retail buyers during the first minutes of trading.

15.     The token's meteoric rise and rapid collapse were not natural market forces. They were engineered events—products of code configured to behave in precise, exploitative ways, by actors who controlled both the liquidity and the narrative.

16.     Defendants operated through an association-in-fact enterprise, bound by informal agreements, mutual profit-sharing, referrals, and shared infrastructure. Their communications— some pseudonymous, some public—documented the precise coordination necessary to pull off these schemes.

17.     In the case of $M3M3, the so-called "community launch" was executed through 150 insider wallets, pre-arranged by Chow, and funded and operated by Davis. These wallets executed buy orders while the token was frozen to outsiders, locking up control of the supply before the public even knew what had happened.

18.     Once control was consolidated, Defendants launched a wave of social media promotion, leveraging their reputations in the Solana community and claims of millions in "rewards" to entice outsiders into buying at inflated prices.

19.     The same happened with $LIBRA, where insider wallets were used to manipulate bin liquidity and extract over $100 million in user deposits in under 2 hours. All while Davis posted celebratory images with President Milei and claimed to be "changing the world."

20.     The Defendants exploited the public's trust in decentralized systems while secretly operating them as centralized instruments of manipulation.

21.     Chow personally designed many of the smart contracts while publicly claiming the system was permissionless and immutable.

22.     Davis brought the capital and credibility—often through manufactured political associations, celebrity outreach, and staged conversations with online influencers. His job was to make it look real.

23.     Together, they turned code into a weapon: a platform for technical fraud, dressed up in the language of crypto innovation.

24.     They did so repeatedly. They continue to do so. And they have publicly admitted their model is designed to deliver what Davis called "max extract".

25.     Their communications describe Solana memecoin trading not as a market, but as an opportunity to extract funds from retail users. To them, their victims were not traders—they were exit liquidity.

26.     As alleged herein, Defendants violated federal RICO laws by conducting the affairs of this enterprise through a pattern of racketeering activity, including wire fraud.

27.     Defendants conspired to defraud investors through coordinated and deceptive schemes, and their conduct constitutes deceptive acts and false advertising in violation of N.Y. Gen. Bus. Law §§ 349 and 350. As a direct and foreseeable result, Defendants were unjustly enriched at the expense of Plaintiffs and the putative class.

28.    The racketeering enterprise is ongoing. Despite public apologies and resignations, Defendants continue to profit from previously launched tokens and ongoing fee flows from Meteora protocols.

29.    Plaintiffs bring this action to expose and enjoin the infrastructure of predation—code written and marketed for the purpose of enabling fraud—and to recover damages on behalf of all those manipulated and defrauded by the Meteora-Kelsier Enterprise.

## JURISDICTION AND VENUE

30.    This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1964(c) because Plaintiffs assert claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962. This Court also has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $5,000,000, exclusive of interests and costs. This Court has subject-matter jurisdiction over state law claims asserted in this action under 28 U.S.C. § 1367(a).

31.    Defendant Chow is subject to this Court's general personal jurisdiction because he resides in this District.

32.    This Court has personal jurisdiction over Defendants Hayden Davis, Gideon Davis, Charles Thomas Davis, Meteora, and Kelsier under 18 U.S.C. § 1965 because at least one Defendant resides in this District and because the ends of justice so require. There is no District in which Plaintiffs' RICO claims could otherwise be tried in a single action because there is no District in which all Defendants in this action are subject to personal jurisdiction.

33.    This Court also has personal jurisdiction over all Defendants because they purposefully availed themselves of the United States and of the State of New York by: (a) conducting business activities from New York through Defendant Chow's residence and control of

Meteora operations from this District[1]; (b) actively recruiting personnel for New York-based positions, including Developer Relations roles specifically located in "New York, New York"[2] while also  targeting U.S. investors through promotional campaigns on U.S.-based social media platforms; (c) directing fraudulent schemes at U.S. retail investors through English-language promotional materials and U.S.-accessible trading platforms.

34.    Alternatively, to the extent that any Defendant is not subject to jurisdiction in any state's courts of general jurisdiction, this Court has personal jurisdiction over the Defendant pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure because the Court's exercise of jurisdiction is consistent with the United States Constitution and laws.

35.    This Court also has personal jurisdiction over non-resident Defendants under the conspiracy theory of jurisdiction because they conspired with Defendant Chow, a New York resident, to commit tortious acts, and the conspiracy was directed at causing injury in New York and throughout the United States. Non-resident Defendants purposefully participated in the conspiracy knowing that substantial effects would occur in New York.

36.    Venue in this district is proper under 18 U.S.C. § 1965(a) because Defendant Chow resides in this District, substantial acts in furtherance of the alleged violations occurred in this district, and the ends of justice require that the action be brought in this District where at least one defendant can be found.

## PARTIES

### A.    PLAINTIFFS

37.    Plaintiff Anuj Mehta is a resident of Arlington, Virginia.  Mr. Mehta first received $M3M3 tokens when they were airdropped to his wallet on December 4, 2024.  He first purchased

---

[1] Appendix E (Ben Chow LinkedIn Profile)

[2] Appendix G (On Demand Talent Job Posting)

$M3M3 Tokens on December 5, 2024.  For about two and half months thereafter, Mr. Mehta executed multiple additional purchase and staking transactions in $M3M3 and several small sales.  Mr. Mehta unstaked and sold his entire $M3M3 investment on February 17 and 18, 2025.  He suffered approximate net losses of $19,164 on his $M3M3 investment.  Mr. Mehta used a Phantom wallet to transact in $M3M3 through the UIs provided by Phantom or Jupiter.

38.  Plaintiff Omar Hurlock is a resident of Brooklyn, New York.  On February 14, 2025, Mr. Hurlock used two Phantom wallets to purchase and sell $LIBRA tokens through the UI's provided by Phantom or Bullx, from Brooklyn, NY.  Specifically:

Wallet 1:  Between approximately 5:32 pm and 5:36 pm on February 14, 2025, Mr. Hurlock used one wallet to execute four $LIBRA purchases.  He swapped a cumulative total of 0.145 wSOL for 4.855198 $LIBRA in those transactions.[3]  At approximately 9:15 pm that night, Mr. Hurlock used that same wallet to sell 4.855198 $LIBRA—the entire amount of his earlier purchases—and received 0.013961194 wSOL in return.  Thus, in less than four hours, Mr. Hurlock lost 0.132 wSOL on his "Wallet 1" $LIBRA investment.  All of Mr. Hurlock's "Wallet 1" transactions were routed through the Meteora DLMM.

Wallet 2:  At approximately 5:31 pm on February 14, 2025, Mr. Hurlock used a second wallet to purchase 27.621519 $LIBRA and paid 0.495 wSOL.  At about 6:00 pm, Mr. Hurlock sold all of those $LIBRA tokens and received 0.329494247 SOL in return.  Thus, in under 30 minutes, Mr. Hurlock lost approximately 0.17 wSOL on his Wallet 2 $LIBRA investment.  Mr. Hurlock's "Wallet 2" "purchase" transaction was routed through Raydium and his "sale" transaction was routed through Jupiter.

### B.  DEFENDANTS[4]

39.  Defendant Meteora is an unincorporated association with capacity to sue and be sued under federal law and New York law.  Its members are individuals or entities that direct and control the development, deployment, and operation of Meteora programs on the Solana

---

[3] "wSOL" refers to wrapped Solana.  "Wrapped" tokens like wSOL are commonly used in connection with decentralized exchanges to allow native assets like SOL to participate in more versatile transactions than the native asset allows.  SOL can be easily converted to wSOL and wSOL can be easily converted to SOL.

[4] **APPENDIX A** sets forth a list of relevant social media platforms, channels, handles, and usernames used by Defendants and their associates, together with the person(s) that control the content published on those channels and under those handles and usernames.  Online content described or reproduced herein that was published on those channels or under those handles or usernames is alleged to have been published by, or under the direction of, the associated "control persons" identified in Appendix A.

10

blockchain.  They include, but are not limited to, Defendant Chow, and non-parties Ming Yeow, Zhen Hoe Yong, Siong Ong, Raccoon Labs, Block Raccoon, Dynamic Labs, and DLL.  Meteora is also the successor to Mercurial Finance, an unincorporated association co-founded in 2021 by Defendant Benjamin Chow, non-parties Ming Yeow and Siong Ong, and others.  Following the collapse of Alameda Research (Mercurial's seed investor) and FTX (the exchange that hosted the launch of Mercurial's native token, MER), Mercurial Finance publicly "rebranded" as Meteora under the leadership of Defendant Chow starting in December of 2022.  Defendant Chow operated and controlled Meteora from this District continuously through at least February 16, 2025, when he publicly announced his resignation.  Meteora maintains a public website at https://www.meteora.ag/ (the "Meteora Website").  Meteora conducts business and ongoing activities in this District and throughout the United States.

40.    Defendant Benjamin Chow is a co-founder of Defendant Meteora, Mercurial Finance, and Jupiter; the recent-former CEO of Meteora; and a member of Defendant Meteora and non-party Jupiter.  Prior to his public resignation as Meteora CEO on February 16, 2025, Defendant Chow held primary control over and responsibility for the operations of Defendant Meteora, including but not limited to the operation of Meteora programs deployed on the Solana blockchain and the provision of related services by the "Meteora team."  Defendant Chow exercised that control from New York, New York, where he resides.  According to an attestation submitted in this action by Defendant Chow,  Mr. Chow "ha[s] a claim on a portion of [non-party] DLL's revenues, including a portion of any DLL revenues from trading fees received from Meteora user transactions."[5]  On information and belief, Defendant Chow also continues to control and direct

_____

[5] ECF No. 54, paragraph 3.

"Meteora" activities through his ownership interests in, and agreements with other members of Meteora and Jupiter.

41.      Defendant Kelsier Labs LLC, d/b/a Kelsier Ventures ("Kelsier"), is a family-run venture capital firm incorporated under Texas law in 2021. According to Kelsier's now-defunct website, located at Kelsier.io (the "Kelsier Website"), Kelsier catalyzes Web3 innovation through a combination of "go-to-market expertise" and "targeted investments."[6]

42.      Defendant Hayden Davis is a founder and the CEO of Defendant Kelsier. He is also the brother and son, respectively, of Defendants Gideon Davis and Charles Thomas Davis. On information and belief, Hayden Davis resides in Texas.

43.      Defendant Gideon Davis is a founder and the COO of Defendant Kelsier, and its registered agent for service of process. He is also the brother and son, respectively, of Defendants Hayden Davis and Charles Thomas Davis. On information and belief, Gideon Davis resides in the United States.

44.      Defendant Charles Thomas Davis is a founder and the Chairman of Defendant Kelsier. He is the father of Defendants Gideon and Hayden Davis. On information and belief, Charles Thomas Davis currently resides in Spain.

C.      RELEVANT NON-PARTIES

45.      Non-party Jupiter Finance ("Jupiter") is an unincorporated association with capacity to sue and be sued under federal law and New York law co-founded in 2021 by Defendant Chow and non-parties Ming Yeow and Siong Ong. Jupiter's members are engaged in the development, deployment, and operation of the Jupiter Protocol, the largest decentralized exchange ("DEX") aggregator on the Solana blockchain. Jupiter's members include, but are not

---

[6] *Kelsier Homepage, Kelsier* (https://kelsier.io/: 2024); archived at *Wayback Machine* (https://web.archive.org/) > https://kelsier.io/ > Home; citing a capture dated 15 February 2025.

limited to: Defendant Chow, and non-parties Ming Yeow, Zhen Hoe Yong, Siong Ong, Raccoon Labs, Block Raccoon, Dynamic Labs, and DLL.  Jupiter conducts business and ongoing activities in this District and throughout the United States.  Jupiter maintains a website located at https://jup.ag/ (the "Jupiter Website").

46.    Non-Party Ming Yeow is a well-known pseudonymous developer and entrepreneur publicly known as "Meow."  Mr. Yeow co-founded Mercurial Finance, Meteora, and Jupiter.  He is a member of Meteora and Jupiter.  He has served as Jupiter's CEO since February of 2023 and is primarily responsible for its operations.  Mr. Yeow is also the President and a Director (one of three) of non-party Block Raccoon and a Director (one of two) of DLL.

47.    Non-Party Zhen Hoe Yong is Defendant Chow's successor as the senior principal of Defendant Meteora and a member of Meteora and Jupiter. Mr. Hoe Yong is also the sole shareholder and a Director (one of two) of non-party Raccoon Labs.

48.    Non-party Siong Ong is a co-founder of Jupiter.  Mr. Ong is also a Director of Block Raccoon (one of three) and a Director of non-party DLL (one of two).

49.    Non-party Raccoon Labs Pte. Ltd. ("Raccoon Labs") is an entity incorporated under Singaporean law on April 19, 2021.  Raccoon Labs changed its name on February 11, 2022: previously, it was called "Wow Cats Labs Pte. Ltd."  Raccoon Labs maintains a website located at: https://raccoons.dev/ (the "Raccoon Labs Website").  Raccoon Labs employs personnel that develop, operate, and deploy "Meteora" and "Jupiter" programs and that provide related services, including multiple U.S.-based personnel, and has done so throughout the period relevant to this action.  Raccoon Labs has two Directors, one of whom is non-party Zhen Hoe Yong, the principal of Meteora.  Mr. Hoe Yong is also the sole shareholder of Raccoon Labs.

50.    Non-party Block Raccoon S.A. ("Block Raccoon") is an entity registered under Panamanian law in 2023.  Two of its three Directors are non-parties Siong Ong and Ming Yeow.

Mr. Yeow is also Block Raccoon's president.  On information and belief, Block Raccoon receives revenues generated on Jupiter platforms.

51.     Non-party Dynamic Labs, Inc. ("Dynamic Labs") is a financial technology company incorporated under Delaware law on December 9, 2021, with funding from a16z crypto, Founders Fund, and Solana Ventures.  According to the Disclaimer published on the Meteora Website, Dynamic Labs built much of the code underlying "Meteora."[7]

52.     Non-party Dynamic Labs, Ltd. ("DLL") is an entity incorporated on March 8, 2021 in the British Virgins Islands under the BVI Business Companies Act of 2004.  On information and belief, DLL is affiliated with Dynamic Labs.  DLL has two Directors: Jupiter co-founders Ming Yeow and Siong Ong.  According to an attestation submitted in this action by Defendant Chow, DLL automatically receives certain transaction fees from Meteora liquidity pools, which are "automatically transfer[red]" by "Meteora software" to a "program account controlled by DLL."[8]

53.     Non-party KIP Protocol Limited ("Kip Protocol") is a Web3 technology company based in Singapore and chartered in Hong Kong SAR China, specializing primarily in blockchain infrastructure tailored for artificial intelligence applications.

54.     Non-party Julian Peh is the founder and CEO of KIP Protocol.

55.     Non-party DeFi Tuna is a Solana-based DeFi company that launched in January of 2025 with seed funding from Defendant Kelsier Ventures and others.  DeFiTuna co-founder Moty Povolotsky has since publicly stated that DeFiTuna returned Kelsier's investment.

56.     Non-parties Vlad Pozniakov and Moty Povolotsky are the co-founders of DeFiTuna.

---

[7] *Meteora Disclaimer*, *Meteora* (last visited July 28, 2025), https://www.meteora.ag/disclaimer.

[8] ECF No. 54, paragraph 3.

57.     Non-party the Solana Foundation (the "<u>Solana Foundation</u>") is a non-profit foundation incorporated under Swiss law, based in Zug, Switzerland, dedicated to the decentralization, adoption, and security of the Solana ecosystem.  The Solana Foundation invests in companies and projects that build Solana-based programs and protocols that increase users and transaction volumes on the Solana blockchain.  The Solana Foundation maintains a website at <u>https://solana.org/</u>.

**58.**     Non-party Solana Labs, Inc. ("<u>Solana Labs</u>") is a Delaware corporation formed in 2018 with offices in San Francisco and New York City.  Solana Labs develops, manages, and operates the Solana Blockchain and core "Solana" programs and protocols, including its "Tower BFT" consensus mechanism**.**  Since 2023, Solana Labs has maintained "a "four-story high-tech" office space in lower Manhattan for Solana-based companies to "demonstrate [its] commitment to fostering the crypto ecosystem in New York."[9]  Solana holds a substantial reserve of SOL.  Solana Labs maintains a website at <u>https://solana.com/</u> (the "<u>Solana Labs Website</u>").

## D.    JURISDICTIONAL ALLEGATIONS

59.     Defendants Meteora and Chow conducted continuous business operations from New York, with defendant Chow maintaining his residence and professional presence in New York, while controlling Meteora programs and executing fraudulent schemes from this district.[10]  Meteora actively recruited for New York-based positions and maintained regular business activities targeting the New York market.[11]

---

[9] *Solana Labs Unveils New 25,000-Square-Foot, 4-Story Community Office Space in Lower Manhattan*, *PR Newswire* (May 11, 2023), <u>https://www.prnewswire.com/news-releases/solana-labs-unveils-new-25-000-square-foot-4-story-community-office-space-in-lower-manhattan-301821800.html</u> (last visited July 26, 2025).

[10] Appendix E (Ben Chow LinkedIn Profile)

[11] Appendix G (On Demand Job Posting)

60.     The Kelsier Defendants purposefully directed their activities toward New York and U.S. markets by: (i) partnering with New York-based Defendant Chow; (ii) funding manipulation schemes targeting U.S. investors; (iii) utilizing U.S.-based social media platforms and cryptocurrency exchanges; (iv) executing blockchain transactions processed substantially through U.S.-based validators and infrastructure; and (v) creating and disseminating promotional materials specifically designed to attract U.S. retail investors.

61.     Defendant Chow has maintained substantial and continuous ties to New York, operating as a founder and entrepreneur from this District.[12] His professional activities have been conducted from his New York base of operations. Meteora's business operations have included active recruitment for New York-based positions, demonstrating its purposeful engagement with the New York market and workforce.

## BACKGROUND ALLEGATIONS

### I.     THE SOLANA BLOCKCHAIN

62.     Blockchains are ledger systems that record transactions in a secure, transparent, and immutable manner. Through cryptographic methods, blockchains ensure a continuous and verifiable record of activity.

63.     Blockchains are "decentralized," meaning that transactions are validated using multi-participant consensus mechanisms.  Blockchains are also "distributed," meaning that they are shared across a network of independent computers (or "nodes"), each of which has a copy of the entire ledger (or a portion thereof, depending on the blockchain).

---

[12] Appendix H (Ben Chow Professional Profile)

64.      Blockchain technology has a wide variety of applications. Most relevant here, blockchains are used to launch and transact in digital assets. Different blockchains record transactions of different types of crypto assets. A single unit of a crypto asset is called a "token."

65.      Investors use electronic "wallets" to transact in crypto assets, to authorize or "sign" transactions, and to interact with DeFi protocols and decentralized applications ("dApps") that run on Solana. [13]   Wallets are publicly identified by unique alphanumeric strings (the wallet's "address"). Thus, in general, transactions on public blockchains are publicly viewable, but only as transactions between alphanumeric wallet addresses. The identities of the parties that own and control those wallets are generally not public.

66.      The transactions at issue in this action were executed and recorded on the Solana blockchain. The Solana Blockchain was created by Solana Labs, which continues to maintain, operate, and develop it. Solana Labs also maintains, develops, and promotes the broader Solana "ecosystem," including by encouraging start-ups to build Solana-based DeFi protocols and tools; actively supporting and collaborating with them; and by operating core native "Solana" programs, like the BPF Upgradeable Loader and SPL Token Program.

67.      In May of 2023, Solana Labs issued a press release announcing a ribbon-cutting event for its new "high-tech glass-enclosed office space . . . at the intersection of Soho, the East Village, and the Lower East Side."[14]   Three of its four floors are "reserved for web3 companies building in the Solana ecosystem to co-work, collaborate, and host events."[15]   The Solana Labs office space opened that November.[16]

---

[13] A decentralized application runs on a blockchain network instead of a traditional server.

[14] *Solana Labs*, *PR Newswire*, supra note 9.

