# **Exhibit A**

1           Mr. Enzer?

2           MR. ENZER:  Yes, your Honor.

3           THE COURT:  And Mr. Sbaiti?

4           MR. SBAITI:  Yes, your Honor.

5           THE COURT:  Mr. Burwick, I have all the papers, but
6    the floor is yours on anything you wish to present.

7           MR. BURWICK:  I'll take the podium, your Honor.

8           THE COURT:  Please.

9           MR. BURWICK:  Your Honor, I am genuinely surprised
10   that we're here today and that the defense has put across such
11   a strong opposition to this preliminary injunction largely for
12   two reasons.  One, the defense is stating that the company that
13   one of the defendants works for doesn't exist, and the second
14   is that the property here is not their property.  A couple
15   things I wanted to just get out before I get to my main points.
16   Currently Burwick Law represents over 370 clients in this
17   matter with over $10 million in damages, and that in the *ex*
18   *parte* hearing, we discussed different buckets of assets.

19           There was one bucket that was readily traced to the
20   USDC.  There was a second bucket and a third bucket.  I wanted
21   to clarify right out of the gate that there's really only two
22   different types of assets at issue here, or we could say what
23   is the property and then the remainder.  And in that, there is
24   $111 million, $111,921,035, across several different wallets
25   that are traced in the same form that were supplied in the TRO,

1    but it is, again, in subsequent documents that were in the
2    amended complaint.  And I brought the different wallet
3    addresses that currently have those assets in them if defense
4    counsel would like them.
5             There was something stated at the TRO that stuck with
6    me, and I've read it several times since.  Temporary asset
7    freeze will serve the public's interest in stopping,
8    investigating, and remedying frauds.  It would also provide
9    assurance that courts could protect investors, assets from
10   theft, and will aid investors in their recovery of stolen
11   assets when they can readily be located and traced to specific
12   locations like the purloined assets in this action.
13            Also of note, something, I think, worth identifying,
14   is that all of these accounts that we're referencing where
15   these assets are currently located, these accounts are not the
16   defendants' property.  They are not associated with any of the
17   defendants' other assets.  As a matter of fact, they were
18   created either immediately proceeding this fraud, as in minutes
19   before, or shortly thereafter.  And for pointing this out is
20   that none of these wallets have been KYC'd, or what is
21   traditionally known as know your customer.  There's only an
22   alphanumeric set of identifiers.  No one has come forth and
23   said that they are the actual controller of these wallets, that
24   they have the ability to transfer funds from these wallets.  We
25   have $111 million that were conveyed through fraud sitting in

1  these assets -- sitting in these wallets currently.  I know
2  defendants will make a big to do about the distinction between
3  the assets and property, but we'll get back to that.
4         These assets, like I've stated, they've been traced.
5  They're narrowly tailored.  They have not been commingled.  And
6  there's been significant discussion around *Grupo*, but the
7  reality here is that this case falls into a very similar line,
8  like that of *Deckert*.  I'm aware that that was not briefed.  I
9  brought those cases for defense counsel, which includes*:*
10 *Deckert v. Independent Shares*, *Great-West Life & Annuity*
11 *Insurance v. Knudson, Grupo*, *Montaneil v. Board of National*
12 *Elevators*, *US Ex Rel. Rahman v. Oncology Associates*, and *De*
13 *Beers Mines Limited v. United States*.  These should be familiar
14 in the line and related to the *Grupo*.
15        *Grupo* stands for a very specific proposition, which is
16 this:  It's that the courts should not reach towards a
17 defendant's general assets in the possibility of insolvency
18 when creditors are in play.  I think this is an excellent
19 business proposition in that the creditors shouldn't be allowed
20 to ask the courts to step in when it looks as though the
21 company is about to go under and ask the courts to freeze those
22 assets such that this creditor could reach forward; whereas, we
23 compare this to *Deckert* where assets were obtained via
24 fraudulent misrepresentation.  In that instance, a preliminary
25 injunction was acceptable when it was narrowly tailored.  The

assets were traceable, and they were not commingled with the defendants' general assets.

There's been a lot of discussion about *Casa*. *Casa* just simply isn't applicable here. In that *Casa* is raising issues in regards to the separation of powers, which is obviously a critical issue, and raising issues around executive orders that in some instances are going to be questioned as far as the constitutionality of those orders, and the question of judicial activism as far as injunctive relief. But here we're not dealing with that type of an issue. We're not dealing with a universal injunction.

We're dealing with a narrowly tailored injunction. It serves the public's interest. The defendants here are not prejudiced, in that the defendants, other than a YouTube video where one of the defendants is stating that he is the custodian. I'm not quite sure what a custodian means in this instance, but he is the custodian over these assets. And most importantly is that these assets here, as I've stated previously several times, is that they are directly traced to this fraud, as in these tokens were created. They were placed into the dynamic liquidity market maker. They were swapped for the assets that are currently frozen, and then these assets now sit in these wallets and have now the quality of property.

