# **<u>Exhibit B</u>**

**Impeachment Chart**

| # | Defense assertion (paraphrased) | Source (public) | Contradicting CI material (sanitized, paraphrased) | Why this matters to irreparable harm / equitable-res | How it proves non-speculative dissipation risk |
|---|---|---|---|---|---|
| 1 | Chow had only a limited "consultant" role; no involvement in LIBRA launch/marketing/pool setup; no control over transfers. | Chow Decl. & defense hearing proffers | CI-2 (M3M3 Calcs): internal strategy/pricing work prepared by Ben Chow reflects hands-on token-design and supply strategy. CI-3 (Chats): Hayden Davis reports taking direction from Chow regarding LIBRA mechanics. | Shows human operator capacity to direct launch mechanics and flows. If operators can act, outbound movement from the Target Wallets is a real, not speculative, risk—loss of the specific res (and thus the equitable remedy) if funds move/commingle. | Shows human operators coordinated launch mechanics and marketing—capacity exists to redirect/move the res quickly; prior "no-control" premise is impeached. |
| 2 | Meteora is merely decentralized software; not an operating company; neither Chow nor DLL controls any Subject Wallets; fees just sit in a program account. | Yong Decl.; Chow Decl. | CI-1 (M3M3 Launch Doc): identifies Meteora as an operating business with a marketing arm; assigns marketing responsibility jointly to Meteora and Kelsier; describes use of KOL/paid marketing. CI-3 (Chats): exclusive marketing rights for LIBRA held by Meteora + Kelsier; contractor selection authority on the Kelsier side. | Undercuts the "software-only/no-actor" framing. Confirms coordinated decision-makers exist (and can be bound on notice under Rule 65(d)(2)). Supports a wallet-specific restraint because unknown controllers + disclaimers leave a gap unless the order runs to addresses and persons in active concert. | Undercuts "software-only" frame; supports that people + orgs coordinated launches/marketing—real actors exist to move funds, triggering need for address-specific restraint and Rule 65(d)(2) notice. |

| # | Defense Position | Source | Contrary Evidence | Relevance / Harm | Impeachment / Legal Effect |
|---|---|---|---|---|---|
| 3 | No sniping/manipulation; user-configured pools; no one on defense side executed trades to seize supply. | Defense hearing proffers | CI-1 (M3M3 Launch Doc): describes planned use of sniping tools to rapidly acquire supply/control during launch. CI-2 (M3M3 Calcs): Chow provides supply-management tactics to stimulate buyer demand. | Establishes means + intent for fast outbound/swaps/bridges, i.e., the very mechanism by which the identifiable res could be dissipated—precisely the irreparable-harm scenario under Great-West/Montanile. | Demonstrates know-how and practice of supply control and fast transactions; shows practical capability to move/bridge/swaps—not speculative. |
| 4 | No coordinated marketing or launch operations; public docs explain the DLMM; nothing hidden. | Yong Decl. (public-disclosure theme); defense argument | CI-3 (Chats): exclusive LIBRA marketing arrangement between Meteora and Kelsier; Davis describes spending near-constant time coordinating with Chow (Meteora) and Miao (Jupiter). CI-1 (Launch Doc): formalizes joint marketing and roles. | Demonstrates tight, ongoing coordination—i.e., "active concert" persons exist and can be bound upon notice. The more cohesive the team, the more realistic an outbound event becomes without a court order preserving the res. | Directly impeaches the "no coordination" narrative; active concert exists → an injunction can bind those on notice under Rule 65(d)(2). |

2

| # | | | | | |
|---|---|---|---|---|---|
| 5 | This is a money-damages case; no irreparable harm because funds haven't moved and defendants are solvent. | Davis TRO-dissolve filing; defense theme | CI-3 (Chats): repeated operational direction by Chow; pattern of launch operations (e.g., Davis behind another token launch). CI-1/2: documented pre-planning for launch/marketing/supply. | Equitable-res lens controls: the harm is not priceable loss; it is the loss of the remedy if this specific fund leaves and commingles. Unknown controllers + proven operator capacity make the risk imminent, even if balances have been static so far. | Shows ongoing launch operations; combined with unknown controllers of Target Wallets, risk is present + real. One outbound event defeats equitable restitution (Montanile/Great-West). |
| 6 | DLL/Chow do not possess or control the Target Wallets; information is public; status quo is stable. | Yong Decl. | Tracing (public): Target Wallets created minutes pre-LIBRA, LIBRA-only flows, no post-event movement; controllers unknown and not tied to appearing defendants. CI-3/CI-1: operational team exists and made contracting/marketing decisions. | Disclaimers + unknown controllers actually increase risk: no one before the Court is conceding control. The only way to preserve the specific res is a wallet-specific order with Rule 65(d)(2) notice to exchanges/bridges/custodians (and on-chain where feasible). | Because controllers are unknown—and defendants disclaim control—only a wallet-specific order with notice preserves the res and closes the 65(d)(2) gap. |
| 7 | Chow lacks authority over the program account; fees are static; therefore no dissipation risk. | Chow Decl.; Yong Decl. | CI-1/2/3 (combined): show people, not code alone, set launch mechanics, marketing, and supplier/contractor choices (including for LIBRA). The Target Wallets hold proceeds of the LIBRA point-of-sale—not merely "fees." | Even if program fees sit static, the Target Wallets are the traced proceeds the Court must preserve. Without an order, one outbound can destroy the identifiability of that fund, defeating equitable restitution at merits. | Establishes operator authority exists outside the DLL fee account; Target Wallets are separate, traced proceeds subject to outbound risk unless restrained. |

| | | | | | |
|---|---|---|---|---|---|
| 8 | No pattern of coordinated token launches. | Defense theme | CI-3 (Chats): Davis acknowledges involvement in another launch (e.g., "Melania"), consistent with an established playbook. CI-1/2: repeatable launch/marketing/supply structures. | A demonstrated playbook + team elevates the dissipation risk from hypothetical to actual—warranting a narrow, address-specific restraint that permits inbound and pauses outbound. | |