## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

OMAR HURLOCK and ANUJ MEHTA, on behalf of themselves and all others similarly situated,

    *Plaintiffs*,

v.

KELSIER LABS, LLC, d/b/a KELSIER VENTURES, HAYDEN MARK DAVIS, GIDEON DAVIS, CHARLES THOMAS DAVIS, METEORA, *an unincorporated association*, and BENJAMIN CHOW,

    *Defendants*.

Case No. 1:25-cv-03891-JLR

Hon. Jennifer L. Rochon

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DYNAMIC LABS LIMITED'S MOTION TO INTERVENE

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 5

II.   ARGUMENT ....................................................................................................... 6

  A.    Intervention as of Right Under Rule 24(a)(2) Should Be Denied ..................................... 6

    1.    DLL Lacks Any Direct, Substantial, and Legally Protectable Interest in This Action .. 7

    2.    DLL's Absence Will Not Impair Its Ability to Protect Its Interests (No Risk of Preclusive Effect or Other Legal Prejudice) .......................................................................... 8

    3.    DLL's Interests Are Adequately Represented by the Existing Defendants, and DLL Cannot Overcome the Strong Presumption of Adequate Representation ............................. 10

  B.    Permissive Intervention Under Rule 24(b) Should Also Be Denied ............................... 11

    1.    Dynamic Labs Brings No Unique Claim or Defense – Its Intervention Would Be Entirely Redundant .......................................................................................................... 11

    2.    Intervention Would Unduly Delay and Complicate the Case, Prejudicing the Existing Parties. .................................................................................................................. 13

    3.    The Existing Defendants Already Represent the Relevant Interests, Rendering Dynamic Labs' Presence Unnecessary .................................................................................... 14

  C.    DLL's Motion to Intervene is one part of a persistent obfuscation strategy ................... 15

  D.    In the Alternative, Any Intervention Permitted Should Be Tightly Cabined and Subject to Strict Conditions. ........................................................................................................ 18

III.   CONCLUSION ................................................................................................. 20

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                    **Page**

*Beauregard, Inc. v. Sword Servs. L.L.C.,*
    107 F.3d 351 (5th Cir. 1997) (per curiam)........................................................................18

*Brennan v. N.Y.C. Bd. of Educ.,*
    260 F.3d 123 (2d Cir. 2001)...................................................................................................7

*Butler, Fitzgerald & Potter v. Sequa Corp.,*
    250 F.3d 171 (2d Cir. 2001)...........................................................................................10, 15

*Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.,*
    974 F.2d 450 (4th Cir. 1992)...............................................................................................18

*Martin v. Wilks,*
    490 U.S. 755 (1989)................................................................................................................9

*Mortg. Lenders Network, Inc. v. Rosenblum,*
    218 F.R.D. 381 (E.D.N.Y. 2003)...........................................................................................7

*Restor-A-Dent Dental Labs., Inc. v. Certified Alloy Prods., Inc.,*
    725 F.2d 871 (2d Cir. 1984)...................................................................................................8

*S & S Kings Corp. v. Westchester Fire Ins. Co.,*
    2017 WL 396741 (S.D.N.Y. Jan. 27, 2017)........................................................................7

*Tachiona ex rel. Tachiona v. Mugabe,*
    186 F. Supp. 2d 383 (S.D.N.Y. 2002)...................................................................................7

*Taylor v. Sturgell,*
    553 U.S. 880 (2008)................................................................................................................9

*U.S. Postal Serv. v. Brennan,*
    579 F.2d 188 (2d Cir. 1978)...........................................................................................14,15

*United States v. Pitney Bowes, Inc.,*
    25 F.3d 66 (2d Cir. 1994)..............................................................................................14, 15

*Washington Elec. Co-op. v. Mass. Mun. Wholesale Elec. Co.,*
    922 F.2d 92 (2d Cir. 1990).............................................................................................*passim*

**Rules and Statutes**

Fed. R. Civ. P. 24(a)(2)...................................................................................................*passim*

Fed. R. Civ. P. 24(b)(3)...................................................................................................*passim*

Fed. R. Civ. P. 54(b)............................................................................................................17

Fed. R. Civ. P. 65.................................................................................................................20

## I.    INTRODUCTION

Dynamic Labs Limited's ("Dynamic Labs" or "DLL") motion to intervene is premised on a fundamental absurdity: on the one hand, DLL seeks to appear as the "proper" defendant for the entity called Meteora; on the other, it insists that Meteora cannot be sued at all because it is nothing more than autonomous computer code (ECF No. 181 at 5–7).

