# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

OMAR HURLOCK and ANUJ MEHTA, *on behalf of himself and all others similarly situated,*

Plaintiffs,

v.

KELSIER LABS, LLC d/b/a KELSIER VENTURES, HAYDEN MARK DAVIS, GIDEON DAVIS, CHARLES THOMAS DAVIS, METEORA, *an unincorporated association*, and BENJAMIN CHOW,

Defendants.

**Case No.: 1:25-cv-03891-JLR**

Hon. Jennifer L. Rochon

## MEMORANDUM OF LAW IN SUPPORT OF PLAINIFFS' MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT

## **TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT ..............................................................................4

II. BACKGROUND .............................................................................................5

    A.      Procedural History and Prior Pleadings ..................................................5

    B.      Whistleblower Revelations.......................................................................6

    C.      Subsequent Wallet Tracing following the Lead from the CI Revelations...........7

    D.      Scope of the Proposed Second Amended Complaint ...............................9

III. ARGUMENT ................................................................................................11

    A.      Good Cause Exists under Rule 16(b)(4) to Modify the Scheduling Order ...........11

    B.      Leave to Amend Is Warranted under Rule 15(a)(2)'s Liberal Standard ..............13

       1.      No Undue Delay or Bad Faith ..........................................................14

       2.      No Undue Prejudice To Defendants....................................................15

       3.      Judicial Economy Militates in Favor of Amendment.......................................17

       4.      The Proposed Amendment Is Not Futile ............................................17

       5.      Balance of Equities Favors Amendment ............................................18

    C.      In the Interest of Judicial Economy, The PSAC Would Supersede the FAC and Moot the Pending Motions to Dismiss ......................................................19

IV. Conclusion and Prayer for Relief ..........................................................20

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                        **Page**

*Foman v. Davis*,
    371 U.S. 178 (1962) ................................................................................................11, 14

*Infinity Headwear & Apparel, LLC v. Jay Franco & Sons, Inc.*,
    2016 WL 5372843 (S.D.N.Y. Sept. 26, 2016) ................................................12

*Lickteig v. Cerberus Capital Management, LP*,
    2020 WL 7629876 (S.D.N.Y December 22, 2020) ....................................15, 16

*Loreley Fin. v. Wells Fargo Sec.*,
    797 F.3d 160 (2d Cir. 2015)...........................................................................5, 13

*Martell Strategic Funding LLC v. American Hospitality Academy*,
    2017 WL 2937649 (S.D.N.Y. July 10, 2017) ................................................12

*Moresman v. Steuben County*,
    2025 WL 2208130 (W.D.N.Y. August 4, 2025) ............................................15

*Parker v. Columbia Pictures*,
    204 F.3d 326 (2d Cir. 2000)...........................................................................5, 12

**Rules**

Fed. R. Civ. P. 15(a)(2) ...................................................................................*passim*
Fed. R. Civ. P. Rule 16(b)(4) ..........................................................................*passim*

## I. PRELIMINARY STATEMENT

Plaintiffs move under Fed. R. Civ. P. 15(a)(2) for leave to file a Second Amended Complaint ("PSAC") and under Rule 16(b)(4) to modify the scheduling order for good cause.[1] The request is driven by newly discovered insider communications and wallet-level tracing obtained after the filing of the First Amended Complaint and after the amendment deadline. Plaintiffs acted diligently once this evidence became available. The proposed amendment places before the Court a more complete and particularized record without altering the core legal theories.

The PSAC presents a cohesive account of a centrally directed operation that repeated the same token-launch method across multiple projects on Solana. The same group designed, promoted, and executed launches of at least $M3M3, $LIBRA, $MELANIA, $ENRON, and $TRUST. The PSAC alleges "Meteora" operated as an association-in-fact of human operators and distinguishes that association from any neutral protocol. It also describes how Kelsier and the Davis family handled marketing, distribution, and paid promotion while routing retail flow into pools the enterprise controlled.

