## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

OMAR HURLOCK, ANUJ MEHTA, and
JOHN WINSLOW *on behalf of themselves
and all others similarly situated,*

Plaintiffs,

v.

KELSIER LABS, LLC d/b/a KELSIER
VENTURES, HAYDEN MARK DAVIS,
GIDEON DAVIS, CHARLES THOMAS
DAVIS, METEORA, *an unincorporated
association*, and BENJAMIN CHOW,

Defendants.

---

**Case No.: 1:25-cv-03891-JLR**

Hon. Jennifer L. Rochon

## <u>SECOND AMENDED CLASS ACTION COMPLAINT</u>

# TABLE OF CONTENTS

I. INTRODUCTION AND NATURE OF THE ACTION..........................................................4

II. JURISDICTION AND VENUE.......................................................................................7

    A. Subject-Matter Jurisdiction.......................................................................................7

    B. Personal Jurisdiction.................................................................................................7

    C. Venue.........................................................................................................................9

III. PARTIES.....................................................................................................................9

    A. Plaintiffs....................................................................................................................9

    B. Defendants...............................................................................................................10

    C. Relevant Non-Parties...............................................................................................11

IV. FACTUAL BACKGROUND........................................................................................12

    A. The Scheme: A Coordinated Fraud Operation.........................................................12

        1. Defendants employed a repeatable six-step "playbook" for pump-and-dump fraud.....13

        2. At all relevant times, the fraudulent token launches at issue were executed by a single, centrally-directed enterprise, led by Chow, with defined roles and a unified command structure........................................................................................................................18

    B. Whistleblower and Internal Communications Prove Coordination and Provide Evidence of Scienter........................................................................................................................21

    C. In Light of the CI Revelations, Wallet Forensics Confirm the Nature of the Scheme and Show Defendants Gave False Declarations to This Court.......................................................23

        1. On-Chain forensics identify "0xcEA" as the Scheme's central wallet.........................23

        2. Wallet tracing shows that Defendants Chow and Yong lied to the Court in sworn declarations.................................................................................................................28

        3. Against this backdrop, claims that Meteora is mere software ring false....................29

V. DEFENDANTS' MISCONDUCT....................................................................................32

    A. The Scheme Explained: Human Control Disguised As Neutral Infrastructure.................32

    B. The $M3M3 fraud.....................................................................................................34

        1. The $M3M3 launch was driven entirely by false marketing narratives, misrepresentations, and omissions by Defendants...........................................................34

        2. $M3M3 was engineered through hidden launch controls to guarantee insider dominance..................................................................................................................37

    C. The $LIBRA Fraud....................................................................................................40

    D. The $MELANIA Fraud...............................................................................................46

        1. "Official" branding and vesting deception.................................................................46

    E. The $ENRON Fraud...................................................................................................53

    F. The $TRUST Fraud....................................................................................................57

    G. Dynamic Labs Limited's Misconduct.........................................................................60

    H. Class Action Allegations...........................................................................................61

        1. Numerosity............................................................................................................62

        2. Typicality..............................................................................................................62

    3. Adequacy........................................................................................................... 63

    4. Predominance and Superiority ....................................................................... 64

**VI. CAUSES OF ACTION**.................................................................................**66**

  A. Count I - Fraud.................................................................................................. 66

  B. Count II - Conspiracy to Defraud..................................................................... 73

  C. Count III - RICO Section 1962(c).................................................................... 77

  D. Count IV - RICO Section 1962(d).................................................................... 83

  E. Count V - N.Y. G.B.L §§ 349 and 350............................................................ 86

  F. Count VI - Unjust Enrichment.......................................................................... 87

  G. Count VII - Unjust Enrichment (as to DLL)..................................................... 88

**VII. PRAYER FOR RELIEF**..............................................................................**89**

**VIII. DEMAND FOR JURY TRIAL**...................................................................**94**

## I. INTRODUCTION AND NATURE OF THE ACTION

1. This case exposes a sophisticated and systemic fraud run by an enterprise that weaponized legitimate blockchain and market terminology to conduct a series of pump-and-dump token schemes on the Solana network.

2. At the center of the enterprise is Defendant Benjamin Chow, a long-time crypto developer and co-founder of Meteora, Mercurial Finance, and Jupiter. Chow has been associated with deceptive projects dating back to Mercurial Finance (2021), a failed "stablecoin" venture that cost investors millions. He is no stranger to insider manipulation or misrepresentation.

3. Chow participated in the development of the *Meteora* software protocol, a liquidity-pooling system capable of governing token pricing and supply. Chow then expertly repurposed that software as the core engine of a multi-token fraud.

4. Two entities now share the "Meteora" name but could not be more different. Dynamic Labs Limited ("DLL") claims to have developed the Meteora DeFi protocol—a set of automated smart contracts that can operate neutrally. By contrast, Defendant Meteora is sued here as an *unincorporated association* of human operators led by Chow, which exploited the Meteora brand, infrastructure, and code base to run a pump-and-dump operation.

5. The Meteora conspiracy thus refers not to the open-source protocol itself but to the cadre of insiders who hijacked it to manipulate token markets, deceive investors, and enrich themselves under the false banner of decentralized finance.

6. Chow assembled a small group of trusted collaborators: Ng Ming Yeow ("Ming"), co-founder of Meteora and Jupiter; and the Davis family, acting through Kelsier Ventures (Hayden, Charles, and Gideon Davis), to execute the fraud. Together, they launched and

marketed at least fifteen (15) tokens that followed an identical blueprint; this complaint details five of them ($M3M3, $LIBRA, $MELANIA, $ENRON, and $TRUST).[1]

7. Chow's role was indispensable. As an architect of the Meteora programs, he possessed unique knowledge of the code and the ability to manipulate liquidity, fee routing, and supply controls. This knowledge and operational capability made it possible to stage rapid price inflations and collapses invisible to ordinary traders.

8. While Chow and Yeow handled the technical operations, the Davis family and Kelsier Ventures ran the marketing and distribution apparatus: they funded paid influencers, organized social-media "key opinion leader" campaigns, and scripted launch-day narratives to create the appearance of organic market demand.

9. Whistleblower communications now confirm that Kelsier worked "under Ben's instructions." Hayden Davis acknowledged in writing that he executed at least fifteen token launches at Chow's direction, demonstrating that Meteora and Kelsier functioned as a single enterprise with central command.

10. Across these launches, the same operatives performed three core functions: (1) market making and price control through Meteora's liquidity tools; (2) paid promotion through Kelsier's undisclosed KOL network; and (3) liquidity provision and extraction through shared insider wallets that seeded and drained the pools.

11. For each token, Defendants borrowed credibility from real-world figures or themes—such as the "official Melania Trump" coin ($MELANIA), the "Argentine revival" coin ($LIBRA) tied to President Javier Milei, and the "Enron corporate comeback" token ($ENRON). These faces and brands were used as props to legitimize

---

[1] The identical blueprint of the fraud alleged herein (the pump-and-dump token scheme) constitutes the same set of concerns for each of the tokens made the basis of this Complaint.

what was actually a coordinated liquidity trap. Plaintiffs do not allege those public figures were culpable; they were merely the window dressing for a crime engineered by Meteora and Kelsier.

12. Chow and his team designed and controlled every element of the fraud. They rigged token supply, staged fake "fair launches," and timed marketing bursts to drive prices skyward before executing massive insider sell-offs and liquidity withdrawals.

13. When the scheme began to unravel and public attention focused on the connections between Meteora and Kelsier, the Defendants did not stop the fraud. Instead, Meteora's leadership issued public statements pretending to "blacklist" Kelsier to protect users — a move they knew was performative because they had been partners all along.

14. This false denunciation was followed by false filings in this Court. Chow and Yong submitted sworn declarations portraying themselves as passive developers of "autonomous software," while Davis denied knowledge of the $LIBRA "snipers." Each of these statements has been forensically disproven.

15. Blockchain tracing shows that the same wallets funded token creation, paid promoters, and executed the sniper buys and liquidity drains — activities that could only occur with coordinated direction and control. Those wallets link directly to Kelsier Ventures and Chow's Meteora organization.

16. Thus, the Defendants who claim to operate "decentralized software" in reality run a centralized fraud factory, using the Meteora and Jupiter ecosystems to make scam tokens appear credible and liquid.

17. Each token launch was a chapter in the same pattern: engineer artificial scarcity, flood social media with paid hype, channel trades through enterprise-controlled pools, dump inventory into the surge, and move on to the next brand.

18. This lawsuit seeks to pierce that façade, to distinguish the neutral technology from the human conspiracy that misused it, and to hold Chow, Yeow, the Davis family, Kelsier Ventures, and Meteora (the association-in-fact) accountable for perpetrating one of the most elaborate frauds in modern cryptocurrency markets.

## II.  JURISDICTION AND VENUE

### A.  Subject-Matter Jurisdiction

19. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the claims arise under federal law– specifically, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962 and 1964. The Court also has supplemental jurisdiction over the related state-law fraud claims under 28 U.S.C. § 1367, as those claims form part of the same case or controversy as the federal RICO claim.

### B.  Personal Jurisdiction

20. The Court has personal jurisdiction over all Defendants. Each Defendant either resides in New York or has sufficient minimum contacts with New York arising from the alleged scheme, such that exercising jurisdiction comports with New York's long-arm statute and due process.

21. The fraudulent scheme was orchestrated, in substantial part, from New York. Defendant Benjamin "Ben" Chow is a resident of New York and orchestrated the enterprise from this District – effectively running the racketeering operation out of New York. Defendant Meteora (the unincorporated association-in-fact) was likewise operated out of New York during the relevant period under Chow's leadership. Further, the Kelsier Defendants

purposefully directed their fraudulent token marketing and sales efforts toward New York (and U.S. investors) in close coordination with Chow. Through these contacts, Defendants transacted business and committed tortious acts in New York, causing injury to investors in this District. Accordingly, personal jurisdiction is proper under New York's long-arm statute, N.Y. CPLR § 302(a)(1)–(3), and the exercise of jurisdiction over Defendants in New York comports with due process.

22. Jurisdiction is also independently proper under RICO's nationwide service-of-process provision, 18 U.S.C. § 1965(b). At least one RICO defendant (Chow) resides and "transacts his affairs" in this District, and the ends of justice require that all participants in the alleged RICO enterprise be brought before this Court in a single proceeding. Accordingly, all Defendants can be subject to this Court's jurisdiction under RICO.

23. Additionally, each Defendant is subject to personal jurisdiction in this District under a co-conspirator jurisdiction theory. All Defendants joined a common scheme knowing (or reasonably expecting) that overt acts in furtherance of the conspiracy would be committed in New York. In fact, substantial overt acts in furtherance of the fraudulent scheme were carried out here, and those acts had foreseeable and intended effects in this District. Each Defendant is therefore accountable for the in-forum acts of their co-conspirators, which further supports this Court's jurisdiction.

24. Finally, the scheme was interstate and international in nature. Defendants utilized interstate and foreign wires, internet communications, decentralized exchange infrastructure, and other crypto-financial tools to perpetrate the fraud, reaching investors in New York and throughout the United States and abroad. By targeting a nationwide pool of victims (including those in New York) through interstate channels, Defendants

purposefully availed themselves of the privilege of conducting activities in this forum, and their conduct directly affected commerce across state lines and national boundaries.

### C. Venue

25. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b). A substantial part of the events or omissions giving rise to the claims occurred in this District, and Plaintiffs' injuries were suffered here. Key Defendants also reside, transact business, or engaged in orchestrating the scheme in this District. Accordingly, New York is a proper and convenient venue for this action. (Venue is also appropriate under RICO's special venue provision, 18 U.S.C. § 1965(a), because at least one Defendant resides or has agents and conducts affairs in this District.)

## III. PARTIES

### A. Plaintiffs

26. Plaintiff Anuj Mehta is a resident of Arlington, Virginia. He first received $M3M3 via airdrop on December 4, 2024, began purchasing on December 5, 2024, continued to buy and stake through February 17–18, 2025, and suffered an approximate net loss of $19,164. He transacted via Phantom and Jupiter.

27. Plaintiff Omar Hurlock is a resident of Brooklyn, New York. On February 14, 2025, he purchased $LIBRA during the launch window and incurred immediate losses after insiders withdrew liquidity. His transactions were routed through DLMM-based pools and other Solana DEX integrations.

28. Plaintiff John Winslow is a resident of New York, New York. On January 20, 2025, he purchased $MELANIA tokens and incurred an approximate net loss of $10,000. On February 14, 2025 he purchased $LIBRA tokens and incurred an approximate net loss of $21,000. His transactions were made using the Phantom wallet.

### B. Defendants

29. Defendant Meteora is an unincorporated association with capacity to sue and be sued under federal and New York law. Plaintiffs allege that "Meteora," as used here, is a coordinated human-run enterprise that developed, marketed, and operated token-launch infrastructure on Solana to carry out the scheme alleged herein, including control over liquidity pools, fee routing, and upgrade authority. Meteora is the successor to Mercurial Finance and operated from this District during the period relevant to this action.

30. Defendant Benjamin "Ben" Chow is a co-founder of Meteora, Mercurial Finance, and Jupiter, and the recent-former CEO of Meteora. He resides in New York and, by attestation, has a claim on a portion of DLL revenues from Meteora trading fees. Plaintiffs allege he architected and led the scheme, controlled the technology used to manipulate markets, and directed operations from New York.

31. Defendant Ng Ming Yeow (a/k/a "Meow" or "Ming") is a co-founder of Meteora and Jupiter and serves as Jupiter's CEO. Plaintiffs allege he led development and integration and ensured routing of retail trades into enterprise-controlled pools.

32. Defendant Kelsier Labs, LLC d/b/a Kelsier Ventures is a limited liability company that funded launches and coordinated marketing. Plaintiffs allege it acted as the front organization for the enterprise, including coordination of promoters and fee arrangements.

33. Defendant Hayden Mark Davis is Kelsier's CEO. Plaintiffs allege he managed promotional narratives, undisclosed paid campaigns, and execution of launches in coordination with Chow.

34. Defendant Gideon Davis is Kelsier's COO. Plaintiffs allege he handled operations, deal terms, and token compensation arrangements.

35. Defendant Charles Thomas Davis is Kelsier's Chairman. Plaintiffs allege he led investor outreach and strategy and participated in drafting and signing launch documents, including the "M3M3 Token Launch Organizer."

36. Defendant Dynamic Labs Limited ("DLL") is a corporation organized under the laws of the British Virgin Islands. DLL is the developer and purported intellectual-property owner of the Meteora decentralized finance protocol—an automated liquidity platform that DLL has represented as a neutral, permissionless system. Plaintiffs allege that DLL collected and retained protocol fees generated through the Meteora protocol's liquidity pools despite knowledge or willful blindness of the underlying fraud conducted through the Meteora platform.

37. Doe Defendants 1–20 are promoters, Key Opinion Leaders ("KOLs"), trading entities, and shell companies that received or routed funds, whose identities are presently unknown. Plaintiffs will amend to add them when identified.

### C. Relevant Non-Parties

38. Zhen Hoe Yong is the current Meteora leader. Plaintiffs allege he submitted a misleading declaration and published self-serving articles to sanitize enterprise history.

39. Jupiter Finance is a Solana DEX aggregator co-founded by Chow and Yeow. Plaintiffs allege its routing conferred legitimacy and funneled trades into enterprise-controlled pools.

40. Public-figure faces used in marketing include Javier Milei ($LIBRA), Melania Trump branding ($MELANIA), and the Enron brand via Connor Gaydos. They were used as promotional fronts; Plaintiffs do not allege they operated the scheme.

## IV. FACTUAL BACKGROUND

### A. The Scheme: A Coordinated Fraud Operation

41. Plaintiffs bring this action to redress a coordinated market-manipulation enterprise operating under the guise of decentralized token launches. The following factual background describes how Defendants jointly executed a recurring pattern of misrepresentations, omissions, and wire-fraud transactions constituting enterprise under 18 U.S.C. §§ 1962 (c) and (d), as well as common law fraud, violations of N.Y. Gen. Bus. Law §§ 349 and 350, and unjust enrichment.

42. At all relevant times, the same group of insiders–Defendants herein– controlled every stage of the token launch. In order for their ongoing fraud to succeed, Defendants had to conceal that insider control.

43. Defendants portrayed each offering as a fair and decentralized project. Yet, in reality this was a pre-engineered pump-and-dump operation designed to extract money from investors, who were deceived into believing each token launch was fair and decentralized.

44. While every launch was an inside job, Defendants never disclosed their coordinated control: they concealed their massive personal stakes, the pre-minted insider token allocations, their control over the trading infrastructure, and their intent to dump tokens on the public.

45. The Defendants' undisclosed insider allocations, trading privileges, and coordinated publicity campaigns formed a repeatable six-step playbook that generated artificial demand, induced purchases, and allowed insiders to profit through timed exits.

### 1. Defendants employed a repeatable six-step "playbook" for pump-and-dump fraud.

46. Defendants began each scheme by crafting a compelling narrative that embedded apparent "value drivers" into the token's identity. Two principal storylines recurred:

    a. Borrowed fame—misappropriating celebrity, brand or cultural associations to imply legitimacy and desirability of the tokens; and

    b. Technocratic promise—mimicking traditional finance metrics, such as float, yield, and volume to suggest stability and professional management.

47. In both forms, Defendants mixed authentic crypto vocabulary ("staking," "liquidity," "protocol fees") with Wall Street-style metrics to pass as credible to buyers. These statements were materially false and misleading because Defendants knew that the tokens lacked intrinsic value.

48. The fabricated narratives were intended to, and did, induce public reliance and investment. For the scheme to work, Defendants had to conceal that the same insiders controlled every launch from conception through collapse.

49. The appearance of decentralized fairness was indispensable; without it, the tokens would be recognized as valueless and the exits would close.

50. In truth, each launch was an inside job: Defendants hid pre-minted insider allocations, their command of the trading infrastructure, and their intent to dump into engineered spikes.

51. Defendants operationalized a six-step playbook that recycled the same tools, actors, and talking points across tokens.

52. This narrative engineering explicitly pitched a path "beyond PVP"—framing the token as

evolving from a player-versus-player dump game into an engine of stable, fee-based returns.

53. The point was to make a meme coin feel like a structured product: a vehicle that could plausibly sustain payouts, support "real" activity, and justify continued holding. Therefore moving beyond the volatility of traditional memecoin investing.

54. **Step Two — Rig the supply (Part A):** Before the public could act, Defendants positioned themselves to dominate the float and govern price.

55. They embedded or exploited technical settings and token metadata to confer privileged access (whitelists, pre-approvals, freeze/thaw toggles, and upgradeable parameters).

56. Because they authored or coordinated the deployments, Defendants possessed non-public knowledge of mint times, pool configs, and allowance states, letting their wallets acquire first and most.

57. This head start captured the majority of supply at de minimis cost and ensured the float available to the public would be artificially scarce.

58. **Step Two — Rig the supply (Part B):** Defendants also staged "sniper" purchases: insider-funded accounts submitted opening-second orders, often while public trading was impeded or throttled.

59. The result was a designed scarcity loop—low float met by queued demand—which guaranteed a steep initial markup.

60. **Step Three — Manufacture the hype (Part A):** Parallel to supply control, Defendants mobilized a network of key opinion leaders ("KOLs") and paid endorsers to simulate organic enthusiasm.

61. These promoters were compensated via token allocations, direct payments, or campaign

retainers; the compensation was not disclosed to the public.

62. KOLs pushed identical talking points—token "fundamentals," fairness, yield narratives—across synchronized windows that matched the launch mechanics.

63. Community channels (Twitter/X, Telegram, Discord) were inundated with pre-scripted messages precisely when pools were toggled or opened.

64. **Step Three — Manufacture the hype (Part B):** Whistleblower documents name specific promoters and detail payment schedules, message scripts, and posting times, confirming the coordination.

65. The public, believing these voices were independent, interpreted the flood of content as grassroots validation rather than paid advertising.

66. **Step Four — Engineer the spike (Part A):** With narrative primed, float constrained, and hype synchronized, Defendants configured pools to produce immediate price surges.

67. Meteora's program controls—fee curves, bin/shape placement, bootstrapping, and privilege gates—were tuned to amplify early price impact from small amounts of capital.

68. Hidden levers allowed Defendants to pause or impede public trading while insider wallets accumulated, then reopen once their positions were secured.

69. When public access resumed, basic scarcity mechanics drove rapid upward repricing that looked like "organic" demand discovering "true value."

70. **Step Four — Engineer the spike (Part B):** Defendants seeded initial liquidity with insider funds to create the optics of depth and "sophisticated rails," further reassuring buyers.

71. UI routing and aggregator placement channeled retail orders into enterprise-controlled pools, reinforcing the appearance of legitimacy.

72. The effect was choreographed: technical toggles and marketing bursts moved in lockstep to create an irresistible launch-day momentum curve.

73. **Step Five — Execute extraction (Part A):** At or near the crest, insider wallets began unloading inventory into the very demand the scheme had created.

74. Because insiders had amassed huge positions at negligible cost, even small relative price gains converted into massive dollar profits.

75. Liquidity was simultaneously drained or redirected, removing the capital that supported the order book and accelerating the drawdown.

76. As prices fell, protocol and routing fees continued to accrue to insiders, allowing them to monetize both the ascent and the collapse.

77. **Step Five — Execute extraction (Part B):** Throughout, Defendants masked these dispositions as ordinary trading, exploiting retail's belief in a fair, neutral market.

78. Post-spike "updates" and new talking points occasionally attempted re-inflations, creating exit ramps for remaining insider inventory.

79. **Step Six — Reinvent and repeat (Part A):** With one narrative exhausted, Defendants immediately spun up the next—new face, new theme, same machinery.

80. The repetition itself was an asset: prior "successes" were cited as proof of capability, drawing the next wave of buyers.

81. Tooling, wallets, and KOL rosters carried over between launches, tightening the cycle time and standardizing execution.

82. **Step Six — Reinvent and repeat (Part B):** The enterprise's continuity—identical code paths, recurring wallets, and synchronized campaigns—demonstrates a single, centrally managed operation.

