## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

OMAR HURLOCK and ANUJ MEHTA, *on behalf of himself and all others similarly situated,*

Plaintiffs,

v.

KELSIER LABS, LLC d/b/a KELSIER VENTURES, HAYDEN MARK DAVIS, GIDEON DAVIS, CHARLES THOMAS DAVIS, METEORA, *an unincorporated association*, and BENJAMIN CHOW,

Defendants.

**Case No.: 1:25-cv-03891-JLR**

Hon. Jennifer L. Rochon

## <u>PLAINTIFFS' OPPOSITION TO DYNAMIC LABS LIMITED'S MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(B)(6)</u>

## **<u>TABLE OF CONTENTS</u>**

I. PRELIMINARY STATEMENT..................................................................................................5

II. FACTUAL BACKGROUND................................................................................................. 6

    A. Untangling the "Three Meteoras": DLL's Strategy of Deliberate Conflation.....................6

    B. Meteora, The Association, Operates as a Coordinated Business Enterprise, Not
"Just Software"..........................................................................................................................6

        1. A Business with Leadership, Governance, and Personnel.............................................6

        2. Public Representations as an Operating Company........................................................7

    C. The Meteora-Kelsier RICO Enterprise and its Fraudulent Schemes..............................7

    D. DLL's Role in the Persistent Obfuscation Strategy........................................................10

III. ARGUMENT........................................................................................................................11

    A. Legal Standard................................................................................................................ 11

    B. DLL, A Non-Party, Lacks Standing to Litigate the Capacity of Defendant.....................12
Meteora......................................................................................................................................12

    C. Meteora Is An Unincorporated Association or Partnership with Capacity to be
Sued.........................................................................................................................................12

        1. Meteora Is Not "Just Software".................................................................................. 12

        2. Meteora Qualifies as a Partnership or Unincorporated Association Under New
York Law..................................................................................................................................13

        3. Independently, Meteora Has Capacity to Be Sued for Federal RICO Claims
Under Rule 17(b)...................................................................................................................... 14

    D. DLL'S Alternative Technical Defenses Fail As a Matter of Law....................................... 14

        1. The Meteora Defendants Cannot Escape Liability under the Martin Rule, Because
Meteora Members' Ratification of the Fraudulent Acts Can Be Inferred........................ 14

        2. Meteora is a "Person" Subject to Suit Under RICO......................................................17

    E. The FAC Plausibly States Claims Against Defendant Meteora For Which Relief
Can Be Granted.......................................................................................................................19

        1. The Complaint States Claims for Fraud and Conspiracy with Particularity Under
Rule 9(b)................................................................................................................................. 19

            a. Defendants Made Numerous Material Misrepresentations and Omissions,
Not "Puffery"........................................................................................................................ 19

            b. The Complaint Pleads a Strong Inference of Scienter.............................................20

            c. Plaintiffs Plausibly Allege Justifiable Reliance and Loss Causation.......................21

        2. The Complaint Plausibly States Claims for RICO Violations (18 U.S.C. §§ 1962(c)
& (d))...................................................................................................................................... 22

        3. The Complaint Plausibly States Claims Under N.Y. GBL §§ 349 & 350 and for
Unjust Enrichment................................................................................................................. 26

IV. CONCLUSION....................................................................................................................27

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)............................................................................................11

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)............................................................................................11

*CFTC v. Ooki DAO,*
2022 WL 17822445 (N.D. Cal. Dec. 20, 2022)...................................................18

*Congel v. Malfitano,*
31 N.Y.3d 272 (N.Y. 2018).................................................................................13

*DiVittorio v. Equidyne Extractive Indus., Inc.,*
822 F.2d 1242 (2d Cir. 1987)..............................................................................11

*Ganino v. Citizens Utils. Co.,*
228 F.3d 154 (2d Cir. 2000)................................................................................19

*Henry v. Daytop Vill., Inc.,*
42 F.3d 89 (2d Cir. 1994)....................................................................................27

*In re Inclusive Access Course Materials Antitrust Litig.,*
2021 WL 2419528 (S.D.N.Y. June 14, 2021)......................................................13

*Kehr Packages, Inc. v. Fidelcor, Inc.,*
926 F.2d 1406 (3d Cir. 1991)..............................................................................24

*Lentell v. Merrill Lynch & Co.,*
396 F.3d 161 (2d Cir. 2005)................................................................................21

*Martin v. Curran,*
303 N.Y. 276 (N.Y. 1951)...................................................................................14

*McIntyre v. Longwood Cent. Sch. Dist.,*
2008 WL 850263 (E.D.N.Y. Mar. 27, 2008), aff'd, 380 F. App'x 44 (2d Cir. 2010)...................14

*Meyer v. Jinkosolar Holdings Co.,*
761 F.3d 245 (2d Cir. 2014)................................................................................19

*Mills v. Polar Molecular Corp.,*
12 F.3d 1170 (2d Cir. 1993)................................................................................11

*Novak v. Kasaks,*
216 F.3d 300 (2d Cir. 2000)...................................................................................20

*Precedo Cap. Grp. Inc. v. Twitter Inc.,*
33 F. Supp. 3d 245 (S.D.N.Y. 2014)........................................................................15

*Reich v. Lopez,*
858 F.3d 55 (2d Cir. 2017)......................................................................................23

*Reves v. Ernst & Young,*
507 U.S. 170 (1993)................................................................................................25

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,*
2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021)................................................12

*Spool v. World Child Int'l Adoption Agency,*
520 F.3d 178 (2d Cir. 2008)....................................................................................23

*United States v. Bonanno Organized Crime Family,*
879 F.2d 20 (2d Cir. 1989)..................................................................................18,19

*United States v. Minicone,*
960 F.2d 1099 (2d Cir. 1992)..............................................................................23, 24

*Washington Elec. Co-op. v. Mass. Mun. Wholesale Elec. Co.,*
922 F.2d 92 (2d Cir. 1990)......................................................................................12

