# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

OMAR HURLOCK and ANUJ MEHTA, *on behalf of himself and all others similarly situated,*

Plaintiffs,

v.

KELSIER LABS, LLC d/b/a KELSIER VENTURES, HAYDEN MARK DAVIS, GIDEON DAVIS, CHARLES THOMAS DAVIS, METEORA, *an unincorporated association*, and BENJAMIN CHOW,

Defendants.

**Case No.: 1:25-cv-03891-JLR**

Hon. Jennifer L. Rochon

**PLAINTIFFS' OPPOSITION TO THE MOTION TO DISMISS FILED BY DEFENDANTS KELSIER LABS, LLC, HAYDEN MARK DAVIS, GIDEON DAVIS, AND CHARLES THOMAS DAVIS PURSUANT TO F.R.C.P. 12(B)(2) AND 12(B)(6)**

## **TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT .................................................................................. 8

II. FACTUAL BACKGROUND .................................................................................. 9

   A.  THE KELSIER-METEORA ENTERPRISE: A PARTNERSHIP FOR FRAUD .............. 9

   B.  THE KELSIER DEFENDANTS' MANAGERIAL ROLE IN THE $M3M3 SCHEME .. 10

   C.  THE KELSIER DEFENDANTS' ESCALATION OF THE FRAUD WITH $LIBRA ..... 11

III. ARGUMENT ...................................................................................................... 12

   A.  LEGAL STANDARD ........................................................................................ 12

   B.  PLAINTIFFS SATISFY RULE 9(b)'S HEIGHTENED PLEADING STANDARD
      WITH OVERWHELMING PARTICULARITY AS TO THE KELSIER AND
      DAVIS DEFENDANTS ....................................................................................13

      1. The FAC Details Each Kelsier Defendant's Specific Role, Defeating Their "Group
         Pleading" Defense ....................................................................................14

      2. The Kelsier Defendants' Misrepresentations Were Material Factual Claims,
         Not Immaterial "Puffery." .......................................................................... 16

      3. The Complaint Pleads a Strong Inference of the Kelsier Defendants'
         Scienter ....................................................................................................17

   C.  PLAINTIFFS HAVE RICO STANDING BASED ON DIRECT INJURY
      PROXIMATELY CAUSED BY THE KELSIER/DAVIS RACKETEERING
      SCHEME ........................................................................................................ 19

      1. Plaintiffs Suffered a Concrete, Out-of-Pocket Financial Loss, a Classic Injury to
         Property ................................................................................................... 20

      2. The Injury Was Proximately Caused "By Reason Of" the Kelsier Defendants-Led
         Scheme, Not Intervening Forces. ............................................................... 20

   D.  THE FAC PLAUSIBLY ALLEGES A "PATTERN OF RACKETEERING
      ACTIVITY" .....................................................................................................22

      1. The $M3M3 and $LIBRA Frauds Are "Related" Predicates Constituting a
         Cohesive "Playbook." ............................................................................... 22

      2. The Scheme Demonstrates Closed-Ended and Open-Ended Continuity ....................23

   E.  THE COMPLAINT PLAUSIBLY ALLEGES A RICO "ENTERPRISE" AND
      EACH KELSIER DEFENDANT'S PARTICIPATION IN ITS
      MANAGEMENT ..............................................................................................25

      1. The Kelsier-Meteora Association Is a Cohesive Enterprise with a Common
         Fraudulent Purpose, Structure, and Longevity. ..............................................26

      2. Each Kelsier Defendant Participated in the "Operation or Management" of
         the Enterprise ........................................................................................... 27

   F.  THE CONSPIRACY CLAIMS ARE SUFFICIENT BECAUSE THE
      UNDERLYING RICO AND FRAUD CLAIMS ARE WELL-PLEADED ..................... 28

   G.  PLAINTIFFS' STATE-LAW CLAIMS ARE SUFFICIENTLY PLEADED .................... 29

1. The New York General Business Law Claims Are Valid..................................................30

2. The Unjust Enrichment Claims Are Properly Pleaded in the Alternative.....................31

H. THIS COURT HAS PERSONAL JURISDICTION OVER THE KELSIER

DEFENDANTS...........................................................................................................32

1.  Jurisdiction Is Proper Under New York's Long-Arm Statute via the Conspiracy

Theory of Jurisdiction. ...........................................................................................32

2. Exercising Jurisdiction Comports with Due Process.....................................................33

IV. CONCLUSION.............................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alexander & Alexander of N.Y., Inc. v. Fritzen,*
    68 N.Y.2d 968 (1986) ..................................................................28

*Ashcroft v. Iqbal,*
    556 U.S. 662 .................................................................... 12

*Baisch v. Gallina,*
    346 F.3d 366 (2d Cir. 2003) ................................................. 20

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ...........................................................12

*Boyle v. United States,*
    556 U.S. 938 (2009) .......................................................... 26

*Bridge v. Phoenix Bond & Indem. Co.,*
    553 U.S. 639 (2008) .......................................................... 22

*Burger King Corp. v. Rudzewicz,*
    471 U.S. 462 (1985) .......................................................... 33

*Charles Schwab Corp. v. Bank of Am. Corp.,*
    883 F.3d 68 (2d Cir. 2018) ................................................. 33

*Corsello v. Verizon N.Y., Inc.,*
    18 N.Y.3d 777 (2012) ........................................................ 31

*DiVittorio v. Equidyne Extractive Indus., Inc.,*
    822 F.2d 1242 (2d Cir. 1987) ....................................... 13, 14

*ECA, Loc. 134 IBEW Joint Pension Tr. v. JPMorgan Chase Co.,*
    553 F.3d 187 (2d Cir. 2009) ............................................... 18

*First Cap. Asset Mgmt. v. Satinwood, Inc.,*
    385 F.3d 159 (2d Cir. 2004) ............................................... 28

*First Nationwide Bank v. Gelt Funding,*
    27 F.3d 763 (2d Cir. 1994) ................................................. 20

*Ganino v. Citizens Utils. Co.,*
    228 F.3d 154 (2d Cir. 2000) ............................................... 16

*Goshen v. Mut. Life Ins. Co. of N.Y.*,
    98 N.Y.2d 314 (2002) ................................................................. 30

*H.J. Inc. v. Nw. Bell Tel. Co.*,
    492 U.S. 229 (1989) ............................................................. 22, 23

*Henry v. Daytop Village, Inc.*,
    42 F.3d 89 (2d Cir. 1994) ......................................................... 32

*Holmes v. SIPC*,
    503 U.S. 258 (1992) ................................................................. 20

*In re Firestar Diamond, Inc.*,
    654 B.R. 836 (Bankr. S.D.N.Y. 2023) ......................................... 29

*In re Vivendi Universal, S.A. Sec. Litig.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003) .......................................... 18

*International Shoe Co. v. Washington*,
    326 U.S. 310 (1945) ................................................................. 34

*Kashi v. Gratsos*,
    790 F.2d 1050 (2d Cir. 1986) ..................................................... 29

*Kehr Packages, Inc. v. Fidelcor, Inc.*,
    926 F.2d 1406 (3d Cir. 1991) ..................................................... 25

*McLaughlin v. Am. Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008) ...................................................... 20

*Meyer v. Jinkosolar Holding Co.*,
    761 F.3d 245 (2d Cir. 2014) ...................................................... 16

*Moore v. PaineWebber, Inc.*,
    189 F.3d 165 (2d Cir. 1999) ...................................................... 17

