UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| OMAR HURLOCK and ANUJ MEHTA, *on behalf of himself and all others similarly situated,*<br><br>Plaintiffs,<br><br>v.<br><br>KELSIER LABS, LLC d/b/a KELSIER VENTURES, HAYDEN MARK DAVIS, GIDEON DAVIS, CHARLES THOMAS DAVIS, METEORA, *an unincorporated association*, and BENJAMIN CHOW,<br><br>Defendants. | **Case No.: 1:25-cv-03891-JLR**<br><br> Hon. Jennifer L. Rochon |

**PLAINTIFFS' OPPOSITION TO DEFENDANT CHOW'S MOTION TO DISMISS PURSUANT TO F.R.C.P 12(B)(6)**

**TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT.................................................................................6

II. FACTUAL BACKGROUND SPECIFIC TO DEFENDANT CHOW.......................8

    A. Defendant Chow's Hidden Control Over the Meteora Platform........................8

    B. The Secret Meteora-Kelsier Partnership.............................................................9

    C. The $M3M3 Scheme: Chow's Intimate Role in Planning and Execution...........10

    D. The $LIBRA Scheme: Chow's Knowing Enablement and Endorsement..........11

    E. Chow's Post-Fraud Admissions and Consciousness of Guilt...........................12

III. ARGUMENT.......................................................................................................13

    A. Legal Standard.................................................................................................13

    B. Plaintiffs' Fraud Claims Against Defendant Chow Are Overwhelmingly Sufficient.........14

        1. The Complaint Details Chow's Specific, Central Role in the Fraud, Defeating Any Claim of "Group Pleading"...................................................................14

        2. Chow's Personal Provision of Infrastructure for Fraud Distinguishes This Case from Risley.........................................................................................16

        3. The FAC Adequately Alleges Scienter Through Both Direct Evidence and Compelling Circumstantial Facts.........................................................17

            i. Direct Evidence of Fraudulent Intent..........................................18

            ii. Circumstantial Evidence of Fraudulent Intent.............................18

    C. Plaintiffs' RICO Claims Are Properly Pleaded................................................19

        1. The Complaint Alleges an Actionable RICO Enterprise with Defendant Chow as a Central Participant.........................................................................19

        2. Chow Participated in the Operation and Management of the Enterprise................20

        3. The Complaint Alleges a Clear Pattern of Racketeering Activity..........................21

    D. Plaintiffs' Conspiracy Claims Are Well-Pleaded............................................23

    E. Plaintiffs State Valid Claims Under New York Law.........................................24

        1. Plaintiffs' Claims Under N.Y. G.B.L. §§ 349 and 350 Are Legally Sufficient........24

        2. Plaintiffs' Unjust Enrichment Claim is Properly Pleaded in the Alternative..........25

IV. CONCLUSION....................................................................................................27

# TABLE OF AUTHORITIES

**Cases**

*Anwar v. Fairfield Greenwich Ltd.,*
    728 F. Supp. 2d 372 (S.D.N.Y. 2010) ...............................................................................16

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ............................................................................................................8, 14

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007) ................................................................................................14

*Baisch v. Gallina,*
    346 F.3d 366 (2d Cir. 2003) ..............................................................................................24

*Barron v. Helbiz Inc.,*
    2023 WL 5672640 (S.D.N.Y. Sept. 1, 2023) .................................................................25

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ............................................................................................................14

*Boyle v. United States,*
    556 U.S. 938 (2009) ............................................................................................................19

*Buchwald v. Renco Grp.,*
    539 B.R. 31 (S.D.N.Y. 2015) ......................................................................................26, 27

*Caro Cap., LLC v. Koch,*
    653 F. Supp. 3d 108 (S.D.N.Y. 2023) ............................................................................26

*DiVittorio v. Equidyne Extractive Indus., Inc.,*
    822 F.2d 1242 (2d Cir. 1987) ............................................................................................14

*Ernst & Ernst v. Hochfelder,*
    425 U.S. 185 (1976) ............................................................................................................17

*Georgia Malone & Co. v. Rieder,*
    19 N.Y.3d 511 (2012) ........................................................................................................25

*Goshen v. Mutual Life Ins. Co. of N.Y.,*
    98 N.Y.2d 314 (2002) ........................................................................................................24

*H.J. Inc. v. Northwestern Bell Tel. Co.,*
    492 U.S. 229 (1989)...............................................................................................21, 22

*In re Refco, Inc. Sec. Litig.,*
    826 F. Supp. 2d 478 (S.D.N.Y. 2011)...............................................................................17

*Mills v. Polar Molecular Corp.,*
    12 F.3d 1170 (2d Cir. 1993)...............................................................................................14

*Minicone v. United States,*
    960 F.2d 1099 (2d Cir. 1992).............................................................................................22

*Novak v. Kasaks,*
    216 F.3d 300 (2d Cir. 2000)...............................................................................................17

*Reves v. Ernst & Young,*
    507 U.S. 170 (1993)......................................................................................................20, 21

*Risley v. Universal Navigation Inc.,*
    2023 WL 5609200 (S.D.N.Y. Aug. 29, 2023).............................................................*passim*

*Salinas v. United States,*
    522 U.S. 52 (1997)......................................................................................................23, 24

*S.E.C. v. Apuzzo,*
    689 F.3d 204 (2d Cir. 2012)...............................................................................................16

