**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

OMAR HURLOCK and ANUJ MEHTA, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

KELSIER VENTURES, HAYDEN DAVIS, GIDEON DAVIS, METEORA, THOMAS DAVIS, and BENJAMIN CHOW,

Defendants.

Case No. 25-cv-03891-JLR

**DEFENDANT BENJAMIN CHOW'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT ....................1

BACKGROUND ....................3

I. THE SAC IS NOT MATERIALLY DIFFERENT THAN THE FAC. ....................3

II. PLAINTIFFS' MOTION TO AMEND IS THE LATEST IN A LONG LINE OF MERITLESS MOTIONS DESIGNED TO INCREASE COSTS AND FORESTALL THESE PROCEEDINGS. ....................7

LEGAL STANDARD....................10

ARGUMENT....................11

I. THE COURT SHOULD REJECT THE SAC AS FUTILE. ....................11

A. The SAC Does Not Allege that Mr. Chow Engaged in Misconduct. ....................12

B. The Fraud Claims Fail. ....................15

C. The NYGBL Claims Fail. ....................18

D. The Unjust Enrichment Claims Fail. ....................18

E. The RICO Claims Fail. ....................19

F. The Conspiracy Claims Fail....................21

G. Plaintiffs Lack Standing to Pursue Claims Relating to $ENRON or $TRUST. ....................22

H. Claims Against Mr. Yeow and DLL are Futile....................23

II. PLAINTIFFS' GAMESMANSHIP WARRANTS DENIAL....................24

CONCLUSION....................27

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Afriyie* v. *NBCUniversal Media, LLC*,
775 F. Supp. 3d 791 (S.D.N.Y. 2025)....................23

*Akridge* v. *Whole Foods Market Group, Inc.*,
2022 WL 955945 (S.D.N.Y. Mar. 30, 2022)....................22

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009)....................11, 23

*ATSI Communications, Inc.* v. *Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007).................... 16-17

*Burch* v. *Pioneer Credit Recovery, Inc.*,
551 F.3d 122 (2d Cir. 2008).................... 10-11

*Carroll* v. *Trump*,
590 F. Supp. 3d 575 (S.D.N.Y. 2022)....................26

*D. Penguin Bros. Ltd.* v. *City National Bank*,
587 F. App'x 663 (2d Cir. 2014)....................20

*DeLuca* v. *SmithKline Beecham Corp.*,
2007 WL 541656 (S.D.N.Y. Feb. 20, 2007)....................25

*DiMuro* v. *Clinique Labs, LLC*,
572 F. App'x 27 (2d Cir. 2014).................... 22-23

*In re Eight-115 Assosiates, LLC*,
650 B.R. 43 (Bankr. S.D.N.Y. 2023)....................18

*In re Express Scripts/Anthem ERISA Litigation*,
285 F. Supp. 3d 655 (S.D.N.Y. 2018)....................16

*Footbridge Ltd. Trust* v. *Countrywide Home Loans, Inc.*,
2009 WL 4278179 (S.D.N.Y. Nov. 23, 2009)....................11, 26

*Fresh Del Monte Produce, Inc.* v. *Del Monte Foods, Inc.*,
304 F.R.D. 170 (S.D.N.Y. 2014)....................10

*Gardner* v. *Sensio Inc.*,
645 F. Supp. 3d 310 (S.D.N.Y. 2022)....................16, 17

*Goodman* v. *Board of Managers of Harborview Condominium*,
2023 WL 6977450 (S.D.N.Y. Oct. 23, 2023)....................13

*In re Interest Rate Swaps Antitrust Litigation*,
2018 WL 2332069 (S.D.N.Y. May 23, 2018) ....................25

*Ohr Somayach / Joseph Tanenbaum Educational Center* v. *Farleigh International Ltd.*,
2021 WL 3038470 (S.D.N.Y. July 19, 2021) ....................6n

*Kominis* v. *Starbucks Corp.*,
692 F. Supp. 3d 236 (S.D.N.Y. 2023)....................11

*Lucente* v. *International Business Machines Corp.*,
310 F.3d 243 (2d Cir. 2002)....................11

*Mayor & City Council of Baltimore, Maryland* v. *Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013)....................13

*McCarthy* v. *Dun & Bradstreet Corp.*,
482 F.3d 184 (2d Cir. 2007)....................24

*NECA-IBEW Health & Welfare Fund* v. *Goldman Sachs & Co.*,
693 F.3d 145 (2d Cir. 2012)....................22

*PI, Inc.* v. *Quality Prods., Inc.*,
907 F. Supp. 752 (S.D.N.Y. 1995) .................... 26-27

*Risley* v. *Universal Navigation Inc.*,
2025 WL 615185 (2d Cir. Feb. 26, 2025)....................1, 14

*Sly Magazine, LLC* v. *Weider Publications L.L.C.*,
241 F.R.D. 527 (S.D.N.Y. 2007) ....................11, 25

*Velez* v. *Lasko Products, LLC*,
706 F. Supp. 3d 444 (S.D.N.Y. 2023)....................15

*Wade Park Land Holdings, LLC* v. *Kalikow*,
2023 WL 2614243 (S.D.N.Y. Mar. 23, 2023) ....................7n

*Wheeler* v. *Topps Co., Inc.*,
652 F. Supp. 3d 426 (S.D.N.Y. 2023)....................11

*Yuille* v. *Uphold HQ Inc.*,
686 F. Supp. 3d 323 (S.D.N.Y. 2023)....................18

*Zamora* v. *FIT International Group Corp.*,
834 F. App’x 622 (2d Cir. 2020) ....................20

Defendant Benjamin Chow respectfully submits this memorandum of law in opposition to Plaintiffs' Motion for Leave to File a Second Amended Complaint (Dkt. 204 ("Motion to Amend" or the "Motion")).

**PRELIMINARY STATEMENT**

On August 19, 2025, the Court denied Plaintiff's application for a preliminary asset freeze and warned that it was "extremely skeptical" of Plaintiffs' claims in the operative Amended Complaint ("FAC"). If anything, the Court should be even more skeptical now that Plaintiffs have sought leave to file a Second Amended Complaint ("SAC") in the midst of briefing a motion to dismiss the FAC. The Motion to Amend should be denied for two principal reasons.

***First***, the amendment is futile because the SAC fails to state a claim. As set forth in Mr. Chow's Motion to Dismiss (Dkt. 176, "MTD"), the FAC fails to state any claims against Mr. Chow for several reasons, including because: (i) Plaintiffs fail to plead any plausible allegations of wrongdoing by Mr. Chow and it "defies logic" to suggest a software developer could be liable for "a third-party user's misuse of the platform." *Risley* v. *Universal Navigation Inc.*, 2025 WL 615185, at *4 (2d Cir. Feb. 26, 2025); (ii) Plaintiffs fail to plead claims for fraud, unjust enrichment, or under the NYGBL because they fail to allege actionable false or misleading statements or omissions by Mr. Chow, that Mr. Chow owed Plaintiffs a duty to disclose any omitted information, that Plaintiffs relied on any statements or omissions by Mr. Chow when trading their memecoins, that Mr. Chow caused any losses they suffered, or facts giving rise to a strong inference of scienter; and (iii) Plaintiffs fail to allege a RICO injury or enterprise, RICO or fraud violations by Mr. Chow, or an agreement that could support Plaintiffs' RICO, RICO conspiracy, and conspiracy to defraud claims. Nothing in the SAC cures these fatal defects.

