## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OMAR HURLOCK and ANUJ MEHTA, on behalf of himself and all others similarly situated,<br><br>    Plaintiffs,<br><br>vs.<br><br>KELSIER LABS, LLC, D/B/A KELSIER VENTURES, HAYDEN MARK DAVIS, GIDEON DAVIS, CHARLES THOMAS DAVIS, METEORA, an unincorporated association, and BENJAMIN CHOW,<br><br>    Defendants. | Case No. 1:25-cv-03891 (JLR) |

## DEFENDANTS KELSIER VENTURES, HAYDEN MARK DAVIS, GIDEON DAVIS, AND CHARLES THOMAS DAVIS'S CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT

**M. CRIS ARMENTA, P.C.**
M. Cris Armenta (Admitted *Pro Hac Vice*)
217 Clancy Way
Bozeman, MT 59718
T: (310) 488-2080
F: (310) 421-1021
E: cris@crisarmenta.com

*Counsel for Mark Hayden Davis*

**SBAITI & COMPANY PLLC**
Mazin A. Sbaiti
New York Bar No. 4339057
George M. Padis (Admitted *Pro Hac Vice*)
3102 Maple Avenue, Suite 400
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367
E: mas@sbaitilaw.com
   george.padis@sbaitilaw.com

*Counsel for Kelsier Labs, LLC, Hayden Mark Davis, Gideon Davis, and Charles Thomas Davis*

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES.........................................................................................iii

I.   SUMMARY OF THE NEW ALLEGATIONS ..........................................................2

    A.   The Only New, Person-Specific Allegations of Conduct Ascribed
        to Hayden Davis, Kelsier Ventures, Charles Thomas Davis, and
        Gideon Davis Describe Legitimate Arm's Length Business
        Activity.........................................................................................................2

    B.   The Proposed Amended Complaint Does Not Identify Pre-Launch
        Statements Made by the Individual Defendants; the Only Statements
        Attributed to Kelsier Were Not False...................................................3

II.   LEGAL STANDARD .............................................................................................4

III.   ARGUMENT & AUTHORITIES...........................................................................5

    A.   Allowing the SAC Would Inflict Concrete Prejudice and Disrupt the
        Court's Management of the Case ..........................................................5

    B.   The Proposed Amendment is Futile Because It Does Not and Cannot
        Cure the Fundamental Legal Defects ...................................................8

        1.   The New Tokens Are So Dissimilar in Purpose, Method, and
            Audience From $M3M3 and $LIBRA That They Reinforce—
            Not Remedy—Plaintiffs' Failure to Plead the Relatedness
            Needed for the RICO "Pattern" Element.................................8

        2.   Continuity Still Fails: the proposed Amendment Does Not
            Convert Short Discrete Events Into Closed- or Open-Ended
            Continuity .................................................................................9

        3.   Fraud Concerning the New Tokens is Not Pleaded with
            Particularity............................................................................. 11

        4.   The SAC's New Materials—Whistleblower Chats and the
            "0xcEA" Clustering—Do Not Cure Core "Enterprise"
            Pleading Defects. ....................................................................14

5.    Proximate Cause and RICO Standing Are Still Lacking ......................... 18

6.    The SAC Fails to Fix Myriad Other Flaws ............................................... 19

C.    Plaintiffs' Motion Reflects Bad-Faith Tactical Gamesmanship to Evade
Adverse Rulings. ........................................................................................ 20

D.    Serial Amendment After Notice of Defects and Shifting Theories
Contravenes Judicial Economy and the Court's Case-Management
Orders .......................................................................................................... 22

IV.    CONCLUSION ............................................................................................................ 23

CERTIFICATE OF COMPLIANCE ...................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**

*Beach v. Citigroup Alt. Invs. LLC,*
  No. 12-CV-7717, 2014 WL 904650 (S.D.N.Y. Mar. 7, 2014) ....................................................19

*Boyle v. United States,*
  556 U.S. 938 (2009) .......................................................................................................... 14, 16

*Bryant v. Collins,*
  No. 15-CV-00302, 2017 WL 1354941 (E.D. Pa. Apr. 13, 2017) ................................................18

*Burch v. Pioneer Credit Recovery, Inc.,*
  551 F.3d 122 (2d Cir. 2008) ............................................................................................... 4

*Cerni v. J.P. Morgan Secs. LLC,*
  208 F. Supp. 3d 533 (S.D.N.Y. 2016) ................................................................................. 4

*Cuoco v. Moritsugu,*
  222 F.3d 99 (2d Cir. 2000) ................................................................................................ 20

*DeFalco v. Bernas,*
  244 F.3d 286 (2d Cir. 2001).................................................................................................18

*Denney v. Deutsche Bank AG,*
  443 F.3d  253 (2d Cir. 2006) ...............................................................................................18

*Elsevier Inc. v. W.H.P.R., Inc.,*
  692 F. Supp. 2d 297 (S.D.N.Y. 2010) .................................................................................18

*Equinox Gallery Ltd. v. Dorfman,*
  306 F. Supp. 3d 560 (S.D.N.Y. 2018) .................................................................................18

*Evolution Fast Food One, LP v. HVFG, LLC,*
  720 F. Supp. 3d 251 (S.D.N.Y. 2024) ................................................................................. 4

*First Nationwide Bank v. Gelt Funding Corp.,*
  27 F.3d 763 (2d Cir 1994).....................................................................................................19

*Flexborrow LLC v. TD Auto Fin. LLC,*
  255 F. Supp. 3d 406 (E.D.N.Y. 2017) .................................................................................19

*Foman v. Davis,*
  371 U.S. 178 (1962) ....................................................................................................... 1, 23

*Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.,*
  No. 09-CV-4050, 2009 WL 4278179 (S.D.N.Y. Nov. 23, 2009)............................................5, 6

*Foster v. 2001 Real Estate*,
  No. 14-CV-9434, 2015 WL 7587360 (S.D.N.Y. Nov. 24, 2015) ............................................... 17

*Freeman v. Cont'l Gin Co.*,
  381 F.2d 459 (5th Cir. 1967) ............................................................................................ 22

*GICC Capital Corp. v. Tech. Fin. Grp., Inc.*,
  67 F.3d 463 (2d Cir. 1995) ........................................................................................ 10, 11

*H.J. Inc. v. Nw. Bell Tel. Co.*,
  492 U.S. 229 (1989) ..................................................................................................8, 9, 10

