# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OMAR HURLOCK AND ANUJ MEHTA, *on behalf of themselves and all others similarly situated*<br><br>Plaintiffs,<br><br>v.<br><br>KELSIER LABS, LLC, d/b/a KELSIER VENTURES, HAYDEN MARK DAVIS, GIDEON DAVIS, CHARLES THOMAS DAVIS, METEORA, *an unincorporated association*, and BENJAMIN CHOW,<br><br>Defendants. | Case No.: Case No. 1:25-cv-03891-JLR |

**MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER TO PREVENT DESTRUCTION OF <u>BLOCKCHAIN EVIDENCE</u>**

# TABLE OF CONTENTS

**I. PRELIMINARY STATEMENT**   **6**

**II. FACTUAL BACKGROUND**   **8**

  A. The Meteora–Kelsier Enterprise and the LIBRA Scheme   8

  B. Procedural History and Prior Injunctive Proceedings   9

  C. New On-Chain Evidence of Imminent Anonymization   10

    1. November 16, 2025: Test anonymization through NEAR Intents   10

    2. November 18, 2025: Mass conversions of USDC to SOL and consolidation in "positioning" wallets   10

    3. Notice to Defendants and lack of explanation   11

  D. Technical Background: How Anonymization Would Destroy the Blockchain Evidence   12

**III. LEGAL STANDARD**   **13**

  A. Standard for Temporary Restraining Orders and Preliminary Injunctions   13

  B. Irreparable Harm   13

  C. "Likelihood of Success" and "Serious Questions" Alternatives   14

  D. Heightened Showing for Mandatory or Disruptive Relief (Not at Issue Here)   14

**IV. ARGUMENT**   **15**

  A. Plaintiffs Face Imminent and Irreparable Harm from the Destruction of Blockchain Evidence   15

    1. The Harm Is Destruction of Evidence and Chain of Custody, Not Non-Payment of a Money Judgment   15

    2. Federal Courts Recognize That Destruction or Spoliation of Evidence Constitutes Irreparable Harm   17

    3. The Threat of Evidence Destruction Is Actual and Imminent, Not Speculative   19

  B. Plaintiffs Are Likely to Succeed on the Merits, or at Minimum Raise Serious Questions Going to the Merits   21

    1. The Record Shows a Strong Likelihood of Success on Plaintiffs' Core Claims   21

  C. The Balance of Equities Decisively Favors the Narrow Evidence-Preservation TRO Plaintiffs Seek   26

    1. The TRO Imposes Minimal Burdens and Preserves Defendants' Ability to Conduct Legitimate Transactions   26

    2. By Contrast, Plaintiffs Face Severe and Irreversible Prejudice Without Relief   27

    3. Preserving the Evidentiary Status Quo Is the Equitable Course   28

  D. The Public Interest Strongly Supports Granting the Requested TRO   28

    1. The Public Has a Strong Interest in the Integrity of the Judicial Process and Preservation of Evidence   29

    2. Preventing the Use of Anonymization Tools to Evade Accountability Aligns with Regulatory and Law-Enforcement Policy   29

    3. Protecting Crypto Investors and Market Integrity Is a Matter of Public Concern    30

    4. The TRO Is Carefully Tailored to Serve These Public Interests Without Undue Burden 31

E. The Requested TRO Is Narrowly Tailored to Preserve Evidence and Should Be Entered in the Proposed Form    31

    1. The TRO Prohibits Only Anonymization and Chain-Breaking From Identified Wallets 31

    2. The TRO Expressly Preserves Defendants' Ability to Use and Move Funds in Ordinary Ways    33

    3. The TRO Is Time-Limited and Paired With an Expedited Hearing    34

    4. The Requested Bond Should Be Modest Given the Narrow Scope and Minimal Burden 34

**V. CONCLUSION**    **35**

## **TABLE OF AUTHORITIES**

<u>**Cases**</u>

*Am. Friends Serv. Comm. v. Webster*,
    485 F. Supp. 222 (D.D.C. 1980))..................................................................17, 18, 19

*Andres v. Town of Wheatfield*,
    2017 WL 4484347 (W.D.N.Y. October 6, 2017).............................................18, 19

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
    784 F.3d 887 (2d Cir. 2015)...............................................................................13

*Brenntag Int'l Chems., Inc. v. Bank of India*,
    175 F.3d 245 (2d Cir. 1999)....................................................................14, 15, 19

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    598 F.3d 30 (2d Cir. 2010)............................................................................13, 14

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
    559 F.3d 110 (2d Cir. 2009)..........................................................................13, 19

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
    883 F.3d 32 (2d Cir. 2018)................................................................................ 15

*SEC v. Cooper*,
    402 F.Supp. 516 (S.D.N.Y. 1975)....................................................................31

*State Farm Fire & Cas. Co. v. U.S. ex rel. Rigsby*,
    120 F.4th 72 (2d Cir. 2024)..............................................................................19

*Tom Doherty Assocs., Inc. v. Saban Ent. Inc.*,
    60 F.3d 27 (2d Cir. 1995)............................................................................14,15

*United States v. Sum of $70,990,605*,
    991 F. Supp. 2d 154 (D.D.C. 2013)......................................................17, 18, 19

*West v. Goodyear Tire & Rubber Co.*,
    167 F.3d 776 (2d Cir. 1999)............................................................................. 17

*Winter v. NRDC*,
    555 U.S. 7 (2008)............................................................................................14

*Wisdom Import Sales Co. v. Labatt Brewing Co.*,
    339 F.3d 101 (2d Cir. 2003)..............................................................................15

*Zubulake v. UBS Warburg LLC,*
  220 F.R.D. 212 (S.D.N.Y. 2003) ........................................................................................................17

**<u>Statutes</u>**

Fed. R. Civ. P. 65(b) ........................................................................................................ 6, 35

Fed. R. Civ. P. 65(c) ........................................................................................................34

## I.    PRELIMINARY STATEMENT

Plaintiffs move for an emergency temporary restraining order that does one thing only: it preserves critical blockchain evidence by temporarily restraining Defendants from using anonymization tools from a small set of LIBRA-related wallets, pursuant to Fed. R. Civ. P. 65(b). This motion does not seek to freeze Defendants' assets, secure a fund for a future judgment, or recreate the broad asset freeze this Court declined to extend at the preliminary-injunction stage.

