**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**OMAR HURLOCK AND ANUJ MEHTA,** ***on behalf of themselves and all others similarly situated,***

**Plaintiffs,**

**v.**

**KELSIER LABS, LLC, d/b/a KELSIER VENTURES, HAYDEN MARK DAVIS, GIDEON DAVIS, CHARLES THOMAS DAVIS, METEORA,** ***an unincorporated association*****, and BENJAMIN CHOW,**

**Defendants.**

**Case No.: 1:25-cv-03891-JLR**

**PLAINTIFFS' REPLY IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER TO PREVENT DESTRUCTION OF BLOCKCHAIN EVIDENCE**

## TABLE OF CONTENTS

**I. PRELIMINARY STATEMENT ........ 4**

**II. DEFENDANTS' POSITIONS ARE INTERNALLY INCONSISTENT AND UNDERMINE THEIR OWN ARGUMENTS ........ 7**

A. Defendants Disclaim Control Over LIBRA Wallets While Invoking a "Right" to Use Those Same Assets ........ 7

B. The Sniper-Wallet Pattern After TRO Dissolution Further Shows Control and Coordination ........ 8

C. Defendants' Opposition to a Neutral Evidence-Preservation Order Is Itself Telling 9

D. The "Locked Wallet" Explanation Reinforces the Inconsistency of ........ 9

Disavowing Control or Liability While Requesting a Carve Out ........ 9

**III. DEFENDANTS' TECHNICAL CHARACTERIZATIONS ARE INACCURATE AND MISLEADING ........ 10**

A. "No anonymization tools were used" Is Technically Wrong ........ 10

B. The "only $3,170" Argument Misses the Point; The Test Proves the Pipeline Works ........ 11

C. The November 18 USDC→SOL Conversions Are Classic Staging for Anonymization, Not Random Transfers ........ 12

**IV. EVIDENCE PRESERVATION IS A RECOGNIZED BASIS FOR IRREPARABLE HARM AND FITS SQUARELY WITHIN THE COURT'S EQUITABLE POWERS ........ 13**

A. In This TRO, Irreparable Harm Is the Loss of the Blockchain Evidentiary Record ........ 13

B. Destruction and Spoliation of Evidence Are Recognized Forms of Irreparable Harm ........ 14

**V. THE RELIEF SOUGHT IS NARROW, NEUTRAL AND SERVES BOTH SIDES' INTERESTS ........ 14**

A. No Restriction on Spending or "Project Use" of Funds ........ 15

B. Preserving Traceability Benefits Defendants If Their Story Is True ........ 15

**VI. CONCLUSION ........ 15**

# TABLE OF AUTHORITIES

## Cases

*American Friends Service Committee v. Webster*,
485 F. Supp.222 (D.D.C. 1980))........................................................................14
*Andres v. Town of Wheatfield*,
2017 WL 4484347 (W.D.N.Y . October 6, 2017)........................................................14
*United States v. Sum of $70,990,605*,
991 F. Supp. 2d 154 (DDC 2013)........................................................................14

Plaintiffs Omar Hurlock and Anuj Mehta, individually and on behalf of all others similarly situated, file this Reply in Support of Emergency Motion for Temporary Restraining Order to Prevent Destruction of Blockchain Evidence [Dkts. 243-247] and respectfully show as follows.[1]

## I. PRELIMINARY STATEMENT

It is important to note that this was not some "memecoin", but a fraud that involved the sitting president of a foreign nation. And, that the defendants, the parties behind this fraud, stole hundreds of millions of dollars from everyday citizens lured by the opportunity to participate in an innovative new technology.

Under Second Circuit law, irreparable harm exists where, absent equitable relief, there is a substantial chance that the parties cannot be returned to the positions they previously occupied, and where money damages cannot adequately compensate for the injury.

Historically courts treat spoliation and destruction of core proof as a paradigmatic form of irreparable harm, warranting interim equitable relief to preserve the status quo. The injury is not a marginal increase in litigation costs; it is the permanent loss of the plaintiff's ability to prove liability, to identify all responsible actors, and to obtain the full measure of remedies that the law would otherwise allow. No money judgment at the end of the case can reconstruct a record that has been deliberately erased.

