**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

OMAR HURLOCK and ANUJ MEHTA,
*on behalf of himself and all others similarly situated,*

Plaintiffs,

v.

KELSIER LABS, LLC d/b/a KELSIER VENTURES, HAYDEN MARK DAVIS, GIDEON DAVIS, CHARLES THOMAS DAVIS, METEORA, *an unincorporated association*, and BENJAMIN CHOW,

Defendants.

Case No.: 1:25-cv-03891-JLR

Hon. Jennifer L. Rochon

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINIFFS' MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**I. INTRODUCTION...6**
**II. FACTUAL BACKGROUND...11**
A. POST-TRO ASSET MOVEMENT AND 0xCEA WALLET TRACING REVELATIONS:...11
B. CHOW'S ROLE AS IT RELATES TO TOKEN LAUNCHES AND THE KELSIERS... 15
C. CHOW'S ROLE WITH METEORA AND METEORA'S ROLE GENERALLY...18
**III. ARGUMENT...21**
A. Rules 15(a)(2) and 16(b)(4) Are Satisfied: Timely, Fair Amendment with No Undue Prejudice...21
1. Plaintiffs have demonstrated diligence and good cause under Rule 16(b)(4)...21
2. Rule 15(a)(2)'s liberal standard strongly favors leave to amend here...25
3. Defendants' "gamesmanship" rhetoric does not establish bad faith or dilatory motive...30
4. Footbridge, Interest Rate Swaps, and similar cases are distinguishable and do not bar amendment...32
B. The PSAC Is Not Futile; the New Evidence Makes the RICO and State-Law Claims Plainly Plausible...34
1. The PSAC pleads a robust RICO pattern and continuity by alleging five coordinated launches routed through the 0xCEA hub...35
2. The PSAC pleads a concrete association-in-fact enterprise and RICO distinctness...38
3. Defendants' Reliance on Risley and similar cases is misplaced and does not render the PSAC Futile...40
4. Meteora is adequately pleaded as an unincorporated association with capacity to be sued; DLL's "software only" and Martin-rule arguments raise merits questions, not clear futility...41
5. The PSAC's fraud and RICO predicate-act allegations satisfy Rule 9(b); defendants' group-pleading objections go to degree, not to futility...43
6. The PSAC pleads scienter with the circumstantial detail Second Circuit law requires...45
7. Plaintiffs adequately plead RICO injury and proximate cause...46
8. Plaintiffs have class standing to challenge all five launches as part of one integrated scheme...48
9. The PSAC's state-law claims (fraud, GBL §§ 349–350, unjust enrichment) are likewise plausibly pled and not clearly futile...49
**IV. CONCLUSION...52**

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Akridge v. Whole Foods Mkt. Grp., Inc.*,
2022 WL 955945 (S.D.N.Y. Mar. 30, 2022). ....................48
*ATSI Communications, Inc. v. Shaar Fund, Ltd.,*
493 F.3d 87 (2d Cir. 2007)....................45, 46
*Boritzer v. Calloway*, 2013 WL 311013
(S.D.N.Y. January 24, 2013)....................43
*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008)....................47
*Carroll v. Trump*,
590 F. Supp. 3d 575 (S.D.N.Y. 2022)....................30, 32, 33
*DeLuca v. SmithKline Beecham Corp.*,
2007 WL 541656 (S.D.N.Y. Feb. 20, 2007)....................30, 32, 33
*DiMuro v. Clinique Labs*., LLC,
572 F. App'x 27 (2d Cir. 2014)....................48
*Duane Reade Inc. v. Local 338*,
6 Misc. 3d 790 (Sup. Ct. N.Y. Cnty. 2004)....................42
*Duling v. Gristede's Operating Corp*
265 F.R.D. 91, 101 (S.D.N.Y 2010)....................32
*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co*.,
553 F.3d 187, 198 (2d Cir. 2009)....................45
*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.,*
837 F.Supp.2d 162 (S.D.N.Y. 2011)....................50
*Expoconsul Intern. Inc. v. A/E Sys., Inc.*,
145 F.R.D. 336 (S.D.N.Y. 1993)....................*passim*
*Foman v. Davis*,
371 U.S. 178, 182 (1962)....................*passim*
*Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.*,
2009 WL 4278179 (S.D.N.Y. Nov. 23, 2009)....................30, 32, 33, 34
*Francisco v. Abengoa*, S.A.,
559 F. Supp. 3d 286 (S.D.N.Y. 2021) ....................*passim*
*Fustok v. Conticommodity Servs., Inc.*,
103 F.R.D. 601 (S.D.N.Y. 1984)....................26, 27, 29, 34
*GICC Capital Corp. v. Tech. Fin. Grp., Inc.*,
67 F.3d 463 (2d Cir. 1995)....................35
*H.J. Inc. v. Nw. Bell Tel. Co.*,
492 U.S. 229 (1989)....................36, 37
*Holmes v. Sec. Inv'r Prot. Corp.*,
503 U.S. 258 (1992)....................46
*Infinity Headwear & Apparel, LLC v. Jay Franco & Sons, Inc.*,
2016 WL 5372843 (S.D.N.Y. Sept. 26, 2016)……………………..………………22, 24, 25

*In re Boesky*,
882 F. Supp. 1371 (S.D.N.Y. 1995) ....................................................................36, 39

*In re Firestar Diamond, Inc.*,
634 B.R. 265 (Bankr. S.D.N.Y. 2021) .......................................................................46

*In re Interest Rate Swaps Antitrust Litig.*,
2018 WL 2332069 (S.D.N.Y. May 23, 2018)..............................................................*passim*

*In re LIBOR-Based Financial Instruments Antitrust Litig.*,
962 F. Supp.2d 606 (S.D.N.Y. 2013) ..........................................................................35

*In re Platinum-Beechwood Litig.*,
427 F.Supp.3d 395 (S.D.N.Y. 2019)..............................................................*passim*

*In re Tether & Bitfinex Crypto Asset Litigation*,
576 F. Supp. 3d 55 (S.D.N.Y. 2021) ..........................................................................51

*Jund v. Town of Hempstead*,
941 F.2d 1271 (2d Cir. 1991)..........................................................................41, 42

*Kleeberg v. Eber*,
331 F.R.D. 302 (S.D.N.Y. 2019) ..........................................................*passim*

*Lerner v. Fleet Bank, NA*,
459 F.3d 273 (2d Cir. 2006)...............................................................................43

*Lucente v. Int'l Bus. Machs. Corp,*
310 F.3d 243 (2d Cir. 2002)...............................................................................35

*Martell Strategic Funding LLC v. Am. Hospitality Acad.*,
2017 WL 2937649 (S.D.N.Y. July 10, 2017)...................................................22, 24, 25

*Martin v. Curran,*
303 N.Y. 276 (1951)..................................................................................42, 43

*Middle Atl. Utils. Co. v. S.M.W. Dev. Corp.*,
392 F.2d 380 (2d Cir. 1968)...............................................................................32

*Moresman v. Steuben County*,
2025 WL 2208130..........................................................................................31

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
693 F.3d 145 (2d Cir. 2012) ...................................................................48, 49

*Newbro v. Freed,*
409 F. Supp. 2d 386 (S.D.N.Y. 2006)..........................................................................49

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)...............................................................................45

*Parker v. Columbia Pictures Indus.*,
204 F.3d 326 (2d Cir. 2000) ...................................................................21, 25

*Posadas de Mexico, S.A. de C.V. v. Dukes*,
757 F. Supp. 297 (S.D.N.Y. 1991). ..........................................................................31

*Spool v. World Child Int'l Adoption Agency*,
520 F.3d 178 (2d Cir. 2008)...............................................................................35

*St. Paul Fire & Marine Ins. Co. v. Heath Fielding Ins. Broking Ltd.*,
1996 WL 19028 (S.D.N.Y. January 17, 1996)..........................................................32

*Risley v. Universal Navigation Inc.*
2025 WL 615185 (2d Cir. Feb. 26, 2025)...................................................................40

*Travelers Indem. Co. of Illinois v. CDL Hotels USA, Inc.*
322 F.Supp.2d 482 (2004)..................................................................................48

*United States v. Bonanno Organized Crime Family of La Cosa Nostra*,
879 F.2d 20 (2d Cir. 1989)........................................................................................38, 39
*United States v. Turkette,*
452 U.S. 576 (1981)..................................................................................................38
*Williams v. Citigroup Inc.,*
659 F.3d 208 (2d Cir. 2011)..........................................................................................26
*WIXT Television, Inc. v. Meredith Corp.*
1003(N.D.N.Y.1980)..................................................................................................37

**Rules**

Fed. R. Civ. P. 15(a)(2).......................................................................................*passim*

Fed. R. Civ. P. 16(b)(4).......................................................................................*passim*

Fed. R. Civ. P. 17(b)(3)(A)..........................................................................................41

## I. INTRODUCTION

An ongoing fraud often times requires complaints to be amended.

$LIBRA was just one iteration of a playbook that paired a borrowed brand with hidden snipers and bespoke launch mechanics designed to extract maximum value from the retail public. Defendants made the First Lady into a meme, they made ENRON into a meme, but the joke was on the public who lost hundreds of millions of dollars.

Defendants came to this Court and told a very different story about $LIBRA. During the token's launch, the retail public was ravaged by "snipers" who front-ran the public on inside information and sold for tremendous profit. Understanding how predatory those snipers were, Hayden Davis swore that the snipers were unknown to him, that he had no advance knowledge of them, and that he did not purchase LIBRA for his own account or for anyone else.

Benjamin Chow and Dynamic Labs told another story to this Court: Meteora was "just software." Chow swore that he was unaware of the alleged fraud on LIBRA buyers. He portrayed himself only as a consultant for Dynamic Labs Limited, acting at its direction, who helped people use the Meteora software.

If those declarations were accurate, Plaintiffs' existing pleadings might have been enough. Plaintiffs' did not set out to write another amended complaint.

Unfortunately, Defendants have done in this courtroom what they did in the markets: they wrapped their fraud in a story that concealed who controlled the launch and where the money went, while asking both investors and this Court to believe them.

The record that existed when the first amended complaint was filed is not the record before the court today. After the TRO was lifted, the same people who used a president's likeness to sell $LIBRA were exposed as having quietly controlled the snipers, launched a token

leveraging Melania Trump, recycled famous corporate and cultural brands, while travelling around the world together "24/7."

The first inflection which warranted this amendment came on the day after the TRO dissolved. Wallets that had sat still during the freeze suddenly began moving money from the LIBRA scam out of Circle USDC and into tokens that cannot be programmatically frozen by this Court.

When Plaintiffs' forensic team followed the flow of funds backwards, the trails converged on a single hub wallet with a hexadecimal prefix 0xCEA. That wallet sent money into the LIBRA deployer wallet, funded the very sniper wallets Davis had sworn were strangers, and then received profits as those wallets sold into public demand.

