**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

OMAR HURLOCK, on behalf of himself and all others similarly situated,

Plaintiff,

-against-

Case No. 25 CV 03891 (JLR)

KELSIER VENTURES, KIP PROTOCOL, HAYDEN DAVIS, GIDEON DAVIS, METEORA, THOMAS DAVIS, JULIAN PEH, And BENJAMIN CHOW,

Defendants.

______________________________________/

**DECLARATION OF TIMOTHY J. TREANOR**

Pursuant to 28 U.S.C. § 1746, I, TIMOTHY J. TREANOR, declare under penalty of perjury that the following is true and correct:

1. I am an attorney duly admitted to practice law in the State of New York and have been an attorney of record for the named plaintiff, Omar Hurlock ("Hurlock"), in the above-captioned matter.

2. I submit this declaration in support of my application for the Court to hold a hearing into the circumstances surrounding the purported termination of Treanor Devlin Brown PLLC ("Treanor Devlin Brown")[1] by Hurlock, who is the sole representative of the putative class in this matter. I believe the purported termination undermines the integrity of these judicial proceedings [redacted]

[1] Treanor Law PLLC became Treanor Devlin Brown PLLC on June 19, 2025, with the addition of Arlo Devlin-Brown as a new partner. For consistency, I use the new name throughout.

[redacted] In reality, the purported termination had nothing to do with the quality of services provided by Treanor Devlin Brown but instead was procured by Burwick [redacted]

3. Burwick began seeking this firm's termination one day after it obtained from the Court a temporary restraining order freezing potentially hundreds of millions of dollars of cryptocurrency, including $57.6 million in USDC. [redacted]

[redacted]

[redacted]

5. I also submit this declaration in support of my application to the Court, pursuant to Fed. R. Civ. P. 23(g)(3), to appoint Treanor Devlin Brown as interim class counsel in this matter, [redacted]

---

[redacted]

[redacted]

BACKGROUND

6. My interactions with Burwick began on April 2, 2025, when he reached out to me the very day he learned from media reports that I was investigating the $LIBRA matter. I started this investigation shortly after the $LIBRA coin was launched on February 14, 2025. [redacted] Burwick suggested that we explore working together, [redacted] During the discussions, Burwick introduced me to Dave Goldman and Peter Rowe, who Burwick described on multiple occasions as his "non-lawyer partners." [redacted] To my knowledge, Burwick is the only lawyer at his firm.

7. During our discussions, Burwick expressed interest in my experience as a federal prosecutor. I let him know that, in addition to myself, I was talking to another former federal prosecutor about joining me as a partner in the near future. Burwick informed me that he began working as a litigator only 18 months earlier because he realized there was a need for litigation services in the cryptocurrency space. During that time, he built a small team and a marketing presence that was directed at earning the trust of victims in fraudulent cryptocurrency investments,

who he described as a skeptical group. To my knowledge, Burwick filed his first case late in 2024 and has no experience managing complex litigation or even engaging in some of the key activities that comprise complex litigation, such as drafting briefs or conducting hearings, formal witness examinations, or trials. In the cases he filed, he almost always did so together with more experienced litigation counsel, and he was only admitted to the Southern District of New York, his firm's home federal district, on the day of the TRO conference in this matter. In my opinion, Burwick Law is essentially a cryptocurrency investigations and marketing operation with a focus on building and maintaining a social media presence and a desire to develop a litigation profile but without any real experience as of yet.

8. The essence of the arrangement between Treanor Devlin Brown and Burwick Law was that Burwick Law would contribute blockchain expertise and a system for managing communications with class members and Treanor Devlin Brown would serve as lead litigation counsel. At some point, I informed Burwick that the former federal prosecutor I was in discussions with was Arlo Devlin-Brown, a partner at a large law firm, and I introduced him to Burwick. Burwick repeatedly indicated that he was impressed by Treanor Devlin Brown's litigation capabilities and readily and repeatedly noted his comfort with Treanor Devlin Brown serving as lead counsel, which Burwick Law would support with its subject matter expertise. We went forward on that basis.

