# BURWICK LAW
*1 World Trade Center, 84th Fl.*
*New York, NY 10007*

March 23, 2026
**VIA ECF**

The Honorable Judge Jennifer L. Rochon
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

RE: *Hurlock v. Kelsier Ventures, et al.*, No. 25 Civ. 03891 (JLR)

Dear Judge Rochon:

Plaintiffs respectfully submit this letter in response to the letter filed by Defendant Benjamin Chow and non-party Dynamic Labs Limited on March 13, 2026 (Dkt. 269), which cites *Risley v. Universal Navigation Inc.*, 2026 WL 572065 (S.D.N.Y. Mar. 2, 2026) ("*Risley III*"), as supporting dismissal of the complaint and denial of Plaintiffs' motion for leave to amend.

In *Risley*, the court addressed a decentralized exchange protocol whose developer had no contact with the perpetrators who used it, no knowledge of their identities, and no involvement in the creation or marketing of the tokens at issue. Unsurprisingly, it declined to hold that developer liable. Every holding rested on the assumption that the people who built the platform had nothing to do with the people who used it to defraud investors.

Benjamin Chow, co-founder and CEO of Meteora, personally designed the smart contracts while publicly claiming the system was permissionless and immutable. (AC ¶ 21.) He directed at least fifteen token launches, including $MELANIA and $LIBRA, tokens that traded on the names of the First Lady and the President of Argentina, with his co-conspirator Hayden Davis, who boasted in chat logs provided to Plaintiffs by a whistleblower that he was following Chow's instructions. (PSAC ¶ 114.) For $LIBRA alone, over $110 million was extracted in a matter of hours. (PSAC ¶ 255.)

*Risley III* drew the line between "merely creating an environment where fraud could exist" and "affirmatively assisting in its perpetration." *Id.* at *9. Defendants Chow and Meteora are the perpetrators. The holding in *Risley III* stands for the proposition that the perpetrators of a racketeering enterprise can and should be held liable for their conduct.

## I. Defendants Did Not Simply Provide a Platform—They Weaponized It.

*Risley III* noted that "[s]imply providing the platform on which a fraud takes place is not the same as substantially assisting that fraud." *Id.* at *9. That holding applied to a platform that was genuinely permissionless—one anyone could use without the developer's knowledge or approval. *Id.*

Meteora was not that platform. Its own documentation told launchers that customized fee structures and pool configurations required the Meteora team's direct involvement: "You can't do it on your own." (AC ¶ 142.) That is the opposite of permissionless. During launches, Defendants froze public trading so retail buyers' transactions silently failed while 150 insider

1

wallets accumulated tokens at suppressed prices. (AC ¶¶ 195–197; PSAC ¶¶ 215–218.) That is not a neutral platform being misused by third parties. It is the platform's operators weaponizing their own infrastructure. On a planning call, Chow made the purpose of the deception explicit: "no one will play the game if they see, like, 90% of the supply already locked up." (AC ¶¶ 207–208.) During the $MELANIA and $LIBRA launches, Chow and Davis were together "24/7" travelling internationally (PSAC   163), personally directing the very launches Defendants now attribute to independent third parties.

**II. The "Unidentified Third-Party Issuers" Are Named Defendants in This Action.**

*Risley III* held that "Plaintiffs cannot hold Defendants liable for the misconduct of the unidentified third-party issuers," *Id.* at *5, and that even "a veritable forest of red flags" cannot supply actual knowledge of specific frauds. *Id.* at *6. These holdings depend on a separation between the platform operator and the people who committed the fraud. The *Risley III* plaintiffs failed because the issuers were anonymous, the developer had no contact with them, and the complaint contained no particularized facts raising a strong inference of actual knowledge. *Id.* at *6–8.

That separation does not exist here. The PSAC introduced the evidence that proves it. The PSAC identifies a six-step playbook that "recurred across tokens, times, and themes, proving a coherent, repeatable fraud rather than isolated events." (PSAC   93.) The steps: invent a story to induce investment, lock the supply, pay promoters to manufacture hype, rig the price, drain the money, start over. (*See* PSAC ¶¶ 46–83.) For $M3M3, Chow created and owned the planning spreadsheet—the "M3M3 Calcs Template"—modeling token economics to optimize the extraction. (AC ¶¶ 202–205.)

