**BURWICK LAW, PLLC**
43 West 43rd Street, Suite 114 · New York, New York 10036 · (646) 762-1080

September 15, 2026

**VIA ECF**
The Honorable Jennifer L. Rochon
United States District Judge

**RE:** ***Hurlock v. Kelsier Ventures, et al.*, No. 25 Civ. 03891 (JLR)**
**Notice of Supplemental Authority:** *Aguilar v. Baton Corp. Ltd.*, No. 25-cv-880 (CM) (S.D.N.Y. Aug. 31, 2026), and *Balfour-Browne v. Eden Fine Art NY Inc.*, No. 25-cv-1142 (MMG) (S.D.N.Y. Sept. 3, 2026)

Dear Judge Rochon:

Plaintiffs write to bring to the Court's attention two decisions issued after briefing closed on the motions to dismiss the First Amended Complaint ("FAC," Dkt. 115) (Dkts. 170–176, 222) and the motion for leave to amend (Dkt. 203). Burwick Law represents the plaintiffs in both. Together they reject the core of every pending motion.

*Aguilar v. Baton Corp. Ltd.*, No. 25-cv-880 (CM), slip op. at 1, 3 (S.D.N.Y. Aug. 31, 2026) (McMahon, J.), ECF No. 184 (Ex. A), sustained RICO claims against the operator and founders of Pump.fun, which, like Defendant Meteora, is a platform for launching and trading memecoins on the Solana blockchain.

*Balfour-Browne v. Eden Fine Art NY Inc.*, No. 25-cv-1142 (MMG), slip op. at 1–4, 11 (S.D.N.Y. Sept. 3, 2026) (Garnett, J.), ECF No. 21, (Ex. B), sustained a GBL § 349 claim by a purchaser of NFTs marketed with perks that never materialized.

**I. Aguilar sustained RICO claims on allegations mirroring the FAC's (Counts IV and V).**

The *Aguilar* plaintiffs alleged that Pump.fun's operator and founders, working with paid promoters ("KOLs"), gave insiders advance access to tokens before public promotion and sold into the resulting retail demand, all while Pump.fun "represented its token launches as 'fair.'" *Aguilar*, slip op. at 2, 5, 7–8.

The FAC alleges the same playbook: Defendants marketed the $M3M3 and $LIBRA launches as fair and Meteora as "permissionless and immutable" while insider wallets secretly took most of each token's supply before the public could trade (FAC ¶¶ 5–7, 21, 193–197, 258–265). Judge McMahon sustained the RICO and conspiracy claims against the platform operator and every founder, slip op. at 3, 70, 73, rejecting the four arguments on which Defendants' motions depend.

**A. A founder who builds the insider system is a RICO participant, however he labels his role.**

Chow's defense is that he merely "provided technical support services" (Dkt. 176 at 28); he and DLL invoke *Risley* to cast Meteora as a neutral tool (Dkt. 269). *Aguilar* rejected that defense from Pump.fun's own technology officer, who "performed technical work on the platform" but, as alleged, "did more than that." Slip op. at 42. The court held that the operator, officers, and promoters formed an enterprise and each officer satisfied *Reves*: the CEO "directed platform strategy and token campaigns," the product officer "coordinated platform operations and KOL management," and the chief technology officer "directed the technical integration and execution systems on which the alleged trading scheme depended." *Id.* at 35–37. It inferred the technology officer's scienter from his building "priority pathways relied upon by insiders." *Id.* at 42. (internal

quotation marks omitted). It dismissed only the Solana defendants, who supplied the blockchain network and were not shown to know of the insider advantages. *Id.* at 43–45.

Chow is the technology officer, not Solana. He "personally designed many of the smart contracts while publicly claiming the system was permissionless and immutable" (FAC ¶ 21), ran the "Meteora team" that alone could change launch-pool settings (¶¶ 40, 142; see ¶ 381), modeled the $M3M3 extraction in a spreadsheet (¶¶ 202–204), and told Davis that "no one will play the game if they see, like 90% of the supply already locked up" (¶ 207).

**B. "Fair launch" representations are actionable facts, and the wires that administer the scheme are predicates.**

The Kelsier Defendants dismiss the alleged misstatements as "immaterial puffery" (Dkt. 174 at 17–18). *Aguilar* forecloses that label. It held that a CEO's posts calling Pump.fun an "unruggable fair launch platform" and "as much of an even playing field as it gets" "did not merely express [his] subjective enthusiasm for the platform" but, as alleged, "communicated something factual about the manner in which tokens were launched – namely, that there were no favored participants who might have some undisclosed advance access over other members of the investing public." Slip op. at 39 (internal quotation marks omitted). A speaker who controlled that access "necessarily knew facts inconsistent with his representations." *Id.* at 40. And internal communications administering the insider system are predicate wires, because "the use of the wires in furtherance of a fraud need not itself contain the misrepresentation." *Id.* at 41–42. That analysis governs Chow's representations (FAC ¶ 21) and each Defendant's planning communications (¶¶ 197, 202–208, 388).