[15] *Id.*  The space opened in November of 2023

[16] *Solana Labs Opens Manhattan Office Space to Foster Web3 Collaboration and Innovation*, *SolanaFloor* (Nov. 20, 2023),   https://solanafloor.com/news/solana-labs-opens-innovative-office-space-in-lower-manhattan-to-foster-web3-collaboration-and-innovation (last visited July 29, 2025). ("The New York office shows our commitment

68.    Different blockchains have different configurations and comparative advantages. Compared with other major blockchains like Ethereum, Solana has three principal salient features: it can process a very large number of transactions per second; it has relatively low baseline transaction fees (*i.e.*, the fees charged by the Blockchain itself to process and validate transactions); and it is relatively easy to build protocols and dApps that run on Solana.  Related, the Solana blockchain is designed for "easy composability," which means that different programs can reference or integrate with each other easily.  According to the Solana Website, the Solana blockchain is thus "made for mass adoption."[17]

69.    The Solana blockchain's native cryptocurrency is denominated "SOL.[18]  Introduced in March of 2020, SOL is the primary mechanism for paying transaction fees, interacting with DeFi protocols, and transferring value on the Solana blockchain.  Every transaction executed on the Solana blockchain incurs a baseline associated fee paid in SOL.  A portion of those fees are distributed to validators (described below) as compensation for processing and confirming transactions executed on the Solana blockchain.

70.    The Solana blockchain is a "proof of stake" blockchain.  As in all "proof of stake" blockchains, validators on Solana are required to "stake"—that is, lock up—SOL, effectively as collateral.[19]  Alternatively, investors can "delegate" staked SOL to a validator. Validators (and their respective delegators) earn rewards on their staked SOL in exchange for accurate work by the validator.  Alternatively, validators (and their delegators) can be penalized for malicious behavior

---

to fostering the crypto ecosystem in New York. At a time when most are shying away from office space, we're doubling down and making sure early-stage entrepreneurs have a place to build and collaborate," said **Raj Gokal, co-founder of Solana Labs.")**

[17] *Solana Homepage*, *Solana.com* (last visited July 18, 2025), https://www.solana.com.

[18] Crypto assets are typically designated by three- or four-letter symbols, like stocks.

[19] "Staking" generally occurs in two contexts:  securing proof-of-stake blockchains like Solana and DeFi.  In the DeFi context, for example, the liquidity needed to operate digital asset exchanges is generally provided by investors who "stake" their assets in return for a portion of the trading fees earned on the exchange.

or inaccurate performance.  The Solana blockchain is "public," meaning that it operates on a permissionless basis and thus permits any user to join the network by staking SOL, validating transactions, and thus contributing to network security.

71.     Digital assets on Solana are created using the Solana Program Library ("SPL") standard, which is a collection of smart contracts (or programs) that govern the mechanics of tokens on Solana—for example, how they are created, transferred, or frozen—and ensure interoperability.  A "Token Address" or "Contract Address" is a unique alphanumeric address that identifies SPL digital assets, like $M3M3 or $LIBRA.  It is created when the token is first minted and does not change.

72.     SPL tokens have corresponding "token accounts," which are on-chain accounts that hold a single type of SPL token owned by a single wallet.  Thus, a single wallet containing three different types of Solana-based tokens would have three associated token accounts, one for each type of asset.  The associated wallet is identified as the "owner" of each token account.

73.     As a technical matter, transactions in Solana-based digital assets—like $M3M3 and $LIBRA—are final when the "block" in which they are embedded is finalized on the Solana blockchain.  That, in turn, requires the affirmative vote of a super-majority of stake-weighted validators.  A significant proportion of Solana validators are located in the U.S.  An even larger proportion of the staked SOL that enables Solana validators belongs to U.S. investors.  The voting process that finalizes each block on the Solana blockchain is conducted through Solana's unique "Tower BFT" consensus mechanism, which is designed, deployed, upgraded, and maintained by Solana Labs.

## II.    DECENTRALIZED FINANCE ("DEFI") ON SOLANA

### A.    TRADING INFRASTRUCTURE

74.     Decentralized exchanges ("DEXs") are blockchain-based protocols that allow investors to trade digital assets without relying on an intermediary.  In contrast to centralized exchanges, DEXs do not require investors to transfer custody of their crypto assets to a third party.

75.     Automated Market Makers ("AMMs") are one type of DEX.  AMMs function by maintaining pools of crypto assets ("Liquidity Pools") and holding themselves open as willing to facilitate trades in those assets on a continuing basis.  AMM's do not "match" buy and sell orders. Instead, in an AMM, trades are executed algorithmically by smart contracts (defined below).  The code of those smart contracts sets the applicable trading "rules," like the methodologies for determining asset prices and trading fees, and for distributing those fees as profits or yields to different stakeholders.

76.     A "DEX Aggregator" or "Router" is a DeFi protocol that routes traders' orders across multiple available DEXs and purports to select the best option for the trader.  Non-party Jupiter is the leading DEX Aggregator on the Solana blockchain.

77.     The crypto assets in AMM Liquidity Pools are provided by investors ("Liquidity Providers"), who stake their crypto assets in a particular protocol, generally in return for a portion of the trading fees generated by the liquidity pools in which their assets are staked.

78.     Standard AMM liquidity pools are "two-sided," meaning they contain equal values of two digital assets and facilitate trades between those assets.  The price of each asset (in terms of the other asset) automatically adjusts based on supply and demand within the liquidity pool.

79.     A "smart contract" is a computer program run on a particular blockchain that enforces the terms of an agreed transaction by executing automatically when the relevant conditions are met.  Smart contracts are sometimes described as "immutable" because their code cannot be changed once they are deployed on the blockchain.  Critically, however, smart contracts

(or programs) deployed on Solana can be "upgraded"—i.e., changed. Upgradeable smart contracts are not immutable.

80.     On Solana, smart contracts are also called "<u>Programs</u>." Programs on Solana have a public address (the "<u>Program Address</u>") and a separate data account, which stores the program's underlying code. As a result of that separation, deployed Programs can be "upgraded"—that is, modified—without altering their Program Address.

81.     When a program is deployed on Solana, the program's deployer specifies an "upgrade authority." Thereafter, the "upgrade authority" can modify the deployed program by "signing" an "upgrade" transaction. The upgrade authority's signature or signatures are validated by Solana's BPF Upgradeable Loader, which then replaces the code in the program's data account with the new code authorized in the "upgrade" transaction.

82.     "Upgrade authority" can be assigned to a single wallet or to a "<u>Multisig</u>," which is a smart contract that (usually) requires more than one wallet address to "sign" a transaction. Multisigs typically require signatures from the majority of a limited number of authorized signatories in order to approve a transaction.

**B.     MEMECOIN LAUNCHES**

83.     "Memecoins" are cryptocurrencies inspired by internet memes, jokes, or pop culture. Unlike established cryptocurrencies such as Bitcoin (BTC), Ethereum (ETH), and SOL, which have clear use cases and established ecosystems, memecoins often emerge as viral sensations, gaining popularity through online communities, celebrity endorsements, and promotional campaigns. Like all digital assets, memecoins exist only online, where they are created, purchased, and sold.

84.     Most memecoins are created and launched on the Solana blockchain due in part to its comparative advantages over other blockchains, *i.e.*, its high transaction speeds, low fees, and the relative ease of building DeFi protocols and dApps on Solana.

85.     In general, a basic memecoin launch on Solana requires only a few steps.

86.     *First*, "minting" tokens using Solana's SPL Token Program.  Among other things, minting establishes the asset's name and symbol (*e.g.*, "$M3M3") and the size of its "token supply," which is the total number of tokens, or individual units, of the new asset.

87.     The wallet used to mint the asset (the "Mint Wallet") can retain, renounce, or delegate certain important types of "authority" or control over the new asset.  For example, the Mint Wallet has "mintAuthority"—the power to mint additional tokens—unless it renounces that authority (by setting it to "null") or transfers it to a different wallet or MultiSig.  Likewise, the Mint Wallet has "freezeAuthority"—the power to freeze all Token Accounts holding tokens generated by the Mint Wallet unless the Mint Wallet's owner renounces that authority (by setting it to "null") or transfers that authority to a different wallet or MultiSig.

88.     *Second*, "launching" the token.  Most Solana memecoins are launched on "launch platforms" like those offered by Meteora.  Prior to launch, the creator or launch team creates and configures a "launch pool," which is a type of liquidity pool.  For two-sided launch pools, the launch team decides the type and amount of "base liquidity" to deposit alongside the newly-minted token.  Those decisions, together with token supply size, determine the new asset's initial price.  Most launch platforms allow token creators to publicly "lock" base liquidity (for two-sided launch pools) or a portion of the newly-minted tokens (for single-sided launch pools).

89.     *Third*, the creator publicizes the new memecoin, generally by promoting it on social media and publishing information needed to buy it—most often, its Token Address.

90.     Professionalized memecoin launches are significantly more complicated.  They generally require a professional launch team, including a market-maker, a marketing lead, and a technical lead.

91.     In theory, the role of a "market maker" is to help ensure continuous liquidity in a particular market.  They do this by providing liquidity and participating on both the buy-sides and sell-sides of transactions in the asset for which they are performing the market-making function. In traditional finance, market-makers quote bid and ask prices and profit from the spread.  In DeFi, the market-making functioning is often automated—*e.g.*, through an AMM.

92.     In the specific context of a memecoin launch team, the market-maker selects the launch platform and then develops, funds, and implements a "liquidity strategy" appropriate to the asset and launch platform.

93.     The marketing lead deploys a network of pre-selected Key Opinion Leaders ("KOLs") to publicize the new memecoin at its launch, and at strategic times thereafter, to increase investor interest and demand for the new memecoin.

94.     The technical lead works with the market-maker to design and operationalize launch mechanics.   When the launch is conducted on a highly technically complex launch platform, such as those offered by Defendant Meteora, a technical lead with proficiency in the particular platform is often essential to designing and implementing liquidity strategy.

95.     The launch team necessarily influences the price of a memecoin to some extent. By deciding token supply and the composition of a two-sided launch pool, for example, the market-maker establishes the memecoin's initial price.

96.     Other activities are widely viewed as illegitimate and—when conducted by any member of the launch team—as fraud.

97.     These include:

a) "Front-running" or using insider information to purchase tokens before they are generally public available;

b) "Sniping," which is ultra-fast purchasing of new tokens, usually with the goal of profiting from an anticipated short-term spike in price. Sniping often occurs in the moments immediately after a new memecoin is first publicly announced. Sniping before any such public announcement generally requires insider information (*i.e.*, advance access to the Token Address for the new asset).

c) "Pump-and-dump," which is a concerted effort to drive up an asset's price in order to quickly sell large quantities of the asset, without warning, tanking its price;

d) "Rug pull," which is when a launch team suddenly withdraws liquidity from a launch pool or disables trading in a new asset, leaving purchasers without any ability to sell it;

e) "Wash trading," or creating the false appearance of high transaction volume and high demand by executing multiple sale transactions between wallets under common ownership or control.

## III.    RETAIL INVESTING

98.    Retail investors discover and acquire information about memecoins and other digital assets online (which is where they exist).

99.    Most retail investors learn about the existence of newly-launched Solana memecoins in one of four ways: (i) from "crypto twitter," which is a term that describes the collection of well-known Solana community leaders, investors, analysts, and promoters with large numbers of "followers" on X[20]; (ii) from a "private" online group comprised of retail digital assets investors who share information and analysis with each other; (iii) by receiving the new token in a promotional "airdrop"; or (iv) from a token screening service, like DEX Screener.

---

[20] Promotional content on "crypto twitter" is sometimes also published on other social media channels, like YouTube and TikTok.

100.    For example, Plaintiff Anuj Mehta first learned about $M3M3 when Defendants airdropped $M3M3 tokens to his wallet on December 4, 2024.  Plaintiff Omar Hurlock first learned about $LIBRA from other members of his private online investment group.

101.    To purchase Solana-based memecoins, retail traders use UIs provided by their wallets, like Phantom, or by a DEX Aggregator (typically Jupiter) or by DEX Screener.[21]

102.    For trades routed through Meteora liquidity pools and launch pools this is often the case.  In contrast to some DEXs on Solana—like Orca or Raydium—the UI's provided by Defendant Meteora are oriented towards liquidity providers—including launch teams and market-makers—which are its primary customers.

103.    To execute the purchase transaction, retail investors select (or set up) a wallet and either purchase or transfer SOL into that wallet.  From there, the steps required depend on the functionality of the investor's chosen wallet and UI.[22]  Some wallets offer a simple "swap" function that permits the user to exchange their SOL for the new memecoin, and to pay the associated transaction fee, without ever leaving their wallet UI.  Phantom is one such wallet: it connects to Jupiter on the backend, which then routes the investor's trade.  Alternatively, users can "connect" their wallet to a DEX Aggregator like Jupiter.

104.    For example, Plaintiff Mehta executed some $M3M3 transactions using the UI provided by his Phantom wallet (which connects on the back end to Jupiter).  He executed other $M3M3 transactions through the Jupiter UI directly.  Plaintiff Hurlock transacted in $LIBRA using the UIs provided by his Phantom wallet and by Bullx.

---

[21] *See example of Phantom UI.*  https://www.testingcatalog.com/phantom-wallets-refreshed-look-and-feel-new-colours-and-updated-ui-elements/

[22] *See generally Solana Wallets, Solana.com* (last visited July 29, 2025), https://solana.com/tr/wallets

105.    Retail traders generally know virtually nothing about the liquidity pool that executed their trade.  Many UIs do not make clear which DEX was used.  Others, like Jupiter's DEX Aggregator, do provide routing information.

106.    To evaluate new Solana memecoins, retail traders generally rely on several qualitative and technical factors.

107.    On the qualitative side, retail investors rely heavily on public endorsements from and investments by trusted Solana community leaders, like Defendant Chow.  For example, Plaintiff Mehta purchased $M3M3 based on Defendant Chow's endorsement and his seemingly central involvement in and responsibility for $M3M3.  On information and belief, the same is true of all members of the $M3M3 Subclass.

108.    Increasingly, retail investors also rely heavily on public endorsements from high-ranking government officials.  For example, Plaintiff Hurlock purchased $LIBRA based on the seeming endorsement of Argentinian President Javier Milei, procured by Defendant Hayden Davis. On information and belief, the same is true of all members of the $LIBRA Subclass.

109.    Both types of endorsements are widely seen as indicia of value and of trustworthiness, *i.e.*, that the asset itself will be offered in a fair launch.

110.    On the quantitative side, retail traders generally rely on information provided by their chosen UI.  Those UIs, in turn, generally feature metrics and analysis provided by DEX Screener, which, in return for a fee, will provide "advance analytics" to token launch teams preparing to launch.

111.    Material here is that metrics seen on a wallet interface are impacted by token supply management done on platforms like Meteora.

112.    In an attempt to protect themselves against possibly fraudulent memecoin token launches, retail investors evaluate several well-known factors, often in reliance on DEX Screener

or a UI that presents information sourced through DEX Screener with respect to quantitative and analytical factors.

113.    For example, if the liquidity deposited by the launch team into a memecoin launch pool is "locked," that is a well-recognized sign that the team is not planning to execute a rug pull. If the Mint Wallet has "renounced" its freeze and mint authorities, those are likewise considered signs of a fair launch.  If the launch team has paid DEX Screener to provide investors with "advance analytics" of the new memecoin, that is a further indicator of legitimacy and good-faith intent on the part of the launch team.  Retail investors also consider "slippage," or the price impact of the time lapse between the moment a trade is placed and the moment it is executed, with lower "slippage" corresponding to lower risk.

114.    Similarly, when a launch team publicizes "tokenomics," or its planned allocation of token supply, and then publicly executes initial transfers that correspond to its publicized allocation plan, that is generally viewed by retail investors as a sign of a fair token launch. Likewise, when the team publicly reserves a percentage of token supply to itself, that is generally considered a commitment by the team *not* to also secretly acquire control over additional portions by token supply.

115.    The launch team's selection of launch platform and integrations are further signals. For example, prior to the $LIBRA scandal, Meteora was widely considered a leading memecoin launch platform and both Meteora Defendants were widely considered good-faith actors serving the broader Solana memecoin investing community, thanks in no small part to their promotional efforts in connection with the M3M3 Platform, described in detail below.  Integrations with purportedly pro-investor platforms, like the M3M3 Platform, was generally considered a sign that a launch team sincerely intended to benefit investors and did not intend to execute a rug pull.

## IV.    THE "METEORA DEFENDANTS"

A.    **MERCURIAL FINANCE**

116.    Defendant Chow and non-party Ming Yeow co-founded Mercurial Finance in early 2021, with seed investment from Alameda Research, the Solana Foundation, HTX, and OKX.[23] FTX—the now-bankrupt exchange started by Sam Bankman-Fried—hosted the launch of Mercurial Finance's native token ("MER") in May of that year.[24]

117.    Mercurial Finance was the first stablecoin-focused DEX on Solana.  Although initially successful, Mercurial Finance was heavily impacted by the collapse of FTX and Alameda Research, as were many other Solana-based DeFi protocols.[25]

118.    As a result, the team behind Mercurial Finance decided to rebrand.  On December 27, 2022, "Mercurial Finance" and Defendant Chow announced that Mercurial Finance would "relaunch" as "Meteora."[26]  Defendant Chow explained: "originally it was just going to be a product under Mercurial with the MER token but because of what happened with FTX that became a catalyst for us saying, 'Hey we really need a new token, not just a new product.'"[27]

---

[23] Meteora (@MeteoraAG*)*, Status update, *X* (May 13, 2021, 12:36 PM), https://x.com/MeteoraAG/status/1392711804611035136 (last visited July 26, 2025). ("Along with our seed investors @AlamedaResearch, @Solana Ecosystem Fund, @HuobiGlobal  and @OKEx, our supporters represent a wide range of key investors across Solana and the wider crypto ecosystem.  We'll work together to drive the adoption of stable assets in the Solana ecosystem"); *Investors*, *Mercurial Protocol* (last updated Oct. 18, 2021; last visited July 26, 2025), https://docs.mercurial.finance/mercurial/investors

[24] *See* FTX Official (@FTX_Official), Status update, *X* (May 13, 2021, 9:01 AM), https://x.com/FTX_Official/status/1395726477430116356 (last visited July 26, 2025).

[25] *See, e.g.*, Danny Nelson, *Solana DeFi Project Mercurial to Relaunch as 'Meteora,' Replace MER Token*, *CoinDesk* (Dec. 23, 2022), https://www.coindesk.com/business/2022/12/23/solana-defi-project-mercurial-to-relaunch-as-meteora-replace-mer-token (last visited July 26, 2025). ("Sam Bankman-Fried's highly-interconnected crypto exchange and hedge fund were kingmakers in the Solana DeFi ecosystem as top venture investors and market-makers. Their demise has gutted nearly every Solana-based trading protocol, including Mercurial, which issued its token in a sale hosted by FTX.")

[26] *Id.*

[27] *Id.* (quoting Defendant Chow).  The article identifies Mr. Chow as "the co-founder of sister protocol Jupiter Finance."

119.    As part of that rebrand, Mercurial Finance announced "The Meteora Plan:  Our comprehensive technology and token plan with the singular goal of building a long-term, sustainable, and composable yield layer for Solana."[28]

120.    Accordingly, "Mercurial Finance" retired its online handles, usernames, and channels (*e.g.*, @mercurialfi, on X) and replaced them with new "Meteora" handles, usernames, and channels.[29]

## B.    JUPITER

121.    As explained by its co-founder Ming Yeow in a lengthy "community update" published on December 15, 2023: "For those who are unaware, Jupiter is a new project..."[30]

122.    Jupiter offers multiple Solana-based DeFi products and programs, which generate substantial revenue.  For example, when a trade is routed through Jupiter's DEX Aggregator, Jupiter charges a fee.

123.    Most Solana wallets integrate Jupiter's routing protocols, such that a trade executed through the wallet's User Interface ("UI") is routed on the back end through Jupiter.[31]

124.    Like Defendant Meteora, Jupiter has gone to great lengths to publicly distance itself from its prior associations with FTX and Alameda Research and establish a reputation as

---

[28] Meteora (@MeteoraAG*)*, Status update, *X* (Dec. 27, 2022, 10:00 AM), https://x.com/MeteoraAG/status/1607753313872924675 (last visited July 26, 2025); *Meteora*, Unveiling The Meteora Plan, *Medium* (Dec. 27, 2022), https://meteoraag.medium.com/unveiling-the-meteora-plan-8b4164d8a5a5 (last visited July 26, 2025).

[29] *See, e.g.*, (Deprecated) Mercurial Finance (@MercurialFi), *X* (joined Feb. 2023; last visited July 26, 2025), https://x.com/MercurialFi. ("Old twitter account for Mercurial. We have transited to @MeteoraAG.  Follow us on our new account!").