Just a couple of statements from one of the defendants, Mr. Davis, on a YouTube video in regards to his

perspective on these funds.  And if I'm being extremely transparent, that's also my leverage with certain groups and parties, right?  I'm not sure who he is referencing.  The fact that I have control is also what's making me a target and also protecting me because this is an international incident.  This isn't some random f'ing scam.

As far as what to do with the funds, there's no refund, and just you know -- and give all the money to Argentine nonprofits.  I don't know if we've yet to see anything with regard to any Argentine nonprofits, and moreover, they're not parties to this case.  A refund is going to be based on, again, a bunch of different metrics, and people are still going to be pissed and people are still going to come for me.

When looking at the general attitude towards these funds, it's not reflective of somebody that really is concerned about the degree of fraud that they've just been involved in or the care involved for taking care of those who have been defrauded.  And if defense counsel would like those cases or those wallets, I'm happy to provide those.

Thank you, your Honor.

THE COURT:  Thank you, Mr. Burwick.  Anything further before I move to defense counsel?

MR. BURWICK:  No, your Honor.

THE COURT:  Thank you.

1    frozen assets and emphasize "the intangible, fast-moving, and
2    opaque nature of cryptocurrencies." Reply at 8-9.  Defendants
3    Chow and Davis, however, dispute that there is any
4    non-speculative risk of asset dissipation in this case.  See
5    Chow opposition at 11-16; Davis opposition at 12-14.  The Court
6    agrees with defendants and finds that plaintiffs have not made
7    a sufficient showing of irreparable harm on this basis.
8            Plaintiffs highlight a handful of cases for the
9    proposition that the unique nature of cryptocurrency supports a
10   finding of irreparable harm.  And the Court found some of these
11   cases persuasive on the TRO context but now on further briefing
12   does not.
13           Most of these cases, unlike the instant case involved
14   unidentified John Doe defendants, which suggested a heightened
15   risk of asset dissipation when combined with the untraceable
16   and anonymous nature of cryptocurrency.  See, for example,
17   *Mirashi v. Doe,* 2025 WL 893003, at *5 (D.N.J. Mar. 21, 2025).
18   Because the court -- one moment.
19           OK.  Moving on.  Indeed, Defendant Davis, whose
20   conduct the Court previously found posed a particularly
21   heightened risk of dissipation in the TRO context, has since
22   accepted service through counsel, appeared in this case,
23   participated in conferences and briefing through counsel, and
24   fully complied with the Court's orders.  These new
25   circumstances cut against evidence submitted with plaintiff's

1   *ex parte* application for a TRO that indicated that Davis
2   appeared to be evading service and potentially relocating
3   himself and his company internationally.  That's at TRO
4   transcript, 23-25.
5           While a party's good-faith participation in litigation
6   may not be dispositive on the question of asset dissipation ——
7   Indeed, at least a limited appearance by Davis was necessary to
8   challenge the TRO at all —— it adds additional context to prior
9   indications that Davis may have been intentionally evading the
10  Court's reach to frustrate the collection of an eventual
11  judgment does not seem to be the case here.  See, for example,
12  *Brewer,* 2025 WL 435827, at *8.  And in that case, again, which
13  is different than this case, the court analyzed irreparable
14  harm in a cryptocurrency fraud case by looking to factors such
15  as "whether the defendants' identities are known, whether the
16  fraudulent scheme is ongoing, and the defendants' conduct in
17  the litigation."
18          I also looked to *Bilalov v. Gref*, 2022 WL 19560947, at
19  *3 (SDNY Mar. 18, 2022), where the court found that risk of
20  asset dissipation or transfer of assets to defendants' foreign
21  contacts was speculative and unlikely based in part on
22  defendants' appearance in the action and active litigation in
23  the case.  Put more simply, the recent briefing and expanded
24  record in this case indicates that the defendants are not the
25  sort of untraceable, evasive actors that other courts have

1    found to pose a heightened risk of asset dissipation in the
2    cryptocurrency context, information that the Court did not have
3    before it in the TRO setting.
4        Plaintiffs further argue that there exists an actual
5    and imminent risk of asset dissipation in light of evidence of
6    defendants' alleged "concerted efforts to conceal the
7    cryptocurrency assets and their threats to use these assets for
8    their own benefit." Reply at 9.  While it is true that evidence
9    of a defendants' concealment or secretion of assets can support
10   a finding of irreparable harm, a plaintiff must still show that
11   the target assets are "likely to disappear" in the future
12   absent a preliminary injunction. *Westchester Fire Insurance*
13   *Co. v. DeNovo Constructors, Inc.*, 177 F. Supp. 3d 810, 814
14   (SDNY 2016).
15       In this respect, courts typically require evidence of
16   ongoing or active efforts of concealment or other fraud to
17   support a finding of irreparable harm.  See, for example, *Levy*
18   *v. Young Adult Institute, Inc.*, 2015 WL 170442, at *9 (SDNY
19   Jan. 13, 2015).  Here, however, the evidence plaintiffs
20   provide — and it is sparse at that — relates to conduct
21   occurring in February 2025, at or around the time of the
22   alleged fraud underlying the first amended complaint, which
23   does not establish a likelihood that defendants will continue
24   to secrete or obscure the targeted cryptocurrency assets in the
25   future.