Defendants and non-party DLL have presented the following narrative that is not only confusing, but it contradicts itself.:

First, there is no company to sue because "Meteora" is merely autonomous, peer-to-peer software and thus, they say, not a suable business nor capable of defending itself (ECF No. 181 at 5–7).

Second, a foreign company directs the consultants that developed the autonomous software operations. Specifically, Dynamic Labs Limited ("Dynamic" or "DLL") says it directs Meteora's operations—specifically, Defendant Benjamin Chow (ECF No. 181 at 5–7).

Third, a separate foreign entity employs and compensates the consultants that developed the autonomous software. Raccoon Labs Pte. Ltd., a Singapore company, hires and pays the Meteora personnel (including Mr. Chow) (ECF No. 115 ¶ 49). A Panamanian company, Block Raccoon S.A., handles additional revenue distribution (ECF No. 115 ¶ 50).

Fourth, Mr. Chow publicly held himself out as "CEO of Meteora," until he was removed following the LIBRA controversy (ECF No. 115 ¶¶ 40, 315).

Fifth, DLL and Mr. Chow now tell the Court that he was not the CEO of Meteora, that he was only a consultant and software developer. That as a software developer he had no client contact(ECF No. 54 ¶ 1; *See e.g.* ECF No. 197-1).

In reality, Meteora is a company that has been operating in New York for four years at the direction of Defendant Chow. It is the rebrand and continuation of Mercurial Finance, operated by the same individuals Plaintiffs will name in the amended complaint, including Benjamin Chow (Mercurial's CEO) (ECF No. 115 ¶¶ 40, 116-20). The very fact that Plaintiffs must engage with this shifting, mutually inconsistent storytelling is itself prejudicial and unnecessary, and it counsels against expanding the cast with a nonparty whose sole contribution would be more labels and delay.

Dynamic's motion is, in substance, a policy bid to recast settled corporate and agency doctrines. DLL requests that the court convert a contingent revenue stream into a litigable property right. Notably, any Meteora user who manages a liquidity pool is entitled to a similar contingent revenue stream consisting of protocol fees.

Rule 24(a)(2) requires a direct, substantial, legally protectable interest in "the property or transaction" at issue; a prospective share of protocol fees in a "fee wallet" is, at most, an investor-like expectancy (akin to a dividend or profit-share) and does not confer party status.

In the end, DLL's position collapses on its own terms and as a result DLL has no distinct, legally protectable interest that warrants intervention. Even their attempt to intervene imposes a prejudicial cost on the Plaintiffs and this Court. This motion practice is already bloating the litigation by requiring Plaintiffs to respond to a non-party who seeks to raise the same arguments already being made by the appearing Defendants, with the same ultimate goal: to defeat Plaintiffs' claims. DLL's motion to intervene should be denied.

## II.    ARGUMENT

### A.  Intervention as of Right Under Rule 24(a)(2) Should Be Denied

### 1. DLL Lacks Any Direct, Substantial, and Legally Protectable Interest in This Action

DLL cannot meet Rule 24's interest requirement because it cannot coherently say what it or Meteora is. At most, DLL asserts a pseudo-contingent expectancy interest, not a direct stake in the property or transaction. This does not satisfy Rule 24's interest requirement.