The evidentiary foundation has sharpened materially. On September 4-12, 2025, a confidential insider provided chats in which Hayden Davis identified Benjamin Chow as the person directing token launches and stated he acted "under Ben's instructions" on more than fifteen launches. Internal planning files corroborate that account: calendars and scripts for paid KOL campaigns, itemized compensation, posting windows tied to pool events, and spreadsheets modeling extraction, including a "M3M3 Calcs Template" and a companion "Token Launch Organizer." On-chain analysis then linked deployer, sniper, and liquidity wallets to a central treasury cluster beginning 0xcEA that seeded capital, pre-funded early buys, and later

---

[1] Pursuant to Rule 15.1 of this Court's Local Civil Rule 15.1, clean and redlined versions of the PSAC are attached as Exhibit "A" of the Declaration of Max Burwick.

reconsolidated proceeds. Post-TRO movements on August 20, 2025, further tied profits back to the same hub. Taken together, these materials contradict prior denials and show common control over both sides of the market.

The amendment is targeted and material. It adds three launches to show repetition of method, adds a new investor plaintiff tied to those launches, and names additional defendants identified through the chats and tracing. It pleads the role of each participant with greater particularity—dates, messages, routes, and wallet paths—and maps flows that connect the launches to a single command structure. The legal causes of action remain the same; the facts are broader and more specific. The additions strengthen the RICO pattern and enterprise allegations and the omissions-based fraud claims grounded in uniform scripts and undisclosed privileges.

Good cause exists under Rule 16: the key materials surfaced only after the scheduling deadline despite diligent efforts. Plaintiffs moved promptly to analyze the data, engage tracing, and prepare the PSAC. This is not a re-do of facts available earlier; it is an update compelled by information that was previously inaccessible.

The case posture remains early. Proceeding on the PSAC may moot motions aimed at a potentially superseded pleading and will allow all related conduct to be resolved in one action, which conserves resources for the Court and the parties. There is no undue delay, bad faith, undue prejudice or futility. Because good cause exists, leave to amend should be granted. *See Parker v. Columbia Pictures*, 204 F.3d 326, 340 (2d Cir. 2000) (good cause is diligence); *Loreley Fin. v. Wells Fargo Sec.*, 797 F.3d 160, 190–91 (2d Cir. 2015) (liberal amendment, especially upon new facts).

## II. BACKGROUND

### A.  Procedural History and Prior Pleadings

Plaintiffs exercised their amendment as of right by filing their First Amended Complaint ("FAC") on July 30th, 2025 (ECF No. 115). In response to the FAC, Defendants filed their motions to dismiss on September 29th, 2025 (ECF Nos. 170, 171, 172, 173, and 175).

## B. Whistleblower Revelations

As alleged in the PSAC, the coordinated nature of the enterprise is confirmed through newly obtained extensive whistleblower communications obtained by Plaintiffs (PSAC ¶110). A confidential informant ("CI") with direct access to Defendant Hayden Davis contacted Plaintiffs' counsel on or about September 4, 2025, to report firsthand knowledge of the scheme (PSAC ¶111), and after an initial interview on September 8, 2025, provided preserved chat logs reflecting communications with Davis on September 12, 2025 (PSAC ¶112). In those conversations, Davis made multiple admissions revealing the inner workings of the enterprise and identifying Chow as its leader (PSAC ¶113), including that he acted "under Ben's instructions" on more than fifteen token launches—an allegation that Chow directed both technical and operational components (PSAC ¶114). These admissions, as pled, establish that Chow was not a passive software developer, but the orchestrator of a serial token-launch operation which he oversaw personally and continuously (PSAC ¶115).

Most stunningly, Davis admits for the first time that he was responsible for launching the $MELANIA token (PSAC ¶117). This comports with another core revelation embedded in the chat logs: that the launches were sequenced and part of an ongoing scheme. In a January 2025 exchange, messages show planning was sequencing, with the $MELANIA launch to be followed the next week by the "Milei" themed $LIBRA token (PSAC ¶118). The logs also feature statements from Davis that, after one early launch, he entered an "exclusive marketing" arrangement with Meteora (then operated by Chow) (PSAC ¶119).