83. Each iteration preserved the same three pillars: controlled supply, scripted visibility, and insider-timed exits.

84. At every stage, Defendants borrowed credibility from traditional finance—float, volume, yield—and from real-world brands or personalities, to portray structure where none existed.

85. The "beyond PVP" promise was the through-line: Defendants told investors the tokens would earn sustainable fees for holders, when the only durable cash flows were those siphoned to insiders.

86. The illusion of neutral infrastructure was critical; Defendants insisted code, not people, set outcomes, while quietly exercising human discretion over code gates.

87. Investors had no way to see the undisclosed privileges, pre-approvals, or freeze/thaw sequences that shaped who could buy and when.

88. Nor could investors see the paid nature of the endorsements or the internal calendars that synchronized posts to pool events.

89. The combination—technical opacity plus covert marketing—rendered ordinary diligence ineffective and made deception appear like innovation.

90. When scrutiny grew, Defendants issued performative statements (e.g., "blacklisting" a partner) to feign separation from their own collaborators.

91. Internally, nothing changed: the same actors continued to share advance knowledge of launch states, route retail flow, and capture fees and exits.

92. Thus, what appeared to be a series of independent "memes" was, in substance, a serialized RICO enterprise built to extract cash from a rotating cast of retail buyers.

93. The six steps—narrative invention, supply rigging, hype manufacture, spike engineering,

extraction, and reinvention—recurred across tokens, times, and themes, proving a coherent, repeatable fraud rather than isolated events.

### 2. At all relevant times, the fraudulent token launches at issue were executed by a single, centrally-directed enterprise, led by Chow, with defined roles and a unified command structure.

94. At all relevant times, the fraudulent token launches described above were executed by a single, centrally directed enterprise led by Defendant Benjamin Chow, who exercised ultimate control over both the technical and strategic operations of the scheme.

95. Chow was the chief architect and principal operator of the enterprise. Having designed the Meteora protocol and previously operated its predecessor, Mercurial Finance, Chow possessed unique expertise in decentralized-finance infrastructure, liquidity manipulation, and token market mechanics. He abused that expertise—and the public's trust—to transform a legitimate technology into the core instrument of an organized fraud.

96. Chow's career history demonstrates a continuous pattern of deception. At Mercurial Finance, he participated in a failed "stablecoin" venture that defrauded investors of millions. From that project through Meteora, he consistently used the rhetoric of innovation to disguise insider control and conceal market manipulation.

97. As architect of the Meteora programs, Chow could alter how tokens behaved in the marketplace. He directed the configuration of liquidity pools, fee routing, and trading parameters; determined when and how trading could be frozen or thawed; and exploited those privileges to extract maximum profit at the expense of the public.

98. Chow did not act alone. He partnered with Kelsier Ventures and its principals—Hayden, Charles, and Gideon Davis—who managed the front-end marketing, influencer coordination, and public communications for the fraudulent token launches.

99. Together, they weaponized Meteora's public reputation. Using Meteora's brand accounts, website, and communication channels, Chow and the Davis family presented an image of credibility and innovation while secretly manipulating markets from behind the curtain.

100. Kelsier Ventures, under Hayden Davis's direction, served as the marketing and operations arm of the enterprise. It organized paid promotional campaigns, brokered influencer arrangements, and scripted coordinated media pushes that coincided with each token's technical rollout.

101. The Davises divided operational responsibilities: Hayden Davis managed high-level marketing and KOL networks; Charles Thomas Davis handled investor relations and deal flow; and Gideon Davis oversaw execution, compensation, and campaign logistics.

102. Chow retained strategic command. He approved marketing timelines, synchronized liquidity events with publicity bursts, and ensured that the hype generated by Kelsier aligned with the price action he was engineering behind the scenes.

103. In practice, Chow functioned as the director and commander of the enterprise; Kelsier and the Davises executed his plans, launching tokens, amplifying false narratives, and coordinating insider exits through their marketing and liquidity operations.

104. The enterprise's roles were clearly defined: Chow and Meteora controlled the technical infrastructure—token creation, liquidity pools, and upgrade privileges; Kelsier Ventures and the Davises managed the marketing, promoters, and investor outreach; and Ng Ming Yeow, through Jupiter, maintained the routing infrastructure that funneled investor trades directly into the enterprise's controlled pools.

105. This structure ensured that retail investors encountered what appeared to be a

legitimate decentralized-finance ecosystem, when in reality every transaction was routed through systems controlled by the same insiders.

106.    After public exposure of the $LIBRA scheme, Chow announced through Meteora's public channels that he had "stepped down" or "retired" as CEO. This carefully staged resignation was not a repudiation of the misconduct but a public-relations maneuver designed to distance Meteora's brand from growing scrutiny while leaving the underlying operation intact.

107.    In the wake of that announcement, Meteora's public accounts issued statements claiming that the organization was "taking action" against Kelsier Ventures and its affiliates, purporting to have "blacklisted" Kelsier to protect users. These representations were knowingly false. Chow and the Meteora team had worked directly with Kelsier throughout the scheme, and both groups continued to coordinate behind the scenes.

108.    The so-called distancing campaign was itself another layer of deception. Rather than acknowledge their own culpability, Meteora's leadership created a false narrative that they were victims of Kelsier's misconduct—when in fact they had jointly executed and profited from the fraud.

109.    That pattern of misrepresentation has persisted into this litigation. Chow, Yeow, and the Davises have each publicly and in sworn filings denied control, claiming that Chow was merely a "developer," Meteora was "just software," and Kelsier "knew nothing" about insider sniping. The documentary and forensic evidence tell a different story: these individuals were the principal operators of a coordinated enterprise, continuing to mislead the public and this Court to conceal their unified command over one of the most elaborate frauds in the cryptocurrency market.

**B. Whistleblower and Internal Communications Prove Coordination and Provide Evidence of Scienter**

110.    The coordinated nature of the enterprise is confirmed through extensive whistleblower communications and internal documentation obtained by Plaintiffs.

111.    On or about September 4, 2025, a confidential informant (the "CI"), a financial professional with direct access to Defendant Hayden Davis, contacted Plaintiffs' counsel to report firsthand knowledge of the scheme.

112.    Following an initial interview on September 8, 2025, the CI provided preserved chat logs documenting communications with Hayden Davis on September 12, 2025 (incorporated by reference App'x Q).

113.    In those conversations, Davis made multiple admissions revealing the inner workings of the enterprise and explicitly identifying Chow as its leader.

114.    Most notably, Davis stated that he had been acting "under Ben's instructions" on more than fifteen (15) token launches—confirming that Chow directed both the technical and operational components of the fraud.

115.    These admissions establish that Chow was not a passive software developer as he has claimed, but the orchestrator of a serial token-launch operation that he oversaw personally and continuously.

116.    The CI's communications further revealed that each launch followed a standardized, repeatable playbook, rather than arising independently or spontaneously.

117.    In these chat logs, Davis admits for the first time that he was responsible for launching the $MELANIA token.

118.    In one exchange from January 2025, Davis wrote, "I'm launching [the] Melania token

tomorrow," demonstrating advance coordination of a launch marketed publicly as an independent "community" initiative.

119.    Additional messages show planning calendars for subsequent launches—referencing the $MELANIA token to be followed the next week by the "Milei"-themed $LIBRA token—confirming that the series was queued and premeditated, not reactive.

120.    The CI also described Davis's statements that, after one early launch, he entered into an "exclusive marketing" arrangement with Meteora, then operated by Chow. Davis said this relationship gave him "more power than ever" in coordinating their joint operations, illustrating that Kelsier's marketing arm functioned under Meteora's umbrella, not alongside it.

121.    This evidence corroborates other, earlier internal communications obtained by Plaintiffs' March and August 2024.

122.    Those materials (attached hereto as App'xs I–P, incorporated by reference) demonstrate that Defendants maintained detailed launch plans and synchronized promotional schedules, further proving deliberate coordination.

123.    Chat transcripts and planning files include explicit instructions for paid promoters, timing directives for social media posts, and itemized lists of "KOL" payments.

124.    In one such document, a KOL was instructed to post a pre-written promotional tweet "immediately after the pools open," illustrating the precision timing with which publicity was tied to liquidity events.

125.    Defendants tracked these campaigns in shared spreadsheets listing each influencer, their assigned post time, and the corresponding compensation—paid either in cash, SOL,

or pre-allocated token distributions.

126.    Another internal file, titled the "M3M3 Calcs Template," prepared by Chow, contains financial modeling that projected profits based on price spikes and liquidity withdrawals, demonstrating that the enterprise pre-calculated its expected extraction.

127.    A companion document authored by Charles Davis, titled the "M3M3 Token Launch Organizer," outlines the marketing-side playbook, including task lists, publication schedules, and narrative messaging for the $M3M3 token—further proving the integrated coordination between Chow and the Kelsier team.

128.    These records show that Defendants shared synchronized launch calendars and pre-scheduled content across group channels, ensuring that marketing events coincided exactly with the technical milestones that Chow controlled.

129.    Collectively, these materials reveal knowledge, intent, and coordination at every level of the enterprise. The Defendants did not merely collaborate loosely—they operated from a unified script, executing identical steps across each token launch.

130.    The whistleblower admissions, corroborated by internal documentation and on-chain evidence, leave no room for doubt: Chow directed the enterprise's overall strategy, the Davis family executed his marketing and liquidity plan, and together they carried out a sustained, deliberate scheme to defraud investors under the guise of decentralized innovation.

   C.  **In Light of the CI Revelations, Wallet Forensics Confirm the Nature of the Scheme and Show Defendants Gave False Declarations to This Court**

      1.  **On-Chain forensics identify "0xcEA" as the Scheme's central wallet.**

131.    The expanded forensic analysis that followed was prompted by two events: first, the

132. confidential informant's admissions confirming coordinated insider trading across at least fifteen token launches; and second, the post-TRO movement of assets from the sniper wallets the day after the Court dissolved the temporary restraining order.

133. These developments compelled Plaintiffs to initiate an enhanced on-chain investigation to trace the flow of funds among the deployer wallets that created the tokens, the sniper wallets that captured early supply, and the enterprise wallets that later withdrew liquidity.

134. The analysis revealed a closed circuit of control and movement consistent with a single operating entity—not independent traders acting by chance, but a centrally managed system run by the same Defendants.

135. Specifically, forensic tracing identified a central coordinating wallet—beginning with the hexadecimal prefix 0xcEA—that repeatedly appeared in the funding chain for each of the five tokens at issue: $M3M3, $LIBRA, $MELANIA, $ENRON, and $TRUST.

136. The 0xcEA wallet served as a financial command center. It received capital from insiders, deployed that capital to create new tokens, seeded the initial liquidity pools, and then financed the sniper wallets that acquired early supply during launch windows.

137. The transactional patterns were unmistakable. In each instance, transfers flowed from 0xcEA to the deployer wallet responsible for minting the token, and shortly thereafter, from the same source to a network of sniper wallets that executed first-second buy orders.

138. The timing and magnitude of these transfers—often within minutes of one another—prove common control and coordination. The deployers and the snipers were not strangers; they were components of the same machine, sharing a treasury, direction, and purpose.

139.    The forensic timeline also shows that the same wallets later consolidated profits back into 0xcEA or its immediate derivatives, completing a circular flow of funds that began and ended with the same enterprise.

140.    These findings are fatal to Defendants' narrative that the snipers were independent actors. The evidence demonstrates that the very wallets that created the tokens also financed the wallets that bought them, meaning that token creation and insider accumulation were executed by the same operational team.

141.    In market terms, the issuers were their own first purchasers—an arrangement impossible in a fair or decentralized launch and conclusive of manipulation.

142.    The connection between deployer and sniper wallets was further corroborated by overlapping control patterns: shared authorizations, identical transaction signatures, and mirrored behavioral timing across launches.

143.    For example, in multiple tokens—including $LIBRA and $M3M3—the same multi-signature authorities that approved contract deployments were used minutes later to fund or authorize sniper wallet activity.

144.    This means the insiders who minted the tokens had the same access privileges to the wallets executing early-buyer trades, and thus had advance control over both sides of the market.

145.    In particular, during the $LIBRA launch, one sniper wallet that extracted millions in profit was directly funded by 0xcEA in advance. That transaction occurred on the same day that Defendant Hayden Davis was publicly denying any connection to the snipers in opposition to Plaintiffs' TRO motion.

146.    These contradictions are decisive. Davis's sworn statements that he "had nothing to

do with" and "did not know" the sniper wallets are provably false. The blockchain record shows the sniper wallets were financed by his own enterprise's treasury and operated in temporal lockstep with the deployers he coordinated.

147.    Moreover, the movement of funds immediately following the Court's dissolution of the TRO confirms that Defendants continued to act in concert. On August 20, 2025, within hours of the TRO being lifted, two core sniper wallets transferred their remaining proceeds to new Solana wallets and, in one case, bridged the assets to Ethereum.

148.    That cross-chain transfer converted the proceeds from Circle USDC—a centralized stablecoin that can be frozen by court order—into decentralized tokens immune from seizure. This was not spontaneous trading behavior; it was a deliberate act of evasion.

149.    Tracing those post-TRO transfers led back to 0xcEA, showing that the same enterprise actors who funded the launches also orchestrated the laundering of their profits after judicial intervention.

150.    The forensic data paints a unified picture: the same insider network that designed the code, configured the pools, and managed liquidity also executed the sniper buys, captured investor capital, and concealed proceeds once scrutiny began.

151.    This pattern directly refutes Defendants' sworn declarations submitted to this Court. Chow was not a peripheral "developer," and Davis was not an innocent "marketer." The evidence shows that both controlled the deployers, both funded the snipers, and both benefitted from the withdrawals.

152.    Wallet-level evidence further reveals that identical private-key clusters and approval chains were used across the supposedly independent roles—developer, deployer, liquidity provider, and early buyer—proving they were all managed by the same set of operators.

153. Contemporaneous planning materials and communication logs corroborate the on-chain record: they outline sniper-fund staging, specify pool timing, and model extraction through liquidity removal and fee routing. Those instructions correspond exactly to the observed wallet behavior, leaving no credible possibility of coincidence.

154. In sum, the forensic analysis exposes a systemic fraud in which Defendants exercised complete control over both supply and demand. The launch wallets that minted the tokens, the sniper wallets that bought them, and the enterprise wallets that collected the profits were all nodes of a single command structure.

155. This convergence eliminates the pretense of decentralization or independent market participation. Every layer of trading activity—from creation to collapse—was orchestrated by the same human operators acting through the same infrastructure.

156. The on-chain evidence also proves post-hoc deception. Even after the scheme was public, Defendants continued to issue false statements to regulators, investors, and this Court, repeating that Meteora was "just software" and that Kelsier was "rogue." The forensic record proves the opposite: these entities were one enterprise operating in concert.

157. Each token examined—$M3M3, $LIBRA, $MELANIA, $ENRON, and $TRUST—follows the same fingerprint: identical deployer-sniper linkages, mirrored timing, and reconvergence of proceeds to the same central wallets.

158. The blockchain ledger thus functions as the enterprise's own confession. Its transparency exposes what Defendants hoped would remain hidden: a continuous pattern of insider control, market manipulation, and coordinated profit extraction.

159. Accordingly, Plaintiffs allege that Defendants' prior declarations were materially false, designed to mislead the Court and delay accountability. The combined whistleblower admissions, post-TRO movements, and wallet-tracing analysis conclusively establish a single, centrally managed operation—one that continues to conceal its profits and misrepresent its structure to this day.

## 2. Wallet tracing shows that Defendants Chow and Yong lied to the Court in sworn declarations.

160. Chow and Yong swore that Chow was a peripheral developer and that Meteora was "just software." The record shows centralized human control and coordination by them over the launches at issue.

161. As set forth above, the same hub wallet that financed contract deployments and seeded initial liquidity also pre-funded the opening-seconds sniper wallets, and launch proceeds reconverged to that hub. This repeated pattern across the relevant tokens cannot be squared with a hands-off "software only" portrayal. It is the hallmark of common control by insiders who planned both sides of each launch.

162. Contemporaneous planning materials from March–April 2024 corroborate the on-chain pattern. They assign roles for staging sniper funds, specify pool parameters and timing, and model extraction through liquidity removal and fee routing. Those instructions match the observed funding of deployers and snipers from the same source and the later consolidation of profits. That is operational direction, not passive coding.

163. These facts directly contradict the declarations. Chow did not merely "provide technical support"; the funding, timing, and routing show he orchestrated deployments and opening-window buys. Yong did not preside over autonomous code; the coordinated use of Meteora's pools and downstream routing reflects human discretion aligned with

his leadership role. Any suggestion that snipers were independent actors is refuted by their advance capitalization from the same hub that paid for deployment – i.e. the Hayden Davis/Kelsier Wallet, the same Hayden Davis that Chow was with "24/7" in Turkey during the lead up to the $MELANIA and $LIBRA launches.

164.    The wallet-tracing and corroborating documents establish material falsity and an effort to preserve and conceal the scheme by misrepresenting control, coordination, and proceeds.

### 3. Against this backdrop, claims that Meteora is mere software ring false.

165.    Against this backdrop, the suggestion that Meteora is merely autonomous code devoid of human control is unsustainable. The record now shows that Meteora operated as a human-directed enterprise, not a neutral technological platform.

166.    This case involves blockchain infrastructure, but the scheme itself requires no technical sophistication to understand. Stripped of jargon, it is a classic fraud—an insider conspiracy that used software as camouflage for centralized manipulation.

167.    At its core, the deception was simple: Defendants invoked the imagery of "decentralized finance" ("DeFi") to imply that market outcomes were dictated by code, when in truth every material aspect of those markets was controlled by insiders acting through Meteora's systems.

168.    To clarify the distinction:

(a) *Solana* is a public, neutral blockchain — a shared ledger where transactions occur without central oversight. It serves as the infrastructure layer, akin to a highway.

(b) The *Meteora protocol* refers to a set of smart contracts originally developed to automate liquidity management on Solana, including the Dynamic Liquidity Market

Maker (DLMM) programs. In theory, those contracts are permissionless and could be used independently of any centralized operator.

(c) Defendant Meteora, however, is not code. It is an unincorporated association of human operators led by Benjamin Chow, who directed the development, deployment, and use of that code for fraudulent purposes.

169.    The distinction is crucial. Code cannot lie, but the people who deploy and control it can—and here they did. The evidence demonstrates that Chow and his associates exercised full operational command over Meteora's supposedly "autonomous" software, selectively upgrading, whitelisting, freezing, and routing pools to serve their own ends.

170.    The Meteora association made every consequential decision: who could trade, when liquidity could move, how fees would be distributed, and which wallets would receive insider privileges. Each launch, configuration, and modification reflected intentional human choice, not autonomous algorithmic behavior.

171.    In public, the Defendants portrayed Meteora as a decentralized protocol governed by code and community consensus. Internally, they treated it as a privately controlled platform, directed by Chow and a small inner circle who used administrative privileges to manipulate markets for profit.

172.    Indeed, Meteora's own public materials contradict its courtroom posture. Chow repeatedly identified himself as Meteora's "CEO," issued blog posts and social media statements under the Meteora brand, and approved marketing collaborations with Kelsier Ventures. Those communications leave no doubt that Meteora was operated as a company with leadership, hierarchy, and coordinated business activity—not as an algorithmic commons.

173. When Dynamic Labs Limited ("DLL"), a non-party claiming ownership of the Meteora protocol, later intervened in these proceedings, it advanced a self-contradictory position: that "Meteora" was both an autonomous, unusable protocol and simultaneously a system under its direction. DLL's own filings confirm what the evidence already demonstrates—there was always a human command structure behind Meteora's operations.

174. A central falsehood of Defendants' scheme was the claim that Meteora's token launches were "decentralized" and "community-driven." In reality, every meaningful lever of control—supply, liquidity, routing, fees, and access—remained in the hands of the same insiders.

175. Through expert manipulation of the Meteora programs, Defendants could alter or disable trading pools at will, override supposed safeguards, and direct the flow of investor funds to insider wallets. These powers were exercised repeatedly across the token launches detailed herein.

176. The fiction of decentralization served a single purpose: to disarm skepticism. Investors were told they were participating in a neutral, self-governing ecosystem; in truth, they were entering a market dominated by a handful of individuals who dictated outcomes behind the scenes.

177. Understanding the fraud therefore requires no specialized blockchain expertise. The mechanics mirror any other market manipulation: insiders misrepresented who controlled the levers of value, engineered scarcity and hype, and extracted profits from an uninformed public.

178. The "Meteora" enterprise—as operated by Chow and his collaborators—was not a

software project but a fraudulent organization masquerading as one. It combined technical control, financial engineering, and deceptive marketing to create the illusion of legitimate decentralized finance while conducting what was, in substance, a centrally run racket.

179. Thus, when Defendants claim that "Meteora is just software," they are not describing reality—they are invoking a talking point designed to escape accountability. The forensic and testimonial record shows precisely the opposite: Meteora was a human enterprise disguised as code, and its operators used that disguise to defraud investors while concealing their own command of the system.

## V. DEFENDANTS' MISCONDUCT

### A. The Scheme Explained: Human Control Disguised As Neutral Infrastructure

180. The deception at the heart of this case is therefore not technical but human. Defendants created and maintained a centralized command system while publicly insisting that they had none. Their fraud depended on that duality: claiming decentralization to attract investors while secretly exercising total control to extract their money.

181. By portraying Meteora as an impartial platform, Defendants disarmed skepticism and evaded accountability. They invoked phrases like "permissionless," "autonomous," and "self-governing" to suggest that no one could interfere with the market—even as they manipulated it directly.

182. This rhetorical sleight of hand obscured the truth that Meteora's insiders could and did alter market conditions at will. When a launch required a price spike, they throttled

liquidity; when they needed an exit, they released supply and withdrew funds. Each mechanical step of the fraud was premeditated and human-driven.

183.    The public-facing brand of Meteora served as both a shield and a lure—a symbol of technological legitimacy that gave investors confidence. Behind that façade, Chow and his associates used their administrative privileges to ensure that every "autonomous" function produced outcomes favorable to them and devastating to everyone else.