**Rules and Statues**

18 U.S.C. § 1343.....................................................................................................24
18 U.S.C. § 1961(3).................................................................................................19
18 U.S.C. § 1962(c).................................................................................................23
18 U.S.C. § 1962(d).................................................................................................23
Fed. R. Civ. P. 8(d)(2).............................................................................................29
Fed. R. Civ. P. 9(b)......................................................................................13, 20, 21
Fed. R. Civ. P. 12(b)(6)........................................................................................12,13
Fed. R. Civ. P. 17(b)(3)(A)......................................................................................15
N.Y. Gen. Bus. Law §§ 349, 350........................................................................27, 28
N.Y. Partnership Law § 10(1)..................................................................................14

# I. PRELIMINARY STATEMENT

The dismissal motion filed by Dynamic Labs Limited ("DLL"), is a procedurally improper and substantively meritless attempt by a non-party affiliate to shield a fraudulent enterprise from liability. DLL, a foreign shell company, has no standing to move for dismissal on behalf of the named defendant, Meteora, an unincorporated association. DLL's motion is the latest step in a persistent strategy of obfuscation designed to distract the Court from the core issues and evade accountability for a massive, multi-million dollar fraud perpetrated against consumers such as Plaintiffs.

DLL's argument rests entirely on a deliberate shell game. It attempts to conflate Meteora, the unincorporated association that Plaintiffs have sued and which is led by Defendant Benjamin Chow who operated publicly under the "Meteora" name—with Meteora, the software protocol, which Plaintiffs have not sued. This is a distinction DLL intentionally blurs, but it is the central issue in this case.

Plaintiffs' claims are not against software; they are against a Racketeer Influenced and Corrupt Organizations ("RICO") Act enterprise composed of individuals who used that software as an instrument of fraud. Meteora, the association, held itself out to the public as a business, had leadership, conducted operations, and generated revenue. It has the capacity to be sued under both New York and federal law.

The First Amended Complaint ("FAC") pleads with sufficient particularity the details of this fraudulent enterprise, including the specific roles of its members, the mechanics of the $M3M3 and $LIBRA token frauds, and the predicate acts of wire fraud that form a pattern of racketeering activity. The FAC states multiple viable claims for relief, and DLL's attempt to

dismiss them on behalf of a party it does not represent is a transparent attempt at misdirection. The Court should deny DLL's motion in its entirety and allow the case against the Meteora association to proceed.

## II. FACTUAL BACKGROUND

### A. Untangling the "Three Meteoras": DLL's Strategy of Deliberate Conflation

DLL's motion is designed to create confusion by treating three distinct entities as one. To provide clarity, Plaintiffs offer the following delineation, which will be maintained throughout this Opposition. This framework is essential for parsing DLL's arguments, which depend entirely on ambiguity to create the illusion of a defense. By clearly defining each entity at the outset, the Court can readily identify DLL's tactic of conflating the non-party software with the defendant association.

### B. Meteora, The Association, Operates as a Coordinated Business Enterprise, Not "Just Software"

### 1. A Business with Leadership, Governance, and Personnel

The record flatly contradicts the "autonomous code" narrative central to DLL's dismissal motion. The entity Plaintiffs have sued, Meteora, is an unincorporated association. Defendant Benjamin Chow publicly held himself out as "CEO of Meteora" until his resignation following the public exposure of the fraud alleged in the present case. (FAC ¶40). Software does not have a CEO who can resign.

The Meteora association also possesses a clear governance structure, including a "seven-member board"—the 4-of-7 multisignature wallet—that functions like a board of directors, voting on key business decisions such as setting customer fees and approving software upgrades. (FAC ¶¶ 132–133, 381).

### 2. Public Representations as an Operating Company

When speaking to users, partners, and potential investors, Meteora consistently presents itself as an association, not an algorithm. The association maintains a coordinated brand across multiple social media platforms and actively recruits for job positions (including roles based in New York) (FAC ¶33). This is the antithesis of a decentralized, autonomous protocol; it is a centrally managed business operation.

### C. The Meteora-Kelsier RICO Enterprise and its Fraudulent Schemes

The FAC alleges that in October 2024, Meteora (the association, led by Chow) entered into a formal, secret agreement with Kelsier Ventures to combine Meteora's technical platform with Kelsier's capital and promotional reach. (FAC ¶163). The explicit purpose was to execute fraudulent token launches that appeared legitimate while guaranteeing insider profits through covert manipulation. The Kelsier Defendants agreed to "invest" approximately $2 million USD to fund the launch and initial price inflation scheme for $M3M3. (FAC ¶ 164).

The enterprise executed this playbook with precision. In the $M3M3 scheme, which launched on December 4, 2024, Defendants used a hidden "Freeze Authority" within the Meteora software to lock out the public while 150 insider wallets acquired 95% of the token supply at a floor price. (FAC ¶¶ 209–226). Behind the scenes, Defendants had engineered the launch to enrich insiders at the expense of everyone else. (*see e.g.* FAC ¶¶ 200–208). Just before launch, they created the official $M3M3 liquidity pool on Meteora and seeded it with 900 million $M3M3 tokens (90% of the total supply) and only a small amount of SOL as initial liquidity. (FAC ¶¶ 213-214). They also designated a special "$M3M3 Mint Wallet" under their control with "Freeze Authority" over the pool—meaning they could halt all trading in the pool at will.

(FAC    210).

At the scheduled launch moment, Defendants opened the $M3M3 pool, making it appear that public trading had begun, but in the same instant, they secretly invoked the Freeze Authority to lock the pool, preventing any outside buyers from actually executing trades. (FAC ¶¶ 194, 215). This maneuver was invisible to ordinary observers: on the surface $M3M3 looked live, but in reality only Defendants' pre-approved insider wallets could transact at the outset. (FAC    222). As a planning call made clear, Defendants knew they had to keep the public float extremely small (around 5%) so no one would realize insiders controlled the rest. (FAC ¶¶ 207-208).