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ................................................. 16, 17

*Reich v. Lopez*,
    858 F.3d 55 (2d Cir. 2017) ........................................................ 24

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993) ................................................................. 27

*Salinas v. United States,*
    522 U.S. 52 (1997) .......................................................................................................28, 29

*SEC v. Terraform Labs Pte Ltd.,*
    708 F. Supp. 3d 450 (S.D.N.Y. 2023) ....................................................................... 19

*Shields v. Citytrust Bancorp, Inc.,*
    25 F.3d 1124 (2d Cir. 1994) ....................................................................................... 18

*Small v. Lorillard Tobacco Co.,*
    94 N.Y.2d 43 (1999) .................................................................................................... 31

*Spool v. World Child Int'l Adoption Agency,*
    520 F.3d 178 (2d Cir. 2008) .......................................................................................24

*Stutman v. Chem. Bank,*
    95 N.Y.2d 24 (2000) .................................................................................................... 31

*United States v. Indelicato,*
    865 F.2d 1370 (2d Cir. 1989) ..................................................................................... 23

**Statutes**

18 U.S.C. § 1961 (RICO) ................................................................................................ *passim*

18 U.S.C. § 1962(c) ........................................................................................................ 26

18 U.S.C. § 1962(d) ........................................................................................................ 28

18 U.S.C. § 1964(c) ........................................................................................................ 20

N.Y. Gen. Bus. Law § 349 ........................................................................................29, 30, 31

N.Y. Gen. Bus. Law § 350 ........................................................................................29, 30, 31

N.Y. C.P.L.R. § 302 .......................................................................................................32

**Rules**

Fed. R. Civ. P. 8(d)(2) .................................................................................................. 31

Fed. R. Civ. P. 9(b) ........................................................................................................ *passim*

Fed. R. Civ. P. 12(b)(2) ................................................................................................32

Fed. R. Civ. P. 12(b)(6) ................................................................................................ *passim*

Fed. R. Civ. P. 4(k)(2) ........................................................................................................ 34, 35

## I.    PRELIMINARY STATEMENT

This case is not, as Defendants Kelsier Labs, LLC, Hayden Mark Davis, Gideon Davis, and Charles Thomas Davis (collectively, the "Kelsier Defendants") contend, about two "completely unrelated alleged schemes." (*See* Defs.' MTD at 1)[1]. It is about a single, cohesive, and fraudulent enterprise—a "fraud factory"—architected and managed by the Kelsier Defendants, who provided the capital, the promotional machinery, and the strategic direction to execute a repeatable playbook for defrauding cryptocurrency investors. Their motion to dismiss is a calculated attempt to fragment this unified scheme, disavow their managerial role, and hide behind their co-conspirator, Defendant Benjamin Chow ("Defendant Chow").

In the fall of 2024, the Kelsier Defendants formed a clandestine partnership with Defendant Chow to leverage his Meteora platform as the technical engine for their schemes. (FAC ¶163). They invested $2 million as "pay-to-play" funding, meticulously planned the extraction of investor capital in shared, confidential documents, and deployed a network of approximately 150 insider wallets to seize control of nearly the entire token supply while locking the investing public out of the market. (FAC ¶¶ 164, 197, 209–226). This was not a legitimate business venture; it was a conspiracy to rig a market from its inception.

Their playbook was simple and cynical: manufacture hype through deceptive promotions, secretly control the market mechanics, and then execute a coordinated dump or a "rug pull" to extract millions of dollars at the direct expense of ordinary investors. They first executed this playbook with the $M3M3 token in December 2024. Emboldened by their success, they escalated the fraud just two months later with the $LIBRA token, this time fabricating a

---

[1]Defendants Hayden Mark Davis, Charles Thomas Davis, Gideon Davis, and Kelsier Labs LLC d/b/a Kelsier Ventures filed a consolidated motion to dismiss. *See* ECF Nos. 170–73. References to "Defs.' MTD" cite the Consolidated Memorandum of Law in Support of the Motions to Dismiss, ECF No. 174, using the brief's internal page numbers.

government endorsement from the President of Argentina to lure a new wave of victims into their trap. (FAC ¶¶ 242-251, 253-263). These were not market failures; they were engineered thefts.

The Kelsier Defendants' motion to dismiss is predicated on a self-serving and factually bankrupt narrative. They feign ignorance of their own planning documents, dismiss their specific and highly material misrepresentations as mere "puffery," and advance the absurd argument that the very investors they targeted were not directly harmed by their scheme. (*See e.g.* Defs.' MTD at 18–19). They attempt to distance themselves from their own actions by erroneously claiming the FAC engages in "group pleading," a charge that dissipates upon any good-faith reading of the FAC's detailed allegations outlining each individual Defendant's central role in the enterprise. (Defs.' MTD at 14–16). This Court should reject this transparent attempt to evade accountability.

The FAC pleads with sufficient particularity how the Kelsier Defendants operated at the heart of this criminal enterprise, directing its affairs and profiting from its illicit activities. For the reasons set forth herein, the Kelsier Defendants' motion to dismiss should be denied in its entirety.

## I.    FACTUAL BACKGROUND

### A.  THE KELSIER-METEORA ENTERPRISE: A PARTNERSHIP FOR FRAUD

The fraudulent schemes at the center of this litigation were born from a formal, secret partnership established in October 2024 between the Kelsier Defendants and Defendant Chow's Meteora platform. The explicit purpose of this alliance was to combine Kelsier's capital and promotional power with Meteora's technical infrastructure to launch and manipulate cryptocurrency tokens for guaranteed insider profit. The FAC alleges that Kelsier Labs committed approximately $2 million in "pay-to-play" investment capital, which was not a

passive investment but the seed funding required to execute the fraudulent launches. (FAC ¶164). A core component of their agreement was the mutual decision to conceal the partnership from the public, a necessary deception to maintain the false appearance of organic, community-driven projects that were, in reality, centrally controlled and manipulated. (FAC ¶¶ 163, 191, 193.)

This was not a loose or informal arrangement. The enterprise coordinated its illicit activities with precision through private Telegram chats and the collaborative creation of confidential planning documents. Every member of the Kelsier entity—Hayden, Gideon, and Charles Thomas Davis—was, along with Defendant Chow, "intimately involved in designing and implementing the plan from the start." (FAC ¶200). Their shared goal was unambiguous: to engineer token launches that appeared legitimate to the public while exploiting hidden, backend control over the Meteora platform to extract investor funds. (FAC ¶¶ 3, 5, 193).

## B. THE KELSIER DEFENDANTS' MANAGERIAL ROLE IN THE $M3M3 SCHEME

The FAC provides detailed allegations of the Kelsier Defendants' managerial and operational control over the $M3M3 fraud. They were not merely investors; they were the strategic planners and financiers of the scheme. The FAC alleges that Defendant Charles Thomas Davis created the "M3M3 Token Launch Organizer," a shared planning document that served as a blueprint for the fraud, detailing the mechanics of the launch and the subsequent extraction of capital.  (FAC ¶206). This document evidences a level of detailed, operational planning that is irreconcilable with the image of a passive, uninvolved party.

Furthermore, the FAC alleges that Defendant Hayden Davis actively participated in strategic planning calls where the deceptive nature of the launch was explicitly discussed. In a particularly damning exchange, Defendant Chow explained the need to conceal the insiders'

overwhelming control of the token supply, stating, "no one will play the game if they see, like 90% of the supply already locked up." Hayden Davis's response—"agreed"—is a direct admission of his knowing participation in and consent to the deceptive strategy at the heart of the fraud. (FAC   207).