*S.E.C. v. Obus,*
    693 F.3d 276 (2d Cir. 2012)...............................................................................................18

*Spool v. World Child Int'l Adoption Agency,*
    520 F.3d 178 (2d Cir. 2008)...............................................................................................22

*Turkette v. United States,*
    452 U.S. 576 (1981)......................................................................................................19, 20

## Statutes and Rules

15 U.S.C. § 78 .....................................................................................................................18
18 U.S.C. § 1341...................................................................................................................22
18 U.S.C. § 1343...................................................................................................................22
18 U.S.C. § 1961(4)..............................................................................................................21
18 U.S.C. § 1961(5)..............................................................................................................22
18 U.S.C. § 1962(c)..............................................................................................................21

18 U.S.C. § 1962(d)..................................................................................................23
N.Y. Gen. Bus. Law §§ 349, 350.........................................................................23, 24
Fed. R. Civ. P. 8(d)(2)..............................................................................................25
Fed. R. Civ. P. 9(b)............................................................................................ *passim*
Fed. R. Civ. P. 12(b)(6)......................................................................................*passim*

## I. PRELIMINARY STATEMENT

Defendant Benjamin Chow's ("Defendant Chow") motion to dismiss (ECF No. 175) represents a transparent attempt to recast himself as an unwitting bystander to a fraudulent scheme of his own making. (Def.'s MTD at 8–9, 18–19).[1] His motion is predicated on a wholesale mischaracterization of the First Amended Complaint ("FAC") (ECF No. 115) and a fundamental misrepresentation of his central role within the fraudulent enterprise it exposes. Chow is not, as he strenuously claims, a mere software developer whose neutral platform was inadvertently misused by unscrupulous third parties. The AC's detailed and particularized allegations paint a starkly different picture: Chow is the architect, engineer, and operator of a sophisticated predatory infrastructure—a technological system he deliberately designed for the "sole purpose of simulating legitimacy while enabling extraction of retail capital." (FAC 3).

Plaintiffs' opposition is not premised on a theory of vicarious or third-party liability, as Chow disingenuously suggests. Rather, it is grounded firmly on Chow's direct, first-party participation as a co-conspirator who personally built the fraudulent technological tools, meticulously modeled the extraction schemes, and actively directed the technical execution of the fraud from his base of operations in New York. (*See* FAC ¶¶ 33, 163, 201-204, 207-208, 313.) The FAC alleges with specificity that Chow was not merely present during the fraud—he was its technical mastermind, the person who embedded the hidden features that made the scheme possible, and who personally profited from its execution. (FAC ¶¶ 21, 166, 200, 300).

The heavy reliance on *Risley v. Universal Navigation Inc.*, No. 22-CV-2780, 2023 WL 5609200 (S.D.N.Y. Aug. 29, 2023) in Chow's motion, is therefore entirely misplaced. (Def.'s

---

[1] Defendant Chow moved to dismiss. *See* Notice of Motion, ECF No. 175; Memorandum of Law in Support of Motion to Dismiss ("Def.'s MTD"), ECF No. 176. Citations in the form "Def.'s MTD at __" refer to ECF No. 176 and use the brief's printed page numbers.

MTD at 1, 12). While *Risley* may shield legitimate developers of genuinely neutral platforms from liability for the unforeseen misuse of their tools by independent bad actors, it offers no sanctuary to a defendant who, like Chow, deliberately embedded hidden, manipulative features into his platform by design and then conspired with partners to systematically exploit those features for illicit personal enrichment. (FAC ¶¶ 21, 166, 200, 300). This distinction is not a subtle one—it is dispositive.

The FAC is replete with particularized allegations of Chow's own misconduct that go far beyond the provision of neutral technology. These include: Chow's personal design of the manipulative Meteora Dynamic Liquidity Market Maker ("DLMM") with its hidden control mechanisms (FAC ¶¶ 300, 313); his individual creation of the "M3M3 Calcs Template," a sophisticated financial model that served as the operational blueprint for the fraud (FAC¶ 202–204); his direct participation in planning calls where he explicitly acknowledged the scheme's deceptive nature and discussed strategies to conceal critical information from investors (FAC¶¶ 207-208); and his retention of control over the platform's hidden "upgrade authority" that enabled the manipulation (FAC¶¶ 137-140).

Defendant Chow's motion seeks to recast Chow as a surprised victim who was "totally rugged" (Def.'s MTD at 9, 32) alongside other investors, and presents a self-serving fictional account that crumbles under the weight of the FAC's detailed allegations and Chow's own admissions. The FAC demonstrates through specific factual allegations that Chow played a premeditated, knowing, and utterly indispensable role in planning, enabling, and executing the sophisticated frauds that systematically harmed Plaintiffs and the Class. (*See, e.g.*, FAC ¶¶ 138, 200-208, 209–226.) His motion should be denied in its entirety.

## II. FACTUAL BACKGROUND SPECIFIC TO DEFENDANT CHOW

The following facts, drawn from Plaintiffs' FAC and accepted as true for purposes of this motion, establish Defendant Chow's central role in orchestrating and executing the fraudulent scheme made the basis of this action. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (on a motion to dismiss, courts accept all factual allegations as true).