The SAC merely rewrites the FAC without changing its core theory. Plaintiffs allege that Mr. Chow provided technical support to memecoin creators who used the Meteora software to launch their memecoins. This is not enough to state a claim against him, even if the memecoin creators misused Meteora and employed allegedly manipulative tactics during the launches of their memecoins.

Plaintiffs' new allegations regarding three additional token launches, "planning documents" that the FAC previously described but did not attach, text messages purportedly sent by Defendant Hayden Davis, and an undisclosed forensic analysis (described further below in Background Section I), do not change the case. Plaintiffs still ***do not*** allege that Mr. Chow engaged in the allegedly manipulative tactics they say caused their losses—false promotions of tokens and manipulative trading—and their group pleadings regarding "Defendants" are wholly insufficient under Federal Rule of Civil Procedure 9(b)'s heightened pleading standard. Moreover, nothing in the new allegations cures the pleading failures dooming each of their claims against Mr. Chow.

The claims against newly added Defendants are also futile. Similar to problems with the claims against Mr. Chow, the SAC fails to state a claim against Ng Ming Yeow (a/k/a "meow") or Dynamic Labs Limited ("DLL") because the SAC contains no allegations of wrongdoing whatsoever.

***Second***, and even if the SAC could plausibly state a claim for relief (it cannot), the Court should deny leave because the amendment is nothing more than a bad faith effort—consistent with Plaintiffs' tactics since the denial of their motion for a preliminary injunction—to further delay these proceedings, which would prejudice Mr. Chow. Their Motion to Amend is simply the latest in a line of frivolous or near frivolous motions they have filed in the last several months and that

have wasted Mr. Chow's (and the Court's) resources. Their tactics are wasteful and simply forestall the inevitable dismissal of the case.

Indeed, Plaintiffs have been on notice of the defects in their claims since at least June 27 (when Mr. Chow filed his opposition to Plaintiff's preliminary injunction motion), but stalled in bringing their Motion to Amend. Although they claim to have only recently received certain materials attached to the SAC, the timeline is not so simple. They possessed the "new" materials before Defendants moved to dismiss on September 29. Their "sharp tactic" of moving to amend only after seeing Defendants' motions to dismiss should be rejected.

At some point, Rule 15's generosity must yield to Rule 1's command for the just, speedy, and inexpensive determination of every action. That point is now. The Court should end this litigation by denying this Motion to Amend and subsequently granting Defendants' and DLL's motions to dismiss the FAC with prejudice.

## BACKGROUND

In the eight short months this action has been pending, Plaintiffs have filed a series of meritless (and sometimes vexatious) motions that have done little more than delay resolution of their claims and impose undue burdens on the Defendants forced to respond. The present Motion to Amend is no exception. As explained below in Section I, despite rewriting the complaint from scratch, Plaintiffs' core theory of liability is unchanged between the FAC and SAC, and the SAC adds few truly new factual allegations. In addition, as set forth in Section II, the timing of this Motion raises numerous red flags, and is yet another example of a filing that will only delay this action and impose additional costs on Defendants.

### I. The SAC is Not Materially Different than the FAC.

As Mr. Chow explained in his MTD, Plaintiffs purchased highly speculative "memecoins" and their FAC purports to allege fraudulent schemes and a conspiracy between the Kelsier

Defendants, "Meteora," and Mr. Chow to manipulate the launches of memecoins that Plaintiffs purchased from liquidity pools set up by the Kelsier Defendants. (*See* MTD at 4-10). At bottom, Plaintiffs assert that Defendants leveraged insider wallet control and social media hype to defraud memecoin purchasers. (*See* MTD at 4-10).

This theory of liability is largely unchanged in the SAC. The SAC includes cosmetic additions and new rhetorical flourishes, but it still rests on the same specious and insufficiently alleged premise: a "Meteora-Kelsier Enterprise" that used insider wallet control and social media hype to allegedly defraud investors. Defendants' alleged actions are the same, as are Plaintiffs' purported injuries and claims for relief.

The SAC's so-called "six-step playbook" (SAC ¶ 93) is emblematic of Plaintiffs' revisions. The steps are presented as fresh new allegations, but these allegations were already set forth in the prior complaint using different turns of phrase:

| **SAC "Six-Step Playbook" (¶ 93)** | **Equivalent FAC Allegations** |
|---|---|
| Narrative invention | Hype creation (¶¶ 186-192) |
| Supply rigging | Secret "freeze" period & insider wallet control (¶¶ 195-198) |
| Hype manufacture | Celebrity/government endorsements (¶¶ 249-252, 268) |
| Spike engineering | Coordinated insider trading (¶¶ 197-199) |
| Extraction | Liquidity withdrawal and fee routing (¶¶ 204, 226-232) |
| Reinvention | Ongoing token launches and rebranding (¶¶ 384, 386-390) |

Indeed, Plaintiffs' new factual allegations are *de minimis*, essentially adding four categories of new allegations that do nothing to strengthen Plaintiffs' claims: (i) three additional token launches; (ii) copies of shared "planning documents" the FAC already described; (iii) excerpts of text messages between Hayden Davis and an unidentified "financial professional;" and (iv) conclusory assertions regarding a "tracing analysis" that identified a central "hub wallet" purportedly used in each of the at-issue token launches.

**Token Launches.** The FAC focused on the $M3M3 and $LIBRA launches, and the SAC purports to add three more: $MELANIA, $ENRON, and $TRUST. Plaintiffs allege that these launches followed the same pattern as the $M3M3 and $LIBRA launches, but offer few particulars. For example, the SAC fails to provide any specific factual allegations connecting Mr. Chow to any of the alleged manipulation for these three launches, instead relying on conclusory speculation that Mr. Chow "control[ed] the technology" (SAC ¶¶ 294, 320) and was part of the "command structure" (SAC ¶ 354). And although the SAC purports to identify certain false statements about the tokens (*see* SAC ¶ 384), it lacks specific details about them (such as the who, what, where, and when) and improperly attributes them to "Defendants," while alleging in a conclusory fashion that Plaintiffs relied on the statements in making purchasing decisions (*see* SAC ¶ 402).

**"Planning Documents."** In the FAC, Plaintiffs described two "planning documents"—the "M3M3 Calcs Template" and "M3M3 Token Launch Organizer"—that they say evidence a scheme to manipulate the launch of the M3M3 token (*see* FAC ¶¶ 194-203). Plaintiffs now attach the documents to the SAC. (*See* SAC, App. I, N).

As Mr. Chow has explained (MTD at 31-32), Mr. Chow's alleged creation and circulation of the M3M3 Calcs Template is entirely consistent with his role providing technical support to tokens launched on Meteora. Plaintiffs conclusorily assert that the document demonstrates that Mr. Chow "engineered $M3M3's launch to benefit a handful of insiders" (SAC ¶ 397) and "model[s] how insiders could exploit the token's economics," (SAC ¶ 412(b)), but, in reality, the content of the document—which shows staking calculations, tokenomics information, and liquidity metrics—simply confirms that the document provided precisely the kind of technical assistance that users of the Meteora software sometimes required and Mr. Chow sometimes provided.