*In re Eaton Vance Mut. Fund Fee Litig.*,
  403 F.Supp.2d 310 (S.D.N.Y. 2005) ................................................................................... 6

*In re Int. Rate Swaps Antitrust Litig.*,
  No. 16-MC-2704, 2018 WL 2332069 (S.D.N.Y. May 23, 2018) ........................................... 22

*Jones v. Scott Davis Chip Mill*,
  No. 7:15-CV-00661, 2017 WL 5127717 (N.D. Ala. Nov. 6, 2017) ........................................ 18

*Lerner v. Fleet Bank, N.A.*,
  459 F.3d 273 (2d Cir. 2006) ........................................................................................11, 12

*Lucente v. IBM*,
  310 F.3d 243 (2d Cir. 2002) ....................................................................................4, 8, 14

*McCarthy v. Dun & Bradstreet Corp.*,
  482 F.3d 184 (2d Cir. 2007) .............................................................................................. 4

*Moore v. PaineWebber, Inc.*,
  189 F.3d 165 (2d Cir. 1999) .................................................................................. 11, 13, 14

*Moss v. BMO Harris Bank, N.A.*,
  258 F. Supp. 3d 289 (E.D.N.Y. 2017) ................................................................................ 17

*Neuman v. Garcia*,
  No. 20-CV-10723, 2022 WL 1239329 (S.D.N.Y. Apr. 27, 2022) ........................................6, 7

*Nunes v. Fusion GPS*,
  531 F. Supp. 3d 993 (E.D. Va. 2021) ................................................................................. 18

*Polar Int'l Brokerage Corp. v. Reeve*,
  108 F. Supp. 2d 225 (S.D.N.Y. 2000) ................................................................................ 11

*Reich v. Lopez*,
  858 F.3d 55 (2d Cir. 2017) ............................................................................................. 8, 9

*Sly Magazine, LLC v. Weider Publ'ns L.L.C.*,
  241 F.R.D. 527 (S.D.N.Y. 2007) ......................................................................................... 5

*Spool v. World Child Int'l Adoption Agency,*
  520 F.3d 178 (2d Cir. 2008) ................................................................ 10, 11

*State Trading Corp. v. Assuranceforeningen Skuld,*
  921 F.2d 409 (2d Cir. 1990) ...................................................................... 22

*TycoLabs., Inc. v. Cutler-Hammer, Inc.,*
  490 F. Supp. 1 (S.D.N.Y. 1980) ...................................................................7

*United States v. Indelicato,*
  865 F.2d 1370 (2d Cir. 1989) ....................................................................... 8

*United States v. Litvak,*
  808 F.3d 160 (2d Cir. 2015) ...................................................................... 13

*Vemco, Inc. v. Camardella,*
  23 F.3d 129 (6th Cir. 1994) ......................................................................10

*Volunteer Fire Ass'n of Tappan, Inc. v. Cnty. of Rockland,*
  No. 09-CV-4622, 2010 WL 4968247 (S.D.N.Y. Nov. 24, 2010)...........................5

*Williams v. Affinion Group, LLC,*
  889 F.3d 116 (2d Cir. 2018) ...................................................................... 11

## Constitutional Provisions & Statutes

8 U.S.C. § 1962 ...........................................................................................17

## Rules

Fed. R. Civ. P. 9 ................................................................................... *passim*

Fed. R. Civ. P. 12 ................................................................................. *passim*

Fed. R. Civ. P. 15...........................................................................1,4, 7, 23

Plaintiffs Omar Hurlock and Anuj Mehta's Motion for Leave to File a Second Amended Complaint (Dkt. Nos. 203, 204) ("Mot. for Leave") should be denied because the relevant factors under Federal Rule of Civil Procedure 15(a)—undue prejudice, undue delay, bad-faith gamesmanship, and futility, *see Foman v. Davis*, 371 U.S. 178, 182 (1962)—all weigh decisively against further amendment.

This is particularly so because Plaintiffs have already amended once after extensive motion practice spotlighting the defects in their theories and after the Court expressed "extreme skepticism" about the merits. The current Motion is a tacit admission that the Motion to Dismiss should be granted. From the ex parte outset of the case, Plaintiffs have supposedly been one "confidential informant" (CI) or "secret" piece of evidence (that they would, of course, not share with Defendants or the Court) away from justifying some form of relief. Plaintiffs' latest proposed amended complaint is just more of the same and leave should be denied.

Here, more is not better. The proposed amendment's additions simply throw more stuff at the wall in the hopes that something—*anything*—sticks. Despite having the benefit of Defendants' briefing in support of the motions to dismiss, the proposed amendments do not cure the fatal flaws in Plaintiffs' case: Plaintiffs still fail to identify specific pre-launch statements that would have misled a reasonable purchaser of a meme coin. Plaintiffs' now-expanded "enterprise" is comprised of five, instead of two, unrelated meme coin launches—a majority of which were successful, and all of which were the result of arms' length business arrangements. The inclusion of these new various coin launches that had no underlying thesis—such as ending player-versus-player (PvP) competition for M3M3 or supporting Argentine businesses for $LIBRA—further undermines

1

Plaintiffs' allegations of a RICO[1] "enterprise" or a RICO "pattern."

Given Plaintiffs' repeated invocation of "secret evidence" and hidden sources, one thing is plain as day: Plaintiffs have not been acting in good faith. They should have brought all of these allegations to begin with last March when they filed the case, or in August when they filed the First Amended Complaint, or when they filed for leave to "supplement" the First Amended Complaint. The proverbial sandbagging is not evidence of good faith, which, when combined with the clear evidence of failure to cure deficiencies, it yields the inescapable conclusion that this is all gamesmanship and an attempt to kick the coming reckoning down the road. For these reasons and those further explained below, the Court should deny Plaintiffs' motion for leave to amend.

## I.    Summary of the New Allegations

The proposed amended complaint principally focuses on three additional pure meme coins—$MELANIA, $ENRON, and $TRUST (*See id.* SAC ¶¶ 117, 51)—as evidence that Defendants used the same playbook across multiple launches which caused the same or similar injuries to meme coin purchasers, thus reflecting an "enterprise" with a "pattern of racketeering activity" under RICO.[2]

## A.    The Only New, Person-Specific Allegations of Conduct Ascribed to Hayden Davis, Kelsier Ventures, Charles Thomas Davis, and Gideon Davis Describe Legitimate Arm's Length Business Activity.