The narrow TRO Plaintiffs request is an evidence-preservation order, not an asset-preservation order. Plaintiffs ask the Court to prevent Defendants, for a short period, from converting roughly $94.5 million in LIBRA proceeds—currently held in the LIBRA Team and Exit wallets, including approximately $62 million in newly converted SOL in two 'positioning' wallets—into privacy coins, mixers, or other anonymizing rails that would permanently destroy the public, on-chain record of where those proceeds go next.

Defendants would remain free to transfer funds among transparent wallets, convert assets to fiat on regulated exchanges, pay lawyers, vendors, employees, and personal expenses, and trade among transparent cryptocurrencies. The only restraint is on using specific privacy and obfuscation tools from specified wallets to effectively erase the evidentiary trail.

This motion is therefore materially different from Plaintiffs' prior preliminary-injunction application. The earlier motion sought a comprehensive asset freeze to prevent dissipation of value that might later be needed to satisfy a judgment.

The Court denied that relief, expressing concern that a broad freeze would function primarily to secure a potential damages award. Plaintiffs accept that ruling and do not seek to relitigate it. This motion targets a different problem with a different remedy: it seeks to prevent

the effective destruction of uniquely probative blockchain evidence, not to preserve a pot of money.

The need for this relief is driven by new on-chain activity. On November 16, 2025, a LIBRA Team wallet executed a 'test run' of Defendants' anonymization pipeline: LIBRA was swapped for SOL, routed through a fresh first-hop wallet, and then sent through NEAR Intents into Zcash's shielded pool, where the trail terminates and the assets become permanently untraceable.

Two days later, on November 18, 2025, Exit Wallet 1 and the LIBRA Deployer wallet converted more than $61.5 million in USDC into approximately 456,491 SOL and consolidated those tokens into two new 'positioning' wallets. These steps are the textbook staging phase for full anonymization, which can then be completed in under a minute via decentralized exchanges and privacy protocols.

If Defendants are permitted to push this SOL through privacy coins, mixers, or cross-chain anonymizing bridges, Plaintiffs will not simply face a harder collection problem; they will permanently lose the forward-looking evidentiary record that shows who receives LIBRA proceeds, how profits are allocated among insiders and associates, and how those flows correlate with public statements and market events.

No money judgment, discovery order, or sanctions regime can recreate that transaction-level history once the funds are routed into cryptographic dead ends. The irreparable harm at issue is therefore a classic, recognized form of equitable injury: destruction and spoliation of core evidence that cannot be restored and that goes to the heart of Plaintiffs' fraud, consumer-protection, and RICO claims.

Plaintiffs will show that (i) absent a TRO, the effective destruction of this blockchain evidence is actual, imminent, and not compensable by money; (ii) they are likely to succeed, or at minimum present serious questions, on their underlying claims; (iii) the balance of equities strongly favors preserving evidence; and (iv) the public interest is served by ensuring that alleged wrongdoers cannot use privacy technology to frustrate judicial oversight.

Because the relief sought is tightly tailored to those concerns and respects this Court's prior refusal to impose a broad asset freeze, the Court should grant the requested temporary restraining order.

## II.    FACTUAL BACKGROUND

### A.  The Meteora–Kelsier Enterprise and the LIBRA Scheme

This action arises from a coordinated enterprise that used the appearance of legitimate decentralized finance to execute a series of pump-and-dump schemes on the Solana blockchain.

As detailed in the operative First Amended Complaint ("FAC") complaint, Defendants Benjamin "Ben" Chow, Meteora, and the Kelsier Defendants (Hayden, Gideon, and Charles Davis, through Kelsier Labs, LLC d/b/a Kelsier Ventures) carried out a recurring playbook across multiple tokens, including $M3M3 and $LIBRA.

In public, Defendants presented token launches as a decentralized, community-driven project. (*See e.g.* FAC ¶¶ 171–176, 253–257). In reality, the launches were centrally orchestrated. (*See e.g.* FAC ¶¶ 193–208, 278–292).

They timed publicity and endorsements to coincide with insider trading and liquidity withdrawals, using hype to create artificial price spikes and then selling into that demand. (*See e.g.* FAC ¶¶ 179, 268, 271).

$LIBRA fits squarely within this pattern. Defendants marketed $LIBRA as "Viva La Libertad" – a project supposedly tied to Argentine small businesses and backed by President Javier Milei's public endorsement. (FAC ¶¶ 253–263).

The "Viva La Libertad" narrative was a façade, and Defendants used Meteora's infrastructure and Kelsier's promotions to create a rapid pump, extract tens of millions of dollars in USDC and other assets, and leave outside purchasers holding tokens that collapsed in value within hours of launch. (FAC ¶¶ 270, 278–292).

### B. Procedural History and Prior Injunctive Proceedings

On May 29, 2025, this Court granted Plaintiffs' initial motion for a temporary restraining order [Dkt. 19], finding that:

> Plaintiff has established the likelihood of irreparable harm in the absence of temporary injunctive relief given the ease through which these assets could be dissipated, the risks that Defendants will do so, and the value of the Defined Assets in relation to losses alleged to have been suffered by the Plaintiff putative class.

Following a hearing on August 19, 2025, the Court denied Plaintiffs' motion for preliminary injunction seeking a complete asset freeze and dissolved the temporary restraining order previously granted [Dkt.138]. At the preliminary-injunction hearing, the Court noted that Plaintiffs' own expert could trace the LIBRA-related wallets and that, on the record then available, there was no evidence of post-event movement or use of privacy tools that would defeat that traceability. [Dkt. 156-2 at 64, 65].

Since that time, Plaintiffs have continued litigating their claims and sought leave from this Court to amend the operative pleading with a Proposed Second Amended Complaint ("PSAC") to reflect that this scheme is far greater than initially understood in light of revelations from a recent whistleblower and subsequent renewed wallet tracing efforts [Dkt. 203].

The present motion is materially different from the prior preliminary-injunction request. Plaintiffs do not ask the Court to freeze all of Defendants' assets or to secure a pool of funds for eventual damages. Instead, they seek a narrow order prohibiting Defendants, for a short period, from using specific anonymization tools from a small set of LIBRA-related wallets in a way that would effectively destroy the on-chain evidentiary record.