Defense counsels' Oppositions rest on a misunderstanding of both the technology and Plaintiffs' evidence. Once that misunderstanding is corrected, there is no serious

---

[1] This Reply addresses the main arguments advanced by Defendants in their various oppositions to Plaintiffs' request for emergency TRO [Dkts. 248-251].

dispute that anonymization tools have already destroyed evidence, and the destruction appears ongoing.

In their Oppositions, Defendants offer no expert, no competing blockchain analysis, and no alternative account of how the November 16 NEAR Intents to ZCash transaction could be anything other than a successful test of an anonymization path. Instead, they rely on rhetoric (i.e. "whopping difference-making $3,170") and the assertion that, because of Plaintiffs' expert's refusal to speculate about ultimate wallet ownership, there is "no evidence" of anonymization tools at all. That is not a factual rebuttal; it is a refusal to engage with the technical record.

Defendants assert that "there is no evidence Defendants used anonymization tools." Kelsier Opp. [Dkt. 249] at 3. That is incorrect. Plaintiffs submitted a detailed technical declaration documenting "anonymization tools" in a November 16 transaction in which LIBRA proceeds were routed from a LIBRA Team wallet through NEAR Intents and into a ZCash shielded address, thus breaking the tracing chain. *See* Goldman Decl. ¶¶ 9–13 & Ex. DG-B.

On a blockchain, anonymization tools erase the record; Privacy coins, mixers, shielded pools, and anonymizing cross-chain bridges exist to defeat transparency. They are not required to transfer assets. Nothing in this TRO prevents Defendants from sending LIBRA proceeds to Argentina, to vendors, to exchanges, or anywhere else using normal, fully traceable transactions.

That is what makes the recent on-chain activity so troubling. The record already shows that Defendants used one type of obfuscation tool, FixedFloat, to fund the wallets that created LIBRA and to seed the sniper wallets. The new tools that warranted this TRO

were developed to evade the methods previously implemented to prevent the type of laundering at issue here.

Two days later, on November 18, Defendants initiated the same process, converting more than $60 million in LIBRA-linked USDC into roughly 456,000 SOL and consolidated that SOL into two new "positioning" wallets. That activity stopped only after Plaintiffs' counsel wrote to defense counsel identifying the wallets, explaining the privacy path, and stating Plaintiffs' intent to seek emergency relief.

This TRO prevents only one thing: using the same sorts of tools that cartels, sanctions evaders, ransomware groups, and other bad actors use to conceal the destination of funds thus destroying the evidentiary value of the ledger. The tools' sole role is to blind the Court and everyone else to where LIBRA proceeds go.

Ironically, the best way to prove LIBRA's legitimacy is to leave the on-chain trail intact. A transparent, auditable ledger from LIBRA wallets to Argentinian recipients would be the strongest possible evidence in Defendants' favor. Yet defense counsel insist on destroying this record.

Additionally, in accordance with the LIBRA project's thesis, investors bought into a project with the expectation of transparent blockchain transfers, to use anonymization tools is yet another departure from a legitimate project.

This TRO is not about *Grupo Mexicano*, securing a damages fund, or relitigating the preliminary injunction. It seeks a narrowly tailored more traditional form of equitable relief: an order that, for a short period, prevents one side from unilaterally destroying the core evidence while the Court adjudicates the merits.

## II. DEFENDANTS' POSITIONS ARE INTERNALLY INCONSISTENT AND UNDERMINE THEIR OWN ARGUMENTS

### A. Defendants Disclaim Control Over LIBRA Wallets While Invoking a "Right" to Use Those Same Assets

Defendants' opposition insists that there is "no evidence" they control LIBRA Wallet 2 or the other wallet addresses, and that they "neither control Libra Wallet 2 nor did what Plaintiffs' counsel say they did." Kelsier Opp. at 4. The clear message is that these wallets and the anonymization activity Plaintiffs describe are just things happening "out there" on the blockchain, unrelated to Defendants.

Conversely, Defendants' counsel argue as though the requested TRO would burden their clients. They invoke the Court's August preliminary-injunction ruling as having "confirmed Defendants' right to transfer, use, or alienate the tokens and assets" and complain that Plaintiffs are again trying to interfere with how LIBRA proceeds are deployed. *Id*. at 5. That argument only makes sense if Defendants actually claim a practical ability to direct what happens with these wallets and a concrete interest in preserving their ability to move this specific pot of LIBRA proceeds however they choose.