Once 0xCEA was identified, it did not stop at LIBRA. The same hub wallet showed up as the funder of the deployer wallets for $MELANIA and for the other branded launches at issue, including $M3M3, $ENRON, and $TRUST. The same capital source was both seeding pools and funding snipers– Defendants were on every side of the markets they created.

In other words, Defendants did not just take a president's image to sell one fraudulent meme coin. They built a machine. They swapped Milei for the First Lady, swapped politics for nostalgia and "fair launch" rhetoric, but they ran the same hidden-extraction architecture over and over.

The second inflection point came when a confidential informant approached Plaintiffs' counsel with stunning chat logs where Hayden Davis makes a number of incredible admissions.

In those chats, Davis admits that he was "launching the Melania token tomorrow" and that "Milei" would come shortly after. He admits that he followed Chow's instructions on fifteen token launches, not two. He describes traveling "24/7" with Chow and Meteora co-founder Ng

Ming Yeow in the lead-up to these launches, and refers to an "exclusive marketing" relationship tying Kelsier to Meteora's infrastructure.

Those are not the words of a promoter who happened to use neutral software once. They are the words of a participant describing a serial launch operation in which Chow, Ng, Meteora, and Kelsier worked together, in person and in real time, to stage and execute the same type of launch again and again.

The whistleblower materials added new meaning to documents Plaintiffs' received from a CI earlier this year– internal planning documents for M3M3, including the "M3M3 Calcs Template" authored by Chow and the "M3M3 Token Launch Organizer" authored by Charles Thomas Davis. These documents show Chow modeling insider allocations and profit scenarios and Charles Davis assigning Meteora the responsibility for launching the token and coordinating key opinion leaders.

Taken together, the chats and the internal files show that the LIBRA and M3M3 stories presented to the Court were effectively false. Chow was not a passive software developer, and Meteora was not a faceless and permissionless software protocol. Chow and Meteora designed tokenomics that hid insider dominance, controlled the launch mechanics, and coordinated with Kelsier's marketing engine to maximize extraction from public buyers.

The same pattern repeats when one looks at Meteora itself. Publicly, Meteora presents as a team with a CEO, co-founder, staff, job postings, blog posts, and a brand. In testimony, Chow and DLL insist that "Meteora" is nothing but decentralized code that cannot be sued.

On-chain and in the PSAC, Meteora is alleged as something very different: an unincorporated association who exercised deliberate control of the software Defendants now try to hide behind. Software does not hire, travel, negotiate "exclusive marketing" deals, or

configure fee splits; but Meteora does.

The same dissonance appears in Davis's story about the snipers. On paper, he told the Court that he did not snipe $LIBRA. On-chain evidence says otherwise– sniper wallets are now directly linked to 0xCEA which Plaintiffs allege to be a Hayden Davis/Kelsier wallet.

Defendants also told the Court that the frozen LIBRA proceeds would be used to benefit Argentinian businesses and pointed to the fact that the funds sat unmoved as proof that Davis was not "trying to abscond with money." Yet as soon as the TRO was lifted, some of those same proceeds were moved in a pattern of consistent concealment, not with a philanthropic business plan.

At each of these junctures, Defendants had an opportunity to reconcile their public and courtroom narratives with what continues to happen. They did not. The emerging record instead shows a small group of insiders using borrowed political and commercial brands to sell rigged meme tokens, while assuring both investors and the Court that they were neutral, hands-off, or simply misunderstood.

Plaintiffs' proposed second amended complaint is not an attempt to reinvent this case. It is an attempt to catch the pleadings up to the evidence that now exists: the 0xCEA hub, the cross-launch wallet clustering, the CI admissions about fifteen launches, the internal spreadsheets and launch organizers, and the contradiction between Defendants' sworn descriptions of their roles and their actual conduct.

The amendment does not change who the core players are. It clarifies that the President Milei token, the First Lady token, the nostalgia tokens, and the "fair launch" tokens are all iterations of the same scheme, using the same Meteora and Kelsier infrastructure, the same sniper and deployer machinery, and the same fee-routing channels.

Nor does the amendment spring from delay or gamesmanship. Plaintiffs could not have pled the CI chats from September, the post-TRO movements from August 20, or the 0xCEA hub when they filed the First Amended Complaint. Those facts only crystallized when Defendants' own conduct, after the TRO, and a new whistleblower's evidence provided the missing anchor points.

Once those anchors appeared, Plaintiffs moved quickly. They interviewed the informant, secured and reviewed the chat logs, commissioned and verified additional tracing, and drafted a proposed second amended complaint within weeks, while the case remained at the pleadings stage and before any Rule 12 ruling or opening of discovery.

The Federal Rules do not require this Court to evaluate a complex RICO, fraud, and consumer case on a snapshot frozen before the key evidence emerged. They favor amendment when diligent plaintiffs obtain new, case-shaping information that materially changes the picture of what happened and who did what.

At bottom, this motion is about whether the Court will evaluate Defendants' motions and Plaintiffs' claims on an incomplete narrative in which LIBRA was a one-off and the snipers were strangers, or on the fuller record now available in which the President of Argentina, the First Lady, and multiple brands were all used as wrappers around the same extraction machine.

Plaintiffs respectfully ask the Court to allow the proposed second amended complaint so that the ensuing motions and merits litigation proceed on that fuller record,.

## II. FACTUAL BACKGROUND

### A. POST-TRO ASSET MOVEMENT AND 0xCEA WALLET TRACING REVELATIONS:

On August 20th, the day after the TRO was lifted by this Court, Hayden Davis sold and

transferred LIBRA proceeds held in sniper wallets using laundering and anonymizing technologies. PSAC ¶¶ 147–149, 163[1].

A "Sniper Wallet" is defined as a wallet that executes a buy transaction in the same block (or immediately succeeding block) that a liquidity pool opens for trading. *See e.g.* PSAC ¶¶ 58, 141) (generally explaining the economics of a sniper wallet). Put plainly, snipers buy the token before the public and then sell the token to the public for a significant profit.

In order to buy a token before the public, a sniper must know something that the public does not and cannot know: the timing of the token launch, the name of the token, and the mechanics of that launch. The knowledge of a token launch's timing, name, and mechanics is squarely information possessed by the people who launch a given token.

Following dissolution of the TRO, two of the three major LIBRA Sniper Wallets transferred assets to new Solana wallets. PSAC  147. One sniper wallet then moved the money off Solana and onto the Ethereum network using a "bridge," which is a tool that sends assets across blockchains in a way that makes tracing much more difficult. PSAC  147.

Before these transfers, the LIBRA proceeds in the Sniper Wallets were held as Circle USDC. PSAC ¶148. Circle USDC is described in the PSAC as a centralized stablecoin whose issuer can freeze tokens in response to court orders (as Circle did with the TRO). *Id*. One sniper wallet converted those Circle USDC proceeds into other, decentralized digital tokens on a different blockchain that cannot be programmatically frozen by the courts. *Id*.

Alarmed by the asset movement, Plaintiffs undertook an expanded on-chain investigation to trace the flow of funds to and from these sniper wallets holding LIBRA proceeds. PSAC ¶¶ 131–137.

---

[1]Citations to the PSAC are to Exhibit A to the Declaration of Max Burwick, ECF No. 205-1.

A wallet beginning with the hexadecimal prefix "0xcEA" funded these $LIBRA sniper wallets. PSAC  149. 0xCEA is identified as a Hayden Davis/Kelsier Wallet in the PSAC for the reasons both in the PSAC and also detailed below. PSAC  163.

Importantly, the 0xCEA wallet also funded both the LIBRA Deployer Wallet (which launched the $LIBRA token). PSAC ¶¶ 135–137.

But, the 0xCEA wallet was used for far more than just launching the LIBRA snipers and deployers. Blockchain records show that 0xCEA directly funded the Deployer Wallet responsible for minting the $MELANIA token. PSAC ¶137. Additionally, Blockchain records further show that 0xCEA directly funded the Deployer Wallets for $M3M3, $ENRON, and $TRUST. PSAC ¶¶ 135–137. Indeed, the PSAC describes the 0xCEA wallet as receiving capital from insiders, deploying that capital to create new tokens, seeding initial liquidity pools, and financing Sniper Wallets that acquired early supply during launch windows. PSAC  136.

The PSAC alleges that the deployer–sniper linkage is further corroborated by "overlapping control patterns: shared authorizations, identical transaction signatures, and mirrored behavioral timing across launches." PSAC  142. Indeed, "in multiple tokens—including $LIBRA and $M3M3—the same multi-signature authorities that approved contract deployments were used minutes later to fund or authorize sniper wallet activity." PSAC  143.

Stepping back, the post-TRO asset movement by these 0xCEA sniper wallets was plainly foreshadowed in the record. Hayden Davis has never denied having launched LIBRA– instead, his counsel has repeatedly claimed that Hayden's goal was to save Argentinian businesses, not defraud the public out of hundreds of millions of dollars. *See e.g.* Preliminary Injunction Hearing Transcript ("PI Hr'g Tr.") 46:25–47:4, Dkt. No. 152-2.

Specifically, on July 1st, 2025, in a scheduling conference concerning the PI, Counsel for Hayden Davis told the Court that "Mr. Hayden still has intended to use this property [, the LIBRA proceeds subject to the TRO,] for the purposes of benefiting Argentinian businesses." *See* Conference Transcript, July 1, 2025 ("Scheduling Conf. Tr.") 9:11–9:12, Dkt. No 81.

Consequently, in that same hearing, Counsel for Davis asked this Court for a permissible-use exception. *Id.* at 9:12–9:14. Mr. Sbaiti remarked that "just because [Davis] didn't [use the property for the purposes of benefiting Argentinian businesses] the day after the launch, doesn't mean he never intended to do that….there's a lot of hoops that have to be jumped through in order to make that happen…we would ask for an exception to the TRO…One of the permissible uses that we'd like to have…would be him using these coins… for him to utilize them for their intended purpose, which is to benefit Argentinian businesses." *Id.* at 9:18–10:10.

This was an effective admission of control over the $LIBRA proceeds by Davis and his counsel.

Davis's control was again acknowledged at the PI hearing on August 19, 2025. There, counsel for Defendant Davis represented to the Court that the LIBRA funds were static because "it was being planned to be used to benefit Argentinian businesses." PI Hr'g Tr. 46:25–47:1.

Counsel represented that Davis "still intends to use [the funds] if he can." *Id.* at 15:20.

Defense counsel argued that the fact "[e]very dollar... has been sitting there for four months" was proof that Davis was "not trying to abscond with money." *Id.* at 13:23–14:2.

Further corroboration that Davis's launched LIBRA and MELANIA comes from the newly-available confidential informant chat logs.