[redacted]

[redacted]

[redacted]

12. Notwithstanding the success of Treanor Devlin Brown in advancing the interests of Hurlock and the putative class, Burwick began seeking to terminate the firm's involvement in the case before the Court had even docketed the TRO. Burwick tried connecting with me on the evening of May 29, but was unable to do so since I was on a long flight. He then sent me a message

through Devlin-Brown indicating that he was ending the co-counsel arrangement. At 9:00 a.m., the following morning (May 30), Burwick sent a formal, written termination letter that purported to terminate the role of Treanor Devlin Brown as co-counsel to Hurlock and stated "do not take any further action or contact the court without our knowledge and written consent." Seventeen minutes later he followed with an e-mail stating "Now that you are no longer co-counsel on the matter, please do not take any further action or contact the court without our knowledge and written consent." [redacted]

13. As set forth below, it is clear Burwick's actions in seeking the removal of Treanor Devlin Brown from this case were precipitated by the fact that he could not accept appropriate criticism [redacted]

[redacted] Portnoy is a social media figure with a wide following. He has publicly called meme coins "Ponzi schemes, and I don't mean that in a negative way." In February 2025, Portnoy began posting about his ability to inflate the price of meme coins—which has allowed Portnoy to make tremendous profits. Portnoy then spent over a week with Hayden Davis so Davis could help Portnoy launch a token for his media company Barstool Sports, which Portnoy described as "like a good way, almost, to go public without having to do the paperwork." Portnoy described spending "a week, a week and half, hours with Hayden Davis, peppering him with every question you could have." During this period, Davis told Portnoy that the $LIBRA coin would be launching and sent him "free coins from [President] Milei [] in exchange for tweeting about the launch." In his own words, Portnoy was an "inch away" from promoting $LIBRA but backed out at the last minute because Davis wouldn't let him disclose that he was being compensated for the promotion.

16. Although Portnoy did not tweet about $LIBRA, he decided to use his inside information about the planned launch to capitalize on it. He invested approximately $5 million of his own money into $LIBRA, thinking that "it was going to go nuts" after the Milei promotion and

he was "gonna make like $100 million." Portnoy ended up losing money, however, because he was in Manhattan attending a Saturday Night Live event and failed to dump the tokens he bought before the price crashed within 90 minutes of launch. To compensate Portnoy for his $LIBRA investment losses, Davis sent him approximately $5 million in cryptocurrencies late at night after the $LIBRA launch. Davis sent these funds to Portnoy from a wallet that had links to other pump-and-dump schemes that Davis and other defendants had conducted on Meteora. Portnoy was then confronted by a reporter who saw the blockchain transfer and asked if he had been reimbursed, which he then publicly admitted. Both Davis and Portnoy later discussed the transfer of those funds extensively in publicly-available recorded videos. Portnoy called what had been returned to him "stolen funds" and acknowledged that Davis probably should not have sent them back to him.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

23. On the morning of the May 29, 2025, I traveled on an early morning flight to Dallas, and when I landed, I received media inquiries about the TRO, which was surprising to me because the order had not yet been docketed. I ran a news search on my phone and only then learned that Burwick had started discussing the TRO with the media in the early afternoon of May 28, less than 24 hours after we appeared before the Court for the conference and more than 24 hours before the motion papers and TRO would be filed on ECF and docketed. (Motion Papers docketed on May 29 between 3:49 and 4:13 p.m.; TRO docketed on May 29 at 5:57 p.m.). From a review of posts on X and news stories, it appears that Burwick began discussing the issuance of the TRO by the

Court as early at 1:24 p.m. on May 28, 2025. *See* Burwick Law posts on X (located at https://x.com/BurwickLaw/status/1927793106784555362) ($LIBRA update with news from Burwick Law on the Court's Order and including subsequent posts from Burwick Law). The disclosures from Burwick Law generated multiple news reports about a TRO that the Court had not yet publicly released. *See, e.g.,* "Circle Freezes $58 million in USDC Linked to Libra Scandal," Coin Desk, May 28, 2025 at 6:39 p.m. ("Burwick Law stated that the freeze was due to a temporary restraining order issued at their request, supported by Tim Treanor."); DeepNewz, "Circle Freezes $57 Million USDC Linked to Libra Team Following Burwick Law Court Order in LIBRA Memecoin Scam Lawsuit," The Defiant, May 28, 2025 ("Circle, the issuer of the USDC stablecoin, has frozen approximately $57 million in USDC linked to the Libra team. This action was taken in response to a U.S. court order requested by Burwick Law as part of a lawsuit involving individuals including Hayden Davis, Kelsier, Ben Chow, and Meteora. The freeze targeted two wallets associated with an alleged scam involving the LIBRA memecoin."); Danny Park, "Circle freezes $58 million in USDC linked to libra memecoin scandal: Arkham," The Block, May 28, 2025 ("Burwick Law . . . claimed that the U.S. District Court for the Southern District of New York granted its temporary restraining order to freeze the wallets."). Burwick's disclosures also generated numerous reports on X that received hundreds of comments. *See, e.g.*, Solana News (located at https://x.com/solananew/status/1927803712895889629) (reporting breaking news about Court issuing TRO at 3:06 p.m. on May 28, 2025); Degen News (located at https://x.com/DegenerateNews/status/1927805529717395857) (reporting at 3:13 p.m. on May 28, 2025: "New: @BurwickLaw POSTS ON X "YESTERDAY THE U.S. DISTRICT COURT (SDNY) GRANTED BURWICK LAW'S EMERGENCY TRO, SUPPORTED BY CO-COUNSEL TIM TREANOR, FREEZING ~ $57.65 M USDC HELD AT CIRCLE."); Abhi