Blockchain forensics prove the same point from the other direction. The same central wallet funded both token creation and the insider wallets that purchased them first, across the launches at issue. (PSAC ¶¶ 131–179.) The same clusters controlled the deployer wallets, the sniper wallets, and the enterprise wallets. (PSAC   152.) The issuers were their own first purchasers—"an arrangement impossible in a fair or decentralized launch and conclusive of manipulation." (PSAC   141.) The people *Risley III* called "unidentified third-party issuers" are named Defendants in this action.

**III. Defendants' Enrichment Was Direct, Ongoing, and Sworn to Under Oath.**

*Risley III* dismissed unjust enrichment because the platform developer never received fees—the switch "ha[d] not been turned on"—and found the theory that the developer "'played the long game'" to be "far too causally attenuated." *Id.* at *13. The *Risley III* plaintiffs failed because the SAC contained "no allegations of a specific, direct benefit": Labs had never activated its fee switch, and no plaintiff alleged paying an interface fee. *Id.*

Chow's switch was on and running. He admits under oath that he "has a claim on a portion of [non-party] DLL's revenues, including a portion of any DLL revenues from trading fees received from Meteora user transactions." (AC   40.)

DLL charged four times more on launch pools than on standard trading: a 20% fee versus the standard 5%. (AC   147.) This was premium pricing on the exact product used to perpetrate the fraud. DLL's pricing mechanism automatically increased fees during periods of high volatility. The enterprise's freeze-and-snipe operations created exactly those conditions. (*Id.*) Fees flowed automatically to an account DLL controlled. (AC   52.) Despite public exposure of

the scheme, DLL "continued to retain the fees." (PSAC ¶¶ 365–366.) The automated transfers continue to this day. (AC ¶¶ 28, 325.)

**IV. Defendants Themselves Made the Misrepresentations Investors Relied On.**

*Risley III* dismissed claims under NY GBL § 349 because the complaint "does not allege any affirmative misstatements on the part of Defendants" and "repeatedly ties [p]laintiffs' injuries to the issuers' fraudulent misrepresentations and omissions, and not [d]efendants' acts." *Risley III*, at *10–12. Defendants invoke the same reasoning: "Plaintiffs fail to allege that… Mr. Chow or 'Meteora' engaged in any misleading acts or practices." (Dkt. 269 at 2.) The only statement the *Risley III* court could attribute to the platform developer was a Discord bot's remark about security measures, which was neither false nor misleading. *Id.* at *10–11. There was no deceptive act to anchor liability.

Here, the complaints identify deceptive acts attributable to Defendants themselves. For example, the $LIBRA token distribution plan, published on the VLL Website, represented to investors that 50% of supply would fund Argentine entrepreneurship, 20% would go to the treasury, and 30% to liquidity. (AC ¶¶ 258–261.) Investors understood this to mean the launch team was publicly reserving 20% for itself and would not secretly acquire additional supply. (AC ¶ 261.) That representation was false.

Defendants used insider wallets to acquire far more than the disclosed allocation, hours after publication. (AC ¶¶ 265–279.)

Similarly, the causal chain that was absent in *Risley III* is present here. In *Risley*, injuries flowed from unidentified issuers' conduct, not the Defendants' acts. Here, Defendants did not merely host someone else's fraud. They configured each launch, controlled the liquidity, funded the insider wallets, and extracted the proceeds. Investors' losses are not "too causally attenuated" from Defendants' conduct. They are the direct result of it.

Defendants have sought to maintain this separation in the litigation itself. Chow and Yong submitted sworn declarations to this Court portraying themselves as passive developers of 'autonomous software,' the very characterization that sustains the *Risley III* analogy Defendants now invoke. The PSAC alleges those declarations have been "forensically disproven": "the funding, timing, and routing show [Chow] orchestrated deployments and opening-window buys." (PSAC ¶¶ 14, 163.) In effect, every holding Defendants cite cuts against them when applied to the facts alleged by Plaintiffs.

Respectfully submitted,

By: */s/ Max Burwick*
Max Burwick
1 World Trade Center, 84th Fl.
New York, NY 10007
(646) 762-1080
max@burwick.law

*Counsel for Plaintiffs Omar Hurlock*
*& Anuj Mehta*