**C. A "legitimate business" that defrauds investors as its regular way of operating satisfies open-ended continuity.**

The Kelsier Defendants argue that the enterprise "is a legitimate business" and each launch was "fully executed within hours" (Dkt. 174 at 36–37). Pump.fun was a lawful business too; that did not save it. *Aguilar* found open-ended continuity where a platform that was "not inherently unlawful" repeatedly marketed launches as fair while "the same basic sequence – advance information and early acquisition, coordinated promotion, and selling into resulting retail demand – was used across multiple token campaigns beginning in 2024." Slip op. at 68–70. The FAC alleges the same "playbook" (¶¶ 9, 24), run in $M3M3 and again in $LIBRA eight weeks later, and pleads that these acts "were, and continue to be, Defendants' regular way of doing business" (¶¶ 392, 395).

**D. Fees and execution losses on fraud-induced trades are directly caused RICO injuries.**

The Kelsier Defendants argue that Plaintiffs' harms "depend on multiple independent market forces" and that reliance "is an essential element of the causal chain" (Dkt. 174 at 29). *Aguilar* rejected both.

*Aguilar* held that the platform fee on a fraud-induced transaction "followed directly from that transaction," that it is "of no moment" that officers did not personally pocket it, and that under *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008), a plaintiff "need not himself have received or relied upon the fraudulent communication, as long as the fraud directly caused his injury." Slip op. at 61. It likewise held that "execution losses" caused by an "insider-first execution" mechanism were directly caused RICO injuries. *Id.* at 59–60.

The FAC pleads both. Plaintiffs paid fees on trades they would not otherwise have made (¶ 394); those fees flowed to DLL (¶ 52), and Chow admits "a claim on a portion of" them (¶ 40). And a secret freeze caused retail orders to fail while insider wallets took 85% of the $M3M3 supply (¶¶ 195–197, 219–222).

**E. Aguilar also supports the conspiracy count.**

*Aguilar* inferred a § 1962(d) agreement from "coordinated participation in different parts of the same alleged scheme," with no express agreement alleged among the defendants. Slip op. at 71–72. The FAC pleads the agreement itself: the Kelsier and Meteora Defendants "agreed to secretly take control of 95% of the total $M3M3 token supply" (¶ 193).

**II. Balfour-Browne rejects Defendants' GBL territoriality and causation arguments (Counts VI and VII).**

The Kelsier Defendants argue that Plaintiff Anuj Mehta, a Virginia resident who bought $M3M3 (FAC ¶ 37), pleads no New York transaction, and that "emanation" of deceptive marketing from New York is insufficient (Dkt. 174 at 46); Chow agrees (Dkt. 176 at 23–24). *Balfour-Browne* holds the opposite.

*Balfour-Browne* held that the "in this state" requirement "is satisfied if some part of an underlying transaction in which a consumer is deceived occurred in New York," and found it met for a London resident who viewed nothing in New York, because purchasers had "to transact through, and send money to" a New York-based marketplace and because "deceptive advertisements emanated from New York" promising benefits the defendants did not intend to provide. Slip op. at 9–10; Compl. ¶ 11, *Balfour-Browne*, No. 25-cv-1142, ECF No. 1.

Hurlock traded from Brooklyn (FAC ¶ 38), and Chow ran Meteora "from New York, New York, where he resides" (¶ 40).

The court also rejected the Kelsier Defendants' argument here (Dkt. 174 at 29, 49–51) that the plaintiff never alleged viewing the statements. Where the complaint "assiduously chronicles" the posts, "the natural inference is that Plaintiff was exposed to at least some of the conduct described in the complaint." Slip op. at 10–11. The FAC pleads more: Mehta "purchased $M3M3 based on Defendant Chow's endorsement," and Hurlock bought $LIBRA "based on the seeming endorsement of Argentinian President Javier Milei, procured by Defendant Hayden Davis" (¶¶ 107–108). And "a 'price premium' for a unique feature that turns out not to exist is a cognizable injury under Section 349." Slip op. at 10; *see* FAC ¶ 415.

**III. Aguilar's unjust-enrichment dismissal turned on a pleading gap the FAC does not have.**

*Aguilar* dismissed unjust enrichment against Pump.fun's officers because the complaint alleged only that they "moved" corporate proceeds, not that any officer "personally received or retained" anything. Slip op. at 75–76. Chow, by contrast, swore in this action that he has "a claim on a portion of" DLL's revenues from Meteora trading fees (FAC ¶ 40), the very fees Plaintiffs paid (¶¶ 52, 394).

Respectfully submitted,
BURWICK LAW, PLLC
By: /s/*Rylan Maksoud*
Max Burwick
Rylan Maksoud
43 West 43rd Street, Suite 114
New York, NY 10036
Tel: (646) 762-1080
max@burwick.law
rylan.maksoud@burwick.law
*Counsel for Plaintiffs*