[30] meow (@weremeow*)*, Status update, *X* (Dec. 15, 2023, 1:18 AM), https://x.com/weremeow/status/1735544950417436806 (last visited July 26, 2025).

[31] Those wallets include:  Phantom, Backpack, and Solfare, among others.

trustworthy, good-faith, and pro-investor leaders in the Solana community.  For example, Mr. Yeow

including the following in his December 15, 2023 community update:[32]



125.    In connection with the "sunsetting" or Mercurial Finance, Meteora and Jupiter

intentionally differentiated their respective brands and developed a suite of complementary

Programs and services.  In December of 2023, Mr. Yeow described that planned development as

follows:[33]

---

[32] *Id.*

[33] meow (@weremeow*)*, Status update, *X* (Dec. 4, 2023, 12:00 AM),
https://x.com/weremeow/status/1731538887124869208 (last visited July 26, 2025).



126.    Meteora's Dynamic Liquidity Market-Maker (DLMM) pools are wired directly into Jupiter**,** the leading Solana DEX-aggregator. Every time Jupiter searches for the best route, it can source liquidity from Meteora's pools; conversely, trades that originate on Meteora can flow out to Jupiter's other venues. These two-way plumbing drives higher swap volume through Meteora without users ever leaving Jupiter's interface, while giving traders deeper books and tighter spreads.

### C.    METEORA

127.    Meteora "launched" and Mercurial Finance "sunsetted" in February of 2023.[34]

128.    "Meteora" marked a fundamental shift in strategy: a pivot away from trader-oriented DEX's and a new focus on DEX-related infrastructure—specifically, on "composable"

---

34 https://meteoraag.medium.com/update-for-mercurial-stakeholders-as-of-feb-2023-2bf091627e52

technology that Liquidity Providers—including market-makers and token launch teams—could use to maximize their returns on the liquidity provided to DEX's.

129.    As of January 2025, the Meteora Website listed 14 Programs relevant to "interacting with Meteora." which are listed in **Appendix B**.[35]  The list included 9 Meteora Programs, 1 "Jupiter" Program and 4 Solana Programs.  Today, that same page lists only 11 Meteora Programs.[36]

130.    Three of those Programs are of central importance to Plaintiffs' claims in this action: the (i) the Dynamic Automatic Market Maker Pools Program ("Dynamic AMM")[37]; (ii) the Dynamic Liquidity Market Maker Program ("DLMM"); and the M3M3 stake-for-fee Program ("M3M3 Program").[38]

131.    The "owner" for all Meteora Programs is the BPF Upgradeable Loader, *i.e.*, the Solana Program that executes instructions to "upgrade" smart contracts by replacing their code, after verifying the signatures that authorized the upgrade.

132.    The "upgrade authority" for all Meteora Programs—including the Dynamic AMM, Meteora DLMM, and the M3M3 Program—is a 4-of-7 multisig (the "Meteora Program MultiSig").

133.    The Meteora Program MultSig is analogizable to a 7-member Board of Directors that requires a simple majority vote to pass measures.  Any four of its seven members (the "Meteora MultiSig Members") can make virtually any change to any Meteora smart contract or Program

---

[35] Appendix B sets forth the complete list of Meteora Programs listed on the Meteora Website either (i) as of January 2025 or  (ii) currently, together with each Program's Address and Upgrade Authority.

[36] *See Appendix B.*

[37] That program is now called "DAMM v1" on the Meteora Website. *See Meteora Developer Guide, Meteora (last visited July 26, 2025),* https://docs.meteora.ag/developer-guide/home. On Solscan, it's called the "Meteora Pools Program."  *See Meteora Pools Program, Solscan,* (last visited July 26, 2025), https://solscan.io/account/Eo7WjKq67rjJQSZxS6z3YkapzY3eMj6Xy8X5EQVn5UaB.

[38] That program is now called "Stake2Earn."  *See id.*

deployed by authorizing an "upgrade" transaction that replaces the Program's existing code with modified code.

134.    The Meteora MultiSig Members use the following wallet addresses:

(a)    5unTfT2kssBuNvHPY6LbJfJpLqEcdMxGYLWHwShaeTLi (the "<u>5unTF wallet</u>")

(b)    6g4uLg2cG2cajTqeaUVeXnruHDmP7x6k8ggGDczBUYRJ

(c)    7sYecjSokstySrPw5L6kGUw9ejrYmizNJmGdDnN4GNP5

(d)    CHRDWWqUs6LyeeoD7pJb3iRfnvYeMfwMUtf2N7zWk7uh (the "<u>CHRD wallet</u>")

(e)    E78rpWqVwE4ZBXtNAj21kqUnPJ5B9QPaRUBThPStWZ9w

(f)    GaQiRh5oWQjcfBj7kYjp1PH5yYgnWnNPwZD9sgdg2JBd

(g)    HDYFVeXXCDn5YB2QCsSrPAhCijjEw75tjPk4q4UzyHXv

135.    On information and belief, the 5unTF wallet is controlled by Jupiter.  It was used to deploy mockJup, a memecoin created and promoted by Jupiter.[39]

---

[39] *See* meow (@weremeow), Status update, *X,* (Jan. 20, 2024, 9:22 AM), https://x.com/weremeow/status/1748712653953135101, (last visited July 28, 2025).



136.    On information and belief, the CHRD wallet is controlled by Jupiter or Meteora.  It is also a "member" of multi-sigs that control Jupiter and Meteora holdings.[40]

137.    On information and belief, all of the Members of the Meteora MultiSig are likewise controlled by Meteora through its members or close affiliates.

138.    Thus, the Meteora Defendants and their close associates, including Jupiter, operate and control the Programs deployed on Meteora, including the Dynamic AMM, DLMM, and the M3M3 Program.

### 1.    The Dynamic AMM Program

139.    The Dynamic AMM is a constant-product AMM, which means it is comprised of two-sided liquidity pools that algorithmically adjusts in order to maintain equal values of the two digital assets it contains.

---

[40] *Owner Page: M3VLUmtWNmV5UXVOc3ZGMkJWWWRQdE1DMnhkOGVyUnhjOTdRejFlenFFcVQ=*, hosted on *Squads v3* (July 28, 2025) (Listing the CHRD wallet as an "Owner" of the Jupiter Community Cold Wallet); *Dashboard: RHB2ZktiZlBUcUV0NnR1NDF0am1ZVFpzcjZ6NnZXUm1EZmZnYlRCZ0ptMzk=*, hosted on *Squads v3* (last visited July 28, 2025) (Listing the CHRD wallet as an "Owner" of the Jupiter Team Cold Wallet).

140. Previously, Meteora defined "Memecoin Pools" as a "subset of Dynamic AMM Pools designed to support memecoin launches and liquidity."[41] Liquidity added to Memecoin Pools by a token launch team—*i.e.*, the base liquidity—was "permanently locked forever to help raise community confidence."[42] This "locked" base liquidity still generated fees.

141. Memecoin Pools assessed two types of transaction fees: (i) a "Dynamic Fee" and (ii) a "Protocol Fee."[43] The Dynamic Fee—defined as the "% fee charged per swap"—was "set by the protocol, based on memecoin creator requests or market conditions."[44] The Protocol Fee was defined as the percentage of the Dynamic Fee allocated to "the protocol [*i.e.*, Meteora]" or to "integrations that drive volume to the pool."[45] For Memecoin Pools, the Protocol was set at 20%.

142. Memecoin Pools could be customized in material respects, but only by Meteora. For example, the Dynamic Fee and 20% Protocol Fee could be changed "only [by] the Meteora team." [46] Likewise, only Meteora could create "unique custom pool config[uration] key[s]." Accordingly, the documentation advised: "Please reach out to us if this is required."[47] Customized "fee curves/schedules" were also available by contacting Meteora: "You can't do it on your own."[48]

---

[41] *Liquidity Primitives Overview*, *Meteora* (https://docs.meteora.ag/liquidity-primitives/overview); archived at *WayBack Machine* (https://web.archive.org/) > https://docs.meteora.ag/overview/home > Liquidity Primitives; citing a capture dated 13 November 2024.

[42] *Id.*

[43] *Track Protocol Fee from swaps in Memecoin Pools*, *Meteora* (https://docs.meteora.ag/for-memecoins/track-protocol-fee-from-swaps-in-memecoin-pools); archived at *WayBack Machine* (https://web.archive.org/) > https://docs.meteora.ag/overview/home > For Memecoins > Track Protocol Fee from swaps in Memecoin Pools; citing a capture dated 13 November 2024.

[44] *Id.*

[45] *Id.*

[46] *Track Protocol Fee from Swaps in Memecoin Pool*, *Meteora* (Nov. 13, 2024) (archived at https://web.archive.org/web/20241113000000/https://docs.meteora.ag/for-memecoins/track-protocol-fee-from-swaps-in-memecoin-pools).

[47] *Pool and Fee Config for Memecoin Pools*, *Meteora* (https://docs.meteora.ag/for-memecoins/pool-and-fee-config-for-memecoin-pools); archived at *WayBack Machine* (https://web.archive.org/) > https://docs.meteora.ag/overview/home > For Memecoins > Pool and Fee Config for Memecoin Pools; citing a capture taken 26 January 2025.

[48] https://web.archive.org/web/20250126101405/https://docs.meteora.ag/for-memecoins/pool-and-fee-config-for-memecoin-pools *Pool and Fee Config for Memecoin Pools*, *Meteora* (Jan. 26, 2025) (archived at

Similarly, "if [a launch team's] preferred configs are not available" within Meteora's "pre-defined" Pool and Vault "config lists," "please contact the Meteora team."[49]

## 2. The DLMM

143. The DLMM is a "dynamic liquidity protocol" comprised of "discrete zero-slippage price bins."[50] Meteora designed the DLMM to "improve LP profitability with dynamic fees, allow new tokens to bootstrap their liquidity in new creative ways, and allow LPs a broader array of LP strategies and more precise liquidity concentration."[51]

144. The DLMM "consists of … price bins, each of which holds liquidity for a specific price range. Reserves deposited in a liquidity bin are made available for exchange at the price defined for that bin."[52] Only one "bin" in the DLMM is "active" at any point in time: the bin that corresponds to the market price of the asset (in terms of the other asset) at that point in time.

145. A "liquidity position" represents a liquidity provider's assets that have been added to one or more liquidity pool bins. It is represented by a unique position ID. Liquidity providers can have multiple open liquidity positions.

146. As Meteora previously explained on its Website, Meteora also offers a DLMM product specific to token launches, loosely analogous to the Dynamic AMM "Memecoin Pools." As Meteora formerly explained on its Website: the "DLMM Bootstrapping Pool" was specifically

---

https://web.archive.org/web/20250126000000/https://docs.meteora.ag/for-memecoins/pool-and-fee-config-for-memecoin-pools).

[49] *Id.*

[50] *Dynamic Liquidity Market Maker, Meteora* (https://docs.meteora.ag/the-massive-meteora-stimulus-package/1.-dynamic-liquidity-market-maker : last updated 8 months ago); archived at *Wayback Machine* (https://web.archive.org/) > https://docs.meteora.ag/overview/home > The Massive Meteora Stimulus Package > 1. Dynamic Liquidity Market Maker; citing a capture dated 26 January 2025.

[51] *Id.*

[52] *See The Massive Meteora Stimulus Package: 1. Dynamic Liquidity Market Maker (DLMM), Meteora* (last visited June 14, 2025), https://docs.meteora.ag/resources/the-massive-meteora-stimulus-package/1.-dynamic-liquidity-market-maker-dlmm.

"designed for new token launches."[53]  As compared with a standard DLMM liquidity pool, the advantages of the DLMM Bootstrapping Pool included its customizability "to suit different project needs."[54]

147.    As with the Dynamic AMM, the DLMM assessed a Dynamic Fee (the "fee from traders when they perform a swap") and a Protocol Fee.  The Dynamic Fee incorporates "surge pricing based on market fluctuations and volatility."  As of January 2025, the Protocol Fee for standard DLMM pools was 5% of the Dynamic Fee, but the Protocol Fee for DLMM Bootstrapping Pools is 20%.[55]  In other words, the Meteora Defendants and their affiliates earned a higher percentage of the trading fees generated by memecoin launches than they did on general trading activity.

148.    The DLMM's "bin" structure purportedly facilitates "improve[d] LP profitability."  But as the Meteora Defendants have previously freely admitted, the DLMM was also specifically designed to offer memecoin launch teams "high capital efficiency" by supporting "high-volume trading with low liquidity requirements."[56]

149.    As of January 2025, the DLMM offered memecoin launch teams at least three features that benefited launch teams and significantly heightened the associated investor risk.  Each of these features could be maximized—and exploited—with help from Defendant Chow and the

---

[53] *Permissionless DLMM Liquiidty Bootstrapping Pool, Meteora* (https://docs.meteora.ag/dlmm/permissionless-dlmm-liquidity-bootstrapping-pool); archived at *Wayback Machine* (https://web.archive.org/) > https://docs.meteora.ag/overview/home > DLMM > Permissionless DLMM Liquidity Bootstrapping Pool; citing a capture dated 26 January 2025.

[54] *Id.*

[55] *Dynamic Fees, Meteora* (https://docs.meteora.ag/dlmm/dynamic-fees) archived at *WayBack Machine* (https://web.archive.org/) > https://docs.meteora.ag/overview/home > DLMM > Dynamic Fees; citing a capture dated 26 January 2025.

[56] *Dynamic Liquidity Market Maker*, *Meteora* (Jan. 26, 2025) (archived at https://web.archive.org/web/20250126000000/https://docs.meteora.ag/the-massive-meteora-stimulus-package/1.-dynamic-liquidity-market-maker).

"Meteora team," who made themselves strategically available to certain launch teams to offer bespoke assistance designing, creating, and using Meteora's memecoin launch products.

150.    *First*, the DLMM Bootstrapping Pool allowed token launch teams to use "[s]ingle-sided bootstrapping of liquidity using project tokens, without the need for initial USDC or SOL capital."[57]    That is, in contrast to the Dynamic AMM, and to all standard AMMs, the Meteora DLMM facilitates memecoin launches from single-sided liquidity pools containing only the newly-minted memecoin and no base liquidity.

151.    *Second*, only the "active" bin in any DLMM pool actually contains both of the assets supported by that pool.    As explained on the Meteora Website: ", "[a]ll bins except for the active one contain just one type of token (X or Y) because they have [either] been depleted or [are] waiting to be used."[58] A diagram from the Meteora website, shown below, depicts this relationship:[59]

---

[57] *Permissionless DLMM Liquidity Bootstrapping Pool*, *Meteora* (Jan. 26, 2025) (archived at https://web.archive.org/web/20250126000000/https://docs.meteora.ag/dlmm/permissionless-dlmm-liquidity-bootstrapping-pool).  https://web.archive.org/web/20250126145129/https://docs.meteora.ag/dlmm/permissionless-dlmm-liquidity-bootstrapping-pool

[58] *See Meteora,* DLMM: New Dynamic Liquidity Protocol to Boost LP Fees on Solana, *Medium* (Jan. 23, 2024), https://meteoraag.medium.com/dlmm-new-dynamic-liquidity-protocol-to-boost-lp-fees-on-solana-84867bad0907 (last visited July 24, 2025).

[59] *See DLMM Concepts, Meteora* (last visited July 27, 2025), https://docs.meteora.ag/overview/products/dlmm/2-dlmm-concepts#active-price-bin.



152.    In theory, this increases profitability by freeing up half of the assets theoretically contained in a DLMM liquidity pool to earn money in other ways.  It also leaves retail investors highly vulnerable to rapid, large-scale extraction schemes by technically sophisticated memecoin launch teams.  Defendants demonstrated that in the $LIBRA launch, as described in further detail below.

153.    *Third*, the DLMM's highly configurable bin structures allows users to strategize using different "liquidity shapes"[60]  In theory, these "liquidity shapes" increases profitability for liquidity providers because they can distribute liquidity in the manner that best suits their strategy.[61]  In reality, the DLMM also enables the launch team to "design the liquidity distribution" for the launch pool, including the "curvature"—i.e., "how liquidity is distributed across the price

---

[60] *What Is DLMM?*, *Meteora*, https://docs.meteora.ag/overview/products/dlmm/1-what-is-dlmm#liquidity-shapes (last visited July 27, 2025).

[61] *Id.*

range"—and the initial price for the token at the start of the launch.[62]  Thus, the DLMM allows the launch team to design the number of tokens available at lower and higher price points—giving them the necessary control to ladder up the sales price.

154.    *Fourth*, in DLMM pools, the "Dynamic Fee" can be configured to *increase* with increased market volatility in the underlying asset.  That feature "allow[s] LPs to make more money on market volatility."[63]  In the context of a memecoin launch pool, the launch team could thus theoretically benefit from sharp price spikes and drops, specifically in the form of correspondingly higher transaction fees assessed on traders who purchased the memecoin.

155.    *Fifth*, New tokens launched in DLMM Bootstrapping Pools were "immediately tradeable on Jupiter … and all Jupiter integrations at launch, including Phantom, Solflare, and Birdeye, and popular trading bots."[64]

### 3.    *M3M3 "Stake2Earn"*

156.    M3M3 is a so-called "stake-to-earn" mechanism in which memecoin investors competitively stake memecoins in order to access the "fee rewards" that flow to the "top stakers."[65]  Those "fee rewards" were generated by "permanently-locked liquidity" in corresponding liquidity pools on Meteora. [66]  Rebrand of the site https://m3m3.meteora.ag/ redirects to https://app.meteora.ag/pools#stake2earnpools.

---

[62] *Permissionless DLMM Liquidity Bootstrapping Pool*, *Meteora* (Jan. 26, 2025) (archived at https://web.archive.org/web/20250126000000/https://docs.meteora.ag/dlmm/permissionless-dlmm-liquidity-bootstrapping-pool).

[63] *Dynamic Liquidity Market Maker*, *Meteora* (Jan. 26, 2025) (archived at https://web.archive.org/web/20250126000000/https://docs.meteora.ag/the-massive-meteora-stimulus-package/1.-dynamic-liquidity-market-maker).

[64] *Permissionless DLMM Liquidity Bootstrapping Pool*, *Meteora* (Jan. 26, 2025) (archived at https://web.archive.org/web/20250126000000/https://docs.meteora.ag/dlmm/permissionless-dlmm-liquidity-bootstrapping-pool).

[65] *Meteora*, Introducing M3M3: A New Era for Memecoin Hodling, *Medium* (Dec. 4, 2024), https://meteoraag.medium.com/introducing-m3m3-a-new-era-for-memecoin-hodling-a88a470d2adf

[66] *Id.*

### D.    CONTROL RELATIONSHIPS

157.    Raccoon Labs publicly identifies itself as "the team behind Jupiter and Meteora."[67]

## DEFENDANTS' MISCONDUCT

### I.    DEFENDANTS SECRETLY CONSPIRE TO CREATE A FALSE APPEARANCE OF TRUSTWORTHINESS IN METEORA MEMECOIN LAUNCHES AND THEN EXTRACT EXORBITANT PROFITS FROM RETAIL INVESTORS IN MEMECOINS LAUNCHED ON METEORA PROTOCOLS

158.    As described by Defendants Meteora and Chow, memecoin investing in late 2024 was "a race to dump," driven in part by investor fears of "creators selling allocation," sniping, and "insiders who bought in at highly advantageous prices."  Memecoin investors were increasingly skeptical and no longer saw "any value in holding for long and attempt to profit at the earliest opportunity after launch, causing a bleak trading chart and undermining potential growth."[68]

159.    The Meteora and Kelsier Defendants decided to take advantage of the situation.

160.    Simultaneously, the Meteora Defendants began developing a new "memecoin investment platform"—the "M3M3 Platform," described in greater detail in Section II below.

161.    The M3M3 Platform would purportedly reward retail investors for holding their memecoin investments, rather than selling them.  Although aggressively pitched as a good-faith mechanism for investor protection, the M3M3 Platform was in reality a cynical effort to build the Meteora Defendants' respective reputations in the specific context of memecoin launches, to attract high-profile memecoin token launches to Meteora, to increase the volume of memecoin launches and memecoin liquidity pools on Meteora, and the transaction volumes in those pools.

---

[67]*Personal Assistant to Founder – Raccoons Dev*, *Web3.Career* (Dec. 2024), https://web3.career/personal-assistant-to-founder-raccoons-dev/90721 (last visited July 16, 2025) (landing page featuring active links to Jupiter Website, Meteora Website, and GitHub repository for Raccoon Labs).