1          If this evidence alone were sufficient to establish
2    the requisite likelihood of dissipation, a preliminary
3    injunction would be warranted in every case of fraud involving
4    some sort of asset concealment.  See, for example, *Schiermeyer*
5    *ex rel. Blockchain Game Partners, Inc. v. Thurston,* 697
6    F.Supp.3d. 1265 (D. Utah 2023), where the court distinguished
7    other cryptocurrency cases and noting that "just because it
8    is easy for a defendant to dissipate assets does not make
9    it likely that he will do so."
10         Indeed, plaintiffs' own expert acknowledges that there
11   were no transactions coming in or out of the target
12   cryptocurrency wallets since February 2025, including after the
13   lawsuit was filed in state court.  To be sure, the lack of
14   activity in these wallets did not preclude the Court's
15   preliminary finding of irreparable harm in the context of a TRO
16   in May.  But this was based on plaintiffs' argument that was
17   unrebutted at the time because he was proceeding *ex parte* "that
18   the ongoing service attempts, combined with the recent removal
19   of this case to federal court, could 'trigger movement of
20   funds,'" TRO transcript at 23.
21         This was also combined with the concern that the
22   cryptocurrency assets could be easily and anonymously
23   transferred out of the Court's jurisdiction.  As explained
24   above, though, the Court finds that there is significantly
25   lessened risk of asset dissipation based on the augmented

1    record, and finds that the unique nature of cryptocurrency is
2    not alone sufficient to support a finding of irreparable harm.
3    Plaintiffs have not offered evidence, for example, that any of
4    the cryptocurrency assets at issue have been liquidated, or
5    that the defendants might be insolvent at the conclusion of
6    this litigation, both of which courts have considered when
7    analyzing irreparable harm in the cryptocurrency context.  See
8    *Brewer*, 2025 WL 435827, at *9.
9             The Court recognizes that cryptocurrency poses a host
10   of unique concerns that are not ordinarily present in cases
11   involving the traditional banking systems.  Although perhaps
12   that will become less so in the future.  That said, plaintiffs
13   have acknowledged that their expert is able to track the
14   movement of the cryptocurrency at issue here, even if those
15   transactions may be facilitated through anonymous accounts.
16            Defendants will also continue to be subject to the
17   Court's jurisdiction and scrutiny throughout discovery, as
18   would any other defendant.  See, for example, *JSC v. Int'l*
19   *Development & Trade Services,* 295 F.Supp.2d. 366, 390 (SDNY
20   2003).  And in that case, the court found no irreparable harm
21   where the record indicated that the defendants would be subject
22   to continuing scrutiny in the course of discovery, and there
23   was no suggestion that they would flee or not be subject to the
24   continuing orders of the Court.
25            In sum, the Court finds that plaintiff has not

|    |                                                                                 |
|----|---------------------------------------------------------------------------------|
| 1  | sufficiently shown the risk of irreparable harm in the absence                  |
| 2  | of a preliminary injunction.  Because of this, the Court need                   |
| 3  | not address the merits of plaintiffs' claims that are asserted                  |
| 4  | in the first amended complaint or the public interest factor,                   |
| 5  | although I will say that I am extremely skeptical about whether                 |
| 6  | plaintiff would have established a likelihood of success on the                 |
| 7  | merits or serious questions as to the merits, given the record                  |
| 8  | that has been presented at this time in the context of a                        |
| 9  | preliminary injunction.  The Court therefore denies plaintiffs'                 |
| 10 | motion for a preliminary injunction and will issue an order                     |
| 11 | dissolving the TRO later today.                                                 |
| 12 | In addition, the Court will deny Defendant Davis's                              |
| 13 | 12(b)(2) motion as moot in light of complaint and because                       |
| 14 | personal jurisdiction does not factor into the Court's analysis                 |
| 15 | today.  Davis may renew his motion by the extended deadline in                  |
| 16 | which responses to the first amended complaint are due, which                   |
| 17 | is September 29, 2025.                                                          |
| 18 | I will note, though, that plaintiffs are wrong as a                             |
| 19 | matter of law that their filing of a first amended complaint                    |
| 20 | automatically mooted Davis's pending motion to dismiss.  See                    |
| 21 | *Pettaway,* 955 F.3d at 303.  Whether to moot a pending 12(b)                   |
| 22 | motion in light of an amended complaint is within the Court's                   |
| 23 | discretion, not a plaintiff's discretion, and plaintiffs thus                   |
| 24 | should not have unilaterally decided, without seeking leave                     |
| 25 | from this Court, that they were not going to file any                           |