"To intervene as of right, a movant must: (1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action." *See Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 128–29 (2d Cir. 2001). Importantly, and omitted from DLL's framing that the test is only flexible and discretionary (ECF No. 181 at 6), "an applicant must satisfy all four requirements." *S&S Kings Corp. v. Westchester Fire Ins. Co.*, 2017 WL 396741, at 1 (S.D.N.Y. Jan. 27, 2017) (quoting *Tachiona ex rel. Tachiona v. Mugabe*, 186 F. Supp. 2d 383, 394 (S.D.N.Y. 2002)).

Critically, Plaintiffs assert no claim against DLL and seek no relief from it. The Amended Complaint names DLL only as a non-party affiliated with the Meteora venture (ECF No. 115 ¶ 52). DLL identifies no property it owns that is at stake in this litigation and no legal right of its own that this lawsuit jeopardizes (ECF No. 181 at 12–14). In contrast to *Mortg. Lenders Network, Inc. v. Rosenblum*, where the intervenor was an insurer that had been assigned the plaintiff's rights on loans (a direct, substantial legally protectable issue), it remains unclear what DLL's interest is at this time given their non-party status in the case. 218 F.R.D. 381, 383–385 (E.D.N.Y. 2003).

"An interest that is remote from the subject matter of the proceeding, or that is contingent upon the occurrence of a sequence of events before it becomes colorable, will not satisfy the rule." *Washington Elec. Co-op. v. Mass. Mun. Wholesale Elec. Co.*, 922 F.2d 92, 97 (2d Cir. 1990). The Second Circuit requires an interest that is direct, not remote or contingent. *See Restor-A-Dent*

*Dental Labs, Inc. v. Certified Alloy Prods., Inc.*, 725 F.2d 871, 875–76 (2d Cir. 1984). DLL's portion of protocol fees or dividends are a result of user interacting with Meteora software. These potential dividends do not convert into an interest which is legally cognizable as required for intervention.

Plaintiffs allege a fraud perpetrated by Meteora. *See generally* ECF No. 115. Nowhere do Plaintiffs claim that they transacted with DLL or that DLL itself made any misrepresentation to them. Plaintiffs' pleadings do not establish that DLL faces any direct liability or will be directly affected by the relief in this case (to reiterate, none is requested).

Moreover, no Plaintiff assented to any meteora.ag Terms of Service or other contract that could give DLL a legal interest. The transactions occurred on-chain through standard wallets and aggregators such as Phantom and Jupiter that routed orders to Meteora's smart contracts, without any Plaintiff visiting meteora.ag or clicking "I agree." (ECF No. 115 ¶¶ 98–104) Any *browsewrap* link on a marketing site is ineffective absent conspicuous notice and an unambiguous manifestation of assent.

Even if a Plaintiff had accessed the website to use the software, there is no *clickwrap* and no affirmative assent. The site is pseudonymously accessible and does not require identity verification, so Defendants and non-party DLL cannot show who, if anyone, accepted any terms. Consequently, Defendants and DLL cannot use website terms to reallocate liability, compel arbitration, or impose a foreign forum for these on-chain sales. There is no contractual or proprietary nexus between DLL and the Plaintiffs that would support a cognizable interest.

### 2. DLL's Absence Will Not Impair Its Ability to Protect Its Interests (No Risk of Preclusive Effect or Other Legal Prejudice)

Relief does not require DLL as a party. If DLL is Meteora, any order will bind the human operators who direct payroll and install or remove a CEO; if Meteora is just code, DLL has nothing

to protect. Either way DLL has no defined identity or direct stake, so it loses nothing by staying out. DLL's speculative fears about potential future consequences do not constitute the kind of practical impairment Rule 24(a)(2) contemplates.

DLL argues, for example, that if it is not allowed to intervene, a judgment against Meteora (the unincorporated association) "may bind or otherwise have a preclusive effect" on DLL in the future (ECF No. 181 at 14).

As a baseline matter, non-parties are not bound by a judgment *in personam* absent truly unusual circumstances. "One is not bound by a judgment *in personam* in a litigation in which he is not designated as a party," and "a party seeking a judgment binding on another cannot obligate that person to intervene; he must be joined." *Martin v. Wilks*, 490 U.S. 755, 761–63 (1989). Exceptions to that rule are narrow and defined. *See Taylor v. Sturgell*, 553 U.S. 880, 893–95 (2008).