These revelations expand upon earlier-obtained internal communications (March–August 2024) that align with the CI's account (PSAC ¶120), demonstrating detailed launch plans and synchronized promotional schedules (PSAC ¶121). Chat transcripts and planning files include explicit instructions for paid promoters, timing directives for social-media posts, and itemized "KOL" payment lists (PSAC ¶122). One document instructs a KOL to post a pre-written tweet "immediately after the pools open," illustrating precision timing tied to liquidity events (PSAC ¶123). Defendants tracked campaigns in shared spreadsheets listing each influencer, assigned post time, and compensation—cash, SOL, or pre-allocated tokens (PSAC ¶124). Another file—the "M3M3 Calcs Template" prepared by Chow—models profits from price spikes and liquidity withdrawals (PSAC ¶125), while a companion "M3M3 Token Launch Organizer" authored by Charles Davis outlines the marketing-side playbook (PSAC ¶126).

Those additional records show synchronized launch calendars and pre-scheduled content across group channels to match technical milestones Chow controlled (PSAC ¶127). Collectively, these materials evidence knowledge, intent, and coordination at every level; Defendants operated from a unified script and executed identical steps across token launches (PSAC ¶128). The PSAC alleges that, corroborated by internal documents and on-chain evidence, Chow directed overall strategy while the Davis family executed marketing and liquidity plans—together carrying out a sustained scheme to defraud investors under the guise of decentralized innovation (PSAC ¶129).

## C. Subsequent Wallet Tracing following the Lead from the CI Revelations

Plaintiffs' enhanced on-chain analysis was prompted by two events: the CI's admissions of coordinated insider trading across at least fifteen launches, and post-TRO movements from sniper wallets the day after the TRO was dissolved (PSAC ¶130). Those developments led to an

enhanced tracing of flows among deployer, sniper, and enterprise wallets, revealing a closed circuit consistent with a single operating entity (PSAC ¶¶131–132).

The PSAC alleges that tracing identified a coordinating "hub" wallet beginning 0xcEA that repeatedly funded all five tokens at issue—$M3M3, $LIBRA, $MELANIA, $ENRON, and $TRUST (PSAC ¶133). That 0xcEA wallet operated as a financial command center: receiving insider capital, seeding liquidity, and pre-funding sniper wallets for launch-window buys (PSAC ¶134). Transfers flowed from 0xcEA to deployers and, minutes later, to networks of sniper wallets, demonstrating common control and coordination; profits later reconverged to 0xcEA or its derivatives (PSAC ¶¶135–137).

These patterns, as alleged in the PSAC, undercut any claim that snipers were independent: the same insiders who created the tokens financed the early-buyer wallets, effectively making issuers their own first purchasers (PSAC ¶¶138–139). Overlapping control markers—shared authorizations, identical signatures, mirrored timing—further corroborate the deployer–sniper linkage; in multiple tokens (including $LIBRA and $M3M3) the same multi-sig authorities approved deployments and then minutes later funded sniper activity, showing advance control over both sides of the market (PSAC ¶¶140–142).

The PSAC further alleges that during the $LIBRA launch a sniper wallet that reaped millions had been funded in advance by 0xcEA on the same day Hayden Davis publicly denied any connection—contradictions Plaintiffs plead as decisive (PSAC ¶¶143–144). After the TRO lifted on August 20, 2025, two core sniper wallets shifted proceeds, including a bridge to Ethereum; converting Circle USDC to decentralized tokens is pled as deliberate evasion, and the post-TRO paths lead back to 0xcEA (PSAC ¶¶145–147).

Taken together, the tracing paints a unified picture: the same insider network designed code, configured pools, managed liquidity, executed sniper buys, captured investor funds, and concealed proceeds, contrary to sworn denials (PSAC ¶¶148–149). Wallet-level evidence of identical key clusters and approval chains across developer, deployer, liquidity, and early-buyer roles, plus contemporaneous planning materials specifying sniper-fund staging, pool timing, and extraction, are alleged to match observed wallet behavior (PSAC ¶¶150–151).