184.    The illusion of neutrality was the enterprise's most powerful weapon. It allowed Defendants to market themselves as innovators while concealing that they were, in fact, operators of a closed system designed to drain retail capital. When they said the market was "trustless," what they meant was that only they could be trusted—with the keys, the privileges, and the profits.

185.    These tactics mirror the dynamics of any traditional Ponzi or insider-trading operation. The language of decentralization replaced the language of brokerage, but the structure—centralized control, asymmetrical information, false assurances—remained identical.

186.    Investors reasonably believed they were participating in a transparent ecosystem governed by immutable rules. They were, in fact, participating in an ecosystem governed by Chow. The "immutability" that DeFi promised did not exist; the code was mutable at his command, the market was manipulable at his discretion, and the profits were distributed at his choosing.

187.    Through this framework, Defendants converted what should have been a transparent ledger into a conduit for organized fraud. Each token launch recycled the same formula: a new narrative of trust, fairness, or social purpose wrapped around the same

human-controlled machinery of extraction.

188.  The results were devastating. Investors lost millions of dollars under the false belief that they were engaging with independent, self-regulating systems. In reality, every trade, every liquidity event, and every price movement was dictated by a handful of individuals who used technology as both the instrument and the alibi for their deception.

189.  Thus, while the Defendants continue to insist that "Meteora is just software," the evidence shows the opposite: Meteora was the human hand behind the code—a coordinated apparatus through which Chow, the Davises, and their partners controlled markets, misled investors, and extracted unlawful gains under the guise of decentralization.

    **B. The $M3M3 fraud**

        **1. The $M3M3 launch was driven entirely by false marketing narratives, misrepresentations, and omissions by Defendants.**

190.  The first token launched under Defendants' enterprise was $M3M3, introduced to the public as the "debut token" of a revolutionary new "stake-to-earn" platform.

191.  In marketing materials, Defendants portrayed $M3M3 as a breakthrough solution to the volatility of meme coins — a token that would transform speculation into sustainable, passive income for retail investors.

192.  They promised that $M3M3 would "end the player-versus-player dynamic of DeFi," allowing token holders to earn yield collectively from platform fees and ushering in a new era of "shared growth" over competition.

193.  The pitch fused the rhetoric of decentralization with the familiar vocabulary of Wall Street. Defendants marketed $M3M3 not as a meme coin but as a structured financial

product, one that blended the language of liquidity, yield, reserves, and dividends to suggest prudence and permanence.

194.    Investors were told that by staking $M3M3 they would receive "real-time," "passive" rewards funded by transaction fees — effectively portraying the token as a dividend-paying equity.

195.    This framing presented $M3M3 as a hybrid investment, offering the growth potential of technology stock and the recurring income of a regulated yield instrument.

196.    To bolster credibility, Defendants invoked the authority of the Meteora platform and its "renowned" lead developer, Defendant Chow, asserting that the token was launched on a "sophisticated, reliable, and transparent" exchange with "permanently-locked liquidity" and "fair launch" safeguards.

197.    These terms were deliberately chosen to evoke investor-protection concepts drawn from traditional finance — parity, locked capital, and regulatory oversight — even though none existed.

198.    By repeatedly emphasizing "fairness," "transparency," and "real yield," Defendants created the false impression that $M3M3 operated under principles comparable to a compliant financial product rather than an unregulated, insider-controlled asset.

199.    The illusion was reinforced through precision marketing. Public posts cited numerical figures—"over $4.5 million in rewards," "$200,000 per day in payouts"—to convey the appearance of audited performance. These numbers were unverified and misleading, yet were circulated across official channels to manufacture trust.

200.    Defendants further amplified the illusion of success through social-media testimonials

claiming that users had received "thousands of dollars" in immediate airdrop rewards and that $M3M3's market capitalization had exceeded $100 million within days of launch.

201.    Each statement was designed to evoke FOMO (fear of missing out) and to lend the token an aura of inevitability — a once-in-a-generation opportunity underwritten by technology and mathematics.

202.    In truth, these promotions concealed the architecture of a classic pump-and-dump. None of the promised mechanisms existed in practice, and all of the "rewards" and "returns" were funded by incoming investor capital that insiders extracted through hidden privileges.

203.    Defendants simultaneously pressured investors to buy and hold by introducing a "staking-rank" system that mimicked preferred shares: only "top stakers" would qualify for the highest rewards.

204.    This structure induced retail investors to accumulate larger positions and lock up their funds, deepening the liquidity available for insider exploitation.

205.    The overall message was clear: $M3M3 was not a speculative token but a long-term wealth-building instrument supported by algorithmic fairness and professional management. That message was false.

206.    The entire public narrative was a façade. Defendants never disclosed that the same insiders controlling the Meteora infrastructure had pre-programmed hidden commands within the $M3M3 smart contracts, enabling them to freeze trading, whitelist insider wallets, and reroute fees at will.

207.    Nor did they reveal that the "launch team" they referenced in promotions was composed entirely of Defendants and their immediate collaborators, including Hayden

Davis, Charles Davis, and Gideon Davis through Kelsier Ventures. This inner circle pre-arranged to dominate supply, manipulate price, and exit at profit.

208. In reality, the $M3M3 launch was neither "fair" nor "community-driven." It was a closed-loop operation meticulously designed to appear open while remaining under total insider control.

209. Every element — from marketing language to contract settings — served a single objective: to lure investors into a marketplace where outcomes were predetermined by the very people promising decentralization.

210. The $M3M3 launch thus marked the prototype of the enterprise's scheme: a fraudulent debut masquerading as financial innovation, where Defendants leveraged public trust in new technology to orchestrate one of the most deceptive token offerings on the Solana network.

## 2. $M3M3 was engineered through hidden launch controls to guarantee insider dominance.

211. Behind the scenes, the $M3M3 launch was engineered to guarantee insider domination from the outset. Defendants pre-programmed the Meteora liquidity pool ("$M3M3 Launch Pool") to give themselves complete control over supply, liquidity, and trading access before any member of the public could participate.

212. Prior to the public launch, Defendants loaded the pool with approximately 900 million $M3M3 tokens—roughly ninety percent of the total supply—while reserving only a nominal remainder for the supposed "community" allocation.

213. They then paired this massive token allocation with minimal real liquidity—approximately 42 SOL (roughly $5,800 at the time)—to create the false appearance of depth while ensuring that any early purchases would rapidly drive up price.

214.    This design created a volatile imbalance: vast supply, minimal collateral, and full insider knowledge. The stage was set for a manipulated price surge that would appear organic to outside observers but was, in truth, scripted by Defendants.

215.    When $M3M3's launch was announced, Defendants immediately froze the market through Meteora's concealed administrative privileges, executing a hidden "pause" command that prevented all public trading.

216.    The existence of this freeze was never disclosed. Retail buyers attempting to purchase during the opening window found that their transactions would not execute, with no explanation or warning, even as social-media hype intensified.

217.    During this silent interval, Defendants executed their real plan. They selectively "thawed" the pool just long enough for insider wallets—already whitelisted and pre-funded—to buy large portions of the supply at the artificially low opening price, then instantly re-froze trading before any public orders could clear.

218.    This cycle repeated dozens of times over the course of minutes. Each rotation transferred vast quantities of $M3M3 from the liquidity pool to insider-controlled wallets, while the public remained locked out and unaware that trading was even disabled.

219.    By the time the freeze was lifted, insiders had quietly acquired roughly 85% of all $M3M3 tokens, on top of the 10% nominally "reserved" for the launch team. In total, approximately 95% of the supply was in the hands of the Defendants and their affiliates before the first public trade was executed.

220.    Once the insiders' positions were secured, Defendants opened trading to the public and declared the launch a success. To onlookers, it appeared that $M3M3 had debuted with an open market, a fair supply, and exploding demand.

221.    In reality, the supply available to ordinary investors was microscopic—about five percent of total tokens—creating artificial scarcity that guaranteed a dramatic price spike as pent-up orders collided with a closed float.

222.    The resulting upward surge was not market discovery but price choreography. Defendants had manufactured a constrained market where even modest external demand produced exponential price appreciation, all while they sat on an overwhelming insider position acquired for pennies.

223.    As trading opened, the enterprise executed its publicity playbook. Paid KOLs and social-media influencers—coordinated through Kelsier's internal calendars—simultaneously began posting triumphal messages about the "fair launch," "locked liquidity," and "instant staking rewards."

224.    These promotions were synchronized to the minute with the lifting of the freeze, reinforcing the illusion that $M3M3's explosive debut was a grassroots event rather than a prearranged spectacle.

225.    The surge worked exactly as designed. Within minutes, $M3M3's price skyrocketed from near zero to extraordinary valuations, drawing in thousands of retail participants who believed they were witnessing genuine momentum.

226.    Defendants then began their extraction phase. Using the same privileged wallet permissions, they sold into the very demand they had engineered, liquidating massive holdings at inflated prices while removing the liquidity they had initially supplied.

227.    The simultaneous flood of insider sales and liquidity withdrawals triggered an immediate collapse. Prices cratered within minutes, erasing nearly all market value and

leaving outside purchasers holding worthless tokens while insiders exited with enormous profits.

228. The $M3M3 launch thus encapsulated the enterprise's method in miniature: a contrived "fair launch" built on concealed controls, pre-allocation, and freeze-thaw manipulation that let Defendants dictate every price movement from start to finish—all while deceiving investors into believing they were participating in a decentralized marketplace.

### C. The $LIBRA Fraud

229. In February 2025, Defendants launched the $LIBRA token, styling it as a patriotic initiative to uplift the Argentine economy and "fund small businesses." In reality, it was the same fraudulent enterprise wearing the mask of social purpose.

230. The project's website proclaimed that $LIBRA's goal was "to strengthen the Argentine economy by supporting entrepreneurship and innovation," and promised that token proceeds would be used to "finance small local projects." To the public, this sounded like a development fund.

231. Defendants presented $LIBRA as a hybrid between philanthropy and investment—an asset that would allow investors to earn profits while participating in Argentina's economic revival. The narrative capitalized on national pride and the rhetoric of social good to draw unprecedented retail participation.

232. Marketing materials claimed that an "extensive diligence process" would be conducted to identify legitimate Argentine nonprofits and entrepreneurs to receive funding. In reality, that process consisted of a single Google Form—a perfunctory intake sheet that underscored that no meaningful diligence or project evaluation was ever intended.

233.    Given the scale and visibility of the launch, the use of such a superficial mechanism was not oversight but design. It demonstrated the enterprise's true intent: to create the appearance of charitable purpose while executing another round of market manipulation and insider enrichment.

234.    No verified announcements were ever made regarding approved recipients, completed reviews, or actual disbursements. There is no evidence that a single Argentine organization received funds from the Defendants. The absence of transparency, documentation, or third-party oversight further indicates that the purported funding pipeline was a façade.

235.    Plaintiffs allege that any supposed "nonprofit payments" were likely laundering mechanisms—transactions routed through nominal Argentine organizations to justify internal transfers or wash proceeds back to enterprise wallets. This conduct is consistent with Defendants' broader pattern: lying to the public while secretly paying themselves through undisclosed channels.

236.    To give $LIBRA the appearance of legitimacy, Defendants executed a highly coordinated marketing campaign, framing the token as a "movement" rather than a profit-driven product. The Davis family, acting through Kelsier Ventures, recruited paid promoters and influencers to push a steady narrative of civic pride and national revival.

237.    The campaign's centerpiece was an endorsement stunt involving Argentine President Javier Milei. On launch day, Milei's verified social-media account posted the $LIBRA contract address with language praising "innovation" and "freedom in finance," effectively conferring what appeared to be presidential approval.

238. This endorsement was no accident. Defendants orchestrated it to coincide precisely with the moment when the Meteora and Kelsier systems opened the $LIBRA liquidity pools. The illusion of official sanction triggered a retail stampede into the token within minutes of launch.

239. As in previous launches, Defendants seeded the DLMM (Dynamic Liquidity Market Maker) pool with stablecoins (USDC) to simulate financial backing. This liquidity served as the apparent "asset base" underpinning $LIBRA's value and was prominently visible on Solana explorers to reassure the public that real capital supported the token.

240. That display of backing was an illusion. Defendants left the USDC in the pools only temporarily so that public trackers would show solvency while they conducted the initial extraction. As soon as investor inflows peaked, the Defendants began draining the pool.

241. Within hours, the LIBRA deployer wallet—the same wallet that created the token and was later frozen under the TRO—withdrew the entirety of the stablecoin liquidity, pulling millions of dollars of backing out of the market. This act stripped $LIBRA of any foundation, causing its price to collapse instantly.

242. The withdrawal of liquidity coincided almost exactly with President Milei's retraction of his post. When the token's value imploded and reports of the mass withdrawal began circulating, Milei deleted his tweet and disclaimed any connection to the project, severing all political association.

243. That sequence—presidential promotion, insider extraction, liquidity drain, and public disavowal—marked the moment the $LIBRA scam unraveled. The token's credibility vanished in real time as investors realized that the "national project" had been a front for an insider cash-out.

244.   In the hours before the collapse, Defendants engaged in what they called "max extraction," meaning the complete removal of available investor capital from the system. They drained the DLMM pools of their USDC reserves, transferred the proceeds back into the deployer wallet, and routed them through the same treasury cluster identified in Plaintiffs' forensic analysis.

245.   The funds that investors believed were earmarked for Argentine development were, in fact, the liquidity that backed their own purchases. Once that liquidity was gone, $LIBRA's market value evaporated instantly.

246.   Blockchain records show that these withdrawals occurred in coordinated bursts, with multiple insider wallets moving assets to the same treasury hub that funded prior token launches. This recurrence of wallet linkages and timing proves that $LIBRA was not a standalone fraud but another iteration of the same enterprise.

247.   Defendants' supposed "charitable mission" thus functioned as camouflage for a cross-border laundering operation. The rhetoric of public benefit concealed a cycle of capital inflow, internal diversion, and consolidation into enterprise wallets—identical to the structure exposed in $M3M3.

248.   By using the language of social progress, Defendants expanded their reach beyond crypto traders to ordinary citizens who saw $LIBRA as a patriotic venture. Many purchasers bought not out of speculation but civic pride, believing their participation would aid Argentina's recovery.

249.   The outcome was the opposite: within twenty-four hours, $LIBRA's price had fallen more than ninety percent, and millions in stablecoins had been removed from circulation. Investors discovered that the supposed development fund was an empty shell.

250.     The same patterns visible in prior launches repeated here: identical deployer wallets, the same sniper accounts buying early supply, the same marketing scripts, and the same liquidity-removal sequence. $LIBRA's uniqueness was only in its storyline, not its structure.

251.     Plaintiffs allege that this deliberate misuse of charitable branding amplified the fraud's gravity. It not only deceived investors but also exploited a national symbol and misused the image of a sitting head of state to validate theft.

252.     The rapid price collapse triggered panic among retail holders, who rushed to sell into a market that had already been emptied of liquidity. The apparent "fair launch" turned into a free-fall, leaving participants with unsellable tokens and total losses.

253.     Within hours, Defendants began shifting blame. Public statements from Kelsier-affiliated channels described the event as an "unexpected exploit," while Meteora representatives suggested that the liquidity withdrawals were a technical malfunction. Both explanations were demonstrably false.

254.     The on-chain record shows deliberate action: the precise moment the liquidity was pulled corresponded to manual commands executed by the deployer wallet. These were not exploits; they were insider operations designed to drain funds and exit before scrutiny could catch up.

255.     Subsequent analysis confirmed that over $110 million in USDC and SOL had been removed from $LIBRA's DLMM pools and consolidated into wallets under enterprise control. No funds were ever sent to any verified Argentine organization.

256.     The fraudulent nature of $LIBRA's launch is further evidenced by the absence of any follow-through on its stated mission. No grant program was initiated, no beneficiaries

were named, and no audit was ever provided. The so-called "applications" submitted through the Google Form were ignored once investor money had been extracted.

257.    The aftermath was total collapse. $LIBRA's price, once briefly heralded as a symbol of Argentina's financial rebirth, dropped to nearly zero. Investors were left with worthless tokens, and the only wallets enriched were those controlled by Chow, the Davises, and their collaborators.

258.    The project's supposed purpose—to empower Argentine communities—was never real. Its actual function was to provide a false veneer of legitimacy for a massive insider theft executed through the same centralized structure used in all prior launches.

259.    The combination of Milei's endorsement, the illusion of charitable intent, and the public visibility of the DLMM liquidity gave $LIBRA a unique power to attract unsuspecting investors. But each of those features was part of the design of deception, not evidence of authenticity.

260.    When the liquidity vanished, so did the façade. The rapid unraveling of $LIBRA exposed the underlying truth: the "Argentine recovery" narrative was simply the enterprise's most audacious iteration of its pump-and-dump machine.

261.    The $LIBRA scheme stands as one of the clearest examples of the Defendants' method—borrowed credibility, centralized control, fake transparency, and total extraction. Every step was deliberate, rehearsed, and executed by the same inner circle.

262.    Plaintiffs and investors suffered devastating losses as a direct result of these actions. The supposed charity token was nothing more than a mechanism to launder investor funds back to the enterprise itself, completing yet another cycle of the same RICO-level fraud.

### D. The $MELANIA Fraud

#### 1. "Official" branding and vesting deception.

263.    The $MELANIA token was the enterprise's next major iteration—a fraud that leveraged celebrity association and "borrowed fame" to sell legitimacy to unsuspecting investors.

264.    Building on the visibility of its prior launches, Defendants used Melania Trump's name and likeness to project credibility, trust, and exclusivity. The token was marketed as *"the official meme coin of Melania Trump,"* complete with a contract address, official-looking branding, and design cues suggesting authorization by the former First Lady.

265.    This was not subtle marketing. The project's website and social-media accounts explicitly called the token "official," featured Melania Trump's imagery, and presented the coin as a personal or licensed initiative. The presentation was designed to make buyers believe the project had direct approval from Melania Trump or her representatives.

266.    Whether the Defendants or their intermediaries obtained limited consent from someone associated with Melania Trump's team to use certain branding or intellectual property is not at issue. Any such consent was procured, if procured at all, through misrepresentation. Neither Melania Trump nor her representatives knew the project was part of a systemic fraud, and they would not have agreed to any use of her name had they known the truth.

267.    Once the token launched, Defendants exploited that perceived endorsement to give $MELANIA a patina of authority unmatched by any prior meme coin. Investors reasonably interpreted the use of Melania Trump's name and likeness as evidence of

legitimacy and due diligence—trusting that no one of her stature would knowingly associate with a fraudulent venture.

268.    The marketing campaign was orchestrated by Kelsier Ventures, under Hayden Davis's supervision and in coordination with Benjamin Chow's Meteora operation. Through a network of paid influencers ("KOLs"), they saturated social platforms with coordinated messaging that $MELANIA was "official," "vested," "fair," and "community-driven."

269.    Defendants reinforced this appearance of stability by claiming that $MELANIA included a "vesting mechanism" to protect investors. They promised that insider tokens would unlock gradually over time, preventing early dumping and aligning long-term incentives. This assurance was entirely false.

270.    The supposed vesting protocol was a façade. In reality, the insiders who controlled the deployer contract and liquidity pools could—and did—override any restriction. The "vesting" language existed only to lull investors into a false sense of safety.

271.    Prior to the public release, insiders already held near-total control. A network of wallets connected to Meteora and Kelsier accumulated approximately one-third of the entire $MELANIA supply in the minutes before the token's official launch. This pre-launch hoard was funded through the same treasury and wallet clusters used in $M3M3 and $LIBRA.

272.    The public narrative, however, told a different story: $MELANIA was billed as a "community-led," "fair launch," with transparent distribution and equal opportunity for all participants. In truth, the insiders had already cornered the market before a single public buyer could act.

273.    The use of the Melania name completed the illusion. The branding suggested oversight and endorsement by a prominent public figure, neutralizing investor skepticism. In this way, the enterprise weaponized fame to disarm diligence.

274.    The reality was starkly different. Melania Trump's team, to the extent it granted any permission, did so without knowledge of the fraud, the insider rigging, or the deceptive launch mechanics. Had they been aware that the project was part of a coordinated criminal scheme, they would have rescinded any consent immediately.

275.    The launch sequence followed the enterprise's established pattern. Insiders synchronized paid promotions, influencer posts, and liquidity events to coincide with the opening minutes of trading. Public buyers—encouraged by the "official" label—poured in, believing they were participating in a high-profile, secure project.

276.    The token's price soared almost instantly, fueled by artificial scarcity and orchestrated hype. Within hours, $MELANIA's market capitalization climbed into the tens of millions. To retail investors, this appeared to validate the project's legitimacy.

277.    In truth, the rally was a premeditated illusion. Insider wallets dumped tokens into the surging demand almost as quickly as the price rose, reaping millions in profit within hours of the launch.

278.    Blockchain forensics confirm that enterprise-linked wallets—funded by Kelsier's treasury and Meteora's deployer contracts—executed the bulk of these sales, draining liquidity and funneling proceeds back into the same cluster of wallets used in earlier launches.

279.    Once insiders had extracted their profits, the token's value collapsed. Within days, $MELANIA lost over 90% of its market capitalization, leaving retail investors with

worthless holdings.

280. In the aftermath, Defendants attempted to rewrite the narrative. Public posts and statements from Kelsier-affiliated accounts claimed the token was a "community project" and that the organizers had no control over liquidity. These statements were false and contradicted by the on-chain record.

281. $MELANIA was thus not, as a tool in the fraud, an authorized collaboration but a fraudulent exploitation of association. It appropriated a famous name, constructed false investor protections, and executed a rapid insider extraction under the guise of legitimacy.

282. Plaintiffs allege that any appearance of official authorization was obtained by deceit. Defendants concealed their fraudulent intent from anyone connected to Melania Trump, using her brand as bait for public investment and as a shield against scrutiny.

283. The structure of the $MELANIA launch mirrored every other enterprise token: pre-allocation, coordinated hype, concealed insider control, and post-launch dumping. The repetition of this formula proves deliberation, not coincidence.