With outsiders frozen out, approximately 150 insider-funded wallets supplied by Kelsier swiftly bought up nearly the entire available supply of $M3M3 at the low launch price. (FAC ¶¶ 197, 216-220). Defendants acquired almost the entire $M3M3 token supply within minutes, while the general public was still shut out from buying. (FAC ¶219). Each insider trade was authorized by the Meteora-controlled Mint Wallet, underscoring that Meteora's team itself executed the transfers to insider wallets. (FAC ¶¶ 217-218).

Once Defendants had secured almost the entire supply, they lifted the freeze and allowed the broader public to finally start buying in. (FAC ¶221). With so few tokens actually in circulation, the influx of honest buyers drove $M3M3's price up astronomically—over a 1,000,000% increase within about a day, reaching around $0.12 by December 5, 2024 (from a fraction of a cent). (FAC ¶223). On paper the token's market capitalization exceeded $150 million at its peak. (FAC    223).

Defendants then began dumping their stake at these inflated prices. (FAC ¶221). As this flood of insider-held tokens hit the market, $M3M3's price collapsed by over 90%—plummeting from about 15 cents to mere pennies. (FAC ¶226). Even after the initial crash, Defendants sought

to inflate $M3M3's price again to extract additional profit. (FAC ¶227). Meteora (under Chow) publicly promised to "pay back" users through token rewards and hyped upcoming exchange listings to restore confidence, briefly pushing $M3M3 back to around $0.10-$0.15 by mid-December 2024. (FAC ¶¶ 228-229). By repeatedly pumping the price and then dumping insider holdings, Defendants squeezed even more value out of $M3M3 while pretending to support a genuine DeFi project. (FAC ¶230–235). By March 2025, $M3M3 had collapsed to roughly $0.003 per token, a decline of more than 98 percent from its peak. (FAC ¶¶ 236-237).

Two months later, emboldened by the $M3M3 scheme, Defendants set out to replicate it on a larger scale with the $LIBRA token, which launched on February 14, 2025. FAC  13. They escalated their deception by fabricating a narrative that $LIBRA was Argentina's coin, tied to a non-existent project called "Viva La Libertad" (VLL) purportedly endorsed by the Argentine government. (FAC ¶¶ 242-263). Defendants quickly set up a VLL Project website on the same day $LIBRA launched to bolster the appearance of a legitimate initiative. (FAC ¶¶ 253-254).

Prior to launch day, President Milei's social media accounts even shared a photograph with Davis and teased "exciting" developments, to which Defendant Chow replied "What changing the world looks like 🔥." (FAC ¶¶ 249-250). On launch day President Milei posted a statement in support of the project on X, linking to the VLL website and the token address for $LIBRA. (FAC ¶268). This political angle generated tremendous buzz among retail investors—including Plaintiff Omar Hurlock, who believed $LIBRA was backed by President Milei's administration. FAC  108. In reality, no bona fide VLL program existed at all—it was merely a hastily created façade to lure investors. (FAC ¶274). Unbeknownst to the public, Defendants were again orchestrating a sophisticated rug pull behind the scenes. (FAC  286).

The $LIBRA token launched on Meteora's platform using a single-sided liquidity

pool—a setup that gave Defendants even greater control over pricing. (FAC ¶279) In a single-sided pool, the creators initially provided only the new token ($LIBRA) and no base currency (such as USDC or SOL), so early buyers' own purchases would drive the price upward. (FAC ¶150). As soon as trading opened on February 14, 2025, swarms of eager buyers poured funds into $LIBRA. (FAC ¶264–272). Once a large amount of USDC and SOL had been injected by public buyers, Defendants and their insiders executed the rug pull; they withdrew essentially all of the base-currency liquidity from the $LIBRA pool in a series of extractions, leaving only the $LIBRA tokens in circulation (now held by unsuspecting investors). (FAC ¶¶ 278-292).

Over the course of a 107-minute period, from about 4:40pm EST to about 6:27pm EST on February 14, 2025, LIBRA Wallet 1 received a total of 13,060,482 USDC from the $LIBRA/USDC Pool. (FAC ¶279). Between February 14 and 16, 2025, the USDC Intermediary Wallets executed a series of transactions that cumulatively extracted a total of 44,593,888 USDC from the $LIBRA/USDC Pool. (FAC ¶281). On February 14 and 15, 2025, the SOL Intermediary Wallets extracted: 69,275.9 SOL to SOL Wallet 1; 148,343.02 SOL to SOL Wallet 2; 32,045.7 SOL to SOL Wallet 3. (FAC  283).

### D. DLL's Role in the Persistent Obfuscation Strategy

DLL's current motion is not an isolated legal filing; it is the culmination of a months-long strategy to evade service and accountability. This motion is the latest maneuver in a strategy engineered for opacity, designed to shuffle responsibility between the "decentralized" protocol and its various corporate affiliates.

The history of this litigation demonstrates a clear pattern of obfuscation. Initially, when Plaintiffs sought to serve Meteora, Defendant Chow's counsel represented in an email that "Meteora has agreed to sign on" to a joint scheduling letter, an unambiguous acknowledgment of

its existence. Days later, counsel for DLL, Goodwin Procter, appeared, disclaimed any representation of Meteora, and abruptly pivoted, insisting that "Meteora is not a legal entity." Goodwin Procter then made a conditional offer: they would accept service only if Plaintiffs agreed to substitute DLL—a non-party foreign entity—for the named defendant, Meteora. This 'bait and switch' tactic perfectly illustrates the shell game at the heart of the defense.

## III. ARGUMENT

### A.    Legal Standard

The legal standards governing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) are well-established and weigh heavily against dismissal in the present case. The Court must "accept all factual allegations as true" and "draw all reasonable inferences in the plaintiff's favor." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). To survive a motion to dismiss, the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*

Federal Rule of Civil Procedure 9(b) requires that allegations of fraud be pleaded with particularity, specifying "the time, place, and content of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993). Where multiple defendants are involved, "the complaint should inform each defendant of the nature of his alleged participation in the fraud." *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).