Kelsier Labs, as the enterprise's financial engine, funded the network of approximately 150 "Insider Wallets." These wallets were used to execute the core of the $M3M3 manipulation: the secret acquisition of 95% of the token supply at a floor price while public trading was covertly frozen by Defendant Chow. (FAC ¶¶ 193, 196–198, 209–226). Once the public was allowed to trade, the engineered scarcity created a massive price surge, at which point the Kelsier Defendants and their co-conspirators began dumping their massive holdings onto the market. The resulting price collapse of over 90% directly and catastrophically harmed unsuspecting investors, including Plaintiff Anuj Mehta. (FAC ¶¶ 223-226, 37).

## C.  THE KELSIER DEFENDANTS' ESCALATION OF THE FRAUD WITH $LIBRA

Having successfully executed their playbook with $M3M3, the Kelsier Defendants escalated their fraudulent activities two months later with the $LIBRA token. Defendant Hayden Davis personally orchestrated the fraudulent promotional campaign for $LIBRA. He cultivated a relationship with the President of Argentina, Javier Milei, and leveraged that connection to manufacture the false narrative that $LIBRA was Argentina's coin, a project supposedly backed by the Argentine government. (FAC ¶¶ 242-264). This was a deliberate and material falsehood designed to confer legitimacy on a worthless token.

Kelsier Labs, the corporate entity, actively amplified this deception. The firm reposted a tweet from President Milei and added its own commentary, falsely claiming that they were "proud to advise @JMilei on executing this goal in Argentina." (FAC ¶251). This was not mere

"puffery"; it was a specific and false claim of a professional, advisory relationship with a head of state, calculated to induce investor reliance. The fraudulent scheme worked as intended, generating a massive wave of hype that lured-in countless investors, including Plaintiff Hurlock, who purchased $LIBRA tokens under the mistaken belief that he was investing in a legitimate, government-backed project. (FAC   38).

Immediately following the launch, the Kelsier Defendants and their co-conspirators executed a classic 'rug pull.' They used their control over the platform's liquidity pools to systematically siphon millions of dollars in investor deposits, draining the pools of all valuable assets and leaving behind the now-worthless $LIBRA tokens. (FAC ¶¶ 278-292). In the aftermath of the collapse, Hayden Davis publicly admitted his central, managerial role in the scheme, stating in an interview that he had been "in control of $LIBRA's liquidity." (FAC ¶309). Similarly, Defendant Chow admits to collaborating with Hayden Davis to establish the framework for multiple token launches. (FAC ¶313). These admissions corroborate the FAC's allegations of an ongoing, repeatable pattern of racketeering activity directed by the Kelsier Defendants.

## III. ARGUMENT

### A.    LEGAL STANDARD

The legal standards governing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) are well-established and weigh heavily against dismissal in the present case. The Court must "accept all factual allegations as true" and "draw all reasonable inferences in the plaintiff's favor." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). To survive a motion to dismiss, the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at

678 (quoting *Twombly*, 550 U.S. at 570). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*

Federal Rule of Civil Procedure 9(b) requires that allegations of fraud be pleaded with particularity, specifying "the time, place, and content of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993). Where multiple defendants are involved, "the complaint should inform each defendant of the nature of his alleged participation in the fraud." *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).

As demonstrated below, the FAC far exceeds these pleading standards with respect to every claim asserted against the Kelsier Defendants. The FAC provides extensive factual detail about their personal involvement in creating, planning, and executing a sophisticated fraudulent scheme. These are not conclusory allegations or legal conclusions masquerading as facts—they are specific, particularized allegations of misconduct that more than satisfy the applicable pleading standards.

### B. PLAINTIFFS SATISFY RULE 9(b)'S HEIGHTENED PLEADING STANDARD WITH OVERWHELMING PARTICULARITY AS TO THE KELSIER AND DAVIS DEFENDANTS

The Kelsier Defendants' motion to dismiss argues that the FAC fails to meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b), asserting that the allegations are impermissibly "group-pleaded," that any attributed statements constitute immaterial "puffery," and that the Complaint fails to allege scienter. (*See e.g.* Defs.' MTD at 14–16). These arguments fundamentally mischaracterize the specificity and depth of the FAC. Far from engaging in "puzzle pleading," the FAC provides a detailed and methodical account of

a multi-actor conspiracy, carefully delineating the specific role each Kelsier Defendant played in the conception, financing, and execution of the fraudulent schemes. (*See* Defs.' MTD 12).

### 1. The FAC Details Each Kelsier Defendant's Specific Role, Defeating Their "Group Pleading" Defense.

The purpose of Rule 9(b)'s particularity requirement is to provide defendants with fair notice of the fraudulent conduct with which they are charged, enabling them to prepare a defense. The standard is met where a complaint specifies the fraudulent scheme and makes clear each defendant's particular role in that scheme. *See DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987) (Rule 9(b) satisfied where complaint alleges "the nature of the alleged fraud with sufficient particularity to permit defendants to prepare an adequate answer to the allegations").

The Kelsier Defendants' contention that the FAC's allegations constitute "group pleading" is a transparent attempt to obscure the granular detail with which their individual misconduct is alleged. (*See* Defs.' MTD at 14–16). The FAC provides each of them with more than sufficient notice of the allegations.

In the FAC, Defendant Hayden Mark Davis is pleaded as the public-facing leader and chief promoter of the enterprise. His specific acts include: cultivating the relationship with Argentine President Javier Milei to create a false narrative of government backing for $LIBRA (FAC ¶¶ 242-251); posting photographs and other content on social media to amplify this false affiliation (FAC ¶249); participating directly in planning calls for the $M3M3 launch where he explicitly "agreed" to a strategy of deceiving investors about the true token allocation (FAC ¶207); and, in a post-collapse admission, stating that he was in "control of $LIBRA's liquidity" (FAC ¶309). These are specific actions, attributed to a specific individual, that were central to the fraud.

Defendant Charles Thomas Davis is pleaded in the FAC as a key operational planner within the enterprise. His role is specified by his creation of the "M3M3 Token Launch Organizer," a confidential shared document that served as a detailed blueprint for the execution of the $M3M3 fraud. (FAC ¶206). Attributing the authorship of a core planning document to a specific defendant is the essence of particularity; it identifies him as an architect of the scheme, not an undifferentiated member of a "group."

Defendant Gideon Davis, as a founder and the Chief Operating Officer of Kelsier Labs, is pleaded in the FAC as being directly involved in the formation and financing of the enterprise. His participation is specified through his role in operations and the decision to commit the $2 million in "pay-to-play" capital that was essential to funding the fraudulent operations. (FAC ¶¶ 163-164). This was not a passive investment but an active, foundational step in launching the criminal enterprise.

In the FAC, Defendant Kelsier Labs, LLC is pleaded as the corporate vehicle and financial engine of the fraud. Its specific role is detailed through its actions: providing the approximately $2 million in funding that initiated the partnership (FAC ¶164); supplying the capital for the approximately 150 insider wallets used to corner the $M3M3 market (FAC ¶197); and serving as the entity through which the fraudulent promotional campaigns, such as the claim of advising President Milei, were managed and disseminated (FAC   251).