### A. Defendant Chow's Hidden Control Over the Meteora Platform

Defendant Chow is not a peripheral figure in this case—he is the co-founder and Chief Executive Officer of Meteora, exercising "primary control over and responsibility for the operations of Defendant Meteora" from his residence in New York. (FAC ¶¶ 33, 40). This control was not merely administrative or nominal; it was technical, operational, and absolute.

Contrary to Meteora's extensive public marketing as a decentralized, permissionless, and trustless platform—representations specifically designed to induce investor confidence—Defendant Chow and his associates secretly retained "upgrade authority" over all Meteora programs through a 4-of-7 multisignature wallet known as the "Meteora Program MultiSig." (FAC ¶¶ 137-138, 327, 381). This undisclosed control mechanism fundamentally contradicted every public representation, made by Defendant Chow and his co-Defendants, about the platform's nature and purpose.

This hidden control enabled Defendant Chow to "arbitrarily reconfigure or change" the smart contracts governing all transactions on the platform—a capability that was not a bug or oversight, but rather a feature "deliberately preserved... to enable Defendants to control token launches and manipulate markets." (FAC ¶¶ 6, 8). The retention of this backdoor control while simultaneously marketing the platform as "decentralized" constitutes a material

8

misrepresentation that goes to the very heart of the fraud.

The technical architecture of this control was sophisticated and intentionally obscured from public view. Defendant Chow personally designed the system to appear autonomous and trustless on the surface while maintaining multiple hidden levers of control that could be activated at will. This included not only the upgrade authority but also the ability to freeze liquidity pools, manipulate trading parameters, and alter smart contract logic—all while maintaining the facade of a decentralized system. (FAC ¶¶ 87, 193–197, 210, 215–222).

## B. The Secret Meteora-Kelsier Partnership

In October 2024, Chow's Meteora entered into a clandestine partnership with the Kelsier Defendants to jointly execute fraudulent token launches. (FAC ¶2, 163). This was not a casual business relationship or arm's-length transaction—it was a deliberate conspiracy to defraud investors using Meteora's technical capabilities combined with Kelsier's promotional machinery and capital.

The partnership was formalized through a $2 million "pay-to-play" investment from the Kelsier Defendants, made specifically to "secure a partnership with Defendant Chow and the Meteora team" and to provide the initial capital for the $M3M3 price inflation scheme. (FAC ¶¶ 163-164). This substantial investment was not for legitimate business development—it was, as the FAC alleges, the seed money for a fraudulent enterprise. The secrecy of this partnership was paramount; both parties agreed to conceal their relationship from the public to maintain the illusion of organic, community-driven token launches. (FAC   191).

The partnership agreement itself reveals the premeditated nature of the fraud. The parties did not merely agree to collaborate on legitimate token launches; they specifically structured

their arrangement to enable market manipulation while avoiding detection. The agreement included provisions for sharing profits from the scheme, coordinating promotional activities, and most critically, using Meteora's hidden technical controls to guarantee profitable outcomes for the conspirators at the expense of retail investors. (FAC ¶¶ 163).

**C. The $M3M3 Scheme: Chow's Intimate Role in Planning and Execution**

The $M3M3 token launch in December 2024 was not a legitimate cryptocurrency offering that went awry—it was a meticulously planned fraud from inception. Defendant Chow was "intimately involved in and responsible for designing and implementing the $M3M3 launch plan." (FAC ¶200). His involvement was comprehensive, spanning from initial conception through technical implementation to post-fraud damage control.

Defendant Chow actively coordinated every aspect of the fraud with the Kelsier Defendants through a private "$M3M3 Telegram Group," a secure communication channel established specifically to plan and execute the scheme away from public scrutiny. (FAC  201). Within this private forum, the conspirators discussed manipulation tactics, coordinated their activities, and shared real-time updates during the fraud's execution.

Most significantly, Defendant Chow personally created the "M3M3 Calcs Template," a sophisticated Google Sheets spreadsheet that served as the financial and operational blueprint for the entire fraud. (FAC¶ 202). The template was specifically designed to "optimize the extraction scheme" and create a psychological trap for investors. (FAC¶¶ 201-203).

The M3M3 Calcs Template reveals the sophisticated nature of Chow's involvement. This level of detailed planning demonstrates that Defendant Chow was not merely providing technology—he was architecting the fraud itself. (FAC¶¶ 202-204.)

Chow's knowledge of the scheme's deceptive nature became explicit. He stated: "no one will play the game if they see, like 90% of the supply already locked up." (FAC¶ 207). This statement reveals Chow's clear understanding that: (1) the scheme depended on deceiving investors about token distribution; (2) transparency would prevent the fraud from succeeding; and (3) concealment was therefore essential. The conspirators then discussed specific strategies for maximizing Defendants' profits from their planned extraction. (FAC¶¶ 208).

The technical execution of the $M3M3 fraud showcased Chow's indispensable role. Using the Mint Wallet's "Freeze Authority"—a hidden feature Chow had built into the platform—the conspirators locked the trading pool from the public while 150 insider wallets systematically acquired 95% of the token supply at floor prices. (FAC ¶¶ 209-226). This manipulation was only possible because of the hidden controls Defendant Chow had deliberately embedded in the platform's architecture.