Plaintiffs do not allege that Mr. Chow drafted the "M3M3 Token Launch Organizer" (*see* SAC ¶ 127), and the SAC contains no non-conclusory allegations that Mr. Chow contributed to the document or even saw it. And even if Mr. Chow had, the document does not contain any evidence of a fraudulent scheme. The document reports, among other things, that the "[t]eam will buy on the open market aiming for 30-40% of the supply," using "[a]ged wallets" in order to "***avoid aggregators/snipers***" (*see* SAC, App. N (Dkt. 205-1 at 128) (emphasis added)). If anything, this language regarding the need to "avoid aggregators/snipers" undercuts Plaintiffs' suggestion that the insiders themselves were the snipers (*see* SAC ¶¶ 15, 154, 157). There would be no need to "avoid" snipers if the insiders planned to snipe the tokens.

**Hayden Davis texts.** Plaintiffs latch on to a text purportedly sent by Hayden Davis on February 23, 2025, stating: "Well the scam [sic] they have the wrong people[.] Kelsier isn't axiom[.] Axiom are the guys that did all these tokens lol[.] I only did like 15 and just followed Ben's instructions and then got better [laughing/crying emoji]" (SAC, App. Q (Dkt. 205-1 at 150)). Plaintiffs allege this text demonstrates an agreement between Mr. Chow and Mr. Davis, with Mr. Chow "at the center" of the scheme (*see* SAC ¶ 2), but Plaintiffs' reading is conclusory and unsupported by the plain language.[1] The fact that Mr. Davis allegedly followed instructions from Mr. Chow does not mean they shared a common goal or reached any sort of agreement with respect to allegedly fraudulent token launches. The text only underscores that it was Mr. Davis—not Mr. Chow—that "did" the launches, and the reference to "follow[ing] [Mr. Chow's] instruction" is

[1] Moreover, Plaintiffs do not establish that the texts are reliable because they offer an incomplete picture, devoid of potentially crucial context: even though the Court rejected Plaintiffs' motion to seal, Plaintiffs redacted all of the messages sent by the CI, as well as portions of Mr. Davis's texts. *See Ohr Somayach / Joseph Tanenbaum Educational Center* v. *Farleigh International Ltd.*, 2021 WL 3038470, at *2 (S.D.N.Y. July 19, 2021) ("Plaintiff's redactions of the recipient of the e-mail and of the file names of the three attachments are precisely the type of redactions that 'breed suspicions' and 'deprive the reader of context.'")

100% consistent with his (non-fraudulent) role providing technical support to launches using the Meteora platform. Consistent with memecoin token launches being complicated and requiring technical support for novices, Mr. Davis confirms that he launched "like 15 [tokens]" and that he "followed Ben's instructions and then got better" at launching them on his own.

**Forensic analysis.** The SAC asserts a forensic analysis that identified a single wallet (0xcEA) that "served as a financial command center" by funding the creation of the five challenged tokens, seeding their initial liquidity pools, financing the insider "sniper" wallets that captured early supply, and later receiving and distributing the proceeds of the extracted assets from the five launches. (*See* SAC ¶¶ 135-139).

The allegations regarding this analysis, however, are largely conclusory, as Plaintiffs provide no specific details regarding the actual analysis.[2] And although Plaintiffs allege that their identification of this "hub wallet" "cannot be squared with a hands-off 'software-only' portrayal" (*see* SAC ¶¶ 161, 163), they do not (and cannot) allege any non-conclusory facts demonstrating that Mr. Chow owns, controls, or has otherwise benefitted from the 0xcEA wallet.

## II. Plaintiffs' Motion to Amend is the Latest in a Long Line of Meritless Motions Designed to Increase Costs and Forestall these Proceedings.

Given the paucity of truly "new" factual allegations, one would expect Plaintiffs to build upon the FAC by adding targeted new paragraphs that would allow Defendants and the Court to efficiently analyze Plaintiffs' proposed changes. Not so. Plaintiffs chose instead to start from scratch and rewrite every single allegation from the ground up. Although a detailed review

[2] Plaintiffs' strategic choice not to attach the analysis to the SAC precludes them from submitting the evidence in connection with any reply brief in support of the Motion to Amend. *See Wade Park Land Holdings, LLC* v. *Kalikow*, 2023 WL 2614243, at *10 (S.D.N.Y. Mar. 23, 2023) (noting that allowing such a maneuver would "***enable*** artful pleading and promote litigation by ambush" and "cause prejudice to Defendants" (emphasis in original)).

confirms that Plaintiffs' rewrite is simply a repackaging (not a material alteration) of Plaintiffs' claims, Plaintiffs' approach was needlessly vexatious, requiring defense counsel to spend significant resources confirming that the 474 new paragraphs in the SAC are substantially similar to the 465 paragraphs in the FAC.

Furthermore, the Motion to Amend does not explain how the SAC addresses Defendants' bases for dismissal. Rather, Plaintiffs merely argue that the SAC provides a "more complete and particularized record" (Dkt. 204 at 4) that "amplifies and corroborates the existing legal theories" (Dkt. 204 at 10) by "providing a wealth of direct evidence" (Dkt. 204 at 17). Plaintiffs' silence is telling, particularly given the numerous fatal flaws in Plaintiffs' claims that Mr. Chow has detailed several times.[3]

The timing of Plaintiffs' Motion to Amend also raises serious questions. Although Plaintiffs assert that they diligently worked to prepare the SAC after receiving materials from a confidential informant (Dkt. 204 at 12, 14-15), they have been in possession of confidential informant materials for some time now and were contemplating a motion for leave to amend before Defendants filed their motions to dismiss. At the August 19 hearing, Plaintiffs' counsel stated that "we have documents that we're going to put forward at trial that both come from confidential informants, that we've developed, that put both Mr. Davis and Mr. Chow operating together on the $M3M3 asset and evidence of a longer standing conspiracy where they've been operating

[3] In opposing Plaintiffs' preliminary injunction motion on June 27, Mr. Chow explained that Plaintiffs showed neither a likelihood of success nor serious questions on the merits because they alleged no wrongdoing by him, and Second Circuit law forecloses a software developer's liability for the software's misuse by others. (Dkt. 53). On August 8, he filed a sur-reply addressing the FAC and Plaintiffs' new materials, again emphasizing that the amendment cured nothing. (Dkt. 132). On September 29, Mr. Chow moved to dismiss, reiterating that the FAC alleged no misrepresentation, deceptive act, trading activity, or proceeds attributable to him, and that theories such as treating memecoin losses as a RICO injury fail as a matter of law. (Dkt. 176). Finally, on October 17, he again underscored these same defects in opposing Plaintiffs' motion to supplement. (Dkt. 199).

together." (Aug. 19 Tr. 45:14-45:20). And in early September, Plaintiffs provided undersigned counsel with copies of the documents now appearing at Appendices I-P of the SAC.