The Second Amended Complaint alleges that Hayden Davis and Kelsier Labs, LLC worked closely with Defendant Benjamin Chow on numerous coin launches in addition to $M3M3 and

---

[1] "RICO" is the acronym for the Racketeer Influenced and Corrupt Organizations Act enacted as part of the Organized Crime Control Act of 1970.

[2] "SAC" refers to Plaintiffs'¶ proposed Second Amended Class Action Complaint, Dkt. No. 205-1.

$LIBRA. SAC ¶ 9. Davis allegedly entered into an "exclusive marketing" relationship with Meteora and Chow. *Id.* ¶ 120. The new complaint further alleges certain wallets later consolidated "profits" back into a central treasury wallet: 0xcEA. *Id.* ¶ 139. This wallet was allegedly used to fund unidentified snipers. *Id.* ¶¶ 145-46.

As for the other responding Defendants, the complaint alleges Charles Thomas Davis "led investor outreach and strategy and participated in drafting and signing launch documents." *Id.* ¶ 35. It does not allege what he said, when, to whom, why it was false, why it was reasonably relied on, how it led to losses that would not otherwise have been incurred.

Gideon Davis is now alleged to have "handled operations, deal terms, and token compensation arrangements." *Id.* ¶ 34; *see also id.* ¶ 101 ("Hayden Davis managed high-level marketing and [key opinion leader] KOL networks; Charles Thomas Davis handled investor relations and deal flow; and Gideon Davis oversaw execution compensation and campaign logistics.").

## B. The Proposed Amended Complaint Does Not Identify Pre-Launch Statements Made by the Individual Defendants; the Only Statements Attributed to Kelsier Were Not False.

As before, the proposed second amended complaint does not allege a specific pre-launch public statement personally attributed to Hayden Davis or other defendants. The only new statements alleged are private statements to no one who is a plaintiff here (SAC ¶ 118 ("I'm launching [the] Melania token tomorrow")). The proposed amended complaint still does not allege any specific, publicly made statements personally attributable to Charles Thomas Davis or Gideon Davis that did or could have misled a reasonable purchaser.

As for Kelsier, the only public statements added are consistent with a legitimate meme coin launch and not alleged to be false: "The marketing campaign was orchestrated by Kelsier Ventures,

under Hayden Davis's supervision and in coordination with Benjamin Chow's Meteora operation. Through a network of paid influencers ('KOLs'), they saturated social platforms with coordinated messaging that $MELANIA was 'official,' 'vested,' and 'community driven.'" *Id.* ¶ 268. The Second Amended Complaint does not dispute Melania Trump's involvement in the launch; instead, it offers only the conclusory assertion that, had her team known the launch mechanics, "they would have rescinded any consent immediately." *See id.* ¶ 274.

## II. LEGAL STANDARD[3]

"Once a responsive pleading has been filed, plaintiff may amend the complaint only with leave of court." *Cerni v. J.P. Morgan Secs. LLC*, 208 F. Supp. 3d 533, 543 (S.D.N.Y. 2016) (cleaned up). Although leave to amend a complaint shall be "freely" given "when justice so requires," Fed. R. Civ. P. 15(a)(2), "it is within the sound discretion of the district court to grant or deny leave to amend," *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). Motions for leave to amend "should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party." *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008) (per curiam). "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." *Lucente v. IBM*, 310 F.3d 243, 258 (2d Cir. 2002) (cleaned up).

---

[3] The below legal standard is drawn from this Court's Opinion and Order in *Evolution Fast Food One, LP v. HVFG, LLC*, 720 F. Supp. 3d 251, 264 (S.D.N.Y. 2024) (Rochon, J.). Because the Court has not yet entered a Rule 16 scheduling order, we do not provide that legal standard despite the Rule 16 standard being central to Plaintiffs' motion. *See* Mot. for Leave 11–13.

## III.    ARGUMENT & AUTHORITIES

### A.    Allowing the SAC Would Inflict Concrete Prejudice and Disrupt the Court's Management of the Case.

Leave to amend should be denied due to undue prejudice and delay if a plaintiff waits until after receiving a motion to dismiss and then proposes amendments. *See Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.*, No. 09-CV-4050, 2009 WL 4278179, at *2 (S.D.N.Y. Nov. 23, 2009) (denying leave to amend based on such "sharp tactic[s]"), or when the proposed addition of new parties threatens to delay the litigation, *see Sly Magazine, LLC v. Weider Publ'ns L.L.C.*, 241 F.R.D. 527, 532–33 (S.D.N.Y. 2007). In *Footbridge*, plaintiffs, after previously amending their complaint to ostensibly address deficiencies identified by defendants, moved for leave to file another amended complaint "four weeks after receiving defendants' motions" to dismiss. 2009 WL 4278179, at *2. The district court denied plaintiffs' motion for leave. *Id.* The court reasoned: "The defendants would be unfairly prejudiced if the proposed amendments were allowed during the pendency of the now filed motion to dismiss." *Id.* "By intermingling new factual allegations throughout the [proposed amended complaint], plaintiffs have made it impossible for any supplemental briefing to address only the newly added . . . claims." *Id.* Waiting to amend until after receiving defendants' motion to dismiss, the court reasoned, "was a sharp tactic and one that would unfairly prejudice defendants and result in undue delay." *Id.* "The briefing, which this Court can safely and conservatively estimate cost clients hundreds of thousands of dollars to prepare, would largely be for naught." *Id.*; *accord Volunteer Fire Ass'n of Tappan, Inc. v. Cnty. of Rockland*, No. 09-CV-4622, 2010 WL 4968247, at *6 (S.D.N.Y. Nov. 24, 2010) ("Were the Court to permit Plaintiff to amend in this fashion, the Defendants would be unfairly prejudiced: Defense counsel would have wasted resources, and Defendants would have needlessly incurred legal fees,

in drafting motions to dismiss the original Complaint, and they were forced to respond to the new allegations and claims only in reply on their motions rather than in a fresh round of briefing.").

The risk of undue prejudice and delay is especially acute when, as here, a plaintiff alleges fraud in business dealings: "Delay in adjudication of [fraud] claims leaves the cloud hanging over the defendants' heads, and this is prejudice to them." *Neuman v. Garcia*, No. 20-CV-10723, 2022 WL 1239329, at *4 (S.D.N.Y. Apr. 27, 2022).