### C. New On-Chain Evidence of Imminent Anonymization[1]

#### 1. November 16, 2025: Test anonymization through NEAR Intents

On November 16, 2025, Plaintiffs' forensic team observed a sequence of transactions originating from a wallet previously identified as "LIBRA Team Wallet 2." The wallet swapped a sizable quantity of LIBRA tokens for SOL on Solana. Within roughly 90 seconds, it transferred those SOL to a freshly created wallet with no prior activity. Shortly thereafter, the new wallet sent the SOL into the NEAR Intents protocol—a cross-chain system capable of routing assets into other networks and, ultimately, into privacy-enhancing assets.

From that point forward, Plaintiffs' tools could no longer determine where the funds went, on which chain they now reside, or in what assets they are held. The flow from LIBRA Team Wallet 2 to NEAR Intents was, in effect, a test anonymization: a live demonstration that Defendants can take LIBRA-linked funds from a publicly visible Solana wallet and move them, in under two minutes, into an environment where they are practically untraceable.

#### 2. November 18, 2025: Mass conversions of USDC to SOL and consolidation in "positioning" wallets

Two days later, on November 18, 2025, Plaintiffs observed a second, more significant

---

[1] *See* Declaration of David Goldman and accompanying exhibits, for further support of the allegations made herein, attached and incorporated by reference.

development. Multiple wallets associated with the LIBRA scheme, including Exit Wallet 1 and the LIBRA Deployer wallet, began systematically converting large USDC balances to SOL.

Exit Wallet 1 removed USDC liquidity from LIBRA-related pools and converted approximately $44.6 million in USDC into SOL across a series of transactions.

The LIBRA Deployer wallet removed additional USDC liquidity and converted roughly $17 million in USDC into SOL through dozens of transactions, then transferred that SOL and remaining LIBRA tokens into a new "first-hop" wallet.

By the afternoon of November 18, approximately 456,491 SOL sat in just two "positioning" wallets (Exit Wallet 1 and the newly created first-hop wallet linked to the LIBRA Deployer). These wallets were funded almost entirely by USDC originating in LIBRA-related pools and wallets.

This pattern—large-scale conversion of stablecoins into a liquid intermediary asset like SOL, followed by consolidation into fresh wallets with no prior history—is characteristic of the staging phase before anonymization. From this position, Defendants can at any time send the SOL through privacy coins, mixers, or cross-chain protocols to break the on-chain trail.

### 3. Notice to Defendants and lack of explanation

Upon detecting these movements, Plaintiffs' counsel promptly emailed defense counsel on November 18, 2025. The email identified the wallets involved, described the USDC-to-SOL conversions and consolidation patterns, explained that these patterns match known anonymization pipelines, and advised that Plaintiffs intended to seek an emergency TRO that day.

Plaintiffs also informed defense counsel that one previously frozen wallet had attempted to move funds through an anonymizing service. Defendants' counsel did not provide any

substantive explanation for these transactions and did not commit that Defendants would refrain from using anonymization tools with respect to the wallets at issue.

### D. Technical Background: How Anonymization Would Destroy the Blockchain Evidence[2]

The accompanying technical Declaration of David Goldman ("Goldman Decl.") explains why the November 16 and 18 transactions present an immediate threat to the blockchain evidence in this case.

For transparent blockchains like Solana, the public ledger allows analysts to track the movement of funds between wallets, identify patterns suggesting common control, correlate transfers with public statements and market events, and quantify the flow of funds in and out of scheme-related wallets.

This on-chain data is critical evidence for Plaintiffs' claims because it shows, in an objective and timestamped way, who received what, when, and from which wallets.

By contrast, privacy coins (such as Monero or shielded Zcash) and mixing services are explicitly designed to break the traceability of that ledger.

As explained in the Goldman Decl., privacy coins use transaction, account and amount obfuscation so that, once funds are converted, it is effectively impossible to determine the true sender, recipient, or amount.

Once the 456,491 SOL held in the LIBRA Team and Exit wallets and previously traced 249,665 SOL proceeds is pushed through these tools, the public ledger ceases to reflect who receives the proceeds of the LIBRA scheme. The on-chain evidence that currently ties those wallets to LIBRA and to each other will remain, but the present and forward-looking evidentiary

---

[2] See Declaration of David Goldman and accompanying exhibits, for further support of the allegations made herein, attached and incorporated by reference.

record—which shows who is being paid now, how proceeds are distributed, and where the money ultimately lands—will be gone.

The current motion is driven by this reality. The November 16 test transaction shows that Defendants have already used anonymization tools with LIBRA proceeds and can complete that process in under two minutes. The November 18 conversions show that they have now positioned over $94.5 million in LIBRA-linked funds for the same treatment.

## III. LEGAL STANDARD

### A. Standard for Temporary Restraining Orders and Preliminary Injunctions

In the Second Circuit, a party seeking preliminary injunctive relief must generally demonstrate irreparable harm in the absence of the requested relief; and either a likelihood of success on the merits, or sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly in the movant's favor. *See, e.g., Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35–38 (2d Cir. 2010); *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 894–95 (2d Cir. 2015).

In addition, courts consider whether the requested injunction would be against the public interest, and may deny relief where the injunction would disserve important public policies even if the other elements are satisfied. See *Salinger v. Colting*, 607 F.3d 68, 77 (2d Cir. 2010).

### B. Irreparable Harm

Irreparable harm is the single most important prerequisite for injunctive relief. It is "injury that is neither remote nor speculative, but actual and imminent," and for which a monetary award cannot provide adequate compensation. *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). It exists "where, but for the grant of equitable relief,

there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

The movant bears the burden of showing that such harm is actual and imminent, not simply possible or speculative. *Tom Doherty Assocs., Inc. v. Saban Ent. Inc.*, 60 F.3d 27, 37 (2d Cir. 1995). Where the alleged injury is the loss or destruction of evidence, courts have recognized that such loss can constitute irreparable harm because it cannot be undone at the conclusion of the case and may permanently impair a party's ability to prove its claims or defenses.

### C.  "Likelihood of Success" and "Serious Questions" Alternatives

To satisfy the merits prong, the moving party may show either: a clear likelihood of success on the merits, or the existence of sufficiently serious questions going to the merits to make them a fair ground for litigation, coupled with a showing that the balance of hardships tips decidedly in its favor.