The two positions cannot be reconciled. Either the defendants control these wallets and destroyed evidence or this TRO directed at those wallets imposes no burden on them at all. In that scenario, they would have no reason to oppose a narrow, time-limited order that prevents some unidentified third party from using privacy tools to destroy evidence.

Regardless of the above scenario, this TRO in no way impacts the subject wallets' restraint on transmission of funds.

### B. The Sniper-Wallet Pattern After TRO Dissolution Further Shows Control and Coordination

The history of wallet activity in this case reinforces the above contradiction and shows a consistent pattern of coordinated action by the same actors.

During the first TRO cycle, Defendants, through Mr. Sbaiti, represented that Mr. Davis did not control the "sniper" wallets. Those wallet addresses, the Court was told, were independent market participants outside Mr. Davis's control.

Yet the day the original TRO was lifted, those same sniper wallets immediately began moving funds. Indicating that the controller of the Sniper wallets, the defendants, were concerned of being in contempt of the TRO. Hence waiting until the order was lifted to move funds. This is not a coincidence.

Subsequent forensic analysis tied the sniper wallets and the LIBRA deployer addresses into the same wallet cluster, demonstrating that the same actor who created LIBRA also controlled the sniper wallets. In other words, the 'independent sniper' story has been overtaken by objective on-chain evidence of common control.

The current episode is oddly similar. On November 18, wallets associated with the LIBRA deployer and exit addresses converted more than $60 million in USDC into roughly 456,000 SOL and consolidated that SOL into two fresh "positioning" wallets.

Two days earlier, on November 16, we witnessed the same pattern. A LIBRA Team wallet had already run a "test" through the anonymization pipeline, pushing approximately $3,170 of LIBRA-derived value through NEAR Intents and into a shielded environment where the trail ends.

Taken together, these episodes tell a consistent story. Each time Court-imposed restraints are lifted or denied, the same cluster of wallets moves quickly:

- First, to extract and redistribute LIBRA proceeds (via sniper wallets); and
- Now, to stage and partially anonymize those proceeds using privacy rails.

That pattern is powerful circumstantial evidence of control and coordination, regardless of formal statements disavowing ownership. It also confirms that the risk Plaintiffs identify is not hypothetical: the actor behind the deployer and sniper wallets has used anonymization technology once and has staged the next transactions.

**C. Defendants' Opposition to a Neutral Evidence-Preservation Order Is Itself Telling**

Defendants' opposition to this TRO is also revealing in light of how they have repeatedly described the LIBRA project.

If LIBRA proceeds are intended for Argentinian businesses in accordance with the project's stated tokenomics, an on-chain trail from the LIBRA wallets to Argentinian recipients would be the best possible evidence in Defendants' favor. It would allow this Court to see the funds used for the purposes defense counsel has described.

Yet Defendants oppose even a short-term, technology-focused order that preserves visibility. They insist on using privacy coins, mixers, shielded pools, and anonymizing bridges that are specifically designed to make future flows untraceable.

**D. The "Locked Wallet" Explanation Reinforces the Inconsistency of Disavowing Control or Liability While Requesting a Carve Out**

Defendants' own description of the so-called "locked wallet" during the July 1 conference underscores this same tension. In asking the Court to modify or clarify the original TRO, Mr. Sbaiti told Judge Rochon:

> It is my understanding one of the wallets… is what's called a locked wallet. It automatically buys and sells LIBRA, what in the securities world we call a market maker of some kind. And my client doesn't have control over it.

July 18 Conference Transcript [Dkt. 81] at 15–16.

This request by Defense counsel highlights a similar issue as the one currently before the court. Defense counsel states that defendants do not control a specific wallet. Then in the same breath ask for a carve out, just in case the defendant might control the wallet.

It is important to note that it is Plaintiffs' inference that one of the wallets defense counsel identified in the above scheduling conference transcript is the same wallet that used the anonymization tools. It is also the same wallet that is directly connected to the Sniper wallet that moved funds following the dissolution of the TRO. The same Sniper wallet Mr. Davis declared, under oath, that he does not control.

The same dynamic is now at work with anonymization. Defendants maintain that the wallets destroying evidence are not theirs, yet they vigorously oppose a TRO that bars those wallets from using privacy tools to destroy the on-chain record. A party that truly lacked any control or stake in those wallets would have no reason to resist such a neutral evidence-preservation order.