On September 4, 2025, a confidential informant ("CI") with direct access to Defendant Hayden Davis contacted Plaintiffs' counsel. PSAC 111. On September 8, 2025, Plaintiffs

conducted an initial interview of the CI. PSAC 112. On September 12, 2025, the CI provided preserved chat logs documenting communications with Davis. *Id*; *See also* App'x Q.

In a written message contained in the logs, Davis stated: "I'm launching [the] Melania token tomorrow." PSAC 117. Davis then effectively says that he will be launching "Milei," i.e. the $LIBRA token soon after. PSAC 119.

Still, while Davis and his counsel effectively concede that he has control over the primary wallets implicated in the initial TRO, Davis has been adamant that he did not control or own any of the sniper wallets that preyed upon the public during the $LIBRA launch.

Because such sniping is plainly predatory (effectively front-running the public on insider information), Davis has made it a point to disclaim any involvement in sniping the $LIBRA token.

Davis submitted a sworn declaration in opposition to Plaintiffs' TRO application stating that, "[w]ithin seconds after the launch, three 'snipers' (early buyers) who are unknown to me purchased large quantities of $LIBRA." *See* Declaration of Hayden Davis, ("Davis Decl.") 8, Dkt. No. 43-1.

Davis swore that he "had no advance knowledge that those snipers existed." *Id.*

Davis swore that "I was not one of the snipers, as I did not purchase any $LIBRA for my own account or for the account of any other person." *Id.*

Therefore, newly-available evidence reveals Davis' sworn statements to the Court were false: the supposedly "unknown" snipers were insider wallets funded from the same 0xCEA hub that financed his LIBRA deployer and other Davis-linked launches; he exercised control over the LIBRA proceeds in those wallets; and those insider funds were promptly laundered and moved once the TRO was lifted. *See e.g.* PSAC 151.

### B. CHOW'S ROLE AS IT RELATES TO TOKEN LAUNCHES AND THE KELSIERS

The CI revelations do not just speak to Davis's role and dishonesty to the Court. They also shed new light on the roles of Benjamin Chow, Ng Ming Yeow, and Meteora.

The CI chat logs place Defendants Chow, Davis, and proposed Defendant Ng Ming Yeow (a co-founder of Meteora) together physically in Turkey as Davis says that the trio were together "24/7" in the lead-up to the $MELANIA and $LIBRA launches. PSAC 163.

Davis told the CI he had entered into an "exclusive marketing" relationship with Meteora and Chow. PSAC 120.

The PSAC alleges that these whistleblower chats are consistent with earlier internal communications from March–August 2024, including planning spreadsheets and templates that coordinated token launches, marketing posts, and extraction strategies. PSAC ¶¶ 121–128.

In light of the new whistleblowing documents, Plaintiffs included in the PSAC the M3M3 Calcs Template and Token Launch Organizing documents (which had previously only been described) as exhibits to provide additional context for understanding the significance of these new revelations.

The M3M3 Calcs Template, authored by Chow and shared in the internal $M3M3 Team Telegram Group, reflects token allocations that implement this approach: a relatively small public float and larger insider or team allocations, consistent with his call-statement about concealing insider dominance. *See* Apps. I–L.

The PSAC's App'x L shows Chow introducing the M3M3 Calcs Template to the M3M3 Team Telegram chat writing: "hey here's a sheet i did to play with some numbers on m3m3 config. Will be helpful to know what % of token in circulating that can stake and make some guesses to how much will stake. In general it seems a high % of stakers in leaderboard (500?)

and a 21 day reward distribution might be a good starting point. What's interesting is that if there are a lot of SOL rewards, staking will get more and more attractive as price goes down and we might get ppl who decide to stake more or buy+stake to get more SOL rewards."

The companion "M3M3 Token Launch Organizer," authored by Charles Thomas Davis, outlines the marketing-side playbook, including task lists, publication schedules, and narrative messaging for $M3M3.

The PSAC's App'x N shows the M3M3 Token Launch Organizer as including a "Rollout Plan" task list identifying key dates, activities, and "owners" of tasks as they relate to the launch of the $M3M3 token. *See* App'x O (identifying Charles Thomas Davis as owner of that document).

On that task list, responsible for both "Launch [of $M3M3] at 3 PM UTC" and "Coordinated posts from KOLs" are Meteora and Kelsier KOLs ("Key Opinion Leaders" responsible for simulating organic enthusiasm upon launch. *See* App'x N.

Meteora was designated by Charles Thomas Davis as the owner (i.e. responsible) for both the Launch of $M3M3 and for coordinating posts with KOLs. Autonomous software does not 'own' the launch of a token nor can it coordinate KOLs. Plainly, Chow and Meteora were intimately involved in the tokenomics, construction, and launch of the M3M3 scam.

This comports with a recorded call featuring Davis and provided by the $M3M3 whistleblower. In that call, Chow told Davis that "no one will play the game if they see, like 90% of the supply already locked up" and explained that only a small percentage (on the order of 5%) of tokens should be made available to the public, so that the extent of insider holdings would not be apparent – Hayden agreed. PSAC 412(c).

Taken together, the call, the M3M3 Calcs Template, and the M3M3 token launch organizer show that, before LIBRA, Chow and Davis were working together to design and adopt tokenomics that limited the visible public float and concealed the full extent of insider holdings.

In opposing Plaintiffs' TRO, Chow swore that he "did not participate in the alleged fraud on $LIBRA buyers" and "did not even know about" the fraudulent acts. *See* Declaration of Benjamin Chow ("Chow Decl.") ¶¶ 6–7, Dkt. No. 54.

At the PI hearing, counsel for Chow stated: "Mr. Chow has been very upfront about this. He consulted for Dynamic Labs, and at their instruction, he sometimes helped teams across the Meteora software. This doesn't change the calculus at all, in part because he didn't decide that this would be a one-sided liquidity pool. Everything in his declaration about not being involved in the Viva La Libertad project and the launch of $LIBRA is still accurate." PI Hr'g Tr. 36:5–11.

Counsel for Chow similarly argued that "the Court … doesn't have actual evidence that Mr. Chow was involved in this fraud here," after contrasting Plaintiffs' allegations about $M3M3 with the claimed absence of evidence tying Chow to $LIBRA. PI Hr'g Tr. 38:7–10.

Taken together, the CI chat logs, travel descriptions, and internal M3M3 planning files depict a single coordinated launch operation in which Chow and Meteora designed and controlled the token parameters and liquidity structure while Davis and Kelsier executed the marketing and extraction strategy across different token launches. PSAC 130.

These materials are inconsistent with Chow's characterization of himself as a peripheral "technical support," operating "at DLL's direction" who did not participate in, and did not even know about, the alleged fraud on $LIBRA buyers. *See* Chow Decl. ¶¶ 1, 6–7.

Plaintiffs therefore allege, fortified by these CI materials, that Chow, Yeow, Meteora, and Kelsier acted together as coordinated operators of the same enterprise, applying a shared launch

and extraction playbook rather than functioning as independent actors or neutral software providers.

### C. CHOW'S ROLE WITH METEORA AND METEORA'S ROLE GENERALLY

The PSAC clarifies that the "Meteora" named as a defendant is an unincorporated association that used the Meteora brand, infrastructure, and code base to carry out the scheme, not the neutral protocol itself. PSAC 168(c).

The PSAC distinguishes three layers: Solana as the neutral base chain; the "Meteora protocol" as a suite of smart contracts (including DLMM and related programs); and "Defendant Meteora" as the unincorporated organization that designed, configured, and deployed those programs for the launches at issue. PSAC 168 (a–c).

As alleged, Chow and his collaborators retained upgrade and configuration authority over Meteora's core programs through a 4-of-7 multisig, which can change code, fee parameters, and pool behavior at will. *See e.g.* PSAC 424.

The PSAC alleges that these same upgrade and admin privileges were used to implement freeze/thaw functions, whitelist wallets, and adjust DLMM parameters in ways that favored enterprise wallets in the M3M3, LIBRA, MELANIA, ENRON, and TRUST launches. *See e.g.* PSAC ¶¶ 97, 170, 175.

The Meteora programs were also coded so that a portion of every trade's fees automatically accumulated in protocol accounts controlled by Dynamic Labs Limited ("DLL"), giving DLL a direct revenue interest in every transaction routed through Meteora's pools. PSAC ¶¶ 363–363.

The PSAC alleges that DLL, Raccoon Labs, Block Raccoon, and related entities collectively developed, maintained, and monetized Meteora's protocol while Chow and Meteora

coordinated how those tools would be used for specific launches. PSAC ¶¶ 36, 94–105; App'x B.

Under the RICO enterprise theory pled in the PSAC, Meteora and Chow supplied the "technical control" layer (upgrade authority, pool configuration, fee routing); the Davises and Kelsier supplied the "capital and marketing" layer; and DLL, Jupiter, Raccoon Labs, and Block Raccoon comprised a revenue-distribution network that collected and shared proceeds. PSAC ¶¶ 424–426.

The PSAC alleges that Chow publicly presented himself as Meteora's co-founder and "CEO," and used Meteora's brand accounts to speak in the first person about strategy for Meteora. PSAC 172.

Chow's LinkedIn profile and personal founder bio describe him as "Co-founder at Meteora," "a top Solana DEX building dynamic liquidity systems," and list Meteora alongside his prior startups, emphasizing leadership, product strategy, and team growth. Apps. E, H.

Meteora job postings for "Developer Relations" and related roles describe Meteora as one of the most innovative and well-capitalized teams building on Solana, and reference the Meteora team and their protocols, and advertise salary ranges for full-time employees working overlapping hours internationally. Apps. F–G.

Those postings portray Meteora as an operating business with leadership, hiring needs, work schedules, and teams reporting into management; software does not hire staff or have a CEO.

Against this factual backdrop, Defendants have made a litany of representations trying to say none of this is so: Meteora is only software that can't be sued and Chow is a software developer who sometimes assists users.

For example, Chow and DLL have repeatedly told the Court that Meteora is mere

software and not a legal entity. For example, Chow swore that "Meteora is software that runs an automated digital asset trading platform for peer-to-peer swaps of digital assets on the Solana blockchain network." Chow Decl.  2.

Now-CEO Yong submitted a similar declaration describing Meteora as a "decentralized peer-to-peer software protocol" and implicitly framing DLL—not Meteora—as the only entity with legal existence. *See* Declaration of Zhen Hoe Yong ("Yong Decl.") ¶¶ 1–2, Dkt. No. 55.

Chow's declaration further states that he provided support to Meteora users "at DLL's direction," and Yong likewise describes his Meteora work as being undertaken "at the direction of Dynamic Labs Limited," confirming that DLL and named individuals—not anonymous code—decided how Meteora would be used. Chow Decl.  1 Yong Decl.  1.