(located at https://x.com/0xAbhiP/status/192780895343570576) (reporting on the Court issuing TRO at 3:27 p.m. on May 28, 2025); Dev.Eth. (located at https://x.com/Dev_eth0/status/1927813330644639861) (reporting at 3:44 p.m. on May 28, 2025, on the Court issuing TRO). I was concerned to see my own name included in these early media reports and was amused, but not surprised, to see that Burwick largely claimed credit for securing the TRO in a manner that simply was not accurate.

[redacted]

At 9:00 a.m., the following morning (May 30), Burwick e-mailed a letter purporting to terminate Treanor Devlin Brown as co-counsel and stating, "do not take any further action or contact the court without our knowledge and written consent." [redacted]

[redacted]

26. On June 3, 2025, I received an email from Burwick Law's outside counsel attaching a letter purportedly from Omar Hurlock and a pre-drafted Motion for Leave to Withdraw to submit to the Court. The letter itself was dated May 30, 2025—the same date as Burwick's letter terminating the co-counsel term sheet, and it reflected a similar format, suggesting that the letters were prepared at the same time. The letter, however, was not signed by Hurlock until June 2, 2025, and purported to "terminate The Treanor Law Firm PLLC ("Treanor") and all attorneys formally or informally associated therewith." The letter further stated: "In addition, I hereby withdraw and terminate the consent that I provided to have Treanor act as co-counsel in the Matter pursuant to an Addendum to Burwick Engagement Letter dated May 20. 2025 ("Addendum") and such Addendum shall have no further force and effect, effective immediately." [redacted] The pre-drafted Motion for Leave to Withdraw was pre-populated with my electronic signature and a So Ordered line was provided for the Court's signature. I was given instructions by Burwick's outside counsel to execute the motion informing the Court of my withdrawal and the withdrawal of Treanor Devlin Brown from the case and to submit it to the Court by June 6, 2025. I did not do so, and [redacted] decided to file this motion.

INTERIM CLASS COUNSEL

27. Based on the foregoing, I believe that it would be prudent, not only for the Court to hold a hearing regarding the circumstances surrounding the purported termination of Treanor Devlin Brown, but also for the Court to appoint Treanor Devlin Brown to be interim class counsel, pursuant to Fed. R. Civ. P. 23(g)(3), to protect the interests of the putative class even at this early stage. With a preliminary injunction hearing pending, there is substantial risk that the class interests will not be properly protected, and there are more general risks that early strategic decisions, including those related to amended pleadings, discovery, and preservation of claims, will be made by lawyers whose performance or conflicts of interest undermine the integrity of the proceedings.

28. I seek to have Treanor Devlin Brown appointed as interim class counsel in this matter because I believe the firm is well-qualified for the role. As its managing principal, I have significant experience in complex litigation matters, especially those involving sophisticated financial fraud schemes. Arlo Devlin-Brown, who joined me as a partner in the firm on June 19, has similar experience.

29. I have been practicing law for almost thirty years. For almost nine years, I served as an Assistant United States Attorney for the Southern District of New York. I was a member of the Organized Crime and Terrorism Unit for many of those years, and in that capacity investigated and prosecuted numerous racketeering, terrorism, and money laundering cases, including multiple financial fraud cases. I tried a dozen criminal cases in this District Court, including as lead counsel in three separate multi-month, multi-defendant prosecutions of the members of criminal organizations. Those trials and other matters involved many evidentiary hearings and innumerable formal witnesses examinations. In connection with the many cases I managed, I worked closely

with victims, including the victims of financial crime. On multiple occasions, I briefed and argued appeals before the Second Circuit Court of Appeals. I spent more than two years as Deputy Chief of the Organized Crime Unit, where I supervised a significantly broader range of racketeering, financial fraud, and money laundering cases than I handled myself as a member of the unit. As Deputy Chief, I supervised more than 20 senior prosecutors, criminal investigators and other professionals responsible for investigating and prosecuting a wide range of organizations engaged in criminal activity. Among the lines of investigation I personally initiated and led was a series of gambling, money laundering, and fraud cases against more than a dozen offshore internet gambling firms and the financial institutions that served them, many of which were publicly-traded in London. These cases were predecessors to the crypto-fraud cases of today as they involved early online criminal operations and included the first firms that offered web-based international electronic transfers which were often used to transmit criminal proceeds. Before I left the U.S. Attorney's Office, I secured the first convictions and corporate settlements in those matters and recovered more than $250 million in criminal proceeds. After I left, the investigations I initiated led to numerous other prosecutions, including for Ponzi scheme-like frauds, and ultimately the recovery by the Department of Justice of more than $3 billion. Arlo Devlin-Brown was a member of the Organized Crime unit when I was a supervisor and handled the most significant of these cases after my departure.