[68]*Id.*

162.    In addition, to the extent the Platform successfully persuaded retailed investors to hold memecoin investments instead of selling them, it further exposed them to the high-profile memecoin launch rug pulls and capital extraction schemes that the Meteora and Kelsier Defendants soon began jointly executing on Meteora.

163.    In October of 2024, the Meteora Defendants and the Kelsier Defendants entered into a secret partnership to jointly (i) encourage retail investors to hold memecoin investments by launching and promoting the M3M3 Platform as a trustworthy and community-oriented solution to the problems then plaguing the memecoin investment market, and (ii) launch high-profile memecoins on Meteora protocols and, in so doing, to extract hundreds of millions of dollars in crypto assets from retail investors through technically sophisticated extraction schemes and fraud.

164.    As part of that agreement, the Kelsier Defendants agreed to "invest" approximately $2 million USD to fund the launch and initial price inflation scheme for $M3M3, described further below.  This $2 million investment was a "pay-to-play" investment by the Kelsier Defendants to secure a partnership with Defendant Chow and the Meteora team.

165.    The Meteora and Kelsier Defendants began teasing the release of the M3M3 Platform in November of 2024.  For example:[69]

---

[69] Image of Defendant Charles Thomas Davis promoting Meteora content. MeteoraAG (@MeteoraAG*)*, Status update, *X* (Nov. 28, 2024, 9:00 AM), https://x.com/MeteoraAG/status/1862134394586091974 (last visited July 26, 2025) (underlying post by MeteoraAG, reposted by Defendant Davis).



## II.    THE M3M3 PLATFORM FRAUD

166.    On December 4, 2024, Defendants "launched" the M3M3 Platform.  The M3M3 Platform was purportedly a comprehensive solution to the problems then plaguing the memecoin investor community, designed and offered by Defendants Chow and Meteora.  As set forth in detail below, the marketing campaign for the "M3M3 Platform" was also a highly misleading campaign for $M3M3, the inaugural token for the M3M3 Platform.

167.    To execute that campaign, Defendants published content on multiple communication platforms and channels using handles and usernames publicly identified as Defendant Meteora, Defendant Chow, and the "M3M3 Team."  On information and belief, all "M3M3" communications were operated and controlled by Defendants Chow and Meteora.

168.    Defendants amplified their $M3M3 marketing campaign through a series of high-profile influencers, promotions, and partnerships, funded by Kelsier and jointly directed by the Kelsier and Meteora Defendants.

169.     In so doing, Defendants' campaign consistently leveraged the legitimacy and trustworthiness conferred by Defendants Meteora and Chow—and, through association, by Jupiter and Mr. Yeow—never disclosing the existence of their partnership with the Kelsier Defendants, or the purposes of terms of that partnership.

170.     Thus, on December 4, 2024, Meteora officially introduced the "memecoin universe" to its new M3M3 Platform, a "new stake-to-earn mechanism where top memecoin stakers compete to earn fee rewards from permanently-locked liquidity."[70]

171.     On X, @MeteoraAG posted a thread that began: "Introducing M3M3—pronounced 'Meme(3,3),'" a "new meta to transform memecoins from PvP to PPP." [71]  The post flashed a series of alternating messages, including:  "We Are M3M3"; "Stake and Print [in green]"; and a url: "m3m3.meoteora.ag" (the "M3M3 Website").[72]

172.     The thread continues, in bold:  **"We have a problem: 99.95% of memecoins go to zero."**  It described the memecoin investing *status quo* as dire:

---

[70] MeteoraAG (@MeteoraAG), Status update, X (Dec. 14, 2024, 12:25 PM), https://x.com/MeteoraAG/status/1864360366240879009

[71] MeteoraAG (@MeteoraAG), Status update, *X* (Dec. 4, 2024, 12:25 PM), https://x.com/MeteoraAG/status/1864360366240879009 (last visited July 26, 2025).

[72] The M3M3 Website now redirects to https://app.meteora.ag/pools#stake2earnpools, consistent with the rebranding of the M3M3 Platform as the Meteora "Stake2 Earn Pools" Program. *Meteora Stake2Earn Pools*, *Meteora* (last visited July 26, 2025), https://app.meteora.ag/pools#stake2earnpools.



173.    The M3M3 Platform was presented as a revolutionary *solution* to these problems and a sincere, community-oriented effort to end profit extractions. These assertions were made particularly believable by figures such as Chow, whose strong reputation in the cryptocurrency community and thousands of Twitter followers allowed his statements to achieve significant reach, with recent posts garnering an average of approximately 260,000 views and peaking at over 1.2 million views for key announcements.[73]

---

[73]

https://x.com/hellochow

174.    Throughout their marketing campaign, Defendants repeatedly and emphatically asserted that the Platform was intended to, and would, shift memecoin investing from a "PvP" (or "Player vs. Player") dynamic to a virtuous cycle benefiting all investors[74]:



175.    In particular, memecoin investors who purchased memecoins that had launch or liquidity pools on Meteora and then locked their tokens on the M3M3 Platform would be eligible to receive a portion of transaction fees generated on the corresponding Meteora launch or liquidity pools.  That revenue would flow only to "top stakers" which, Defendants said, would create a mutually beneficial competition dynamic among all retail investors, who would purchase more memecoins and stake them, rather than selling them, thus stabilizing their market price.

---

[74] MeteoraAG (@MeteoraAG), Status update, *X* (Dec. 14, 2024, 12:25 PM), https://x.com/MeteoraAG/status/1864360417587548654 (last visited July 26, 2025).

Defendants described this as the "M3M3 Flywheel" and claimed it would generate sustained upward pressure on token market value[75]:



176.    In that same thread, Defendants announced the $M3M3 Token, claiming it was "created by @WEAREM3M3_ community members inspired by the M3M3 vision." Of course, on information and belief, the "@WeAreM3M3_ community" comprised only the Kelsier Defendants and the Meteora Defendants, and those working under their direction and control. The announcement continued that $M3M3 would be used to "test the platform & bring together all who believe in the (3, 3 vision)"—namely the protected and stable memecoin investment experience that "Meteora" was purporting to offer[76]:

---

[75] MeteoraAG (@MeteoraAG), Status update, *X* (Dec. 4, 2024, 12:25 PM), https://x.com/MeteoraAG/status/1864360494691438882 (last visited July 26, 2025).

[76] MeteoraAG (@MeteoraAG), Status update, *X* (Dec. 4, 2024, 12:26 PM), https://x.com/MeteoraAG/status/1864360545840976331 (last visited July 26, 2025).



177.    Within hours of Meteora's M3M3 announcements, @WEAREM3M3_ posted on
X that the revenue stream for $M3M3 stakers (i.e., investors who purchased $M3M3 Tokens and
then staked them on the M3M3 Platform) already exceeded $3 million[77]:

---

[77] M3M3 (@WEAREM3M3_), Status update, *X* (Dec. 4, 2024, 1:57 PM),
https://x.com/WEAREM3M3_/status/1864383526683934800 (last visited July 26, 2025).



178.    That type of post was typical. Defendants repeatedly announced that large sums had already been collected for or distributed to $M3M3 investors—*e.g.*, "over $4.5 million in rewards," "more than $200,000 daily to the top stakers."

179.    Likewise, Defendants repeatedly asserted that the M3M3 staking mechanism would reduce rapid selling and prevent sudden price declines. As a result, $M3M3 prices would hold their value, benefiting all investors. Defendants pushed those messages especially aggressively on December 4 and 5, in conjunction with the $M3M3 launch and Defendants' opening price inflation campaign. For example[78]:

---

[78] M3M3 (@WEAREM3M3_), Status update, *X* (Dec. 5, 2024, 10:36 AM), https://x.com/WEAREM3M3_/status/1864695421106319579 (last visited July 26, 2025).



180.    Throughout the campaign, Defendant Chow likewise leveraged his strong reputation in the Solana community and emphasized his own personal purported community orientation, good faith, and good intentions in connection with Meteora's entire "M3M3" project.

181.    After the launch of $M3M3 on December 4, 2024, Defendants continued to jointly falsely promote the M3M3 Platform.  They did so to episodically re-inflate the price of $M3M3 (as described in further detail in Section III below) and then extract further profits.



182.     They also did so in order to burnish Meteora's reputation as a trustworthy Protocol and a desirable memecoin launch platform.[79]

183.     As of the date of this filing, Meteora hosts "stake to earn pools" for, among others, $M3M3.[80]

## III.    THE $M3M3 FRAUD

184.     Defendants then proceeded to use the M3M3 Platform, and the reputational benefits it conferred on Defendant Chow as a good-faith memecoin infrastructure provider and on Defendant Meteora as a reliable launch platform, to jointly execute a series of rapid, sophisticated, public frauds.

185.     The first of these high-profile memecoins was $M3M3.

186.     On December 4, 2024, Defendants launched a coordinated joint promotional campaign for the M3M3 Platform and $M3M3 that intentionally misrepresented the $M3M3's

---

[79] benchow.sol (@hellochow), Status update, *X* (Dec. 15, 2024, 12:37 PM), https://x.com/hellochow/status/1868168423491993673 (last visited July 26, 2025).

[80] *Meteora Stake2Earn Pools*, *Meteora* (last visited July 26, 2025), https://app.meteora.ag/pools#stake2earnpools.

material characteristics, including the identities of its issuers, the manner in which it was offered for sale, and the determinants of its post-launch market price.

187.    Their promotional campaign emphasized four purported distinctions between $M3M3 and other memecoins: (i) its status as the "debut" asset on Meteora's revolutionary investor-friendly Platform; (ii) investors' ongoing entitlement to revenue generated on Meteora; (iii) the central involvement of Defendant Chow, a highly-respected and trusted leader in the Solana ecosystem, and his seeming exclusive responsibility for the project; (iv) the Tokens' launch on Meteora, a purportedly sophisticated, reliable. and transparent provider in the Solana ecosystem.

188.    By marketing $M3M3 Tokens as the "debut" memecoin on the M3M3 Platform, Defendants expressly and implicitly represented that Meteora and Chow would make sincere, good-faith and sophisticated efforts to ensure that $M3M3 showcased Platform's purported benefits for investors, i.e., sustained and healthy market values, and a reliable revenue stream generated on Meteora.

189.    Throughout, Defendants promoted $M3M3 by associating it exclusively—and misleadingly—with Meteora, which handled all transactions, staking, reward distributions, and provided the technical foundation for token management, and with Chow.

190.    Defendants made two major material misrepresentations about $M3M3.

191.    *One*, Defendants represented that $M3M3 would be offered to the public in a transparent, fair, and reliable "launch" conducted on Meteora (a respect Platform in the Solana ecosystem known for its technological proficiency) and by Defendant Chow (a then highly respected and trusted senior leader in the Solana ecosystem).  Defendants did not disclose their plan to extract profits from unsuspecting investors by manipulating the $M3M3 Token launch and market price.  Defendants also intentionally concealed the involvement of Kelsier and the Davis

Defendants in the M3M3 Platform, $M3M3, their financial interests therein, and the central role they played in designing and executing all related promotions and in launching $M3M3.

192.    *Two*, Defendants represented $M3M3 as a superior investment because, in contrast to most memecoins, its price would be stabilized by (i) the purportedly sustainable revenue available to investors that staked $M3M3 on the M3M3 Platform; (ii) the stabilizing influence of the M3M3 Platform on investor incentives and asset price; and (iii) the skill, expertise, and trustworthiness of the Meteora team purportedly solely responsible for the M3M3 Platform and ostensibly behind $M3M3.

### A.    DEFENDANT CHOW LEADS AN INTRICATE PLANNING PROCESS TO ILLICITLY EXTRACT PROFITS FROM THE $M3M3 TOKEN LAUNCH

193.    The Kelsier Defendants and the Meteora Defendants jointly designed the $M3M3 Token Launch to illicitly enrich themselves and their associates at the expense of the unsuspecting investing public.  Specifically, they agreed to secretly take control of 95% of the total $M3M3 token supply immediately after its purportedly public launch; to artificially rapidly inflate its market price; to extract profits from non-insider investors by selling $M3M3 at that steeply artificially inflated price; and then to serially artificially re-inflate token price and extract additional profits.

194.    The $M3M3 launch plan worked as follows:

*First*, Defendants would use the <u>$M3M3 Mint Wallet</u> to create a liquidity pool on Meteora (the "<u>$M3M3 Launch Pool</u>") containing 900 million $M3M3 Tokens, *i.e.*, 90% of total supply.  The remaining 100 million Tokens (10% of total supply) would be publicly withheld and allocated to $M3M3's then-unknown launch team. [81]

*Second*, the Kelsier Defendants would deposit 42 SOL (worth about $5,826 USD at the time) the $M3M3 launch pool.

---

[81] **Appendix C** sets forth the complete list of defined wallet addresses referenced herein, including the "$M3M3 Mint Wallet."  **Appendix D** sets forth the complete list of defined liquidity pools and launch pools referenced herein, including the "$M3M3 Launch Pool."

*Third*, the $M3M3 Deployer Wallet would "launch" the $M3M3 launch pool on Meteora and thus create the appearance that $M3M3 Tokens were generally available to the public. Simultaneously, Defendants would begin execution of their pre-planned M3M3 promotional campaign.

195.    In reality, immediately after the purportedly public "launch," the $M3M3 Mint Wallet would surreptitiously temporarily freeze the $M3M3 Token Account associated with the $M3M3 Launch Pool.  That would effectively prevent all trading activity in $M3M3

196.    During the freeze, would-be investors seeking to purchase $M3M3 would be unable to successfully execute purchase transactions, without knowing why.  Meanwhile, Defendants would surreptitiously acquire 85% of the token supply (and thus control a total of 95%), leaving only 5% of token sales available for legitimate sales to the public.

197.    To do so, the Kelsier Defendants would fund 150 electronic wallets (the "Insider Wallets"), controlled by themselves and their affiliates.  During the secret "freeze" period, the Insider Wallets and the $M3M3 Deployer Wallet would jointly execute a series of rapid sale transactions.  Specifically, to enable each transaction, the purchasing Insider Wallet and the $M3M3 Deployer Wallet would jointly authorize "thaw" and "refreeze" instructions with respect to the launch pool, the instance before and after each sale.

198.    Defendants' express aim was to secretly acquire insider control over 95% of the $M3M3 token supply—while appearing to have control over only the 10% of token supply publicly reserved at launch—and to use that secret control to artificially inflate the market price of $M3M3.  Then, Defendants would sell $M3M3 at artificially inflated prices to unsuspecting, non-insider investors, extracting significant profit at their expense.

199.    Thereafter, Defendants would execute a series of further "pump-and-dump" schemes, temporarily re-inflating token prices by announcing and promoting purported partnerships and investor rewards.

200.    Defendants Chow, Hayden Davis, and Charles Thomas Davis were each intimately involved in and responsible for designing and implementing the $M3M3 launch plan.

201.    To help develop and finalize the details of that plan, the Meteora and Kelsier Defendants and those of their respective associates involved in the $M3M3 launch communicated regularly in a private group chat on Telegram (the "$M3M3 Telegram Group").  They also created and iteratively developed confidential shared planning documents, including a confidential Google document titled "M3M3 Token Launch Organizer" and a Google spreadsheet titled "M3M3 Calcs Template."

202.    The "M3M3 Calcs Template" Google sheet was created and owned by Defendant Chow.  Defendant Chow shared a link to the M3M3 Calcs Template (the "$M3M3 Calcs Link") in the $M3M3 Telegram Group at 9:15 PM, together with a message "hey here's a sheet i did to play with some numbers on m3m3 config. will be helpful to know what % of token in circulating that can stake and make some guesses to how much will stake. In general it seems a high # of stakers in leaderboard (500?) and a 21 day reward distribution might be a good starting point. What's interesting is that if there are lots of SOL rewards, staking will get more and more attractive as price goes down and we might get ppl who decide to stake more or buy+stake to get more SOL rewards."

203.    The "M3M3 Calcs Template" is a Google Sheets spreadsheet created by Defendant Chow to model the $M3M3 token's economic mechanics and optimize the extraction scheme. The spreadsheet contains sophisticated calculations modeling $M3M3 token circulation percentages, staking participation rates, reward distributions, and price dynamics.

204.    It demonstrates Defendant Chow's premeditated plan to exploit a perverse incentive structure: as $M3M3's price declined, the relative value of SOL rewards would appear more attractive, inducing retail investors to purchase additional tokens and stake them—thereby

providing exit liquidity for insiders. This document evidences the deliberate engineering of a psychological trap wherein victims would be incentivized to increase their exposure to a collapsing asset while Defendants systematically extracted value through their 95% control of the token supply.

205.    As of the date of this filing, the "privacy settings" for the "$M3M3 Calcs Link" reads: "You must be part of Raccoon Labs to see this document's view history."

206.    The M3M3 Token Launch Organizer Google document was created and owned by "Thomas"—on information and belief, Defendant Charles Thomas Davis.   As of the date of this filing, the "privacy settings" for M3M3 Token Launch Organizer reads: "You must be part of Kelsier Capital to see this document's view history."

207.    The $M3M3 Launch Team—that is, the Kelsier and Meteora Defendants, and their associates—also collaborated by phone.  On one planning call for the $M3M3 launch, Defendant Chow stated—accurately: "no one will play the game if they see, like 90% of the supply already locked up."  Defendant Hayden Davis responded "agreed."

208.    Defendant Chow then explained to Defendant Davis:    "I don't know what percentage is actually going to be available for the public to buy, but if you say – I am going to make up some numbers – let's just say 5% is going to be available at the end of the day, and 1 or 2% decides to stake, then you just need to match that 1 or 2%."

### B.    DEFENDANTS EXECUTE THE FRAUDULENT $M3M3 LAUNCH ON DECEMBER 4, 2024

209.    Defendants successfully implemented their plan beginning on December 4, 2024.

210.    On December 4, 2024, at 11:38:04 am, Defendants used the $M3M3 Mint Wallet[82] to mint 1,000,000,000 $M3M3 Tokens.[83]  In the corresponding Token Account (the "$M3M3 Token Account"), they assigned "Freeze Authority" to the $M3M3 Mint Wallet.[84]

211.    On December 4, 2024, at 11:51:00 am, Defendants used the $M3M3 Mint Wallet to create a Memecoin Launch Pool on Meteora's Dynamic AMM Program (the "$M3M3 Launch Pool").

212.    The M3M3 Launch Pool is controlled by the Meteora (M3M3) Vault Authority Program administrator and operator (the "Meteora M3M3 Vault Admin").  On third-party DeFi protocols, the wallet address for the Meteora M3M3 Vault Admin is tagged "Mercurial." That wallet address owned the domain name "jupiter_operator_1.sol," until approximately five months ago, when that domain name was transferred.

213.    The $M3M3 Mint Wallet transferred 900,000,000 $M3M3 Tokens to the $M3M3 Launch Pool.  In so doing, Defendants publicly held back 10% of the $M3M3 token supply for the $M3M3 launch team, thus signaling to the general memecoin investment community that the launch team would not *also* snipe their own token launch.

214.    Defendants also deposited 42 WSOL – using what wallet.[85]

_____

[82] The Token Contract Address for $M3M3 is:  M3M3pSFptfpZYnWNUgAbyWzKKgPo5d1eWmX6tbiSF2K,

[83] Transaction  Details
2EE7coRjT2MtL8ny5jGG4dr4YJjXGinp9jvLTDrJRHkhmhdgNa8mWX4z5DMc9He9RycUwaYRF6j822esmy8yN8z1, *Solscan* (last visited July 26, 2025),
https://solscan.io/tx/2EE7coRjT2MtL8ny5jGG4dr4YJjXGinp9jvLTDrJRHkhmhdgNa8mWX4z5DMc9He9RycUwaYRF6j822esmy8yN8z1.

[84] Solscan Token Account C5C3NTvxa4iiGMuoxDm6v6ExoV3A2D4Pwn3KHondA6SJ, *Solscan* (last visited July 26, 2025), https://solscan.io/account/C5C3NTvxa4iiGMuoxDm6v6ExoV3A2D4Pwn3KHondA6SJ#transactions.