DLL identifies no exception to this rule that would apply here (ECF No. 181 at 14–15). It does not claim to be in legal privity with Meteora, nor is it otherwise situated such that a judgment against Meteora would automatically trigger claim preclusion against DLL. DLL's real concern, at most, is a *stare decisis* concern. Because this is a conventional dispute, "disposition of the instant proceeding" without the putative intervenor will not bar later actions by that non-party under res judicata or collateral estoppel, and "*stare decisis* also will not control future, related actions." *Washington Elec.*, 922 F.2d at 98.

In any event, even the *stare decisis* risk here is minimal. The claims against Meteora turn on the conduct and knowledge of human operators in an alleged scheme. Any liability against the Meteora association would rest on those actors' wrongdoing; it would not adjudicate any distinct defense DLL might raise in a separate case, and Plaintiffs have not sued DLL. DLL's suggestion

that a judgment here could "bind or otherwise have a preclusive effect" on it misstates the law and its posture.

### 3. DLL's Interests Are Adequately Represented by the Existing Defendants, and DLL Cannot Overcome the Strong Presumption of Adequate Representation

There is zero divergence between DLL's ultimate objective and that of the named Defendants – all of whom seek the same outcome (dismissal of the Meteora-related claims) on the same grounds.

DLL cannot satisfy the fourth requirement of Rule 24(a)(2) because its interests are already fully represented by current Defendants. When a proposed intervenor and an existing party "have the same ultimate objective," the movant must rebut a presumption of adequate representation. *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 180 (2d Cir. 2001). DLL's interests are plainly aligned with Defendants' (dismissal of the Meteora-related claims), so DLL must rebut the presumption—typically with evidence of "collusion, adversity of interest, nonfeasance, or incompetence." Butler, 250 F.3d at 180–81. It offers none (ECF No. 181 at 14-15).

It is undeniable that DLL's ultimate objective in this case is identical to that of the existing Defendants: namely, to defeat Plaintiffs' claims entirely and avoid any liability or injunctive remedy arising from the Meteora scheme. Indeed, DLL itself admits as much. DLL's motion bluntly argues that because "Meteora is not a legal entity" and "cannot defend itself," DLL should intervene as the "proper" party to seek dismissal of the claims. (ECF No. 181 at 5–7).

In other words, DLL aspires to join the case for the sole purpose of making the same arguments already advanced by the existing Defendants: that Meteora is an insubstantial, purely software construct and thus not a suable entity (ECF No. 181 at 5–7).

The alignment in interests here is not merely theoretical; it is confirmed by the record. The very individuals behind DLL are the same principals behind Meteora who are already defending this lawsuit.

To that end, Chow and the other Defendants have vigorously opposed the suit, moving to dismiss and arguing that Meteora is "just code" not subject to suit – precisely the defense DLL wants to raise (ECF No. 54 ¶¶ 2–3; ECF No. 55 ¶¶ 1–2). Every argument DLL contends it would make is already being made by the existing parties (ECF No. 181 at 14-15; ECF No. 182 at 12-13). DLL does not identify a single unique claim or defense that it alone could offer. Nor could it – the same people are orchestrating the defense on Meteora's behalf, whether through the nominal Meteora association or through DLL. They have every incentive to present a full defense – not least because, as noted, many of them are the very people who would direct DLL's defense.

The motion papers thus reveal no daylight between DLL's position and that of the Defendants. DLL's suggestion that it is "differently situated" because it controls a fee account is of no moment (ECF No. 181 at 6). A minor difference in role or the desire to emphasize a particular aspect of the case does not equate to a different ultimate interest in the litigation. *See Washington Elec. Co-op.*, 922 F.2d at 98 (rejecting the notion that a "different approach" or strategy can render representation inadequate).

Here, any interest DLL has in the Meteora fee program account is shared by the existing insiders – indeed, Defendant Chow claims a portion of DLL's fee revenues (ECF No. 54 ¶ 3) – and that interest will rise or fall on the same arguments the Defendants already assert.