The PSAC alleges a systemic fraud in which insiders controlled both supply and demand; every trading layer—from creation to collapse—was orchestrated by the same operators (PSAC ¶¶152–153). Plaintiffs further plead post-hoc deception (e.g., "just software"/"rogue" narratives) as contradicted by the on-chain record; each token shows the same fingerprint—deployer-sniper linkages, mirrored timing, and proceeds reconverging to central wallets—such that the ledger functions as the enterprise's "confession" (PSAC ¶¶154–156). Accordingly, Plaintiffs allege prior declarations were materially false, and the whistleblower admissions, post-TRO movements, and tracing establish a centrally managed operation that continues to conceal profits and misstate its structure (PSAC ¶157).

### D.  Scope of the Proposed Second Amended Complaint

The PSAC substantially expands the universe of allegations to present a more complete and up-to-date picture of the fraud. It adds three additional token projects revealed by the new evidence: $MELANIA, $ENRON, and $TRUST.

Correspondingly, the PSAC brings in a new Plaintiff investor who bought into those additional token offerings and suffered losses, ensuring that all victims of the scheme can seek relief in this action.

The PSAC also names additional Defendants who were identified through the whistleblower and tracing evidence. All of these new parties are directly tied to the fraudulent conduct now uncovered. By adding them, the SAC ensures that, to the extent allowed for by the evidence at-present, no segment of the alleged enterprise or its participants is omitted from the case.

The PSAC's factual narrative is dramatically broader and more detailed than in prior pleadings. It sets forth a comprehensive timeline covering all of the token launches and illustrates how Defendants repeated the same deceitful tactics each time. The pleading now incorporates internal communications from the whistleblower to demonstrate Defendants' intent and knowledge, and it includes extensive blockchain tracing data to map out the flow of funds across the enterprise.

By repleading the complaint in its entirety with these additions, Plaintiffs present one coherent story of a single racketeering enterprise engaging in serial token fraud.

Importantly, the PSAC does not fundamentally alter the nature of the lawsuit in terms of legal theories.  Plaintiffs continue to assert the same core causes of action but now bolster them with powerful new factual support and a broader pattern of wrongdoing.

The expansion to multiple token launches strengthens elements such as RICO's "pattern" requirement (by additional multiple predicate acts and new victims). The gravamen of the case remains the same type of fraudulent conduct; it is now demonstrated across five instances instead of two. Any new causes of action added (for example, claims tailored to specific aspects of the new evidence) are closely related to the original claims and arise from the same overall scheme.

Thus, the amendment amplifies and corroborates the existing legal theories rather than introducing any untoward surprise which might prejudice the Defendants.

Given the volume of new material, the PSAC is being submitted as a complete, stand-alone pleading, which will supersede the FAC in its entirety.

As is standard procedure, Plaintiffs are prepared to file the SAC immediately upon the Court's approval so that the litigation can proceed based on the amended pleading without delay.

Once the PSAC is filed, Defendants will have a full opportunity to respond to it — whether by filing new motions to dismiss addressing the PSAC's expanded allegations or by answering the PSAC and proceeding with discovery. In sum, the case is poised to move forward efficiently on the basis of a comprehensive, fulsome complaint if this motion is granted.

## III. ARGUMENT

Under the governing standards, Plaintiffs' request for leave to amend should be granted. First, because the Court's scheduling-order deadline for amendments has passed, Plaintiffs must satisfy Rule 16(b)(4)'s "good cause" requirement to modify that deadline. Plaintiffs meet this standard given their diligent actions upon discovering the previously unavailable evidence. Second, once Rule 16 is satisfied, Rule 15(a)(2) provides that leave to amend should be "freely give[n] when justice so requires." Here, all of the relevant *Foman* factors (no undue delay, no bad faith or dilatory motive, no undue prejudice, and no futility of the amendment) weigh decisively in favor of allowing the amendment.

 Finally, allowing the PSAC will streamline this litigation: it will moot the pending motions to dismiss the FAC and enable the case to proceed on the basis of an operative pleading that presents all of the information available to Plaintiffs in support of their claims. In short, good cause exists and justice requires that Plaintiff's motion for leave to amend their FAC be granted.