284. Once again, wallet clustering analysis showed identical transaction patterns between Meteora and Kelsier's treasuries, confirming continuity with $M3M3 and $LIBRA. The same group of insiders engineered every stage.

285. For investors, the deception was devastating. They relied on the appearance of official branding and the supposed vesting safeguards, believing they were participating in a legitimate, high-profile project rather than a manipulated insider market.

286. Retail buyers lost millions within days, as insiders drained liquidity and abandoned the project. The price collapse was not a market correction—it was the planned conclusion of an extraction cycle.

287. The enterprise's manipulation of celebrity imagery served a strategic purpose: to expand the victim pool beyond crypto traders to mainstream consumers who associated the Melania Trump brand with credibility and sophistication.

288. This use of "borrowed fame" became a cornerstone of the enterprise's playbook. $MELANIA was followed by $LIBRA, which borrowed political credibility, and $ENRON, which borrowed corporate nostalgia. Each variation recycled the same fraudulent infrastructure under a new theme.

289. $MELANIA's collapse was rapid and inevitable. The same insiders who orchestrated its launch leveraged its publicity to advertise the next token in the sequence, using the illusion of success as proof of competence for future victims.

290. Plaintiffs and class members suffered significant losses, both financial and reputational. They invested based on representations of fairness, endorsement, and security that were false from inception.

291. The misuse of Melania Trump's name magnified the harm: it corrupted public trust and injected an element of political and cultural credibility into what was, in reality, a standard pump-and-dump.

292. The fraud's mechanics—front-running, pre-allocation, paid hype, insider liquidity withdrawal—were identical to those already demonstrated in $M3M3 and $LIBRA. The only novelty was the thematic exploitation of a global public figure.

293. No corrective statement, refund, or restitution was ever provided. Defendants simply pivoted to the next project, leaving $MELANIA investors behind.

294. The pattern of conduct demonstrates intent, continuity, and enterprise coordination. Each actor performed their familiar role: Chow controlling the technology; the Davises

controlling the marketing; and the enterprise wallets collecting the proceeds.

295.　In sum, $MELANIA was not a legitimate or endorsed token, but a fraud that misused intellectual property and public trust to create the illusion of integrity while executing a theft.

296.　Any consent or communication that Defendants relied upon from Melania Trump's team was obtained through deception and would have been withdrawn immediately had the truth been known.

297.　The enterprise exploited that misunderstanding to enrich itself, turning even partial or mistaken authorization into a weapon of confidence.

298.　Investors believed they were supporting a celebrity-endorsed innovation. In truth, they were providing liquidity to an insider-controlled market rigged for collapse.

299.　The losses suffered by investors in $MELANIA were the direct and foreseeable result of Defendants' deception, and those profits were recycled into the same network of wallets funding subsequent launches, including $LIBRA.

300.　$MELANIA therefore serves as a defining example of the enterprise's evolving sophistication: a coordinated fraud that merged cultural branding, fake investor protections, and insider mechanics into one seamless scheme.

301.　Plaintiffs allege that this pattern of "borrowed legitimacy"—using fame, politics, or nostalgia as the entry point for financial deception—constitutes the heart of the enterprise's racketeering conduct.

302.　The $MELANIA launch encapsulated that strategy perfectly: fake fairness, fake safety, and a fake connection to power—all designed to make theft look like trust.

303.　What the enterprise called "innovation" was, in reality, exploitation. It used Melania

Trump's image to legitimize its fraud, the same way it later used the Argentine presidency and the Enron brand.

304. Every iteration of this scheme—$M3M3, $LIBRA, $MELANIA, $ENRON, $TRUST—followed the same structure, shared the same operators, and ended the same way: insiders rich, investors ruined.

305. $MELANIA's story, though cloaked in celebrity glamour, was just another chapter in a single, unbroken enterprise designed to extract value under the pretense of innovation and credibility.

306. In short, $MELANIA was the enterprise's template refined: a calculated act of deception that exploited public trust, appropriated a famous name, and executed an insider-controlled liquidity drain disguised as an "official" launch.

307. The damages to Plaintiffs and class members were severe and total. Their funds, channeled through the Meteora and Kelsier wallets, became the profits of the same insiders who continue to deny responsibility.

308. The fraud's success in $MELANIA emboldened the enterprise to scale its next campaigns, applying the same infrastructure to ever-larger narratives of trust and national purpose.

309. $MELANIA thus stands as a pivotal link in the chain of this RICO enterprise—a fraudulent misuse of fame and perception that demonstrated how far Defendants were willing to go to turn deception into profit.

## E. The $ENRON Fraud

310. The $ENRON token marked the enterprise's next iteration, following the same pattern of deception, insider control, and centralized funding that defined $M3M3, $LIBRA, and $MELANIA.

311. Defendants repackaged one of history's most infamous corporate collapses into a "revival" meme coin, styling it as *"the return of the world's leading company"* and branding it with the original Enron logo tilted on its axis—an image synonymous with corporate scandal, now marketed as irony turned opportunity.

312. Public materials described $ENRON as both satire and investment: *"Fuel for Enron's next chapter"* and *"MAXIMUM CORPORATE TRANSPARENCY (MAXTRANS)"*—phrases that played on the company's past notoriety while implying that this new Enron would correct those sins through openness and humor.

313. The campaign was designed to blur parody and legitimacy. Through sleek design, branded merchandise, and "official" web portals, Defendants created the impression that $ENRON was a sanctioned project with organized leadership, financial purpose, and modernized governance.

314. In reality, the $ENRON token was controlled, deployed, and funded by the same central wallet that launched every other token in this enterprise. Blockchain forensics confirm that the same treasury hub—the wallet beginning with prefix *0xcEA*—financed the $ENRON deployer wallet, provided the initial liquidity, and later received proceeds from insider sales.

315. This linkage eliminates any doubt as to control: the same insider group that orchestrated $M3M3, $LIBRA, and $MELANIA also created and operated $ENRON. It

was not a separate project, not a community effort, and not a parody—it was the same team, the same infrastructure, and the same fraud.

316.    The public-facing figure for $ENRON was Connor Gaydos, a self-styled "CEO of Enron" who conducted promotional appearances and social-media campaigns claiming that Enron was "back" and ready to deliver on its new promise of "MAXTRANS."

317.    Gaydos's public persona lent $ENRON the appearance of leadership and accountability. He described himself as reviving Enron's name through "unprecedented transparency" and invited the public to participate in "a new chapter of corporate trust."

318.    Defendants structured the rollout to mimic a legitimate corporate offering. The website included a leadership section, an outlined "mission," and a simplified purchase interface that allowed users to buy directly with SOL or USDC. The presentation echoed an IPO roadshow: an image of governance and structure where none existed.

319.    These optics were calculated. They appealed to retail buyers who saw $ENRON as both a cultural joke and a financial opportunity—the chance to "own" a piece of the comeback story of America's most infamous corporation.

320.    Behind the humor, however, lay the same Meteora–Kelsier command structure that had driven every prior fraud. Chow controlled the technical infrastructure, the Davises controlled the marketing and KOL coordination, and the same centralized wallet cluster funded the deployers, sniper accounts, and liquidity pools.

321.    Prior to the public launch, insider wallets tied to the *0xcEA* cluster were used to mint the $ENRON token and pre-seed liquidity pools with small amounts of SOL and USDC. This tactic replicated the mechanism from $M3M3 and $LIBRA—low real liquidity paired with high token supply to guarantee volatile price behavior.

322.    When the token went live, Defendants immediately executed their freeze-and-seed pattern. Public access was throttled while insider wallets acquired massive quantities of $ENRON at nominal cost. As trading opened, Defendants' coordinated influencer network pushed celebratory messages, fueling retail buying frenzy.

323.    Within minutes, $ENRON's market capitalization soared to over $700 million, making it appear to be one of the most successful launches in Solana history. The illusion of transparency and legitimacy—anchored by the Enron name—convinced thousands of retail investors to pour in.

324.    At its peak, Defendants initiated their extraction phase. The same insider wallets that had been funded by *0xcEA* began offloading holdings into the artificial demand they had manufactured. Millions of dollars in proceeds were transferred to the same treasury cluster that funded earlier launches.

325.    The token's price collapsed within thirty minutes, losing more than 70% of its value. Investors who believed they were participating in a humorous but genuine revival were left holding worthless tokens.

326.    The liquidity that had been used to simulate $ENRON's market backing was drained from the Meteora pools and sent to enterprise-controlled wallets. This operation was identical in structure and timing to the post-extraction liquidity removals observed in $M3M3 and $LIBRA.

327.    In the immediate aftermath, the project's public face, Connor Gaydos, sought to deflect responsibility. He claimed $ENRON had been "hacked" or "attacked by independent traders," and staged a public relations stunt involving a polygraph test to "prove" his innocence.

328.    This theater was meaningless. Blockchain evidence shows that the wallets responsible for the withdrawals and dumps were the same insider wallets funded by the Meteora–Kelsier cluster. The "independent trader" narrative was another false cover story engineered to obscure coordinated control.

329.    Following the crash, Meteora and Kelsier-affiliated channels remained silent, offering no statements, refunds, or explanation—further evidence of shared authorship and collective concealment.

330.    The $ENRON fraud was not parody or cultural commentary; it was a deliberate financial extraction camouflaged as satire. The humor was a shield to distract from the mechanics of theft.

331.    Each step of the $ENRON launch mirrors the earlier frauds: centralized funding through *0xcEA*, insider accumulation during frozen trading windows, coordinated social-media hype, and rapid insider liquidation.

332.    The overlap of wallets, timing, and behavior establishes incontrovertible continuity among the enterprise's operations. $ENRON was another line in a single ledger of criminal coordination.

333.    This wallet convergence is the smoking gun. The same central treasury funded the creation of every token, including $M3M3, $LIBRA, $MELANIA, and $ENRON. It seeded liquidity, paid promoters, executed sniper purchases, and collected the extracted proceeds. There is no daylight between these projects—they are all the product of the same enterprise.

334.    The enterprise deliberately chose Enron's name to exploit the irony of "corporate redemption." They understood that invoking a legacy of fraud would create buzz and

intrigue, and that by joking about corruption, they could normalize it and distract from their own misconduct.

335.    Retail investors interpreted the campaign as tongue-in-cheek transparency—a joke they could profit from. In reality, they were the punchline. Their deposits became the liquidity that insiders drained at the first opportunity.

336.    Within hours of launch, $ENRON's trading volume vanished, and the project's public channels went dormant. The so-called leadership team disappeared, leaving investors with worthless assets and no means of recourse.

337.    As with $M3M3, $LIBRA, and $MELANIA, the $ENRON deployer wallet, sniper wallets, and liquidity addresses were all funded and controlled by the same enterprise treasury. This establishes that each token was not a separate event but part of an ongoing, systemic scheme.

338.    Plaintiffs therefore allege that $ENRON was yet another manifestation of the same RICO enterprise: a coordinated, insider-driven fraud executed under new branding, with the same people, same tools, and same intent—to deceive the public and extract capital.

339.    The supposed "rebirth" of Enron was never satire or community art. It was the reanimation of fraud itself, repackaged through blockchain and executed by the same Defendants who had already perfected this formula. The $ENRON launch stands as the clearest evidence that this was not innovation, not coincidence, but the ongoing operation of a single, centralized criminal enterprise.

### F.   The $TRUST Fraud

340.    In April 2025, Defendants launched $TRUST, branding it as a "community-first" remedy for prior insider abuses—an alleged reset built on patience, transparency, and long-term discipline.

341.　The rhetoric was calculated to disarm skepticism: "Trust the Process," "fair distribution," "no central control," and "long-term vision," all positioned $TRUST as the antithesis of the very conduct that had defined the enterprise's earlier launches.

342.　Behind the slogan, nothing changed. The same central treasury cluster that funded $M3M3, $LIBRA, and $MELANIA—tied to the wallet beginning with 0xcEA—financed the $TRUST deployer wallet, pre-seeded liquidity, and later received insider proceeds.

343.　The launch choreography mirrored the established script: insiders pre-positioned wallets, synchronized KOL posts, and opened trading into a market engineered for artificial scarcity and rapid repricing.

344.　Public materials emphasized a "fair launch," but on-chain activity shows that a concentrated cluster of insider wallets held a significant percentage of total supply within hours, ensuring control over price, float, and exit timing from the outset.

345.　As retail orders arrived, UI routing steered purchases into enterprise-controlled pools, producing an immediate surge in market capitalization that appeared to validate the "process"—while actually reflecting constrained float and insider design.

346.　With price momentum established, the enterprise triggered its extraction phase: coordinated sales from insider wallets and staged liquidity removals drained value while maintaining the façade of "long-term" communications.

347.　Messaging from Kelsier-aligned channels urged holders to "stay disciplined" and "focus on the long game," even as insiders were exiting positions and reducing backing in the pools.

348. The effect was swift: after the initial surge, $TRUST collapsed by more than 99% from peak levels, leaving late-arriving investors with illiquid, near-worthless tokens.

349. No "community fund," "long-term roadmap," or verifiable governance ever materialized; there were no audited disclosures, no beneficiary designations, and no credible vesting safeguards—only the same private control exercised through Meteora's privileges and Kelsier's marketing.

350. As with the other tokens, the deployer, sniper, and liquidity wallets for $TRUST were funded from the same hub, establishing that $TRUST was not an independent experiment but another episode of the same centrally directed enterprise.

351. Post-collapse explanations—"independent traders," "unexpected volatility," or "community governance decisions"—were incompatible with the timing, wallet linkages, and program controls observed on-chain.

352. $TRUST's branding as a values-driven reset was not a mistake; it was a strategy to recycle victims who believed prior failures were aberrations rather than the intended outcome of a repeated scheme.

353. The repetition across themes—stake-to-earn ($M3M3), nation-building ($LIBRA), celebrity endorsement ($MELANIA), corporate revival ($ENRON), and "community integrity" ($TRUST)—demonstrates continuity of purpose, personnel, and profits.

354. Each launch used the same infrastructure (Meteora/Jupiter), the same command structure (Chow + the Davises/Kelsier), the same paid-promoter apparatus, and the same treasury hub to mint, market, manipulate, and monetize.

355. The collapse of $TRUST was therefore not market risk; it was the planned conclusion of a cycle designed to maximize insider returns and externalize losses to the public.

356. Plaintiffs allege that every material representation made to promote $TRUST's fairness, decentralization, discipline, and "process" was false when made and omitted the central fact of insider control over supply, liquidity, routing, and upgrades.

357. The resulting harm was foreseeable and intended: investors were induced to purchase at artificially inflated prices by a narrative crafted precisely to suppress the skepticism that earlier tokens had generated.

358. The same forensic signatures that tie $TRUST to $M3M3, $LIBRA, and $MELANIA—shared funding paths, synchronized transactions, and reconvergence of proceeds to the 0xcEA cluster—establish a single continuing enterprise rather than isolated misconduct.

359. Defendants' refusal to provide restitution, verifiable reports, or credible governance after the $TRUST collapse further evidences knowledge, intent, and ongoing concealment.

360. While this Complaint pleads five tokens—$M3M3, $LIBRA, $MELANIA, $ENRON, and $TRUST—Plaintiffs' investigation has identified approximately ten additional tokens exhibiting the same wallet linkages, timing patterns, and program-control behavior, and Plaintiffs reserve the right to amend to add those launches upon completion of confirmatory tracing.

361. $TRUST thus closes the pleaded sequence not as a coda but as proof of open-ended racketeering: the same actors, same tooling, same treasury, and same deception—each "new" token merely a fresh wrapper for the enterprise's continuing extraction machine.

### G. Dynamic Labs Limited's Misconduct

362. At all relevant times, DLL knowingly or recklessly facilitated the Meteora enterprise by monetizing its fraudulent token launches. Each token launch orchestrated by the

insider Defendants generated transaction fees through Meteora's Dynamic Liquidity Market Maker ("DLMM") smart contracts.

363. Those fees were automatically routed to DLL-controlled protocol wallets, allowing DLL to profit from every trade executed during the scheme.

364. Plaintiffs allege that DLL was aware—or at minimum willfully blind—that these fees were derived from fraud, given the irregular fee volume, anomalous trading patterns, and public reports tying Meteora's launches to market manipulation.

365. Despite multiple red flags and public exposure of the scheme, DLL failed to take any corrective action. Even after evidence of insider manipulation became public and internal indicators pointed to abuse of the protocol, DLL continued to retain the fees gleaned from the fraudulent launches.

366. By standing silent while collecting ill-gotten gains, DLL not only benefited from the fraud but also enabled its continuation by providing the infrastructure that made the scheme possible.

### H. Class Action Allegations

367. **Class Definition:** Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a proposed class (the "Class") of all investors who purchased and lost money based on the operations of the Meteora-Kelsier enterprise, after purchasing $M3M3, $LIBRA, $MELANIA, $ENRON, and/or $TRUST tokens between December 4, 2024 to the present (the "Class Period").

368. Excluded from the Class are Defendants and their agents, representatives, corporate officers, directors, senior executives, immediate family members, heirs, successors, assigns, and any entity in which any Defendant has or had a controlling interest.

369. The proposed Class satisfies the requirements of Rule 23.

### 1. Numerosity

370.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number is unknown and can only be determined through discovery. Plaintiffs believe there are thousands of investors in total across the five token launches. On information and belief, each token launch involved many hundreds of non-insider investors (for example, hundreds bought $M3M3, $MELANIA, $ENRON, or $TRUST), and in the case of $LIBRA, many thousands of investors participated.

### 2. Typicality

371.    Plaintiffs' claims are typical of the Class. Like other members, each Plaintiff purchased one or more tokens during the Class Period at prices artificially inflated by Defendants' uniform misrepresentations and omissions and manipulative launch mechanics, and suffered damages as a direct result of Defendants' fraudulent scheme.

372.    Plaintiff Anuj Mehta is a typical member of the Class. Like other Class members, he: (1) received $M3M3 tokens via airdrop on December 4, 2024; (2) purchased additional $M3M3 tokens based on Defendants' false representations about the M3M3 Platform and $M3M3's legitimacy; (3) relied on Defendant Chow's reputation and Meteora's purported trustworthiness; (4) was unaware of Defendants' secret partnership and market manipulation scheme; and (5) suffered net losses of approximately $19,164 when the token's artificially inflated price collapsed.

373.    Plaintiff Omar Hurlock is a typical member of the Class. Like other Class members, he: (1) purchased $LIBRA tokens on February 14, 2025, based on Argentine President Javier Milei's public endorsement; (2) believed there was a legitimate "Viva La Libertad" project backed by the Argentine government; (3) relied on Meteora's reputation as a trustworthy launch platform; (4) was unaware that there was no actual underlying project

and that Defendants were executing a sophisticated capital-extraction scheme; and (5) suffered immediate losses when $LIBRA's price collapsed after Milei's retraction of support, losing approximately 0.302 wSOL across his two wallets.

374.    Plaintiff John Winslow is a typical member of the Class (and also participated in the $LIBRA launch). Like other investors in the $MELANIA launch, he (1) purchased $MELANIA tokens upon its launch based on promotional materials invoking Melania Trump's name and supposed endorsement, (2) believed the token was associated with a legitimate project or cause affiliated with the former First Lady, (3) relied on Defendants' marketing and the Meteora platform's perceived legitimacy in deciding to invest, (4) was unaware that the "Melania" branding was merely a promotional front used without any actual authorization or backing from Melania Trump, and (5) suffered significant losses when $MELANIA's price swiftly collapsed after launch (once the token's lack of genuine endorsement or substance was exposed).

375.    Investors in the $ENRON and $TRUST token launches experienced a similar pattern. Defendants marketed those tokens with deceptive narratives – for example, falsely appropriating the Enron corporate name (via promoter Connor Gaydos) to lend a veneer of legitimacy, and touting "trust" and stability for $TRUST – and class members in those launches likewise relied on Defendants' misrepresentations, were unaware of the hidden manipulation, and suffered losses when those tokens inevitably crashed. Accordingly, the named Plaintiffs' claims typify the claims of the Class, as all arise from the same core fraudulent scheme.

### 3.  Adequacy

376.    Plaintiffs will fairly and adequately protect the interests of the Class. Their interests are fully aligned with those of the absent class members, and they have no conflicts of

interest. Plaintiffs have retained competent counsel experienced in complex class actions, digit asset litigation, RICO and consumer protection law, who will vigorously prosecute this action on behalf of Plaintiffs and the Class.

### 4. Predominance and Superiority

377.    Questions of law and fact common to all Class members predominate over any questions affecting only individual members. The claims of the Plaintiffs and the Class arise from a uniform course of conduct by Defendants, and share common questions that can be resolved on a class-wide basis. These common questions include, but are not limited to, the following:

a. Whether the Defendants together constituted an "enterprise" under the federal RICO statute;

b. Whether Defendants conducted or participated, directly or indirectly, in the affairs of that enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c);

c. Whether that pattern of racketeering activity was carried out in furtherance of a common fraudulent scheme;

d. Whether Defendants' pattern of racketeering activity caused injury to the Class;

e. Whether Defendants operated as an association-in-fact enterprise;

f. Whether Defendants' conduct violated federal wire fraud statutes;

g. Whether the proper measure of damages includes restitution and disgorgement.

h. Reliance/causation is susceptible to common proof. For omissions-based liability (fraud/GBL), reliance is presumed where the duty to disclose material facts is alleged and the omissions were uniformly presented.

i. For misrepresentations, Plaintiffs will prove class-wide exposure via widespread, synchronized promotions, official project channels, and public posts contemporaneous with liquidity gates; causation is shown via event studies tying price inflation and collapses to coordinated launch toggles/liquidity withdrawals.

j. For RICO, proximate cause is established by common evidence that the scheme's mail/wire transmissions and launch mechanics artificially inflated prices.

378. A class action is the superior method for fairly and efficiently adjudicating this controversy. Class treatment will enable a large number of similarly situated investors to collectively pursue their common claims in a single forum, thereby avoiding the duplication of evidence and expense that would occur if each investor had to proceed individually. Given the relatively modest losses of many individual Class members, absent a class action most would be unable or unwilling to litigate their claims to remedy Defendants' fraud. Moreover, prosecuting separate actions by individual members would create a risk of inconsistent adjudications and incompatible standards of conduct for Defendants. Adjudicating all Class members' claims together ensures a uniform result and maximum recovery for the victims of the scheme.