### B. DLL, A Non-Party, Lacks Standing to Litigate the Capacity of Defendant Meteora

A non-party generally lacks standing to file a Rule 12(b)(6) motion on behalf of a named defendant. An interest that is "remote from the subject matter of the proceeding, or that is contingent upon the occurrence of a sequence of events before it becomes colorable, will not satisfy the rule" for intervention, let alone confer the right to litigate a defendant's defenses. *See Washington Elec. Co-op. v. Mass. Mun. Wholesale Elec. Co.*, 922 F.2d 92, 97 (2d Cir. 1990).

DLL is not a named defendant in this action. Its claimed interest is, at most, a "contingent revenue stream" derived from protocol fees generated by the Meteora software, which is akin to an "investor-like expectancy." While DLL has filed a motion to intervene, its status as a party has not been granted. Indeed, the instant motion is styled as DLL's "[Proposed]" Motion to Dismiss, filed in support of its yet-unresolved motion to intervene which Plaintiffs' have opposed. (ECF Dkt. 182–3).

As a non-party with only a remote and contingent financial interest, DLL lacks the standing to appear on behalf of the named defendant, Meteora (the association), and argue that it cannot be sued; the motion is therefore procedurally improper and should be denied on this threshold basis alone.

### C. Meteora Is An Unincorporated Association or Partnership with Capacity to be Sued.

### 1. Meteora Is Not "Just Software"

The determination of an entity's legal form is a fact-intensive inquiry based on the conduct and representations of its members, not on self-serving labels adopted for litigation. *See e.g. Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 2021 WL 3477479, at *10 (Bankr. S.D.N.Y. Aug. 6, 2021).

As detailed in the Factual Background, Meteora has a CEO (Defendant Chow), a "team" that funds operations and holds offsites, a governance body that votes on fees, and it holds itself out to the public as an operating company. (FAC ¶¶ 40, 132–133, 381). DLL's claim that Defendant Meteora is "merely software operated by a corporation" is a legal conclusion flatly contradicted by the public statements of its own principals.

The overwhelming factual record set forth in the FAC demonstrates that Defendant Meteora, the association, is a coordinated business enterprise run by and for a number of actors, not an autonomous piece of software, and DLL's central premise is factually baseless.

### 2. Meteora Qualifies as a Partnership or Unincorporated Association Under New York Law

New York recognizes partnerships formed by "two or more persons to carry on as co-owners of business for profit," which can be inferred from the "conduct of persons carrying on a business for profit as co-owners." N.Y. Partnership Law § 10(1); *Congel v. Malfitano*, 31 N.Y.3d 272, 278-279 (2018). An unincorporated association is a "voluntary group of persons, without a charter, formed by mutual consent for a common objective." *In re Inclusive Access Course Materials Antitrust Litig.*, 2021 WL 2419528, at *18 (S.D.N.Y. June 14, 2021).

The FAC pleads concrete indicia of a partnership or association: (1) Joint Control: A seven-member authority functions like a board, making joint decisions on core business matters (FAC ¶¶ 132, 381); (2) Pooled Labor: The 'Meteora team' collaborates to build and operate the business, as evidenced by public statements and job postings; and (3) Profit-Making Objective: The enterprise was formed for the express purpose of profiting from fraudulent token launches and collecting transaction fees (FAC ¶¶ 163-164, 378-379).

Based on the FAC's pleaded facts of collective control, pooled labor, and joint decisions regarding a business for profit, Plaintiffs' FAC has plausibly alleged that Meteora is a partnership

or unincorporated association with the capacity to be sued under New York law.

### 3. Independently, Meteora Has Capacity to Be Sued for Federal RICO Claims Under Rule 17(b)

Federal Rule of Civil Procedure 17(b)(3)(A) explicitly authorizes a suit against a "partnership or other unincorporated association" in its common name to enforce a substantive federal right, such as a RICO claim, even if it lacks capacity under state law.

Plaintiffs' FAC asserts federal claims against Defendant Meteora under the RICO Act. (FAC ¶¶ 370–407). The FAC pleads that Defendant Meteora is an unincorporated association of identified members, including Defendant Chow, who joined together for the common objective of perpetrating the fraudulent schemes made the basis of this action. (FAC ¶¶ 378–386).

Because Plaintiffs seek to enforce federal rights under RICO, Rule 17(b)(3)(A) provides an independent and sufficient basis for Defendant Meteora's capacity to be sued in its common name, rendering DLL's arguments under New York law irrelevant to the federal claims.

### D. DLL'S Alternative Technical Defenses Fail As a Matter of Law

### 1. The Meteora Defendants Cannot Escape Liability under the *Martin* Rule, Because Meteora Members' Ratification of the Fraudulent Acts Can Be Inferred

Under the *Martin* rule, an unincorporated association is liable for the tortious acts of its members only if all members authorized or ratified the act. *McIntyre v. Longwood Cent. Sch. Dist.,* 2008 WL 850263, at *13 (E.D.N.Y. Mar. 27, 2008), *aff'd,* 380 F. App'x 44 (2d Cir. 2010) (citing *Martin v. Curran,* 303 N.Y. 276, 279-81 (N.Y.1951)). Nonetheless the Meteora Defendant should not be allowed to hide behind the Martin Rule, where the unincorporated association's members have received the financial benefits derived from the fraudulent scheme (in the form of profits), in tacit ratification of the association's fraudulent actions, as set forth in the FAC.