The FAC thus provides a granular breakdown of each Kelsier/Davis Defendant's distinct and complementary contribution to the enterprise—from strategic planning (Charles) and public promotion (Hayden) to financing and corporate structuring (Gideon and Kelsier Labs). This is the antithesis of impermissible group pleading. It is a detailed account of a coordinated, multi-actor fraud that fully satisfies the notice requirements of *DiVittorio* and Rule 9(b).

### 2. The Kelsier Defendants' Misrepresentations Were Material Factual Claims, Not Immaterial "Puffery."

The Kelsier Defendants' attempt to dismiss their false statements as immaterial "puffery" defies both law and logic. (Defs.' MTD at 17–19). A statement is material if a reasonable investor would view it as significant in altering the "total mix" of available information. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000). Vague, optimistic statements of opinion may constitute puffery, but specific, verifiable claims about affiliations, endorsements, or investment returns do not. *See Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000).

The statements and omissions attributed to the Kelsier Defendants fall squarely into the category of material factual claims. With respect to the $LIBRA launch, the Kelsier Defendants orchestrated a narrative that the token was "Argentina's coin" and that they were advising President Milei. Kelsier Labs' public tweet stating it was "proud to advise @JMilei on executing this goal in Argentina" is a specific, factual claim of a professional advisory relationship with a head of state. (FAC ¶251). This is not a vague boast about being "the best"; it is a concrete assertion designed to convey credibility, official state sanction, and reduced risk.

For any reasonable investor, particularly in the volatile cryptocurrency market, the suggestion of sovereign backing is profoundly material. As the Second Circuit recognized in *Meyer v. Jinkosolar Holding Co.*, having chosen to speak about compliance measures, an issuer has "a duty to tell the whole truth"—omitting contemporaneous serious violations renders statements misleading. 761 F.3d 245, 250-52 (2d Cir. 2014). Here, claims that the funds would be going to Argentinian non-profits were demonstrably false. FAC ¶¶364-366.

Similarly, for the $M3M3 launch, the Defendants made specific, quantifiable representations about the token's "stake-to-earn" mechanism. They publicly claimed "Over $4.5 million in rewards already accumulated" and "$200,000 or more daily being paid out to top

stakers." (FAC ¶¶ 187, 355). These are not aspirational statements; they are hard numbers presented as facts about investment returns. Such specific, numerical claims about performance are precisely the type of information a reasonable investor would rely upon and are therefore material. *See Moore v. PaineWebber, Inc*., 189 F.3d 165, 170-73 (2d Cir. 1999) (misstatements misdescribed the economic value of the bargain, supporting materiality).

The Kelsier Defendants' argument that their statements should be discounted because memecoins are inherently speculative is a red herring. The fact that an asset class is risky does not grant issuers a license to lie. To the contrary, in a market characterized by high risk and information asymmetry, specific claims that suggest stability, legitimacy, or official backing become even more material to an investor's decision-making process. The Kelsier Defendants' attempt to re-characterize these calculated falsehoods as "immaterial puffery" is a transparent effort to evade accountability for the core deceptions that lured their victims. These claims fail as a matter of law under the standards set forth in *Ganino* and *Novak*.

### 3. The Complaint Pleads a Strong Inference of the Kelsier Defendants' Scienter.

A complaint satisfies Rule 9(b)'s scienter requirement by alleging facts that give rise to a "strong inference" of fraudulent intent. This can be established by alleging either: (1) a motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness. *Novak*, 216 F.3d at 307; *ECA, Loc. 134 IBEW Joint Pension Tr. v. JPMorgan Chase Co.*, 553 F.3d 187, 198-99 (2d Cir. 2009). The FAC provides overwhelming evidence of scienter for each of the Kelsier Defendants under both prongs of this test. Their dismissal motion's assertion that the FAC lacks a factual basis for fraudulent intent ignores the mountain of facts pleaded in the FAC which demonstrate a premeditated and concealed scheme. (*See* Defs.' MTD at 21–25).

First, the Kelsier Defendants had a clear and concrete motive: the extraction of millions of dollars in risk-free profit. This was not a "generalized profit motive," as their motion suggests. It was a specific, illicit goal to be achieved through market manipulation, as evidenced by the more than millions extracted from the $LIBRA launch alone and the coordinated dumping of their 95% insider stake in $M3M3. (FAC ¶¶ 226, 278-285). Their opportunity was unique and absolute: as the financiers and promoters of the enterprise, they controlled the capital and the public narrative, while their co-conspirator, Defendant Chow, controlled the technical backend. This combination of a specific, massive financial motive and the exclusive opportunity to execute the fraud satisfies the first prong of the scienter test. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) ("Scienter can also be pleaded by alleging facts that demonstrate both motive and opportunity to commit fraud. Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged").

Second, the FAC is replete with strong circumstantial evidence of conscious misbehavior. The secret planning of the schemes is the most powerful evidence of intent. The creation of confidential planning documents, such as the "M3M3 Calcs Template" and Charles Thomas Davis's "M3M3 Token Launch Organizer," demonstrate a level of premeditation and calculation that is antithetical to any notion of negligence or mistake. (FAC ¶¶ 200-206). These were not business plans; they were blueprints for a heist. *See In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 186 (S.D.N.Y. 2003) (holding that internal contemporaneous documents can provide "strong circumstantial evidence" of scienter).

Furthermore, the FAC alleges direct evidence of conscious deception. Hayden Davis's "agreed" response on a planning call to Defendant Chow's strategy of concealing the 95% insider

allocation of $M3M3 is a direct acknowledgment and endorsement of the plan to defraud the public. (FAC ¶ 207). This is not an inference; it is an admission of intent.

Finally, the Kelsier Defendants' actions after the fraud evidence a consciousness of guilt. The FAC alleges that after profiting from the $M3M3 scheme, they deliberately used blockchain mixers and a complex web of cryptocurrency wallets to "anonymize transactions and disrupt transparent tracking" of their illicit proceeds. (FAC ¶ 241). The use of such tools, which are specifically designed to obfuscate the flow of funds, is compelling circumstantial evidence of scienter. *See SEC v. Terraform Labs Pte Ltd*., 708 F. Supp. 3d 450, 488-89 (S.D.N.Y. 2023) (finding scienter where defendants took steps to conceal fraudulent activity).

Taken together, the allegations paint an undeniable picture of fraudulent intent. The Kelsier Defendants had a multi-million dollar motive, the exclusive opportunity, and engaged in secret planning, explicit deception, and active concealment of their wrongdoing. The inference of scienter is not just strong; it is inescapable.

### C. PLAINTIFFS HAVE RICO STANDING BASED ON DIRECT INJURY PROXIMATELY CAUSED BY THE KELSIER/DAVIS RACKETEERING SCHEME

The Kelsier Defendants argue that Plaintiffs lack standing to bring a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO") because their harm was not "direct." (*See* Defs.' MTD at 28). They construct a fallacious narrative of  market forces and a lack of direct transactional privity to argue that the causal chain is too attenuated. (*See* Defs.' MTD at 29). This argument fundamentally misrepresents both the facts alleged and the nature of proximate causation in the context of a market manipulation scheme. The FAC's allegations establish a straight, unbroken line from the Kelsier Defendants' racketeering activity to the Plaintiffs' out-of-pocket financial losses. Plaintiffs were the direct and intended targets of the

fraudulent enterprise, and their injuries were the scheme's intended result.