**D. The $LIBRA Scheme: Chow's Knowing Enablement and Endorsement**

The $LIBRA fraud in February 2025 "followed the same blueprint" as $M3M3, demonstrating that this was not an isolated incident but rather a repeatable criminal enterprise. FAC   264. The scheme again leveraged "custom tools in Meteora's Dynamic Liquidity Market Maker ('DLMM')" to execute a devastating "rug pull" that extracted tens of millions of dollars from investors within hours. (FAC ¶¶ 264-272).

For $LIBRA, the conspirators added an additional layer of deception: they fabricated an entirely false narrative that $LIBRA was 'Argentina's coin,' supposedly backed by a non-existent government initiative. (FAC ¶¶ 242-263). Defendant Chow publicly lent his considerable credibility within the cryptocurrency community to this fraudulent launch, commenting, "What

changing the world looks like 🔥" in response to a staged photograph of Hayden Davis with Argentina's President—a key piece of the scheme's promotional campaign designed to create false legitimacy. (FAC  250).

Chow's public endorsement was not casual or inadvertent—it was calculated to leverage his reputation as a supposedly legitimate technology entrepreneur to induce investor confidence. By publicly associating himself with the launch and vouching for its world-changing potential, Chow provided the technical credibility that the scheme required to attract sophisticated investors who might otherwise have been skeptical.

After the $LIBRA scheme spectacularly collapsed amid public outcry, Defendant Chow made a critical admission that revealed the true extent of his involvement. Defendant Chow stated that he had provided "IT support, including commenting on the liquidity curve." (FAC ¶305). This admission is highly significant. The 'liquidity curve' is not a minor technical detail—it is the core mechanism that determines how prices move in response to trades. By "commenting on" (i.e., advising on the design of) the liquidity curve, Defendant Chow was directly involved in structuring the very mechanism that would be exploited to defraud investors. This goes far beyond providing neutral technology; it constitutes active participation in designing the fraud itself.

**E. Chow's Post-Fraud Admissions and Consciousness of Guilt**

In the aftermath of the frauds' exposure, Defendant Chow's statements and actions provide compelling evidence of his guilty knowledge and central role in the scheme. In a recorded call after the $LIBRA fraud was exposed, Defendant Chow stated: "I fucked up because I enabled the guy. I should not have enabled him." (FAC ¶313). This is not the statement of an

innocent bystander or a duped service provider—it is an admission by someone who understood exactly what he had "enabled" and now recognized the legal jeopardy he faced.

Defendant Chow's use of the word "enabled" is particularly telling. One does not "enable" legitimate business activity—one facilitates it, supports it, or participates in it. The term "enable" in this context clearly implies making possible something that should not have occurred, something wrongful that required Chow's technical expertise and platform access to accomplish. This admission, made when Defendant Chow believed he was speaking privately, reveals his understanding of his essential role in facilitating the fraud.

Furthermore, Chow's public resignation as CEO of Meteora on February 16, 2025—just days after the $LIBRA scheme unraveled and faced intense public scrutiny—constitutes powerful evidence of consciousness of guilt. (FAC ¶39). The timing was not coincidental. Defendant Chow did not resign due to poor business performance, strategic disagreements, or personal reasons. He resigned immediately after his role in facilitating massive fraud became public, suggesting an attempt to distance himself from the criminal enterprise he had helped create and operate. This claim is belied by the FAC's extensive evidence of his involvement in planning and executing the fraud, his creation of the technical tools that enabled it, and his own admissions of having "enabled" the wrongdoing.

## III. ARGUMENT

### A.    Legal Standard

The legal standards governing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) are well-established and weigh heavily against dismissal in the present case. The Court must accept all well pleaded factual allegations as true and draw all reasonable inferences in the

plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). To survive a motion to dismiss, the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*

Federal Rule of Civil Procedure 9(b) requires that allegations of fraud be pleaded with particularity, "specify[ing] the statements that the plaintiff contends were fraudulent, identify[ing] the speaker, stat[ing] where and when the statements were made, and explain[ing] why the statements were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993). Where multiple defendants are involved, "the complaint should inform each defendant of the nature of his alleged participation in the fraud." *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).

As demonstrated below, the FAC far exceeds these pleading standards with respect to every claim asserted against Defendant Chow. The FAC provides extensive factual detail about Defendant Chow's personal involvement in creating, planning, and executing a sophisticated fraudulent scheme. These are not conclusory allegations or legal conclusions masquerading as facts—they are specific, particularized allegations of misconduct that more than satisfy the applicable pleading standards.

## B. Plaintiffs' Fraud Claims Against Defendant Chow Are Overwhelmingly Sufficient

### 1. The Complaint Details Chow's Specific, Central Role in the Fraud, Defeating Any Claim of "Group Pleading"

The FAC meets the heightened pleading standard of FRCP 9(b) by specifically

14

identifying the fraudulent acts and statements by Defendant Chow, providing him with clear notice of his alleged role in the scheme. As such, the FAC does not rely on impermissible "group pleading" but rather details Defendant Chow's individual role and contributions to the fraud. (*see e.g.* Def.'s MTD at 12–13).

First, the FAC alleges that Defendant Chow personally created the "M3M3 Calcs Template" that served as the financial blueprint for the fraud. (FAC ¶202). This was not a document created by "defendants" collectively—it was created by Chow himself, using his expertise in financial modeling and token economics to optimize the extraction of investor funds.