Furthermore, Plaintiffs informed the Kelsier Defendants in late September they were considering an amended pleading. In an effort to save resources ahead of the September 29 motion to dismiss deadline, counsel for Mr. Chow reached out to Plaintiffs' counsel on September 22 and September 23 to inquire about Plaintiffs' amendment. (Miles C. Wiley November 4, 2025 Declaration ("Wiley Decl.") ¶¶ 3, 4). On September 24, counsel for Mr. Chow followed up again, and Plaintiffs' counsel responded that they would confer if and when they decided to seek leave to amend. (Wiley Decl. ¶ 5). Notably, these exchanges occurred after Plaintiffs had received the purportedly critical confidential informant materials, yet Plaintiffs nonetheless allowed Defendants to proceed with motions to dismiss. Waiting to amend until after Defendants filed their motions also raises questions about whether this Motion aims to cause Defendants to waste resources and to further delay these proceedings.[4]

This Motion is just the latest example of Plaintiffs' vexatious approach to this case. For example, after the Court denied Plaintiff's motion for a preliminary injunction for lack of irreparable harm and explained it was "extremely skeptical" of the claims in Plaintiffs' Amended Complaint (Dkt. 138 ("PI Denial Order"); August 19, 2025 Tr., Dkt. 156-2 at 49-66:11), Plaintiffs filed motions to supplement the PI Denial Order pursuant to Rule 52(b) (Dkt. 150) and modify the PI Denial Order and freeze wallets pursuant to Rules 52(a)(2), 54(b), and 65 (Dkt. 154) (together, the "PI Modification Motions"). Mr. Chow opposed (Dkt. 166), and on October 31, the Court denied the PI Modification Motions, noting that they "do no more than reiterate and repackage

[4] Plaintiffs waited to file the Motion to Amend until just a week before their deadline to oppose Mr. Chow's motion to dismiss and also asked the Court to deny Defendants' motions to dismiss as moot (*see* Dkt. 204 at 19).

[Plaintiffs'] earlier arguments" that the Court "already rejected" in denying the motion for a preliminary injunction. (Dkt. 220 at 2).

The PI Modification Motions were not the only example of Plaintiffs pursuing relief the Court had already effectively denied. On October 21, Plaintiffs filed a letter motion seeking to appoint a monitor to oversee a token launch scheduled to take place on October 23. (Dkt. 206-207). The Court denied this request *sua sponte*, explaining that the Court had "already considered substantially similar arguments in connection with the earlier PI motion regarding the risk of asset dissipation and the inadequacy of legal remedies and found them without merit." (Dkt. 210).

On other occasions, Plaintiffs have sought relief that is plainly unavailable. On October 1, for example, Plaintiffs filed a motion to seal materials purportedly obtained from a confidential informant (Dkt. 187), which the Court denied, noting that Plaintiffs "offered only speculative and 'conclusory assertions'" about harm of disclosure. (Dkt. 192).[5]

## LEGAL STANDARD

Contrary to Plaintiffs' unsupported suggestion (Dkt. 204 at 13), there is no "default position" that motions for leave to amend should be granted under Rule 15(a)(2). Rather, each request must be analyzed based on the specific facts and circumstances presented, *see, e.g.*, *Fresh Del Monte Produce, Inc.* v. *Del Monte Foods, Inc.*, 304 F.R.D. 170, 174, 176 (S.D.N.Y. 2014), and such requests "should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party." *Burch* v. *Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008).

[5] Nevertheless—and seemingly in defiance of the Court's order—Plaintiffs attached the text messages to the SAC with substantial redactions, depriving the Court and the parties of crucial context and calling into question the reliability of the records.

"An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss," *Lucente* v. *International Business Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002), which requires "sufficient factual matter" to "state a claim to relief that is plausible on its face," *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). In deciding a motion to dismiss, the Court "need not consider conclusory allegations or legal conclusions couched as factual allegations," *Wheeler* v. *Topps Co., Inc.*, 652 F. Supp. 3d 426, 435 (S.D.N.Y. 2023), and the well-pleaded factual allegations must allege "more than a sheer possibility that a defendant has acted unlawfully" and more than "facts that are 'merely consistent with' a defendant's liability," *Iqbal*, 556 U.S. at 678. Furthermore, because Plaintiffs' claims sound in fraud, Plaintiffs must "state with particularity the circumstances constituting fraud." *Kominis* v. *Starbucks Corp.*, 692 F. Supp. 3d 236, 254 (S.D.N.Y. 2023).

Leave to amend should also be denied due to prejudice and delay when a plaintiff waits to amend until after receiving a motion to dismiss and then proposes "extensive" amendments, *Footbridge Ltd. Trust* v. *Countrywide Home Loans, Inc.*, 2009 WL 4278179, at *2 (S.D.N.Y. Nov. 23, 2009) (denying leave to amend based on such "sharp tactic[s]"), or when the proposed addition of new parties threatens to delay the litigation, *see Sly Magazine, LLC* v. *Weider Publications L.L.C.*, 241 F.R.D. 527, 532-33 (S.D.N.Y. 2007).

## ARGUMENT

### I. The Court Should Reject the SAC as Futile.

As set forth in Mr. Chow's MTD, the FAC's claims against Mr. Chow fail for myriad reasons. The SAC—which is largely a repackaging of the FAC that adds cosmetic variations—does not add any allegations that save Plaintiffs' claims. As explained below in Sections I.A-F, Plaintiffs' new factual allegations do not move Plaintiffs' claims from conceivable to plausible.

The Motion to Amend should be denied as futile for the same reasons the FAC should be dismissed.

Moreover, and as set forth in Section I.G, Plaintiffs' claims relating to $ENRON and $TRUST should be dismissed for the additional reason that they did not trade in these memecoins and therefore lack class standing to pursue any claims relating to them.

Finally, as set forth in Section I.H, the proposed amendment is also futile as to proposed Defendants Mr. Yeow and DLL for many of the same reasons the SAC fails to state a claim against Mr. Chow.

### A. The SAC Does Not Allege that Mr. Chow Engaged in Misconduct.

Mr. Chow's MTD demonstrated that, although he provided technical support for projects launching tokens using Meteora, the FAC fails to allege ***any*** misconduct by him. Instead, the FAC relies on improper group pleading and rank speculation and does not plausibly allege that Mr. Chow personally made false statements, manipulated wallets, or profited from any purported manipulation of memecoin launches. (*See* MTD at 11-13).

Nothing in the SAC cures these pleading failures. Plaintiffs once again try to spin Mr. Chow's provision of technical support and the theoretical ability to upgrade Meteora's software into a conspiracy with the Kelsier Defendants (and now purport to assert that Mr. Chow was at the "center" of the alleged enterprise (SAC ¶ 2)), but they still fail to offer any non-conclusory allegation tying Mr. Chow or the upgrade authority to the alleged fraud.[6]

[6] Plaintiffs allege that Meteora's "4-of-7 multi-signature [upgrade] authority" enabled Mr. Chow to "modify, upgrade, or manipulate the code governing token launches and trading" (*see* SAC ¶ 424) but misconstrue this standard security feature, which is designed to prevent unilateral and unauthorized changes to Meteora software code writ large. In any event, Plaintiffs plead no facts suggesting that Mr. Chow actually used, directed, or even retained such authority in connection with the specific token launches at issue here.