Here, as in *Footbridge*, Plaintiffs waited to file proposed amendments until after receiving Defendants' motions to dismiss. *See* 2009 WL 4278179, at *2. And as in *Footbridge*, Plaintiffs already had the benefit of extensive preliminary-injunction briefing and a motion to dismiss for lack of personal jurisdiction when they filed the first amended complaint such that the amended complaint previously filed should already have reflected "plaintiffs' best effort at presenting their claims in response to the objections raised by the defendants." *See id.* (citing and quoting *In re Eaton Vance Mut. Fund Fee Litig.,* 403 F.Supp.2d 310, 318–19 (S.D.N.Y. 2005)).

Critically, Defendants have already invested the time and money to brief Plaintiffs' lengthy 109-page, 465-paragraph civil RICO complaint at considerable cost, which would "be for naught" should Plaintiffs' amendment be allowed, forcing Defendants to have to re-brief. *See id.* Here, the proposed SAC would:

- Require a new round of Rule 12 briefing from multiple defendants— multiplying work the Court has already set for decision, delaying resolution, and wasting the considerable resources already expended under the Court's various consolidated briefing orders.

- Radically expand the case from the originally alleged two token launches to a roving, multi-launch "enterprise" across additional parties, projects, actors, and transactions. That expansion would force new jurisdictional, merits, and class-certification issues and reset the litigation posture at square one.

- Compel Defendants to re-analyze and re-brief issues they have already addressed once, while simultaneously confronting newly minted allegations and parties—precisely the scenario that Rule 15's prejudice factor guards against.

All of this would only delay resolution of Plaintiffs' fraud claims and impose undue prejudice—delay that, as in *Neuman*, "leaves the cloud hanging over the defendants' heads, and this is prejudice to them." *See* 2022 WL 1239329, at *4.

By contrast, Plaintiffs have already had three bites at the apple: the original Complaint, the First Amended Complaint, and the Supplement to the Complaint—all purportedly to cure deficiencies identified in Defendants' briefing (but futilely so). Plaintiffs articulate no cognizable prejudice should the amendment be denied. Nor can they because the new matters (as summarized above)[4] in the Second Amended Complaint relate principally to the issues of a RICO enterprise and a RICO pattern. *See* Mot. for Leave 5 ("The legal causes of action remain the same"; "[t]he additions strengthen the RICO pattern and enterprise allegations"). Those issues have already been fully briefed, and the new allegations do nothing to cure the fundamental defects in Plaintiffs' civil RICO claims.

Therefore, "[P]laintiffs will suffer no prejudice through denial of their motion." *See TycoLabs., Inc. v. Cutler-Hammer, Inc.*, 490 F. Supp. 1, 3–4 (S.D.N.Y. 1980) (denying motion for leave to amend complaint, reasoning "inasmuch as the new matter in the proposed amended and supplemented complaint relates principally to the issue of estoppel," an issue concerning which the court had sufficient briefing to reach an informed decision).

---

[4] *See supra* Part I.

**B.** **The Proposed Amendment is Futile Because it Does Not and Cannot Cure The Fundamental Legal Defects.**

Futility independently warrants denial. As noted above, leave to amend should be denied as futile "if the proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." *Lucente*, 310 F.3d at 258. Plaintiffs' RICO and fraud theories remain fatally deficient even with the proposed embellishments.

**1.** **The New Tokens Are So Dissimilar in Purpose, Method, and Audience From $M3M3 and $LIBRA That They Reinforce—Not Remedy— Plaintiffs' Failure to Plead the Relatedness Needed for the RICO "Pattern" Element.**

To plead a RICO "pattern," a plaintiff must allege at least two predicate acts that are *related* to one another. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239–41 (1989). "Because RICO does not apply to 'isolated or sporadic criminal acts,' it has a relatedness requirement . . . ." *Reich v. Lopez*, 858 F.3d 55, 60 (2d Cir. 2017). Relatedness requires that the predicate acts share common purposes, participants, victims, or methods of commission, or "otherwise are interrelated by distinguishing characteristics," *id.* at 60–61, such as "common goals" or "similarity of methods," *see United States v. Indelicato*, 865 F.2d 1370, 1382 (2d Cir. 1989).

In this case, Plaintiffs added allegations about the $MELANIA, $ENRON, and $TRUST to try to stitch together a single "pattern." SAC ¶¶ 135, 157, 288, 304–05, 310, 315, 342, 354, 358–361. But the new allegations underscore that the launches are heterogeneous in purpose, audience, and method:

- $M3M3 is pleaded as a "stake-to-earn" debut token emphasizing platform legitimacy, with a different liquidity architecture and a "freeze/thaw" sniping theory (SAC ¶¶ 190–99, 203–205, 211–227); and

- $LIBRA is pleaded as a token to support Javier Milei's libertarian ideals and channel funding to Argentinian businesses to encourage development of a larger crypto market in Argentina, linked to a head-of-state tweet, and

premised on a single-sided liquidity extraction (SAC ¶¶ 229–33, 257–63, 237–38, 268–69, 272, 275–76, 239–246, 259–61).

By contrast, the meme coin launches mentioned in the new allegations have no underlying thesis (e.g., ending player-versus-player competition or promoting Argentinian businesses) but instead link the coin to a mascot or theme:

- $MELANIA relies on celebrity and "official" branding (SAC ¶¶ 263–68, 272–75, 285);

- $ENRON on ironic corporate nostalgia (SAC ¶¶ 311–13, 316–17, 334–35); and

- $TRUST on general alleged assurances of "fairness" and "discipline" (SAC ¶¶ 340–341, 347, 356).

The SAC tries to abstract over these differences by asserting high-level commonalities (shared "infrastructure," "treasury hub," and "paid-promoter apparatus") and by labeling all activity as "borrowed legitimacy."

But these coins were largely successful launches. And the pleaded specifics show divergent themes, narratives, targets, and mechanics across tokens. That is the opposite of the "common purposes, results, victims, or methods" that federal courts require for horizontal relatedness. *See Reich*, 858 F.3d at 60–61. The variety of narratives (celebrity, irony, politics, and nostalgia), distinct launch mechanics, and different purchaser appeals amplify, rather than cure, the earlier relatedness problem.

### 2. Continuity Still Fails: the Proposed Amendment Does Not Convert Short Discrete Events Into Closed- or Open-Ended Continuity.