The Second Circuit has confirmed that this "serious question" formulation remains valid after *Winter v. NRDC*, 555 U.S. 7 (2008). *See Citigroup*, 598 F.3d at 35–38. Under this alternative, the movant need not establish that it is more likely than not to prevail on every element; rather, it must show that the case presents substantial, non-frivolous issues and that the equities strongly favor temporary relief while those issues are adjudicated.

### D.  Heightened Showing for Mandatory or Disruptive Relief (Not at Issue Here)

When a movant seeks a mandatory injunction—one that alters, rather than preserves, the status quo, or that provides substantially all the relief sought and could not be undone even if the defendant prevails—courts require a "clear" or "substantial" showing of likelihood of success

and a strong showing of irreparable harm. *See Tom Doherty*, 60 F.3d at 34; *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).

By contrast, a prohibitory injunction that maintains the last actual, peaceable, uncontested status between the parties is evaluated under the ordinary standard. The relief sought here is prohibitory and status-quo preserving: it temporarily restrains Defendants from using specific anonymization and obfuscation tools that would destroy the existing traceable state of $LIBRA proceeds while the Court considers fuller relief.

## IV.    ARGUMENT

### A. Plaintiffs Face Imminent and Irreparable Harm from the Destruction of Blockchain Evidence

#### 1. The Harm Is Destruction of Evidence and Chain of Custody, Not Non-Payment of a Money Judgment

Irreparable harm is the "single most important" prerequisite for injunctive relief and requires "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113 (2d Cir. 2003).

Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems.*, Inc., 175 F.3d at 249.

Here, the harm Plaintiffs face is not the risk that Defendants may be unable to satisfy a future money judgment. The harm is the permanent destruction of uniquely probative blockchain evidence—specifically, the transaction-level record showing where LIBRA proceeds sit now, how they have been moved to date, and to whom they will be transferred if Defendants are not restrained from using anonymization tools.

As set out in the Goldman and Burwick declarations, the wallets identified as the "LIBRA Team" and "Exit" wallets currently hold approximately 456,491.11 SOL—more than

$62 million (depending on the current price of SOL)—traceable to prior USDC balances funded by investor money. Those balances are now consolidated in a small set of positioning wallets that can be pushed through anonymizing rails in seconds.

In addition, on November 16, 2025, Defendants executed a test anonymization: LIBRA proceeds were swapped to SOL, moved through an intermediary wallet, and then sent to a NEAR Intents address, after which Plaintiffs' tracing tools could no longer determine where the funds went or what assets they became. That test demonstrated that Defendants not only possess but have successfully deployed a working anonymization pipeline.

The evidentiary value of the current on-chain record is profound for Plaintiffs. That evidence allows Plaintiffs to:

1. Map the full chain of custody from investor deposits, to LIBRA liquidity, to treasury and team wallets, and ultimately to downstream recipients;

2. Identify additional participants whose first appearance in the story will be as new wallets receiving funds from the LIBRA Team wallets;

3. Quantify, on a wallet-by-wallet basis, how much each Defendant or affiliated actor received, and when; and

4. Prove coordination and scienter from timing patterns (for example, coordinated cash-outs following public statements or marketing pushes).

If Defendants are allowed to convert these SOL balances into privacy coins, mixers, or anonymizing cross-chain bridges, that chain of custody is broken.

This loss is categorically different from the asset-freeze that the Court declined to impose at the preliminary-injunction stage. Plaintiffs do not seek to stop Defendants from using their assets.

Under the proposed order, Defendants would remain free to transfer funds among transparent wallets, convert assets to fiat on regulated exchanges, pay counsel and vendors, and trade between transparent cryptocurrencies. The only restriction targets anonymization steps from specifically identified wallets. The objective is to preserve the integrity of the evidentiary trail, not to lock up assets for later collection.

In short, the irreparable harm here is that, without a TRO, Defendants can deliberately destroy the core on-chain record on which Plaintiffs' claims depend.

### 2. Federal Courts Recognize That Destruction or Spoliation of Evidence Constitutes Irreparable Harm

Federal courts have repeatedly recognized that destruction or spoliation of evidence can itself constitute irreparable harm sufficient to justify injunctive relief.

Under Second Circuit law, spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation. *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003).

In *United States v. Sum of $70,990,605*, the D.C. District Court, applying the familiar equitable standard, expressly noted that "[d]estruction of evidence may also rise to the level of irreparable harm," citing with approval a case enjoining continued destruction of FBI files. 991 F. Supp. 2d 154, 163 (D.D.C. 2013) (citing *Am. Friends Serv. Comm. v. Webster*, 485 F. Supp. 222, 233 (D.D.C. 1980)). The court denied relief there only because the movants had failed to present concrete proof that destruction was actually occurring; the principle is clear: where there

is evidence that significant proof will be destroyed, destruction of that proof is an irreparable injury.

In *American Friends Service Committee*, the court granted a preliminary injunction to halt an FBI records-destruction program, holding that continued destruction would cause "significant, irreparable injury" to plaintiffs who needed those files to vindicate statutory and legal rights. 485 F. Supp. at 233. Once destroyed, the files could never be recreated, and plaintiffs' ability to obtain information and pursue claims would be permanently impaired. That is the same structure of harm presented here: Plaintiffs' ability to obtain and use the on-chain data is what allows them to pursue their claims; anonymization destroys that data.

Closer to home, in *Andres v. Town of Wheatfield*, the Western District of New York granted a preliminary injunction requiring plaintiffs in an environmental toxic-tort case to provide notice, contemporaneous access, and split samples for environmental testing. 2017 WL 4484347, at *4-5. (W.D.N.Y. October 6, 2017). The court agreed that, without such an order, defendants would suffer "actual and imminent" harm "in the form of spoliation of the evidence," because changing environmental conditions and lack of chain-of-custody information would make it impossible to replicate plaintiffs' sampling and fairly confront it at trial. *Id*. at *3. *Andres* is directly analogous: the injunction there was not about preserving a damages fund; it was about preventing the irretrievable loss of critical proof.

Courts in other contexts—including FOIA and records-retention cases, and cases seeking preservation orders over electronic information—have likewise treated the obliteration of unique records as paradigmatic irreparable harm. *See, e.g.*, *Am. Friends Serv. Comm.*, 485 F. Supp. at 233 (FBI files); *Sum of $70,990,605*, 991 F. Supp. 2d at 163 (collecting cases recognizing record destruction as irreparable harm).