## III. DEFENDANTS' TECHNICAL CHARACTERIZATIONS ARE INACCURATE AND MISLEADING

### A. "No anonymization tools were used" Is Technically Wrong

Defendants' attempt to dismiss the November 16 transaction as being just transfers and fully visible reflects a basic misunderstanding of how anonymization works in this context. Plaintiffs' expert describes a specific sequence:

1. A LIBRA Team wallet holding LIBRA-derived value swaps LIBRA for SOL on Solana.
2. That SOL is sent to a freshly created "first-hop" wallet with no prior history.

3. The first-hop wallet then routes the SOL through NEAR Intents and into a Zcash shielded pool (or an equivalent shielded environment).

The initial hops—the LIBRA-to-SOL swap and the transfer to the first-hop wallet are visible on Solana's transparent ledger.

However, the concerning element of this sequence is the final hop into a shielded pool, where the transaction trail becomes opaque. Once the funds enter the shielded environment, Plaintiffs' tracing tools, which are used by law-enforcement and forensic vendors, can no longer determine where the value resides, in what asset it is held, or who ultimately receives it.

To avoid any further confusion, Plaintiffs set out the anonymization pipeline and associated transaction hashes in detail. Goldman Decl. ¶¶ 4, 25, Exs. DG-A – DG-H. Having now been fully apprised of how NEAR Intents and ZCash shielded pools operate, Defendants and their counsel cannot credibly continue to assert that there is "no evidence" of anonymization tools, or that Plaintiffs' concern about destruction of the on-chain record is "pure speculation." At a minimum, the record establishes a concrete, imminent risk to critical evidence that warrants the narrow, time-limited restraint Plaintiffs seek.

**B. The "only $3,170" Argument Misses the Point; The Test Proves the Pipeline Works**

Defendants also mock the November 16 anonymization as insignificant because it involved "only" approximately $3,170 worth of LIBRA-derived value. This misses the point.

The significance of the November 16 sequence is not the dollar amount; it demonstrates active evidence destruction. In every domain where sophisticated actors

move value—whether traditional banking or digital assets—it is standard practice to run small test amounts through a new channel or pipeline before pushing larger sums.

From an evidentiary perspective, the November 16 test has two critical consequences:

- It shows that whoever controls the LIBRA Team wallet has already chosen to take LIBRA proceeds off the transparent blockchain, permanently destroying the traceability (as they did); and
- It shows that the technical and operational pieces required to anonymize LIBRA proceeds—DEX swaps, first-hop routing, use of NEAR Intents, and deposit into a shielded system—are in place and functioning.

### C. The November 18 USDC→SOL Conversions Are Classic Staging for Anonymization, Not Random Transfers

Defendants' effort to downplay the November 18 activity as mere transfers is equally unpersuasive when considered in context. Plaintiffs' expert explains that the pattern matches the standard three-stage structure of modern laundering pipelines:

1. Consolidation – gather value from multiple sources into a smaller set of accounts;
2. Staging – convert that value into a highly liquid intermediary asset (here, SOL) and park it in "clean" wallets that are ready to transact;.
3. Anonymization – push that staged value through privacy coins, mixers, or cross-chain bridges into opaque environments.

When these November 18 transfers are read alongside the November 16 test anonymization, the story is straightforward: a small amount was first routed through the pipeline to ensure it worked, and then a much larger amount of LIBRA proceeds was positioned for anonymization.

In that context, it is not technically or factually accurate to describe the November 18 activity as ordinary, benign transaction flow.

## IV. EVIDENCE PRESERVATION IS A RECOGNIZED BASIS FOR IRREPARABLE HARM AND FITS SQUARELY WITHIN THE COURT'S EQUITABLE POWERS

### A. In This TRO, Irreparable Harm Is the Loss of the Blockchain Evidentiary Record

The injury at issue here is not the potential loss of a pot of money; it is the loss of the information as funds move across the chain.

If Defendants use privacy coins, mixers, shielded pools, and anonymizing bridges, Plaintiffs and the Court will permanently lose:

- the chain of custody—who is paid, when they are paid, and in what amounts;
- the ability to identify downstream wallets and new wrongdoers whose only on-chain footprint will be receipt of LIBRA proceeds from those addresses;
- the ability to quantify enrichment and damages precisely, on a wallet-by-wallet and actor-by-actor basis rather than by rough inference;
- the timing evidence that shows coordination and scienter, such as patterns of payments following tweets, AMAs, listings, and other public events; and
- potentially exculpatory evidence, if true that LIBRA proceeds are being sent to legitimate Argentine businesses consistent with the project's stated mission.