DLL's general counsel Spillane attested that DLL "created the computer code underlying the automated digital asset trading platform called Meteora," and reported telling Plaintiffs' counsel that Meteora was merely "the decentralized set of smart contracts" and therefore "improperly named" as a defendant. *See* Declaration of Meghan K. Spillane ("Spillane Decl.") ¶¶ 3, 5, Dkt. No. 57.

DLL's persistently argued, *e.g.* in its opposition to alternative service and its motion to intervene, that "Meteora is software created by Dynamic Labs" and "is not a legal entity," arguing that only DLL can appear because "Meteora" allegedly lacks capacity to sue or be sued. *See* Dynamic Labs Limited's Memorandum of Law in Opposition to Plaintiffs' Motion for an Order Granting Alternative service and an Extension of Time to Serve Defendant Meteora at 1, 6, 9, Dkt. No. 146; *See* Memorandum of Law in Support of Dynamic Labs Limited's Motion to Intervene at 1, Dkt. No. 181.

These descriptions omit the upgrade authority, fee-routing arrangements, travel, and

enterprise hierarchy alleged in the PSAC, and are difficult to reconcile with Chow's role as "CEO," Meteora's hiring of staff, and the RICO structure assigning Meteora the technical-control layer of the enterprise.

Autonomous software does not have a CEO.

Autonomous software does not make blog posts and social-media statements under the Meteora brand.

Autonomous software does not enter into and approve marketing collaborations with entities and actors engaged in a multi-million-dollar fraud.

Taken together, the CI evidence, the on-chain tracing, Meteora's own corporate-style communications, and DLL's control over protocol fees and collective upgrades support the PSAC's allegation that "Meteora" is far more than mere autonomous and permissionless software.

## III. ARGUMENT

### A. Rules 15(a)(2) and 16(b)(4) Are Satisfied: Timely, Fair Amendment with No Undue Prejudice.

#### 1. Plaintiffs have demonstrated diligence and good cause under Rule 16(b)(4).

Once a scheduling order has set a deadline for amendment, a plaintiff seeking to amend thereafter must satisfy Rule 16(b)(4)'s "good cause" requirement before the Court applies Rule 15(a)(2)'s liberal standard. *See Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000) (good cause "depends on the diligence of the moving party").[2]

[2] Plaintiffs addressed Rule 16(b) in their opening brief because they understood the Court's May 15, 2025 endorsed scheduling order (Dkts. 9, 10) - which directed that Plaintiffs file an amended complaint on a specified timetable and stayed discovery pending motions to dismiss - to operate, at least in part, as a scheduling order governing amendments. In an abundance of caution, Plaintiffs therefore made a full "good cause" showing under Rule 16(b)(4) in addition to addressing Rule 15(a)(2). To the extent the Court concludes that Dkts. 9 and 10 did not establish a Rule 16(b) amendment deadline, however, we agree with Kelsier Opp. at 4 that the Rule 16(b)(4) standard does not apply. Under either framework, Plaintiffs' motion should be granted.

Good cause is established where the movant, despite diligent efforts, could not reasonably have met the scheduling deadline and moves promptly once new facts crystallize. *See Kleeberg v. Eber*, 331 F.R.D. 302, 317 (S.D.N.Y. 2019) (finding good cause where plaintiffs moved within a few months of discovering new facts in discovery); *Martell Strategic Funding LLC v. Am. Hospitality Acad.*, 2017 WL 2937649, at *2 (S.D.N.Y. July 10, 2017) ("courts commonly find that a party acts diligently if it seeks leave to amend within approximately two months of acquiring information of a new claim or defense"); *Infinity Headwear & Apparel, LLC v. Jay Franco & Sons, Inc.*, 2016 WL 5372843, at *5–6 (S.D.N.Y. Sept. 26, 2016) (same).

Here, the record easily satisfies that standard. Plaintiffs' motion is driven by two sets of developments that occurred only after the First Amended Complaint ("FAC") was filed: (i) whistleblower communications from a confidential informant ("CI") with direct access to Hayden Davis, and (ii) post-TRO wallet tracing that for the first time identified a central hub wallet ("0xCEA") linking all five launches.

As the PSAC and opening memorandum explain, a confidential informant with direct access to Davis contacted Plaintiffs' counsel on or about September 4, 2025, to report firsthand knowledge of the scheme; Plaintiffs conducted an initial interview on September 8; and on September 12 the CI provided preserved chat logs documenting Davis's admissions. PSAC ¶¶ 111–12.

In those communications, Davis expressly identified Benjamin Chow as the leader of the enterprise, stated that he had acted "under Ben's instructions" on more than fifteen token launches, and—critically—admitted for the first time that he launched $MELANIA and that $MELANIA was followed by the "Milei" (i.e. $LIBRA) in a contemplated sequence. PSAC ¶¶ 114–19.

Those admissions fundamentally changed the evidentiary picture: Chow was no longer plausibly a peripheral "developer" tied only to $M3M3; the CI evidence confirmed a centrally directed, repeat-launch operation, with Davis and Kelsier executing a standardized marketing and extraction playbook under Chow's direction. PSAC ¶¶ 51–82.

Those CI revelations directly prompted enhanced on-chain analysis in conjunction with the post-TRO asset movement. As Plaintiffs alleged and explained in their opening brief and above, the whistleblower admissions—combined with suspicious post-TRO movements from sniper wallets in the hours after the TRO was dissolved—compelled a new round of tracing. PSAC  131.

That analysis revealed, for the first time, a coordinating "hub" wallet beginning with 0xCEA that repeatedly funded, at least, each of the five tokens at issue ($M3M3, $LIBRA, $MELANIA, $ENRON, and $TRUST), seeding deployer wallets and pre-funding sniper wallets that captured early supply, with profits later reconverging to the same cluster. PSAC ¶¶ 134–139.

Post-TRO transfers on August 20, 2025—including a cross-chain bridge that moved LIBRA proceeds out of Circle USDC into decentralized tokens immediately after the TRO was lifted—further tied those sniper wallets and profits back to 0xCEA. PSAC ¶¶ 147–149. These events occurred after the amendment cutoff and after the FAC was filed; they could not have been pled earlier.

Plaintiffs then moved with dispatch. Within roughly six weeks of receiving the CI logs, Plaintiffs prepared the Proposed Second Amended Complaint ("PSAC") and filed the present motion on October 21, 2025. Dkt. No. 203. During that period, counsel engaged analysts, verified forensic results, integrated the CI evidence with existing communications, and drafted a substantially more detailed PSAC that maps roles and wallet flows across five launches.

Courts routinely find diligence where parties move to amend within a few months of learning new information; Plaintiffs' six-week turnaround is "comfortably" within the window that *Martell*, *Infinity Headwear*, and *Kleeberg* treat as exemplary diligence. *See Martell*, 2017 WL 2937649, at *2; *Infinity Headwear*, 2016 WL 5372843, at *5–6; *Kleeberg*, 331 F.R.D. at 317.

Chow nonetheless argues that Plaintiffs "have been in possession of confidential informant materials for some time" and that their August 19 TRO-hearing reference to "confidential informants" and "planning documents" shows an absence of diligence. *See* Defendant Benjamin Chow's Memorandum of Law in Opposition to Plaintiffs' Motion for Leave to File a Second Amended Complaint ("Chow Opp.) at 8, Dkt. No. 228.

That misstates the record and the standard. The August 19 hearing reference concerned earlier whistleblower materials and internal "planning documents" relating to $M3M3 that Plaintiffs described in the FAC and which came to Plaintiffs by way of a different whistleblower than the one who provided the chat logs with Hayden Davis. Those materials did not include the September 4–12 CI logs, provided by a different individual, identifying Chow as instructing Davis on more than fifteen launches, naming $MELANIA, or describing "exclusive marketing" arrangements with Meteora; nor did they include the post-TRO tracing that later revealed 0xCEA.

Rule 16 looks to when the key facts forming the basis of the *new* claims and *expanded* theory reasonably became available, not to when a plaintiff first possessed any piece of evidence touching on the general subject matter. *See Kleeberg*, 331 F.R.D. at 316–17 (finding diligence even where some documents pre-dated the motion, because the significance of the information became clear only later).

Plaintiffs had no obligation to forfeit their Rule 15/16 rights by locking in an amendment decision days after receiving new CI materials, while still vetting forensic work. Moreover, counsel for Chow nor counsel for the Kelsier Defendants proposed or requested Plaintiffs harmonize their contemplated 15(a)(2) motion with Defendants' motion to dismiss practice.

In sum, the sequence is straightforward: (1) whistleblower contacts and CI logs on September 4–12; (2) enhanced tracing prompted by the CI revelations and post-TRO asset movements, yielding the 0xCEA hub; and (3) a targeted motion to amend filed about six weeks later, while the case remained at the pleadings stage with no discovery.

Under *Parker*, *Kleeberg*, *Martell*, and *Infinity Headwear*, that chronology comfortably establishes diligence and thus "good cause" under Rule 16(b)(4). Once good cause is shown, the Court must apply Rule 15(a)(2)'s liberal standard.

**2. Rule 15(a)(2)'s liberal standard strongly favors leave to amend here.**

Rule 15(a)(2) provides that courts "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). The Supreme Court has held that this mandate "is to be heeded," and that leave should be denied only for limited reasons—"undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

The Second Circuit likewise instructs that district courts must be mindful that the rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice, bad faith or dilatory motive. *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011).

*Francisco v. Abengoa*, S.A., 559 F. Supp. 3d 286, 310 (S.D.N.Y. 2021), synthesizes these principles in circumstances analogous to this case. There, the court described Rule 15 as "a liberal standard" and reaffirmed that "mere delay, without a showing of bad faith or undue prejudice, does not provide a basis for denying leave," and emphasized that a motion to amend may not be denied simply because the plaintiff could have alleged these facts earlier or previously possessed the information. *Id*. at 312.

The court further held that the non-movant bears the burden to show both undue prejudice and futility, and that the prospect of additional motion practice or discovery (which has not even begun in the present case), standing alone, is not "undue" prejudice. *Id*. at 311–12, 314.

Likewise, in *Fustok v. Conticommodity Servs., Inc.*, Judge Lasker granted leave to add extensive new theories and new defendants in a large, discovery-heavy case, stressing that "mere delay" did not justify denial and that even "massive" additional work and enlarged proceedings did not amount to "undue" prejudice where the new claims arose from the same overall scheme. 103 F.R.D. 601, 603–04 (S.D.N.Y. 1984). The court's reasoning is instructive in our context noting that "[t]he existing defendants [can] adequately defend[ ] against the new claims because they are already aware of many of the essential facts and can uncover additional information through the discovery process . . . [and] the proposed defendants . . . do not enter as completely ignorant parties because they have already participated in various aspects of the proceedings to date." *Id*. at 604.