30. After I left the U.S. Attorney's Office, I became a partner at global law firm, Sidley Austin LLP, and was there for seventeen years until the end of 2024. During that time, I spent more than ten years as Global Co-Chief of the White Collar Crime and Investigations practice and managed many financial crime investigations and litigations, including: 1) defending a global bank in foreign-exchange rate manipulation investigations resulting in various corporate resolutions

with enforcement agencies around the world; 2) defending a LIBOR panel bank in multiple LIBOR-benchmark manipulation investigations; 3) serving for five years as lead counsel to the monitor of HSBC Bank, one of the largest banks in the world in one of the most complicated corporate compliance monitorships ever; 4) representing a global foreign bank that was under a monitorship in the U.S.; 5) conducing multiple internal investigations and defending soccer confederation, CONCACAF, in connection with the FIFA corruption prosecutions, recovering more than $200 million in remission for the global football community; 6) defending several major companies in government investigations of potential violations of money laundering laws and the Foreign Corrupt Practices Act and obtaining declinations of prosecution and negotiating corporate resolutions; and 7) representing and advising the Federal Reserve Bank of New York in connection with its relief programs in the aftermath of the 2008 financial crisis. I also defended parallel civil litigations in connection with several criminal matters I managed, and I defended major companies against individual civil RICO and Anti-Terrorism Act cases. I also represented clients in significant cryptocurrency cases, including defending the "Bitcoin King" in the Silk Road prosecutions and representing a portfolio manager of Three Arrows Capital, the crypto hedge fund that collapsed and contributed to the crypto winter in 2022.

31. Arlo Devlin-Brown joined me as a partner on June 19, 2025, at which time the firm was renamed Treanor Devlin Brown PLLC. Devlin-Brown is an experienced litigator with over 25 years of practice prosecuting and defending complex financial fraud cases. He was until recently a partner at Covington & Burling. His extensive litigation experience includes fifteen federal jury trials and numerous appeals before the Second Circuit. Devlin-Brown served in the U.S. Attorney's Office for the Southern District of New York for ten years, including as an AUSA in its Securities Fraud Unit and ultimately as Chief of its Public Corruption Unit. As a Securities

Fraud Prosecutor, Devlin-Brown was responsible for an enforcement action against JPMorgan Chase relating to its handling of accounts linked to Bernie Madoff and resulting in the forfeiture of $1.7 billion dollars used to compensate victims of the Madoff Ponzi scheme. He was also responsible for the prosecution of preeminent hedge fund SAC Capital and a number of its portfolio managers, an action that resulted in a $1.8 billion criminal fine to SAC Capital. In the same case, Devlin-Brown successfully prosecuted the highest dollar insider trading scheme ever charged, obtaining a conviction of the responsible portfolio manager following trial. Devlin-Brown worked together with Treanor in the Department of Justice's prosecution of the world's largest offshore illegal gaming operators, resulting in billions of dollars in financial recovery and the closure of sites that in addition to illegal gaming activities were operating Ponzi-style schemes with player deposits. As Chief of the Public Corruption Unit, Devlin-Brown supervised more than 20 prosecutors, criminal investigators and other professionals responsible for investigating and prosecuting a wide range of domestic and foreign corruption offenses and cases involving fraud against the government.

32. Devlin-Brown joined Covington & Burling LLP in 2015 as a partner in its New York office. There, he represented companies in high stakes government investigations and related civil litigation. He is ranked in Band 2 of Chambers and Partners for White Collar criminal defense. His clients included global financial institutions, Fortune 100 companies, White House officials, CEOs and law firm partners and his matters often involved complex financial frauds. He also represented numerous clients in the fintech space, including cryptocurrency lending platforms and 15 current and former employees of FTX in the DOJ's prosecution of the largest cryptocurrency-related fraud case charged to date.

[redacted]

[redacted]

CONCLUSION

34. I believe that the relief I have requested with this Motion is warranted at this time.

[redacted]

[redacted]

Dated: June 23, 2025

/s/Timothy J. Treanor
Timothy J. Treanor