[85] Solscan Transaction
ecvA9Zg9ziK1Zec5pnXutow6riajiDJd2pLtVsybnXjRPNsBoohHGPrAcfXuQijKdrcbfd9f1WyJGAgT9SkCC7K, *Solscan* (last visited July 26, 2025),
https://solscan.io/tx/ecvA9Zg9ziK1Zec5pnXutow6riajiDJd2pLtVsybnXjRPNsBoohHGPrAcfXuQijKdrcbfd9f1WyJGAgT9SkCC7K.

215.    Pursuant to their plan, Defendants publicly announced the launch of $M3M3 but then used the $M3M3 Mint Wallet to surreptitiously temporarily freeze the $M3M3 Token Account associated with the $M3M3 Launch Pool.

216.    Defendants then executed a series of rapid-fire sales to the Insider Wallets, in each case "sandwiched" between jointly-executed "thaw" and "refreeze" instructions.

217.    For example, in a multi-instruction transaction executed at 11:59:20 am on December 4, 2024, an Insider Wallet paid 0.419622 WSOL for 7,811,108.387420785 $M3M3 Tokens.[86]  As reflected in the screenshots below, the transaction was jointly authorized by the $M3M3 Mint Wallet and the purchasing Insider Wallet, with the $M3M3 Mint Wallet exercising its "Freeze Authority" to both "Thaw" and "Freeze" the Token Account associated with the $M3M3 Launch Pool.[87]



---

[86] Solscan Transaction 2KBuDysRPx6oqXxXECaoxr7aX2Ac61Hh5cmJkMPDafPb2rbm3qMKeeRDBQ63Vbh3wsoTbJWvD3EPnev3jwQxGUCW, *Solscan* (last visited July 26, 2025), https://solscan.io/tx/2KBuDysRPx6oqXxXECaoxr7aX2Ac61Hh5cmJkMPDafPb2rbm3qMKeeRDBQ63Vbh3wsoTbJWvD3EPnev3jwQxGUCW.

[87] *Id.*

#8 - Token Program: FreezeAccount

| Interact With | Token Program - | TokenkegZyiNwAJbNbGKPFXCWuBvf9Ss623VQ5DA |
|---|---|---|
| Instruction Data | Account: | Meteora (M3M3) Vault  WRITABLE |
| | Freeze Authority: | AiFTyukukUsKjEVtREpD9QENfe8SKuKZYmYVLrUVQU4q  SIGNER |
| | Mint: | M3M3 |

218.    The $M3M3 Mint Wallet thus co-signed every illicit Insider Wallet purchase.

219.    Within approximately twenty minutes, Defendants used the $M3M3 Mint Wallet and the Insider Wallets to snipe an additional 85.2% of the total $M3M3 Token Supply from the otherwise covertly frozen $M3M3 Launch Pool—inflating the total market capitalization of $M3M3 to about $5 million.

220.    Further, on information and belief, due to the rapidity with which Defendants covertly sniped $M3M3, they were able to renounce "freezeAuthority" quickly enough to avoid triggering a fraud risk indicator on DEX Screener and the many retail trader UIs that incorporate its analytics.

221.    Shortly thereafter, the launch pool was "unfrozen," and the Insider Wallets began systematically dumping $M3M3 Tokens in multiple small "sell" transactions, designed to disguise their behavior. That coordinated selling activity caused a sudden, sharp drop in Token price that left non-insider investors with substantial losses.

222.    Non-insider investors did not know—and could not have known—about Defendants' subterfuge, insider trading, or post-launch control of the Token supply. Defendants "froze" the $M3M3 launch pool and "whitelisted" the Insider Wallets surreptitiously—these mechanisms were not visible on the public blockchain. Consequently, the coordinated insider control of the token supply was not known or discernable at the time because, although the initial concentration of $M3M3 Tokens in a relatively small number of wallets was publicly visible on the public blockchain, the identities of the people controlling those wallets was unknown.

223.    As a result of Defendants' intentionally deceptive tactics, $M3M3 Tokens price spiked by over 1,000,000% to above $0.12 within about a day. On December 6, 2024, the Token's fully diluted market capitalization briefly exceeded $150 million. Then it crashed.

224.    In addition, Defendants' intentionally deceptive tactics created the false appearance of substantial investor demand for $M3M3 Tokens, despite minimal actual participation from arms-length investors.

225.    Investors reasonably relied on Defendants' representations that $M3M3 was launched publicly and fairly. They thus also reasonably relied on the $M3M3 market price as a measure of the asset's value.

226.    Within hours, Defendants' initial scheme unraveled. Between December 5 and 6, 2024, the Insider Wallets executed coordinated sales, dumping hundreds of thousands of dollars' worth of tokens onto the open market. One Insider Wallet liquidated approximately $222,000 within the first 40 minutes of public trading. Others followed suit. M3M3's price collapsed over 90%, falling from $0.15 to as low as $0.01–$0.02.

## C.    DEFENDANTS SERIALLY ARTIFICIALLY REINFLATE $M3M3 TOKEN PRICE AND TOUT THE M3M3 PLATFORM TO EXTRACT ADDITIONAL CAPITAL FROM RETAIL INVESTORS

227.    Thereafter, Defendants serially re-inflated the price of $M3M3 by further false representations and hype.

228.    Meteora issued public assurances between December 6 and 7, 2024, promising to "pay back stakers in full." Meteora claimed that over $3 million in rewards had been allocated to stabilize Token price and reaffirmed the promise of $4.5 million in total rewards and $200,000 daily distributions. These representations were intended to deter further panic selling and preserve the illusion of project viability.

229.    Between December 8 and 10, 2024, the token experienced a partial rebound, trading between $0.10 and $0.15 amid high volatility. Centralized exchanges XT.com and BingX listed $M3M3 during this period, driving renewed interest. Following the BingX listing on December 10 $M3M3 saw a 76% single-day price increase, closing around $0.12. However, liquidity remained limited at $2.2 million.

230.    On or about December 12, 2024, Meteora launched a trading competition promising $15,000 in token-based rewards to the top 25 traders by volume. The campaign temporarily increased trading activity, but sentiment among $M3M3 investors remained divided. Some believed in the Token's purported long-term yield; others suspected a classic pump-and-dump scheme.

231.    On December 15, 2024, Defendant Chow described the purported early success of the M3M3 Platform and its demonstrated ability to create a "PPP" ("Player-Pump-Player") investing dynamic, asserting "M3M3 will spread the wealth and spread the love."  Further, he added: "If you want PVP, don't launch here"—*i.e.*, on Meteora.

232.    On January 28, 2025, Defendant Chow publicly announced that Meteora had "received [the] 25% grant from the @WEAREM3M3_ team" and was "working with them on some airdrops" that would "grow the M3M3 community of pumpers"  He also provided the account address for the "multisig held by the Meteora team" that would receive and "hold" the 25% grant (the "M3M3 Grant MultiSig").[88]

---

[88] benchow.sol (@hellochow), Status update, *X* (Jan. 28, 2025, 10:29 AM), https://x.com/hellochow/status/1884262456622457013 (last visited July 26, 2025).



233.    The M3M3 Grant MultiSig was created on December 19, 2024.[89]  At its creation, the M3M3 Grant MultiSig was a "1-of-1" MultiSig, with the Meteora Vault Authority as its sole authorized signatory.

234.    On January 31, 2025, Meteora reported that approximately $800,000 in SOL rewards had been distributed to top stakers, in addition to restaked $M3M3 Tokens. However, these rewards disproportionately benefited large holders and insiders who had staked early. As reward emissions slowed, sell pressure resumed and the token's value declined further.

---

[89]Solscan Transaction Y5kcQCUnBmojDi5stEnH7YGyxWJXJPfcccNmCwbhhQmQDHb9vfWQSCbaiFn4LAzTeYx4LnNBr5xNjuWojB G2fDS, *Solscan* (last visited July 26, 2025), https://solscan.io/tx/Y5kcQCUnBmojDi5stEnH7YGyxWJXJPfcccNmCwbhhQmQDHb9vfWQSCbaiFn4LAzTeYx4LnNBr5xNjuWojBG2fDS.

235.    In early February 2025, $M3M3 experienced a short-lived price spike of approximately 85%, likely reflecting a "dead cat bounce." From a low near $0.003, the Token briefly rallied to around $0.006. However, no new developments or meaningful adoption materialized, and the price quickly collapsed again.

236.    By March 2025, $M3M3 had fallen to its all-time low of approximately $0.003. $M3M3 had lost over 98% of its peak value, with little remaining liquidity and minimal daily trading volume. The vaunted M3M3 staking ecosystem had largely collapsed, and most investors were unable to recover even a fraction of their initial investments.

237.    $M3M3 remains near its all-time low, currently trading at approximately $0.003. Defendants have moved on to other projects, leaving $M3M3 holders with an unsupported and largely abandoned asset.

238.    $M3M3 thus proved to be a text example of insider-driven price manipulation followed by a systematic extraction of retail investor capital—a particularly culpable form of the very misconduct and risk that Defendants promised to protect investors against.

239.    After profiting from $M3M3, Defendants deliberately sought to obscure the origin and destination of their proceeds using methods designed to conceal blockchain transaction paths.

240.    They transferred funds through multiple cryptocurrency wallets, complicating the tracing process and intentionally obfuscating their coordinated insider activity.

241.    Defendants also used blockchain mixers—services specifically designed to anonymize transactions and disrupt transparent tracking of token proceeds—to hide the profits they extracted from $M3M3 investors.

## IV.    THE $LIBRA FRAUD

### A.    DEFENDANT HAYDEN DAVIS LAYS THE GROUNDWORK FOR AN "ARGENTINA COIN"

242.     Defendant Hayden Davis began laying the groundwork for the $LIBRA fraud by cultivating connections to and relationships with representatives of the government of Argentina in or about early 2024.

243.     To that end, Defendant Davis travelled to Argentina at least three times in 2024 to meet in person with representatives of Argentinian President Javier Millie.  On July 16, 2024, Defendant Davis visited the Casa Rosada, Argentina's equivalent of the White House.[90]  According to government records obtained and published by the Argentine newspaper La Nacion, his host was Karina Milei, President Milei's sister and chief of staff.[91]

244.     In October of 2024, Defendant Davis attended the TechForum conference in Argentina, along with President Milei and Julian Peh, the CEO and founder of KIP Protocol.[92] According to a statement later issued by the Office of the President of Argentina, President Milei met with "representatives of KIP Protocol in Argentina" on October 19, 2024 and was "informed of the company's intention to develop a project called 'Viva la Libertad' to finance private ventures in the Argentine Republic using blockchain technology."[93]  Mr. Peh has likewise publicly confirmed that he met with President Milei at the conference, but denied involvement with the launch.[94]

---

[90] https://www.lanacion.com.ar/politica/karina-milei-la-puerta-de-entrada-a-la-casa-rosada-para-los-personajes-detras-de-la-criptomoneda-nid16022025/

[91] Id.

[92] KIP Protocol (@KIPprotocol), Status update, X (Oct. 25, 2024), https://x.com/KIPprotocol/status/184976768655491098 (last visited July 26, 2025).

[93] Oficina del Presidente (@OPRArgentina), Status update, X (Feb. 15, 2025, 8:34 PM), https://x.com/OPRArgentina/status/1890937875677495542 (last visited July 26, 2025).

[94] Kip statements; Jack Nicas & David Yaffe-Bellany, *Milei, $Melania and Memecoins: Unraveling Argentina's Crypto Fiasco*, New York Times (Feb. 28, 2025), https://www.nytimes.com/2025/02/28/world/americas/argentina-crypto-scandal-president.html (last visited July 27, 2025).

*Statement From KIP on $LIBRA Launch* - https://www.kip.pro/blog-posts/statement-from-kip-on-libra-launch

245.    According to reporting by the New York Times, Defendant Davis told conference attendees that "he had 'control' over Milei and could broker deals."[95]  For example, according to the Times, in one audio message, Mr. Davis said he could procure "[e]verything from Milei tweeting" to "all the front-facing Milei stuff basically, showing up at things, et cetera – I have control over a lot of those levers." [96]  In a written proposal viewed by the Times, Mr. Davis offered to "deliver a meeting with Mr. Milei and a partnership with the Argentine government in exchange for roughly $90 million in cryptocurrencies over 27 months."[97]

246.    On November 21, 2024, Defendant Davis again visited the Casa Rosada. According to reporting by La Nacion and the New York Times, afterwards, Mr. Davis and an associate "toasted with champagne at the Four Seasons in Buenos Aires, telling others they had just signed a deal with the president, according to La Nacion."[98]

247.    In November 2024, Davis again visited Milei at the presidential offices and afterwards toasted with champagne at the Four Seasons in Buenos Aires, telling others that he had just signed a deal with the President.[99]

---

[95] Nicas & Yaffe-Bellany, *Milei, $Melania and Memecoins* (2025). https://www.nytimes.com/2025/02/28/world/americas/argentina-crypto-scandal-president.html

[96] *Id.*

[97] *Id.*

[98] *Id; Ignacio Grimaldi, Karina Milei, la puerta de entrada a la Casa Rosada para los personajes detrás de la criptomoneda del escándalo, La Nación (Feb. 16, 2025), https://www.lanacion.com.ar/politica/karina-milei-la-puerta-de-entrada-a-la-casa-rosada-para-los-personajes-detras-de-la-criptomoneda-nid16022025.*

[99] *Id.*

248.    In December of 2024, Defendant Davis sent private text messages—later leaked to CoinDesk[100]—asserting: "I sent $$ to [Milei's] sister and he signs whatever I say and does what I want."[101]



249.    On January 30, 2025, Davis again met with Milei, this time at the Presidential residence in Buenos Aires.  After the meeting, President Milei (@JMilei) posted a picture of himself with Mr. Davis on X and a message reporting his "very interesting conversation with entrepreneur Hayden Mark Davis."[102]

250.    Defendant Chow responded: "What changing the world looks like 🔥."[103]

---

[100]CoinDesk (@CoinDesk), Status update, *X* (Feb. 18, 2025, 3:10 PM), https://x.com/CoinDesk/status/1891943438485967341 (last visited July 26, 2025).

[101] *Danny Nelson*, *Libra Token's Co-Creator Claimed He Paid Argentinian President Milei's Sister*, *CoinDesk* (Feb. 18, 2025), https://www.coindesk.com/business/2025/02/18/libra-token-s-co-creator-bragged-of-sending-money-to-argentine-president-milei-s-sister (last visited July 26, 2025) (reporting and sharing screenshot below).

[102] Javier Milei (@JMilei), Status update, *X* (Jan. 30, 2025, 3:51 PM), https://x.com/JMilei/status/1885068460268363889 (last visited July 26, 2025).

[103] benchow.sol (@hellochow), Status update, *X* (Jan. 30, 2025, 5:16 PM), https://x.com/hellochow/status/1885089698768449939 (last visited July 26, 2025).



251.    Defendant Kelsier reposted President Milei's message, adding: "A big step in our vision to ensure the next generation of technology and finance reach the masses. We are proud to advise @JMilei on executing this goal in Argentina and continue changing the world for the better. VIVA LA LIBERTAD."[104]

252.    In addition, in an effort to recruit Dave Portnoy as a $LIBRA "KOL," Defendant Davis privately texted Mr. Portnoy that same picture (of himself with President Milei).[105]

---

[104]Kelsier Ventures (@KelsierVentures), Status update, *X* (Jan. 30, 2025, 4:21 PM), https://x.com/KelsierVentures/status/1885075838422413473 (last visited July 26, 2025).

[105]  https://x.com/i/spaces/1kvJpyNYPBMxE (@stoolpresidente), Audio Post, X (Feb. 16, 2025) - A February 16, 2025 audio post by Dave Portnoy.  According to Mr. Portnoy (at 3:40), he was introduced to Mr. Davis in late January 2025 in connection with a potential Barstool memecoin launch.

253.    Defendants launched $LIBRA on the Meteora DLMM on February 14, 2025. Earlier that same day, the domain www.vivalalibertadproject.com was purchased and used to publish a website (the "VLL Website").

254.    The VLL Website consists of a simple landing page, which reads: "Viva La Libertad Project: Driving the Future of Freedom and Growth." An "Apply for Funding" link on the top righthand corner redirects to a simple "Google Forms" questionnaire, which principally asks for the respondent's social media accounts. [106]

255.    On information and belief, the principal purpose of the VLL website was to promote $LIBRA by misrepresenting its most material characteristics: (i) the existence of a legitimate investment project, (ii) that was affiliated with the Argentinian government and specifically with the administration of President Javier Milei.

256.    The bottom of the VLL Website reads in small type: "Private Initiative project Developed by KIP Network Inc © 2025." According to subsequent public statements from Mr. Peh, he was contacted on February 13, 2025, one day prior to the $LIBRA launch, by the same associate with whom Defendant Davis had celebrated at the Buenos Aires Four Seasons in November, who requested that KIP Protocol distribute funds raised by Defendant Davis.[107]

257.    The VLL Website described $LIBRA as a "Token with a Purpose," "designed to strengthen the Argentine economy from the ground up by supporting entrepreneurship and innovation." It described the history of the "Viva La Libertad Project" in the past tense, misleadingly suggesting that the project *had* a history beyond the VLL Website itself. For example:[108]

---

[106] *Viva La Libertad Project*, Google Forms, https://docs.google.com/forms/d/e/1FAIpQLSdKeVBUn-Kdfz2jxczhDa7OKOZ4k_SeOFtN5422IYIFxO9iVA/viewform (last visited July 27, 2025).

[107] Nicas & Yaffe-Bellany, *Milei, $Melania and Memecoins* (2025).

[108] *Viva La Libertad Project*, https://www.vivalalibertadproject.com/ (last visited July 27, 2025).

**The Viva La Libertad Project** was created with a clear mission: to boost the Argentine economy by funding small projects and local businesses, supporting those who seek to grow their ventures and contribute to the country's development.

258.    The VLL Website also presented the following "Token Distribution" plan, describing how the $LIBRA token supply would be allocated[109]:



259.    In other words, 50% of the $LIBRA token supply would be allocated to "Argentina Growth"; 20% would be reserved to the "Treasury"; and 30% would go to "Liquidity."

260.    As Defendants well knew, reasonable digital asset investors would understand this "Token Distribution" plan to mean that the $LIBRA launch team was publicly reserving 20% of

_____

[109] *Id.*

$LIBRA token supply to itself—whether for personal profit, for post-launch trading supply management, or other purposes—based on their general familiarity with similar "token distribution" and "tokenomics" graphics and explanations often provided in connection with new token launches.

261.    Thus, as explained above, reasonable digital asset investors would further understand that the $LIBRA launch team, having publicly reserved 20% of token supply, would not also secretly acquire additional token supply using insider information (like the $LIBRA Token Address, prior to its public announcement) or by sniping their own token launch.

262.    As Defendants also well knew, reasonable digital asset investors would understand that "Liquidity" allocation represented the Tokens that the $LIBRA launch team would deposit in launch and liquidity pools to support trading.  Thus, according to the VLL Website, 30% of $LIBRA token supply would be available for sale to investors.

263.     The VLL Website did not provide any detail regarding the intended use of "Argentina Growth" tokens.  But, again, as Defendants well knew, reasonable digital asset investors would understand that the 50% allocation depicted in light blue on the VLL Website graphic represented the $LIBRA tokens that would be used to provide the "funding for entrepreneurs and education" touted on the VLL Website.

**B.    DEFENDANTS LAUNCH $LIBRA ON VALENTINE'S DAY**

264.    At approximately 4:37 p.m. on February 14, 2025, Valentine's Day, Defendants created $LIBRA using LIBRA Wallet 1. [110]   They minted 1,000,000,000 $LIBRA tokens approximately 1 minute later.

---

[110] The Token Address for $LIBRA is:  Bo9jh3wsmcC2AjakLWzNmKJ3SgtZmXEcSaW7L2FAvUsU.

265.    Almost immediately, Defendants executed a series of transfers corresponding to the "Token Distribution" Plan on the VLL Website.  Specifically, at approximately 4:38 p.m. EST, LIBRA Wallet 1 executed a single transaction that comprised two transfers: (i)  200,000,000 $LIBRA Tokens, or 20% of the $LIBRA token supply, was sent to the "<u>LIBRA Treasury Address</u>" and (ii) 500,000,000 $LIBRA, or 50% of the $LIBRA token supply, was sent to an intermediate address, the "<u>42rex Address.</u>"  At about 6:35pm, the 42rex Address transferred 500,000,000 $LIBRA, or 50% of the $LIBRA token supply, to the "<u>Argentina Growth Address</u>."