### B. Permissive Intervention Under Rule 24(b) Should Also Be Denied

#### 1. Dynamic Labs Brings No Unique Claim or Defense – Its Intervention Would Be Entirely Redundant

Permissive intervention must add value without prejudice. DLL adds none: they intend on expanding the scope of the litigation only to raise arguments which are presently being made by appearing Defendants at only additional cost to Plaintiffs' and the Court.

Permissive intervention is discretionary and available only where a proposed intervenor "has a claim or defense that shares with the main action a common question of law or fact," and even then only if intervention will not unduly delay or prejudice the existing parties. *See Washington Elec.*, 922 F.2d at 99.

Here, Dynamic Labs' proposed defense undoubtedly overlaps with the main action as DLL's arguments are already being raised (ECF No. 181 at 14-15). Adding Dynamic Labs as a party would therefore contribute nothing new to the factual development or legal adjudication of this case. To the contrary, that very redundancy counsels against intervention. Dynamic Labs is simply the corporate embodiment of the same insiders who are already litigating this case.

The knowledge Dynamic Labs purports to bring – e.g., technical information about the Meteora protocol that it developed (ECF No. 181 at 18) – is duplicative of evidence the existing Defendants and witnesses can provide. Defendant Chow, for instance, was publicly touted as Meteora's CEO (ECF No. 115 ¶ 40) and has acknowledged that Dynamic Labs "created the computer code underlying Meteora" (ECF No. 54 at 1; ECF No. 115 ¶¶ 39, 51); thus the key facts about Meteora's operation are already within the current record or readily obtainable from the parties.

In short, nothing would be gained by adding Dynamic Labs as an intervenor, and its presence would not "significantly contribute" to the adjudication of any issue in a way that the existing parties cannot. This case is fully capable of being fairly and efficiently adjudicated without Dynamic Labs' intervention.

Plaintiffs' decision not to name Dynamic (or Raccoon) as defendants at this stage was intentional and does not prejudice any party. As noted, as far as Plaintiffs know presently, these entities played a back-office role: neither Dynamic Labs nor Raccoon Labs ever solicited, contracted with, or transacted directly with the Plaintiffs, and no Plaintiff entered into any agreement with them.

If discovery later shows that a corporate affiliate was in fact a direct operator or that it holds property necessary for complete restitution, Plaintiffs will promptly seek leave to add that entity as a defendant (or at least name it as a relief/nominal defendant for purposes of disgorgement or constructive trust). But at present, adding these label-holders would only introduce delay and complexity with no corresponding benefit.

### 2. Intervention Would Unduly Delay and Complicate the Case, Prejudicing the Existing Parties.

Admitting DLL would force threshold litigation over identity, namely whether it is the Meteora association we already sued or only software with no party rights. That detour is already bloating briefing and will have a similar effect on discovery concerning corporate form, control of keys and wallets, and foreign-law issues. Plaintiffs' deliberately sought relief from the human-actors who remain at the center of Meteora and who defrauded victims for millions.

The principal consideration under Rule 24(b) is whether the addition of a new party would "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3); *See United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 73 (2d Cir. 1994) (this factor is the "principal guide" in the Rule 24(b) analysis); *See also U.S. Postal Serv. v. Brennan*, 579 F.2d 188, 191–92 (2d Cir. 1978) (permissive intervention appropriate only where the intervenor will "significantly contribute to full development of the underlying factual issues" without harming the parties).

Allowing Dynamic Labs to intervene here would inevitably cause delay and undue complication, to the clear prejudice of Plaintiffs (and at the expense of the Court's resources). Unraveling the unduly complex web of foreign entities and responding to this motion have already caused undue delay. Moreover, Dynamic Labs waited months after learning of this lawsuit before moving to intervene, filing its motion at the same time as Defendants' motions to dismiss.