### A. Good Cause Exists under Rule 16(b)(4) to Modify the Scheduling Order

When a party seeks to amend after the court's scheduling-order deadline has expired, it

must first demonstrate "good cause" under Rule 16(b)(4) to modify that deadline. In the Second Circuit, "[a] finding of 'good cause' depends on the diligence of the moving party." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000). The primary question under Rule 16 is whether the movant acted diligently to meet the Court's schedule; if not, the court will then consider whether some extraordinary circumstance or external factor prevented timely compliance. "Where the deadline for asserting additional claims or defenses set forth in the scheduling order has passed, courts commonly find that a party acts diligently if it seeks leave to amend within approximately two months of acquiring information of a new claim or defense." *Martell Strategic Funding LLC v. American Hospitality Academy*, 2017 WL 2937649, at *2 (S.D.N.Y. July 10, 2017) (collecting cases); *Infinity Headwear & Apparel, LLC v. Jay Franco & Sons, Inc.*, 2016 WL 5372843, at *5-6 (S.D.N.Y. Sept. 26, 2016) (granting leave to amend where plaintiff demonstrated diligence and sought leave within two months of learning of the facts underlying the claim).

Here, Plaintiffs have been exceedingly diligent, comfortably satisfying Rule 16's good cause requirement. The new evidence underlying this amendment was not—and could not have been—obtained before the amendment cutoff. Less than two months have elapsed since Plaintiffs obtained the newly acquired information from the whistleblower insider.

The whistleblower revelations and wallet-tracing results only came to light after the court's amendment deadline had already passed. Plaintiffs had no prior knowledge of the additional token schemes; this critical information remained in Defendants' exclusive control until an insider exposed it and forensic analysis connected the dots. This is the textbook definition of "good cause": crucial facts surfaced late despite Plaintiffs' best efforts, through no fault of their own.

As soon as Plaintiffs encountered the new evidence, they moved with alacrity. They engaged experts, analyzed the data, and began preparing the SAC within weeks. This motion was

filed at the earliest possible moment. There was no period of indecision or undue delay—only the time necessary to verify the information and carefully draft the expanded complaint. Indeed, Plaintiffs promptly alerted the Court and Defendants at the first appropriate opportunity that additional evidence had emerged and that an amendment would be sought. Such prompt action underscores Plaintiffs' diligence.

Plaintiffs could not have included these new allegations in any earlier pleading because the supporting evidence simply was not accessible until now. This amendment stems from new developments, not from any oversight or omission in prior complaints. Plaintiffs are not seeking to redo something that could have been done before; they are seeking to plead facts that only recently became available. Rule 16 does not demand the impossible, and it would be patently unjust to penalize Plaintiffs for not pleading facts they had no way of knowing about earlier.

Given these circumstances, Plaintiffs satisfy Rule 16(b)(4)'s good cause standard. Plaintiffs have demonstrated that they acted diligently and in good faith and could not have met the original deadline due to factors outside their control. Accordingly, the scheduling order's deadline should yield to allow a just outcome. In sum, the diligence prong is fulfilled, clearing the way for the Court to consider the request under Rule 15's lenient standard.

## B. Leave to Amend Is Warranted under Rule 15(a)(2)'s Liberal Standard

Once the Rule 16 hurdle is cleared, the governing standard is the generous one of Rule 15(a)(2), which directs courts to "freely give leave when justice so requires." The default position is that amendments are to be allowed absent a substantial reason to deny. This permissive approach reflects the federal policy that cases should be decided on their merits rather than on technicalities. As the Second Circuit has emphasized, Rule 15's generosity is "consistent with [the] strong preference for resolving disputes on the merits." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo*

*Sec.*, LLC, 797 F.3d 160, 190 (2d Cir. 2015). Thus, a motion to amend should be denied only for legitimate reasons such as undue delay, bad faith, undue prejudice, or futility of the amendment – the factors originally identified by the Supreme Court in *Foman v. Davis*, 371 U.S. 178, 182 (1962). Here, none of those disqualifying factors are present. In fact, every pertinent consideration points toward allowing this amendment.