379. Finally, no substantial difficulties are anticipated in the management of this action as a class action. The identities of Class members can be readily ascertained from public blockchain transaction records, and this case presents common issues that can be efficiently managed in one proceeding without undue complexity or inconvenience to the Court or the parties.

## VI.    CAUSES OF ACTION

### A.  Count I - Fraud

380.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

381.    In order to prevail on a claim of common law fraud, Plaintiffs must establish: 1) material misrepresentation or omission; 2) knowledge of falsity (scienter); 3) intent to induce reliance; 4) justifiable reliance; 5) damages.

382.    Defendants engaged in a fraudulent scheme involving multiple cryptocurrency token launches (including, inter alia, the $M3M3 launch in December 2024 and the $LIBRA launch in February 2025) to defraud investors. In furtherance of this scheme, Defendants made numerous material misrepresentations and omissions to the investing public, creating the false impression that each token launch was fair, independent, and legitimate, when in reality the launches were secretly rigged by a single coordinated enterprise for Defendants' own benefit.

383.    Defendants' manipulative leveraging of brands, KOLs, misrepresentations and omissions were all for the purpose of causing investor reliance by marketing a product that Defendants' knew from the outset was a scam. The sole purpose of these misrepresentations and omissions was to inflate value and, in the words of the Defendants, 'max extract.' Defendants' tokens were never intended to be collectables, an investment, or anything other than a fraud.

384.    **Misrepresentations (who/what/when/where).** In public posts, websites, launch pages, AMAs, and coordinated KOL promotions disseminated on Twitter/X, Telegram, Discord, Medium, and official project channels during the Class Period (Dec. 4, 2024–Apr. 19, 2025), Defendants misrepresented, among other things, that:

- "Fair/transparent launch" & "decentralized" control (e.g., $M3M3 December 2024 launch materials) and "locked liquidity," "staking yields," and "real-time rewards."

- $LIBRA was a "Viva La Libertad" development initiative for Argentina, promoted at launch with an apparent official endorsement and a distribution pie-chart implying only 20% team allocation.

- $MELANIA was "official" and protected by "vesting

- $ENRON promised "corporate transparency";

- $TRUST promised "community-first," "no central control," and "long-term discipline."

385.    These statements were false and deceptive as detailed below.

386.    False Fair Launch & Project Claims: Defendants marketed each token as a legitimate, fair opportunity while concealing their behind-the-scenes control. For example, they represented that $M3M3 would be offered to the public in a transparent, fair "launch" on a reputable platform (Meteora) under the leadership of a trusted developer (Defendant Chow), thereby encouraging trust in the $M3M3 launch. Similarly, for $LIBRA, Defendants claimed there was a bona fide "Viva La Libertad" project to fund Argentine entrepreneurs – even securing a public endorsement from Argentine President Javier Milei – implying official support and a real philanthropic purpose, when in fact no such genuine project existed beyond a hastily made website.

387.    They also published a "token distribution" pie chart suggesting that the $LIBRA team would only keep 20% of the tokens, misleading investors to believe the team would not

secretly take more. In truth, Defendants had pre-arranged to covertly acquire far more than the disclosed allocation through insider trading and "sniping" their own launch.

388. **False Promises of Investment Benefits:** Defendants touted the tokens as exceptionally rewarding investments. For instance, $M3M3 was portrayed as a "stake-to-earn" opportunity with permanently locked liquidity and generous passive income rewards, backed by the skill and trustworthiness of the Meteora team. Defendants advertised eye-catching figures – e.g., claims of "over $4.5 million in rewards already accumulated" and "$200,000 or more daily being paid out to top stakers" for $M3M3 investors – to suggest a sustainable, high-yield ecosystem.

389. In reality, these figures were grossly inflated and misleading; the platform's economics were engineered to enrich insiders, not retail investors. Likewise, Defendants falsely implied that the $LIBRA token's value was backed by government endorsement and a social mission ("Token with a Purpose"), further enticing investors with a sense of security and legitimacy.

390. **Material Omissions:** Defendants failed to disclose, among other facts:

- Insider control over token supply, pool parameters, freeze/thaw privileges, routing, and upgrades.

- Pre-minting and pre-allocation of massive insider stakes

- Liquidity seeding/removal strategy and intent to dump into engineered spikes.

These concealed facts corrected the half-truths Defendants chose to speak about, thus giving rise to a duty to disclose. The materiality of these omissions is further-detailed below.

391.    Perhaps most materially, Defendants failed to disclose their coordinated control and premeditated manipulation of each token's launch and market. Unbeknownst to investors, the Meteora Defendants (led by Chow) and the Kelsier Defendants (led by the Davises) were working in concert as a single unit to stage these launches.

392.    Defendants never revealed that they had pre-minted enormous token supplies, retained broad control over the token infrastructure (such as the ability to freeze or configure liquidity pools), and intended to dump large quantities of tokens onto the market for their own profit.

393.    Defendants also concealed the involvement of Kelsier (the marketing/promotions arm) in what was presented as a Meteora-driven technology project, hiding the conflicts of interest and insider collusion from investors. In sum, Defendants omitted that the launches were not decentralized or fair at all, but rather centrally orchestrated scams designed to funnel value to insiders at the expense of outside purchasers.

394.    These misrepresentations and omissions were material. They went to the very core qualities of the tokens and their launches – such as whether a token's launch was fair/public and whether the project had genuine legitimacy and independent value – which are facts any reasonable investor would consider important when deciding to purchase the tokens.

395.    By portraying the tokens as fair investments (with reputable backing, real use-cases or missions, and equitable distribution) while concealing the rigged, insider-controlled nature of the launches, Defendants distorted the risk profile and value of the tokens in the eyes of investors. Had the truth been known – that Defendants were secretly controlling

the market and planning a rapid pump-and-dump – no reasonable investor would have purchased these tokens on the offered terms.

396.  **Knowledge of Falsity and Scienter:** Defendants knew that their statements were false and misleading at the time they made them, and acted with intent to defraud. Defendants themselves had devised the fraudulent launch mechanisms and thus knew the falsity of their statements.

397.  For example, Defendant Chow had engineered $M3M3's launch to benefit a handful of insiders (using tactics like a secret 95%-insider supply, a temporary freeze of the token pool, and 150 "Insider Wallets" to snap up tokens during the freeze). Internal planning documents – such as Chow's "M3M3 Calcs Template" and the "M3M3 Token Launch Organizer" – detailed this extraction plan, and were shared among the conspirators well in advance.

398.  Likewise, Defendants had pre-planned the $LIBRA scheme, knowing full well that the VLL project was a façade: Defendant Hayden Davis later admitted that no real "Viva La Libertad" project ever existed aside from the website, confirming that the public narrative for $LIBRA was a complete fabrication. In private, Defendants discussed how they would snipe their own $LIBRA launch and extract massive sums using Meteora's trading protocols.

399.  Additionally, communications obtained from a whistleblower show that Defendant Hayden Davis acknowledged taking instructions from Defendant Ben Chow on over 15 token launches, directly affirming Chow's central role and the deliberate, repeat nature of the fraud.

400. All of this demonstrates that Defendants acted with knowledge of falsity: they deliberately crafted false narratives and technical tricks to mislead investors, with the goal of inducing purchases that would become Defendants' profit.

401. **Intent and Reliance:** Defendants intended that Plaintiffs and the class rely on the glossy marketing, false assurances, and withheld information in order to trust the launches and buy in, so that Defendants could then execute their extraction of funds.

402. Plaintiffs and Class members did in fact rely—making purchases on the tokens in question during the Class Period—in light of Defendants' reputational claims, apparent endorsements, and supposed investor protections.

403. For omission-based claims, reliance is further supported because the concealed facts were material to any reasonable purchaser choosing whether, when, and at what price to buy.

404. Plaintiffs and other members of the class reasonably relied on Defendants' misrepresentations and deceptive omissions when deciding to purchase these tokens. Given the complexity of the technology and the apparent credibility of the Defendants' presentations, investors had little choice but to take Defendants' public statements at face value.

405. For example, Plaintiffs were influenced by President Milei's high-profile endorsement of $LIBRA and the official-looking VLL project materials, which were orchestrated by Defendants to lend the token an aura of government-backed legitimacy. Investors in $M3M3 likewise relied on Meteora's reputation and the promises of generous staking rewards, believing that such claims would not be made falsely by respected industry figures.

406.  In short, class members trusted that the token launches were what they appeared to be – good-faith, market-driven events – and thus bought tokens they otherwise might have avoided had the truth been disclosed.

407.  **Causation and Damages:** As a direct and proximate result of Defendants' misrepresentations and material omissions, Plaintiffs and members of the Class have suffered substantial damages, including but not limited to:

    a.  Inflated Prices: Plaintiffs and members of the Class purchased tokens at artificially inflated prices that did not reflect the tokens' true value, because those prices were propped up by Defendants' manipulative tactics and false hype.

    b.  Market Collapse Losses: Investors lost the majority of their investment value when the tokens' prices collapsed after Defendants had extracted their profits. For example, $LIBRA's price spiked massively and then plummeted to near-zero within hours once Defendants pulled liquidity and President Milei retracted his endorsement, causing immediate devastating losses to those who bought in. Similarly, $M3M3's price crashed after insiders finished exploiting the freeze/unfreeze scheme, leaving outside purchasers with almost worthless tokens.

    c.  Insider Liquidity Drain: Defendants' scheme drained liquidity and siphoned off funds that belonged to the investing public. In the $LIBRA launch, tens of millions of USDC were pulled out of the pools by Defendants' wallets in a matter of hours, meaning that class members who bought $LIBRA could not later sell at a fair price – their money had already been extracted by Defendants. In $M3M3, Defendants' coordinated insider trading during the freeze ensured that insiders

held ~95% of the supply, leaving retail buyers holding tokens that insiders were primed to dump en masse.

d.  Excess Transaction Fees: Plaintiffs incurred transaction costs and fees (on the Solana network and Meteora platform) while trading in these manipulated markets. These fees directly enriched Defendants (who, through Meteora, collected fees from the trading activity), adding insult to injury for the victims.

e.  Lost Opportunity Costs: By tying up their capital in these fraudulent schemes, class members missed out on legitimate investment opportunities. For example, many investors held onto tokens like $M3M3 longer than they otherwise would have – lured by false promises that staking would yield ongoing rewards – only to see their holdings collapse in value. The opportunity cost of investing in Defendants' tokens (instead of in genuine projects or assets) is a further component of the harm suffered.

408.  Plaintiffs and members of the Class have sustained these damages by reason of Defendants' fraud, and seek full relief. This includes compensatory damages in an amount to be proven at trial, punitive damages (given the egregious and willful nature of the fraud), and equitable relief such as the imposition of a constructive trust over Defendants' ill-gotten gains to prevent unjust enrichment. Plaintiffs also seek interest, attorneys' fees, and costs to the extent permitted by law, and any further relief deemed just and proper.

**B.  Count II - Conspiracy to Defraud**

409.  Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

410. Defendants Benjamin Chow (and the Meteora entities he controls) and Defendants Hayden, Charles, and Gideon Davis (and the Kelsier entities they control) conspired and agreed among themselves to carry out the fraudulent scheme described above.

411. In late 2024, these Meteora and Kelsier Defendants formed a corrupt agreement to launch a series of high-profile "memecoin" tokens in a rigged manner, using Meteora's protocols to manipulate each token's market and extract funds from retail investors. In furtherance of this agreement, each Defendant cooperated with and aided the others in the planning, execution, and cover-up of the fraud.

412. All Defendants had actual knowledge of the fraudulent scheme and knowingly participated in it. There was a continuous meeting of the minds among the Defendants, evidenced by their close coordination and secrecy. In particular, evidence shows:

   a. Private Coordination Channels: Defendants communicated in closed, non-public channels to orchestrate the fraud. For example, they created a private "$M3M3" Telegram chat group for the specific purpose of coordinating the $M3M3 token launch. In this group (and similar channels for other launches), the conspirators shared plans and ensured everyone was on the same page regarding the timing and mechanics of the scheme.

   b. Shared Secret Documents: Defendants jointly developed and used confidential planning documents to carry out the fraud. Notably, Defendant Chow prepared an internal spreadsheet dubbed the "M3M3 Calcs Template," modeling how insiders could exploit the token's economics, and Defendant Charles Davis authored an "M3M3 Token Launch Organizer" document – these files were shared among the group to coordinate the $M3M3 launch strategy. The use of such common

playbooks shows a high level of agreement and teamwork in executing the fraudulent launches.

c.  Overt Discussions of the Scheme: Defendants held planning meetings and calls where they openly discussed how to deceive the market. During one such planning call for $M3M3, Defendant Chow explicitly acknowledged the need to hide their insider advantage – stating "no one will play the game if they see, like 90% of the supply already locked up" – and explained that only a small percentage (on the order of 5%) of tokens would actually be made available to the public. Defendant Hayden Davis was present and agreed with these strategies, evidencing a shared intent to mislead investors about the true float and insider holdings. These conversations demonstrate that Defendants reached a mutual understanding about the fraudulent tactics to be used.

d.  Secret Funding Agreements: The conspirators also entered into explicit agreements to finance and profit from the scheme together. In or around October 2024, the Kelsier Defendants (the Davis group) secretly agreed to invest approximately $2 million into Meteora's operations as a "pay-to-play" buy-in to join the scheme. This money was used to fund the insider trading and price manipulation of $M3M3 (and subsequent launches), and in return the Meteora side welcomed Kelsier as a partner in the enterprise. This clandestine partnership agreement was never disclosed to the public; it shows that Defendants had a formal agreement to collude and share the spoils of their fraud.

e.  Admissions of Coordination: Recent whistleblower evidence confirms the existence of the conspiracy. In September 2025, Defendant Hayden Davis

privately admitted that he was acting "under Ben's instructions" on more than 15 token launches, unequivocally pointing to Defendant Chow as the director of the entire fraudulent operation. Such an admission by one conspirator underscores that all Defendants were knowingly working together as part of an ongoing fraudulent enterprise, rather than engaging in independent, coincidental acts.

413.    Throughout this period, Defendants took active steps to conceal their conspiracy. They deliberately kept their partnership and coordination hidden from investors and the public. For example, Defendants did not disclose the Kelsier–Meteora partnership or any of their insider arrangements, and in fact portrayed Meteora and Kelsier as unrelated entities dealing at "arm's length".

414.    By maintaining this façade of separation, Defendants sought to prevent outsiders from suspecting that the supposedly independent token launches were actually jointly orchestrated. This secrecy was an integral part of the conspiracy, as it allowed the fraud to continue across multiple launches without detection.

415.    As a result of the above agreements and concerted acts, each Defendant is legally liable for the actions of all co-conspirators taken in furtherance of the fraud. Every Defendant knowingly contributed to the overall scheme, and each one foreseeably benefitted from and/or enabled the misrepresentations, market manipulations, and token dumps carried out by the others.

416.    Under well-established principles of civil conspiracy, all Defendants are jointly and severally liable for the harm caused to Plaintiffs by the entire scheme, including the $M3M3 manipulation in December 2024 and the $LIBRA extraction in February 2025, regardless of which specific Defendant performed any given act. In sum, the Defendants

formed a single unified conspiratorial enterprise to defraud the class, and each Defendant is responsible for the full extent of the injury to Plaintiffs and the Class.

### C. Count III - RICO Section 1962(c)

417. Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

418. By engaging in the conduct described above, Defendants have violated the Racketeer Influenced and Corrupt Organizations Act (RICO), specifically 18 U.S.C. § 1962(c), where: 1) each Defendant is a person; 2) there is an enterprise; 3) conduct/participation; 4) pattern of racketeering; and 5) damages as a result of the RICO violations.

419. **Person:** Each Defendant is a "person" within the meaning of RICO (an individual or entity capable of holding a legal interest in property), and each Defendant conducted or participated in the conduct of a criminal enterprise's affairs through a pattern of racketeering activity, as detailed below.

420. **Enterprise:** The Defendants formed an association-in-fact enterprise known as the "Meteora–Kelsier Enterprise."

421. This enterprise is an ongoing organization with a formal or informal structure, consisting of the Meteora Defendants (Benjamin Chow and Meteora's affiliated entities) together with the Kelsier Defendants (Hayden, Charles, and Gideon Davis and Kelsier-affiliated entities), along with other collaborators and facilitators including non-parties Ming "Meow" Yeow, Jupiter, Raccoon Labs, Dynamic Labs, and Dynamic Labs Limited (DLL). The members of the Enterprise functioned as a continuing unit with a common purpose, and had ongoing relationships with each other. In effect, the Meteora–Kelsier Enterprise operated as an integrated fraud factory, with distinct but coordinated roles for its members.

422.   The common purpose of the Enterprise was to systematically defraud retail cryptocurrency investors and extract profits for the Enterprise's members. The Enterprise's scheme had a two-pronged strategy: (i) create a false façade of safety and legitimacy – by marketing Meteora's platforms and token launches as safe, transparent, and fair – while (ii) building a technical framework for maximum extraction – by using Meteora's sophisticated smart-contract infrastructure to covertly manipulate token markets and siphon investors' funds.

423.   In this way, the Enterprise would attract unsuspecting investors into its trap and then exploit them, all while maintaining plausible deniability through the complexity of the technology and the false narratives of legitimacy.

424.   **Conduct and Participation:** The Meteora–Kelsier Enterprise was structured with a clear hierarchy and division of labor. At the top, Defendant Chow and the Meteora Defendants provided the "Technical Control" layer – they controlled the underlying blockchain programs and protocols (via Meteora's 4-of-7 multi-signature authority over the smart contracts), which enabled them to modify, upgrade, or manipulate the code governing token launches and trading. This technical control was crucial to carrying out the fraudulent schemes (for example, implementing secret freeze/thaw functions or configuring the Dynamic Market Maker parameters to favor insiders).

425.   Next, the Davises and the Kelsier Defendants served as the "Capital and Marketing" layer – they supplied funding to bankroll the token launches and price manipulation efforts, and they coordinated high-profile promotional campaigns to generate hype. The Kelsier side arranged for celebrity and political endorsements, paid influencers, and marketing pushes at key moments (such as President Milei's tweet for $LIBRA), thereby

creating buzz and luring in retail trading volume. Supporting these core layers was a "Revenue Distribution Network" of allied entities and accounts (including the Jupiter exchange/service, Raccoon Labs, Block Raccoon, and DLL) which facilitated the collection and sharing of the proceeds of the scheme (trading fees, siphoned liquidity, etc.) among Enterprise members.

426.    Through these entities, Defendants funneled the illicit gains back to themselves while obscuring the trail. Overall, the Enterprise had the organization, longevity, and cohesion to accomplish its goals: Meteora and Kelsier acted in lockstep, each fulfilling essential functions needed to repeatedly perpetrate the fraud.

427.    **Pattern of Racketeering Activity:** The Meteora–Kelsier Enterprise engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5). Specifically, in furtherance of their scheme, Defendants executed a pattern of thousands of acts of wire fraud (18 U.S.C. § 1343) spanning multiple token launches and several months, all related by a common scheme or artifice to defraud.

428.    The Enterprise operated in a systematic, repeatable manner — effectively a template for fraud — across different token projects. In each instance, the Enterprise would: (1) design and promote a token and platform with false claims (touting innovation, safety, community rewards, etc., while hiding exploitative features); (2) build trust and interest in the community through deceptive marketing and the Meteora Defendants' reputation; (3) identify an opportune theme or figurehead for a new token (such as a trending meme or political figure) to maximize publicity; (4) coordinate a technically complex launch and manipulation using Meteora's custom liquidity pools and programs to rig the price trajectory; (5) defraud retail investors by artificially inflating the token's price and then

extracting capital (selling off large positions or withdrawing liquidity) once outsiders have bought in; and (6) distribute the profits among Enterprise members while publicly denying responsibility, often letting the token crash and blaming market forces. This playbook was followed in $M3M3, $LIBRA, and other launches, demonstrating a continuity of racketeering conduct rather than isolated incidents.

429. **Effect on Interstate Commerce:** The activities of this Enterprise affected interstate and foreign commerce. Defendants' scheme involved blockchain transactions and communications that traveled over the internet and through interstate wires. For example, the fraudulent promotional posts and announcements were disseminated via U.S.-based social media platforms and websites (Twitter/X, Medium, etc.), reaching investors nationwide. The token trades and transfers were processed by a network of cryptocurrency infrastructure (nodes, validators, exchanges) distributed across different states and countries. Defendants also targeted U.S. investors (among others), and a substantial portion of the victimized class are U.S. residents.

430. Millions of dollars of fiat and cryptocurrency were obtained from U.S. individuals and then moved through interstate commerce, including being laundered through international exchanges and mixers. Thus, the Enterprise's fraudulent operations were firmly connected to interstate commerce, satisfying RICO's jurisdictional element.

431. **Continuity:** The racketeering conduct was not a one-time event; it exhibits both closed-ended continuity (a series of related acts over a substantial period) and open-ended continuity (a threat of ongoing criminal conduct). The Enterprise has been operating from at least October 2024 and continued through 2025, executing multiple fraudulent token launches in succession. It remains active to this day – indeed, after the initial launches,

the Enterprise rebranded certain platforms (e.g., the "Stake2Earn" platform related to $M3M3) and continued to attract new users, indicating that the scheme is ongoing. The pattern of activity is inherently repeatable (as shown by the serial nature of the launches and the plans for future tokens discussed internally), posing a risk of continued fraud if not enjoined. The frequency and number of predicate acts (detailed below) also underscore that this was not an isolated endeavor, but a long-term illicit business of the Defendants.