Here, the FAC specifically alleges that Defendant Benjamin Chow served as Meteora's

CEO with "primary control over and responsibility for the operations of Defendant Meteora, including but not limited to the operation of Meteora programs deployed on the Solana blockchain." FAC ¶40. Chow operated as the public face and primary decision-maker for all Meteora operations. *Id.*

The scope of Defendant Chow's actual authority demonstrated by his own admissions. In his February 16, 2025 public statement, Chow acknowledged that he "personally provide[s] tech support for launches to help teams navigate the product" because "[m]istakes can seriously impact a launch and it's important to Meteora to help teams by configuring the product correctly." FAC  ¶300. He confirmed that launch teams provide him with "token/pool address" information "a few minutes before an actual launch," demonstrating his central operational role. FAC ¶301. Most tellingly, when confronted about his involvement in fraudulent launches, Chow admitted: "I fucked up because I enabled the guy. I should not have enabled him." FAC   313.

These are not the statements of a rogue actor exceeding his authority—they are admissions by Meteora's CEO that he acted within his recognized role as the association's technical leader and primary interface with launch teams. Further, "[u]nder New York law, it is possible to imply ratification if the principal retains the benefit of an unauthorized transaction with knowledge of the material facts. Thus, ratification is a form of retroactive activity that occurs when the principal, having knowledge of the material facts, accepts the benefits of the agent's action already made on his behalf." *Precedo Cap. Grp. Inc. v. Twitter Inc.,* 33 F. Supp. 3d 245, 254 (S.D.N.Y. 2014).

 The FAC alleges that all Meteora members continue to receive transaction fees from the fraudulent launches through automatic distributions to DLL's program account. FAC ¶52 ("DLL automatically receives certain transaction fees from Meteora liquidity pools, which are

automatically transfer[red]' by 'Meteora software' to a 'program account controlled by DLL.'")

The continuous flow of millions of dollars in fees from the $M3M3 and $LIBRA frauds directly to accounts benefiting all Meteora members establishes ratification even if, *arguendo*, Chow had somehow exceeded his authority. The Complaint alleges that Meteora Defendants "conti[nue] to extract profits from their token launch fraud scheme" (FAC ¶323), and that these fees flow automatically through the technical infrastructure that Chow configured in his role as CEO. (FAC ¶324). No Meteora member has disgorged these ill-gotten gains or disavowed Defendant Chow's conduct.

Indeed, the post-scandal response confirms ratification. When the frauds became public, Ming Yeow—speaking with apparent authority for the organization—stated "I have accepted his resignation" and announced that "we will be looking for new leadership for Meteora." FAC ¶315. One does not "accept" a resignation from someone acting without authority, nor does one search for "new leadership" to replace an unauthorized actor. These statements confirm that Defendant Chow acted as Meteora's authorized agent throughout the relevant period.

Further, as alleged in the FAC, all Meteora Programs—including the Dynamic AMM, DLMM, and M3M3 Programs used to execute the fraudulent schemes—are governed by a 4-of-7 multisig wallet (the "Meteora Program MultiSig"). FAC ¶132. This MultiSig is "analogizable to a 7-member Board of Directors that requires a simple majority vote to pass measures." FAC ¶133. Critically, "[a]ny four of its seven members...can make virtually any change to any Meteora smart contract or Program deployed by authorizing an 'upgrade' transaction that replaces the Program's existing code with modified code." *Id.*

The FAC identifies some of the specific wallet addresses used by the Meteora Multisig Members in the fraudulent scheme. (FAC ¶134), including wallets controlled by Jupiter (FAC

¶135) and wallets used to deploy tokens and control multi-sigs for Meteora and Jupiter holdings (FAC ¶136). The FAC alleges, based on information and belief, that "all of the Members of the Meteora MultiSig are likewise controlled by Meteora through its members or close affiliates." FAC 137.

The technical reality of blockchain operations makes Meteora member's ratification even more absolute than in a traditional corporate structure. As alleged in the FAC, smart contracts on Solana can be "upgraded"—that is, their code can be completely replaced—only through the MultiSig's authorization. FAC ¶¶ 80-81. Every transaction, every fee distribution, every technical manipulation required to execute the fraudulent schemes required the MultiSig's approval or prior authorization through deployed code.

Indeed the FAC alleges that transaction fees "automatically transfer" to accounts controlled by DLL (FAC ¶52), that Defendant Chow continues to have "a claim on a portion of DLL's revenues, including a portion of any DLL revenues from trading fees received from Meteora user transactions" (FAC ¶324), and that all Meteora members benefit from these ongoing distributions (FAC ¶¶ 324-326), thus evincing Member ratification of the fraudulent actions.

The Meteora Defendants cannot credibly claim ignorance of or opposition to the fraudulent schemes when every technical capability used to execute those schemes required their collective authorization through the MultiSig. Either they actively participated in authorizing the fraudulent configurations, or they previously authorized Chow to act on their behalf—either way, liability attaches under New York law. The Meteora Defendants' attempt to hide behind the *Martin* Rule therefore fails.

### 2. Meteora is a "Person" Subject to Suit Under RICO

Under RICO, a "person" includes any "entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). While the Second Circuit in *United States v. Bonanno Organized Crime Family*, 879 F.2d 20, 29-30 (2d Cir. 1989), held that a non-commercial criminal enterprise could not be a RICO defendant, federal courts have since recognized that online commercial enterprises, like Decentralized Autonomous Organizations (DAO), can be treated as unincorporated associations with the capacity to be sued. *See, e.g., Commodity Futures Trading Commission v. Ooki DAO*, 2022 WL 17822445, at *4 (N.D. Cal. Dec. 20, 2022) (recognizing that Plaintiff was suing an entity, not a technology "as a litigation strategy [Plaintiff] is permitted to make, at least at the preliminary stage before the parties can litigate otherwise").

DLL argues that Defendant Meteora cannot hold property and thus is not a RICO "person" under *Bonanno*. This argument relies on a flawed analogy. Unlike the non-commercial organized crime family in *Bonanno*, Defendant Meteora is a for-profit business enterprise that generates revenue through transaction fees, which are automatically transferred to accounts beneficially controlled by its members and affiliates, such as DLL. (FAC   40). The enterprise controls crypto assets in various wallets and directs the flow of illicit proceeds, demonstrating its capability to hold beneficial interests in property. (FAC ¶¶ 278–292). The DAO cases, which DLL unsuccessfully tries to distinguish, are highly analogous: they involve groups of people running an association under a common name, using online channels, and intentionally structuring themselves to be opaque to evade jurisdiction.