1. **Plaintiffs Suffered a Concrete, Out-of-Pocket Financial Loss, a Classic Injury to Property.**

To establish standing under 18 U.S.C. § 1964(c), a plaintiff must first allege an injury to "business or property." A concrete, out-of-pocket financial loss is the quintessential injury of this type. *See McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 227-29 (2d Cir. 2008) (affirming that a showing of injury requires proof of a concrete financial loss, and not mere injury to a valuable intangible property interest).

The FAC alleges with specificity that Plaintiff Anuj Mehta suffered "approximate net losses of $19,164 on his $M3M3 investment" after the Kelsier Defendants' scheme caused the token's value to collapse. (FAC ¶37). Similarly, Plaintiff Omar Hurlock suffered immediate and calculable losses on his $LIBRA investments within hours of the token's launch, losing 0.132 wSOL on one wallet and approximately 0.17 wSOL on another as a direct result of the Defendants' rug pull. (FAC ¶38). These are tangible, out-of-pocket losses that squarely constitute an injury to property under RICO, satisfying the first element of the standing analysis. *See First Nationwide Bank v. Gelt Funding*, 27 F.3d 763, 768 (2d Cir. 1994) ("The general rule of fraud damages is that the defrauded plaintiff may recover out-of-pocket losses caused by the fraud").

2. **The Injury Was Proximately Caused "By Reason Of" the Kelsier Defendants-Led Scheme, Not Intervening Forces.**

The core of RICO's standing requirement is proximate causation—the injury must be "by reason of" the defendant's violation. This requires a "direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. SIPC*, 503 U.S. 258, 268 (1992). The Kelsier Defendants' argument that Plaintiffs' losses were caused by "intervening market forces" or the actions of third parties is a deliberate mischaracterization of the alleged scheme. The FAC makes

clear that the "market forces" that destroyed the value of Plaintiffs' investments were the Kelsier Defendants' own pre-planned and fraudulent actions.

The proximate cause standard is readily met when the plaintiff is the direct "target" and "primary and intended victim" of the fraudulent scheme. *Baisch v. Gallina*, 346 F.3d 366, 373-74 (2d Cir. 2003) (finding proximate cause where plaintiffs were the direct victims of defendants' scheme). Here, the entire purpose of the Kelsier-Meteora enterprise was to induce investment from retail purchasers like Plaintiffs so that their capital could be extracted. Plaintiffs were not incidental casualties of a fraud directed elsewhere; they were the primary targets. As the Supreme Court clarified in *Holmes*, "a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover." 503 U.S. at 268. Here as alleged in the FAC, Plaintiffs suffered harm directly, not through any third party.

The causal chain is direct and unbroken. For the $M3M3 token, the price collapse was not a random market fluctuation; it was the direct and foreseeable result of the Kelsier Defendants and their co-conspirators executing a coordinated dump of the token supply they had secretly acquired. (FAC ¶¶ 219, 226). For the $LIBRA token, the collapse to zero was the direct result of the Kelsier Defendants and their insiders systematically withdrawing all of the base-currency liquidity from the market in a pre-planned rug pull. (FAC ¶¶ 278-292). As the FAC states, the tokens' "meteoric rise and rapid collapse were not natural market forces. They were engineered events." (FAC ¶ 15).

Defendants' reliance on a lack of direct transactional privity is misplaced. (*See* Defs.' MTD at 28–30). The Supreme Court has clarified that first-party reliance is not a prerequisite for RICO standing where the injury flows directly from the defendant's fraudulent scheme. *Bridge v.*

*Phoenix Bond & Indem. Co.*, 553 U.S. 639, 661 (2008) ("We hold that a plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of the claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations"). The injury here as alleged in the FAC—the destruction of the tokens' value—flowed directly from the execution of the market manipulation scheme. The causal link is not attenuated; it is the scheme's intended and actual outcome. Plaintiffs' losses were the mirror image of the Defendants' gains. This constitutes precisely the type of direct injury required for RICO standing.

### D. THE FAC PLAUSIBLY ALLEGES A "PATTERN OF RACKETEERING ACTIVITY"

The Kelsier Defendants' motion advances a "divide and conquer" strategy, attempting to sever the $M3M3 and $LIBRA frauds into two "unrelated" and "isolated or sporadic" incidents to defeat RICO's pattern requirement. This argument ignores the clear and cohesive "playbook" that connects these acts and the ongoing nature of the criminal enterprise that executed them, as detailed in the FAC. A RICO "pattern" requires at least two predicate acts that are both "related" and "amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). The FAC overwhelmingly satisfies both prongs of this test.

#### 1. The $M3M3 and $LIBRA Frauds Are "Related" Predicates Constituting a Cohesive "Playbook."

Predicate acts are "related" for RICO purposes if they share the "same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics." *H.J. Inc.*, 492 U.S. at 240. The Kelsier Defendants' attempt to portray the $M3M3 and $LIBRA schemes as unrelated by focusing on superficial differences in their technical execution—an AMM freeze versus a DLMM rug pull—is a disingenuous attempt

to obscure their fundamental similarities.

The FAC alleges that both schemes shared the exact same core characteristics. The schemes bore the same purpose: to engineer a fraudulent token launch for the sole purpose of extracting investor capital for guaranteed, risk-free insider profits. The schemes involved the same participants: The same core Kelsier-Meteora enterprise, with the Kelsier Defendants providing the capital and promotion and Defendant Chow providing the technical infrastructure. The schemes targeted the same victims: unsuspecting retail cryptocurrency investors lured in by deceptive marketing. The schemes used the same method: deceptive promotion to generate hype, combined with the exploitation of hidden, backend control over the Meteora platform to manipulate market mechanics and siphon away investor funds.

The FAC explicitly refers to this consistent methodology as the Defendants' "playbook for price manipulation and capital extraction." (FAC ¶9). It alleges that the $LIBRA launch "followed the same blueprint" as the $M3M3 launch, but was executed with "even greater audacity." (FAC ¶13). The change in the specific technical tool used for extraction does not sever the relationship between the acts; it merely demonstrates an evolution in the enterprise's fraudulent tactics. The two schemes are textbook examples of related predicate acts under the *H.J. Inc.* standard. *See United States v. Indelicato*, 865 F.2d 1370, 1383-84 (2d Cir. 1989) (Predicate crimes will be related where there are external or internal commonalities among the offenses).

### 2. The Scheme Demonstrates Closed-Ended and Open-Ended Continuity

Continuity can be either "closed-ended" (a series of related predicate acts extending over a substantial period of time) or "open-ended" (past conduct that by its nature projects into the future with a threat of repetition). *H.J., Inc.,* at 241-42. Here, both forms of continuity are

present as alleged in the FAC

For closed-ended continuity, the FAC alleges that the enterprise operated from at least October 2024 through filing of the complaint, executing multiple complex fraudulent schemes that affected thousands of victims and extracted millions of dollars. (FAC ¶¶ 386, 389). While the Second Circuit often looks for periods exceeding two years, there is no bright-line rule and courts consider factors such as the number and variety of predicate acts, the number of victims, the presence of separate schemes, and the complexity of the fraud. *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183-85 (2d Cir. 2008).

The fraud here as alleged in the FAC was not a 'one-shot deal' but rather involved two separate, complex schemes affecting hundreds of thousands of potential victims. The schemes required months of planning, sophisticated technical implementation, and coordinated execution by multiple participants. This level of complexity and the repeated nature of the fraud support a finding of closed-ended continuity even within a period of less than two years. *See United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992) (finding continuity where scheme was inherently unlawful and involved ongoing fraudulent activity).