Second, the FAC directly quotes Chow's own words from a planning call where he acknowledged the deceptive nature of the scheme: "no one will play the game if they see, like 90% of the supply already locked up." (FAC ¶207). This statement, attributed specifically to Defendant Chow and not to defendants generally, demonstrates his understanding that the scheme required concealing material information from investors.

Third, the FAC details Chow's unique technical contributions: his admitted, hands-on configuration of Meteora launch mechanics, including locking liquidity and designing liquidity curves (FAC ¶¶ 300–301), his role in planning and directing the $M3M3 mechanics while the team used the Mint Wallet's "Freeze Authority" to execute the insider-sniping sequence (FAC ¶¶ 200, 207–210, 215–221), and the platform's retained "upgrade authority" over AMM/DLMM programs via the 4-of-7 Meteora Program MultiSig (FAC ¶¶ 132–138). These technical elements, which were the driving force behind the fraudulent scheme, could only have been created by someone with Defendant Chow's specific expertise and platform access.

Fourth, the FAC alleges specific misrepresentations made by Chow to the public,

including his false characterization of Meteora as decentralized and permissionless when he knew he retained backend control (FAC ¶¶ 6, 20, 137), and his public endorsement of the fraudulent $LIBRA token as "changing the world" (FAC¶ 251).

These detailed, individualized allegations far exceed the particularity requirements of Rule 9(b) and provide Chow with more than adequate notice of the claims against him. Courts routinely deny motions to dismiss where, as here, the complaint attributes specific statements to individual defendants and specifies each defendant's role in the alleged fraud. *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 405 (S.D.N.Y. 2010).

### 2. Chow's Personal Provision of Infrastructure for Fraud Distinguishes This Case from *Risley*

Defendant Chow's reliance on *Risley v. Universal Navigation Inc.* in his dismissal motion fundamentally mischaracterizes both the factual bases of that case and the allegations in the FAC. (Def.'s MTD at 8, 12) In *Risley*, the court dismissed claims against a software developer who provided a content-neutral platform that was subsequently misused by third parties for fraudulent purposes. 2023 WL 5609200, at *15. The critical distinction that Defendant Chow ignores is that the *Risley* defendant provided genuinely neutral technology without knowledge of or participation in any fraudulent scheme.

Here, by stark contrast, Defendant Chow did not provide a neutral platform that was unexpectedly misused. He deliberately designed and built a platform with hidden manipulative features specifically intended to enable fraud. As the Second Circuit has recognized, a defendant's knowing association with, participation in, and actions to make a fraudulent venture succeed suffice for liability. *See S.E.C. v. Apuzzo*, 689 F.3d 204, 206, 212-13 (2d Cir. 2012).

The FAC alleges facts that bring Defendant Chow squarely within this principle. He did

not merely provide neutral technology that happened to be misused. Instead the FAC alleges that Defendant Chow: deliberately embedded hidden control mechanisms that contradicted the platform's public representations of decentralization (FAC ¶¶ 21, 166, 200, 300); created sophisticated financial models specifically designed to optimize investor exploitation (FAC¶¶ 200-204); participated in planning sessions where deceptive strategies were explicitly discussed (FAC¶¶ 207-208); provided specific technical advice on how to structure the fraud for maximum effectiveness (FAC ¶¶ 200–208, 305); and publicly endorsed fraudulent tokens to lend them credibility (FAC 250).

These allegations establish that Defendant Chow's platform was not content-neutral, but rather specifically designed as a tool for fraud. As courts have recognized, when a defendant participated in the fraud as something more than an ordinary service provider, liability is appropriate. *In re Refco, Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 518-19 (S.D.N.Y. 2011). Defendant Chow's creation of specialized tools for manipulation, his participation in planning the fraud, and his provision of technical expertise essential to its execution place him far outside the protective scope of *Risley*.

### 3. The FAC Adequately Alleges Scienter Through Both Direct Evidence and Compelling Circumstantial Facts

To establish scienter, Plaintiff must show that the defendant acted with "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). This can be demonstrated through either direct evidence of fraudulent intent or strong circumstantial evidence of conscious misbehavior or recklessness. *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). The FAC provides sufficient grounds to establish both despite Defendant's arguments. (Def.'s MTD at 17–19).

### i. Direct evidence of fraudulent intent

First, the FAC directly references Defendant Chow's recorded statement acknowledging that transparency about token distribution would prevent the scheme from working, noting that: "no one will play the game if they see, like 90% of the supply already locked up." (FAC ¶207). This statement demonstrates Defendant Chow's understanding that deception was essential to the scheme's success.

Second, the FAC highlights Defendant Chow's admission after the fraud that he "enabled" the scheme and "should not have enabled him." (FAC ¶313). This admission reveals Chow's awareness that he was facilitating wrongdoing, not legitimate business activity.

Third, the FAC alleges that Defendant Chow created the M3M3 Calcs Template and specifically designed it to model and optimize the extraction scheme and create a psychological trap for investors. (FAC ¶¶ 201-204). One does not create detailed models for "extracting" funds from "trapped" investors without fraudulent intent.

### ii. Circumstantial evidence of fraudulent intent

The FAC also alleges overwhelming circumstantial evidence of scienter. The Second Circuit has identified several factors that may give rise to a strong inference of scienter, including where the defendant: (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor. *S.E.C. v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012).