As an initial matter, like the FAC, the SAC is plagued by improper group pleading; Plaintiffs haphazardly lump Mr. Chow in with the acts of "Defendants" and so-called "insiders." (*See, e.g.*, SAC ¶ 270 ("insiders who controlled the deployer contract and liquidity pools could—and did—override any restriction")). Such group pleading fails to state a claim against Mr. Chow. *See Goodman* v. *Board of Managers of Harborview Condominium*, 2023 WL 6977450, at *5 (S.D.N.Y. Oct. 23, 2023) ("[P]laintiffs cannot simply lump defendants together for pleading purposes."); (MTD at 12).

The SAC's "new" allegations also do not allege any misconduct by Mr. Chow. For starters, Mr. Davis's text message that he "followed [Mr. Chow's] instructions" does not amount to a statement that Mr. Chow did anything in relation to the fraud alleged and is not evidence of any meeting of the minds. Indeed, because this generic, ambiguous phrase is equally consistent with Mr. Chow's provision of technical support (and in no way proves that he took any steps relating to the fraud, let alone that he was at the "center" of it), allegations relating to the text message do not make Plaintiffs' claims plausible. *See Mayor & City Council of Baltimore, Maryland* v. *Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013) (allegations that could be construed in "equally plausible" ways are insufficient to support a conspiracy claim).

With respect to the three additional token launches alleged in the SAC, Plaintiffs do not allege any fraudulent or manipulative conduct by Mr. Chow, only that the launches used "the same infrastructure" which purportedly included Meteora. (*See* SAC ¶¶ 308, 315, 354). More specifically, Plaintiffs simply assert that these additional launches "followed the same structure" and "shared the same operators" as $M3M3 and $LIBRA (SAC ¶ 304), but they identify no specific act or statement by Mr. Chow relating to any of them, nor do they provide anything beyond speculation that Mr. Chow benefitted from them in any way. Instead, they rely on speculation that

Mr. Chow "control[led] the technology" (SAC ¶¶ 294, 320) and was part of an amorphous "command structure" (SAC ¶ 354). The supposed misstatements they cite (SAC ¶ 384) are vague and unattributed.

Plaintiffs' additions of the "M3M3 Calcs Template" and "M3M3 Token Launch Organizer" as appendices I and N to the SAC also do not save their claims. As discussed in Mr. Chow's MTD, Plaintiffs' allegations regarding the M3M3 Calcs Template are consistent with Mr. Chow's IT support role. (MTD at 11, 18-19, 31). Indeed, the document itself merely reflects potential rewards calculations under different staking conditions—exactly the kind of technical support that cannot serve as a basis for liability. *See Risley*, 2025 WL 615185, at *2, *4 (it would "def[y] logic that a drafter of a smart contract, a computer code, could be held liable" for "a third-party user's misuse of the platform"—even where the drafter of the code is "aware of and do[es] nothing to stop" the fraudulent misuse because it is profitable).

As to the "M3M3 Token Launch Organizer," Plaintiffs fail to allege that Mr. Chow edited, approved, or relied on it (outside of group-pled allegations that the Court need not credit). (MTD at 10-11). And even if Mr. Chow had involvement with that document, it would still not support a claim as to him because it reflects a plan to release the full token supply at launch and for the team to buy on the open market using aged wallets to avoid snipers—not to act as them—undercutting Plaintiffs' theory of insider manipulation. (SAC, App. N). It is entirely consistent with Mr. Chow's remark explaining that excessive token lock-up can lead to less demand for a token. (SAC ¶ 412(c) (alleging that during an undated "planning call" Mr. Chow stated that "no one will play the game if they see, like 90% of the supply already locked up")).

Finally, Plaintiffs' so-called "forensic analysis" that allegedly identifies a central "hub wallet" is far from a "smoking gun" (SAC ¶ 333) that saves Plaintiffs' claims. As an initial matter,

the FAC alleged that so-called "insider wallets" were "funded by Kelsier" (FAC ¶ 11)—not Mr. Chow. Nothing in the SAC changes that. Plaintiffs still do not allege that Mr. Chow owned, funded, or even knew of the wallets in question, much less that he received any proceeds from them. (*See supra* Background Section I). Moreover, the "forensic analysis" is not provided and is only described in vague, conclusory terms that the Court need not credit.

**B. The Fraud Claims Fail.**

To state a claim for fraud, a plaintiff must allege: (1) a material misrepresentation or omission of fact; (2) which the defendant knew to be false; (3) made with intent to defraud; (4) upon which plaintiff reasonably relied; and (5) which caused injury to plaintiff. *Velez* v. *Lasko Products, LLC*, 706 F. Supp. 3d 444, 461-62 (S.D.N.Y. 2023) (Rochon, J.). As Mr. Chow explained in his MTD, the FAC fails to plead a viable fraud claim against Mr. Chow because the FAC does not allege: (i) any false statements attributable to Mr. Chow; (ii) that he intended to deceive anyone; (iii) that Plaintiffs relied on any representation by Mr. Chow; or (iv) that Mr. Chow's acts caused Plaintiffs' losses. (MTD at 13-22). Plaintiffs' theory—that providing technical support equals fraudulent misrepresentation—comes nowhere close to stating a claim.

Nothing in the SAC changes these conclusions. For starters, Plaintiffs still do not allege that Mr. Chow knowingly made any false statements. The SAC adds no new misrepresentation, omission, or reliance allegation tied to him in any non-conclusory way. None of the three additional token launches are alleged to involve a single communication or false statement by Mr. Chow. Instead, Plaintiffs merely repeat that those launches followed the same "playbook." (SAC ¶¶ 93, 304, 354).

Notably—and contrary to Rule 9's particularity requirements—the SAC offers even ***less*** detail than the FAC. Whereas the FAC identified specific false statements and speakers (*see, e.g.*, FAC ¶¶ 181, 232), the SAC retreats to comparatively conclusory allegations—abandoning even

the minimal specificity of the FAC, and substituting atmospheric rhetoric for concrete allegations. (*See, e.g.*, SAC ¶ 301) (alleging that the "heart" of Defendants' conduct is a "pattern of 'borrowed legitimacy'"). And even when Plaintiffs ostensibly identify allegedly false statements, they are presented without basic details. For example, in describing the $MELANIA token launch, Plaintiffs allege that "a network of paid influencers . . . saturated social platforms with coordinated messaging that $MELANIA was 'official,' 'vested,' 'fair,' and 'community driven'" (SAC ¶ 268), but never allege who made those statements, or where and when they were made. "All of those details are required under Rule 9." *In re Express Scripts/Anthem ERISA Litigation*, 285 F. Supp. 3d 655, 686 (S.D.N.Y. 2018) (dismissing misrepresentation-based RICO claim where "[p]laintiffs do not explain what the misrepresentations were, nor do they explain when, where, and by whom they were made"), *aff'd sub nom. Doe 1* v. *Express Scripts, Inc.*, 837 F. App'x 44 (2d Cir. 2020).