To plead a RICO "pattern," a plaintiff must also allege continuity, meaning these acts "amount to or pose a threat of continued criminal activity." *H.J.*, 492 U.S. at 239. Continuity may be shown through either (i) closed-ended continuity—a series of related predicates extending over a "substantial period of time"—or (ii) open-ended continuity—a threat that racketeering acts will

continue into the future. *GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 465–66 (2d Cir. 1995); *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184–85 (2d Cir. 2008). If, as here, the enterprise is a legitimate business, continuity is not inferred merely because the enterprise will keep operating; plaintiffs must plead facts showing that racketeering is the association's regular way of conducting business or that concrete plans exist for future racketeering. *See H.J.*, 492 U.S. at 242; *GICC*, 67 F.3d at 466.

Here, the window between the predicate acts in the live pleading (December 2024 through February 2025 or two months) was far too short to establish closed-ended continuity. *See Spool*, 520 F.3d at 184 ("[I]t will be rare that conduct persisting for a shorter period of time [than two years] establishes closed-ended continuity); *GICC*, 67 F.3d at 467–68 (affirming district court decision dismissing an eleven-month scheme, noting that an alleged scheme "lasting seventeen months" would be "insufficient to show continuity" (citing *Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994))). The SAC adds the launch of $MELANIA in January 2025 and references the launches of $ENRON and $TRUST, but does not provide concrete, particularized dates pleading predicate acts across a long enough sustained period to establish closed-ended continuity.

Open-ended continuity fares even worse. Each new meme coin launch is still pleaded as rapidly executed and "inherently terminable," *see GICC*, 67 F.3d at 466, completed "within hours" or days when liquidity is withdrawn and prices collapse. SAC ¶¶ 277, 279 ($MELANIA "lost over 90% of its market capitalization" "[w]ithin days"), 323–25 ($ENRON's price "collapsed within thirty minutes"), 325, 344, 348 (with $TRUST, the "effect was swift").

The Second Circuit has routinely held that such finite, one-off extraction schemes—however lucrative—do not plead open-ended continuity absent well-pleaded facts showing a threat

of ongoing racketeering as a regular way of doing business. *See GICC*, 67 F.3d at 466; *Spool*, 520 F.3d at 186. And the Second Amended Complaint still paints an enterprise consisting of otherwise legitimate actors and platforms, and does not plausibly allege that racketeering is the "regular way of conducting" Kelsier's or Meteora's business. Adding more thematically different launches marketed to different audiences does not transform a set of short, discrete token events into a single, integrated racketeering "pattern" tied to a common racketeering purpose.

In an apparent effort to salvage their deficient continuity theory, Plaintiffs' proposed second amended complaint references "approximately ten additional tokens" launched by the alleged RICO enterprise and even alludes to *yet another* amended complaint. SAC ¶ 360 ("Plaintiffs reserve the right to amend to add those [unnamed] launches"). These bare assertions are speculative and unsupported by specific facts, underscoring the weakness of Plaintiffs' continuity theory. That even after Defendants' extensive briefing, Plaintiffs still fail to supply the necessary particulars, demonstrates that further leave to amend would be futile.

### 3. Fraud Concerning the New Tokens is Not Pleaded with Particularity.

For the RICO wire-fraud predicates and for the common-law fraud claims, each fraud predicate or claim must be pleaded with particularity for each defendant and each token— identifying the specific false statements or deceptive devices, the speaker, when and where, and why they were fraudulent. *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172 (2d Cir. 1999); *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006); *Williams v. Affinion Group, LLC*, 889 F.3d 116, 124 (2d Cir. 2018) (holding a plaintiff must, at a minimum, "detail the specific statements that are false or fraudulent, identify the speaker, state when and where the statements were made, and explain why they were fraudulent."). Group pleading is prohibited. *Polar Int'l Brokerage Corp. v. Reeve*, 108 F. Supp. 2d 225, 237 (S.D.N.Y. 2000) ("The requirements of Rule 9(b) are

11

"not satisfied by a complaint in which defendants are clumped together in vague allegations.").

Here, the new token sections ($MELANIA, $ENRON, and $TRUST) rely on generalized marketing themes (e.g., "official," "vested," "trusted," "corporate nostalgia" (SAC ¶¶ 264–65, 268–69, 288, 311–13, 340–41, 347, 384, 443) and group-pleaded "Defendants," without clearly attributing specific actionable misstatements to each moving defendant. The proposed amended complaint further depicts the branding and imagery used to promote the meme coin token launches as fraudulent, but never concretely ties particular statements, attributable to each defendant, to specific transactions, with dates and channels, or explain why they were false when made. In other words, instead of amending to show specific false statements by specific defendants, reliance, causation and damages relating to the $M3M3 and $Libra meme coins, the Plaintiffs simply add three more launches and adorn them with even more abstract, vague and conclusory allegations.

As before, the new allegations in the proposed amended complaint do not quote, paraphrase, or reference any public, pre-launch statements or affirmative representations made by Hayden Davis, Charles Thomas Davis, or Gideon Davis themselves (in their own name, voice, or social media handle) regarding the three new launches.[5] The failure to identify statements specifically made by the individual defendants and to even plead reliance and reasonable reliance manifestly fails to satisfy Rule 9(b)'s particularity requirements. *See Lerner*, 459 F.3d at 290.

As for Kelsier, the only public statements added are consistent with a legitimate meme coin launch, amount to immaterial puffery, and are not alleged to be false. The proposed amended complaint alleges that "[t]he marketing campaign was orchestrated by Kelsier Ventures, under

---

[5] *See supra* Part I.B.

Hayden Davis's supervision and in coordination with Benjamin Chow's Meteora operation. Through a network of paid influencers ('KOLs'), they saturated social platforms with coordinated messaging that $MELANIA was 'official,' 'vested,' and 'community driven.'" SAC ¶ 268. These vague and aspirational statements ("official," "vested," and "community driven") are classic examples of puffery, "so obviously unimportant to a reasonable [purchaser] that reasonable minds could not differ on the question of their importance." *See United States v. Litvak*, 808 F.3d 160, 175 (2d Cir. 2015). It is also not clear that any such statements were false. For instance, the proposed Second Amended Complaint does not dispute Melania Trump's involvement in the launch of the $MELANIA token; instead, it offers only the conclusory assertion that, had her team known the launch mechanics, "they would have rescinded any consent immediately." (*See* SAC ¶ 274). But who on her team said that? They never say.

And the notion that the $ENRON token would be associated with "MAXIMUM CORPORATE TRANSPARENCY" (*id.* ¶ 312) is so obviously intended to be ironic, no reasonable person would deem that representation as "significant" in "considering whether to enter into the transaction." *Moore*, 189 F.3d at 170.