The situation here fits squarely within that line of authority. For Plaintiffs, the relevant "records" are not paper files but the current and future state of the LIBRA-related wallets on transparent blockchains. That live on-chain data is the evidentiary record: it reveals the identity and hierarchy of actors, the timing and coordination of their conduct, and the allocation of illicit proceeds. When Defendants anonymize those flows, they are not simply moving money; they are effectively destroying the publicly visible record of their conduct in a way no subpoena or discovery order can undo.

Accordingly, under the principles recognized in *Brenntag*, *Sum of $70,990,605*, *American Friends*, and *Andres*, the deliberate destruction of this evidence is precisely the kind of irreparable harm that justifies temporary injunctive relief.

### 3. The Threat of Evidence Destruction Is Actual and Imminent, Not Speculative

To establish irreparable harm, Plaintiffs must show "an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *State Farm Fire & Cas. Co. v. U.S. ex rel. Rigsby*, 120 F.4th 72, 80 (2d Cir. 2024) (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)). Plaintiffs easily meet that standard.

*First*, the record shows that Defendants have already begun using anonymization tools with LIBRA proceeds. On November 16, 2025, a LIBRA Team wallet executed a series of transfers—LIBRA to SOL, SOL to an intermediary wallet, and then SOL into NEAR Intents—after which Plaintiffs' expert could no longer trace where those funds went, on which chain they now sit, or in what asset they are held. That sequence was not hypothetical; it was a live "test" anonymization.

*Second*, on November 18, 2025, Defendants converted more than $61 million in USDC stablecoins into SOL tokens from multiple wallets, including approximately $44.6 million from Exit Wallet 1 and approximately $18 million from the $LIBRA Deployer wallet, consolidating the resulting 456,491.11 SOL in just two "first-hop" wallets. Plaintiffs' expert explains that this pattern—mass conversion of stablecoins into a highly liquid intermediary asset, followed by consolidation into fresh wallets—is the textbook positioning before anonymization via privacy coins, cross-chain bridges, or mixers.

*Third*, the speed and automation of crypto anonymization mean that, once Defendants continue to execute their plan, the harm will be complete in seconds. Goldman explains that converting SOL into a privacy coin such as Zcash, or routing it through a cross-chain anonymizing protocol, can be accomplished in under a minute using decentralized exchanges and bridges that operate 24/7 and require no KYC process.

*Fourth*, Plaintiffs have already attempted to provide notice to Defendants' counsel, identifying the wallets, describing the conversions, and explaining that the observed pattern matches known anonymization techniques. Defense counsel offered no explanation for the activity and no assurance that anonymization would not occur.

Because Defendants have (i) demonstrated their ability and willingness to anonymize fraud proceeds; (ii) taken concrete steps to position more than $94.5 million for exactly that treatment; and (iii) can complete anonymization in less time than it would take to hold even a brief conference, the threat to the blockchain evidence is actual, imminent, and irreversible. Once the SOL currently sitting in the LIBRA Team wallets is converted into privacy assets and washed through anonymizing tools, the evidentiary record will be permanently degraded, and Plaintiffs

can never be restored to their present ability to trace LIBRA proceeds and observe future flows. That is irreparable harm under any formulation of the Second Circuit standard.

### B.  Plaintiffs Are Likely to Succeed on the Merits, or at Minimum Raise Serious Questions Going to the Merits

To obtain temporary injunctive relief, Plaintiffs must show irreparable harm and either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation, with the balance of hardships tipping decidedly in their favor. As set out in the Proposed Second Amended Complaint and supporting declarations, Plaintiffs easily satisfy this standard. The record demonstrates a strong likelihood of success on their core fraud, RICO, and consumer-protection claims arising from the LIBRA scheme. At a bare minimum, it presents serious, non-frivolous questions that readily justify narrowly tailored evidence-preservation relief.

#### 1.  The Record Shows a Strong Likelihood of Success on Plaintiffs' Core Claims

Defendants sold LIBRA to the public as the centerpiece of the "Viva La Libertad Project," supposedly driving the future of freedom and growth by funding Argentine entrepreneurs and education, even though the project consisted of a same-day domain registration and a bare-bones landing page and form. (FAC ¶¶ 253–255, 257–258.)

On-chain, the FAC alleges a highly structured extraction plan that could not have occurred by accident. Immediately after minting the full 1 billion-token LIBRA supply on February 14, Defendants transferred 20% of the supply to a "Treasury" wallet and 50% to an Argentina Growth wallet, mirroring the Viva La Libertad distribution graphic, and seeded LIBRA launch pools on Meteora's DLMM, including a single-sided $LIBRA/USDC pool. (FAC ¶¶ 258–260, 264–267).

Within roughly 107 minutes, LIBRA Wallet 1 alone had received 13,060,482 USDC from that pool. (FAC    279.) Other LIBRA-funded "USDC Intermediary Wallets" then repeated the maneuver, ultimately extracting 44,593,888 additional USDC from the same pool and forwarding it into a second LIBRA wallet. (FAC ¶¶ 280–281). Parallel "SOL Intermediary Wallets" drained 69,275.9 SOL, 148,343.02 SOL, and 32,045.7 SOL, respectively, from the LIBRA/SOL DLMM pools into three concentrated receiving wallets. (FAC    283.)

The FAC further alleges that these extractions were accomplished by rapidly opening and closing DLMM liquidity positions in specific price bins, timed to LIBRA's launch-day price spike, so that the insider wallets could capture the USDC and SOL deposited by retail purchasers in the interim. (FAC ¶¶ 286–288.)

The FAC links the ensuing crash to Defendants' concealed extraction mechanics: LIBRA's price and liquidity were driven by the same DLMM pools and insider liquidity positions that Defendants were using to siphon out USDC and SOL in real time. (FAC ¶¶ 278–283, 286–291.)

Davis cultivated access by traveling repeatedly to Argentina, meeting in the Casa Rosada with Milei's chief of staff, and pitching "Viva La Libertad" as a government-linked project; he privately boasted that he had "control" over Milei and could obtain "everything from Milei tweeting" to formal partnerships. (FAC ¶¶ 242–247, 249).

On the facts pled in the FAC, Plaintiffs are likely to succeed on all of their Civil RICO, common-law fraud and consumer-protection claims.