This harm differs from what the Court addressed at the preliminary-injunction stage. Here, the injury is the loss of the live evidentiary record created by LIBRA proceeds. If that record is destroyed, Plaintiffs cannot be restored to their current position, where the Court, the parties, and regulators can see in real time where proceeds move from LIBRA Team and Exit wallets. That is classic irreparable harm: imminent,

non-monetizable, and permanently erasure of critical evidence.

### B. Destruction and Spoliation of Evidence Are Recognized Forms of Irreparable Harm

Courts routinely hold that destruction of evidence constitutes irreparable harm. In *American Friends Service Committee v. Webster*, the FBI was enjoined from destroying surveillance files because once shredded, they could never be reassembled, permanently impairing plaintiffs' ability to vindicate their rights.485 F. Supp. 222, 233 (D.D.C. 1980). In *United States v. Sum of $70,990,605*, the court recognized that evidence destruction can constitute irreparable harm, though the government failed to show actual risk on those facts. 991 F. Supp. 2d 154, 163 (D.D.C. 2013). In *Andres v. Town of Wheatfield*, a preliminary injunction was issued to prevent environmental spoliation because changing soil conditions would erase critical proof. 2017 WL 4484347, at *4-5 (W.D.N.Y. October 6, 2017).

These decisions track Second Circuit doctrine: when evidence is uniquely at risk and cannot be recreated, money damages are inadequate and equitable relief is warranted. Just as courts enjoin the destruction of paper files, backup tapes, or physical evidence to prevent irreparable harm to the fact-finding process, this Court can and should enjoin the use of privacy tools from specified wallets to destroy the ledger entries that are the core evidence in this case.

## V. THE RELIEF SOUGHT IS NARROW, NEUTRAL AND SERVES BOTH SIDES' INTERESTS

Defendants' effort to portray this TRO as a repeat of Plaintiffs' earlier asset-freeze motion ignores what the proposed order actually does—and, just as importantly, what it does not do.

### A. No Restriction on Spending or "Project Use" of Funds

The proposed TRO does not prevent Defendants from moving their assets in the ordinary course. The only prohibition sought is that, for a short period, Defendants not use privacy coins, mixers, shielded pools, or anonymizing cross-chain bridges to move LIBRA proceeds out of the LIBRA Team and Exit wallets in a way that destroys traceability.

The request is both narrow and neutral.

### B. Preserving Traceability Benefits Defendants If Their Story Is True

Preserving traceability benefits Defendants if their narrative is correct. Under Plaintiffs' proposed order, nothing prevents Defendants from sending LIBRA proceeds to Argentinian vendors, charities, or businesses. By contrast, if Defendants are permitted to anonymize these flows, the losses are symmetrical: Plaintiffs lose the ability to show that the proceeds were misused, and Defendants lose the ability to prove that the proceeds were used as promised.

## VI. CONCLUSION

Plaintiffs' emergency motion for TRO presents a very different request than the one the Court denied at the preliminary-injunction stage.

Defendants' oppositional arguments are internally inconsistent and technically inaccurate. Under settled law, deliberate destruction of evidence—whether paper files, backup tapes, environmental samples, or, here, live ledger entries—constitutes irreparable harm warranting equitable intervention.

The narrowly tailored relief Plaintiffs seek addresses precisely that risk. Plaintiffs therefore respectfully request that the Court:

1. Grant the TRO, prohibiting for a short period the use of privacy coins, mixers,

shielded pools, and anonymizing bridges from the identified LIBRA Team and Exit wallets; or, at minimum,

2. Enter an interim order immediately barring such anonymization and set an expedited hearing schedule for the Parties to be heard.

Only such relief will preserve the blockchain evidence necessary for full adjudication of this case on an unspoiled record.

Dated: November 23, 2025
New York, New York

Respectfully submitted,

**BURWICK LAW, PLLC**

*/s/ Max Burwick*
Max Burwick, Esq.
1 World Trade Center, 84th Fl.
New York, NY 10007
(646) 762-1080
max@burwick.law

*Counsel for Plaintiffs*

**WORD COUNT CERTIFICATION**

I certify that the foregoing Reply contains 3,100 words, as determined by the word-count function of Microsoft Word, and complies with the word-limit requirements in the Individual Rules and Practices of Judge Jennifer L. Rochon.