And in *Expoconsul Intern. Inc. v. A/E Sys., Inc.*, the court allowed amendment to add closely related insiders and affiliates, rejecting prejudice arguments even after years of litigation because the new claims flowed from the same core conduct and judicial economy favored resolving all related liability in one action. 145 F.R.D. 336, 338–39 (S.D.N.Y. 1993).

Taken together, *Expoconsul*, *Francisco, Fustok, and Williams*, underscore three points directly applicable here: (1) the default is to grant leave freely; (2) the burden is on Defendants to show a *Foman* factor; and (3) added work, new factual material, or even new defendants tied to the same scheme are not, by themselves, sufficient to defeat leave to amend. *See Id.; Francisco*, 559 F. Supp. 3d at 310–312; *Williams*, 659 F.3d at 212–13; *Fustok*, 103 F.R.D. at 603–04.

Here, every feature of the PSAC places it squarely within Rule 15(a)(2)'s liberal heartland. The amendment:

- preserves the same core defendants (Chow, Meteora, the Kelsier defendants, DLL and related entities) and the same causes of action (RICO, fraud, NY GBL, unjust enrichment, and related claims);
- adds three additional launches—$MELANIA, $ENRON, and $TRUST—that follow the same playbook as $M3M3 and $LIBRA, along with a new investor plaintiff tied to those launches; and
- incorporates new CI evidence and wallet-level tracing that further particularize and corroborate the already-pled centralized scheme, including the identification of 0xCEA as a hub wallet funding deployers and snipers across all five tokens.

*See* Dkt. No. 204 at 5–11.

The present case remains at an early stage: there has been no Rule 12(b)(6) ruling, no class-certification schedule, and no discovery.

Defendants' own narrative confirms that their objection is not grounded on any concrete prejudice, but in a desire to preserve motions directed at a superseded pleading. Chow repeatedly asserts that the SAC (and thus the PSAC) is "not materially different" from the FAC, adds "few truly new factual allegations," and is simply "a rewrite." Chow Opp. at 3.

Kelsier similarly complains that Plaintiffs have engaged in "tactical pleading brinkmanship" by amending after defendants identified supposed defects and while dismissal motions were pending. *See* Defendants Kelsier Ventures, Hayden Mark Davis, Gideon Davis, and Charles Thomas Davis's Consolidated Memorandum of Law in Opposition to Plaintiffs' Motion to File a Second Amended Complaint ("Kelsier Opp.") at 22, Dkt. No. 241.

But under *Foman*, *Williams*, *Francisco* and *Kleeberg*, neither the loss of tactical advantage nor the need to adjust briefing is "undue" prejudice or a basis to deny leave. *See, e.g.*, *Kleeberg*, 331 F.R.D. at 316 ("merely defending against a new theory is not prejudicial" and even additional discovery taking "one or two months" is not undue delay or prejudice to defendant where discovery is ongoing).

To show undue prejudice, defendants must establish that the amendment would "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Francisco*, 559 F. Supp. 3d at 314 (citation omitted).

Defendants here make no such showing. The PSAC's new material is tightly tethered to the existing allegations: the same actors, the same technical infrastructure (Meteora DLMM and related programs), the same marketing apparatus (Kelsier and the Davis family), and the same pattern of seeding liquidity, orchestrating sniper buys, draining pools, and routing proceeds back to a centralized treasury cluster.

For example, Kelsier's reliance on *Neuman v. Garcia*, 2022 WL 1239329 (S.D.N.Y. Apr. 27, 2022), is misplaced. *See* Kelsier Opp. at 6. In *Neuman*, the plaintiff moved for a third amended complaint after roughly nine months of delay after the court had expressly offered

further leave to amend and he elected to stand on his pleadings, eighty-three days after defendants filed a detailed Rule 12(b) motion, and on the day before his already-extended opposition was due; the court denied leave based on undue delay, undue prejudice, and bad faith, stressing that defendants had already expended substantial resources on their dismissal motion and that further postponement would leave serious fraud accusations hanging over them. Plaintiffs' request here bears no resemblance to the circumstances in Neuman.

Moreover, whatever incremental discovery is eventually required—for example, to address the three additional launches or CI-related issues—would have been required in any event if Plaintiffs filed a separate action or later sought to bring those same facts into the case. As the court in *Fustok* and *Expoconsul* recognized, it is more efficient and fair to litigate closely related misconduct in one proceeding than to force parallel suits. *See Fustok*, 103 F.R.D. at 604; *Expoconsul*, 145 F.R.D. at 338–39.

Nor can Defendants invoke "repeated failure to cure" as a *Foman* factor. (*see e.g.* Kelsier Opp. at 4). Plaintiffs have used only one amendment as of right (to file the FAC) and have never had the sufficiency of their pleadings evaluated on the merits. Dkt. No. 204 at 6.

This is not a case where a plaintiff has cycled through multiple complaints after adverse rulings. Rather, Plaintiffs filed the FAC early in the case, then moved to amend again promptly when new CI and tracing evidence materially expanded and sharpened the known facts. That sequencing is consistent with the Second Circuit's admonition that the "proper time" to amend is when the plaintiff understands, based on new events or clarified information, how to plead the claims more fully—not before. *See e.g. Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190–91 (2d Cir. 2015) ("pleading defects may not only be latent, and easily missed

or misperceived without full briefing and judicial resolution; they may also be borderline, and hence subject to reasonable dispute").

Finally, to the extent Defendants gesture at futility in this portion of their briefing, that is not a reason to deny leave under Rule 15(a)(2) on the present record. Futility is assessed under the Rule 12(b)(6) standard: the question is whether the proposed complaint states a plausible claim, not whether it will ultimately succeed. *Francisco*, 559 F. Supp. 3d at 315.

Indeed "when considering a motion to amend a pleading, a 'court must accept as true all well-pleaded facts and draw all reasonable inferences in the moving party's favor.'" *Id*. The PSAC pleads far more detailed and corroborated allegations than the FAC, including admissions that Davis launched $MELANIA and acted at Chow's direction on more than fifteen launches, plus forensic tracing that contradicts prior declarations and shows the same insiders funded both deployer and sniper wallets across all tokens.

**3. Defendants' "gamesmanship" rhetoric does not establish bad faith or dilatory motive.**

Unable to show undue delay or concrete prejudice, Defendants devote substantial focus on accusing Plaintiffs of "unacceptable gamesmanship," "tactical pleading brinkmanship," and "stall tactics," relying on *In re Interest Rate Swaps Antitrust Litig.*, *Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.*, *DeLuca v. SmithKline Beecham Corp.*, and *Carroll v. Trump*. But labels are not evidence, and these cases are inapposite. In this Circuit, "bad faith" and "dilatory motive" exist where the movant uses amendment for an improper purpose, "such as to harass or to cause unnecessary delay." *Posadas de Mexico, S.A. de C.V. v. Dukes*, 757 F. Supp. 297, 302 (S.D.N.Y. 1991).

In addition, recent authority emphasized that "inconvenience and additional cost of litigation do not ordinarily add up to prejudice" as to preclude leave to amend. *Black Lives*

*Matter D.C. v. Trump*, 720 F. Supp. 3d 1, 12 (D.D.C. 2024).

Further, in *Moresman v. Steuben County* the court squarely rejected defendant's "legal gamesmanship" allegations in situations where, as here, the record shows that the plaintiff moved to amend in response to new information rather than to delay or relitigate adverse rulings. 2025 WL 2208130, at *5.

Defendants' contrary narrative rests on two points that do not withstand scrutiny.

*First*, they point to Plaintiffs' prior as-of-right amendment that ultimately mooted Hayden Davis's Rule 12(b)(2) motion and to the Court's admonishment that Plaintiffs "should not have unilaterally decided" that the amendment automatically mooted that motion without seeking leave. Kelsier Opp. at 21.

But the Court declined to treat that episode as a basis for cutting off amendment; it simply admonished counsel regarding future procedure. *Id*. Plaintiffs have complied with the Court's directives and now seek leave to amend supported by detailed new evidence and legal briefing. Using amendment in the manner the Rules contemplate is not gamesmanship; it is the textbook procedure that *Foman* and its progeny endorse.

*Second*, Defendants fault Plaintiffs for not coordinating their amendment plans on Defendants' timetable (which was never suggested by any of the Defendants in this litigation) and for filing the Rule 15 motion "when dismissal motions are nearly fully briefed." Kelsier Opp. at 21. But courts have repeatedly rejected the notion that a plaintiff acts in "bad faith" merely because amendment may affect pending motion practice or require additional discovery. As the court in *Duling v. Gristede's Operating Corp.* explains, "[t]he prejudice that would flow from any additional required discovery can generally be mitigated by adjustments to the discovery schedule." 265 F.R.D. 91, 101 (S.D.N.Y 2010) (citing *Middle Atl. Utils. Co. v. S.M.W.*

*Dev. Corp.,* 392 F.2d 380, 386 (2d Cir. 1968) ("The burden of further discovery and motions is not a satisfactory basis to deny the motion to amend. Such procedural aspects can be regulated and controlled by the trial court."); *St. Paul Fire & Marine Ins. Co. v. Heath Fielding Ins. Broking Ltd.,* 1996 WL 19028 at *7 (S.D.N.Y. January 17, 1996) (same)).

The court in *Duling* recognized, "[t]he fact that a proposed amendment would add new issues is normally not prejudicial unless the opposing party would be confronted with some unique difficulty in defending against the new issues" and allowed the proposed amendment where, as here, "addition of the new claims will not prejudice defendants because the proposed claims are 'related closely to the original claim[s].'" (citation omitted). 265 F.R.D. at 102–03.

Here, any perceived prejudice which results from the PSAC's filing during the FAC motion to dismiss briefing is significantly mitigated by two facts: (1) Defendants chose to proceed with FAC-directed motions after becoming aware that Plaintiffs were contemplating a PSAC, and (2) the need to file a PSAC only arose because of Defendants' own conduct prior to and during this litigation, as evidenced by the newly-discovered information presented therein.

The Rules do not require Plaintiffs to surrender the right to present newly-discovered, case-forming evidence in order to protect Defendants from having to account for their own conduct.

**4. *Footbridge*, *Interest Rate Swaps*, and similar cases are distinguishable and do not bar amendment.**

Finally, Defendants invoke *Footbridge*, *Interest Rate Swaps*, *DeLuca*, *Carroll*, and related decisions to argue that Rule 15's "generosity must yield." Chow Opp. at 3. However, those cases are inopposite as they describe narrow, exceptional circumstances not present here.

In *Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.*, the court denied leave to amend where plaintiffs, ***without any genuinely new factual basis***, waited until after defendants

had fully briefed motions to dismiss and then proposed a sweeping, interlineated amended complaint that would have rendered months of briefing "for naught." 2009 WL 4278179, at *2 (S.D.N.Y. Nov. 23, 2009). The court characterized that tactic—repeated re-pleading ***without new facts***, timed to wipe out nearly completed motion practice—as "sharp" and refused to allow plaintiffs to "wipe the slate clean" at that late stage. *Id*.