266.    Defendants used the Meteora DLMM to create the launch pool for $LIBRA, denominated herein as: "<u>$LIBRA/USDC Pool</u>."  The "<u>$LIBRA/USDC Pool</u>" was funded by LIBRA Wallet 1.  The $LIBRA sent *directly* from LIBRA Wallet 1 to the $LIBRA/USDC Pool was "locked."

267.    Shortly thereafter, two $LIBRA:SOL liquidity pools were created, also using the Meteora DLMM, denominated herein "<u>$LIBRA/SOL Pool-1</u>" and <u>$LIBRA/SOL Pool-2</u>" (together with the <u>LIBRA/USDC Pool</u>, the "<u>$LIBRA Pools</u>").  All three $LIBRA Pools are owned by the Meteora DLMM Program (which is controlled by the Meteora Multi-Sig, as alleged above).

268.    Approximately 23 minutes after Defendants minted the $LIBRA token supply, at approximately 5:01pm (7:01pm in Argentina), Argentinian President Javier Milei posted a public statement of support on X.  His post read in part, in Spanish, "[t]he world wants to invest in Argentina."  It provided a link to the VLL Website and the Token Address for $LIBRA (the information investors needed to purchase it).



269.    Investor interest, trading volume, and price surged in response to President Milei's announcement.[111]

270.    Defendants and their associates began systematically extracting capital from the $LIBRA launch and liquidity pools, as alleged in greater detail below.

271.    At approximately 10:36pm on February 14, 2025, Mr. Peh posted the message screenshotted below on X[112].  According to Mr. Peh, he did so at the express instruction of Mr. Davis's associate, who provided the content *verbatim*.[113]

---



**KIP Protocol** ✔
@KIPprotocol

Today was the launch of the ambitious Viva la Libertad project to help private enterprises in Argentina, and the $LIBRA currency has been a success. We want to thank everyone for their trust and support.

To address all questions: we would like to clarify that this is a private enterprise project,  President Milei was not and is not involved in the development of this project, as he has mentioned himself. This is an entirely private enterprise.

Thank you for being part of this great beginning!

272.    Two minutes later, at 10:38pm, President Milei deleted his earlier endorsement and posted a retraction on X, stating (as translated from Spanish) that he was "not aware of the details of the project and after having become aware of it I decided not to continue spreading the word."[114]

### C.    DISSECTING THE $LIBRA FRAUD

273.    The February 14, 2025 launch of $LIBRA on the Meteora DLMM was an extraordinary public fraud in several ways.

274.    <u>First</u>, and most straightforward: there was no "Viva La Libertad" Project at all: beyond the several-hours-old VLL Website, and a call the preceding day to Mr. Peh to request Kip Protocol's involvement distributing funds, it did not exist.  Defendant Davis has publicly admitted as much, as set forth in greater detail below.

275.    Of course, the tens of thousands of investors who traded valuable digital assets for $LIBRA tokens after the publication of President Milei's first post on X ostensibly did so because

---

[114] Javier Milei (@JMilei), Status update, *X* (Feb. 14, 2025, 10:38 PM), https://x.com/JMilei/status/1890606683291779195.

they believed the opposite, *i.e.*, that there was a legitimate "Argentinian" investment project affiliated with and supported by the Milei administration.

276.    Dave Portnoy, the founder and owner of Barstool Sports publicly explained his purchase decision as follows: "I bought 10 minutes or so after Milei tweeted. I woulda (sic) bought 10 milly (sic) if I could have. That's how sold I was on this."[115]

277.    As explained in greater detail immediately below, the Kelsier and Meteora Defendants designed and executed a highly sophisticated capital extraction scheme based on the unique features of the Meteora DLMM—and the unique expertise in those features furnished by the Meteora Defendants—that yielded them hundreds of millions of dollars in profits, at investors' expense, in a matter of a few hours.

### D.    THE CAPITAL EXTRACTION SCHEME

278.    Almost immediately, Defendants and their associates began systematically extracting tens of millions in USDC and SOL paid by investors to purchase $LIBRA.

279.    Shortly after using LIBRA Wallet 1 minted 1,000,000,000 $LIBRA, it began transferring $LIBRA to, and receiving $LIBRA and USDC from, the $LIBRA/USDC Pool.  Over the course of a 107-minte period, from about 4:40pm EST to about 6:27pm EST on February 14, 2025, LIBRA Wallet 1 received a total of 13,060,482 USDC from the $LIBRA/USDC Pool—*i.e.*, the single-sided DLMM pool Defendants had created to launch $LIBRA.[116]

280.    In addition, LIBRA Wallet 1 sent $LIBRA to a series of other wallets (the "USDC Intermediary Wallets") that similarly began transferring $LIBRA to, and receiving $LIBRA and USDC from, the $LIBRA/USDC Pool.

---

[115] https://x.com/stoolpresidente/status/1891286119347630523

[116] The flow of funds between LIBRA Wallet 1, LIBRA Wallet 2, the USDC Intermediary Wallets and the $LIBRA/USDC Pool is laid out in detail in the Declaration of Justin Ehrenhofer, filed in this action on May 29, 2025 (ECF No. 17).  That report is incorporated by reference herein.

281.    Between February 14 and 16, 2025, the USDC Intermediary Wallets executed a series of transactions that cumulatively extracted a total of 44,593,888 USDC from the $LIBRA/USDC Pool, and then sent those assets to LIBRA Wallet 2.

282.    A similar pattern of systematic extraction played out in $LIBRA/SOL Pool-1 and $LIBRA/SOL Pool-2, with LIBRA Wallet 1 funding a series of other wallets (the "SOL Intermediary Wallets"), which in turn transacted directly and indirectly with $LIBRA/SOL Pool-1 and $LIBRA/SOL Pool-2.

283.    On February 14 and 15, 2025, the SOL Intermediary Wallets executed a series of transactions that cumulatively extracted significant quantities of SOL from the $LIBRA/SOL liquidity pools, and sent it to three principal receiving wallet addresses, as follows: (i) 69,275.9 SOL to SOL Wallet 1; 148,343.02 SOL to SOL Wallet 2; 32,045.7 SOL to SOL Wallet 3.[117]

284.    On February 15, 2025, at approximately 0:15 UTC... the wallet owner added liquidity to the pool and then removed it shortly after, resulting in a net extraction of value. This pattern indicates intentional short-duration positions to inflate prices before dumping.[118]

285.    Transactions show funds flowing from retail wallets into the pools, then extracted via intermediate wallets controlled by insiders, totaling over 100 SOL in net outflows within the first hour.[119]

286.    This capital extraction was a highly technically sophisticated fraud that manipulated the Meteora DLMM and the systems upon which retail investors relied to detect fraud.

---

[117] The flow of funds between LIBRA Wallet 1, the SOL Intermediary Wallets, the $LIBRA/SOL Pools and SOL Wallets 1, 2, and 3 is laid out in detail in the Declaration of Justin Ehrenhofer filed in this action on July 28, 2025. That report is incorporated by reference herein.

[118] ECF 112 at Page 14, ¶ 28

[119] ECF 112 at Page 12, ¶ 23

The technical sophistication of the scheme suggests that Defendant Chow's role was not, as he has publicly asserted, limited to technical "support," but also included technical design.

287.    In essence, LIBRA Wallet 1, the USDC Intermediary Wallets, and the SOL Intermediary Wallets, sent a series of instructions to the Meteora DLMM, by which they initialized and then terminated specific liquidity positions in the $LIBRA Pools.  As the price of $LIBRA changed, so did the active DLMM "bin."  As a result, during the period of rapid price inflation, by adding liquidity (in the form of $LIBRA tokens) to specific "bins," and then removing that liquidity from those bins just a few minutes later, the USDC Intermediary Wallets and SOL Intermediary Wallets extracted the USDC and SOL paid by investors in the interim.  The USDC Intermediary Wallets and SOL Intermediary Wallets extracted enormous quantities of both assets by executing such transactions repeatedly.[120]

288.    Defendants also intentionally designed a DLMM "bin" structure that helped facilitate the rapid post-launch escalation in the price of $LIBRA.

289.    Defendants' capital extraction plan also manipulated retail traders' reliance on UIs and on DEX Screener analytics.

290.    For example, by using a one-sided Meteora DLMM launch pool, Defendants manufactured a highly misleading "slippage" assessment that showed only buy-side slippage for $LIBRA.  If omitted sell-side slippage which, on information and belief, would have been considerable, due to Defendants' rapid extraction of capital from the $LIBRA Pools.

291.    As seen in Figure 6 which includes the total number of positions, the average duration of positions was under 10 minutes, with the majority closed within seconds of creation.

---

[120] See ECF 112

This excludes positions with zero duration, indicating rapid extraction rather than genuine liquidity provision.[121]

292.    Likewise, in contrast to the $LIBRA sent directly from LIBRA Wallet 1 to the $LIBRA/USDC, which was "locked," none of the $LIBRA deposited in the $LIBRA Pools by the USDC or SOL Intermediary was locked.   Defendants successfully mimicked an important indicator that the $LIBRA Launch was not a rug pull—*i.e.*, because the Mint Wallet had publicly "locked" its liquidity—and then executed a rug pool using different wallets.

## V.    IN THE WAKE OF THE $LIBRA SCANDAL, DEFENDANTS ARE WIDELY PUBLICLY ACCUSED OF SERIAL FRAUD

293.    $LIBRA was an instant, and very high-profile, scandal.   In its wake, there widespread accusations of corruption and fraud, aimed at the Meteora Defendants, the Kelsier Defendants, KIP Protocol, Julian Peh, and President Javier Milei, among others.

294.    In response, Defendants took to social media to offer purported explanations and partial apologies, to disclaim fault, and to implicate others.   Many of Defendants' associates and collaborators did the same.   Their respective statements contain a surprising number of presumably unintended material admissions.

295.    On February 15, 2025, at 2:15pm, KIP Protocol posted a statement on X disclaiming any role in the $LIBRA launch and asserting: that "The [$LIBRA] token launch and market making were fully handled by @Kelsier Ventures, represented by Hayden Davis, the initiators of the Project."[122]   The post also reported that, based on KIP Protocol's "discussions with Kelsier," certain steps would be imminently taken including: "all SOL from today's launch will be

---

[121] ECF 112 Page 26, ¶ 57

[122] KIP Protocol (@KIPprotocol), Status update, *X* (Feb. 15, 2025, 2:22 PM), https://x.com/KIPprotocol/status/1890844030235561984.

re-injected into the LP/chart" and (ii) "[a]ll market-making fees will go to a foundation in Argentina," which would "continue running the program as originally planned."[123]

296.     **February 15, 2025 – Defendants Hayden Davis and Kelsier**.  On February 15, 2025, at 7:05 p.m., Kelsier posted on X two statements from Defendant Hayden Davis (i) a video statement from Defendant Hayden Davis[124], and (ii) a press release from Defendant Hayden Davis titled "Libra Token Launch: Addressing Recent Developments."[125]

297.     In the press release, Defendant Davis confirmed: "Regarding my role, I was responsible for ensuring liquidity for the project and still maintain control over all associated fees and treasury funds."  He also admitted that investors had relied on the Milei endorsement, explaining:

> "It is crucial to recognize that memecoin investments are driven by trust and endorsement. When Milei and his team deleted their posts, investors who had purchased the token based on their trust in his endorsement felt betrayed. This led to a wave of panic selling, further exacerbating the situation. The sudden loss of confidence had a catastrophic impace on the token's market stability"

298.     In the video statement, Defendant Davis asserted that he had "managed to round up" "every single dollar that's been collected, or from fees or farming, or liquidated."  He asserted that it was his "intention is to inject everything back into the libra chart" within "the next 24 to 48 hours."  Moments later, he invited alternative suggestions:  "I am open if there is a different plan that benefits all of you more, for anybody, especially any crypto leaders that have a structural plan."

---

[123] *Id.*

[124] Kelsier Ventures (@KelsierVentures), Status update, *X* (Feb. 15, 2025, 7:02 PM), https://x.com/KelsierVentures/status/1890914579493863532.

[125] Kelsier Ventures (@KelsierVentures), Status update, *X* (Feb. 15, 2025, 7:02 PM), https://x.com/KelsierVentures/status/1890914583910449505.

299.    Defendant Davis also publicly named others that had "benefited from [$LIBRA] on the fee side," including Defendant Meteora, Jupiter, BullX, Photon, and Moonshot, and publicly "call[ed] on" them to "do the same thing."

300.    **February 16, 2025 – Defendant Chow.**  On February 16, 2025 at 11:18PM, Defendant Chow published a purported explanation of "Meteora and my involvement in $LIBRA" on X. [126]  He statement confirmed that, as a practical matter, Meteora protocols are *not* "permissionless," explaining:

> Meteora's DLMM and Dynamic AMM is a complex permissionless system with an incredible number of configuration options for teams looking to launch with it. There are various ways to lock liquidity, assign custody, design liquidity curves, and different ways to combat snipers including using our Alpha Vault.  I often personally provide tech support for launches to help teams navigate the product. Mistakes can seriously impact a launch and it's important to Meteora to help teams by configuring the product correctly.

301.    Thus, launch time and "token/pool address" are provided "to me and an on-call engineer or two," although only "a few minutes before an actual launch, if at all."

302.    'lockReleasePoint' is described as 'Timestamp' that depositor can withdraw the liquidity from the position... analysis shows positions were locked briefly then released en masse, allowing insiders to extract liquidity after price peaks, with average durations indicating coordinated dumping. [127]

303.    Defendant Chow further explained the particular circumstances presented by high-profile memecoin launches:

> When non-crypto natives (e.g. celebrities, politicians, etc.) want to launch a token, they typically need to hire a "deployer" and/or market-maker, which is a service we do not provide. These deployer

---

[126] benchow.sol (@hellochow), Status update, *X* (Feb. 16, 2025, 11:18 PM), https://x.com/hellochow/status/1891341548115149190.

[127] ECF 112 at Page 23, ¶ 53 (cross referencing page 25 ¶ 56)

teams are typically experts in using Meteora's SDK or CLI and can design more sophisticated launches, as our tech allows for tons of customization. In the past, if a project did not have those resources, they would often ask me for deployer and/or market-making referrals.

304.    With respect to $M3M3:

When we launched our new memecoin AMM platform in December 2024, I asked Hayden and Kelsier Ventures if they would be interested in launching a token on the M3M3 platform in order to provide an initial case study on how it worked. And, while they deployed and launched M3M3 on their own, post-launch we decided on a new set of tokenomics and facilitated a grant for the Meteora community as well as to establish a long-term foundation for M3M3.

305.    With respect to $LIBRA:

For, although we were made aware of the possibility of it several weeks ago by Hayden, we had no involvement in the project at all beyond providing IT support, including commenting on the liquidity curve and helping verify the token's authenticity after the token was publicly launched.

306.    **February 16, 2025 – Jupiter.**    On February 16, 2025 at 12:42p.m., Jupiter published a statement purporting to disclaim its involvement in the $LIBRA scandal.[128]

307.    **February 16, 2025 – Coffeezilla interview with Hayden Davis**.[129]    On February 16, 2025, [coffeezilla] published a recorded interview with Defendant Hayden Davis.

308.    CZ interview:

"there's an unfair advantage if you're a genius on chain and you know how to game the system on Meteora. And there's 30 guys in the world that know how to do that."  13:07.

With respect to $Melania: "I was part of it. I think the team did want to snipe it because of how big the snipe was on Trump's." – 27:15

---

[128] https://bitpinas.com/cryptocurrency/quick-take-jupiter-libra/

[129] https://www.youtube.com/watch?v=EqizJTbxAEM

Asked about "One of the wallets we traced to the Portnoy thing, the Portnoy thing, your wallet, or not, I don't know if it's your wallet, whoever's wallet that was, sent money to a wallet which had like, got sent $1.5 million of Melania token from something called melania-liquidity2.sol, and then that wallet seemed to sell Melania tokens that it received for free.", Davis clarifies that the launch team: "Didn't swap liquidity. Didn't swap into single-sided. I didn't say there was no money sold. There's a difference between swapping the liquidity and selling liquidations." – 29:04.

Fees:

And then there's also, of course, the platforms that make fuckloads of money. No matter if there's a rug pull or a project goes well or not, which I completely disagree with. And I completely disagree with it. Like pump funds, fucking full of shit, Meteora, Jupiter, BullX, Photon, all these guys, it doesn't matter. They're just making money on trading fees. – 30:05

309. **February 17, 2025 – Dave Portnoy interview with Hayden Davis.**[130] In an interview with Defendant Davis, he admits to being in control of the liquidity funds used in the $libra token launch.

310. **February 17, 2025 - Moty Povolotski (@CavemanDhirk)**. On February 17, 2025 at 9:55a.m., Moty Povolotski, the co-founder of DeFiTuna, posted a thread to X in which he announced that DeFiTuna had "refunded" an investment recently received from Defendant Kelsier and "cut all ties" upon "finding out about Kelsier's activities."[131]

311. Mr. Povolotski accused Defendant Chow of complicity and Mr. Yeow of complacency:

"It has been an internal secret that there is a massive spiderweb of influencers who are banking millions from the Meteora community enabled by the leadership team of Ben."

"I have personally called Ben and have received clear communication on his behalf that he will be stepping down after his realization that his playground was exposed. Today he gave everyone a nothingburger of a statement."

---

[130] https://www.youtube.com/watch?v=N5XqQlGSq0M

[131] *Hayden Davis Tells All On The $LIBRA Launch*, *Dave Portnoy, Youtube* (Feb. 17, 2025), https://www.youtube.com/watch?v=N5XqQlGSq0M (last visited July 27, 2025).

"I have seen no initiative, no names called out on @hellochow or @weremeow 's behalf."[132]

312.    **February 17, 2025 – Solana Floor**.  That same day, @SolanaFloor announced on X: " 🚨 BREAKING: SolanaFloor has obtained exclusive video evidence exposing a $200M+ memecoin extraction scheme tied to @KelsierVentures, @MeteoraAG and @WEAREM3M3_".[133]

313.    The "exclusive evidence" in question was the recording of a call between Mr. Povolotski and Defendant Chow. Defendant Chow admits to collaborating with Hayden Davis to establish the framework for multiple token launches. He also acknowledges instructing other launchers on using Meteora's technology to maximize profits from unsuspecting investors. Regarding his relationship with Hayden Davis and reflecting on the resulting harm, Defendant Chow states, "I fucked up because I enabled the guy. I should not have enabled him," in reference to their involvement in various token launches.

314.    **February 17, 2025 – Ming Yeow**.  Later that same day, on February 17, 2025 at 8:42pm, Mr. Yeow published his own account of the scandal, emphasizing the operational separation between Meteora and Jupiter.[134]

315.    Mr. Yeow's statement suggested that he and Jupiter had authority over the Meteora Defendants.  For example, with respect to Defendant Chow: "I have accepted his resignation." With respect to Defendant Meteora:  "we are hiring an independent 3rd party (Fenwick & West, one of the most reputable law firms in the world) to investigate and issue an [*sic*] report which

---

[132] CavemanDhirk (@CavemanDhirk), Status update, *X* (Feb. 17, 2025, 9:55 AM), https://x.com/CavemanDhirk/status/1891501745844502760.

[133] SolanaFloor (@SolanaFloor), Status update, *X* (Feb. 17, 2025, 6:43 PM), https://x.com/SolanaFloor/status/1891634661748527554.

[134] weremeow (@weremeow), Status update, *X* (Feb. 17, 2025, 8:42 PM), https://x.com/weremeow/status/1891664435321647186.

they will publish independently."[135]  Going forward, "we will be looking for new leadership for Meteora."

316.    On March 6, 2025, Meteora announced its new leadership:  Zhen Hoe Yong (@realdezen), who introduced himself in a statement published on X and partially reproduced below:[136]



317.    Later in that same post, Mr. Hoe Yong announced that Meteora would "be further bolstering the team" with an "integral" member of the Jupiter team, who would "spearhead our efforts on partnerships, integrations and comms."

## VI.    CONTINUING FRAUD

---

[135] On information and belief, no such report has been published.

[136]  Zen (@realdezen), Status update, *X* (Mar. 6, 2025, 11:02 AM), https://x.com/realdezen/status/1897679079694106992.

318.    In addition to the M3M3 Platform, $M3M3 and $LIBRA, the Meteora Defendants and the Kelsier Defendants have collaborated on multiple other similar and related investor frauds, directly, and through their respective associates and affiliates.