This can only serve to protract and complicate proceedings that are otherwise focused on the merits of Plaintiffs' claims. Indeed, it already has with this motion practice. Despite Dynamic Labs' assurances that its involvement "would neither delay this case nor prejudice any of the parties" (ECF No. 181 at 16), the reality is quite the opposite. By design, Dynamic Labs' participation would divert the focus of this litigation into side disputes over corporate form and technicalities of legal personality– issues collateral to the core question of whether Defendants operated a RICO enterprise and extracted millions of dollars from victims.

Here, Dynamic Labs' proposed intervention creates a lopsided trade-off: at best, the result is a marginal appearance of judicial economy (resolving Dynamic Labs' status in this suit) at the cost of redundantly complicating the proceedings. The balance tips decidedly against intervention. The existing parties, in particular the Plaintiffs who seek redress, would be prejudiced by the delay, distraction, and procedural headaches that Dynamic Labs' belated entry would cause.

Permitting this kind of tactical complication is not what Rule 24(b) envisions.

### 3. The Existing Defendants Already Represent the Relevant Interests, Rendering Dynamic Labs' Presence Unnecessary.

Finally, Dynamic Labs' participation is unnecessary because all relevant interests in this litigation are already before the Court. Plaintiffs have sued Meteora itself as an unincorporated association (ECF No. 115 ¶ 39) and have also sued the actual individuals and entities alleged to be

behind Meteora's operations (including its public figurehead, Defendant Chow)(ECF No. 115 ¶¶ 40-44).

Where the proposed intervenor and an existing party share the same ultimate objective, there is a presumption of adequate representation the movant must overcome. *See Brennan*, 579 F.2d at 191. As explained above, Dynamic Labs' ultimate objective in this suit is identical to that of the existing Defendants: to defeat Plaintiffs' claims and avoid any liability. The company's interests are thus wholly aligned with those of the current parties, and its views will necessarily be represented (and are already being advocated) by those parties.

Courts have broad discretion to deny permissive intervention where, as here, the proposed intervenor's interests are fully represented and its addition would mainly serve to delay and complicate the proceedings. *See, e.g., Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 182–83 (2d Cir. 2001) (affirming denial of permissive intervention where the movant's interest was adequately represented by existing parties).

### C.  DLL's Motion to Intervene is one part of a persistent obfuscation strategy

Finally, it is important to view Dynamic Labs' bid to intervene in context: it is the latest maneuver in a broader strategy of obfuscation by the principals of the Meteora enterprise. The very structure of Meteora's operations was engineered for opacity. What began as a project called Mercurial Finance was simply rebranded as Meteora in late 2022. (ECF No. 115 ¶¶ 39, 116-20.)

This cosmetic name-change followed public controversy surrounding Mercurial; by renaming themselves Meteora, the insiders shed a tainted label and continued their business under a fresh banner (ECF No. 115 ¶¶ 117-18). Notably, the public-facing materials for Meteora did not actually purport to be mere autonomous software – to the contrary, they highlighted that real people were in charge. (ECF No. 115 ¶¶ 39–49.)

Defendant Benjamin Chow was the CEO of Meteora, and other individuals were identified as part of the Meteora team. (ECF No. 115 ¶¶ 40, 46-49.) Meteora maintained official websites, social media accounts, and conducted itself like a company or association, not an ungoverned algorithm. (ECF No. 115 ¶¶ 352, 412) Yet now that those same actors have been sued, they have retreated behind a rhetoric of decentralization. Suddenly Meteora is nothing more than a collection of self-executing software contracts that "does not exist" as an entity.

Behind the scenes, Meteora's operators set up a byzantine network of interrelated entities across jurisdictions, all controlled by the same small group of insiders, precisely to enable this shell game. (ECF No. 115 ¶¶ 49–53.)

The purpose of this patchwork is clear: when the protocol is blamed, the operators point to a company; when the company is blamed, they point back to the "decentralized" protocol or to another affiliate. The Meteora structure is obfuscation-by-design, a multi-layered facade created to shuffle responsibility. This embodies the RICO enterprise, as the same actors use interchangeable affiliates to conduct the enterprise through a pattern of racketeering activity.