### 1. No Undue Delay or Bad Faith

Plaintiffs' request for leave comes at the earliest possible juncture given the circumstances. All of the new information was obtained in recent weeks, and Plaintiffs moved to amend without any needless lapse of time once those facts were in hand. There has been no protracted delay, as this is Plaintiffs' first opportunity to plead these revelations. The FAC was filed promptly in the case's early stages, and at that time Plaintiffs had no inkling of the scheme's broader scope. As soon as Plaintiffs discovered the truth, they swiftly set the amendment process in motion. Moreover, there is no indication whatsoever of bad faith or dilatory motive on Plaintiffs' part. Plaintiffs are not seeking to harass Defendants, nor are they using this amendment as a tactic to delay the litigation or evade an adverse ruling. To the contrary, Plaintiffs' aim is to consolidate all related misconduct into this case now — a good-faith effort to facilitate a just and efficient resolution on the merits. Notably, this amendment is not a reaction to any court decision (no ruling on the FAC has been issued); it is compelled solely by the genuine desire to present newly-encountered evidence of fraudulent conduct. Plaintiffs gain no tactical advantage by waiting — if anything, they are eager to proceed with the case fully informed by the new facts. Courts have recognized that when a plaintiff promptly amends upon learning new facts, it negates any inference of undue delay or bad faith. Here, Plaintiffs' conduct has been transparent and diligent at every step. They promptly notified Defendants (and the Court, when appropriate) of the emerging

evidence and their intent to amend, and then diligently prepared this motion. *See Moresman v. Steuben County*, 2025 WL 2208130, at *5 (W.D.N.Y. August 4, 2025)(noting that the burden is on the defendant to establish that a motion was filed in bad faith and finding that no bad faith exists when the record shows that the motion for leave to amend was not filed merely as a delay tactic or form of legal gamesmanship).  Plaintiffs have proceeded without undue delay and with complete good faith, satisfying these prongs of the Rule 15 analysis.

### 2.  No Undue Prejudice To Defendants

Allowing the SAC will not unfairly prejudice Defendants. There is no unfair surprise here, because the additional allegations center on Defendants' own conduct and additional token schemes that Defendants themselves orchestrated. Defendants can hardly claim to be "caught off guard" by the inclusion of fraudulent projects in which they were active participants. All of the new information — the insider communications, the wallet linkages, etc. — pertains to activities within Defendants' knowledge and control. In fact, since the early stages of this case (for example, during the TRO proceedings), Defendants have been aware that Plaintiffs were investigating further token transactions; they knew that additional allegations might emerge as that investigation progressed. There is nothing genuinely new to Defendants about their own actions, and thus no element of surprise that could constitute undue prejudice. *See Lickteig v. Cerberus Capital Management, LP*, 2020 WL 7629876, at * 4 (S.D.N.Y December 22, 2020) (noting that to determine whether the proposed amendment will cause undue prejudice, courts 'generally consider whether the assertion of the new claim or defense would (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction" and noting that "central to this analysis is the extent to which the new claims arise

from the existing ones and whether a party had prior notice of the new claim"). As in *Lickteig*, the proposed amendment here would not unduly prejudice Defendants because "it pleads additional factual allegations on which Plaintiff bases his claim for securities fraud . . . rather than adding entirely new claims or defendants." *See id*.

Furthermore, the case remains at an early stage. No final decision on the merits has been rendered, and formal discovery has either not begun or is in its infancy, pending resolution of the motions to dismiss. The proposed amendment comes well before the close of discovery and long before any trial. Granting leave will essentially put the parties in the position they would have occupied had these facts been known from the outset: Defendants will have ample time to adjust their defense and strategy in response to the PSAC. Defendants are free to file a new motion to dismiss or an answer addressing the expanded allegations, and to conduct whatever additional discovery is necessary on the new factual matters.

There is no loss of evidence or unavailability of witnesses attributable to the timing of this amendment, nor is there any "sandbagging" of a new claim on the eve of trial. The mere fact that Defendants now must defend against a larger swath of misconduct does not equate to undue prejudice—it is a natural consequence of the scope of their alleged scheme being greater than initially known. Courts in this District recognize that the need for some additional discovery or briefing, by itself, does not constitute undue prejudice, especially when the case is still young and the expansion arises from newly uncovered facts. Here, any additional burden on Defendants (such as having to collect information about the $ENRON or $TRUST token deals) is both manageable and foreseeable, given the nature of the claims. Far from prejudicing Defendants, bringing all related misconduct into one proceeding may actually benefit them by providing a single forum for resolution and preventing multiple lawsuits over time.