432. **Predicate Acts – Wire Fraud:** The Defendants, as members of the Enterprise, executed countless acts of wire fraud in furtherance of their scheme to defraud, constituting the pattern of racketeering activity. These acts include, but are not limited to, the following categories:

   a. **Fraudulent Communications:** Defendants transmitted thousands of false or misleading communications over interstate wires – for example, posting promotional materials, updates, and assurances on platforms like Twitter (X), Medium, YouTube, Discord, Telegram, and official websites (e.g., the Meteora site and the $LIBRA project site) – all to induce the public to invest in $M3M3, $LIBRA, and other tokens. These electronic communications contained the deceptive statements outlined in Count I (claims of fair launches, big rewards, official endorsements, etc.), and each such posting or message is an instance of wire fraud.

   b. **Blockchain Transactions as Wire Fraud:** Defendants also engaged in numerous blockchain transactions that utilized interstate wire communications to carry out their fraudulent scheme. For example, to launch $M3M3 and $LIBRA,

Defendants used the internet and blockchain networks to: transfer large sums of cryptocurrency (USDC, SOL, etc.) for funding the scheme (such as the $2 million "investment" Kelsier sent in October 2024); mint tokens and configure smart contracts (e.g., setting up the $M3M3 token account with freeze authority, creating the DLMM pools for $LIBRA); and execute coordinated trades (like insider wallets sniping $M3M3 during the freeze, or dumping $LIBRA after the price spike). Each of these transactions involved electronic signals crossing state or national boundaries (since the Solana blockchain and related infrastructure are globally distributed), and they were done as part of defrauding investors, thus qualifying as predicate wire fraud acts.

433. Each Defendant committed or aided and abetted the commission of at least two acts of wire fraud in furtherance of the Enterprise's affairs, and typically far more. These predicate acts were related to one another (each being part of the overall fraudulent scheme) and amount to or pose a threat of continued criminal activity, given the ongoing nature of the enterprise. Indeed, engaging in fraudulent token promotions and manipulations became Defendants' regular way of doing business. By the conduct described, every Defendant has conducted or participated in the conduct of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

434. **Injury:** As a direct and proximate result of Defendants' racketeering activities and violations of § 1962(c), Plaintiffs and the Class have suffered substantial injuries to their property. These injuries include, without limitation, the loss of money and cryptocurrency that class members invested in $M3M3, $LIBRA, and other tokens orchestrated by the Enterprise, which money was wrongfully taken by Defendants' scheme. Plaintiffs and

class members paid artificially inflated prices and transaction fees for digital assets they would not have purchased but for Defendants' fraud, and they incurred heavy losses when the tokens' value plummeted due to the manipulative acts. Such economic losses – losing cryptocurrency and fiat currency investments due to fraudulent conduct – are concrete injuries to property under 18 U.S.C. § 1964(c). The injuries were directly caused by Defendants' predicate acts (for example, Plaintiffs would not have sent funds to the token pools or exchanges were it not for Defendants' deceitful online communications, and Plaintiffs' assets would not have lost value but for Defendants' covert withdrawals and dumps executed via wire transmissions). Plaintiffs and the Class have thus been injured in their property "by reason of" Defendants' racketeering violations, as RICO requires.

### D. Count IV - RICO Section 1962(d)

435.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

436.     In addition to the substantive RICO violation above, Defendants violated 18 U.S.C. § 1962(d) by conspiring to violate § 1962(c), where Defendants knowingly agreed and combined with each other to conduct and participate in the affairs of the Meteora–Kelsier Enterprise through the pattern of racketeering activity described in Count III. At all relevant times, each Defendant understood the overall objective of the Enterprise (to defraud investors via wire fraud) and agreed to further that objective.

437.     As part of this RICO conspiracy, Defendants and their co-conspirators undertook numerous overt acts in furtherance of their agreement, including, but not limited to, the following:

a. **Forming the Partnership:** Entering into a secret partnership agreement in October 2024 in which the Kelsier Defendants agreed to invest approximately $2 million as "pay-to-play" funding to secure their collaboration with Defendant Chow and Meteora. This infusion of capital was used to finance the fraudulent token launches (such as providing liquidity and funding insider trades), and the agreement cemented the conspiracy by aligning Meteora's and Kelsier's financial interests.

b. **Private Communication Channels:** Creating and maintaining private communication channels (for example, the exclusive $M3M3 Telegram group and other encrypted chats) where Defendants coordinated their fraudulent schemes outside the view of the public. Through these channels, conspirators shared non-public information (like token contract addresses before release) and synchronized their actions (such as when to deploy capital or release marketing tweets), thereby manifesting their agreement to act together illegally.

c. **Joint Planning Documents:** Jointly developing and using confidential planning documents to execute the scheme, including the "M3M3 Calcs Template" created by Defendant Chow and the "M3M3 Token Launch Organizer" created by Defendant Charles Davis. These documents, exchanged among the conspirators, outlined the mechanics of the fraud (token allocations, manipulation strategy, marketing schedule) and demonstrated the deliberate coordination and meeting of minds required for a § 1962(d) conspiracy.

d. **Coordinated Planning Meetings:** Conducting group planning calls and meetings to explicitly discuss the fraudulent enterprise. For example, Defendants held calls

in which they strategized about deceiving investors – including Defendant Chow's statement that "no one will play the game if they see, like 90% of the supply already locked up," which was part of a discussion on how to hide insider-held supply and make the launches appear fair. Such candid discussions about the scheme's deceptive nature show an agreement on the methods of committing racketeering acts (wire fraud via false representations and manipulative trades).

e. **Concealment Agreement:** Agreeing to conceal the Kelsier Defendants' true role in the enterprise from the public. The conspirators mutually understood that keeping the Meteora–Kelsier alliance hidden was essential to avoid scrutiny. They thus agreed to portray Meteora as the sole party in charge and to omit any mention of Kelsier's involvement in public communications – a coordinated cover-up effort that further proves the existence of the conspiracy.

f. **Synchronizing Launch Operations:** Coordinating the timing and execution of the token launches and manipulations as a unified team. Defendants agreed on who would perform which tasks during each launch: the Meteora Defendants handled the technical deployment (minting tokens, setting up pools, executing on-chain maneuvers), while the Kelsier Defendants handled marketing pushes and capital deployment. This joint operational planning (for instance, timing a celebrity tweet exactly when a liquidity pool opens, or pre-positioning insider wallets for a freeze event) could only happen via conspiratorial agreement.

438.   Through the above and other acts, Defendants manifested their agreement to participate in the racketeering enterprise. Each Defendant was a willing conspirator, sharing the objective of defrauding investors and agreeing to commit acts of wire fraud

(or to aid and abet such acts) as part of the scheme. None of the Defendants acted unknowingly or in isolation; all were aware of the fraudulent nature of the enterprise and knowingly agreed to pursue its goals.

439.    **Injury**: The conspiracy to violate RICO caused injury to Plaintiffs and the Class. As detailed in Count III, Plaintiffs' property was injured by the pattern of racketeering acts. Because the RICO conspiracy allowed the racketeering scheme to succeed (and persist across multiple instances), the conspiracy was a direct, proximate cause of Plaintiffs' damages. Plaintiffs and class members suffered the same financial injuries – paying inflated prices, losing funds, incurring fees – as already enumerated, by reason of the conspiracy's conduct.

### E.    Count V - N.Y. G.B.L §§ 349 and 350

440.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

441.    New York General Business Law § 349 prohibits deceptive acts and practices in the conduct of any business, trade, or commerce or in the furnishing of any service in New York. Section 350 prohibits false advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in New York. This Count adapts and consolidates the § 349/§ 350 allegations previously pleaded for individual tokens.

442.    Defendants orchestrated a mass-market promotional scheme directed at the general public—retail purchasers of Solana-based tokens—through broad advertising and promotional campaigns across social-media channels (including X/Twitter posts and Spaces, YouTube, Discord and Telegram), token-launch pages and microsites, wallet and DEX-aggregator user interfaces, and paid influencer placements. The scheme covered the following tokens (collectively, the "Tokens"): $M3M3, $LIBRA, $MELANIA, $TRUST,

and $ENRON. The messaging was uniform and market-wide, not bespoke to any single purchaser.

443.    In advertising, promotions, AMAs/Spaces, launch pages, and UI copy, Defendants represented that the Tokens and their launches were "fair," "community-first," "decentralized," subject to "locked liquidity," "vesting," "no central control," and tied to "official/charity/mission" initiatives; for example, platform-level assertions touting fair-launch mechanics and "stake-to-earn" fee distributions, and for $LIBRA, references to a purported public-purpose initiative. Defendants omitted that insiders controlled launch mechanics and liquidity, that promotions were paid or coordinated, that supply was pre-allocated or sniped through privileged access, and that liquidity withdrawals and fee routing to insiders were planned and executed. These misstatements and omissions were material to reasonable consumers deciding whether, when, and at what price to buy, stake, or hold the Tokens.

444.    A substantial portion of the deceptive conduct occurred in, was directed from, or targeted New York, including planning, postings, and operations by a New York-based principal; transactions by New York residents; and dissemination of advertising and solicitations via platforms and infrastructure operating in interstate commerce that include New York. Consistent with the class pleadings, this Count is asserted on behalf of the Class and, to the extent required by §§ 349–350.

### F.  Count VI - Unjust Enrichment

445.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

446.    This claim is pled in the alternative to Plaintiffs' legal claims.

447.   Defendants were enriched at Plaintiffs' expense. Equity and good conscience preclude Defendants from retaining those benefits.

448.   Plaintiffs and Class members conferred direct, traceable benefits on Defendants through purchases, sales, staking, and liquidity provision in tokens launched or operated on Meteora protocols, including $M3M3, $LIBRA, $MELANIA, $TRUST, and $ENRON (the "Tokens"). Defendants captured those benefits through insider allocations, engineered price spikes, rapid liquidity withdrawals, and fee take on trades and staking routed across Meteora's Dynamic AMM and DLMM, including Protocol-Fee splits and automatic transfers to affiliated program accounts.

449.   These benefits are identifiable in on-chain records, including Token proceeds, liquidity extractions, and fee flows to wallets, multisigs, and program accounts controlled by or for Defendants.

450.   Retaining these benefits would be inequitable given Defendants' deceptive and manipulative scheme that created the appearance of fair launches and trustworthy liquidity while enabling covert insider capture and extraction at Plaintiffs' expense.

451.   Plaintiffs and the Class seek restitution and disgorgement of all unjust gains traceable to the Tokens, together with the imposition of a constructive trust over all ill-gotten assets, wallets, multisigs, and program accounts holding those proceeds, an accounting, and pre- and post-judgment interest.

### G.  Count VII - Unjust Enrichment (as to DLL)

452.   Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

453.    As the developer and fee beneficiary of the Meteora protocol, DLL derived substantial financial benefits from the token launches orchestrated by the other Defendants.

454.    Specifically, DLL collected transaction fees from the Meteora liquidity pools used in each fraudulent launch. Those fees – funded by Plaintiffs' and Class members' investments – conferred an unjust benefit upon DLL while Plaintiffs and the Class suffered corresponding losses.

455.    DLL appreciated and knowingly accepted these benefits under inequitable circumstances. DLL was aware, or should have been aware, that the fees it retained were generated through manipulated trading activity and investor deception.

456.    Yet DLL chose to keep these proceeds rather than refuse or return them, even as the scheme's true nature came to light.

457.    Equity and good conscience do not permit DLL to retain these ill-gotten gains. Allowing DLL to keep the transaction fees collected from the fraudulent scheme would unjustly enrich DLL at the expense of Plaintiffs and the Class.

458.    Accordingly, DLL should be compelled to disgorge its ill-gotten profits and make restitution to Plaintiffs and the Class.

## VII.    PRAYER FOR RELIEF

459.    Certify, pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), a Class for damages, injunctive, and equitable relief consisting of all investors who purchased or otherwise acquired $M3M3, $LIBRA, $MELANIA, $ENRON, $TRUST, or any other tokens offered by Defendants as part of the alleged scheme, between December 4, 2024 and April 19, 2025; and appoint the named Plaintiffs as class representatives and their counsel as class counsel.

460. An order compelling Defendants to disgorge all profits and ill-gotten gains acquired through their misconduct in connection with the token launches at issue (including $M3M3, $LIBRA, $MELANIA, $ENRON, and $TRUST), including but not limited to: (a) profits obtained through structured, pre-arranged insider liquidity extraction and concealed trading activities; (b) stable assets (such as SOL and USDC) siphoned from retail purchasers through manipulative one-sided liquidity pools; (c) all revenue generated by Defendants through transaction fees, market-making commissions, and other profits arising from the artificially inflated valuation of these tokens; and (d) full restitution to restore Plaintiffs and the Class to the financial positions they would have occupied absent Defendants' fraudulent, deceptive, and unfair practices.

461. A preliminary and permanent injunction prohibiting Defendants from engaging in any further deceptive or fraudulent token launches, market manipulation, or liquidity-extraction schemes (including launching or promoting any new cryptocurrency token or similar investment product); freezing Defendants' assets to prevent the further dissipation or concealment of investor funds; and requiring the implementation of adequate compliance and oversight measures for any future cryptocurrency-related activities of Defendants (including oversight by a Court-appointed monitor and mandatory disclosures of insider holdings, token allocations, liquidity structures, and material market risks).

462. Direct Defendants to provide a full and complete accounting of all funds and assets raised, transferred, or received in connection with each of Defendants' token launches (including $M3M3, $LIBRA, $MELANIA, $ENRON, and $TRUST), including all

blockchain transaction records, token distributions, revenue streams, and insider transactions from December 4, 2024 through the date of judgment.

463.    Impose a constructive trust over all ill-gotten gains — including fees, commissions, any digital asset appreciation, and any digital or fiat proceeds — that are traceable directly or indirectly to Defendants' token launches or the racketeering enterprise described in the Complaint, so that such funds are preserved for the benefit of Plaintiffs and the Class.

464.    Award Plaintiffs and the Class compensatory damages in an amount to be proven at trial, including (but not limited to) the difference between the price paid for the tokens and the value of those tokens at the time of sale or at the point of collapse, together with appropriate pre- and post-judgment interest.

465.    Treble all compensatory damages awarded, pursuant to 18 U.S.C. § 1964(c), for Defendants' violations of 18 U.S.C. §§ 1962(c) and 1962(d).

466.    Award statutory damages under N.Y. Gen. Bus. Law §§ 349–350, including any enhanced or treble damages permitted by those statutes for willful or knowing violations.

467.    Award punitive damages to the maximum extent permitted by law, in light of the willful, malicious, and egregious nature of Defendants' fraudulent and deceptive conduct.

468.    Pursuant to 18 U.S.C. § 1964(a), Fed. R. Civ. P. 66, and the Court's inherent equitable powers, appoint a qualified independent receiver ("Receiver") over Defendant Meteora (including its assets and its upgradeable smart-contract programs on the Solana blockchain). The Receiver shall assume exclusive control of Meteora's operations and assets as necessary to prevent continued harm and to preserve the status quo pending final judgment.

469.     Meteora's upgradeable smart-contract technology represents a uniquely powerful —
and dangerous — mechanism that Defendants have weaponized to perpetrate a massive
fraud. As alleged herein, this technology has already been used to defraud investors of
hundreds of millions of dollars across at least five token launches ($M3M3, $MELANIA,
$LIBRA, $ENRON, and $TRUST). The same centralized control that allows Defendants
to execute rapid, unilateral changes to the Meteora protocols (via a 4-of-7 multi-signature
"Upgrade Authority") also enables them to (i) redirect transaction fees to insider wallets;
(ii) deploy secret "freeze" or "thaw" functions to manipulate trading; (iii) modify
liquidity-pool parameters to facilitate insider extraction of funds; and (iv) alter fee
structures or other code provisions without notice to users. These capabilities — which
Defendants have already exploited in prior launches (as detailed above) and even
exercised to evade oversight once a Temporary Restraining Order was lifted — pose
ongoing risks that a routine asset freeze or other standard remedy cannot adequately
address.

470.     The Receiver shall be empowered to:

    a.  Take exclusive custody and control of any administrative or multi-signature
accounts (including Meteora's "4-of-7" program authority) that enable Defendants
to upgrade, alter, or control the Meteora decentralized exchange protocols, and
secure all associated cryptographic keys and wallets to prevent unauthorized
access;

    b.  Secure all Meteora program addresses, data accounts, source-code repositories,
deployment keys, and related infrastructure to prevent destruction of evidence or
further unauthorized changes;

c.  Conduct forensic audits of all Meteora program code updates or upgrades executed since October 2024, in order to identify any hidden backdoors, undisclosed functionalities, or other mechanisms designed to enable continued extraction or fraud;

d.  Maintain core liquidity services and other legitimate Meteora platform functionality as needed to preserve asset value and market stability, so as to prevent harm to innocent third-party users during the pendency of this litigation;

e.  Freeze the collection and distribution of any Meteora protocol fees, revenues, or other proceeds that would otherwise be payable to Defendants or their affiliates (including halting any automatic transfers of such funds to insider-controlled accounts);

f.  Identify, trace, and, where appropriate, repatriate digital assets or fiat funds that have been transferred to Defendants, insiders, affiliates, or third parties in connection with the fraudulent scheme;

g.  Commence, defend, or settle legal actions in the name of Meteora (the Receivership Entity) as necessary to recover voidable transfers or fraudulent conveyances of assets;

h.  Prepare and file periodic reports with the Court detailing the Receiver's actions and findings, and facilitate interim distributions or other relief to victimized investors pursuant to a Court-approved claims process; and

i.  Pay reasonable fees and expenses of the receivership from receivership assets, subject to Court approval.

471.   The benefit of the receivership and related injunctive relief far outweighs any temporary disruption to Meteora's operations. In particular, any such disruption is greatly outweighed by the critical need to: (i) protect current and future investors from Defendants' ongoing and predatory schemes; (ii) preserve and examine evidence of Defendants' fraudulent activities (including evidence embedded in smart-contract code and transaction records); (iii) prevent Defendants from exploiting their technical control to destroy evidence or divert additional funds; and (iv) maintain broader market stability by ensuring that the thousands of legitimate liquidity pools on Meteora can continue operating under neutral supervision. Given Defendants' demonstrated willingness to exploit their control for fraudulent purposes and to evade legal restraints, immediate judicial intervention in the form of a receivership is essential to prevent further irreparable harm.

472.   Award pre-judgment interest at the maximum rate permitted by law; award post-judgment interest as provided in 28 U.S.C. § 1961; and award Plaintiffs their reasonable attorneys' fees, expert witness fees, and costs of suit as authorized by 18 U.S.C. § 1964(c), N.Y. Gen. Bus. Law § 349(h), and any other applicable statute or law.

473.   Grant such other and further legal or equitable relief as the Court deems just and proper, including (without limitation) interim asset freezes, expedited discovery to locate and secure Defendants' assets, the appointment of an independent monitor if necessary to ensure compliance with Court orders, issuance of writs of attachment or other provisional remedies, and any other relief needed to protect the interests of Plaintiffs and the Class.

## VIII.   DEMAND FOR JURY TRIAL

474.   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury trial as to all issues triable by jury.

DATED October 21, 2025
New York, NY

Respectfully submitted,

By: /s/ DRAFT

**BURWICK LAW PLLC**

Max Burwick
1 World Trade Center, *84th Fl.*
New York, NY 10007
(646) 762-1080
max@burwick.law

*Counsel for Plaintiffs Omar
Hurlock, Anuj Mehta, & John
Winslow*

# APPENDIX A:  SOCIAL MEDIA ACCOUNTS

| Party | Platform | Channel | Username | Handle | Link | Control Person |
|-------|----------|---------|----------|--------|------|----------------|
| B. Chow | Discord[1] | Meteora | 21661210 | n/a | https://discord.com/invite/WwFwsVtvpH | n/a |
| B. Chow | X | n/a | benchow.sol | @hellowchow | https://x.com/hellochow | n/a |
| C. Thomas | X | n/a | Dr. Tom | @cthomasdavis | https://x.com/cthomasdavis | n/a |
| G. Davis | X | n/a | n/a | @gideondavis_ | n/a[2] | n/a |
| H. Davis | LinkedIn | n/a | Hayden Davis | n/a | https://www.linkedin.com/in/hayden-davis-433964296?trk=org-employees | n/a |
| Julian Peh | X | n/a | Julian @ KIP ⊗⫸ | @julian_kip | https://x.com/julian_kip | n/a |
| Jupiter | Discord | Jupiter Space Cadets | n/a | n/a | https://discord.com/invite/JUP | n/a |
| Jupiter | Reddit | r/jupiterexchange | n/a | n/a | https://www.reddit.com/r/jupiterexchange/ | n/a |
| Jupiter | Telegram | Jup Marketing Command Center | n/a | @jup_marketing | https://t.me/jup_marketing | n/a |
| Jupiter | X | n/a | Jupiter ( 🪐 , 🐱 ) | @JupiterExchange | https://x.com/JupiterExchange | n/a |
| Jupiter | X | n/a | Jupiter Portfolio | @jup_portfolio | https://x.com/jup_portfolio | n/a |
| Jupiter | X | n/a | Jupiter Uplink | @Jup_Uplink | https://x.com/Jup_Uplink | n/a |
| Jupiter | X | n/a | JUP Catdets | @JUPCatdets | https://x.com/JUPCatdets | n/a |
| Jupiter | X | n/a | JupiterDAO | @Jup_dao | https://x.com/Jup_dao | n/a |
| Jupiter | X | n/a | JUP AND JUICE | @JUPANDJUICE | https://x.com/JupAndJuice | n/a |

---

[1] Discord is a social media platform organized into servers, which contain topic-based channels. Users can subscribe to specific chat rooms, such as the Meteora server. See *Discord*, **Wikipedia**, https://en.wikipedia.org/wiki/Discord; *What Is Discord?*, **Discord Safety Center**, https://discord.com/safety/360044149331-What-is-Discord.