Therefore, Defendant Meteora, as a for-profit business enterprise that controls and distributes assets, is an "entity capable of holding a... beneficial interest in property" and is a

"person" under RICO, making the holding in *Bonanno* inapplicable and the principles from modern cases addressing decentralized online organizations highly persuasive.

### E. The FAC Plausibly States Claims Against Defendant Meteora For Which Relief Can Be Granted

#### 1. The Complaint States Claims for Fraud and Conspiracy with Particularity Under Rule 9(b)

##### a. Defendants Made Numerous Material Misrepresentations and Omissions, Not "Puffery"

A statement is material if a reasonable investor would view it as significant in the "total mix" of available information. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000). While vague optimism or "puffery" is not actionable, specific, verifiable claims about a product's characteristics, safety, or backing are. Once a defendant chooses to speak on a topic, it assumes a duty to disclose all material information necessary to make its statements not misleading. *Meyer v. Jinkosolar Hldgs. Co.*, 761 F.3d 245, 250-51 (2d Cir. 2014).

DLL's characterization of Defendants' statements as mere "aspirational puffery" is misguided. The FAC alleges numerous concrete, false claims that a reasonable investor would find material. For the $LIBRA token, for example, the representation that Viva La Libertad was a real investment project with government affiliation was a factual claim designed to convey legitimacy, not a vague boast. (FAC ¶¶ 13, 251, 255, 364). For the $M3M3 token, there were a number of promises, *e.g.* of "$4.5 million in rewards already accumulated" and "$200,000 or more daily being paid out" which were specific, quantifiable representations about investment returns, not aspirational goals. (*see e.g.* FAC ¶¶ 170-176, 350-351). Furthermore, the representation of Meteora as a "fair and open marketplace" constituted a material omission, as Defendants failed to disclose the hidden "Freeze Authority" and other back-end controls used to rig the launches. (FAC ¶¶ 349, 353, 355–357).

19

The FAC pleads numerous specific, verifiable, and material misrepresentations and omissions that go far beyond mere puffery, satisfying the first element of fraud with the particularity required by Rule 9(b).

### b. The Complaint Pleads a Strong Inference of Scienter

Scienter can be established by alleging facts showing (1) motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness. *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). The use of tools to conceal illicit proceeds, such as cryptocurrency mixers, constitutes strong circumstantial evidence of Defendants' scienter.

The FAC alleges overwhelming evidence of scienter. Defendants had the clear motive of generating millions in illicit profits and the unique opportunity to do so through Chow's hidden control over the Meteora platform. (FAC ¶¶ 356, 366). The FAC details strong circumstantial evidence of conscious misbehavior, including the secret partnership agreement (FAC ¶¶ 163-165), the creation of confidential planning documents and channels (e.g., "M3M3 Calcs Template") (FAC ¶¶ 200-208, 401-403), the use of insider wallets and avoidance of fraud risk indicators (FAC ¶¶ 197, 216-220), the deliberate freezing/unfreezing of the liquidity pool (FAC ¶¶ 215–216), and Chow's own admission that he "enabled the guy." (FAC 313). Finally, Defendants' use of blockchain mixers and multiple wallets to obscure the path of their fraudulent proceeds serves as compelling evidence of their consciousness of guilt. (FAC ¶¶ 239-241).

The FAC further alleges that each Defendant had actual knowledge of the fraudulent scheme through participation in the Telegram group, collaborative document creation, planning calls with explicit discussion of deception, and execution of the secret partnership agreement. (FAC ¶¶ 372-375). On one planning call, Defendant Chow stated: "no one will play the game if

20

they see, like 90% of the supply already locked up," and when he explained to Defendant Hayden Davis that only about 5% would actually be available to the public, Hayden responded "agreed." (FAC ¶¶ 207–208). This is direct evidence of scienter—Defendants knew they needed to deceive investors about the true token allocation.

The FAC's detailed allegations of a premeditated scheme, admissions of wrongdoing, and active concealment of proceeds create a strong and cogent inference of fraudulent intent sufficient to satisfy the heightened pleading standards for fraud.

### c. Plaintiffs Plausibly Allege Justifiable Reliance and Loss Causation

Loss causation requires pleading that the loss was a foreseeable result "caused by the materialization of the risk concealed by the fraudulent statement." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).

DLL incorrectly argues that Plaintiffs' losses were caused by independent market manipulation, not by any statements from Defendant Meteora. This argument is fatally flawed because the Meteora association and its platform were the instruments of manipulation. Plaintiffs Hurlock and Mehta purchased the tokens in direct reliance on the fraudulent hype—the Milei endorsement for $LIBRA and the promises of a fair, stable launch for $M3M3. (FAC ¶¶ 37-38, 359, 367). The losses were not caused by random market volatility; they were the direct and foreseeable result of Defendants executing their pre-planned scheme. The price of $M3M3 collapsed because insiders dumped their 95% stake. FAC ¶ 226. The price of $LIBRA collapsed because Defendants executed the rug pull and drained the liquidity. (FAC ¶¶ 278-292). The concealed risk—that the entire system was rigged—was precisely the risk that materialized and caused the loss.

The FAC directly links Plaintiffs' injuries to the fraudulent scheme: As a direct and

proximate result of their reasonable reliance on Defendants' material misrepresentations, Plaintiffs and Class members suffered damages including: (i) purchasing tokens at artificially inflated prices that collapsed within hours or days; (ii) losses from Defendants' sophisticated capital extraction scheme that systematically drained liquidity from the pools; (iii) transaction fees on manipulated trading; and (iv) the complete or near-complete loss of investment value when the tokens collapsed after the schemes were executed. (FAC ¶¶ 360, 368).

The FAC directly and plausibly links Plaintiffs' financial losses to the fraudulent scheme orchestrated and executed by the Meteora association, thereby satisfying the elements of both reliance and loss causation.