In addition, open-ended continuity is established by showing conduct "that by its nature projects into the future with a threat of repetition," such as when the predicate acts are part of the defendant's "regular way of doing business." *Reich v. Lopez*, 858 F.3d 55, 60 (2d Cir. 2017); *see also Spool*, 520 F.3d at 184. The Kelsier Defendants' argument that their scheme was "inherently terminable" is flatly contradicted by the allegations and their own admissions. (Defs.' MTD at 37).

The FAC alleges the existence of an ongoing Kelsier-Meteora enterprise designed specifically for serial token-launch schemes. (FAC ¶¶ 378–379). This was not an ad hoc group

formed for a single transaction; it was a fraud factory with a repeatable business model. (FAC 384). Defendant Chow admitted to referring a "handful of other projects" to the Kelsier Defendants, indicating a continuous pipeline of potential future schemes. (FAC 319).

The very nature of the enterprise as alleged in the FAC—combining a financial and promotional arm (Kelsier) with a technical platform (Meteora)—is built for repetition. The infrastructure for fraud remains in place, and the participants' admissions confirm their intent to use it repeatedly. This establishes a clear and present threat of future criminal conduct that easily satisfies the test for open-ended continuity. *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1413 (3d Cir. 1991) (finding that "a single fraudulent scheme can give rise to RICO liability, when that scheme is short-lived and directed at a limited number of people, [insofar as there is] some further indication that the defendant's fraudulent activities are likely to continue"). The Kelsier Defendants' attempt to frame their conduct as two discrete, completed events is a fiction designed to escape the reach of a statute aimed squarely at this type of ongoing criminal enterprise. (*See* Defs.' MTD at 31–38).

### E. THE COMPLAINT PLAUSIBLY ALLEGES A RICO "ENTERPRISE" AND EACH KELSIER DEFENDANT'S PARTICIPATION IN ITS MANAGEMENT

The Kelsier Defendants' motion argues that Plaintiffs have failed to plead the existence of a RICO "enterprise," claiming a lack of common purpose, relationships, or longevity. This argument requires ignoring the detailed factual allegations in the FAC, that describe a well-structured, purposeful, and ongoing criminal association. The FAC properly pleads an association-in-fact enterprise and details how each Kelsier Defendant participated in its operation and management, satisfying all requisite elements under RICO.

### 1. The Kelsier-Meteora Association Is a Cohesive Enterprise with a Common Fraudulent Purpose, Structure, and Longevity.

An association-in-fact enterprise under RICO must have at least three structural features: (1) a common purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit the associates to pursue the enterprise's purpose. *Boyle v. United States*, 556 U.S. 938, 946 (2009). The group must function as a "continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981). The FAC alleges a textbook example of such an enterprise.

First, the common purpose was explicit and fraudulent: to engineer token launches that appeared legitimate while exploiting hidden control to guarantee outsized insider profits at the expense of retail investors. (FAC ¶379). Defendants' claim that they merely had "parallel business interests" is belied by the singular, illicit goal that animated all their coordinated actions. (*See* Defs.' MTD at 38, 40–41).

Second, the relationships and structure were clear and defined. The relationship was not informal or coincidental; it was formalized through a secret partnership agreement and cemented by Kelsier's $2 million "pay-to-play" investment. (FAC ¶¶ 163-164). The enterprise exhibited a clear division of labor, a hallmark of a structured organization. The FAC describes a "Capital and Marketing Layer" controlled by the Kelsier Defendants, which provided the funding and promotional campaigns, and a "Technical Control Layer" managed by Defendant Chow, which provided the blockchain infrastructure for the fraud. (FAC ¶¶ 380–383). Their coordination through private Telegram groups and shared planning documents further evidences a cohesive, functioning unit. (FAC ¶¶ 200–208).

Third, the enterprise demonstrated sufficient longevity to pursue its purpose. It existed from at least October 2024 through February 2025, a period during which it successfully planned and executed two complex, multi-stage fraudulent schemes. This duration was more than

sufficient to achieve its illicit goals and demonstrated its capacity for continued operations. The allegations in the FAC describe a "fraud factory" with a systematic pattern, not a fleeting arrangement. (FAC ¶384). The FAC thus satisfies all three prongs of the *Boyle* test, plausibly alleging an association-in-fact enterprise.

### 2. Each Kelsier Defendant Participated in the "Operation or Management" of the Enterprise.

To be liable under RICO, a defendant must "participate, directly or indirectly, in the conduct of such enterprise's affairs." 18 U.S.C. § 1962(c). The Supreme Court has interpreted this to require that the defendant have "some part in directing" the enterprise's affairs. *Reves v. Ernst & Young,* 507 U.S. 170, 179 (1993). The Kelsier Defendants were not mere employees or outsiders providing services; they were the directors of the enterprise.

The Amended Complaint alleges specific managerial roles for each Kelsier Defendant that meet the Reves test: Defendant Hayden Davis directed the promotional and public-facing strategies of the enterprise. He made strategic decisions about how to craft and disseminate the fraudulent narrative surrounding $LIBRA, a core operational function of a scheme reliant on public deception. (FAC ¶¶ 242-272). His participation in planning calls and his explicit agreement to the deceptive strategy further evidence his managerial role. (FAC ¶207–208). Defendant Charles Thomas Davis directed the operational planning of the $M3M3 fraud. By creating the "M3M3 Token Launch Organizer," he was not merely participating; he was authoring the operational plan for the enterprise's criminal activity. (FAC ¶206). Kelsier Defendants directed the financial and capital-allocation functions of the enterprise. Their decision to invest $2 million and to fund the insider wallets was a key directorial act that enabled the entire fraudulent operation to proceed. (FAC ¶¶ 163-164, 197).

Each Kelsier Defendant is alleged to have directed a core component of the enterprise's

affairs—promotion, operational planning, or finance. Their roles were not ministerial; they were managerial and essential to the fraud's success. S*ee First Cap. Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 176-78 (2d Cir. 2004) (explaining that outsiders may be liable if they participate in the operation or management of the enterprise, and that even one who assists in the fraud can be said to "conduct or participate" in the enterprise's affairs). Their collective actions satisfy the "operation or management" test under *Reves*, and their attempt to portray themselves as anything less than central figures in the scheme is contradicted by the detailed allegations in the FAC.

### F. THE CONSPIRACY CLAIMS ARE SUFFICIENT BECAUSE THE UNDERLYING RICO AND FRAUD CLAIMS ARE WELL-PLEADED

The Kelsier Defendants argue that Plaintiffs' conspiracy claims under both RICO and New York common law must fail because the underlying substantive claims are deficient. (*See* Defs.' MTD at 42). This argument is entirely circular and depends on the Court accepting their flawed premise that the substantive claims are not well-pleaded. As demonstrated extensively above, the substantive RICO and common-law fraud claims are robustly pleaded with overwhelming particularity. Because the underlying torts are adequately alleged, the conspiracy claims, which are supported by extensive evidence of an agreement, must also survive.

A RICO conspiracy under 18 U.S.C. § 1962(d) requires an allegation that each defendant agreed to facilitate a scheme that includes the commission of at least two predicate acts. The agreement itself need not be proven by direct evidence; it can be inferred from circumstantial evidence of coordinated action. S*alinas v. United States*, 522 U.S. 52, 63-66 (1997). Similarly, a New York common-law conspiracy to defraud claim survives a motion to dismiss as long as the underlying fraud is well-pleaded. *See Alexander & Alexander of N.Y., Inc. v. Fritzen*, 68 N.Y.2d 968, 969 (1986); *Kashi v. Gratsos*, 790 F.2d 1050, 1054 (2d Cir. 1986) (all members of a civil conspiracy are jointly and severally liable for acts of co-conspirators).