Each of these factors is present in the FAC. The FAC shows the manner in which Defendant Chow personally benefitted from the fraud through his ownership interest in Meteora

and his claim on trading fees generated by the fraudulent transactions (FAC ¶40). It further shows that Defendant Chow engaged in deliberately illegal behavior by creating hidden control mechanisms while publicly representing the platform as decentralized. Defendant Chow had complete access to information about the platform's true nature and the fraudulent schemes being executed through it (*see e.g.* FAC ¶¶ 201–205, 207–208, 300–301, 313). And Defendant Chow failed to monitor or prevent the misuse of the platform despite his position as CEO and his technical control over its operations.

Moreover, as set forth in the FAC, the magnitude of the fraud supports a strong inference of scienter. *See In re Livent, Inc. Sec. Litig.*, 148 F. Supp. 2d 331, 367 (S.D.N.Y. 2001). The schemes here involved millions of dollars, sophisticated technical manipulation, extensive planning over months, and the creation of elaborate false narratives. Such complex, premeditated fraud cannot be executed without scienter.

**C. Plaintiffs' RICO Claims Are Properly Pleaded**

### 1. The Complaint Alleges an Actionable RICO Enterprise with Defendant Chow as a Central Participant

A RICO enterprise is "any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). To establish an association-in-fact enterprise, a plaintiff must show (1) a common purpose among the participants, (2) organization, and (3) continuity. *United States v. Turkette*, 452 U.S. 576, 583 (1981); *Boyle v. United States*, 556 U.S. 938, 946 (2009).

The FAC comprehensively alleges each element. The enterprise had a clear common purpose: to leverage Meteora's technological capabilities and market position to execute fraudulent token launches that would generate massive, risk-free profits for the enterprise members while causing substantial losses to retail investors. (FAC ¶¶ 379). This purpose was not

19

legitimate business activity gone wrong—it was fraud from the outset.

The enterprise was highly organized, with defined roles and a clear hierarchy. Chow provided the technological infrastructure and technical expertise; the Kelsier Defendants provided capital and promotional capabilities; all participants coordinated through private communication channels and shared planning documents. (FAC ¶¶ 380–384). The enterprise had a structure "separate and apart from the pattern of racketeering activity in which it engaged"—it existed as a partnership between Meteora and Kelsier that could and did execute multiple fraudulent schemes. *Turkette*, 452 U.S. at 583.

The enterprise demonstrated continuity through its execution of multiple fraudulent schemes over several months, with plans for additional frauds that were only prevented by public exposure. (FAC ¶ 386). The enterprise was not an *ad hoc* arrangement for a single fraud but rather an ongoing criminal organization designed to execute repeated scams using the same playbook.

### 2. Chow Participated in the Operation and Management of the Enterprise

To be liable under § 1962(c), a defendant must have "participated in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993). This requires some degree of direction over the enterprise's affairs, though the defendant need not hold a formal position within the enterprise. *Id.* at 179. The FAC reveals Chow's participation in the enterprise's operation and management. Contrary to the Defendant's assertions, He was not a passive service provider or outside vendor—he was an architect of the fraud who exercised substantial control over its execution. (*see e.g.* Def.'s MTD at 27–28). The FAC alleges that Chow: designed and controlled the technological platform that was the enterprise's primary tool

20

for executing fraud (*see e.g.* FAC ¶¶ 201–205, 207–208, 300–301, 313); created planning documents and models that determined how the fraud would be structured and executed (FAC ¶¶ 200–206); participated in strategic planning sessions where key decisions about the fraud were made (FAC¶¶ 207-208); provided technical expertise essential to the fraud's success (FAC 305); and made public statements to promote the fraudulent tokens (FAC   250).

These allegations are sufficient to establish that Defendant Chow played "some part in directing the enterprise's affairs." *Reves*, 507 U.S. at 179. Indeed, without Defendant Chow's technological platform and expertise, the enterprise could not have functioned. His role was not merely important—it was indispensable. Courts have consistently found that defendants who, like Chow, provide essential services that enable the enterprise to function satisfy the *Reves* test. *See e.g. United States v. Diaz*, 176 F.3d 52, 92 (2d Cir. 1999) (finding that defendants who "exercised discretion and judgment" in carrying out the enterprise's objectives, thereby participated in its operation and management).

### 3. The Complaint Alleges a Clear Pattern of Racketeering Activity

A "pattern of racketeering activity" requires at least two predicate acts of racketeering activity within ten years. 18 U.S.C. § 1961(5). Additionally, the acts must be related and must "amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989). The FAC alleges numerous predicate acts by Defendant Chow, including multiple instances of wire fraud (18 U.S.C. § 1343) and mail fraud (18 U.S.C. § 1341). Each fraudulent token launch involved multiple predicate acts. (FAC ¶¶ 387–395).

The predicate acts alleged in the FAC are clearly related, sharing common participants, victims, methods, and purposes. They were all part of a single scheme to defraud investors

through manipulated token launches. This satisfies the relatedness requirement. *H.J., Inc.,* at 240.