Nor do Plaintiffs plausibly allege that Mr. Chow possessed the requisite scienter, which requires an individualized showing of "motive and opportunity" or "conscious misbehavior or recklessness." *See Gardner* v. *Sensio Inc.*, 645 F. Supp. 3d 310, 322 (S.D.N.Y. 2022). As explained in Mr. Chow's MTD, the FAC failed to plead any facts suggesting that he intended to defraud Plaintiffs. (MTD at 17-19). And even though the FAC focused on $M3M3 and $LIBRA only, the SAC's sparse and undetailed allegations relating to three other tokens get Plaintiffs no closer to establishing scienter. As for the so-called "planning documents," as discussed above (Section I.A), they corroborate that Mr. Chow's role was technical. The same goes for allegations regarding the "following instructions" text, which also do not give rise to an inference of scienter because, as discussed above, Mr. Davis's statement that he followed Mr. Chow's instructions is entirely consistent with Mr. Chow's role of providing technical support. *See ATSI Communications, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 104 (2d Cir. 2007) (conduct consistent

with legitimate business practices does not show scienter). In addition, because the SAC's allegations regarding the "central wallet" are speculative and conclusory and lack any well-pled connection to Mr. Chow, they cannot support a finding that Mr. Chow had the requisite "motive and opportunity" or serve as evidence of his "conscious misbehavior or recklessness." *Gardner*, 645 F. Supp. at 322.

The SAC also does not plead reasonable reliance, given that it rehashes the same conclusory allegations that undergirded the FAC. As Mr. Chow explained, the FAC fails to plead reasonable reliance with respect to $M3M3 and $LIBRA because Plaintiffs do not allege reliance on any statements by Mr. Chow, and statements about "fairness" or "trustworthiness" are inactionable puffery. (MTD at 20-21). The SAC does not address these shortcomings, and Plaintiffs allege even less with respect to the three new token launches in the SAC. For example, Plaintiffs allege that the $ENRON launch "blur[red] parody and legitimacy" and that purchasers "interpreted the campaign as tongue-in-cheek transparency—a joke they could profit from." (SAC ¶¶ 313, 335). As for $MELANIA, Plaintiffs allege they "relied on the appearance of official branding and the supposed vesting safeguards," (SAC ¶ 285), while for $TRUST they allege reliance on a "narrative crafted precisely to suppress the skepticism that earlier tokens had generated" (SAC ¶ 357). But Plaintiffs never identify with specificity the statements they read and relied upon, much less that Mr. Chow made them.

Finally, like the FAC (MTD at 21-22), the SAC does not plead causation.[7] Simply put, Plaintiffs do not link Mr. Chow's alleged conduct to their injuries and do not allege that Mr. Chow engaged in the "manipulations" that purportedly caused their losses. Allegations that

---

[7] The FAC acknowledged that virtually all memecoin prices eventually drop to zero (*see* FAC ¶¶ 172-73), but Plaintiffs seemingly try to bolster their claims by omitting these allegations from the SAC.

"Defendants" caused their losses (*e.g.*, SAC ¶¶ 407-408) are insufficiently particularized. *See In re Eight-115 Assosiates, LLC*, 650 B.R. 43, 56 (Bankr. S.D.N.Y. 2023) ("[L]umping all the defendants together fails to satisfy the particularity requirement.").

**C. The NYGBL Claims Fail.**

In order to state a claim under Sections 349 and 350 of NYGBL, a plaintiff must allege a consumer oriented act or practice that "was misleading in a material respect" and injured plaintiff. *Yuille* v. *Uphold HQ Inc.*, 686 F. Supp. 3d 323, 343-44 (S.D.N.Y. 2023). As Mr. Chow explained in his MTD, the FAC fails to state a claim under the NYGBL for many of the same reasons it fails to plead a claim for fraud: the FAC does not plead any misleading act or practice by Mr. Chow (Plaintiffs' group pleading is insufficient), and Plaintiffs fail to allege a causal link between Mr. Chow's conduct and their alleged injury. (MTD at 23). Moreover, with respect to the NYGBL claim relating to $M3M3, the claim also fails because Plaintiffs do not allege a sufficient connection to New York. (MTD at 23-24).

Nothing in the SAC changes these conclusions with respect to Plaintiffs' claims relating to $M3M3 and $LIBRA, and Plaintiffs' allegations with respect to $MELANIA, $ENRON, and $TRUST are similarly deficient. As explained above, Plaintiffs' new allegations in the SAC do not sufficiently allege that Mr. Chow engaged in any wrongdoing in connection with the five token launches, nor do they allege any causal link to Plaintiffs' injuries. (*Supra* Section I.B). Moreover, Plaintiffs do not allege any additional facts connecting their transactions in $M3M3 to New York and their claims relating to $ENRON and $TRUST fail for the same reason: Plaintiffs do not allege that they purchased either in New York. (MTD at 23).

**D. The Unjust Enrichment Claims Fail.**

As Mr. Chow made clear in his MTD, the unjust enrichment claims fail because: (1) Plaintiffs have not plausibly alleged wrongdoing by Mr. Chow; and (2) Plaintiffs do not allege that

their purchases "enriched" Mr. Chow or that he had any involvement with the alleged extraction of assets from the liquidity pools. Allegations that Mr. Chow received compensation from DLL are too attenuated to state a claim for unjust enrichment. (*See* MTD at 24-25). Again, nothing in the SAC changes these conclusions.

***First***, as discussed above (*supra* Section I.A), the SAC gets Plaintiffs no closer to pleading wrongdoing by Mr. Chow. Nothing in Plaintiffs' "new" allegations connects Mr. Chow to any alleged wrongdoing in a non-conclusory way.

***Second***, the FAC also fails to plead that Mr. Chow was enriched at Plaintiffs' expense because there are still no allegations that Plaintiffs conveyed a benefit directly to Mr. Chow. There are no sufficiently pleaded allegations that Mr. Chow received proceeds from token sales, wallet extractions, or liquidity withdrawals in connection with any of the five token launches. Plaintiffs' group pleading is insufficient and their central "hub wallet" theory does not save the claim because they fail to plead any connection between Mr. Chow and this wallet. (*Supra* Background, Section I).

**E. The RICO Claims Fail.**

As explained in Mr. Chow's MTD, the FAC fails to state a RICO claim against him because Plaintiffs fail to plausibly allege: (i) predicate acts committed by Mr. Chow; (ii) a RICO injury caused by him; (iii) a RICO enterprise operated or directed by Mr. Chow; or (iv) a "pattern" of racketeering activity (MTD at 26-30 (citing *Kim* v. *Kimm*, 884 F.3d 98, 103 (2d Cir. 2018))).

Plaintiffs' allegations in the SAC—which are fundamentally no different than their allegations in the FAC—do nothing to save their RICO claims.

***First***, Plaintiffs fail to allege any predicate acts by Mr. Chow because, as discussed above (*supra* Section I.A), Plaintiffs do not allege any misconduct by Mr. Chow.

***Second***, Plaintiffs' losses on memecoin purchases do not qualify as a RICO injury as a matter of law and Plaintiffs fail to allege that conduct attributable to Mr. Chow directly caused their losses. (MTD at 26-27). As discussed above and in the MTD, Plaintiffs' group pleading that "Defendants'" conduct generally caused their losses is insufficient. (*See* Section I.A; MTD at 12, 16, 24). Also, because all of Plaintiffs' alleged losses are still "purely contingent" on the alleged manipulation and extraction schemes that Plaintiffs do not plausibly allege Mr. Chow participated in, the RICO claims against him in the SAC fail for lack of proximate cause. (MTD at 27).