Moreover, as noted above, $MELANIA, $ENRON, and $TRUST are more strictly "pure" meme coins in the sense that their launches did not have some underlying (ending PvP or promoting Argentinean growth) thesis. Thus, there is an even stronger argument with respect to these perhaps more classic meme coins that statements promoting these meme coins should not be deemed "material." As the SEC recognizes, "[m]eme coins typically are purchased for entertainment, social interaction, and cultural purposes, and their value is driven primarily by

market demand and speculation. In this regard, meme coins are akin to collectibles."[6] The statements promoting these three meme coins should, therefore, not be "deemed significant to a reasonable person considering whether to enter into the transaction" as memecoins have no intrinsic or economic value and therefore are not investible assets. *See Moore*, 189 F.3d at 170.

In sum, as to the new tokens, the proposed amended complaint remains long on rhetoric and short on the "who, what, when, where, and why" for each defendant and each predicate act. That is a classic Rule 9(b) defect that would warrant dismissal under Rule 12(b)(6) of the as-amended RICO claims and common-law fraud claims, rendering any further leave to amend futile. *See Lucente*, 310 F.3d at 258.

### 4. The SAC's New Materials—Whistleblower Chats and the "0xcEA" Clustering—Do Not Cure Core "Enterprise" Pleading Defects.

To state a RICO claim, a plaintiff must plausibly allege a RICO "enterprise," that defendants shared a distinct, wrongful purpose beyond parallel business interests. *See Boyle v. United States*, 556 U.S. 938, 946 (2009). The SAC continues to allege that Defendants' work together on, now, five meme coin launches constituted an associated-in-fact RICO enterprise, as opposed to a formal legal entity. *See* SAC ¶¶420–22. To plead an association-in-fact enterprise, the grouping must have "at least three structural features": (1) a common fraudulent purpose, (2) relationships among those associated with the alleged enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose. *See Boyle*, 556 U.S. at 946.

On the first element, as with the relatedness and continuity requirements analyzed above,[7]

---

[6] *See* https://www.sec.gov/newsroom/speeches-statements/staff-statement-meme-coins (Feb. 27, 2025).

[7] *See supra* sections III.B.1 and III.B.2.

the additions of the $MELANIA, $ENRON, and $TRUST coin launches—each linked to a different theme—undercuts any reasonable inference of a shared fraudulent purpose. The SAC itself describes materially different marketing narratives and purchaser appeals for each new token: $MELANIA is framed around celebrity/"official" branding and vesting optics (SAC ¶¶ 263–76, 281–85); $ENRON trades on corporate nostalgia and parody-as-legitimacy (*id.* ¶¶ 311–18, 331–36); and $TRUST is pitched as a "community-first" reset emphasizing fairness, discipline, and process (¶¶ 340–346, ¶¶ 354–356).

Those divergent themes are precisely the facts one would expect from distinct marketing strategies or successive legitimate product launches, not the signpost of a common, illicit objective. Where plaintiffs plead multiple projects that differ in audience, framing, and tokenomics, a court may reasonably infer non-criminal commercial motives unless the complaint supplies additional facts tying those differences to a single shared intent to defraud. The SAC offers only high-level rhetoric of "borrowed legitimacy" and repeating mechanics; it does not allege that every putative associate shared a concrete plan to use each theme as a purposeful device of fraud across projects.

Next, the new whistleblower and chat allegations are probative of coordination but are not alleged in the SAC with facts that neutralize innocent explanations or show an agreement to commit fraud across the launches. The SAC cites supposed confidential-informant admissions and planning calendars (SAC ¶¶ 110–19, 131–37) that a series of launches were queued and that certain individuals coordinated marketing. But those facts can be read as evidence of a marketing and product pipeline rather than proof that every participant agreed to defraud retail purchasers in a repeating pump-and-dump scheme. The PSAC does not plead facts showing that all identified defendants understood and intended that the launches would be executed through deceptive

mechanisms as a recurring course of illegal conduct. Absent such factual allegations, the chats show planning and hierarchy, not a shared illicit design.

*Finally*, the SAC's group-pleading and conclusory characterizations of roles and intent cannot carry the day under Rule 12 or Rule 9(b). The proposed amended complaint repeatedly recites a division of labor (Chow controlling technology; the Davises controlling marketing; the treasury collecting proceeds) and a two-pronged "fraud factory" strategy (SAC ¶¶ 424–426, 379–385). But federal courts dismiss RICO enterprise allegations when plaintiffs merely string together defendants and label their coordination an enterprise without pleading factual predicates of a shared illicit purpose. *See Town of Mamakating, N.Y. v. Lamm*, No. 15-cv-2865, 2015 WL 5311265, at *9 (S.D.N.Y. Sep. 11, 2015), aff'd, 651 F. App'x 51 (2d Cir. 2016).

Here, the SAC fails to identify who among the numerous alleged associates agreed to the fraudulent objective, when that agreement was reached, and what each participant specifically agreed to do to carry out the fraud across multiple launches. The absence of such allegations is not cured by pleading that "identical private-key clusters and approval chains were used" or by asserting that "the blockchain ledger thus functions as the enterprise's own confession" (SAC ¶¶ 152–156, 157–158). Those forensic facts may support separate fraud or conspiracy claims tied to a single launch or to certain Defendants' acts, but they do not plausibly establish the cross-project, shared wrongful intent necessary to plead an association-in-fact enterprise.

As for the relationships requirement, the SAC does not plausibly allege relational structure showing the associates "functioned as a continuing unit." *Cf. Boyle*, 556 U.S. at 942–43 & n.1. The new materials describe disparate, episodic collaborations around short-lived token launches that vary markedly in theme, audience, and mechanics.

16

The complaint continues to rely on generalized, role-based labels—e.g., "Chow controlled technology," "the Davises controlled marketing," "treasury hub received proceeds"—and on group allegations that "the same infrastructure" and "same command structure" were used across tokens.