Plaintiffs' consumer protection claims  (and any parallel statutory claims such as GBL §§ 349–350) are properly supported by the factual allegations set forth in the operative complaint:

- Material misrepresentation or omission:

  Defendants' statements and omissions about the nature of the LIBRA launch, the distribution and control of the token supply, the presence or absence of insider trading, and the safety and legitimacy of the project were material to reasonable purchasers deciding whether to buy LIBRA. (FAC ¶¶ 408-431).

- Scienter:

  Scienter is supported by (i) the tight correlation between public marketing and insider trading; (ii) the reuse of the same small constellation of wallets across multiple tokens; and (iii) Defendants' subsequent efforts to move and anonymize the proceeds once litigation commenced. These are not innocent or random patterns; they are consistent with a deliberate plan to mislead investors, extract funds, and then conceal the trail. (FAC ¶¶ 376-407).

- Reliance and causation:

  Plaintiffs allege that they purchased LIBRA in reliance on Defendants' representations and omissions regarding the project's nature, fairness, and prospects, and that the concealed insider dumping and supply manipulation caused the crash in token value that produced their losses. (FAC ¶¶ 408-431).

- Damages:

  Plaintiffs' losses are set out in detail in the PSAC and supporting declarations, and are tied directly to their purchases of LIBRA at inflated prices and the subsequent collapse engineered by the scheme. (FAC ¶¶ 376-407, 408-431, 432-443).

At this stage, Plaintiffs need not prove their case to a jury; they must show that their claims are "sufficiently strong to justify the use of the extraordinary remedy of injunction." The

complaint and declarations do so, providing a granular, wallet-level picture of a deceptive scheme that is more than plausible—it is well-corroborated.

Plaintiffs also plead RICO and unjust-enrichment claims that are directly anchored in the same wallet-level evidence.

- RICO enterprise and pattern.

   Plaintiffs allege a RICO enterprise comprised of the core developers, marketers, and financial controllers who repeatedly launched tokens (including LIBRA) through the same mechanisms, using overlapping wallets and infrastructure, and extracting investor funds in a patterned way. (FAC ¶¶ 376-407). The blockchain record shows:

   - a common set of deployer and treasury wallets;

   - repeated use of sniper wallets to acquire tokens at advantageous moments; and

   - structured liquidations from insider wallets shortly after public promotion campaigns.

- These facts support an association-in-fact enterprise and a pattern of racketeering activity centered on wire fraud.

- Unjust enrichment.

   The wallet flows also establish that specific Defendants and their controlled entities were enriched at Plaintiffs' expense by receiving traceable LIBRA proceeds. (FAC ¶¶ 432-443). That they now seek to anonymize those proceeds underscores both the enrichment and the inequity of allowing them to retain the benefits of the scheme.

Taken together, Plaintiffs have more than met the "likelihood of success" threshold on their core claims. The complaint is detailed and corroborated; the declarations add concrete,

technical support; and Defendants' own post-filing conduct is consistent with consciousness of wrongdoing.

Even if the Court were to conclude that Plaintiffs have not yet demonstrated a strong likelihood of success across every element of every claim, the record easily satisfies the alternative standard of "sufficiently serious questions going to the merits to make them a fair ground for litigation," with the balance of hardships tipping decidedly toward Plaintiffs.

First, the questions presented are undeniably serious:

- whether LIBRA was promoted and traded through a coordinated insider-control scheme;

- whether repeated misstatements and omissions about the fairness and safety of the token launch violated federal and state antifraud and consumer-protection laws;

- whether Defendants' ongoing handling of LIBRA proceeds—including efforts to move them into untraceable formats while litigation is pending—constitutes further wrongful conduct.

These issues are not speculative or contrived; they go to the heart of modern crypto-fraud enforcement and are substantiated by extensive factual allegations and forensic analysis.

Second, the balance of hardships decisively favors Plaintiffs:

- Absent relief, Plaintiffs suffer the permanent loss of core evidence that is central to their ability to prove liability, identify all responsible parties, and obtain appropriate remedies. That harm is immediate and irreparable, as explained in Point I.

- By contrast, the narrow TRO Plaintiffs seek imposes minimal burden on Defendants. It does not prevent them from using or spending funds generally, from paying counsel or employees, or from trading in transparent cryptocurrencies. It simply prohibits the use of

privacy and obfuscation tools from a defined set of wallets to prevent destruction of the on-chain record.

Where, as here, the merits present substantial, well-supported questions, courts routinely grant targeted preliminary relief designed to preserve the status quo and protect the integrity of the judicial process. This is particularly appropriate given that the status quo to be preserved is not Defendants' unfettered ability to anonymize funds, but Plaintiffs' current ability to observe and trace LIBRA proceeds on public blockchains while the Court adjudicates the merits.

Accordingly, the Court should find that Plaintiffs have shown at least serious questions going to the merits, and that the balance of hardships and the public interest warrant granting the narrowly tailored TRO they request.[3]

### C. The Balance of Equities Decisively Favors the Narrow Evidence-Preservation TRO Plaintiffs Seek

The balance of equities supports the requested relief. On Plaintiffs' side of the scale is the permanent loss of core evidence essential to proving their claims and identifying all responsible parties. On Defendants' side is, at most, a modest inconvenience: for a short period, from a small set of wallets, they may not employ anonymization tools designed to make funds untraceable. That asymmetry is precisely the kind of imbalance that warrants temporary injunctive relief.

#### 1. The TRO Imposes Minimal Burdens and Preserves Defendants' Ability to Conduct Legitimate Transactions

The proposed order is narrow in both scope and effect.

*First*, it applies only to a limited, identified set of wallets—those that Plaintiffs' expert has traced as "LIBRA Team" and "Exit" wallets holding proceeds derived from investor USDC.

---

[3] Additionally, Plaintiffs have a pending motion for leave to file the Proposed Second Amended Complaint, which renews and strengthens the merits showing in light of the whistleblower communications and the expanded wallet-tracing analysis that followed. This ongoing development of the factual record underscores that the true scope and mechanics of the LIBRA scheme are still being uncovered, and that discovery is expected to further amplify and corroborate the already substantial evidentiary foundation.

It does not purport to regulate every address ever associated with Defendants, much less their global asset base.

*Second*, the order does not prevent Defendants from using or moving assets in the ordinary course. In practical terms, Defendants retain the ability to live their lives, operate businesses, and defend this case. The TRO does not function as a traditional "freeze"; it is an evidence-preservation constraint, not a liquidity constraint.