In *In re Interest Rate Swaps Antitrust Litig.*, the court likewise denied amendment only after plaintiffs had already amended multiple times, repeatedly shifting theories, and then withheld until late in the briefing schedule the fact that a further amendment was forthcoming—behavior the court deemed "unacceptable gamesmanship" given the extraordinary scale of the proceedings and the absence of new catalysts. 2018 WL 2332069, at *17, *27 (S.D.N.Y. May 23, 2018).

*DeLuca* and *Carroll* similarly involved post-discovery or post-ruling amendments, where the movant sought yet another opportunity to re-plead claims or defenses that had already been deemed deficient ***by the Court*** or failed to raise new facts as to justify the amendment. *See DeLuca v. SmithKline Beecham Corp.*, 2007 WL 541656, at *3 (S.D.N.Y. Feb. 20, 2007); *Carroll v. Trump*, 590 F. Supp. 3d 575, 582, 587–88 (S.D.N.Y. 2022).

In contrast, Plaintiffs' present motion:

- is anchored in ***genuinely new,*** post-FAC evidence—the September 4–12 CI chats tying Chow, Meteora and the Davises to a serial launch operation, identifying $MELANIA and sequencing with $LIBRA, and describing an "exclusive marketing" arrangement with Meteora, plus post-TRO tracing that first revealed 0xCEA as a central hub wallet;
- was filed about six weeks after that evidence crystallized, well within the time frame that courts treat as diligent;

• comes at an early, pre-discovery stage, before any Rule 12(b)(6) ruling and before trial or class-certification dates have been set; and

• preserves the same core legal theories and defendants, enlarging the record on a single cohesive scheme rather than pursuing additional lawsuits.

Far from the serial, no-new-facts re-pleading in *Footbridge* and *Interest Rate Swaps*, Plaintiffs here present a more particularized version of the very scheme already at issue—grounded in new insider admissions and post-TRO conduct which could not have been assembled when the FAC was filed.

Under *Foman*, *Williams*, *Francisco*, *Fustok*, and *Expoconsul*, that is precisely the sort of amendment Rule 15(a)(2) is designed to allow so that more complete pleadings can be evaluated such that the claims may be ultimately tested on their merits. *See Foman*, 371 U.S. at 182; *Williams*, 659 F.3d at 212–143; *Francisco*, 559 F. Supp. 3d at 312; *Fustok*, 103 F.R.D. at 603–04; *Expoconsul*, 145 F.R.D. 338–39.

Accordingly, Plaintiffs acted diligently once new CI and blockchain tracing evidence emerged; the amendment is timely, fair, and directed at the same underlying scheme; and Defendants have not carried their burden to show undue delay, undue prejudice, bad faith, repeated failure to cure, or futility. Leave to amend should therefore be granted.

**B. The PSAC Is Not Futile; the New Evidence Makes the RICO and State-Law Claims Plainly Plausible.**

Futility is judged under the Rule 12(b)(6) plausibility standard; leave may be denied only where the proposed claims are clearly frivolous or legally insufficient as to not withstand a motion to dismiss. *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (futility mirrors Rule 12(b)(6)); *In re LIBOR-Based Financial Instruments Antitrust Litig.*, 962 F. Supp.2d 606, 634–35 (S.D.N.Y. 2013) (on a Rule 15 motion, the question is whether the claims

are at least plausibly pled, not whether defendants' competing factual narrative might later prevail on the merits).

The PSAC's detailed new allegations—CI chats, post-TRO asset movement, and 0xCEA tracing—improve Plaintiffs' the RICO and state-law theories and easily clear the bar for amendment. The arguments in Defendants' oppositions which largely re-urge their Rule 12 arguments and ask the Court to resolve disputed merits issues are unavailable at this stage.

**1. The PSAC pleads a robust RICO pattern and continuity by alleging five coordinated launches routed through the 0xCEA hub.**

A RICO "pattern" requires related predicate acts and continuity—"either a closed period of repeated conduct, or past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241–42 (1989).

Relatedness is satisfied when the acts share similar purposes, results, participants, victims, or methods. *Id.* Continuity may be "closed-ended" (a series of related acts over a substantial period) or "open-ended" (a threat that similar acts will continue in the future as part of the defendants' regular way of doing business). *Id.*; *GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 465–66 (2d Cir. 1995); *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008).

The PSAC adequately alleges both forms of RICO.

It pleads that a single hub wallet beginning with 0xCEA served as the financial command center for five coordinated token launches—$M3M3, $LIBRA, $MELANIA, $ENRON, and $TRUST—by receiving insider capital, seeding deployer wallets and early-buyer sniper wallets, and later re-collecting profits, creating a circuit of funds across all launches. PSAC 136.

The pleading further alleges that CI chats and planning materials confirm that Chow and Kelsier executed this same six-step "playbook" across at least fifteen launches, with the five pled

tokens exemplifying a continuing strategy, not isolated projects. PSAC ¶¶ 46–93 (describing the playbook).

These allegations defeat Kelsier's futility argument that Plaintiffs merely describe a short, "inherently terminable" run of disconnected "memecoins" over four-and-a-half months. *See* Kelsier Opp. at 10.

The PSAC now alleges a scheme operating "from at least October 2024 and continu[ing] through 2025," with multiple launches executed in succession and an ongoing "Stake2Earn" platform continuing to attract users—all under the same Meteora–Kelsier umbrella, with the same hidden controls and the same 0xCEA coordination. PSAC   431.

Those allegations describe both (i) a closed-ended series of related wire-fraud acts over a substantial period and (ii) an open-ended threat of repetition, because the racketeering activity is alleged to be the defendants' regular way of doing business, not an accident of a single token launch. *H.J. Inc.*, 492 U.S. at 242–43.

At the Rule 15 stage, allegations that the same core group repeated this playbook across five launches, using the same 0xCEA hub wallet and the same infrastructure, suffice to plead horizontal relatedness and continuity at this stage. *See e.g. In re Boesky,* 882 F. Supp. 1371, 1384–85 (S.D.N.Y. 1995) (rejecting futility arguments and noting that "[t]o the extent that [defendants] are suggesting that the plaintiffs cannot prove the [RICO] allegations they have made, they are raising issues of fact better left for decision on a properly briefed motion for summary judgment" not a Rule 15 motion) (citing *WIXT Television, Inc. v. Meredith Corp.,* 506 F.Supp. 1003, 1010 (N.D.N.Y.1980) ("Although [the party opposing the motion for leave to amend] argues that plaintiff's proposed amended complaint is unsupported by the facts and fails

to state a claim upon which relief can be granted, these matters can best be considered in the context of the motions to dismiss and for summary judgment").

Kelsier's contrary argument boils down to factual disagreement with the meaning of Plaintiffs' wallet tracing and CI evidence. *See* Kelsier Opp. 17 (dismissing 0xCEA allegations as showing only repeat use of common "tools," and "fund flow…consistent with ordinary vendor relationships, serial marketing partnerships or parallel use of popular deployment practices").

But the PSAC does not simply point to repeat use of tools: it alleges that 0xCEA funded both deployer and sniper wallets for each pled token, that profits reconverged there, and that overlapping authorization patterns and signatures show common key clusters controlling all those wallets. PSAC ¶¶ 135–144. Those detailed allegations readily satisfy *H.J. Inc.*'s pattern standard.

Additionally and contrary to Kelsier's position that the tokens are unrelated (*See* Kelsier Opp. 8–9), on Plaintiffs' allegations, it is untenable to suggest that swapping in different superficial branding somehow severs horizontal relatedness when the same core actors are alleged to have used the same Meteora/Kelsier infrastructure and the same 0xCEA routing to drain retail liquidity each time. The different themes point is therefore a misreading of the PSAC, not a defect in the pattern, and it cannot support a futility finding at the pleading stage.

Describing these as "largely successful launches" (Kelsier Opp. at 9) is even more untenable. The only success alleged in the PSAC is success for the Defendants who repeatedly generated retail demand, dumped into it, froze or rigged trading, and pulled tens of millions out of the pools while open-market purchasers were left holding collapsing tokens.

**2. The PSAC pleads a concrete association‑in‑fact enterprise and RICO distinctness.**

A RICO enterprise may be "any union or group of individuals associated in fact although not a legal entity," including an informal association‑in‑fact—"a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 944 (2009).

The enterprise must have: (1) a common purpose; (2) relationships among those associated; and (3) longevity sufficient to permit them to pursue the enterprise's purpose. Id. at 946. Formal hierarchy is unnecessary. *Id.* at 946.

RICO also requires that the "person" and the "enterprise" be distinct, but the enterprise itself may include corporations, unincorporated associations, and individuals working in concert. *United States v. Turkette*, 452 U.S. 576, 580, 583 (1981); *United States v. Bonanno Organized Crime Family of La Cosa Nostra*, 879 F.2d 20, 25–26 (2d Cir. 1989).

The PSAC pleads an association‑in‑fact "Meteora–Kelsier Enterprise" that satisfies *Boyle*. It alleges that Chow and the Meteora association provided "Technical Control"—retaining upgrade and admin authority over Meteora's DLMM and related programs via a 4‑of‑7 multisig, configuring pools, freeze/thaw functions, and routing of fees. *See e.g.* PSAC ¶¶ 420–426.

The Davises and Kelsier supplied "Capital and Marketing"—providing funds to bankroll launches and price manipulation, orchestrating celebrity and political endorsements (including President Milei's LIBRA tweet), and coordinating paid‑influencer and KOL campaigns. PSAC 425. DLL, Jupiter, Raccoon Labs, Block Raccoon, and related entities formed a "Revenue Distribution Network," collecting protocol fees and siphoned liquidity into accounts they controlled. PSAC ¶¶ 425–426.

These role-based allegations show an enterprise with a clear common purpose—systematically defrauding retail investors through rigged token launches—and structured relationships and longevity sufficient to carry out that purpose across multiple tokens.

They also satisfy distinctness: Chow, the Davises, Kelsier, DLL, and the other entities are alleged as "persons" who conducted the affairs of a separate association-in-fact enterprise, the Meteora–Kelsier Enterprise, rather than merely conducting their own affairs. PSAC 419. See *Bonanno*, 879 F.2d at 26–29 (La Cosa Nostra "family" as enterprise distinct from its members).

Kelsier argues that the PSAC alleges only "planning and coordination for individual launches," not the "stable, interdependent relationships" or "collective mechanisms" *Boyle* requires. Kelsier Opp. at 17–18.

But *Boyle* expressly rejects the notion that a RICO enterprise must have rigid hierarchy or a corporate-style structure; it is enough that the group functions as a continuing unit with a common purpose. 556 U.S. at 948.