319.    As Defendant Chow admitted in his February 16, 2025 post on X, he "referred" a "handful of other projects that had inquired with us about deployer firms" to the Kelsier Defendants.[137]

320.    Defendant Hayden Davis has openly admitted the Kelsier Defendants' involvement in the launch of other high-profile tokens launched on Meteora and he has publicly admitted covertly sniping those launches.

321.    All of those token launches have been credibly publicly accused of fraud, similar to that alleged herein with respect to the launches of $M3M3 and $LIBRA.

322.    The Meteora and Kelsier Defendants have also used the M3M3 Platform and purported "M3M3 Community" to artificially re-inflate the price of tokens in which both sets of Defendants have a continuing financial interest.    That includes all tokens that the Kelsier Defendants launched on Meteora for which they created "stake to earn" pools which, on information and belief, is every token launched using Meteora's Dynamic AMM.

323.    The Meteora and Kelsier Defendants are thus continuing to extract profits from their token launch fraud scheme.

324.    For example, as of the date of this filing, Meteora hosts "stake to earn" pools for, among others, $M3M3, $ENRON, and $AIAI.    Each of these pools drives profit to the Meteora Defendants, as do the corresponding liquidity pools on Meteora Programs.    That includes Defendant Chow who, by his own admission, continues to earn Meteora trading fees through non-

_____

https://x.com/hellochow/status/1891341548115149190

party DLL. On information and belief, they simultaneously drive profit to the Kelsier Defendants, who created and control the "stake to earn" pools and associated launch and liquidity pools on Meteora.

325. The Meteora and Kelsier Defendants are likewise jointly profiting from the trading fee revenues they continue to split on ongoing trading activities in Kelsier-launched tokens.

326. Contrary to their respective representations, the Meteora and Kelsier Defendants exercise continuing, joint control over that activity and their own continuing, joint unjust enrichment.

327. The Meteora Defendants exercise control over every relevant Meteora Program—the DLMM, the Dynamic AMM, and M3M3—through the Meteora Program MultiSig, as alleged in detail above.   The Kelsier Defendants exercise control over the relevant launch and liquidity pools operating in those Programs through their control of the corresponding Mint Wallets.

## VII.    CLASS ACTION ALLEGATIONS

328. Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a proposed class (the "Class") of all investors that purchased $M3M3 Tokens or $LIBRA Tokens between December 4, 2024 and the date on which this action was initiated, April 19, 2025 (the proposed "Class Period"); a proposed sub-class of all investors that purchased $M3M3 during the Class Period (the "$M3M3 Subclass"); and a proposed sub-class of all investors that purchased $LIBRA (the "$LIBRA Subclass," and together with the M3M3 Subclass, the "Subclasses") during the Class Period.

329. Excluded from the Class and Subclasses are Defendants and their agents, representatives, corporate officers, board members, senior executives, immediate family members, heirs, successors, assigns, and any entities in which any of the foregoing have or had a controlling interest.

330.    The proposed Class and Subclasses satisfy the requirements of Rule 23 as follows:

### A.    Numerosity

331.    The members of the Class and both Subclasses are so numerous that joinder of all members is impracticable. While the exact number of members is unknown and can only be ascertained through appropriate discovery, on information and belief, there are many hundreds of non-insider investors that purchased $M3M3 during the Class Period and many thousands of investors that purchase $LIBRA during the Class Period.

### B.    Typicality

332.    Plaintiffs are non-insider retail investors in Solana-based digital assets who purchased Tokens at inflated prices as a direct result of Defendants' fraudulent scheme. Plaintiffs' claims are thus typical of the claims of all unnamed members of the Class.

333.    Plaintiff Anuj Mehta is a typical member of the $M3M3 Subclass. Like other subclass members, he: (1) received $M3M3 tokens via airdrop on December 4, 2024; (2) purchased additional $M3M3 tokens based on Defendants' false representations about the M3M3 Platform and $M3M3's legitimacy; (3) relied on Defendant Chow's reputation and Meteora's purported trustworthiness; (4) was unaware of Defendants' secret partnership and manipulation scheme; and (5) suffered net losses of approximately $19,164 when the token's artificially inflated price collapsed.

334.    Plaintiff Omar Hurlock is a typical member of the $LIBRA Subclass. Like other subclass members, he: (1) purchased $LIBRA tokens on February 14, 2025, based on President Milei's endorsement; (2) believed there was a legitimate "Viva La Libertad Project" backed by the Argentine government; (3) relied on Meteora's reputation as a trustworthy launch platform; (4) was unaware that there was no actual underlying project and that Defendants were executing a

sophisticated capital extraction scheme; and (5) suffered immediate losses when the token price collapsed after Milei's retraction, losing approximately 0.302 wSOL across his two wallets.

### C.    Adequacy

335.    Plaintiffs will adequately protect the interests of all unnamed members of the proposed Class and Subclasses, with whom Plaintiffs have no known conflicts.  Each Plaintiff's claims are typical of the proposed Class and of the proposed Subclass to which he belongs.

### D.    Predominance and Superiority

336.    Questions of fact and law common to all members of the Class and Subclasses predominate in this action over any questions affecting only individual members.

337.    Questions of law and fact common to all members of the Class include:

(a)    Whether the Meteora Defendants and the Kelsier Defendants constitute a RICO "enterprise";

(b)    Whether the Defendants conducted or participated, directly or indirectly, in the conduct of that enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c);

(c)    Where that pattern of racketeering activity was conducted in furtherance of a common fraudulent scheme;

(d)    Whether Defendants' pattern of racketeering activity caused injury to the Class;

(e)    Whether Defendants operated as an association-in-fact enterprise;

(f)    Whether Defendants' conduct violated federal wire fraud statutes;

(g)    Whether the proper measure of damages includes restitution and disgorgement.

338.    Questions of law and fact common to all members of the $M3M3 subclass include:

(a)    Whether Defendants committed "deceptive acts and practices" in violation of New York's General Business Law in connection with their offer, sale, and promotion of $M3M3;

(b)    Whether Defendants engaged in false advertising in violation of New York's General Business Law in connection with $M3M3;

(c)    Whether Defendants were unjustly enriched as a result of their offer and sale of $M3M3;

(d)    Whether non-insider investors sustained damages as a result of Defendants' offer and sale of $M3M3;

(e)    Whether Defendants are liable to non-insider investors for damages sustained in connection with their purchase of $M3M3 and, if so, the proper measure of damages;

(f)    Whether punitive damages are warranted;

339.    Questions of law and fact common to all members of the $LIBRA subclass include:

340.    Whether Defendants committed "deceptive acts and practices" in violation of New York's General Business Law in connection with their offer, sale, and promotion of $LIBRA;

(a)    Whether Defendants engaged in false advertising in violation of New York's General Business Law in connection with $LIBRA;

(b)    Whether Defendants were unjustly enriched as a result of their offer and sale of $LIBRA;

(c)    Whether non-insider investors sustained damages as a result of Defendants' offer and sale of $LIBRA;

(d)    Whether Defendants are liable to non-insider investors for damages sustained in connection with their purchase of $LIBRA and, if so, the proper measure of damages;

341.    Members of the Class are readily identifiable by publicly accessible information. The public nature of the blockchain transactions at issue in this action means it is relatively easy to communicate with $M3M3 and $LIBRA investors and to ascertain the dates and amounts of their investments.

342.    Class treatment is superior to all other methods because it will permit a large number of similarly situated persons to prosecute their common claims in a single forum efficiently, and without the duplication of effort and expense that numerous individual actions would require.

343.    Class treatment will also permit adjudication of claims belonging to a large number of Class members who could not afford to litigate those claims on an individual basis. In addition, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent adjudications establishing incompatible standards of conduct for Defendants.

344.    Plaintiffs are unaware of any difficulties likely to arise in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I.  Fraud - $M3M3
(*on behalf of the $M3M3 Subclass; against all Defendants*)

345.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

346.    By marketing the $M3M3 Token as the "debut" memecoin on the M3M3 Platform, Investors had a reasonable expectations that Defendants would make sincere, good-faith efforts to ensure that the launch would be transparent and fair.

347.    Instead, these Defendants systematically rigged the launch at the expense of Plaintiffs and class members' and for the benefit of a few, select insiders to extract value from Plaintiffs and the other Subclass members.

348.    Defendants made material false representations of fact about the M3M3 Platform and the $M3M3 Token launch to Plaintiffs, Subclass members, and the investing public generally.

349.    For example, Defendants represented that $M3M3 would be offered to the public in a transparent, fair, and reliable "launch" by repeatedly associating the launch exclusively with Meteora (whose technological proficiency had earned it a reputation for being a respectable platform) and by Defendant Chow (a then highly respected and trusted senior leader in the Solana ecosystem).

350.    Defendants also represented $M3M3 as a superior investment because, in contrast to most memecoins, $M3M3 offered retail investors consistent, passive income generated on Meteora through the innovative staking mechanism purportedly at the heart of the M3M3 Platform and the skill, expertise, and trustworthiness of the Meteora team purportedly solely responsible for the M3M3 Platform and ostensibly behind $M3M3.

351.    Defendants publicly represented that $M3M3 stakers would receive substantial passive income, specifically claiming 'Over $4.5 million in rewards already accumulated' and '$200,000 or more daily being paid out to top stakers,' when in fact these figures were inflated and the Platform was designed to benefit insiders rather than retail investors.

352.    They also falsely represented—on statements prominently displayed on Meteora's website and on social media—that the amount of passive income available to $M3M3 investors was substantial, *e.g.*, "Over $4.5 million in rewards already accumulated," "$200,000 or more daily being paid out to top stakers."

353.    Defendants also committed fraud by omission.  Defendants did not disclose their plan to extract profits from unsuspecting investors by manipulating the $M3M3 Token launch and market price.

354.    Defendants also intentionally concealed the involvement of Kelsier and the Davis Defendants in the M3M3 Platform, $M3M3, their financial interests therein, and the central role they played in designing and executing all related promotions and in launching $M3M3.

355.    Defendants' representations and omissions were materially misleading because the $M3M3 launch was neither public nor fairly conducted and because $M3M3 market price was secretly intentionally manipulated by Defendants, as alleged herein.

356.    Defendants knew that those material representations were false when made because they had secretly designed the $M3M3 launch to benefit insiders through the coordinated use of

90

150 Insider Wallets, the temporary freezing of the $M3M3 Token Account, and their pre-planned capital extraction scheme detailed in their private planning documents including the 'M3M3 Calcs Template' and 'M3M3 Token Launch Organizer.

357.    These misrepresentations were material because they concerned the fundamental characteristics of the $M3M3 investment - specifically whether it was offered in a fair public launch and whether it would generate the promised returns - factors that reasonable investors would consider important in deciding whether to purchase $M3M3 tokens.

358.    Defendants intended for Plaintiffs and other investors to rely on their false representations and omissions, and they intended to defraud thereby.

359.    Plaintiffs and other Subclass members reasonably relied on Defendants' false representations and omissions to purchase the $M3M3 Tokens at artificially inflated prices.

360.    As a direct and proximate result of their reasonable reliance on Defendants' material misrepresentations, Plaintiffs and other Subclass members suffered damages including: (i) purchasing $M3M3 tokens at artificially inflated prices that did not reflect their true market value; (ii) holding tokens longer than they otherwise would have due to false promises about the M3M3 Platform's benefits; (iii) incurring transaction fees on manipulated trading; and (iv) opportunity costs from investing in a fraudulent scheme rather than legitimate investments.

361.    Plaintiffs and other Subclass members are entitled to damages, imposition of a constructive trust over all ill-gotten gains traceable to the $M3M3 fraud, and punitive damages in amounts to be determined at trial, along with interest, attorneys' fees, and litigation costs, and such other relief as may be available.

362.    Plaintiffs and class members reasonably relied upon these Defendants' representations and omissions in deciding to use the M3M3 Platform and purchase the M3M3 token.

## COUNT II. Fraud - $LIBRA
(*on behalf of the $LIBRA Subclass; against all Defendants*)

363.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

364.    Defendants made material false representations including: (i) that a legitimate 'Viva La Libertad Project' (VLL) existed to provide funding for Argentine entrepreneurs and education when no such project existed beyond a hastily-created website; (ii) that the project was affiliated with and supported by the Argentine government and President Milei's administration; (iii) that the token distribution plan published on the VLL Website accurately reflected how $LIBRA tokens would be allocated, when Defendants secretly planned to acquire far more than the publicly disclosed 20% 'Treasury' allocation through insider trading and sniping; and (iv) that the launch would be conducted fairly on Meteora's trusted platform.

365.    Defendants knew these representations were false when made because: (i) Defendant Davis admitted there was no actual 'Viva La Libertad Project' beyond the website created hours before launch; (ii) they had contacted KIP Protocol only one day before launch to request fund distribution, demonstrating the project's fabricated nature; (iii) they had pre-planned to snipe their own launch and extract capital through sophisticated DLMM manipulation techniques; and (iv) they coordinated the timing of President Milei's endorsement as part of their fraudulent scheme.

366.    Defendants intended to defraud investors by timing President Milei's endorsement to create maximum investor interest, designing sophisticated capital extraction mechanisms using the Meteora DLMM's technical features, and pre-positioning themselves to systematically extract tens of millions in USDC and SOL from retail investors within hours of launch, as evidenced by their extraction of 57,653,370 USDC.

367.     Plaintiffs and other Subclass members reasonably relied on Defendants' false representations and omissions, including President Milei's endorsement procured by Defendants, the false representation of a legitimate investment project, and the misleading token distribution plan, in deciding to purchase $LIBRA tokens.

368.     As a direct and proximate result of their reasonable reliance on Defendants' material misrepresentations, Plaintiffs and other Subclass members suffered damages including: (i) purchasing $LIBRA tokens at artificially inflated prices that collapsed within hours; (ii) losses from Defendants' sophisticated capital extraction scheme that systematically drained liquidity from the pools; (iii) transaction fees on manipulated trading; and (iv) the complete loss of investment value when the token collapsed after President Milei's retraction.

369.     Plaintiffs and other Subclass members are entitled to damages, imposition of a constructive trust over all ill-gotten gains traceable to the $LIBRA fraud, punitive damages in amounts to be determined at trial, along with interest, attorneys' fees, and litigation costs, and such other relief as may be available.

## COUNT III.  Conspiracy to Defraud
(*on behalf of the Class; against all Defendants*)

370.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

371.     The Meteora Defendants and the Kelsier Defendants conspired with each other by entering into a series of corrupt agreements to launch high-profile memecoins in a manner that defrauded retail investors by manipulating Meteora protocols.

372.     Each Defendant had actual knowledge of the fraudulent scheme through: (i) their participation in the private $M3M3 Telegram Group where they coordinated planning; (ii) their collaborative creation and sharing of confidential planning documents including the 'M3M3 Calcs Template' created by Defendant Chow and the 'M3M3 Token Launch Organizer' created by

Defendant Charles Thomas Davis; (iii) coordinated planning calls where Defendant Chow explicitly acknowledged the deceptive nature of their scheme, stating 'no one will play the game if they see, like 90% of the supply already locked up' and explaining to Defendant Hayden Davis that only about 5% would actually be available to the public; and (iv) their joint execution of the secret partnership agreement in October 2024 whereby the Kelsier Defendants agreed to invest approximately $2 million to fund the launch and price inflation scheme for $M3M3.

373.    The Defendants therefore ensured that this [partnership] would remain secret from the marketplace as a whole, including by not disclosing the partnership to Plaintiffs and class members.

374.    Every Defendant knowingly participated in the fraudulent schemes described above and intentionally took independent actions in furtherance of those schemes.

375.    Under principles of conspiracy liability, each Defendant is liable for all reasonably foreseeable acts of co-conspirators committed in furtherance of their joint fraudulent scheme, including the $M3M3 manipulation scheme executed in December 2024 and the $LIBRA extraction scheme executed in February 2025, regardless of which specific Defendant performed each individual act.

### COUNT IV.  RICO Section 1962(c)
(*on behalf of the Class; against all Defendants*)

376.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

377.    Each Defendant is a "person" under 18 U.S.C. § 1961(3) because each is an "individual or entity capable of holding a legal or beneficial interest in property."

### *Enterprise*

378.    The "Meteora-Kelsier Enterprise" consists of an association-in-fact created by the ongoing relationships between Defendants Benjamin Chow, Meteora, Hayden Davis, Charles

Thomas Davis, Gideon Davis, and Kelsier Ventures, and non-Parties Ming Yeow ("Meow"), Jupiter, and their respective agents, employees, and controlled entities including Raccoon Labs, Block Raccoon, Dynamic Labs, and DLL. The Enterprise operates as an integrated fraud factory with distinct but coordinated roles: the Meteora Defendants provide the technical infrastructure and cultivate legitimacy, while the Kelsier Defendants provide capital, marketing expertise, and execute extraction schemes.

379.    ***Common Purpose and Structure.*** The Enterprise operates with a unified purpose to systematically defraud retail cryptocurrency investors through a two-pronged approach: (i) False Safety Apparatus: marketing Meteora's protocols as safe, transparent, and pro-investor technology when they are specifically designed to facilitate insider manipulation and capital extraction; and (ii) Maximum Extraction Infrastructure: utilizing the technical sophistication of Meteora's upgradeable smart contracts, particularly the DLMM and Dynamic AMM programs, to enable coordinated insiders to extract maximum capital from retail investors while maintaining plausible deniability.

380.    **Organization. The** Enterprise operates through a defined hierarchy:

381.    ***Technical Control Layer****:* Defendant Chow and the Meteora Defendants control the underlying blockchain programs through the 4-of-7 Meteora Program MultiSig, enabling them to modify, upgrade, and manipulate the smart contracts that govern all transactions;

382.    ***Capital and Marketing Layer****:* The Kelsier Defendants provide funding for manipulation schemes and coordinate high-profile promotional campaigns, including procuring celebrity and government endorsements;

383.    ***Revenue Distribution Network****:* Non-parties Jupiter, Raccoon Labs, Block Raccoon, and DLL facilitate the ongoing distribution of trading fees and profits generated from the fraudulent schemes, ensuring all Enterprise members benefit from the continuing fraud.

384.    ***Fraud Factory Operations.*** The Enterprise operates as a systematic fraud factory that repeatedly executes the same pattern: (i) the Meteora Defendants build and promote "innovative" DeFi protocols while concealing their extractive features; (ii) the Enterprise cultivates trust within the Solana community through false representations about fairness and transparency; (iii) the Kelsier Defendants identify high-profile memecoin launch opportunities; (iv) the Enterprise coordinates technically sophisticated launch and extraction schemes using Meteora's infrastructure; (v) retail investors are systematically defrauded through artificial price manipulation and capital extraction; and (vi) the Enterprise members split the proceeds while publicly disclaiming responsibility.

385.    ***Interstate Commerce.*** The Enterprise's activities affect interstate and foreign commerce through: blockchain transactions processed by validators located throughout the United States; targeting of U.S. retail investors through English-language promotional campaigns; utilization of U.S.-based social media platforms, cryptocurrency exchanges, and financial infrastructure; and the systematic extraction of millions of dollars from U.S. investors, which is then laundered through international cryptocurrency mixers and offshore entities to obscure the Enterprise's coordinated activities.

386.    ***Continuity and Ongoing Operations.*** The Enterprise demonstrates continuity through its systematic operation since at least October 2024, its ongoing revenue-sharing arrangements, its repeated execution of similar fraudulent schemes across multiple token launches ($M3M3, $LIBRA, and others), and its continuing operation of the rebranded "Stake2Earn" platform that perpetuates the fraud by attracting new victims and generating ongoing trading fees for Enterprise members.

### ***Pattern of Racketeering Activity***

387. Defendants engaged in a pattern of racketeering activity by devising a scheme to defraud retail investors in Solana-based digital assets out of money or property and by repeatedly using the interstate wires in furtherance of that scheme, as alleged in detail herein, in violation of 18 U.S.C. § 1343.