The record in this case illustrates a pattern of attempted obfuscation. Dynamic Labs' motion leans heavily on declarations from Meteora insiders, specifically Benjamin Chow and Zhen Hoe Yong, that paint a self-serving picture of Meteora's operations. Mr. Chow's declaration (filed earlier in this litigation) downplays his role, suggesting he was merely an "advisor" or consultant with little involvement in the fraudulent token launches (ECF No. 54 ¶ 1). Mr. Yong's declaration, in turn, portrays Meteora as run by autonomous code, with Dynamic Labs just providing tools (ECF No. 55 ¶¶ 1–2).

But these narrow accounts collapse under scrutiny of the full record. In reality, Mr. Chow was at the center of Meteora's token launch schemes. Whistleblower materials and internal

communications flatly contradict Chow's minimization. (ECF No. 115 ¶313.) For example, in a recorded internal call disclosed in the Amended Complaint, Chow admitted to working with co-defendant Hayden Davis to "establish the framework" for multiple token launches and instructing others how to use Meteora's technology to maximize insider profits. On that call, Chow even lamented, *"I **ed up because I enabled the guy. I should not have enabled him," referring to Davis's misuse of Meteora (ECF No. 115 ¶ 313). This candid admission directly undermines any claim that Chow was a bit player or that Meteora's fraud happened independent of human direction. The whistleblower's account and other internal evidence make clear that Meteora's operations were directed by a small leadership team (with Chow at the helm) – even as that team tried publicly to mask their control behind decentralization rhetoric.

This is especially clear in light of Plaintiffs' newly submitted whistleblower chat logs in support of their 54(b) motion (ECF No. 197-1) wherein Defendant Hayden Davis remarks that not only was he with Chow and Yong "24/7," embarking on joint international business travel, but that he followed Benjamin Chow's instructions on over 15 coin launches.

Ironically, even Dynamic Labs' own proffered evidence confirms that Meteora was under centralized human control. Mr. Yong – who took over Meteora's leadership after Chow's February 2025 resignation – admits in his declaration that he works "at the direction [of] Dynamic Labs Limited." (ECF No. 55 ¶ 1) Likewise, Mr. Chow himself described his role during the relevant period as "a consultant to Dynamic Labs, the software development company behind Meteora." (ECF No.  54 ¶ 1) These are direct admissions that Meteora's supposedly "autonomous" protocol is in fact run by identifiable people acting through Dynamic Labs and its affiliates.

In other words, Dynamic Labs has acknowledged that Meteora was far from autonomous. Dynamic Labs' attempt to intervene on Meteora's behalf while disavowing Meteora's legal existence is a paradox that only makes sense as a tactic for evasion.

### D. In the Alternative, Any Intervention Permitted Should Be Tightly Cabined and Subject to Strict Conditions.

For all the reasons above, Plaintiffs believe DLL's intervention should be denied outright. However, if the Court is inclined to allow DLL to participate in some limited capacity, Plaintiffs respectfully request that the Court exercise its discretion to impose appropriate limitations and conditions on that intervention. District courts have broad authority to condition an intervenor's participation to prevent prejudice or inefficiency. *See Beauregard, Inc. v. Sword Servs. L.L.C.*, 107 F.3d 351, 352–53 (5th Cir. 1997) (affirming district court's power to limit intervenor's role); *See also Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 974 F.2d 450, 469 (4th Cir. 1992) (courts may impose "reasonable conditions" on intervention).

Here, any allowance of DLL's intervention should be tailored as narrowly as possible so that DLL's presence is purely facilitative (ensuring notice and preservation of assets) and does not interfere with the pending emergency motions or broaden the scope of the litigation. Specifically, if DLL is permitted in, Plaintiffs request that the Court order the following:

DLL's participation should be strictly limited to practical matters of facilitating the litigation – namely, (a) accepting or aiding in alternative service of process on the Meteora association or overseas individuals (to the extent service has not already been achieved), and (b) complying with and implementing any preservation or injunctive orders directed at Meteora's assets or infrastructure under DLL's control. DLL should not be permitted to file any dispositive motions or to engage in merits briefing at this stage.