### 3.  Judicial Economy Militates in Favor of Amendment

Permitting the amendment will also promote judicial economy and consistency. It avoids the need for parallel or duplicative proceedings in multiple forums. Defendants will not face separate lawsuits down the road from other investors in $MELANIA or $TRUST, because those parties and claims are being folded into this case now. It is more efficient for the Court and all parties to address the entire alleged scheme in one lawsuit. In summary, Defendants will not suffer any undue prejudice from this amendment; they will simply be required to answer for all related conduct in one comprehensive case, which is exactly how the justice system is supposed to handle a fraud enterprise of this scope.

### 4.  The Proposed Amendment Is Not Futile

The proposed amendments are substantively meaningful and are far from futile. In the Rule 15 context, "futility" means that the amended complaint would not withstand a motion to dismiss (i.e. that it fails to state a claim even if all allegations are assumed true). Here, that is plainly not the case. To the contrary, the PSAC's new factual allegations make Plaintiffs' overall claims even stronger and more detailed than before. Plaintiffs are adding particularized details from an insider and concrete blockchain evidence, which bolster the fraud and RICO counts by showing a repeated pattern of deception and a unified scheme. For example, the PSAC pleads with significantly greater specificity the role each Defendant played in each token launch, satisfying Rule 9(b)'s stringent requirement that fraud be pled with particularity by providing the "who, what, when, where, and how" of the newly revealed events. If the original complaint could survive a Rule 12(b)(6) challenge (and even if the FAC had arguable weaknesses), the SAC's additional facts cure any such deficiencies by providing a wealth of direct evidence of the fraud. In short, the new pleading more than meets the Rule 12(b)(6) standard for stating each claim plausibly.

Nor is there any other legal barrier that would render the amendment futile. The new claims and new parties are not, for example, time-barred or beyond the Court's jurisdiction. The amendment is timely in relation to Plaintiffs' discovery of the scheme, and the new allegations likely relate back to the original complaint under Fed. R. Civ. P. 15(c) because they arise out of the same conduct, transaction, or occurrence (indeed, they are part of the same overall pattern of fraud). Defendants may attempt to argue futility by previewing merits-based defenses, but at this stage Plaintiffs need only show that the PSAC is not frivolous or legally insufficient on its face. Given the extensive new evidence backing the claims, Plaintiffs easily clear this low bar. It is far more prudent—and more in keeping with judicial economy—to allow the amendment now and permit Defendants to raise any substantive arguments in a responsive pleading or a fresh Rule 12 motion (or later at summary judgment), rather than to preemptively shut the courthouse door on well-pleaded allegations. In sum, the PSAC is legally viable and it furthers the objective of holding Defendants accountable for all related wrongdoing. There is no futility in granting leave to amend under these circumstances.

### 5. Balance of Equities Favors Amendment

In summary, Plaintiffs satisfy every aspect of the Rule 15(a)(2) analysis. They have been diligent and honest (no undue delay or bad faith), the amendment will not unfairly harm Defendants (no undue prejudice), and the proposed new allegations are meritorious in the sense that they state valid claims (not futile). Equity and common sense strongly favor allowing this update to the pleadings so that the case can proceed on the basis of the complete set of facts. This situation exemplifies why Rule 15 embodies a liberal ethos: when new evidence comes to light that fundamentally changes the scope of a dispute, the Rules encourage courts to permit amendments so that the litigation reflects reality rather than an outdated snapshot. There is simply

no legitimate reason to refuse leave here. On the contrary, allowing the SAC will serve the judicial preference for resolving claims on their merits in one comprehensive proceeding, which is exactly what this amendment will accomplish.

**C.   In the Interest of Judicial Economy, The PSAC Would Supersede the FAC and Moot the Pending Motions to Dismiss**

If Plaintiffs' motion for leave is granted, the PSAC will become the operative pleading, replacing the FAC entirely. Defendants' motions to dismiss the FAC are pending. If the PSAC is allowed and filed, those motions will become moot because the FAC they target will no longer be the operative pleading. In the order granting leave, the Court can accordingly deny the pending motions to dismiss the FAC as moot and set a new deadline for Defendants to respond to the PSAC. This approach conserves judicial resources by avoiding the need to decide motions addressing a complaint that is no longer active, and it refocuses the proceedings on the updated allegations.