[2] This X account no longer exists

| Party | Platform | Channel | Username | Handle | Link | Control Person |
|---|---|---|---|---|---|---|
| Jupiter | YouTube | Jupiter Exchange | n/a | @Jupiter-Exchange | https://www.youtube.com/@Jupiter-Exchange | Meow[3], Kash[4] |
| Kash | X | n/a | Kash (🐱, 🐈) | @kashdhanda | https://x.com/kashdhanda | n/a |
| Kelsier | LinkedIn | n/a | Kelsier | n/a | https://www.linkedin.com/company/kelsier | H. Davis |
| Kelsier | X | n/a | Kelsier | @KelsierVentures | https://x.com/kelsierventures?lang=en | H. Davis[5] |
| KIP | Discord | kipprotocol | n/a | n/a | https://discord.com/invite/Hma2Y | n/a |
| KIP | LinkedIn | n/a | Kip Protocol | n/a | https://www.linkedin.com/company/kip-protocol | J. Peh[6] |
| KIP | Telegram | KIPProtocol_Globol | n/a | @KIPProtocol_Global | https://t.me/KIPProtocol_Global | n/a |
| KIP | X | n/a | KIP Protocol | @KIPprotocol | https://x.com/KIPprotocol | J. Peh[7] |
| KIP | YouTube | KIPprotocol | n/a | @KIPprotocol | https://www.youtube.com/@KIPprotocol | n/a |
| M3M3 | Telegram | M3M3ers | n/a | @M3M3ers | https://t.me/M3M3ers | n/a |
| M3M3 | X | n/a | M3M3 | @WEAREM3M3_ | https://x.com/WEAREM3M3_ | n/a |
| Meow | X | n/a | meow | @weremeow | https://x.com/weremeow | n/a |
| Meteora | LinkedIn | n/a | Meteora.ag | n/a | https://www.linkedin.com/company/meteora-ag?trk=public_jobs_topcard-org-name | B. Chow[8] |
| Meteora | Discord | Meteora | n/a | n/a | https://discord.com/invite/WwFwsVtvpH | B. Chow |

---

[3] *See, e.g., Major Updates for the Jupiverse and Jupiter Platform | JUP Rally,* **YouTube** (Jun. 20, 2025), https://www.youtube.com/watch?v=2Lbs949a108; id. at 4:52:14 ( Meow, cat ).

[4] *See, e.g., Welcome to Jupiter Exchange: Your Ultimate Solana Trading Hub* **YouTube** (___) https://www.youtube.com/watch?v=QB5pY5L-tJ8; id. at__ ("KASH DHANDA Cat Herder, Jupiter")

[5] *See, e.g.,* Hayden Davis (@KelsierVentures), **X** (Feb. 15, 2025), https://x.com/KelsierVentures/status/1890914583910449505; id. at 7:02 pm ("[…] I remain committed to transparency an[d] will continue to provide updates as the situation develops.").

[6] *See, e.g.,* https://julianpeh.com/ (citing a link to **KIP Protocol**, **LinkedIn**, https://www.linkedin.com/company/kip-protocol).

[7] S*ee, e.g.,* https://julianpeh.com/ (citing a link to **KIP Protocol**, X, https://x.com/KIPprotocol).

[8] *See, e.g., https://www.linkedin.com/in/hellochow/* (B. Chow as the Co-Founder in the experience section on LinkedIn)

| Party | Platform | Channel | Username | Handle | Link | Control Person |
|-------|----------|---------|----------|--------|------|----------------|
| Meteora | Medium | Meteora | n/a | @meteoraag | https://meteoraag.medium.com/ | B. Chow[9], Meow[10] |
| Meteora | X | n/a | Meteora | @MeteoraAG | https://x.com/MeteoraAG | n/a |
| Meteora | YouTube | Meteora | n/a | @meteora-ag | https://www.youtube.com/@meteora-ag | B. Chow[11] |
| Moty Povolotsky | X | n/a | Dhirk | @CavemanDhirk | Dhirk 🦝 (@CavemanDhirk) / X | n/a |
| Raccoon | GitHub[12] | Team Raccoons | Studio Raccoons | n/a | https://github.com/TeamRaccoons | n/a |
| Racooon | X | n/a | R.A.C.C.O.O.N.S | @studio_raccoons | https://x.com/studio_raccoons | n/a |
| Yong | X | n/a | Zen | @realdezen | https://x.com/realdezen | n/a |

[9] *See, e.g.,* B. Chow, *I'm Excited to Share With You Crypto's First Reputation System to Incentivize PPP*, **Medium** (Jan. 3, 2025), https://meteoraag.medium.com/im-excited-to-share-with-you-crypto-s-first-reputation-system-to-incentivize-ppp-1e8b413b5f94 ("Can't wait to meet all you M3M3ers in telegram. Ben.").

[10] *See, e.g.,* Meow *Update for Mercurial Stakeholders (as of feb 2023)*, **Medium** (Dec. 9, 2023), https://meteoraag.medium.com/update-for-mercurial-stakeholders-as-of-feb-2023-2bf091627e52 ("Hi all, Meow here").

[11] *See, e.g., Getting Started on Meteora,* **YouTube** (Jan. 5, 2024), https://www.youtube.com/watch?v=Lz1h4AGK5YA; id. at 4:43:59 ("Hi everyone, I'm Ben. I'm one of the co-founders of Meteora.").

[12] GitHub is a website where developers can share, store, and collaborate on software projects. *See What Is GitHub and What Do Geeks Use It For?*, **How-To Geek**, https://www.howtogeek.com/180167/htg-explains-what-is-github-and-what-do-geeks-use-it-for/

**APPENDIX B:  METEORA PROGRAM IDs**

| Program Name – (January 2025)[1] | Program Name (Current)[2] | Program Address | Upgrade Authority (Current)[3] |
|---|---|---|---|
| DLMM | DLMM | LBUZKhRxPF3XUpBCjp4YzTKgLccjZhTSDM9YuVaPwxo | JADaUV8kvDpDbJr55wxXJHVaBS3VCj8thZZHjfeuCVLd |
| Dynamic AMM Pools | DAMM v1 Program | Eo7WjKq67rjJQSZxS6z3YkapzY3eMj6Xy8X5EQVn5UaB | JADaUV8kvDpDbJr55wxXJHVaBS3VCj8thZZHjfeuCVLd |
| M3M3 stake-for-fee | Stake2Earn | FEESngU3neckdwib9X3KWqdL7Mjmqk9XNp3uh5JbP4KP | JADaUV8kvDpDbJr55wxXJHVaBS3VCj8thZZHjfeuCVLd |
| Vault | Vault | 24Uqj9JCLxUeoC3hGfh5W3s9FM9uCHDS2SG3LYwBpyTi | JADaUV8kvDpDbJr55wxXJHVaBS3VCj8thZZHjfeuCVLd |
| Farm | Farm | FarmuwXPWXvefWUeqFAa5w6rifLkq5X6E8bimYvrhCB1 | JADaUV8kvDpDbJr55wxXJHVaBS3VCj8thZZHjfeuCVLd |
| Meteora DLMM Vault | Alpha Vault | vaU6kP7iNEGkbmPkLmZfGwiGxd4Mob24QQCie5R9kd2 | JADaUV8kvDpDbJr55wxXJHVaBS3VCj8thZZHjfeuCVLd |
| Affiliate | [not listed] | GacY9YuN16HNRTy7ZWwULPccwvfFSBeNLuAQP7y38Du3 | JADaUV8kvDpDbJr55wxXJHVaBS3VCj8thZZHjfeuCVLd |
| [not listed] | DAMM v2 | cpamdpZCGKUy5JxQXB4dcpGPiikHawvSWAd6mEn1sGG | JADaUV8kvDpDbJr55wxXJHVaBS3VCj8thZZHjfeuCVLd |
| [not listed] | DBC | dbcij3LWUppWqq96dh6gJWwBifmcGfLSB5D4DuSMaqN | JADaUV8kvDpDbJr55wxXJHVaBS3VCj8thZZHjfeuCVLd |
| Jupiter Aggregator v6 | [not listed] | JUP6LkbZbjS1jKKwapdHNy74zcZ3tLUZoi5QNyVTaV4 | CvQZZ23qYDWF2RUpxYJ8y9K4skmuvYEEjH7fK58jtipQ |
| Mercurial Stable Swap | Mercurial Stable Swap | MERLuDFBMmsHnsBPZw2sDQZHvXFMwp8EdjudcU2HKky | CvQZZ23qYDWF2RUpxYJ8y9K4skmuvYEEjH7fK58jtipQ |
| [not listed] | Lock | LocpQgucEQHbqNABEYvBvwoxCPsSbG91A1QaQhQQqjn | CvQZZ23qYDWF2RUpxYJ8y9K4skmuvYEEjH7fK58jtipQ |
| [not listed] | Dynamic Fee Sharing | dfsdo2UqvwfN8DuUVrMRNfQe11VaiNoKcMqLHVvDPzh | DHLXnJdACTY83yKwnUkeoDjqi4QBbsYGa1v8tJL76ViX |
| Metaplex Token Metadata | [not listed] | metaqbxxUerdq28cj1RbAWkYQm3ybzjb6a8bt518x1s | 6Vwz7AXYG6V1TUPP3KWYZncMEvUv6iPSFbfHDCLRcjtz |
| Token | [not listed] | TokenkegQfeZyiNwAJbNbGKPFXCWuBvf9Ss623VQ5DA | N/A (Solana Program) |
| Associated Token Account | [not listed] | ATokenGPvbdGVxr1b2hvZbsiqW5xWH25efTNsLJA8knL | N/A (Solana Program) |
| System | [not listed] | 11111111111111111111111111111111 | N/A (Solana Program) |
| Compute Budget | [not listed] | ComputeBudget111111111111111111111111111111 | N/A (Solana Program) |

[1] *See* https://web.archive.org/web/20250126123200/https://docs.meteora.ag/resources/meteora-program-ids

[2] *See* https://docs.meteora.ag/developer-guide/home

[3] Retrieved on July 28, 2025, from https://solscan.io/.

## APPENDIX C: BLOCKCHAIN ADDRESSES - WALLETS

| Defined Term | Type | Address |
|---|---|---|
| M3M3 Mint Wallet | Wallet | AiFTyukukUsKjEVtREpD9QENfe8SKuKZYmYVLrUVQU4q |
| LIBRA Wallet 1 | Wallet | DefcyKc4yAjRsCLZjdxWuSUzVohXtLna9g22y3pBCm2z |
| LIBRA Wallet 2 | Wallet | 61yKS9bjxWdqNgAHt439DfoNfwK3uKPAJGWAsFkC5M4C |
| SOL Wallet 1 | Wallet | FTjLYkNARZHnqekpKj5mHzbJx7EqW1fSr15Ec4oijBUQ |
| SOL Wallet 2 | Wallet | B9KTwxhc9e6qrjw5nfmhgcN38oKFTBtnef8AwaTPVQ6q |
| SOL Wallet 3 | Wallet | XNFXF4svhrYVhGWQW6HX26QpPtVFvDyuC4nT5XwSwg5 |
| Gj9es Address | Wallet | Gj9esbWVNJyy55SDJzYudMAznewqmW3Xb6GpUakcCNwT |
| FdWhT Address | Wallet | FdWhTThthSN7mbcmBgh18dzogi1dXqQqBb6BnnzZEJJn |
| 42rex Address | Wallet | 42rex5yRsP1mdAKHzB5avDzagT6mqB5uYPergUFZ2Tgn |

**APPENDIX D:  BLOCKCHAIN ADDRESSES – LIQUIDITY POOLS**

| Defined Term | Address |
|---|---|
| M3M3 Liquidity Pool | 79raiHK7DDEGYAQ5dCgKd55GtoxaytvdDZKLEbCM3gRy |
| Meteora Pool Address | BzzMNvfm7T6zSGFeLXzERmRxfKaNLdo4fSzvsisxcSzz |
| Meteora Pool S1 Address | 3DMUfMxguNdSQYXWLQjYP4U7k6wa57QeLRBoLA6vTZ9S |
| Meteora Pool S2 Address | 2YhiUahn1pem721ermAvabGmnWqtAjXCsyBw3ZLfviV1 |

# Appendix E

 

Home   My Network   Jobs   Messaging   Notifications   Me ▾   For Business ▾   Retry Premi



## Ben Chow · 3rd
Co-Founder at Meteora

• Meteora.ag

New York, New York, United States · Contact info

500+ connections

Message   + Follow   More

Connect if you know each other   ⚭ Connect

## About

Specialties: user experience design, interactive product design thinking and building, visual design, client liaison, product strategy, project scoping and building design framework

## Activity

853 followers

**Ben hasn't posted yet**
Recent posts Ben shares will be displayed here.

Show all activity →

## Experience



**Co-Founder**
Meteora.ag
Feb 2023 – Present · 2 yrs 6 mos

**Founder**
WishWell
Dec 2020 – Present · 4 yrs 8 mos

**Co-Founder** · Full-time
Jupiter Aggregator · Full-time
May 2021 – Feb 2023 · 1 yr 10 mos



**Friended**
3 yrs 2 mos

**Advisor**
Dec 2020 – Feb 2021 · 3 mos

**Co-Founder**
Jan 2018 - Dec 2020 · 3 yrs
New York City Metropolitan Area

**Cofounder**
Minute Inc.
Aug 2016 - Sep 2017 · 1 yr 2 mos

Show all 13 experiences →

## Skills

**Corporate Branding**
3 endorsements

**Product Management**
5 endorsements

Show all 7 skills →

## Patents

**Powered surgical apparatus, method of manufacturing powered surgical apparatus, and method of using powered surgical apparatus**
US 7,416,539 · Issued Aug 26, 2008

See patent

A powered surgical apparatus can be used with a source of irrigation fluid and a source of suction. The powered surgical apparatus can include a cutting blade...

**Other inventors**

10

## Interests

Top Voices Companies Groups

**Nir Eyal** · 2nd
Former Stanford lecturer helping you make sense of the science | Bestelling author of Hooked & Indistractable (>1M sold)
357,893 followers
+ Follow

**Reid Hoffman** · 2nd
Co-Founder, LinkedIn, Manas AI & Inflection AI. Author of Superagency. Investor at Greylock.
2,715,985 followers
+ Follow

Show all Top Voices →

### More profiles for you

**Jitendra Gupta** · 2nd
Founder @ Jupiter(Co-created banking experience) and @Citrus Pay, @Lazypay

+ Follow

**Chad Munroe** · 2nd
Co-Founder & CEO @ Jupiter

Connect

**Hayden Davis** · 3rd
Group Product Line Manager – Artificial Intelligence

Message

**Anatoly Yakovenko** ✓ · 3rd
Co-founder @ Solana

Message

**Mohd Izuddin Helmi Adnan**  · 3rd
Building great UX for Solana, DeFi, and Web3.

Message

Show all

## People you may know
From Ben's job title

 **Najeeba Hayat**
Founder and CEO at Liudmila Est.

Connect

 **Himmat Singh Chouhan**
Founder ( safeNest – in progress) at SafeNest

Connect

 **Joe Upchurch**
Co-Founder at NeuraStasis

Connect

 **Jocelyn Telles** in
Entrepreneur | Coffee Shop Owner | Former Finance Professional

Connect

 **Tonya Reznikovich** ✓
Co-Founder at Gato

Connect

Show all

## You might like
Newsletters for you

 **The Popcorn Report**
If you knew everything about Tomorrow, what would you do differently
Today?
Published monthly

Faith Popcorn



+ Subscribe

**Snack on This**

Smart takes and snackable updates from the innovators at Antithesis Foods

Published monthly

Antithesis Foods Inc.

+ Subscribe

Show all

# Appendix F

 

Home  My Network  Jobs  Messaging  Notifications  Me ▾  For Business ▾  Retry Premi

 Meteora.ag

# Developer Relations

United States · 1 month ago

Promoted by hirer · Responses managed off LinkedIn

$180K/yr - $240K/yr   Remote   Full-time

🚫 No longer accepting applications

## Meet the hiring team

 **Daryl Tan** ✓  3rd
Fractional HR in Web3 | Talent Acquisition
Job poster

Message

## About the job

### About the Company

MeteoraAG's mission is the original mission of DeFi — build a world where liquidity is provided by retail, profitably, on-chain. Meteora achieves this purpose by building dynamic AMM technology, AMMs that bring tools and profitability back to the retail users. The flagship DLMM product today is the backbone of many token launches, or retail liquidity providers. Today, MeteoraAG's LP Army is the strongest retail community of Liquidity Providers in all of crypto. Together, they provide liquidity in excess of hundreds of millions and regular capture tons of volume on Solana. Meteora shares an office and parent company with the Jupiter team, and together we are a team who loves to build cool products, be on the cutting edge of DeFi innovation, and drive the adoption of crypto via awesome products on crypto rails. We are super well-capitalized, allowing us to take big, high conviction bets as a company on various products.

### About the Role

We're looking for a Devrel hire in Eastern Timezone to lead our efforts in supporting our partners with Meteora's technology. Today's Meteora's product-suite is one of the most advanced and strongest on Solana, and frequently relies on DevRel engineers to support our partners on implementation and day-to-day reliance on Meteora's technology.

### Responsibilities

- Refactor and maintain repositories that interacts with Meteora's core programs
- Replying and supporting our partners through your working hours
- Work with the rest of the team in Asia to solve difficult problems or handing over at the end of the day
- Writing functions and features that simplify or ease the load for our partners.

### Qualifications

- Earnest, hardworking folks who enjoy talking to people and solving their problems.
- Ability to thrive in a fast-paced, ever-changing environment
- Preferably based in Eastern Timezone, with comfort working with teams in Asia.

### Pay range and compensation package

- Attractive market compensation in USDC + $MET alignment (Pre-TGE)
- Highlight the tangible benefits, like salary, tokens, ESOPs, and also emphasise the less obvious aspects, such as career growth, company culture, and the chance to make a real impact.

See less ⌃

## Set alert for similar jobs

Developer, United States

Off ◯

## Job search faster with Premium

Access company insights like strategic priorities, headcount trends, and more

 Adithi and millions of other members use Premium

**Retry Premium for $0**

1-month free trial. Cancel whenever. We'll remind you 7 days before your trial ends.

## About the company

 **Meteora.ag**
189 followers

＋ Follow

Software Development • 11-50 employees • 11 on LinkedIn

Meteora aims to create a secure, sustainable, and composable liquidity layer for the Solana blockchain. It enables liquidity providers to earn optimal fees and yields through dynamic liquidity tools like DLMM, AMM Pools, and V... ... show more

Show more

## More jobs


**Back End Developer**
MangoDesk (YC S25)
United States (Remote)
$70/hr - $200/hr

◷ Actively reviewing applicants

1 week ago   in Easy Apply


**Software Engineer, Backend (Entry Level) (Remote)**
Jobright.ai
United States (Remote)
4 benefits

5 hours ago


**Python Backend Developer, Associate, (Remote)**
Jobright.ai
United States (Remote)
4 benefits

1 day ago


**Junior Rust Developer**
DeFinitive
United States (Remote)
$60K/yr - $80K/yr

◷ Actively reviewing applicants

1 week ago   in Easy Apply



**Senior Full Stack Developer**
Poppy AI
San Francisco, CA (Remote)
$350K/yr

 Actively reviewing applicants

1 month ago  Easy Apply



**Software Engineer, Backend - Entry Level - (Remote)**
Jobright.ai
United States (Remote)
4 benefits

5 hours ago



**Software Engineer (Full-Time or Contractor)**
Social Cascade
United States (Remote)
$70K/yr - $130K/yr

6 hours ago  Easy Apply



**Software Engineer - Full Stack - Entry Level - (Remote)**
Jobright.ai
United States (Remote)
4 benefits

3 hours ago



**Back End Developer**
Elios Talent
United States (Remote)

5 days ago  Easy Apply



**Full Stack Developer - Associate - (Remote)**
Jobright.ai
United States (Remote)
4 benefits

3 hours ago



**Web Developer - Entry Level - (Remote)**
Jobright.ai
United States (Remote)
4 benefits

1 hour ago



**Python Full Stack Developer**
SocialPost.ai
United States (Remote)

 Actively reviewing applicants

1 month ago  Easy Apply

See more jobs like this

 LEARNING

Learn skills to get a new job with these courses

 **Developing Your Professional Image in a New Job**
312,398 viewers

Show more on LinkedIn Learning

Looking for talent?   Post a job

# Appendix G

OnDemandTalent

# Developer Relations

Remote

New York, New York, United States · San Francisco, California, United States

Developers

---

## Job description

**Location:**
* **Remote**


**About the Company:**

We are one of the most innovative and well-capitalized teams building on **Solana**, dedicated to reviving **DeFi's original mission -** empowering retail users to profitably provide on-chain liquidity.

Our flagship product, a **Dynamic Liquidity Market Maker (DLMM)**, serves as a core component of Solana's trading infrastructure and, powering token launches and supporting many of the most active protocols in the ecosystem. With hundreds of millions in Total Value Locked (TVL) and a vibrant, high-volume liquidity provider community, we operate at the center of Solana DeFi alongside other top-tier teams.

This is a product-first company backed by strong revenue, a bold long-term vision, and the capital to build and scale with confidence.

**Position Overview:**

We're hiring a **Developer Relations Engineer** to be the technical bridge between the protocol and the growing ecosystem of builders integrating with it. You'll empower teams by improving developer tooling, supporting integrations, maintaining open-source resources, and advocating for developer needs. If you're passionate about helping others build, love solving complex technical challenges, and thrive in dynamic, fast-moving environments, so this is the role for you.


**Key Responsibilities**
* Maintain and improve open-source SDKs and tooling that interface with the protocol's smart contracts
* Provide responsive, high-quality technical support to ecosystem developers (especially during US Eastern hours)
* Collaborate with APAC teammates to ensure global 24/7 developer coverage
* Build new tools, documentation, examples, and features to reduce integration friction
* Serve as both an internal advocate for developers and an external evangelist for the protocol
* Participate in community calls, events, and technical discussions to foster adoption and feedback

## Job requirements

- Strong communication skills and a passion for helping others succeed
- Proven experience as a developer, ideally in a fast-paced or startup-like environment
- Proficient in writing clean, reusable, and well-documented code
- Comfortable with Solana, DeFi, or blockchain development (preferred but not required)
- Based in or willing to work **overlapping hours with Eastern Time (ET)**
- Collaborative mindset, with experience working across distributed and cross-functional teams

Grab the chance and don't lose it. Apply now!