### 2. The Complaint Plausibly States Claims for RICO Violations (18 U.S.C. §§ 1962(c) & (d))

The FAC alleges a pattern of racketeering activity comprising thousands of predicate acts of wire fraud. (FAC ¶¶ 387-393). These acts include: (i) Publishing thousands of false and misleading online promotions about Meteora, M3M3, and LIBRA; (ii) Executing blockchain transactions to transfer the Kelsier Defendants' $2 million "pay to play" investment; (iii) Executing blockchain transactions to apply that investment to fund the artificial price inflation scheme for $M3M3; (iv) Executing blockchain transactions to mint, launch, and illicitly snipe $M3M3; (v) Executing blockchain transactions to mint, configure, and launch $LIBRA; (vi) Executing blockchain transactions to extract liquidity from the LIBRA Launch Pool; (vii) Continuing to execute blockchain transactions that route trading fees from fraudulently launched tokens through Meteora protocols to accounts controlled by Defendants. FAC ¶ 388). Each of these uses of the wires constitutes a separate instance of wire fraud under 18 U.S.C. § 1343 and is thus a RICO predicate act. (FAC ¶ 391).

The scheme operated from October 2024 through at least February 2025, encompassing

two distinct fraudulent token launches affecting numerous investors and involving multiple steps and predicate acts within each launch. This satisfies both closed-ended continuity (repeated conduct over months) and open-ended continuity (the enterprise's nature as a repeatable "fraud factory" with a clear threat of future repetition). The FAC alleges that Defendants' pattern of racketeering activity is continuing and poses a threat of long-term illegality due to the complexity and scope of the fraudulent scheme. (FAC ¶¶ 389, 395).

For closed-ended continuity, the FAC alleges that the enterprise operated from at least October 2024 through filing of the complaint, executing multiple complex fraudulent schemes that affected thousands of victims and extracted millions of dollars. (FAC ¶¶ 163, 264, 389, 395). While the Second Circuit often looks for periods exceeding two years, "there is no bright-line rule" and courts consider factors such as the number and variety of predicate acts, the number of victims, the presence of separate schemes, and the complexity of the fraud. *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183-85 (2d Cir. 2008). The fraud here as alleged in the FAC was not a "one-shot deal" but rather involved two separate, complex schemes affecting hundreds of thousands of potential victims. The schemes required months of planning, sophisticated technical implementation, and coordinated execution by multiple participants. This level of complexity and the repeated nature of the fraud support a finding of closed-ended continuity even within a period of less than two years. *See United States v. Minicone*, 960 F.2d 1099, 1106-07 (2d Cir. 1992) (finding continuity where scheme was "inherently unlawful" and involved "ongoing fraudulent activity").

In addition, open-ended continuity is established by showing conduct "that by its nature projects into the future with a threat of repetition," such as when the predicate acts are part of the defendant's "regular way of doing business." *Reich v. Lopez*, 858 F.3d 55, 60 (2d Cir. 2017). The

Kelsier Defendants' argument that their scheme was "inherently terminable" is flatly contradicted by the allegations and their own admissions. This was not an ad hoc group formed for a single transaction; it was a 'fraud factory' with a repeatable business model. (FAC ¶384). This allegation is substantiated by Defendant Chow's own admission that he had collaborated with Davis on multiple token launches using Meteora's system, confirming that the conduct extended beyond the two schemes detailed in the FAC. (FAC   313).

Further, Defendant Chow admitted to referring a "handful of other projects" to the Kelsier Defendants, indicating a continuous pipeline of potential future schemes. (FAC ¶319). The very nature of the enterprise as alleged in the FAC—combining a financial and promotional arm (Kelsier) with a technical platform (Meteora)—is built for repetition. The infrastructure for fraud remains in place, and the participants' admissions confirm their intent to use it repeatedly. This establishes a clear and present threat of future criminal conduct that easily satisfies the test for open-ended continuity. *See Kehr Packages, Inc. v. Fidelcor, Inc*., 926 F.2d 1406, 1413 (3d Cir. 1991) (finding that "a single fraudulent scheme can give rise to RICO liability, when that scheme is short-lived and directed at a limited number of people, [insofar as there is] some further indication that the defendant's fraudulent activities are likely to continue").

Further, the FAC alleges an association-in-fact enterprise—the "Meteora-Kelsier Enterprise"—with: (i) a common purpose (defrauding investors); (ii) ongoing relationships (evidenced by the secret partnership agreement entered in October 2024, private Telegram chats, shared confidential planning documents, and joint strategy calls); and (iii) a durable structure (a clear division of labor between technical execution by Meteora/Chow and marketing/capital provision by Kelsier/the Davises). (FAC ¶¶ 378-386). The enterprise operates through a defined hierarchy with distinct roles: Defendant Chow and the Meteora Defendants control the

underlying blockchain programs through the 4-of-7 Meteora Program MultiSig, enabling them to modify, upgrade, and manipulate the smart contracts that govern all transactions, while the Kelsier Defendants provide funding for manipulation schemes and coordinate high-profile promotional campaigns, including procuring celebrity and government endorsements. (FAC ¶¶ 381-382). This enterprise is distinct from the pattern of racketeering, as it is the ongoing organization that committed the predicate acts..

The Meteora association, through its leader Chow, was not a mere service provider; it was central to directing the enterprise. Defendant Chow designed the fraudulent architecture, controlled the "Freeze Authority," created the financial models for the extraction scheme ("M3M3 Calcs Template"), and provided the technical instructions for the fraud. (FAC ¶¶ 200-208, 210, 381-386, 402-403). The FAC details how Chow participated in the private Telegram group coordinating the $M3M3 launch, engaged in planning calls where he explained the technical mechanics of fraud to the Davis Defendants, and created sophisticated planning documents. This conduct falls squarely within the "operation or management" test established in *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993).