The FAC provides extensive evidence, both direct and circumstantial, of a conspiratorial agreement among the Kelsier Defendants and Defendant Chow. The existence of a secret partnership agreement, formalized by a $2 million "pay-to-play" investment, is direct evidence of a meeting of the minds. (FAC ¶¶ 163-164). The use of a private Telegram group for coordination (FAC ¶201), the collaborative creation of confidential planning documents like the "M3M3 Token Launch Organizer" (FAC ¶206), and the explicit agreement on a planning call to deceive investors about token allocation (FAC ¶207–208) all serve as powerful evidence of a conscious and willing agreement to perpetrate fraud. S*ee Salinas* 522 U.S. at 65–66 (1997) (RICO-conspiracy agreement may be established by circumstantial evidence); *See also In re Firestar Diamond, Inc*., 654 B.R. 836, 871 (Bankr. S.D.N.Y. 2023) (circumstantial evidence of knowing participation can include participation in conspiracy-related conversations, possession of items important to the scheme, or receipt/expectation of a share of the profits).

The perfectly synchronized execution of the two fraudulent schemes is inexplicable absent a prior agreement. The timing of Hayden Davis's promotional hype for $LIBRA with Chow's technical preparations, and the coordinated dumping of $M3M3 by insider wallets funded by Kelsier, are actions that would be impossible without pre-arrangement. This pattern of coordinated conduct provides compelling circumstantial evidence of a conspiracy. Because the underlying fraud and RICO claims are sufficiently pleaded, and the evidence of an agreement is overwhelming, the conspiracy claims under both federal and state law are valid and should not be dismissed.

### G. PLAINTIFFS' STATE-LAW CLAIMS ARE SUFFICIENTLY PLEADED

The Kelsier Defendants seek dismissal of Plaintiffs' state-law claims under New York General Business Law ("GBL") §§ 349 and 350 and for unjust enrichment, arguing a lack of a

New York nexus for the GBL claims and duplication for the unjust enrichment claim. (*See* Defs.'
MTD at 43–52). Both arguments fail. The GBL claims are anchored by the injury to a New York
plaintiff and the direction of the scheme from New York by a co-conspirator, and the unjust
enrichment claim is properly pleaded in the alternative.

**1. The New York General Business Law Claims Are Valid.**

GBL §§ 349 and 350 prohibit deceptive, consumer-oriented acts and false advertising. A
claim is viable if the conduct has a sufficient nexus to New York, such as when the fraudulent
transaction occurs in the state or the scheme is substantially directed from the state and causes
injury to a New York resident. *See Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324-25
(2002). The Kelsier Defendants' argument that no deceptive act occurred in New York ignores
two critical facts alleged in the FAC.

First, the fraudulent enterprise was substantially directed from New York. The FAC
alleges that Defendant Chow, a New York resident and the Kelsier Defendants' co-conspirator,
"operated and controlled Meteora from this District." (FAC ¶39). The technical architecture of
the fraud—the very code that enabled the market manipulation and rug pulls—was managed
from New York. This provides a strong nexus, as New York has a significant interest in
preventing deceptive schemes from being orchestrated within its borders.

Second, and most dispositively, the scheme targeted and directly injured a New York
resident. The FAC alleges that Plaintiff Hurlock is a resident of Brooklyn, New York, and that he
executed his purchases of the fraudulently marketed $LIBRA token "from Brooklyn, New York."
(FAC ¶38). He was deceived in New York and suffered a direct financial injury in New York.
This combination of a New York-based co-conspirator directing core aspects of the scheme and a
New York resident being deceived and injured within the state provides an unassailable nexus

that satisfies the territorial requirements of GBL §§ 349 and 350. *See Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000) (GBL § 349 protects consumers from deceptive business practices); *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 56 (1999) (injury must be more than receiving something different than expected; it must be a quantifiable loss).

The FAC adequately alleges consumer-oriented conduct that was materially deceptive or misleading. The Kelsier Defendants' promotional campaigns for both $M3M3 and $LIBRA were directed at the public at large—retail cryptocurrency investors—rather than sophisticated parties in arms-length negotiations. (FAC ¶¶ 100-109, 170, 187, 254-263). The claims of governmental backing, legitimate underlying projects, and fair launch mechanisms were material misrepresentations that would mislead reasonable consumers. (FAC ¶¶ 355-366). The resulting injuries—Plaintiffs' financial losses from purchasing tokens based on false representations—were direct and quantifiable. (FAC ¶¶ 37-38, 417-419, 428-431).

### 2. The Unjust Enrichment Claims Are Properly Pleaded in the Alternative.

The Kelsier Defendants argue that the unjust enrichment claims should be dismissed as "duplicative" of the tort claims. (*See* Defs.' MTD at 52). This argument misapprehends the purpose of alternative pleading under the Federal Rules of Civil Procedure. Rule 8(d)(2) expressly permits a party to set out two or more statements of a claim alternatively, and courts routinely allow unjust enrichment claims to proceed alongside tort claims at the pleading stage. Dismissal for duplication is premature when the viability of the primary claims has not yet been adjudicated. *See Henry v. Daytop Village, Inc.*, 42 F.3d 89, 95 (2d Cir. 1994); *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012) ("unjust enrichment is not a catchall cause of action to be used when others fail").

The unjust enrichment claim serves as a vital equitable backstop. The FAC alleges that

the Kelsier Defendants were directly enriched at Plaintiffs' expense. For example, Kelsier-controlled wallets systematically extracted tens of millions of dollars in USDC and SOL that originated directly from the funds of investors like Plaintiff Hurlock during the $LIBRA rug pull. (FAC ¶¶ 278-283). It would be profoundly against equity and good conscience for them to retain these ill-gotten gains. Should the tort claims fail for any technical reason unrelated to the fundamental injustice of the Defendants' enrichment, the unjust enrichment claim provides a necessary avenue for restitution. Dismissing it at this early stage would be improper and premature.

## H. THIS COURT HAS PERSONAL JURISDICTION OVER THE KELSIER DEFENDANTS

The Kelsier Defendants, all non-residents of New York, seek dismissal under Rule 12(b)(2), arguing that this Court lacks personal jurisdiction over them. (*See* Defs.' MTD at 54). They present a misleading picture of themselves as passive, out-of-state actors with no meaningful connection to the forum. This narrative conveniently ignores the most powerful basis for jurisdiction in this case: the conspiracy theory of jurisdiction. By knowingly and purposefully conspiring with a New York resident, Defendant Chow, who directed the enterprise's core technical operations from within New York, the Kelsier Defendants purposefully availed themselves of this forum and are subject to jurisdiction here.

### 1. Jurisdiction Is Proper Under New York's Long-Arm Statute via the Conspiracy Theory of Jurisdiction.

New York's long-arm statute, CPLR § 302, provides for jurisdiction over non-domiciliaries under several theories. The conspiracy theory of jurisdiction, recognized by the Second Circuit, allows a court to attribute the in-state acts of a co-conspirator to an out-of-state defendant for jurisdictional purposes. To establish conspiracy jurisdiction, a plaintiff

must allege (1) a conspiracy, (2) the defendant's participation in it, and (3) that a co-conspirator's overt acts in furtherance of the conspiracy had sufficient forum contacts to support jurisdiction over that co-conspirator." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018) The Amended Complaint satisfies all three requirements.