In addition, continuity can be either "closed-ended" (a series of related predicate acts extending over a substantial period of time) or "open-ended" (past conduct that by its nature projects into the future with a threat of repetition). *Id.* at 241. Here, both forms of continuity are present as alleged in the FAC

For closed-ended continuity, the FAC alleges that the enterprise operated from at least October 2024 through filing of the amended complaint, executing multiple complex fraudulent schemes that affected thousands of victims and extracted millions of dollars. (FAC ¶¶ 163, 389). While the Second Circuit often looks for periods exceeding two years, this is no bright-line rule and courts consider factors such as the number and variety of predicate acts, the number of victims, the presence of separate schemes, and the complexity of the fraud. *See Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183-85 (2d Cir. 2008).

The fraud here as alleged in the FAC was not a "one-shot deal" but rather involved two separate, complex schemes affecting hundreds of thousands of potential victims. The schemes required months of planning, sophisticated technical implementation, and coordinated execution by multiple participants. This level of complexity and the repeated nature of the fraud support a finding of closed-ended continuity even within a period of less than two years. *Cf. United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992) (finding continuity where scheme was inherently unlawful and involved ongoing fraudulent activity).

Open-ended continuity is also supported by the allegations in the FAC. The enterprise's business model was predicated on executing repeated fraudulent token launches using the same technological infrastructure and methods. But for public exposure, the enterprise would have

continued executing similar frauds indefinitely. The threat of continued criminal activity is inherent in the enterprise's structure and purpose. (FAC ¶¶ 379, 395).

**D. Plaintiffs' Conspiracy Claims Are Well-Pleaded**

The Defendant's position that Plaintiffs' conspiracy claims fail is incorrect. (Def.'s MTD at 30–32). The FAC alleges both civil conspiracy to defraud and RICO conspiracy under 18 U.S.C. § 1962(d). A conspiracy claim requires showing that the defendant agreed to participate in an unlawful scheme. Such agreement need not be express; it can be inferred from the defendants' conduct and the circumstances. *See Salinas v. United States*, 522 U.S. 52, 63-66 (1997).

The FAC alleges overwhelming evidence of Defendant Chow's agreement to participate in the fraudulent scheme. This includes direct evidence of agreement: the formal partnership between Meteora and Kelsier backed by a $2 million investment (FAC ¶¶ 163-164); the creation of private communication channels specifically for coordinating the fraud (FAC  201); jointly developed planning documents including Defendant Chow's M3M3 Calcs Template (FAC ¶¶ 201–204); and conversations where Defendant Chow and his co-conspirators explicitly discussed their deceptive strategy (FAC¶¶ 207-208).

The circumstantial evidence of agreement is equally compelling. The sophistication and coordination required to execute these frauds could not have occurred without agreement among the participants. The technical manipulation required Chow's expertise and platform access; the promotional campaign required the Kelsier Defendants' resources and connections; the timing had to be precisely coordinated. This level of coordination cannot occur without conspiracy.

For RICO conspiracy, "the plaintiff need only show that the defendant agreed to facilitate

23

a scheme which includes the operation or management of a RICO enterprise." *Baisch v. Gallina*, 346 F.3d 366, 377 (2d Cir. 2003) (citing *Salinas*, 522 U.S. at 66). The defendant need not have agreed to personally commit the predicate acts. Here, as set forth in the FAC, Chow's agreement to provide the technological infrastructure and expertise necessary for the fraudulent enterprise, with knowledge of its criminal purpose as evidenced by his own statements and admissions, satisfies this standard.

### E. Plaintiffs State Valid Claims Under New York Law

#### 1. Plaintiffs' Claims Under N.Y. G.B.L. §§ 349 and 350 Are Legally Sufficient

New York General Business Law §§ 349 and 350 prohibit "[d]eceptive acts or practices in the conduct of any business, trade or commerce" and false advertising, respectively. To state a claim, a plaintiff must allege that: (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result. *Goshen v. Mutual Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324 (2002).

The Defendant is incorrect that Plaintiffs' GBL allegations fail. (Def.'s MTD at 22–24). The fraudulent token launches were marketed broadly to retail investors through social media and other public channels, making them indisputably consumer-oriented. (*see e.g.* FAC ¶¶ 171, 177–179, 271, 412, 422). The conduct as alleged in the FAC was materially deceptive for all the reasons discussed above—false representations about decentralization, concealment of insider control, fabricated endorsements, and hidden manipulation mechanisms.

The territorial nexus requirement for GBL claims is also satisfied. To apply a New York statute, there must be a sufficient nexus between the defendant's deceptive acts and New York. *Goshen*, 98 N.Y.2d at 324-25.

Here, both grounds for nexus are present in the FAC. Plaintiff Hurlock is a New York resident who purchased tokens while in New York. (FAC ¶38). In addition, Defendant Chow, a central architect of the fraudulent scheme, resided in New York and "controlled" Meteora operations from" this District. (FAC ¶¶ 33, 40). When the fraudulent scheme is substantially directed from New York by a New York resident defendant, the territorial nexus requirement is satisfied. *Barron v. Helbiz Inc.*, 2023 WL 5672640, at *8 (S.D.N.Y. Sept. 1, 2023) (finding sufficient grounds for an extraterritorial nexus where "New York Defendants sent out deceptive communications from websites registered to New York-based addresses, held marketing events in New York to (fraudulently) promote their coin, and administered the ICO website in the state and perpetrated other aspects of their conspiracy from within New York").

### 2. Plaintiffs' Unjust Enrichment Claim Is Properly Pleaded in the Alternative

Under New York law, unjust enrichment requires showing: "that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered". *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (2012). Federal Rule of Civil Procedure 8(d)(2) expressly permits pleading claims in the alternative, even if they are inconsistent.