***Third***, to allege a RICO enterprise, Plaintiffs must allege that the members of the alleged enterprise shared a "common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *Zamora* v. *FIT International Group Corp.*, 834 F. App'x 622, 625 (2d Cir. 2020). But the SAC does not add any factual allegations that "provide a plausible basis for inferring that" Mr. Chow acted "on behalf of the ***enterprise***" as opposed to on behalf of himself. *See D. Penguin Bros. Ltd.* v. *City National Bank*, 587 F. App'x 663, 668 (2d Cir. 2014) (emphasis in original). Indeed, the "following instructions" text message does not establish an enterprise, since (as explained above) it is consistent with Mr. Chow's role of technical support and does not demonstrate a meeting of the minds. For the same reason, the fact that Defendants shared "planning documents" concerning $M3M3 does not demonstrate that Mr. Chow was acting for anyone but himself. And because the SAC does not contain non-conclusory allegations connecting Mr. Chow to the "hub wallet," it likewise does not demonstrate an enterprise that included Mr. Chow.

***Fourth***, Plaintiffs must allege either an open- or closed-ended pattern. (MTD at 29). The SAC alleges that a "pattern of 'borrowed legitimacy'—using fame, politics, or nostalgia as the entry point for financial deception—constitutes the heart of the enterprise's racketeering conduct"

(SAC ¶ 301), but such a conclusory statement does not plausibly establish a pattern sufficient to state a RICO claim. Although Plaintiffs purport to allege open-ended racketeering based on use of the same "structure" for the five token launches (SAC ¶¶ 354, 428), Mr. Chow's resignation in February 2025 forecloses any open-ended pattern. (*See* MTD at 29). And allegations that the scheme took place over the course of a few months comes nowhere close to the Second Circuit's two-year floor for a close-ended pattern. (MTD at 29).[8]

**F. The Conspiracy Claims Fail.**

As explained in Mr. Chow's MTD, the FAC fails to state conspiracy to defraud or RICO conspiracy claims because: (1) they fail to plead fraud and RICO claims; and (2) Plaintiffs do not plausibly allege a corrupt agreement. The FAC's speculation and conclusions do not sufficiently allege—as Plaintiffs must—that Mr. Chow understood the scope of the alleged agreement and knowingly assented to it, or the steps Mr. Chow agreed to take in furtherance of the agreement. (MTD at 30-32).

Yet again, nothing in the SAC saves Plaintiffs' claims. For example, Plaintiffs' framing of a "six step playbook" in launching tokens does not imply an agreement; it is Plaintiffs' after-the-fact description of the same type of conduct that was already alleged in the FAC. (*Supra* p. 4). Similarly, Plaintiffs' re-labeling of Mr. Chow as the "center" of the enterprise is unsupported rhetorical flourish. And Mr. Davis's "following instructions" message is not evidence of an agreement to commit fraud, it is acknowledgment of Mr. Chow's provision of technical support—it does not give rise to a fraud claim or give rise to any inference of an illegal agreement.

---

[8] Plaintiffs allege five token launches, the first of which occurred in December 2024 ($M3M3), and the last of which ($TRUST) they (inaccurately) allege was launched in April 2025 (SAC ¶ 340).

Similarly, nothing in the "planning documents" shows an agreement to commit fraud. As explained above in Section I.A, the "M3M3 Calcs Template" allegedly authored by Mr. Chow shows only ordinary planning calculations consistent with Mr. Chow's technical support role, not deceit, while the "M3M3 Token Launch Organizer" undercuts any inference of agreement to commit fraud because it discusses a plan to release the full token supply at launch and notes a concern about avoiding the very issue ("snipe" the available token supply) that Plaintiffs say formed part of the illegal schemes. And the central "hub wallet" theory does not imply any agreement given the lack of any link to Mr. Chow. Simply put, despite alleging additional token launches and offering a handful of new allegations, the SAC does not plead non-conclusory facts sufficient to allege that Mr. Chow agreed to any fraudulent scheme.

**G. Plaintiffs Lack Standing to Pursue Claims Relating to $ENRON or $TRUST.**

Plaintiffs in a putative class action have class standing only for products or instruments they personally purchased or used, unless the unpurchased items are "nearly identical" to the purchased ones or "implicate[] the same set of concerns." *NECA-IBEW Health & Welfare Fund* v. *Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012). Plaintiffs may not "leverage" a single purchase into a sweeping challenge to other products or transactions that raise distinct factual and legal issues. *See Akridge* v. *Whole Foods Market Group, Inc.*, 2022 WL 955945, at *6 (S.D.N.Y. Mar. 30, 2022).

Here, the proposed SAC purports to assert claims relating to five tokens—$M3M3, $LIBRA, $MELANIA, $ENRON, and $TRUST—but none of the named Plaintiffs allege that they purchased $ENRON or $TRUST, and the SAC does not allege that these tokens were "nearly identical" to the others. (*See* SAC ¶¶ 26-28, 375). Plaintiffs therefore lack class standing to pursue claims relating to $ENRON or $TRUST. *See DiMuro* v. *Clinique Labs, LLC*, 572 F. App'x 27, 29 (2d Cir. 2014) (affirming dismissal of claims relating to unpurchased cosmetic products—even

though the plaintiffs purchased other cosmetic products from the same manufacturer—because the unpurchased products involved different formulations and advertising, requiring "unique evidence" to prove falsity).

The reasoning in *DiMuro* applies here. Plaintiffs acknowledge that each token had distinct branding, narratives, and launch teams—$ENRON invoked corporate satire with an individual named Connor Gaydos at the helm, and the $TRUST token purported to reward "honesty"—distinct from $M3M3, $LIBRA, and $MELANIA. Accordingly, proving alleged fraud involving $ENRON or $TRUST would require different proof, raising a "fundamentally different set of concerns" and precluding class standing. *See Afriyie* v. *NBCUniversal Media, LLC*, 775 F. Supp. 3d 791, 802 (S.D.N.Y. 2025) ("Plaintiffs do not have free reign to bring lawsuits regarding products they never purchased."). Accordingly, even if the Court is inclined to grant the Motion to Amend, the Court should strike all allegations and requests for relief relating to $ENRON and $TRUST.

### H. Claims Against Mr. Yeow and DLL are Futile.

The SAC purports to add Mr. Yeow as a Defendant. (SAC ¶ 31). But aside from noting that he was a co-founder of Jupiter (SAC ¶ 31) and making conclusory allegations that he was a part of the "enterprise" (SAC ¶ 421), the SAC contains no other allegations about him whatsoever. Similarly, the only allegations in the SAC regarding DLL are that it "is the developer . . . of the Meteora decentralized finance protocol" and "collected and retained protocol fees." (SAC ¶ 36). Given this deficiency of allegations, and for the same reasons Plaintiffs' claims fail against Mr. Chow, the SAC fails to state a claim against Mr. Yeow or DLL. *Iqbal*, 556 U.S. at 678 (A complaint "must contain sufficient factual matter" to "state a claim to relief that is plausible on its face").