But Rule 12 requires facts that make it plausible the alleged associates were bound by relationships that enabled them to act as an ongoing unit beyond ad hoc project teams. Absent these structural requirements, "any two thieves in cahoots would constitute an association-in-fact." *Foster v. 2001 Real Estate*, No. 14-CV-9434, 2015 WL 7587360, at *4 (S.D.N.Y. Nov. 24, 2015) (citation omitted). The alleged whistleblower excerpts and chat references show planning and coordination for individual launches, not stable, interdependent relationships with agreed-upon lines of authority, decision-making protocols, or collective mechanisms for pursuing an enduring enterprise purpose. The wallet-clustering allegations (e.g., the '0xcEA' "hub") likewise show financial convergence or repeat use of tools that everyone in the industry uses, not relational cohesion; common service providers, shared technical tooling, or recurring fund flows are equally consistent with ordinary vendor relationships, serial marketing partnerships, or parallel use of popular deployment practices. As before, Plaintiffs' new allegations of coordination toward legitimate business purposes doom their claims. *See, e.g.*, *Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 299 (E.D.N.Y. 2017) ("[F]ailing to allege that members of an association-in-fact enterprise shared a wrongful intent to violate RICO is fatal to an 18 U.S.C. § 1962(c) claim.").

As for longevity, the PSAC does not plead a duration of the alleged enterprise sufficient for the associates to pursue any purported enterprise purpose. Federal courts within the Second Circuit have typically encountered multi-*year* schemes before finding adequate longevity. *Equinox*

17

*Gallery Ltd. v. Dorfman*, 306 F. Supp. 3d 560, 573 (S.D.N.Y. 2018) (finding six years adequately alleges "that the enterprise had sufficient longevity"); *Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 306 (S.D.N.Y. 2010) (finding 11 years is "a sufficient period of time to satisfy the requirement of longevity").

And although courts within the Second Circuit do not appear to have decided whether a four-and-a-half-month period is sufficient to plead longevity, the consensus view of persuasive authority holds that a period so short is not enough. *See, e.g.*, *Nunes v. Fusion GPS*, 531 F. Supp. 3d 993, 1007 (E.D. Va. 2021) ("Neither does the approximately ***six-month period*** outlined in the Second Amended Complaint sufficiently support longevity." (emphasis added)); *Jones v. Scott Davis Chip Mill*, No. 7:15-CV-00661, 2017 WL 5127717, at *17 (N.D. Ala. Nov. 6, 2017) ("the enterprise's, at most, ***two-month*** existence does not satisfy the longevity requirement, assuming a fact dispute exists as to the first two elements." (emphasis added)); *Bryant v. Collins*, No. 15-CV-00302, 2017 WL 1354941, at *6 (E.D. Pa. Apr. 13, 2017) ("an enterprise that existed for only ***forty-three days*** . . . is insufficient to satisfy the longevity requirement for a RICO enterprise" (emphasis added)).

### 5.   Proximate Cause and RICO Standing Are Still Lacking.

To establish RICO standing or reliance for Plaintiffs' RICO and New York fraud and consumer-deception claims, the SAC must allege that each Plaintiff's injury to business or property was proximately caused "by reason of" the RICO predicate acts. *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001). Injury and proximate cause are analyzed together as "RICO standing," which "is a more rigorous matter than standing under Article III." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006). RICO standing must be established as to "each individual defendant." *DeFalco*, 244 F.3d at 306. For the new plaintiff (Winslow) and the new

18

tokens, the causal chain is attenuated.

The pleadings lean on the presence of celebrity or brand imagery and generalized "official" messaging, not on specific, attributable misstatements by each moving defendant that Winslow actually saw and relied upon at purchase. The SAC's theory still depends on rapid post-launch price collapses in highly speculative markets. Without particularized misrepresentations by each defendant that were both material and relied upon, market-loss allegations look like classic, non-RICO investment losses from volatility and hype—too remote for RICO proximate cause or common-law loss causation. *See First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir 1994) (holding that where "the plaintiff's loss coincides with a market-wide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases," and a plaintiff's claim fails when "it has not . . . proven . . . that its loss was caused by the alleged misstatements as opposed to intervening events.").

To the extent the SAC relies on supposedly material omissions, it still does not identify a cognizable duty to affirmatively speak or disclose by, or a special relationship with, the moving defendants in connection with the three new retail token launches. *See Flexborrow LLC v. TD Auto Fin. LLC*, 255 F. Supp. 3d 406, 423 (E.D.N.Y. 2017) (holding material-omissions claim fails because "Plaintiffs have not identified any duty owed to them by defendant under federal or state law); *Beach v. Citigroup Alt. Invs. LLC*, No. 12-CV-7717, 2014 WL 904650, at *20 (S.D.N.Y. Mar. 7, 2014) (requiring a legal duty or a special relationship for a material-omissions theory for common-law fraud under New York law).

### 6. The SAC Fails to Fix Myriad Other Flaws.

*First*, the new allegations do not give rise to a strong, particularized inference of fraudulent intent: the "whistleblower" chat and planning documents largely describe generic "technical

support," "instructions," or coordination and do not supply particularized facts showing each defendant's knowing falsity at the time of each misstatement for each token. Motive (profit) and opportunity (access to tools) are not enough; the SAC lacks individualized "conscious misbehavior or recklessness" details per defendant and per token.

*Second* and factually, the new "hub wallet" theory at the center of Plaintiffs' proposed amendment identifies 0xcEA as a "financial command center" but does not allege non-conclusory facts that any of the Davises or Kelsier owns or controls that wallet, or that funds traced to or from it were theirs. *See* SAC ¶¶ 135–41, 161, 163, 314–15, 342 (labeling the "hub wallet" "the Hayden Davis/Kelsier Wallet" without accompanying non-conclusory facts establishing that Davis or Kelsier owns or controls the wallet or that the traced funds were theirs).

*Third*, the unjust enrichment claims remain duplicative. Fourth, personal jurisdiction and domestic-injury problems persist for non-New York defendants and non-domestic conduct for the New York consumer-deception claims. The proposed SAC's expanded geography exacerbates, rather than cures, threshold jurisdictional failures.

Because the numerous core problems are substantive—not merely "inartful pleading"—further amendment is futile and should be denied. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

## C. Plaintiffs' Motion Reflects Bad-Faith Tactical Gamesmanship to Evade Adverse Rulings.

Plaintiffs' timing suggests tactical motive, not necessity. Just before their opposition deadlines, they proposed sweeping amendments candidly admitting their goal was to "moot the pending motions to dismiss the FAC," asking the Court to "deny the pending motions to dismiss the FAC as moot." Mot. for Leave 11, 19. This is a reprise of earlier gamesmanship. At the July 1

scheduling conference, the parties agreed that Hayden Davis would move to dismiss for lack of personal jurisdiction and that Plaintiff Omar Hurlock would respond 14 days later. Dkt. No. 62. Rather than file the promised response, Plaintiff amended the complaint to "moot the motion to dismiss under Fed. R. Civ. P. 12(b)(2) filed by Defendant Hayden Davis." Dkt. No. 105. At the August 18 hearing, the Court admonished Plaintiffs: that they "should not have unilaterally decided, without seeking leave from this Court," to decline to file an opposition and to instead assert that "their filing of a first amended complaint automatically mooted Davis's pending motion to dismiss." Tr. 66:18-67:7, Dkt. No. 152-2 (Aug. 19, 2025). The Court declined to grant Davis's motion as unopposed because "this admonishment should suffice for plaintiff." *Id.* Evidently, it did not.