*Third*, the TRO is time-limited. Plaintiffs seek a brief restraint sufficient to allow the Court to maintain the existing evidentiary status quo while it considers a preliminary-injunction record. Defendants are not being asked to live indefinitely under this narrow limitation; they are simply being told not to push a specific $94.5 million tranche of assets through anonymization rails while the Court evaluates the issues.

Against this backdrop, Defendants cannot credibly claim substantial hardship. They have no legitimate interest in using privacy coins, tumblers, or anonymizing cross-chain bridges to render fraud proceeds untraceable while litigation is pending.

## 2. By Contrast, Plaintiffs Face Severe and Irreversible Prejudice Without Relief

On Plaintiffs' side, the harm is profound. If Defendants are permitted to anonymize the SOL currently held in the LIBRA Team and Exit wallets, Plaintiffs will permanently lose: the ability to trace future flows from those wallets and see who receives LIBRA proceeds, the ability to identify additional participants whose only footprint is downstream receipt from those wallets, the ability to quantify enrichment and allocation of proceeds on a wallet-by-wallet basis, and the ability to present a coherent, data-backed narrative of the scheme's structure, timing, and coordination.

No later monetary award, discovery order, or sanction can restore those lost data. Once the funds are routed through privacy coins and anonymizing bridges, the evidentiary trail is broken. Plaintiffs will never again be in the position they are in today: able to observe and analyze LIBRA proceeds on transparent rails in real time.

The equities therefore reflect a stark choice: either Defendants forego, temporarily, the use of tools whose only relevant function here is to destroy traceability, or Plaintiffs lose forever a category of evidence central to vindicating their rights.

### 3.  Preserving the Evidentiary Status Quo Is the Equitable Course

The purpose of preliminary relief is to preserve the status quo pending final adjudication. In this context, the relevant status quo is not Defendants' unfettered ability to move funds wherever and however they like; it is the current state of the LIBRA proceeds as traceable balances in known wallets on transparent blockchains.

If the Court grants the TRO, the status quo is maintained: the funds may move, but they remain visible and traceable. If the Court denies relief and Defendants proceed with anonymization, the status quo is shattered: the evidentiary record is permanently altered in Defendants' favor, and no later order can restore it.

When one side seeks to preserve evidence and the other seeks to erase its public visibility, the equities can point in only one direction. The narrow, time-limited prohibition on using anonymization tools from a handful of wallets is a modest restraint compared to the substantial, irreversible prejudice.

### D.  The Public Interest Strongly Supports Granting the Requested TRO

The public interest also favors the narrow, evidence-preservation TRO Plaintiffs seek. This is not a private, purely commercial dispute over the price of a commodity; it is a civil action

alleging fraud, racketeering, and consumer deception in a large-scale crypto scheme, with tens of millions of dollars in investor losses and ongoing attempts to move and anonymize the proceeds.

The public has a compelling interest in ensuring that courts can meaningfully adjudicate such claims, that alleged wrongdoers do not use anonymization tools to frustrate judicial oversight, and that blockchain technology is not leveraged as a one-way exit from legal accountability.

### 1. The Public Has a Strong Interest in the Integrity of the Judicial Process and Preservation of Evidence

Courts consistently recognize that the public interest lies in maintaining the integrity of the judicial process, including by preventing the destruction or concealment of evidence relevant to pending cases. When litigants are allowed to obliterate uniquely important records—whether physical evidence, government files, electronic data, or, here, on-chain transaction histories—the courts' ability to perform their core function is compromised, and public confidence in the legal system is undermined.

Granting a TRO that temporarily restrains Defendants from using anonymization tools to destroy the public visibility of LIBRA proceeds directly serves that interest.

By contrast, denying relief would implicitly authorize sophisticated crypto actors to respond to litigation by routing proceeds into privacy coins and anonymizing bridges, thereby destroying the very evidence courts and regulators require to understand and address misconduct. That outcome would send a damaging signal to the broader market that anonymization is an effective way to place ill-gotten gains beyond judicial reach.

### 2. Preventing the Use of Anonymization Tools to Evade Accountability Aligns with Regulatory and Law-Enforcement Policy

The requested TRO is also consistent with the public policies reflected in federal regulation and law-enforcement guidance concerning privacy-enhancing technologies. Financial-crimes regulators and agencies—including FinCEN and the Department of the Treasury—have repeatedly warned that mixers, tumblers, and certain privacy-focused assets present heightened risks of money laundering, sanctions evasion, and concealment of criminal proceeds.

Issuing a TRO simply prevents Defendants from exploiting the very features regulators have identified as dangerous in order to frustrate the Court's jurisdiction. The public interest is plainly served when courts ensure that technologies associated with concealment are not deployed to destroy probative evidence in active cases.

### 3. Protecting Crypto Investors and Market Integrity Is a Matter of Public Concern

This case also implicates broader public interests in the integrity of digital-asset markets and the protection of retail investors. LIBRA was marketed and sold to a wide audience of purchasers who, according to the complaint, were told that the token was fairly launched, safely structured, and backed by a legitimate project. Allowing the alleged architects of such a scheme to render tens of millions of dollars in proceeds untraceable while litigation is pending would weaken deterrence and embolden similar misconduct.

By contrast, preserving the on-chain record improves the likelihood that all responsible parties will be identified and held to account, strengthens the ability of injured investors to obtain meaningful relief and reinforces the message that blockchain transparency is a tool for accountability, not merely a starting point for obfuscation.

Courts routinely note that enforcing anti-fraud norms, protecting investors, and ensuring honest markets are weighty public interests that support injunctive relief. Those same interests are present here. *See e.g. SEC v. Cooper,* 402 F.Supp. 516, 525 (S.D.N.Y. 1975).

> **4. The TRO Is Carefully Tailored to Serve These Public Interests Without Undue Burden**

Finally, the public interest is furthered by the narrow tailoring of the requested order. The TRO does not attempt to regulate Defendants' general trading activity or to police privacy tools in the abstract. It targets a specific, well-defined problem: the imminent use of anonymization rails to destroy the traceability of a particular $94.5 million tranche of LIBRA proceeds held in identified wallets.

By allowing Defendants to continue transacting on transparent rails, paying expenses, and converting to fiat, while restraining only those actions that would permanently destroy critical evidence, the proposed order promotes the public interest in fair adjudication and accountability without unduly restricting legitimate activity.