Here, the PSAC alleges precisely that: Chow and Meteora controlled the core infrastructure, the Davises and Kelsier ran capital and promotion, and DLL and others handled fee routing—together executing the same fraudulent playbook across launches. *See e.g.* PSAC ¶¶ 420–426. That is plainly more than the "parallel, legitimate business relationships" cases on which Defendants rely.

At a minimum, these allegations render the enterprise and distinctness theories plausible; they are not so defective as to make amendment futile. *See In re Boesky,* 882 F. Supp. at 1384–85 (whether predicate acts and enterprise allegations ultimately satisfy RICO is a merits question where the complaint describes a cohesive scheme and assigns roles to participants).

**3. Defendants' Reliance on Risley and similar cases is misplaced and does not render the PSAC Futile.**

Defendants repeatedly invoke the Second Circuit's recent summary order in *Risley v. Universal Navigation Inc.*, 2025 WL 615185 (2d Cir. Feb. 26, 2025), to argue that it "defies logic" to hold a software developer or smart-contract drafter liable for the misuse of a protocol by others, and that Chow's work on Meteora and the "M3M3 Calcs Template" is the sort of "technical support" that cannot give rise to liability. *See e.g.* Chow Opp. 1, 5, 14–16; DLL Opp. 1–2.

That reliance is misplaced for three independent reasons: (1) Risley is a non-precedential summary order addressing only federal securities-law theories against neutral protocol developers; (2) the factual allegations in *Risley* bear little resemblance to the detailed allegations here that Meteora, Chow, DLL, and their collaborators operated and managed a coordinated fraud; and (3) the issues defendants raise go, at most, to the eventual merits of Plaintiffs' RICO and state-law theories, not to clear futility at the Rule 15(a)(2) stage.

Defendants' attempt to recast Chow as a mere "technical support" consultant providing neutral spreadsheets is similarly inconsistent with the complaint. *See e.g.* Chow Opp. at 2. The PSAC alleges that the "M3M3 Calcs Template," authored by Chow and circulated to the internal M3M3 team, modeled token allocations and staking dynamics in a way that concealed insider dominance while maintaining the appearance of a broad public float, and that the companion "Token Launch Organizer" (authored by Charles Davis) coordinated timing and influencer posts for the launch (including designating Meteora as responsible for launching the token and coordinating KOLs). PSAC ¶¶ 121–28; Apps. I–P.

Those documents are alleged to be part of the enterprise's playbook for structuring and marketing launches to enable precisely the insider extraction described elsewhere in the PSAC.

**4. Meteora is adequately pleaded as an unincorporated association with capacity to be sued; DLL's "software only" and Martin-rule arguments raise merits questions, not clear futility.**

DLL's opposition reprises the argument that "Meteora is software" developed by Dynamic Labs and thus cannot be sued. *See* Dynamic Labs Limited's Combined Reply Memorandum of Law in Further Support of its Motion to Dismiss the Amended Class Action Complaint and Memorandum of Law in Opposition to Plaintiffs' Motion for Leave to File a Second Amended Complaint ("DLL Opp") at 1, Dkt. No 240.

The PSAC, however, makes clear that "Defendant Meteora" is not the neutral smart-contract protocol; it is an unincorporated association of operators led by Chow that leveraged the Meteora brand and infrastructure to run the scheme. PSAC ¶168(c). It alleges that this association maintains a website, social-media accounts, blog posts, developer-relations staff, and job postings describing a "well-capitalized team" with leadership, work schedules, and salary ranges—features that software does not have. *See* Apps. A, E–H.

Plaintiffs further allege that Chow repeatedly referred to himself as Meteora's "co-founder" and "CEO," used Meteora-branded channels to speak about strategy, and approved marketing collaborations with Kelsier Ventures.

Under Rule 17(b)(3)(A), an "unincorporated association" may be sued to enforce a federal right, and RICO defines a "person" broadly to include any entity "capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

The Second Circuit in *Jund v. Town of Hempstead* recognized that the "New York General Associations Law also recognizes that unincorporated associations can hold an interest in property" and "New York law provides for the maintenance of actions by and against unincorporated associations." 941 F.2d 1271, 1282 (2d Cir. 1991). The Second Circuit noted that,

"judgments against unincorporated associations will be satisfied 'out of any personal or real property belonging to the association, or owned, jointly or in common, by all the members thereof" and concluded that the defendant unincorporated association is "capable of holding property and therefore come within the definition of 'person' for the purposes of RICO." *Id.* (internal citations omitted).

DLL's own filings concede that Meteora's programs route a portion of every trade's fees into program accounts it controls for the benefit of DLL and the Meteora insiders, underscoring that the association is at least capable of holding a beneficial interest in property. FAC 363.

DLL's invocation of New York's *Martin* rule and cases like *Martin v. Curran*, 303 N.Y. 276 (1951), and *Duane Reade Inc. v. Local 338*, 6 Misc. 3d 790 (Sup. Ct. N.Y. Cnty. 2004), goes to the scope of state-law tort liability for unincorporated associations, not to whether a federal RICO claim is futile.

In addition, the Second Circuit has counseled that the *Martin* rule "must be disregarded" where the policies underlying the statute at issue "would be undermined if an unincorporated association could avoid substantive liability unless and until unanimous membership authorization or ratification were proved." *Jund*, 941 F.2d at 1281. The Second Circuit reasoned that "[r]equiring such proof, no matter how large the association involved, before assessing liability would prove an insurmountable obstacle to virtually any plaintiff." *Id.* (noting that "imposing on plaintiffs the burden of proving unanimous authorization would give unincorporated associations a license to continue violative and abusive practices with impunity, safe in the knowledge that the organization's assets would be untouchable as long as the membership did not expressly approve the continuation of the illicit activity").

The question whether an association like Meteora can be sued under RICO where it

plainly controls program accounts and protocol fees is, at worst, a debatable legal issue; it is not one that should be resolved against Plaintiffs as a matter of clear futility at the amendment stage. As noted by the Court in *Foman*, "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits" absent undue delay, bad faith or dilatory motive . . . repeated failure to cure deficiencies . . . undue prejudice [or] futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" 371 US at 182.

In all events, even if the Court ultimately were to prune some state-law claims against Meteora on Martin-rule grounds, that would be a question of partial dismissal, not a basis to bar amendment altogether. The PSAC's detailed allegations about Meteora's structure, members, and fee-routing arrangements easily surpass the threshold for a non-futile amended pleading.

**5. The PSAC's fraud and RICO predicate-act allegations satisfy Rule 9(b); defendants' group-pleading objections go to degree, not to futility.**

For fraud claims and RICO predicate acts sounding in fraud, Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Boritzer v. Calloway*, 2013 WL 311013, at * 4 (S.D.N.Y. January 24, 2013) (quoting *Lerner v. Fleet Bank, NA*, 459 F.3d 273, 290 (2d Cir. 2006)).

The same standard applies to omission-based fraud: plaintiffs must identify what was omitted, who had a duty to speak, the context in which the omission occurred, and how the omission misled. *See In re Platinum-Beechwood Litig.,* 427 F.Supp.3d 395, 440 (S.D.N.Y. 2019).

The PSAC does exactly that, launch by launch. For $M3M3, it identifies specific promotional statements—"fair, community-driven launch," "algorithmic fairness," "staking ranks" promising sustained rewards—and attributes them to Meteora-branded accounts, Chow,

and Kelsier's promotional apparatus, with dates and channels. *See e.g* PSAC ¶¶ 203, 205, 208, Appx. A, R.

It then explains why those statements were false: the Meteora pools were pre-loaded with 90% of supply, paired with minimal liquidity, and secretly subject to freeze/thaw controls that allowed insiders to cycle trades while retail buyers could not transact, resulting in insiders acquiring 95% of supply before public trading. PSAC ¶¶ 211–20.

For $LIBRA, $MELANIA, $ENRON, and $TRUST, the PSAC likewise identifies official or endorsed posts and messaging, pinpoints speakers and explains how hidden sniper funding, pool configuration, and freeze authority made those narratives deceptive. *See e.g.* PSAC ¶¶ 237–238, 265, 268, 272, 313, 341.

Defendants protest that the PSAC still engages in improper "group pleading" and fails to isolate precise statements by each RICO defendant. *See e.g.* Chow Opp. 12; DLL Opp. at 7; Kelsier Opp. at 11. But *Platinum-Beechwood* squarely rejects the notion that group allegations are *per se* improper in cases such as this one. The court in *Platinum-Beechwood* explained that the "group pleading doctrine is an exception" that allows particular statements to be attributed to corporate insiders where the complaint alleges their direct involvement in day-to-day affairs of the entity issuing the statement; it then applied that doctrine to sustain fraud and aiding-and-abetting claims against certain defendants despite group phrasing, where role-specific facts and transactional detail were pled. *In re Platinum-Beechwood*, 427 F. Supp. 3d at 438 (noting that the group pleading doctrine does not only apply to fraud claims; "rather, it applies whenever Rule 9(b) applies, which is whenever the alleged conduct of defendants is fraudulent in nature").

The PSAC falls squarely within the group pleading doctrine's mandate as set forth in

*Platinum-Beechwood*. The PSAC does not lump all defendants together; instead, it distinguishes Chow, Meteora, Kelsier, DLL, and the individual Davises, assigns them differentiated roles in the enterprise (technical control, capital and marketing, revenue distribution), and ties them to specific tokens, wallet clusters, and misstatements.

**6. The PSAC pleads scienter with the circumstantial detail Second Circuit law requires.**

Fraud-based RICO claims must plead facts giving rise to a strong inference that each defendant acted knowingly or with reckless disregard, which may be shown by (1) motive and opportunity or (2) strong circumstantial evidence of conscious misbehavior. *ATSI Communications, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 99 (2d Cir. 2007).

Courts routinely infer scienter from internal documents, coordinated conduct, and post-hoc concealment, particularly in complex schemes where direct admissions are unlikely. *See e.g. Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (reaffirming that a strong inference of scienter can be pled by alleging that defendants "knew facts or had access to information" contradicting their public statements, including internal reports); *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co*., 553 F.3d 187, 198 (2d Cir. 2009) (identifying several circumstances that "may give rise to a strong inference of the requisite scienter" including where the complaint alleges that "the defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate . . . "

Here, the PSAC adequately alleges scienter. CI chats recount Hayden Davis acknowledging that he "followed Ben's instructions" in executing at least fifteen token launches, and describe Chow as directing launch mechanics and sniper activity from Defendants' 0xCEA hub. PSAC ¶¶ 114, 136. The "M3M3 Calcs Template" authored by Ben Chow and the "M3M3

Token Launch Organizer" (authored by Charles Thomas Davis) show Chow modeling insider profits from price spikes and liquidity withdrawals and Charles Davis laying out precise influencer timing tied to pool openings (including his assignment of token launch and KOL coordination to 'Meteora'– the purportedly autonomous software). *See* Appx I–K, N.