388. Defendants' pattern of racketeering activity in furtherance of the Meteora-Kelsier Scheme comprises tens of thousands of predicate acts, which include but are not limited to:

(a) Publishing thousands of false and misleading online promotions and communications about Meteora, the Meteora Platform, the M3M3 Platform, $M3M3, $LIBRA, and other Tokens on, without limitation: X, Medium.Com, YouTube, Discord, Telegram, LinkedIn, the Meteora Website, the Libra Website … using the channels and online handles listed in **Appendix A** and described in detail herein;

(b) Executing blockchain transactions to transfer the Kelsier Defendants' $2 million "pay to play" "investment" in Meteora and the M3M3 Platform in October of 2024;

(c) Executing blockchain transactions to apply the Kelsier Defendants' $2 million "pay to play" "investment" in Meteora and the M3M3 Platform in October of 2024 to fund Defendants' artificial price inflation scheme for $M3M3, including but not limited to funding the "Insider Wallets" Defendants used to inflate its price during the secret post-launch "freeze" period on December 4, 2024;

(d) Executing blockchain transactions to mint, launch, and illicitly snipe, and trade $M3M3 on the Meteora Platform on December 4, 2024;

(e) Executing blockchain transactions to mint $LIBRA, configure the $LIBRA Launch Pool on the Meteora DLMM; and launch $LIBRA, on February 14, 2025;

(f) Executing blockchain transactions to extract liquidity from the $Libra Launch Pool , on February 14, 2025;

(g) Executing blockchain transactions to mint, launch, illicitly snipe, and trade $M3M3 on the Meteora Platform on December 4, 2024, and continuing to execute transactions that distribute trading fees from $M3M3 to Defendants through DLL's "program account";

(h) Executing blockchain transactions to mint $LIBRA, configure the $LIBRA Launch Pool on the Meteora DLMM, and launch $LIBRA on February 14, 2025, and continuing to execute transactions related to ongoing trading in $LIBRA that generate fees for Defendants;

(i)     Executing blockchain transactions to extract liquidity from the $LIBRA Launch Pool on February 14, 2025;

(j)     Continuing to execute blockchain transactions that route trading fees from fraudulently launched tokens including $M3M3, $LIBRA, and others through Meteora protocols to accounts controlled by both the Meteora and Kelsier Defendants, including automatic transfers to DLL's program account;

(k)     Facilitating the ongoing dissipation of $M3M3 assets through centralized exchanges including ByBit, where Defendants continue to liquidate tokens acquired through their fraudulent schemes while retail investors suffer continuing losses;

389.    Defendants' pattern of racketeering activity is continuing.

390.    Every Defendant had, and continues to have, specific knowledge that the wires were being used, and are continuing to be used to advance and execute their fraudulent scheme.

391.    Each of these tens of thousands of uses of the wires constitutes a separate instance of wire fraud under 18 U.S.C. § 1343 and is thus a RICO predicate act.

392.    These predicate acts constitute a "pattern of racketeering activity" under 18 U.S.C. § 1961 and § 1962.  These predicate acts were, and continue to be, Defendants' regular way of doing business.

393.    Every Defendant, both individually and as a member of the Meteora-Kelsier Enterprise, conducted or participated in this pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  Every Defendant committed at least two predicate acts of racketeering.

394.    As a direct and proximate result of these violations of 18 U.S.C. § 1962(c), Plaintiffs and the Class have suffered substantial and concrete injury.  Without limitation, they have [paid inflated prices for digital assets and incurred transaction fees for assets they would not have purchased had they known of Defendants' fraudulent scheme].  These harms, and others, constitute injuries to Plaintiffs' property, and that of other members of the Class, under 18 U.S.C. § 1964.

395.    Defendants' pattern of racketeering activity has been directed towards hundreds of thousands of persons, including Plaintiffs and the Class.  Defendants' pattern of racketeering activities poses a threat of long-term illegality due to the complexity and scope of Defendants' fraudulent scheme and because Defendants' predicate acts were and continue to be Defendants' regular way of doing business.

396.    Accordingly, Plaintiffs and the Class are entitled to compensatory and treble damages in an amount to be determined at trial, together with interest, costs, and fees.

## COUNT V.  RICO Section 1962(d)
*(on behalf of the Class; against all Defendants)*

397.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

398.    In violation of 18 U.S.C. § 1962(d), the Meteora Defendants and the Kelsier Defendants conspired to violate the provisions of 18 U.S.C. § 1962(c), in that they knowingly agreed and conspired to conduct and participate in, directly and indirectly, the affairs of an enterprise through the pattern of racketeering described above.

399.    As part of, and to further, their conspiracy, the Meteora and Kelsier Defendants agreed to commit and conspired in the commission of the thousands of predicate acts described above, each with knowledge that those acts were taken in furtherance of a fraudulent scheme and a pattern of racketeering activity.

400.    Entering into a secret partnership agreement in October 2024 whereby the Kelsier Defendants agreed to invest approximately $2 million as "pay-to-play" funding to secure their partnership with Defendant Chow and Meteora;

401.    Creating and maintaining private communication channels, including the $M3M3 Telegram Group, where they coordinated their fraudulent schemes;

402.    Jointly developing confidential planning documents, including the "M3M3 Calcs Template" created by Defendant Chow and the "M3M3 Token Launch Organizer" created by Defendant Charles Thomas Davis;

403.    Conducting planning calls where they explicitly discussed their deceptive scheme, including Defendant Chow's acknowledgment that "no one will play the game if they see, like 90% of the supply already locked up";

404.    Agreeing to conceal the Kelsier Defendants' involvement from the public while leveraging the Meteora Defendants' reputation for legitimacy;

405.    Coordinating the timing and execution of fraudulent token launches, with the Meteora Defendants providing technical infrastructure and the Kelsier Defendants providing capital and marketing.

406.    As a direct and proximate result of these violations of 18 U.S.C. § 1962(d), Plaintiffs and the Class have suffered substantial and concrete injuries to their property under 18 U.S.C. § 1964.

407.    Accordingly, Plaintiffs and the Class are entitled to compensatory and treble damages in an amount to be determined at trial, together with interest, costs, and fees.

### COUNT VI.  N.Y. G.B.L. §§ 349 and 350 - $M3M3
*(on behalf of the $M3M3 Subclass; against all Defendants)*

408.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

409.    New York General Business Law ("GBL") § 349 prohibits "deceptive acts and practices in the conduct of any business, trade, or commerce or in the furnishing of any service" in New York State.

410.    GBL § 350 similarly prohibits "false advertising in the conduct of any business, trade or commerce or in the furnishing of any service" in New York State.

411.    Defendants engaged in "deceptive acts and practices" and in "false advertising" in New York in their joint promotion, offering, and sale of $M3M3. This conduct was aimed at the general public. Defendants also leveraged the reputation and standing of the Meteora Defendants by emphasizing their technological expertise, their purported commitment to investor protection, and their role as trusted leaders in the Solana ecosystem, while intentionally concealing the Kelsier Defendants' involvement.

412.    For example, Defendants publicly represented that $M3M3 offered retail investors consistent, passive income generated on Meteora through the innovative staking mechanism purportedly at the heart of the M3M3 Platform. They also falsely represented—on statements prominently displayed on Meteora's website and on social media—that the amount of passive income available to $M3M3 investors was substantial, *e.g.*, "Over $4.5 million in rewards already accumulated," "$200,000 or more daily being paid out to top stakers."

413.    Defendants also publicly represented that the $M3M3 Token launch was public and fairly conducted, which—if true—would mean that its post-launch price was correlated to its market value, as Defendants likewise strenuously publicly asserted.

414.    Defendants also leveraged the reputation and standing of the Meteora Defendants by emphasizing their connections with and purported good-faith support for $M3M3 and by intentionally concealing the Kelsier Defendants' involvement.  They also expressly encouraged investors to expect stable financial returns from $M3M3 based on the Meteora Defendants' purported good-faith commitment to and support for $M3M3 investors for the memecoin investment community more generally.

415.    Defendants' representations were materially misleading because the $M3M3 launch was neither public nor fairly conducted and because $M3M3 market price was secretly intentionally manipulated by Defendants, as alleged herein.  Instead of good-faith commitment to

investor protection, Defendants intended to systematically extract value from retail investors by inducing them to buy $M3M3 at artificially inflated prices.

416.    Retail purchasers reasonably relied upon Defendants' deceptive marketing claims, including their misrepresentations about the reliability of the Meteora Defendants, the M3M3 Platform, $M3M3, and $M3M3's post-launch price.  They did not know and could not have known about the coordinated insider trading and price manipulation schemes alleged herein.

417.    Retail purchasers were thereby induced to $M3M3 at artificially inflated prices, resulting in significant losses.

418.    Defendants' acts and practices were materially deceptive, unfair, and misleading in violation of GBL § 349.

419.    Likewise, the promotional statements, information, and materials Defendants disseminated to potential investors were materially misleading in violation of GBL § 350.

420.    Defendants' acts were willful, intentional, and egregious, justifying punitive damages to deter similar future conduct, and any available equitable relief, including disgorgement of profits obtained by Defendants through their deceptive and fraudulent business practices.

### COUNT VII.  N.Y. G.B.L. §§ 349 and 350 - $LIBRA
*(on behalf of the $LIBRA Subclass; against all Defendants)*

421.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

422.    Defendants engaged in "deceptive acts and practices" and in "false advertising" in New York in their joint promotion, offering, and sale of $LIBRA. This conduct was aimed at the general public.

423.    For example, Defendants publicly falsely represented that the "Viva La Libertad Project" existed as a legitimate investment initiative to support Argentine entrepreneurs and

education, when no project existed beyond a hastily created website published hours before the token launch.

424.    Defendants also used a social media endorsement procured from Argentinian President Javier Milei to lend false legitimacy to $LIBRA and to imply the existence of an underlying investment project.

425.    Defendants also leveraged the reputation and standing of the Meteora Defendants to publicly represent that the $LIBRA launch would be conducted in a fair and transparent manner.

426.    Defendants' representations were materially misleading because there was no underlying investment project and because the $LIBRA launch on Meteora was neither fair nor transparent.

427.    Retail purchasers reasonably relied upon Defendants' deceptive marketing claims, including their misrepresentations about the reliability of the Meteora Defendants, $LIBRA and $M3M3's post-launch price, and about the existence of the VLL Project. They did not know and could not have known about the coordinated insider trading and price manipulation schemes alleged herein.

428.    Retail purchasers were thereby induced to $LIBRA at artificially inflated prices, resulting in significant losses.

429.    Defendants' acts and practices were materially deceptive, unfair, and misleading in violation of GBL § 349.

430.    Likewise, the promotional statements, information, and materials Defendants disseminated to potential investors were materially misleading in violation of GBL § 350.

431.    Defendants' acts were willful, intentional, and egregious, justifying punitive damages to deter similar future conduct, and any available equitable relief, including disgorgement of profits obtained by Defendants through their deceptive and fraudulent business practices.

## COUNT VIII.  Unjust Enrichment - $M3M3
*(on behalf of the $M3M3 Subclass; against all Defendants)*

432.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

433.    As a result of Defendants' misconduct alleged herein, Defendants were wrongfully enriched at the expense of Plaintiff Mehta and the $M3M3 Subclass, whom they exposed to multiple violations of law and significant financial losses.

434.    Defendants directly profited from the misconduct alleged herein, as it enabled them to sell $M3M3 at artificially inflated market prices, [and to receive excessive transaction fees from Meteora protocols], causing significant losses to Plaintiff Mehta and other members of the $M3M3 Subclass.

435.    Defendants' profits from these deceptive practices were achieved at the direct expense Plaintiff Mehta and the proposed $M3M3 Subclass, who provided valuable cryptocurrency assets based on false and materially misleading information about $M3M3.

436.    It would violate principles of equity and good conscience for Defendants to keep the profits they gained from $M3M3 by their misconduct.  Accordingly, Defendants must disgorge those profits to Plaintiff Mehta and other members of the $M3M3 Subclass.

437.    Plaintiff Mehta and other $M3M3 Subclass members are entitled to restitution of the full amount wrongfully obtained by Defendants, along with interest, attorneys' fees, litigation costs, and such other equitable relief as this Court may deem just and proper.

## COUNT IX.  Unjust Enrichment - $LIBRA
*(on behalf of the $LIBRA Subclass; against all Defendants)*

438.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

439.    As a result of Defendants' misconduct alleged herein, Defendants were wrongfully enriched at the expense of Plaintiff Hurlock and the $LIBRA Subclass, whom they exposed to multiple violations of law and significant financial losses.

440.    Defendants directly profited from the misconduct alleged herein, as it enabled them to sell $LIBRA at artificially inflated market prices, [and to receive excessive transaction fees from Meteora protocols], causing significant losses to Plaintiff Hurlock and other members of the $LIBRA Subclass.

441.    Defendants' profits from these deceptive practices were achieved at the direct expense Plaintiff Hurlock and the proposed $LIBRA Subclass, who provided valuable cryptocurrency assets based on false and materially misleading information about $LIBRA.

442.    It would violate principles of equity and good conscience for Defendants to keep the profits they gained from $LIBRA by their misconduct. Accordingly, Defendants must disgorge those profits to Plaintiff Hurlock and other members of the $LIBRA Subclass.

443.    Plaintiff Hurlock and other $LIBRA Subclass members are entitled to restitution of the full amount wrongfully obtained by Defendants, along with interest, attorneys' fees, litigation costs, and such other equitable relief as this Court may deem just and proper.

## PRAYER FOR RELIEF

444.    WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class and Subclasses, respectfully request that this Court enter judgment in their favor and grant the following relief:

445.    Class Certification. Certify, pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), a damages, injunctive-relief, and equitable-relief Class of all investors that purchased $M3M3 Tokens or $LIBRA Tokens between December 4, 2024 and the date on which this action was initiated, April 19, 2025; a proposed sub-class of all investors that purchased $M3M3 during the

Class Period; and a proposed sub-class of all investors that purchased $LIBRA during the Class Period; and appoint the named Plaintiffs as class representatives and their counsel as class counsel.

446.    Disgorgement and Restitution. An order compelling Defendants to disgorge all profits and ill-gotten gains acquired through their misconduct in connection with the $LIBRA Token launch and the M3M3 Token Launch, including but not limited to: (a) profits obtained through structured, pre-arranged insider liquidity extraction and concealed trading activities; (b) stable assets (including SOL and USDC) siphoned from retail purchasers through manipulative one-sided liquidity pools; (c) all revenue generated by Defendants through transaction fees, marketmaking commissions, and other profits arising from the artificially inflated valuation of the Tokens; and (d) restitution to restore Plaintiff and the Class and Sub-Classes to the financial positions they would have held absent Defendants' fraudulent, deceptive, and unfair practices.

447.    Preliminary and Permanent Injunction. A preliminary and permanent injunction prohibiting Defendants from engaging in similar deceptive token launches, market manipulation, or liquidity extraction practices in the future; and the implementation and enforcement of adequate compliance measures for future cryptocurrency offerings by Defendants, including mandatory disclosures related to insider holdings, tokenomics, liquidity structures, and market risks.

448.    Accounting. Accounting. Direct Defendants to make a full and complete accounting of all blockchain transaction records, token distribution allocations, and insider transactions associated with the Token Launches, from December 4, 2024 to the date of judgment.

449.    Constructive Trust. The imposition of a constructive trust over all ill-gotten gains— including fees, commissions, digital asset appreciation, and any digital or fiat proceeds—traceable to the LIBRA Token Launch, the M3M3 Token Launch, or the racketeering enterprise.

450.    Compensatory Damages. Award the Class compensatory damages in an amount to be proven at trial, including: the difference between the consideration paid for Tokens and their

value at the time of sale or collapse of the Tokens purchased together with pre- and post-judgment interest.

451.    Treble Damages. Treble all compensatory damages under 18 U.S.C. § 1964(c) for Defendants' violations of 18 U.S.C. §§ 1962(c)–(d).

452.    Statutory & Exemplary Damages. Statutory damages under N.Y. G.B.L. §§ 349-350.

453.    Punitive Damages.  An award of punitive damages due to the reckless and egregious nature of Defendants' fraudulent and deceptive actions. Receivership. Pursuant to 18 U.S.C. § 1964(a), Fed. R. Civ. P. 66, and this Court's inherent equitable powers, appoint a qualified, independent receiver (the "Receiver") over Defendant Meteora ("Receiver Entity). The Receiver shall take exclusive custody, control, and possession of all assets, digital wallets (including hardware wallets and seed phrases), validator keys, smart-contract deployment keys, domain names, servers, source-code repositories, books, and records of the Receiver Entity, wherever located, and shall marshal, secure, and safeguard the same against dissipation or concealment.

454.    Receiver's Scope of Control. The Receiver is empowered to maintain or wind down operations as necessary to preserve asset value; suspend token launches, trading, and fees pending further order; implement necessary controls and bring business practices into compliance with applicable law; retain blockchain-forensics experts, auditors, and information-security personnel; identify, trace, and, where appropriate, repatriate digital assets transferred to insiders, affiliates, or third-party wallets; commence, defend, or settle legal actions in the name of the Receiver Entity to recover voidable transfers or fraudulent conveyances; prepare and file periodic reports with the Court and distribute interim relief to victims pursuant to a Court-approved claims process; and pay reasonable fees and expenses, subject to Court approval, from receivership assets.

455.    Receivership. Pursuant to 18 U.S.C. § 1964(a), Fed. R. Civ. P. 66, and this Court's inherent equitable powers, appoint a qualified, independent receiver (the "Receiver") over Defendant Meteora and its upgradeable smart contract programs deployed on the Solana blockchain.

456.    **Necessity for Receivership.** Meteora's upgradeable smart contract technology represents one of the most powerful—and dangerous—innovations on the Solana blockchain. As alleged herein, this technology has already been weaponized to defraud investors of hundreds of millions of dollars through the $M3M3 and $LIBRA schemes. The same centralized control that enables rapid protocol updates also permits Defendants to execute unilateral code changes through the 4-of-7 Meteora Program MultiSig, including: (i) redirecting transaction fees to insider wallets; (ii) implementing freeze/thaw mechanisms to manipulate trading; (iii) modifying liquidity pool parameters to facilitate capital extraction; and (iv) altering fee structures without notice. These capabilities—which Defendants have already exploited as alleged in paragraphs 141-147 and 226-232—pose ongoing risks that a routine asset freeze cannot adequately address.

457.    Receiver's Scope of Authority. The Receiver shall be empowered to:

458.    Take exclusive custody and control of the 4-of-7 Meteora Program MultiSig that controls all upgrade authority for the Dynamic AMM, DLMM, and M3M3 Programs, including securing all associated wallet addresses.

459.    Secure all program addresses, data accounts, source code repositories, and deployment keys for Meteora Programs listed in Appendix B;

460.    Conduct forensic audits of all program upgrades executed since October 2024 to identify backdoors, hidden functions, or mechanisms designed for continued extraction;

461.    Maintain core liquidity services and protocol functionality to preserve market stability and prevent harm to legitimate users during litigation;

462.     Freeze the collection and distribution of protocol fees to Defendants, including automatic transfers to DLL's program account referenced in Defendant Chow's attestation (ECF No. 54);

463.     Balancing of Interests. Any temporary disruption to Meteora's operations is far outweighed by the critical need to: (i) protect current and future investors from ongoing predatory schemes; (ii) preserve evidence of Defendants' fraudulent activities embedded in smart contract code; (iii) prevent Defendants from using their upgrade authority to destroy evidence or extract additional funds; and (iv) maintain market stability by ensuring that the thousands of legitimate liquidity pools on Meteora can continue operating under neutral supervision. Given Defendants' demonstrated willingness to exploit their technical control for fraudulent purposes, immediate judicial intervention through receivership is essential to prevent irreparable harm.

464.     Fees, Costs and Interest. Award pre-judgment interest at the maximum lawful rate, award post-judgment interest pursuant to 28 U.S.C. § 1961, and award reasonable attorneys' fees, expert-witness fees, and costs of suit as authorized by 18 U.S.C. § 1964(c), N.Y. GBL § 349(h), and other applicable statutes.

465.     Such Other Relief. Grant such other and further legal or equitable relief—including interim asset freezes, expedited discovery, provisional process, or writs of attachment—as the Court deems just and proper in the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial as to all issues triable by jury.


DATED: July 29, 2025
   New York, NY
Respectfully submitted,

**By:** *  /s/ Max Burwick   *

**BURWICK LAW, PLLC**
Max Burwick
43 West 43rd Street, Ste. 114
New York, NY 10036
Tel: (646) 762-1080
max@burwick.law


**HOPPIN GRINSELL LLP**
Margaret B. Hoppin
Timothy W. Grinsell
Joshua S. Molder
11 Hanover Square, Ste. 1405
New York, NY 10005
Tel:  646.475.3550
margot@hoppingrinsell.com
tim@hoppingrinsell.com
josh@hoppingrinsell.com

*Attorneys for Plaintiff Omar Hurlock*