The point of allowing DLL in would be to assist the Court's jurisdiction (by ensuring the real decision-makers are before the Court for enforcement purposes), not to give DLL a platform to introduce duplicative defenses or delay. By cabining DLL's role to service and compliance issues, the Court can gain whatever practical cooperation DLL might offer without letting DLL derail the main proceedings.

Within 7 days, DLL must file a sworn declaration mapping Meteora's control points: (a) all holders/signers of upgrade/admin authority (including any multisig composition and custody procedures); (b) current registrants/administrators of all Meteora domains and hosting; (c) all treasury/protocol-fee/issuance wallets and the individuals/entities with signing ability; and (d) accounts controlling front-end repositories and deployments. This transparency is essential to craft effective relief and to prevent further shell games. Non-compliance shall be grounds for immediate remedial relief, including sanctions and striking any DLL submission that relies on incomplete or inaccurate disclosures. If DLL genuinely seeks to assist the Court and ensure the right parties are accountable, it should welcome this opportunity to prove its good faith by disclosing who and what it actually controls.

DLL should formally accept service of process and consent to the Court's jurisdiction solely for purposes of enforcing any injunction or preservation order. In other words, if DLL comes into the case, it must do so with the understanding that it will be fully bound by, and subject to, the Court's orders aimed at maintaining the status quo. (Notably, this is largely redundant of Rule 65's reach, but making it an explicit condition will remove any doubt.) For example, if the Court orders that no Meteora upgrade or token issuance shall occur, DLL (as an intervenor) would be expressly bound to comply (just as it would be as a non-party in active concert, but now with no

ambiguity about notice or scope). This condition ensures that allowing DLL strengthens the Court's ability to enforce relief, rather than creating loopholes.

Finally, the Court should clarify that DLL is intervening, if at all, as a limited-purpose intervenor – not as a full party free to expand the scope of the case. DLL should not be permitted to introduce any new claims, counterclaims, or unrelated defenses that go beyond the existing contours of the litigation. Nor should it be allowed to re-litigate issues already decided (for instance, if the Court has already addressed service or jurisdictional questions). If DLL later believes it needs to file any additional motions (beyond the bounds set above), it should be required to seek leave of Court and show good cause before doing so. This will prevent DLL's involvement from multiplying proceedings or shifting the litigation into new arenas unrelated to resolving Plaintiffs' claims.

By imposing the above conditions, the Court can mitigate the potential harms of intervention. These measures would preserve the urgent timeline, maintain focus on the core issues, and force DLL to contribute constructively (through transparency and compliance) rather than destructively (through obfuscation and delay). If DLL's true motivation for intervening is benign (for example, to ensure the Court has the information it needs) then DLL should readily agree to aid with service, to disclose who runs Meteora, and to abide by whatever injunctive orders are issued.

## III.    CONCLUSION

For the foregoing reasons, the Court should DENY DLL's Motion to Intervene (ECF No. 180). DLL cannot satisfy Rule 24(a)(2)'s requirements (its interests are already adequately represented; it lacks a direct, protectable interest; and its application is ill-timed in context), and

permissive intervention under Rule 24(b) would unduly delay and prejudice the Plaintiffs (as it already has).

If the Court nonetheless permits any participation, it should be strictly limited and expressly conditioned as set forth above.

Dated: October 14, 2025

New York, New York

Respectfully submitted,

By: /s/ Max Burwick
Max Burwick
**BURWICK LAW, PLLC**
43 W 43rd St., Suite 114
New York, NY 10036
(646) 762-1080
max@burwick.law
*Counsel for Plaintiffs Omar
Hurlock
& Anuj Mehta*

## WORD COUNT CERTIFICATION

I certify that the foregoing memorandum of law contains **4884** words, as determined by the word-count function of Microsoft Word, and complies with the word-limit requirements in the Individual Rules and Practices of Judge Jennifer L. Rochon.