Should the Court be inclined to rule on the pending motions to dismiss the FAC before ruling on this motion, Plaintiffs respectfully request that any dismissal be made without prejudice and with express leave to amend, as to allow Plaintiffs to cure any perceived deficiencies, if any.

Given that Plaintiffs have newly-acquired evidence that substantially strengthens and expands their claims, the interests of justice would be best served by allowing leave to amend.

Granting this motion for leave will ensure that the case moves forward on the basis of a fully informed, up-to-date complaint, to the benefit of all parties and the Court. The ultimate resolution of the case — whether via a renewed motion to dismiss, summary judgment, or trial — will then be able to encompass all of the pertinent allegations, rather than being confined to an artificially narrow subset of facts. This approach prevents the injustice that would result from keeping the lawsuit limited to the initially known facts when so much more has now been uncovered. It also avoids duplicative litigation: all related fraud claims against these Defendants

19

are funneled into one proceeding, which is the most efficient and fair outcome for everyone involved. In short, allowing the SAC ensures that the case proceeds on its true scope, laying the groundwork for a just and complete adjudication of the controversy.

## IV. Conclusion and Prayer for Relief

For the foregoing reasons, Plaintiffs have demonstrated both good cause under Rule 16(b)(4) and full satisfaction of Rule 15(a)(2)'s liberal amendment criteria. The late discovery of substantial new evidence after the FAC was filed fundamentally changed the scope of this case, and Plaintiffs acted diligently and in good faith to bring that evidence before the Court at the earliest opportunity. None of the factors that might justify denying leave — undue delay, bad faith, undue prejudice, or futility — is present here. To the contrary, every factor weighs in favor of permitting the amendment. Nor will any unfair prejudice befall Defendants by allowing the SAC; indeed, all parties and the Court will benefit from having the full controversy addressed now, rather than fragmenting claims or ignoring newly revealed facts.

Plaintiffs have cleared the procedural hurdle of Rule 16's good cause requirement, and the generous standards of Rule 15 are fully met: there is no undue delay, no bad faith, no undue prejudice, and the amendment is far from futile. Allowing the SAC will serve the interests of justice by ensuring that all fraud victims and all alleged wrongdoers are before the Court, and that the truth about Defendants' scheme is fully aired. This outcome aligns with the strong federal policy favoring resolution of claims on their merits rather than on procedural technicalities. In short, granting leave to amend is not only permissible under the Rules—it is the course that justice demands on these facts.

Therefore, Plaintiffs respectfully request that the Court grant their motion for leave to file the proposed Second Amended Complaint. Upon receiving the Court's permission, Plaintiffs will

promptly file the SAC (which is submitted in draft form with this motion), and the SAC will become the operative pleading. Defendants can then respond to the SAC within the timeframe provided by the Federal Rules or as directed by the Court. Plaintiffs further request that the Court order any currently pending motions to dismiss the FAC be denied as moot, or alternatively, that any dismissal of the FAC be made without prejudice and with leave to replead in light of the new evidence now available. Granting this motion will ensure that the case proceeds with all relevant parties and allegations included, enabling a just and complete resolution of the entire alleged fraud scheme. All of the requirements of the Rules are satisfied, and justice so requires that leave to amend be freely given in this instance. Plaintiffs stand ready to file the SAC and advance this litigation on its merits as soon as the Court grants the requested relief.

Dated: October 21, 2025
New York, New York

By: */s/ Max Burwick*

**BURWICK LAW PLLC**

Max Burwick
1 World Trade Center, 84th Fl.
New York, NY 10007
(646) 762-1080
max@burwick.law
*Counsel for Plaintiffs Omar*
*Hurlock & Anuj Mehta*

<u>**WORD COUNT CERTIFICATION**</u>

I certify that the foregoing memorandum of law contains **5393** words, as determined by the word-count function of Microsoft Word, and complies with the word-limit requirements in the Individual Rules and Practices of Judge Jennifer L. Rochon.