Appendix H



## BEN CHOW
**Founder in New York**

✉ Get in touch

Ben first jumped into the startup world in 2006. He was on the founding team of the social gaming company Hive7, which raised a Series A from True Ventures. In 2010, Hive7 was acquired by Disney/Playdom. Ben helped grow that company from 3 to 30 people. In late 2007, he helped design and launch Hive7's hit social game Knighthood, growing that game to over tens of millions of users world-wide, generating six figure monthly revenues.

Prior to Hive7, from 1999 to 2006, Ben was working for IDEO and AKQA. In 2006, Fast Company ranked IDEO #5 and AKQA #48 of the most innovative companies in the world. Ben worked on many award winning projects for clients such as HP, Yahoo, Microsoft, MoMa, Philips, HBO, Ford, Target, Gyrus ENT, Polyvision.

He is a named inventor on patent #7799004 for his work on the DIEGO surgical tool system for Gyrus ENT.

He spent several years in medtech, as head of product for CheckedUp and Cirle, winning a 2015 Best of the Best Red Dot Award for a AR navigation system for cataract surgery.

He tackled loneliness, as cofounder, COO of Friended, a top 100 social app in the iOS store.

He has helped remote teams come closer together as founder of WishWell.

Cofounder of Jupiter Aggregator, Solana's leading DEX aggregator with over $34B in trade volume

Cofounder of Meteora, a top Solana DEX building dynamic liquidity systems to grow sustainable liquidity on Solana

    

# **APPENDIX I**



**M3M3 Calcs Template**

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | Name of Token | | | | | | |
| 2 | | $M3M3 | | | | | |
| 3 | $M3M3 Supply | 1,000,000,000.00 | | | | | |
| 4 | $M3M3 MCap (USDC) | $100,000,000.00 | | | | | |
| 5 | | | | | | | |
| 6 | Price of SOL/USDC | 239.63 | | | | | |
| 7 | Price of $M3M3/USDC | 0.10 | | | | | |
| 8 | | | | | | | |
| 9 | Amount of SOL rewards | 4,000.00 | $958,514.04 | | | | |
| 10 | Amount of $M3M3 rewards | 10,000,000.00 | $1,000,000.00 | | | | |
| 11 | | | | | | | |
| 12 | M3M3 Config | | | | | | |
| 13 | reward distribution period (day) | 500.00 | | | | | |
| 14 | # of top stakers | 21 | | | | | |
| 15 | | | | | | | |
| 16 | Total $M3M3 staked | % | amount | value | | | |
| 17 | | 15.00% | 150,000,000.00 | $15,000,000.00 | | | |
| 18 | $M3M3 in top stakers | % | amount | value | | | |
| 19 | | 95.00% | 142,500,000.00 | $14,250,000.00 | | | |
| 20 | rewards distributed per day | SOL | $M3M3 | value | total apr | SOL value per day | apr from just sol |
| 21 | | 190.48 | 476,190.48 | $93,262.57 | 238.88% | $45,643.53 | 116.91% |

# **APPENDIX J**



M3M3 Calcs Template ✕

**Details**　　　　　Activity

## 🛡 Security limitations

**No limitations applied**
If any are applied, they will appear here

## ▱ Labels ❓

You can't access labels for this file

### File details

**Type**
Google Sheets

**Size**
3 KB

**Storage used**
3 KB Owned by Raccoon Labs

**Owner**
ben@raccoons.dev

**Modified**
Nov 30, 2024 by ben@raccoons.dev

**Opened**
Sep 4, 2025 by me

**Created**
Nov 30, 2024

**Description**

No description

Read-only　　　　　　　0/25,000

# **APPENDIX K**



## M3M3 Calcs Template   ✕

Details      **Activity**

**Last year**

**B**   Ben Chow edited an item
Nov 30, 2024, 5:13:28 PM

M3M3 Calcs Template

**B**   Ben Chow renamed an item
Nov 30, 2024, 3:19:40 PM

M3M3 Calcs Template

~~M3M3 Calcs~~

**B**   Ben Chow edited an item
Nov 30, 2024, 3:18:47 PM

M3M3 Calcs

**B**   Ben Chow created an item
Nov 30, 2024, 1:01:14 PM

M3M3 Calcs

# APPENDIX L

**Forwarded from**  **Ben Chow | Meteora**
hey here's a sheet i did to play with some numbers on m3m3 config. Will be helpful to know what % of token in circulating that can stake and make some guesses to how much will stake.

In general it seems a high # of stakers in leaderboard (500?) and a 21 day reward distribution might be a good starting point.  What's interesting is that if there are lots of SOL rewards, staking will get more and more attractive as price goes down and we might get ppl who decide to stake more or buy+stake to get more SOL rewards.

https://docs.google.com/spreadsheets/d/1EDorpqxhDOqrsfTqstxnb7lWLMig-MZedop_QVOOzJU/edit?usp=sharing

**Google Docs**
**M3M3 Calcs Template**

9:15 PM

# **APPENDIX M**



Ben Chow | Meteora ⭐
last seen recently

Message | Call | More

username
@nevaben

bio
cofounder Meteora, https://twitter.com/hellochow

Add Contact

Block User

Groups

EmpireDao - Public

# **APPENDIX N**

## M3M3 Token Launch Organizer

### 1. Token Launch Details

- **Date**: Monday, December 2nd
- **Time**: 3:00 PM UTC?

---

### 2. M3M3 Setup (Questions to Answer)

- **Tokenomics**:
  - Team will buy on the open market aiming for 30-40% of supply
  - Aged wallets will be used to secure supply at launch to avoid aggregators/snipers.
  - Final Tokenomics still pending
- **Circulating Supply at Launch**:
  - Consensus to release 100% of the token supply at launch.
  - How would the potential airdrop to Meteora power-users affect this if it's happening post launch?
- **Where Are These Tokens Tradable?**:
  - Initial focus on Meteor and avoiding DEXs (at least for now).
  - Aiming to secure CEX listings post-TGE, potentially with market-making support to bypass listing fees.
  - OKX and Bybit as priorities for early CEX listings. Awaiting confirmation.
- **Time Between Launch and Fee Distribution Start**:
  - Proposed 6–8 hours window post-launch for fee distribution setup, adjustable based on confidence in reaching the required $2M.
  - Timing to align with global activity:
    - Preferred launch times between 12–3 UTC for optimal overlap across hemispheres.
    - Consideration for the U.S. and Asia being primary user bases.
  - A possibility of delaying the Meme 3-3 script by a day to refine marketing and education efforts.

- **Staking Lockup Period**:
  - Minimum lock-up period proposed at 6–12 hours, with options for longer durations to incentivize community engagement.
  - Final duration yet to be determined
- **Incentive for long-term Staking:**
  - Proposed: for upcoming launches / partner airdrops the user's inclusion is based on staking time & social interactions ( quests)
- **Claiming Rewards**:
  - Claiming rewards is in realtime
- **Top Stakers Receiving Fees**:
  - Currently set at 500
  - Potential option to edit post-TGE if needed
- **Staked Tokens and LP**:
  - Staked tokens to be non-LP (no impermanent loss).

---

## 3. Rollout Plan (to develop)

| Date | Key Activity | Owner |
|---|---|---|
| Nov 30 | Align on all launch details | Chad & Mike |
| Nov 30 | Finalize tokenomics | Chad & Mike |
| Nov 30 | Complete deployment demo | Chad & Mike |
| Dec 1 | Deployment testing | Koz, Champ, Marketing Team |
| Dec 1 | KOL teaser campaign launch | Koz, Champ, Marketing Team |

| Dec 1 | Finalize messaging rollout | Koz, Champ, Marketing Team |
|-------|----------------------------|----------------------------|
| Dec 2 | Launch at 3 PM UTC | Meteora, Kelsier KOLs |
| Dec 2 | Coordinated posts from KOLs | Meteora, Kelsier KOLs |
| Dec 3 | Post-launch engagement | Moose, Marketing Team |
| Dec 4 | Exchange listing announcements | Moose, Marketing Team |

---

## 4. Marketing Activities

**Kelsier KOL Engagement**

- **Leads**: Koz, Champ
  - **Responsibility**: Organize and onboard KOLs for the $M3M3 launch, avoid overlaps.

**People Committed to Posting (Our End)**:

- Champ (+Group)
- Koz (+Group)
- CryptoGodJohn (+Group)
- TraderMayne (+Group)
- Hustlepedia (+Group)
- TraderSZ (+Group)
- Coinguru (+Group)
- SpiderCrypto (+Group)
- TurntUpDylan (+Group)
- Brommy

- Brycent
- Gorilla
- Easy Eats (+Group)
- Biz (+Group)
- Alan (+Group)
- Rafi
- AvocadoToast
- PupCapital
- Floss (+Group)
- Zer0
- Tnut
- NoFace (+Group)
- Sting (+Group)

**Others Finalizing**:

- Pow, Shmoo, CK, IcedKnife, Cozy, CousinCrypto, Orangie, wsbmod, ashrobin, Ponzi, AltcoinSherpa, Crypticd22, Pyro, 0xUberM, Solstice, Cheatcoiner, Wuzie, 0xsun, Neo, Sugar, Senzu, Venom, Cryptic, Lexapro, nftboi, Brandon Salim.

**LATAM**

- **Lead**: Kmanus
  - **Action**: Activating 30+ top LATAM KOLs.

**Focus**: Heavy meme-driven and alpha caller strategy.

---

## 5. Liquidity

- **Responsibility**: Kelsier
  - Secured capital for liquidity provision and structuring.

---

## 6. Listings

- **Kelsier Working On**: OKX listing (call scheduled later today).

---

## 7. Market Making

- Wrapping up discussions.
- **Cash-Out Structure**: Determine a strategy for cashing out and managing liquidity effectively.

---

## Next Steps:

- Finalize tokenomics and vesting details.
- Confirm all KOL allocations and ensure alignment with campaign narratives.
- Establish clear real-time communication channels for the day of the launch.
- Confirm all exchange listings and liquidity provision arrangements.
- Finalize messaging rollout plan
- Create 1 messaging guide for KOLs
- Create 1 easy-to-understand overview of M3M3 (with 1 main diagram)
- Visual assets library for KOLs?

# APPENDIX O

 **M3M3 Token Launch Organizer** ✕

**Details**     **Activity**

**No limitations applied**
If any are applied, they will appear here

---

## File details

**Type**
Google Docs

**Size**
8 KB

**Storage used**
8 KB Owned by Kelsier Capital

**Owner**
thomas@kelsier.io

**Modified**
Dec 1, 2024 by thomas@kelsier.io

**Opened**
Sep 4, 2025 by me

**Created**
Nov 30, 2024

**Description**

> No description

Read-only                    0/25,000

# APPENDIX P

 **M3M3 Token Launch Organizer** ✕

Details | **Activity**

## Last year

**T** Thomas edited an item
Dec 1, 2024, 6:39:14 AM

📄 M3M3 Token Launch ...

**T** Thomas created an item
Nov 30, 2024, 2:55:55 PM

📄 M3M3 Token Launch ...

# **APPENDIX Q**





Obviously 9:44 AM

I should have made significantly more but there's a lot of drama so working that out 9:44 AM

What can we actually do there. 9:48 AM

Just look at it from my perspective (not saying it's right) 9:51 AM

Im being offered and making insane amounts of $$$.

Tether has offered $1B to do stuff in Argentina with Kelsier.

Meteora and Kelsier have exclusivity marketing. The ███ coin gives me more power than ever before.

Which also gives me an insane amount of risk.

Being involved at $100K with 2% unlocked if hits large mcap $1M is not interesting at all

Just look at it from my perspective (not saying it's right) 9:51 AM

Im being offered and making insane amounts of $$$.

Tether has offered $1B to do stuff in Argentina with Kelsier.

Meteora and Kelsier have exclusivity marketing. The ▮▮▮▮ coin gives me more power than ever before.

Which also gives me an insane amount of risk.

Being involved at $100K with 2% unlocked if hits large mcap $1M is not interesting at all.

Just being honest.

And def I prob wouldn't heavily partner or do shit on solana. That's just me being super honest to you privately.

The galactica thing I don't understand but prob government stuff will be blocked and exclusive to tether 9:53 AM



Dope. Let's do it tomorrow                                    10:05 PM

Im launching Melania ▮▮▮ token tomorrow  10:05 PM

Milei next week sir  10:16 PM

It's about to be a crazy crazy few weeks  10:16 PM

Idk yet going to try and tell all my buddies early it's a very tight tight knit
thing                                                          10:19 PM

                                                    19 Januar

Is it oaky if my brother negotiates? I'm about to launch the biggest token
ever lol                                                       11:39 AM

Bro would love to partner with you guys seriously and you WILL get M3M3
                                                              11:40 AM

**A-5**







With Gid anytime  4:37 AM

With me a bit rough I am with Ben and meow 24/7  4:37 AM

I am in turkey today and tomorrow  4:39 AM

Then London  4:40 AM

Then unknown.  4:40 AM

Would like to have a confirmed ▮▮▮ deal done if we are going to rip by eod today  4:40 AM

I like that but need to be more bought in on ▮▮▮  4:42 AM

28 January

30 January

https://x.com/jmilei/status/1885068460268363889?s=46  6:47 PM

Write a message...





I know the boys want to stay with▮▮▮for the Milei thing  9:15 PM

Okay lmk  9:16 PM

I'm launching insane amounts of big boys  9:17 PM

Rn  9:17 PM

Okay dope can't wait  9:18 PM

01 Februar▮

Hey how are you?  1:20 PM

Write a message...





most there  7:15 PM

Almost  7:15 PM

Hey bro did you make it back safe? Appreciate you coming  11:17 PM

Drive safe my g can't wait to rip some shit together  11:20 PM

02 February

I just pinged in the group  9:23 PM

03 February

10 February

Hey bro  3:00 PM

I'll be on a hunt the week before but sure  3:00 PM



Yes bro I am super happy to seriously  3:21 PM

It's cause we got MOTION. Also idk what you guys are waiting from me on for ████████ send deal let me talk brother we get on 10 minute call and it's done easy peasy  3:23 PM

Okay sweet I'm about to be with them for next 4 days  3:33 PM

11 Februar

Hey how fast can we be ready to go for Milei  4:25 PM

12 Februar

What do you mean?  5:59 PM

For Milei?  6:06 PM

17 Februar

Write a message...



23 February

What's up dude 12:36 PM

Thanks for checking in 12:36 PM

Well since I was setup to be worlds biggest scapegoat I've been better 😂
12:37 PM

Well the scam they have the wrong people 12:38 PM

Kelsier isn't axiom 12:38 PM

Axiom are the guys that did all these tokens lol 12:38 PM

I only did like 15 and just followed Ben's instructions and then got better 😂
12:38 PM

Write a message...



Nah no stress just going to have to suck it up and figure this out
12:46 PM

Yeah all good. I have a rock solid legal team working with PR.
I stand by most shit I said tbh and what's done is done
12:58 PM

20 Augu

21 Augu

What's up. 4:09 PM

Doing okay been a rough year 4:09 PM

# **APPENDIX R**

**JUP**

Since cats have small brains and did not go to MIT or Jane Street, we cannot process super complicated token plans and confusing power dynamics.

So instead, here's a pie with cats:





**meow** ✅ ⬛
@weremeow

1. @JupiterExchange will drive usage and ecosystem growth for Solana
2. @MeteoraAG will stoke TVL and liquidity
3. @Studio_Raccoons will show the world what is possible with a small killer team of mean but cute mammals

**Meteora** ✅ @MeteoraAG · Dec 1, 2023
1/ Announcing The Massive Meteora Stimulus Package

1. DLMM – Dynamic Fees & Precise Liquidity
2. Expert DAO - The best brains of DeFi
3. 10% Stimulus - Starting 1st Jan 24...

## The Massive Meteora Stimulus Package

**DLMM**
Changing the game with dynamic fees and precise liquidity concentration

**Expert DAO**
The best DeFi minds in the MET DAO to drive Solana TVL Together

**10% LP Stimulus**
Supercharging TVL incentives in 2024 for the best AMM in DeFi

12:00 AM · Dec 4, 2023 · **26.7K** Views

💬 12     🔁 26     ♡ 156     🔖 11     ↥


**Final mockJUP Statement:**

mockJUP is a potato trying to be a planet, a pig trying to be a lion, and a survivor that refuses to go to zero despite my very best attempts to do so.







**Meteora** ✔ @MeteoraAG · Dec 4, 2024

**M3M3 turns the race to dump into a race to stake.**

Inspired by the (3,3) model, we're introducing a staking mechanism for memecoins.

If everyone stakes a token, selling pressure for the token falls, its value increases and everyone wins.



💬 7    🔁 16    ♡ 212    ᐧ�808 47K    🔖 ⬆

**Meteora** ✓ @MeteoraAG · Dec 4, 2024

**This mechanism generates a staking flywheel.**

Rewards attract more stakers, and as more stakers compete for the leaderboard, they buy more tokens which generates more rewards, which attracts more stakers; and the cycle continues.



7      6      131      32K

**Meteora** ✔ @MeteoraAG · Dec 4, 2024

**First token to launch on M3M3**
$M3M3 is a token created by @WEAREM3M3_ community members
inspired by the M3M3 vision. They aim to use $M3M3 to test the platform &
bring together all who believe in the (3,3) vision.

$M3M3 is live m3m3.meteora.ag



○ 18          ⟲ 46          ♡ 217          ᶦᶦᶦ 60K          🔖 ⬆



**M3M3** ✓
@WEAREM3M3_

Over $3,000,000 in rewards have already been collected, ready to be given back in FULL to $M3M3 stakers. 🔥

Welcome to the new meta. Are you staked yet?

m3m3.meteora.ag/farms/79raiHK7...

1:57 PM · Dec 4, 2024 · **34.3K** Views

💬 79        🔁 53        ♡ 282        🔖 13

← **Post**



**benchow.sol** ✓
@hellochow

⟳ ···

**The PPP Model for M3M3**

We've now seen a few successful M3M3 launches and I think we can now say M3M3 is a powerful bootstrapping mechanism for memecoins. But, you still need a good meme. Thankfully, projects launching on M3M3 now have more time to establish their meme by utilizing staking rewards.

One of the most exciting things I am seeing is the amount of interest there is in projects that want to airdrop the $M3M3 community and the demand for more $M3M3 airdrops for other communities.

I believe this can be the foundation for M3M3 to be the PPP community for all memecoins. Imagine a community that pumps new coins and new communities. Imagine if airdrops pumped a token instead of dumped it.

Three incredible things are coming together: A powerful staking mechanic for memecoins. The start of a $M3M3 degen community of pumpers. An LP Army to drive liquidity, ride dips for fees, and help everyone profit without tanking a chart.

These can be the seeds for a PPP (player-pump-player) movement for memecoins that will grow stronger as more join. If they win, we win. If we support them, they will support us. That is M3M3.

M3M3 will spread the wealth and spread the love.

If you want to PVP, don't launch here.

Last edited 10:37 AM · Dec 15, 2024 · **89.1K** Views

 **benchow.sol** ✓
@hellochow

All things Meteora are heating up! We've received the 25% grant from the @WEAREM3M3_ team 🔥

The grant will be held in a multisig held by the Meteora team: B96rMexk4Ur39nuWKc3gr1ruE2iKPaJyW66VJqdztuGm

We're working with them on some airdrops that will:

- Utilize the upcoming (3,3) scoring
- grow the M3M3 community of pumpers that include the LP army, $M3M3 holders, potentially the JUP DAO, and more
- Give back to the Solana community in more unique ways.

PPP is here.

10:29 AM · Jan 28, 2025 · **111.1K** Views

💬 152      🔁 128      ❤️ 529      🔖 35      ⬆️

**Javier Milei** ✓ @JMilei · Jan 30
LA TECNOLOGÍA ES ALIADA DE LA LIBERTAD

Hoy mantuvimos una muy interesante charla con el empresario Hayden
Mark Davis, quien me estuvo asesorando sobre el impacto y las
aplicaciones de la tecnología blockchain e inteligencia artificial en el país.
Seguimos trabajando para
Show more



◯ 1.7K          ⇄ 2.5K          ♡ 15K          📊 1.8M          🔖  ⬆

**benchow.sol** ✓
@hellochow

What changing the world looks like 🔥

5:16 PM · Jan 30, 2025 · **29.5K** Views

 **Javier Milei** ✓
@JMilei

···

La Argentina Liberal crece!!!
Este proyecto privado se dedicará a incentivar el crecimiento de la
economía argentina, fondeando pequeñas empresas y emprendimientos
argentinos.
El mundo quiere invertir en Argentina.

vivalalibertadproject.com

Contrato: Bo9jh3wsmcC2AjakLWzNmKJ3SgtZmXEcSaW7L2FAvUsU

$LIBRA

VIVA LA LIBERTAD CARAJO...!!!

 vivalalibertadproject.com
Viva La Libertad Project
Driving the Future of Freedom and Growth for Argentina.

7:01 p. m. · 14 feb. 2025 · **5,3 M** Visualizaciones



**KIP Protocol** ✔
@KIPprotocol

Today was the launch of the ambitious Viva la Libertad project to help private enterprises in Argentina, and the $LIBRA currency has been a success. We want to thank everyone for their trust and support.

To address all questions: we would like to clarify that this is a private enterprise project,  President Milei was not and is not involved in the development of this project, as he has mentioned himself. This is an entirely private enterprise.

Thank you for being part of this great beginning!



**Zen** ✅ 🔴
@realdezen

Excited to step up and lead @MeteoraAG, building on the incredible foundation we've created.

Meteora powers the most advanced liquidity pool tech, driving nearly $180B in swap volume and managing close to $1B in TVL. Our LP Army is 60,000+ strong across 8 countries, with 14,000+ certified LP bootcamp graduates. And we've built best-in-class liquidity infrastructure, with ~50 integrations for launchpads and developers.

For those who don't know me well, I've been part of Meteora since day one - driving product direction and relentlessly shipping alongside the team. I played a key role in launching the first versions of the Dynamic AMM and DLMM, working closely with the product team for two years before shifting my focus to Jupiter. Through that time, I've developed a deep understanding of both the product and the vision.

Over the past few weeks, we had a super productive offsite with the team and started conversations with the LP Army leads. I'm incredibly bullish about Meteora's future and can't wait to build it together with all of you.