The secret partnership agreement entered in October 2024, the private Telegram chats, the shared planning documents (including the "M3M3 Calcs Template" created by Chow and the "M3M3 Token Launch Organizer" created by Charles Thomas Davis), and the perfectly synchronized execution of the fraudulent token launches all create a powerful and plausible inference of an agreement among all Defendants to violate RICO. The FAC alleges: "As part of, and to further, their conspiracy, the Meteora and Kelsier Defendants agreed to commit and conspired in the commission of the thousands of predicate acts described above, each with knowledge that those acts were taken in furtherance of a fraudulent scheme and a pattern of

racketeering activity." (FAC   399).

### 3. The Complaint Plausibly States Claims Under N.Y. GBL §§ 349 & 350 and for Unjust Enrichment

#### a. GBL Claims

The fraudulent token launches were quintessentially "consumer-oriented" conduct, as they were marketed broadly to the public via social media and other online channels. The tokens were advertised to the general public using social media blasts, Discord group messages, Telegram channels, and promotional websites—classic mass-market solicitation to retail investors. (FAC ¶¶ 408-416, 422-431). The misrepresentations about governmental backing (the claim that $LIBRA had President Milei's endorsement and support), project legitimacy (the fabricated "Viva La Libertad Project"), and platform fairness (concealing the "Freeze Authority" and insider control mechanisms) were "materially misleading" to a reasonable consumer. A reasonable consumer reading that the token was backed by a legitimate project, had governmental endorsement, and was launched on a fair and transparent platform would be misled about essential characteristics of the investment opportunity.

Plaintiffs suffered actual, quantifiable financial injury as a direct result of this deceptive conduct. Plaintiff Mehta suffered approximate net losses of $19,164 on his $M3M3 investment. (FAC ¶37). Plaintiff Hurlock lost 0.132 wSOL on his Wallet 1 $LIBRA investment and approximately 0.17 wSOL on his Wallet 2 $LIBRA investment, all within hours of purchase. (FAC ¶38). These are out-of-pocket losses—Plaintiffs paid money for tokens and ended up with tokens worth far less than what they paid because of Defendants' conduct. The causal link is straightforward: if Defendants had not engaged in the deceptive promotional campaign, Plaintiffs would not have purchased the tokens at the inflated prices. Without the false representations and concealed extraction plans, the tokens would not have collapsed in value so precipitously. This

satisfies the elements of N.Y. General Business Law §§ 349 and 350.

### b. Unjust Enrichment

Defendants were enriched at Plaintiffs' expense through their fraudulent scheme. The FAC alleges that "Defendants directly profited from the misconduct alleged herein, as it enabled them to sell $M3M3 at artificially inflated market prices, [and to receive excessive transaction fees from Meteora protocols], causing significant losses to Plaintiff Mehta and other members of the $M3M3 Subclass." (FAC ¶434). Similarly, for $LIBRA, "Defendants directly profited from the misconduct alleged herein, as it enabled them to sell $LIBRA at artificially inflated market prices, [and to receive excessive transaction fees from Meteora protocols], causing significant losses to Plaintiff Hurlock and other members of the $LIBRA Subclass." (FAC ¶440). The FAC details how Defendants extracted millions of dollars in investor funds through their manipulative practices—over 13 million USDC in 107 minutes through LIBRA Wallet 1, over 44 million USDC through the USDC Intermediary Wallets, and over 250,000 SOL through the SOL Intermediary Wallets. (FAC ¶¶ 279, 281, 283). It is against equity and good conscience to permit Defendants to retain these ill-gotten gains obtained through fraud and manipulation, and a claim for unjust enrichment is therefore properly pleaded.

Further, Rule 8(d)(2) expressly permits a party to set out two or more statements of a claim alternatively, and courts routinely allow unjust enrichment claims to proceed alongside tort claims at the pleading stage. Dismissal for duplication is premature when the viability of the primary claims has not yet been adjudicated. *See Henry v. Daytop Village, Inc*., 42 F.3d 89, 95 (2d Cir. 1994).

## IV. CONCLUSION

For all the foregoing reasons, DLL's motion is a procedurally improper and substantively

baseless attempt by a non-party to shield the Meteora association from accountability for its role in a massive fraud. The motion should be denied because: (1) DLL lacks standing as a non-party to litigate on behalf of Meteora; (2) Meteora is an unincorporated association or partnership with capacity to be sued under both New York law and federal law; (3) DLL's technical defenses fail because Plaintiffs have adequately alleged authorization and ratification under the *Martin* rule and Meteora qualifies as a RICO "person"; and (4) the FAC plausibly states all claims with the required particularity, alleging material misrepresentations, scienter, reliance, causation, a RICO enterprise and pattern, and consumer-oriented deceptive conduct.

The FAC pleads with sufficient detail a coordinated fraudulent enterprise that operated through the Meteora association, executed two massive token frauds causing millions in losses, and engaged in systematic racketeering activity.

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the DLL's motion to dismiss in its entirety and allow this case to proceed on the merits.

In the alternative, should the Court be inclined to grant DLL's motion to dismiss, Plaintiffs respectfully request that such dismissal be granted with leave to amend, in order to allow Plaintiffs the opportunity to cure pleading deficiencies, if any.

Dated: October 28, 2025
New York, New York

Respectfully submitted,

**BURWICK LAW, PLLC**

By: */s/ Max Burwick*
Max Burwick
1 World Trade Center, *84th Fl.*
New York, NY 10007
(646) 762-1080
max@burwick.law

28

Luis Muñoz de la Vega
1 World Trade Center, 84th Fl.
New York, NY 10007
(646) 762-1080
luis@burwick.law

*Counsel for Plaintiffs Omar*
*Hurlock  & Anuj Mehta*

## WORD COUNT CERTIFICATION

I certify that the foregoing opposition to motion to dismiss contains 7903 words, as

determined by the word-count function of Microsoft Word, and complies with the word-limit

requirements in the Individual Rules and Practices of Judge Jennifer L. Rochon.