First, as established throughout this opposition, the FAC pleads a detailed and plausible conspiracy between the Kelsier Defendants and Defendant Chow. Second, the FAC alleges that the Kelsier Defendants' co-conspirator, Defendant Chow, is a New York resident who "operated and controlled Meteora from this District." (FAC ¶39). Defendant Chow's actions in New York—which include designing and executing the fraudulent smart contracts, managing the platform's manipulative features, and communicating with his co-conspirators—were not merely incidental; they were essential overt and tortious acts committed in furtherance of the conspiracy. Without Chow's New York-based activities, the technical execution of the fraud would have been impossible.

Third, the Kelsier Defendants should have reasonably expected these acts to occur in New York. They knowingly entered into a partnership with a New York-based operator to run the entire technical side of their fraudulent enterprise. It is disingenuous for them to now claim surprise at being hauled into a New York court when they deliberately chose a New Yorker to be the engine of their scheme. By knowingly conspiring with a New York resident who performed substantial acts in furtherance of the scheme from within this state, the Kelsier Defendants are subject to personal jurisdiction here.

### 2. Exercising Jurisdiction Comports with Due Process.

The exercise of personal jurisdiction over the Kelsier Defendants also fully comports with the Due Process Clause of the Constitution. Due process requires that a defendant have

sufficient "minimum contacts" with the forum state such that the maintenance of the suit "does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). A defendant has purposefully availed itself of the forum when it deliberately engages in activities within the state, "thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985).

The Kelsier Defendants purposefully availed themselves of New York in multiple ways. Most significantly, they formed a partnership with a New York resident, Chow, to serve as the technical operator of their nationwide fraudulent scheme. Defendant Chow acted as their agent in New York, and his actions are attributable to them for jurisdictional purposes. They also targeted a national market for their tokens that foreseeably and actually included New York investors, as evidenced by Plaintiff Hurlock, a New York resident who was deceived and injured in New York. They caused a direct financial injury to a resident within this forum, as alleged in the FAC.

These were not random, fortuitous, or attenuated contacts. The Kelsier Defendants deliberately enlisted a New York-based partner to execute their scheme and directly injured a New York resident. It is therefore entirely fair and reasonable to require them to answer for that conduct in a New York court. New York has a strong interest in providing a forum for its residents who are victims of fraud and in policing fraudulent schemes that are orchestrated, in substantial part, from within its borders. The burden on the Kelsier Defendants, who operate a sophisticated, multi-state business, to litigate in New York is minimal compared to the forum's and the Plaintiffs' interests.

Moreover, for the RICO claims, even if New York's statute were not satisfied, Rule 4(k)(2) allows jurisdiction if defendants have contacts with the United States overall. The FAC alleges that "Alternatively, to the extent that any Defendant is not subject to jurisdiction in any

state's courts of general jurisdiction, this Court has personal jurisdiction over the Defendant pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure because the Court's exercise of jurisdiction is consistent with the United States Constitution and laws." (FAC ¶34). The Kelsier Defendants ran an American-focused scheme—Solana is international, but they engaged United States-based partners like Defendant Chow, marketing in United States online communities. Defendants might not concede they targeted any single state specifically, but they certainly have aggregate United States contacts. Thus, Rule 4(k)(2) fills any gap for RICO claims. Once the Court has jurisdiction for RICO, it can assert pendent personal jurisdiction over the state-law claims since they derive from the same nucleus of facts.

## IV. CONCLUSION

For the foregoing reasons, the Kelsier Defendants' Motion to Dismiss should be denied in its entirety. The claims set forth in Plaintiffs' FAC are adequately pleaded with the requisite level of particularity. Defendants' motion is a meritless attempt to evade accountability. The Kelsier Defendants were not passive bystanders or peripheral actors in this fraud—they were its architects, financiers, and chief promoters. They created a sophisticated criminal enterprise designed to systematically defraud cryptocurrency investors through a repeatable "playbook" of market manipulation and capital extraction. The FAC details with precision how each Defendant participated in directing this enterprise's affairs, from Defendant Charles Thomas Davis's creation of the operational blueprints, to Defendant Hayden Davis's orchestration of fraudulent promotional campaigns including the fabrication of government endorsements, to Defendant Gideon Davis and Kelsier Labs' provision of the essential capital that funded the scheme.

The damages sustained by Plaintiffs were not the result of market volatility or business failures—they were the direct and intended consequences of a calculated fraud. Plaintiff Mehta

lost $19,164 when the Kelsier Defendants orchestrated the collapse of $M3M3 after secretly cornering 95% of its supply. Plaintiff Hurlock suffered immediate losses when the Kelsier Defendants executed their $LIBRA rug pull within hours of launch, extracting over $57 million in investor funds through sophisticated technical manipulation. These losses were not incidental or attenuated—they were the mirror image of the Defendants' illicit gains.

The patterns of conduct alleged in the FAC—from the secret partnership agreement sealed with $2 million in "pay-to-play" funding, to the creation of detailed planning documents like the "M3M3 Token Launch Organizer," to Hayden Davis's recorded agreement to conceal the true token allocation from investors—paint a compelling picture of deliberate, calculated fraud. The Kelsier Defendants' post-scheme conduct, including their use of blockchain mixers to obscure the flow of their illicit proceeds and Hayden Davis's public admissions of control over the schemes, further confirms their central roles in this criminal enterprise.

This Court should not permit the Kelsier Defendants to benefit from the complexity of their scheme or the novelty of the cryptocurrency market as a venue for fraud. The fundamental principles of fraud, RICO, and consumer protection law apply with equal force whether the deception occurs in traditional securities markets or in emerging digital asset markets. The victims here—retail investors who trusted the Kelsier Defendants' false representations—deserve the same protections as victims of any other investment fraud.

The Kelsier Defendants' attempt to escape liability through technical arguments about pleading standards, causation, and jurisdiction cannot obscure the fundamental reality alleged in the FAC: Defendants conspired to commit fraud, they executed that fraud with precision, and they profited enormously from it. The law does not permit them to retain these ill-gotten gains or to evade accountability for their actions simply because they operated through complex corporate

structures and cryptocurrency platforms.

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Kelsier Defendants' motion to dismiss, pursuant to F.R.C.P 12(b)(2) and 12(b)(6), in its entirety and allow this case to proceed on the merits.

In the alternative, should the Court be inclined to grant the Kelsier Defendants' motion to dismiss, Plaintiffs respectfully request that such dismissal be granted with leave to amend, in order to allow Plaintiffs the opportunity to cure pleading deficiencies, if any.

Dated: October 28, 2025
New York, New York

Respectfully submitted,

**BURWICK LAW, PLLC**

By: */s/ Max Burwick*
Max Burwick
1 World Trade Center, *84th Fl.*
New York, NY 10007
(646) 762-1080
max@burwick.law

Luis Muñoz de la Vega
1 World Trade Center, 84th Fl.
New York, NY 10007
(646) 762-1080
luis@burwick.law

*Counsel for Plaintiffs Omar*
*Hurlock & Anuj Mehta*

**WORD COUNT CERTIFICATION**

I certify that the foregoing opposition to motion to dismiss contains 9871 words, as determined by the word-count function of Microsoft Word, and complies with the word-limit requirements in the Individual Rules and Practices of Judge Jennifer L. Rochon.