The FAC adequately alleges that Chow was unjustly enriched through his participation in the fraudulent scheme. The enterprise extracted tens of millions of dollars from investors through the fraudulent token launches. Chow personally benefitted from this fraud through his ownership interest in Meteora and his "claim on a portion of [non-party] DLL's revenues, including a portion of any DLL revenues from trading fees received from Meteora user transactions." (FAC ¶40).

These trading fees were generated directly from the fraudulent transactions—the massive trading volumes created by the manipulation generated substantial fees that flowed to Chow. It would be inequitable to allow Chow to retain these ill-gotten gains merely because they passed through a corporate entity he controls and benefits from.

Defendant Chow's argument that unjust enrichment requires a "direct benefit" which Plaintiffs fail to meet, misapprehends the doctrine. Under New York law, in order to prove a claim for unjust enrichment "a plaintiff must show that the defendant actually received a benefit." *Caro Cap., LLC v. Koch*, 653 F. Supp. 3d 108, 124 (S.D.N.Y. 2023). The benefit must be "specific and direct." *Id*. "For the benefit to be 'direct,' the defendant must either be put in possession of the benefit, or otherwise obtain financial relief because of the benefit." *Id*. (citing *Buchwald v. Renco Grp.*, 539 B.R. 31, 49 (S.D.N.Y. 2015)).

Plaintiffs here have met this standard. The FAC alleges that Defendants profited millions of dollars as a result of their pump-and-dump fraudulent scheme. Indeed Defendants extracted hundreds of millions of dollars in crypto assets from $M3M3 and $LIBRA retail investors. FAC ¶¶14, 163, 277, 278, 366. The FAC alleges that Plaintiff Mehta suffered approximate net losses of $19,164 on his $M3M3 investment; the total net gains by Defendants' fraudulent price manipulation and capital extraction scheme were in the millions of dollars. FAC ¶¶ 37, 163, 277.

Similarly, Plaintiff Hurlock who provided valuable cryptocurrency assets to invest in $LIBRA based on false and materially misleading information, sustained significant cryptocurrency net losses due to the fraudulent capital extraction scheme by Defendants, as alleged in the FAC. FAC ¶¶ 38. (As with $M3M3 "the same happened with $LIBRA, where insider wallets were used to manipulate bin liquidity and extract over $100 million in user

deposits in under 2 hours"). These financial gains to Defendants as a result of their fraudulent pump-and-dump scheme constituted direct financial benefits which Plaintiffs conferred on Defendants. Through fraudulent capital extraction, Defendants came into possession of these assets. *See Buchwald,* 539 B.R. at 49. Should Defendants allege no direct link between the monetary losses sustained by Plaintiffs and Defendants' financial gains, due to secondary markets, it is nonetheless undeniable that Defendants obtained financial relief because of the financial benefits extracted from Plaintiffs and the Class. *See id.* The unjust enrichment claim is therefore adequately pleaded in the FAC.

## IV. CONCLUSION

For the foregoing reasons, Defendant Chow's Motion to Dismiss should be denied in its entirety. The FAC pleads with sufficient particularity that Chow was not a passive technology provider or an unwitting dupe, but rather a central architect and knowing operator of a sophisticated fraudulent enterprise. The FAC's detailed allegations of his personal involvement in designing the fraudulent infrastructure, planning the schemes, and executing the technical manipulation far exceed the applicable pleading standards for every cause of action.

Defendant Chow's motion fundamentally mischaracterizes both the applicable law and the allegations against him. His reliance on cases protecting legitimate service providers is misplaced where, as here, the defendant created specialized tools for fraud, participated in planning sessions, and provided expertise essential to the scheme's success. The law does not shield those who build and operate the very mechanisms of fraud.

The sophisticated nature of modern financial fraud often depends on technical expertise and digital infrastructure. If defendants like Chow could escape liability simply by claiming their

technology was "neutral" despite building in hidden manipulation features and participating in planning the fraud, it would create an enormous loophole that would essentially immunize the architects of technologically-enabled fraud. The law recognizes no such immunity.

For the foregoing reasons Plaintiffs respectfully request that the Court deny Defendant Chow's motion to dismiss in its entirety and allow this case to proceed on the merits.

In the alternative, should the Court be inclined to grant Defendant Chow's motion to dismiss, Plaintiffs respectfully request that such dismissal be granted with leave to amend, in order to allow Plaintiffs the opportunity to cure pleading deficiencies, if any.

Dated: October 28, 2025
New York, New York

Respectfully submitted,

**BURWICK LAW, PLLC**

By: */s/ Max Burwick*
Max Burwick
1 World Trade Center, *84th Fl.*
New York, NY 10007
(646) 762-1080
max@burwick.law

Luis Muñoz de la Vega
1 World Trade Center, 84th Fl.
New York, NY 10007
(646) 762-1080
luis@burwick.law

*Counsel for Plaintiffs Omar*
*Hurlock  & Anuj Mehta*

**WORD COUNT CERTIFICATION**

I certify that the foregoing opposition to motion to dismiss contains 7107 words, as determined by the word-count function of Microsoft Word, and complies with the word-limit requirements in the Individual Rules and Practices of Judge Jennifer L. Rochon.