## II. Plaintiffs' Gamesmanship Warrants Denial.

In addition to denying the motion to amend on futility grounds, courts may also exercise discretion and deny leave to amend for bad faith, undue delay, or prejudice. *McCarthy* v. *Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) ("A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.") Here, the Court should deny the Motion to Amend for these additional reasons.

***First***, Plaintiffs have had notice of the deficiency of their claims for months, yet stalled in coming forward with their "new" allegations. Mr. Chow highlighted numerous deficiencies in Plaintiffs' claims on June 27 in opposing Plaintiffs' motion for a preliminary injunction, and again on August 8 when Mr. Chow filed a sur-reply to address the FAC. (Dkt. 53 at 16-23; Dkt. 132 at 4-9). Many of the same arguments that Mr. Chow made in those briefs now serve as the basis for Mr. Chow's MTD.

***Second***, Plaintiffs' assertions of diligence are suspect. Plaintiffs claim they received materials from the confidential informant beginning on September 4, 2025 and that they worked diligently to prepare an amendment to the SAC for the next six weeks. (*See* Dkt. 204 at 4). But this timeline is incomplete. At the August 19 hearing, Plaintiffs' counsel stated that "we have documents that we're going to put forward at trial that both come from confidential informants, that we've developed, that put both Mr. Davis and Mr. Chow operating together on the $M3M3 asset and evidence of a longer standing conspiracy where they've been operating together." (Aug. 19 Tr. 45:14-45:20). Furthermore, the description of the "planning documents" in the FAC strongly suggests that Plaintiffs had possession of them when they filed the FAC, but held them in reserve.

Plaintiffs' purported diligence also does not explain why they refused to confer with the undersigned about a potential SAC, which could have saved substantial resources. While drafting

Mr. Chow's MTD, counsel for Mr. Chow learned that Plaintiffs were contemplating amendment and repeatedly asked Plaintiffs to confirm, in an effort to save resources. (*See* Wiley Decl. ¶¶ 3-5). But even though Plaintiffs were in possession of the confidential informant materials at that time, Plaintiffs did not seek leave to amend and instead allowed Defendants to proceed with filing motions to dismiss the FAC. This type of "unacceptable gamesmanship" is further grounds for denying the Motion to Amend. *See In re Interest Rate Swaps Antitrust Litigation*, 2018 WL 2332069, at *27 (S.D.N.Y. May 23, 2018) (denying motion to amend in light of plaintiffs' "unacceptable gamesmanship" in withholding the fact that an amendment was forthcoming). *See also DeLuca* v. *SmithKline Beecham Corp.*, 2007 WL 541656, at *3 (S.D.N.Y. Feb. 20, 2007) (finding that plaintiff forfeited right to amend where she was on notice of defendant's arguments concerning deficiencies but, instead of amending, stood by as defendants incurred legal fees and expended time briefing a motion to dismiss).

***Third***, there is also prejudice to Mr. Chow because Plaintiffs seek to add new Defendants (Mr. Yeow and DLL) whose existence has been known to Plaintiffs for at least several months. In addition, although Plaintiffs do not allege where Mr. Yeow is located, he may live overseas, which all but guarantees that this case will slow considerably as Plaintiffs attempt to serve him with the SAC, potentially under the Hague Convention. *See Sly Magazine, LLC*, 241 F.R.D. at 533 (denying motion to amend where plaintiffs attempted to add new parties).

***Fourth***, the Motion to Amend is merely the latest in a flurry of vexatious motion practice that appears designed to forestall dismissal. Since the Court denied Plaintiffs' motion for a preliminary injunction on August 19, Plaintiffs have embarked on a crusade to forestall any further unraveling—and the inevitable dismissal—of this case. For example, Plaintiffs filed the PI Modification Motions, a motion to seal the confidential informant materials, and a request to

appoint a monitor to oversee the Meteora token launch. (*See supra* Background Section II). This Motion to Amend is more of the same stall tactic. *See Carroll* v. *Trump*, 590 F. Supp. 3d 575, 588 (S.D.N.Y. 2022) (denying motion to amend where movant's litigation history suggested motive to delay proceedings).

In addition, there is increased prejudice because Plaintiffs elected to rewrite the SAC from scratch; this is not a situation where Mr. Chow can merely add a short supplement to his motion to dismiss brief. *Footbridge*, 2009 WL 4278179, at *2 (finding prejudice because "intermingling new factual allegations throughout the [complaint] . . . made it impossible for any supplemental briefing to address only the newly added . . . claims" and "[t]he briefing, which this Court can safely and conservatively estimate cost clients hundreds of thousands of dollars to prepare, would largely be for naught.").

***Finally***, Plaintiffs waited to file the Motion to Amend until shortly before their opposition to Mr. Chow's motion to dismiss was due, hoping that the Motion to Amend would moot the FAC and relieve them of their obligation to respond. (Dkt. 204 at 19). This is a "sharp tactic" justifying denial. *Footbridge*, 2009 WL 4278179, at *2 ("Plaintiffs' decision to attempt to add these claims four weeks after receiving defendants' motions, coupled with their extensive proposed amendments to the claims that are the subject of the pending motions, suggests that this was a sharp tactic and one that would unfairly prejudice defendants and result in undue delay. The interests of justice do not require that leave to amend be granted in this circumstance.").[9] Indeed, "[w]hen it appears that leave to amend is sought in anticipation of an adverse ruling . . . , the court

[9] Notably, this is the same tactic that Plaintiffs employed in trying to dodge Mr. Davis's Rule 12(b)(2) motion. (*See* Dkt. 105 (Plaintiffs advising the Court that they "did not intend to file an opposition" to the Rule 12(b)(2) motion in light of a forthcoming First Amended Complaint that Plaintiffs said would "moot" Mr. Davis's motion)).

is free to deny leave to amend." *PI, Inc.* v. *Quality Prods., Inc.*, 907 F. Supp. 752, 764 (S.D.N.Y. 1995).

The Court should deny the Motion to Amend for these additional reasons.

## CONCLUSION

The Court should deny the Motion to Amend, and dismiss the FAC with prejudice.

Dated: November 4, 2025

Respectfully submitted,

CAHILL GORDON & REINDEL LLP

By: *<u>/s/ Samson A. Enzer</u>*
Samson A. Enzer
Miles C. Wiley
Gregory Mortenson
32 Old Slip
New York, New York 10005
212-701-3000
senzer@cahill.com
mwiley@cahill.com
gmortenson@cahill.com

*Attorneys for Defendant Benjamin Chow*

## CERTIFICATION OF COMPLIANCE

Pursuant to Paragraph 3.C of the Individual Rules of Practice in Civil Cases of Judge Jennifer L. Rochon, counsel for Defendant Benjamin Chow has complied with all of the formatting rules contained therein. The total number of words contained in this brief—exclusive of the cover page, certificate of compliance, table of contents, and table of authorities—is 8,492 words.

Date: November 4, 2025

CAHILL GORDON & REINDEL LLP

By: /s/ Samson A. Enzer
Samson A. Enzer
32 Old Slip
New York, New York 10005
(212) 701-3000
senzer@cahill.com

*Attorneys for Defendant Benjamin Chow*