Similarly, after the Court denied Plaintiffs' various requests for preliminary relief (*see* Dkt. No. 138), Plaintiffs launched a series of frivolous or near frivolous motions that appear aimed at forestalling the dismissal of the case and have wasted the parties' and judicial resources. Plaintiffs filed various mislabeled motions essentially requesting a do-over of the Court's decision denying a preliminary injunction (*see* Dkt. Nos. 150–55) and a highly unusual request for a "60–90 minute evidentiary hearing" to question Defendant Benjamin Chow about "irreparable harm" and "asset dissipation," (Dkt. No. 169), which the Court summarily denied (Dkt. No. 184). Plaintiffs then attempted to file supposedly confidential information "to complete the irreparable-harm record" ex parte and under seal, which the Court also summarily denied. Dkt. No. 192.

The procedural history, therefore, demonstrates a pattern: amend after Defendants identify defects; attempt to re-litigate adverse rulings; seek to inject new "CI materials" under seal after the Court's rulings; and then, when dismissal motions are nearly fully briefed, move to

supersede the operative complaint and moot those motions. This is precisely the sort of tactical pleading brinkmanship that courts reject as undue delay and bad faith. *See In re Int. Rate Swaps Antitrust Litig.*, No. 16-MC-2704, 2018 WL 2332069, at *27 (S.D.N.Y. May 23, 2018) (denying leave to amend and concluding "reluctantly but firmly" that "plaintiffs' counsel engaged in unacceptable gamesmanship" reasoning that such tactics "cause[d] both [the court and opposing parties] to expend significant time, and counsel to incur substantial costs and expenses, on work that the amended complaint stood to overtake"). The Rules permit liberal amendment to decide cases on the merits; they do not license parties to serially reframe a case to avoid imminent adjudication on well-briefed threshold defects: after all, "'[a] busy district court need not allow itself to be imposed upon by the presentation of theories seriatim.'" *State Trading Corp. v. Assuranceforeningen Skuld*, 921 F.2d 409, 418 (2d Cir. 1990) (quoting *Freeman v. Cont'l Gin Co.*, 381 F.2d 459, 469 (5th Cir. 1967))). Plaintiffs' latest bid to "streamline" the case by mooting pending motions is not a good-faith effort to "conserve[] judicial resources" (Mot. for Leave 11, 19)—it is tactical maneuvering to sidestep adverse rulings. If anything, mooting well-briefed motions would waste the parties' and judicial resources.

## D.    Serial Amendment After Notice of Defects and Shifting Theories Contravenes Judicial Economy and the Court's Case-Management Orders.

Plaintiffs have already amended once with the benefit of extensive briefing and the Court's guidance. They chose not to fix the central problems then; they should not receive a do-over now to add unrelated launches, additional alleged victims, and expanded theories. The Court has invested in structuring efficient and consolidated briefing schedule and admonished counsel to hew to deadlines. Granting this motion would unravel that framework and reward serial amendment despite notice of defects, contrary to the Court's consistent emphasis on disciplined case

management. The better course is to decide the pending motions on the operative complaint, rather than invite an open-ended cycle of plead-and-replead that postpones resolution and multiplies disputes.

## IV. Conclusion

Plaintiffs' motion to file a Second Amended Complaint should be denied. The Court should exercise its discretion under Rule 15 to deny leave because each of the *Foman* factors weigh heavily against amendment:

- **Concrete prejudice.** The proposed SAC intermingles purportedly "new" allegations throughout the operative pleading, adds new tokens and parties, and would require Defendants and the Court to restart Rule 12 briefing. Allowing amendment at this stage would render fully briefed motions largely for naught and substantially delay resolution.

- **Futility.** The SAC does not cure core pleading defects. It fails to plead a RICO pattern with the requisite relatedness or continuity; it continues to allege an association-in-fact without the particularized structure and relationships required; it does not plead predicate fraud with the "who, what, when, where, and how" specificity required by Rule 9(b) for each token and each defendant; and it does not plausibly allege proximate cause for the trading losses alleged. Adding more tokens and parties does not remedy these defects and, instead, highlights the fundamental defects in Plaintiffs' underlying legal theories.

- **Undue delay and tactical motive.** Plaintiffs waited until the eve of opposition deadlines and after extensive, reiterative briefing to seek a wholesale, 400+ paragraph rewrite and to ask the Court to moot fully briefed motions. That timing evidences tactics, not necessity.

- **Judicial economy.** Plaintiffs' proposal to "streamline" by mooting pending motions would waste the parties' and the Court's significant investment in consolidated briefing. The more efficient and fair course is to decide the existing Rule 12 motions on the operative complaint.

23

Therefore, we respectfully request that the Court deny the motion to amend and decide the pending motions to dismiss on the operative complaint.

Dated: November 18, 2025                    Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/ George M. Padis*
**Mazin A. Sbaiti**
New York Bar No. 4339057
**George M. Padis** (Admitted *Pro Hac Vice*)
3102 Maple Avenue, Suite 400
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367
E: mas@sbaitilaw.com
   george.padis@sbaitilaw.com

***Counsel for Kelsier Labs, LLC, d/b/a Kelsier Ventures, Hayden Mark Davis, Gideon Davis, and Charles Thomas Davis***

**M. CRIS ARMENTA, P.C.**
M. Cris Armenta (Admitted *Pro Hac Vice*)
217 Clancy Way
Bozeman, Montana 59718
T: (310) 488-2080
F: (310) 421-1021
E: cris@crisarmenta.com

***Counsel for Hayden Mark Davis***

24

## **CERTIFICATE OF COMPLIANCE**

In compliance with Local Civil Rule 7.1 of the United States District Courts for the Southern District of New York, I hereby certify that this brief contains 6,823 words, excluding the portions of the brief exempted by Local Civil Rule 7.1.

*/s/ George M. Padis*
George M. Padis