> **E. The Requested TRO Is Narrowly Tailored to Preserve Evidence and Should Be Entered in the Proposed Form**
>
> > **1. The TRO Prohibits Only Anonymization and Chain-Breaking From Identified Wallets**

The temporary relief Plaintiffs seek is precisely calibrated to the harm at issue. It does not freeze Defendants' assets, prevent them from using funds for ordinary purposes, or interfere with legitimate business or personal activity. Instead, it targets only the use of specific anonymization and chain-breaking tools from a small set of wallets holding LIBRA proceeds, for a short period, so that the blockchain evidence at the heart of this case is not destroyed before the Court can act.

31

The proposed TRO tracks the arguments presented in this motion. Defendants, and anyone acting in concert with them, should be prohibited from engaging in the following conduct with respect to a defined set of "LIBRA Team" and "Exit" wallets:

1. **Conversion into privacy coins or anonymous formats:** Defendants are restrained from converting, exchanging, swapping, or otherwise transforming digital assets currently held as SOL, USDC, or other traceable cryptocurrencies in the specified wallets into privacy-focused or anonymity-enhancing assets. This includes, but is not limited to, converting into coins or tokens that are specifically designed to obscure wallet addresses, transaction histories, or amounts transferred.

2. **Use of mixers, tumblers, or comparable obfuscation services:** Defendants may not send funds from the identified wallets to any mixing or tumbling service that pools inputs and redistributes outputs in a manner intended to sever the link between sending and receiving addresses, or to any service marketed or understood as providing on-chain transaction privacy or obfuscation.

3. **Use of cross-chain bridges or atomic swaps to break traceability:** Defendants are barred from using cross-chain bridges, atomic swap services, or similar protocols to move assets from the identified wallets to other chains or assets where the purpose or effect is to break traceability—particularly where such services are known to facilitate movement into privacy coins or opaque environments.

4. **Deployment of protocol-level privacy technologies for these funds:** Defendants are prohibited from employing ring signatures, stealth addresses, shielded pools, zero-knowledge proof systems, or any comparable technologies to conceal the movement or ownership of funds originating from the specified wallets.

These prohibitions do not reach Defendants' assets generally. They apply only to the funds currently held in the LIBRA-related wallets that Plaintiffs' expert has traced and that are at imminent risk of being anonymized. The restraints are tailored to prevent precisely the conduct that would destroy the evidence: the use of privacy and obfuscation tools to break the chain of custody.

### 2. The TRO Expressly Preserves Defendants' Ability to Use and Move Funds in Ordinary Ways

Equally important, the proposed order makes clear that Defendants retain broad freedom to use their assets. Among other things, the TRO allows transfers among transparent wallets, allows conversion to fiat on regulated platforms, allows payment of legal, business, and personal expenses, Allows trading among transparent cryptocurrencies.

Defendants remain free to move digital assets between wallets on transparent blockchains, so long as those transfers do not involve anonymization or obfuscation services.

Defendants may convert digital assets to dollars or other fiat currencies through regulated, know-your-customer (KYC) exchanges and financial institutions.

The order permits payments for attorneys' fees, litigation costs, employee salaries, contractor payments, rent and utilities, ordinary business operations, and reasonable personal living expenses.

Defendants may trade among widely-used, non-privacy cryptocurrencies and stablecoins (such as SOL, BTC, ETH, USDC, and similar transparent assets) on ordinary exchanges, so long as they do not route through privacy or obfuscation tools from the identified wallets.

In short, Defendants can continue to defend this case, operate businesses, and manage their affairs. The TRO imposes a single, targeted constraint: for a limited time, they may not use

the subset of technologies whose purpose here would be to erase the public record of where LIBRA proceeds go.

### 3. The TRO Is Time-Limited and Paired With an Expedited Hearing

The proposed order is also limited in duration. Plaintiffs request that the TRO remain in effect only long enough for the Court to preserve the existing evidentiary status quo and conduct a prompt hearing on whether the restraints should be continued, modified, or dissolved as a preliminary injunction.

The order contemplates an expedited schedule, under which Defendants will have a fair opportunity to be heard in short order. Thus, the TRO does not impose an open-ended restriction; it is a temporary measure designed to bridge the gap between the present risk of evidence destruction and a fuller adversarial presentation.

### 4. The Requested Bond Should Be Modest Given the Narrow Scope and Minimal Burden

Under Rule 65(c), the Court may condition injunctive relief on the posting of security. Given the narrow scope of the TRO and the absence of any genuine financial hardship to Defendants, any bond required should be modest.

The order does not block Defendants from accessing or using their assets, does not interrupt business operations, and does not interfere with their ability to generate income or pay counsel. The only prohibited conduct is the use of privacy and obfuscation tools from the specified wallets—conduct that has no legitimate role in defending this action and whose principal effect would be to destroy evidence. In these circumstances, the risk of wrongful restraint is low, and a substantial bond is unwarranted.

## V.    CONCLUSION

Plaintiffs face a unique form of irreparable harm: the effective destruction of blockchain evidence through conversion to untraceable formats. This is not speculation or theory—it is documented fact. Defendants have already tested their anonymization capability and positioned $61.5 million for conversion. Every hour that passes increases the risk that critical evidence will vanish into the cryptographic void of privacy protocols, forever beyond the reach of this Court or any legal process.

The relief requested is narrow, targeted, and preserves Defendants' legitimate rights while preventing only the specific conduct that would destroy evidence.

For these reasons, Plaintiffs respectfully request that this Court immediately enter the proposed Temporary Restraining Order, pursuant to Fed. R. Civ. P. 65(b),  prohibiting Defendants from converting digital assets into untraceable formats for fourteen days or until a preliminary injunction hearing can be held.

Dated: November 19, 2025
New York, New York

Respectfully submitted,

**BURWICK LAW, PLLC**

_/s/ Max Burwick_
Max Burwick, Esq.
1 World Trade Center, 84th Fl.
New York, NY 10007
(646) 762-1080
max@burwick.law

_Counsel for Plaintiffs_

## **WORD COUNT CERTIFICATION**

I certify that the foregoing memorandum of law contains 7,849 words, as determined by the word-count function of Microsoft Word, and complies with the word-limit requirements in the Individual Rules and Practices of Judge Jennifer L. Rochon.