Post-TRO, sniper wallets holding LIBRA proceeds rapidly bridged Circle USDC into assets which cannot be programmatically frozen by the courts—behavior the PSAC alleges was an act of deliberate evasion. PSAC 148.

Those allegations, taken together, are exactly the sort of circumstantial evidence from which courts infer scienter in complex fraud and RICO cases: insiders with unique control over infrastructure, detailed *ex ante* modeling of profits from fraudulent transactions, contemporaneous communications aligning marketing and technical steps, and deliberate *post-hoc* asset movements relative to litigation *See ATSI*, 493 F.3d at 99–103 (scienter inferred where defendants had motive and opportunity to profit from price manipulation and engaged in unusual trading); *In re Firestar Diamond, Inc.*, 634 B.R. 265, 282–86 (Bankr. S.D.N.Y. 2021) (holding that "[a]lthough 'mental states may be pleaded generally, [a plaintiff] must nonetheless allege facts that give rise to a strong inference of fraudulent intent'" and denying motions to dismiss RICO claims based on circumstantial evidence of internal coordination and money-laundering flows).

**7. Plaintiffs adequately plead RICO injury and proximate cause.**

To establish RICO standing under § 1964(c), a plaintiff must allege injury to "business or property" and that the injury was proximately caused "by reason of" the defendant's racketeering conduct. *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 266–68 (1992). Proximate cause requires a "direct relationship between the injury asserted and the injurious conduct alleged," but

does not demand first-party reliance where the scheme itself elevates transaction prices. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654–58 (2008).

The PSAC plainly alleges such direct injury. Plaintiffs and the proposed class bought $M3M3, $LIBRA, and other tokens at prices that were artificially inflated by the defendants' leveraging of software, sniper funding, and control over both supply and early demand, and suffered losses when insiders rapidly drained liquidity and dumped tokens. Those are classic overpayment injuries to property. *See Bridge*, 553 U.S. at 649–50 (overpayment in tainted transactions is cognizable RICO injury).

Kelsier argues that any losses are simply a function of general "memecoin" volatility and hype, and that Plaintiffs do not tie their trades to specific misstatements or acts by each defendant. Kelsier Opp. 19.

But the PSAC does far more than allege market-wide declines; it traces how Plaintiffs purchased into particular launch windows that the enterprise itself controlled—via Meteora's pool parameters, sniper wallets funded by 0xCEA, and freeze authority wielded by insiders—and how the subsequent crashes were triggered by the enterprise's own extraction plan, not by exogenous market events. *See e.g.* PSAC ¶¶ 226, 240, 324. That is a direct causal chain, unlike cases where independent intermediaries break the link between the predicate acts and plaintiffs' losses.

Here, Plaintiffs' trades were directly with the very pools and wallets the enterprise controlled; there are no intervening decision-makers better positioned to sue. That suffices for proximate cause at the pleading stage and certainly defeats any claim that the RICO injury theory is facially futile.

**8. Plaintiffs have class standing to challenge all five launches as part of one integrated scheme.**

Chow and Kelsier contend that Plaintiffs lack "class standing" to represent purchasers in tokens they did not themselves buy, relying on *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012), *DiMuro v. Clinique Labs.*, LLC, 572 F. App'x 27 (2d Cir. 2014), and *Akridge v. Whole Foods Mkt. Grp., Inc.*, 2022 WL 955945 (S.D.N.Y. Mar. 30, 2022).

But in fact, the holding in *NECA-IBEW* supports Plaintiffs' position. There, the Second Circuit held that an RMBS purchaser could represent investors in other offerings where the securities were backed by similar loans and governed by the same alleged misstatements, because the "same set of concerns" was implicated across offerings. 693 F.3d at 158–59.

The PSAC alleges exactly that commonality here. All five pled launches—$M3M3, $LIBRA, $MELANIA, $ENRON, and $TRUST—used the same core architecture (Meteora pools; 0xCEA hub funding; sniper wallets; dynamic pool controls), the same narrative (purported "fair," "decentralized," "community-driven" launches), and the same type of victims (retail traders induced to buy at launch and early post-launch windows).

The named plaintiffs themselves bought into multiple launches within that scheme—particularly $M3M3 and $LIBRA—giving them injuries that arise from the same fraudulent playbook and implicate the same set of concerns as class members in the other tokens.

Further, *DiMuro* and *Akridge* are distinguishable. The court in those cases denied class standing where the products and alleged misrepresentations varied materially across brands and time periods, such that the named plaintiffs' injuries did not raise the same concerns as those of absent class members. *See DiMuro*, 572 F. App'x at 29–31; *Akridge,* 2022 WL 955945, at *4–6 (recognizing that "[t]he majority view holds that a plaintiff who has purchased some of the

products they challenge has class standing if the products are similar to other challenged products or implicate the same challenged course of conduct by the defendants").

Here, Plaintiffs challenge a unitary scheme: the same actors using the same infrastructure and misrepresentations to orchestrate a sequence of nearly identical launches. That is precisely the situation NECA-IBEW contemplates. At a minimum, the class-standing issue is not so one-sided as to render the class allegations "clearly futile" at the amendment stage.

**9. The PSAC's state-law claims (fraud, GBL §§ 349–350, unjust enrichment) are likewise plausibly pled and not clearly futile.**

Finally, defendants urge the Court to deny leave to amend because, in their view, the state-law claims will ultimately fail for lack of reliance, consumer-oriented conduct, or non-duplicative enrichment. Those contentions are, again, merits arguments. At the Rule 15 stage, the question is only whether the PSAC plausibly alleges state-law claims; it plainly does.

On common-law fraud, the PSAC pleads a number of misstatements and speakers but unequivocally argues that all Defendants failed to disclose highly material facts and acted well below their duty to disclose. PSAC ¶¶384–406. There is little room for Defendants' "no duty" to disclose arguments. *See e.g.* Kelsier Opp. at19.

The special facts doctrine applies when one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair. *Travelers Indem. Co. of Illinois v. CDL Hotels USA, Inc.*, 322 F.Supp.2d 482, 499 (2004). For the doctrine to apply, the plaintiff must prove that the material fact was peculiarly within the defendant's knowledge, the information was not readily discoverable by the plaintiff through ordinary intelligence, and the defendant knew the plaintiff was acting on mistaken knowledge. *Newbro v. Freed*, 409 F. Supp. 2d 386, 401 (S.D.N.Y. 2006).

The PSAC alleges that Chow, Meteora, the Davises and Kelsier, DLL, and the other enterprise members alone knew the launch timing, sniper funding, pre-minted insider allocations, Meteora admin and upgrade privileges, freeze/thaw and whitelist settings, and the timing and scale of planned liquidity withdrawals and fee routing, and that none of this information was visible to or reasonably discoverable by public token buyers, who saw only curated "fair launch," "locked liquidity," and "community-first" narratives and surface-level on-chain metrics.

Moreover, New York law recognizes that a duty to disclose arises when a party makes a partial or ambiguous statement, whose full meaning can only be understood with complete disclosure. Once a party undertakes to mention a relevant fact, it cannot provide only part of the truth. *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.,* 837 F.Supp.2d 162, 201 (S.D.N.Y. 2011).

Here, Defendants did not remain silent. They affirmatively promoted the tokens as fair, decentralized, subject to locked liquidity, with modest team allocations and community- or cause-driven missions, while omitting that they retained centralized insider control. PSAC ¶¶384–406.

Having chosen to speak on launch fairness, decentralization, liquidity protections, and team economics, Defendants were obligated to disclose the hidden mechanics and insider benefits necessary to keep those assurances from being misleading; the PSAC pleads that all Defendants who designed, approved, funded, or marketed the launches participated in those half-truths by repeating the same narratives while withholding the same core facts.

On GBL §§ 349 and 350, the PSAC alleges consumer-oriented conduct: Defendants promoted the token launches to retail buyers through mass-market channels and represented the

launches as fair, transparent, and protocol-neutral while secretly employing insider controls, freeze/thaw privileges, routing advantages, and other manipulative mechanisms. PSAC ¶¶ 440–444.

In the crypto context, courts have recognized that manipulation-based deception can sustain fraud and consumer-protection theories where retail purchasers relied on the perceived integrity of a market that defendants covertly distorted. *In re Tether & Bitfinex Crypto Asset Litigation*, 576 F. Supp. 3d 55, 124–31 (S.D.N.Y. 2021) (holding that plaintiffs adequately pleaded reliance for common-law fraud on the integrity of a manipulated crypto-market, while dismissing § 349 on standing grounds because the plaintiffs there were not direct consumers of the stablecoin itself).

Here, by contrast, Plaintiffs allege direct consumer-facing solicitation and direct harm: Defendants marketed the launches to retail token purchasers, positioned the tokens as fair and decentralized, and then traded against those same consumers using concealed insider tools. That conduct is quintessentially consumer-oriented and materially misleading under §§ 349–350.

In re *Platinum-Beechwood Litigation*, the court declined to dismiss an unjust-enrichment claim as duplicative where it was pled expressly as an alternative to fraudulent-conveyance claims, noting that "it is conceivable that the plaintiff could recover under one theory but not the other." (internal citation omitted) 427 F. Supp. 3d at 438, 451 (S.D.N.Y. 2019).

The PSAC follows that blueprint: Counts VI and VII allege unjust enrichment, and are expressly pleaded in the alternative, to capture the substantial fees and extraction proceeds defendants collected through Meteora's pools and related wallets, particularly DLL's automatic fee share, in the event other theories of recovery are narrowed. PSAC ¶¶ 445–458.

Taken together, the PSAC's new allegations transform the pleadings into a detailed, role-specific account of a multi-launch, on-chain fraud, supported by CI chats, internal planning materials, and wallet-tracing evidence.

**IV. CONCLUSION**

For the reasons set forth above and in Plaintiffs' opening memorandum of law, Plaintiffs respectfully request that the Court grant their motion for leave to file the Proposed Second Amended Complaint and deem the PSAC filed as of the date of the Court's order. Plaintiffs further request such other and further relief as the Court deems just and proper.

In the alternative, should the Court conclude that any claim as presently framed in the FAC or PSAC is deficient in any respect, Plaintiffs respectfully request that any dismissal be without prejudice and with leave to file a further amended complaint that can address the Court's concerns and so that all claims can be resolved on a more complete and accurate record.

By: *<u>/s/ Max Burwick</u>*

**BURWICK LAW PLLC**

Max Burwick
1 World Trade Center, 84th Fl.
New York, NY 10007
(646) 762-1080
max@burwick.law
*Counsel for Plaintiffs Omar Hurlock & Anuj Mehta*

**WORD COUNT CERTIFICATION**

I certify that the foregoing memorandum of law contains 13,502 words, as determined by the word-count function of Microsoft Word, and complies with the expanded word-limit requirement for this filing identified in the Court's Order on November 5th, 2025, Dkt. No. 230.