UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

DIEGO AGUILAR, KENDALL CARNAHAN, AND MICHAEL OKAFOR on behalf of themselves and all others similarly situated,

Plaintiffs,

-against-

25-cv-880 (CM)

BATON CORPORATION LTD, d/b/a PUMP.FUN, ALON COHEN, DYLAN KERLER, NOAH BERNHARD HUGO TWEEDALE, SOLANA LABS, INC., SOLANA FOUNDATION, JITO LABS INC., JITO FOUNDATION, ANATOLY YAKOVENKO, RAJ GOKAL, DAN ALBERT, AUSTIN FEDERA, LILY LIU, LUCAS BRUDER, BRIAN SMITH,

Defendants.

---------------------------------------------------------------- x

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS**

McMahon, J.:

Pump.fun is an online platform that allows users to create and trade "memecoins" on the Solana blockchain. The prices of these digital tokens can rise dramatically when they attract attention and new buyers, and fall just as quickly when that demand disappears.

Plaintiffs allege that the reality was quite different. In their telling, Defendants were operating a classic "pump and dump" scheme, using memecoins rather than shares of stock as the vehicle and favoring insiders at the expense of ordinary traders.[1]

---

[1] If this characterization is correct, then someone's ostensibly clever decision to name the business "Pump.fun" calls to mind the infamous "L.H.I.W., Inc." (for "Let's Hope It Works") used by Sun Oil when it pushed the edge of the legal envelope in its effort to carry out a hostile takeover of Becton Dickinson. *See Wellman v. Dickinson*, 475 F.

According to the complaint, Pump.fun insiders obtained positions in selected tokens before those tokens were made available to the public. Coordinated publicity then drew retail buyers into the market and drove prices upward, allowing the early purchasers to sell into the resulting demand. Baton Corporation Ltd., which operates Pump.fun, and its founders allegedly designed and operated this system. The Solana Defendants – Solana Labs, Inc., the Solana Foundation, Anatoly Yakovenko, Raj Gokal, Dan Albert, Austin Federa, and Lily Liu – allegedly ran the infrastructure that helped sustain it. Plaintiffs estimate that retail traders collectively lost between $4 billion and $5.5 billion trading Pump.fun tokens.

Plaintiffs assert two claims under the Racketeer Influenced and Corrupt Organizations Act (“RICO”), 18 U.S.C. §§ 1962(c) and (d), alleging that Defendants conducted the affairs of an enterprise through wire fraud, illegal gambling, and unlicensed money transmission, and conspired to do so. They also allege that twenty tokens offered through Pump.fun were unregistered securities, asserting Counts III and IV against Baton and its three officers under Sections 5, 12(a)(1), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77e, 77l(a)(1), and 77o.[2] Plaintiffs contend that the offers and sales of those twenty memecoins involved “investment contracts” within the rule of *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946), in that they constituted a “scheme involv[ing] an investment of money in a common enterprise with profits to come solely from the efforts of others.” Finally, they assert a claim for unjust enrichment against all Defendants under New York law.

---

Supp. 783, 790 (S.D.N.Y. 1979) (identifying “L.H.I.W., Inc. (an acronym for Lets Hope It Works), the corporation Sun formed to receive the BD shares”), *aff’d*, 682 F.2d 355 (2d Cir. 1982).

[2] The Solana Defendants are not named in the Securities Act counts.

Defendants' motions to dismiss are GRANTED IN PART and DENIED IN PART. Carnahan and Okafor have adequately pleaded substantive RICO and RICO conspiracy claims against Baton, Cohen, Kerler, and Tweedale. Aguilar has not adequately alleged a domestic RICO injury, and no Plaintiff has adequately pleaded either RICO claim against the Solana Defendants. The motions to dismiss Counts I and II are therefore DENIED as to the claims asserted by Carnahan and Okafor against Baton, Cohen, Kerler, and Tweedale and GRANTED as to Aguilar's claims against every moving Defendant and all Plaintiffs' claims against the Solana Defendants.

Plaintiffs' Securities Act claims (Counts III and IV), which are asserted only against the Baton Defendants, are dismissed. Plaintiffs have class standing to pursue those claims only as to the tokens they personally purchased – FRED and GRIFFAIN. But the alleged offers and sales of FRED and GRIFFAIN do not plausibly involve investment contracts within the meaning of *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99 (1946), because Plaintiffs have not pleaded a common enterprise. Counts III and IV are therefore DISMISSED as to FRED and GRIFFAIN on the merits. The claims relating to the other eighteen tokens are DISMISSED for lack of class standing.

Finally, Count V, for unjust enrichment under New York law, is DISMISSED as to every moving Defendant. As against Baton, Count V duplicates a portion of Plaintiffs' RICO theory concerning transaction fees and so is not cognizable under New York law as a separate claim. The complaint does not plausibly allege that Cohen, Kerler, or Tweedale personally received any benefit at Plaintiffs' expense. And the benefits allegedly received by the Solana Defendants are too attenuated to support a claim of unjust enrichment under New York law.

The unidentified Lead KOL Doe Defendants have not been served and are not before the Court on these motions. Plaintiffs are ordered to show cause why the claims against those Defendants should not be dismissed for failure to identify and serve them.

# I. BACKGROUND

## A. The Parties and the Relevant Technology

This case concerns transactions conducted on the Solana blockchain. Dkt. No. 129, Compl., ¶¶ 235–39. A blockchain is, in basic terms, a digital ledger maintained across a network of computers rather than by a single bank, exchange, or other central intermediary. *Id.*, ¶¶ 235–36. Transactions submitted to the Solana blockchain network are processed and recorded by computers known as "validators." *Id.*, ¶ 237. Users pay transaction fees on Solana using SOL, the network's native cryptocurrency. *Id.*, ¶¶ 237–38.

Defendant Solana Labs, Inc. is a Delaware corporation that develops software used to operate the Solana network. Dkt. No. 129, Compl., ¶¶ 68, 235–40. Plaintiffs allege that Solana Labs authored and maintains software, including the Solana Program Library and SPL Token Program, that enables users to create and transfer digital tokens on the network. *Id.*, ¶¶ 239–40. Anatoly Yakovenko is Solana Labs' Chief Executive Officer, and Raj Gokal is its President and Chief Operating Officer. *Id.*, ¶¶ 73–74.

Defendant Solana Foundation is a Swiss nonprofit organization that promotes the Solana network and holds substantial reserves of SOL. Dkt. No. 129, Compl., ¶ 69. Dan Albert is its Executive Director, Austin Federa is its former Head of Strategy, and Lily Liu is President of its Management. *Id.*, ¶¶ 75–77.

Defendant Baton Corporation Ltd. is an English company that operates Pump.fun. Dkt. No. 129, Compl., ¶ 70. Pump.fun began operating in January 2024. It provides a web-based platform through which users can create and trade digital tokens on Solana. *Id.*, ¶¶ 70, 609. Alon Cohen, Noah Tweedale, and Dylan Kerler are Pump.fun's co-founders. *Id.*, ¶¶ 78–80. Cohen serves as Chief Executive Officer, Tweedale as Chief Product Officer, and Kerler as Chief Technology Officer. *Id.*

Plaintiffs also name twenty-five unidentified "Lead KOL Doe Defendants." Dkt. No. 129, Compl., ¶¶ 82–83. "KOL" stands for "key opinion leader," a term Plaintiffs use for online promoters who direct attention toward tokens. *Id.* Plaintiffs allege that these unidentified Defendants promoted select Pump.fun tokens to retail purchasers while, in some instances, concealing both their compensation and their own preexisting positions in the tokens they promoted. *Id.*, ¶¶ 540–41.

**B. How Pump.fun Works**

Pump.fun tries to simplify the process of creating a cryptocurrency token. Dkt. No. 129, Compl., ¶¶ 137–39. Instead of designing a new blockchain or having to independently create the infrastructure through which a token will trade, a user can place his token directly on the Solana network. *See id.*, ¶¶ 137–39, 239. Plaintiffs characterize this as a "one-click" process that permits users with little technical expertise to launch large numbers of new tokens, many of them "memecoins." *Id.*, ¶¶ 239, 437.

A user ordinarily interacts with Pump.fun through a cryptocurrency "wallet." *See* Dkt. No. 129, Compl., ¶¶ 235–39. A wallet is software that enables its user to hold digital assets and authorize transactions on a blockchain. *Id.*, ¶¶ 235–39. A wallet's public address identifies where digital assets can be sent, while its private credentials allow the user to authorize transfers from that wallet. Once a wallet is connected to Pump.fun, a user can spend SOL to purchase a token or receive SOL when selling one. *See id.*, ¶¶ 237–39, 634.

Pump.fun executes these transactions through computer code rather than through a conventional broker. Dkt. No. 129, Compl., ¶ 634. Plaintiffs allege that, when a purchaser sends SOL into Pump.fun's trading mechanism, a smart contract automatically issues – or "mints" – the corresponding tokens. *Id.* When a holder sells, the smart contract removes – or "burns" – the

tokens and returns SOL. *Id.* A "smart contract" is simply computer code that automatically carries out predefined instructions when specified conditions are met. *See id.*, ¶¶ 239, 634.

The price at which Pump.fun executes these transactions is determined by a "bonding curve." Dkt. No. 129, Compl., ¶¶ 137–39. Under the process alleged in the complaint, the programmed price of a token increases as additional tokens are purchased and decreases as holders sell. *Id.*, ¶¶ 137–39, 547. The first purchasers therefore obtain tokens at lower prices than purchasers who arrive after substantial buying has occurred. *Id.*, ¶ 547.

How tokens are transacted is easier to understand by example. Suppose a newly created token begins trading at a very low price. A series of purchases moves the token upward along the bonding curve, so that each successive purchaser generally pays more than those who came before. *See* Dkt. No. 129, Compl., ¶¶ 137–39, 547. If buying continues, an early purchaser can sell at the higher prevailing price. *See id.*, ¶ 547. Conversely, substantial selling will push the programmed price downward. *Id.* The timing of a trade can therefore matter considerably. A trader who buys before a surge in demand stands a greater chance of profiting, while a trader who buys near the top and sells after demand collapses will suffer a substantial loss. *See id.*, ¶¶ 98–103, 137–39, 547. Execution speed can greatly affect which traders obtain the most favorable prices when demand is changing rapidly. *Id.*, ¶¶ 98–103, 240.

Pump.fun earns money from this trading activity regardless of whether a particular trader makes or loses money. Plaintiffs allege that Pump.fun charges a one-percent fee on every purchase and sale executed through Pump.fun. Dkt. No. 129, Compl., ¶¶ 70, 105. Transactions on Pump.fun also require payment of network fees in SOL for processing on the Solana blockchain. *Id.*, ¶ 237.

Plaintiffs allege that selected participants were secretly given an opportunity to obtain tokens before they were made available to ordinary purchasers, that Defendants then helped generate demand for those tokens, and that favored participants sold after ordinary retail purchasers entered the market. Dkt. No. 129, Compl., ¶¶ 95–105, 375–84. Plaintiffs contend that this occurred while Pump.fun represented its token launches as "fair" and open on equal terms to all users. *Id.*, ¶¶ 375–84.

**C. Plaintiffs' Alleged "Fair Launch" Scheme**

Plaintiffs attribute the conduct described above to an association they call the "Solana-Pump.fun Racketeering Enterprise" (the "Enterprise"). Dkt. No. 129, Compl., ¶¶ 535–36. According to the complaint, the Enterprise included Baton and its founders, Solana Labs and the Solana Foundation and their principals, the Lead KOL Doe Defendants, and other unidentified participants who allegedly coordinated their activities. *Id.*, ¶ 536.

Plaintiffs allege that the Enterprise operated through a hierarchy in which access to information depended on a participant's place in the organization. *Id.*, ¶¶ 93–123, 540. At the top was "Leadership," which allegedly included the Pump.fun founders and Solana executives. These individuals allegedly made decisions about which tokens would be promoted and monetized. *Id.*, ¶¶ 106–12. "Operations Command" allegedly translated those decisions into individual campaigns and recruited and managed the KOLs who promoted the selected tokens. *Id.*, ¶¶ 113–15. Lower levels included "Operational Cells," other promoters, and "Friends and Family" networks that received information as a campaign progressed. *Id.*, ¶¶ 116–23. In the complaint's words, "Strategic decisions flowed downward" while "Profits flowed upward." *Id.*, ¶ 7.

Within that hierarchy, Plaintiffs say that token campaigns followed a recurring pattern consisting of "three structural prerequisites." Dkt. No. 129, Compl., ¶ 134.

Selected participants first received advance information that allowed them to acquire a token ahead of the market – *i.e.*, before it was widely promoted. *Id.*, ¶¶ 25–26, 130–43. Plaintiffs refer to this practice as "pre-positioning." *Id.*, ¶ 25. They allege that participants sometimes spread their purchases among different wallets or "bundled" transactions so that multiple purchases could be executed at or near the beginning of a token launch. *Id.*, ¶¶ 130–43. Those who knew which token would soon be promoted could establish positions before the expected influx of public buyers.

Promotion followed. Plaintiffs allege that Pump.fun recruited KOLs to publicize selected tokens and, in some instances, gave them compensation or insider information that was not disclosed to their audiences. *Id.*, ¶¶ 145–49, 199–205. Certain agreements allegedly required KOLs to make their promotion of particular tokens appear "organic." *Id.*, ¶ 203. Other promoters and private networks then amplified the same narrative on social media, which Plaintiffs say made what was actually a coordinated publicity campaign appear to be spontaneous interest in the token. *Id.*, ¶¶ 119–23, 199–205.

The final step was selling the positions purchased earlier. Plaintiffs allege that those sales were managed so that early participants could reduce their holdings while promotional activity continued to attract new purchasers. *Id.*, ¶¶ 29–30, 164–89. Rather than sell simultaneously and cause an immediate decline in price, participants allegedly staggered their exits as retail demand entered the market. *Id.*, ¶ 29. Plaintiffs call those later purchasers "exit liquidity," because their purchases supplied the demand into which earlier holders could sell. *Id.*, ¶¶ 18–30.

The complaint assigns different roles in this alleged arrangement to the Pump.fun and Solana Defendants. Baton and its founders allegedly controlled the Pump.fun platform and its promotional apparatus, while KOLs allegedly converted advance information into public demand.

*Id.*, ¶¶ 540–41, 548–50, 554. Plaintiffs allege that the Solana Defendants supported the arrangement by providing the technical infrastructure on which Pump.fun operated, assisting Pump.fun with transaction-processing issues, and promoting Pump.fun activity on the Solana network. *Id.*, ¶¶ 225, 230–45, 551–53. Whether these allegations establish that the Solana Defendants actually participated in or directed the affairs of the alleged Enterprise is a disputed legal question addressed below.

Plaintiffs allege that this basic playbook was repeated across numerous Pump.fun token campaigns beginning in 2024. *Id.*, ¶¶ 542–43. Their most detailed account of how the scheme allegedly worked in practice concerns a token called "COPE." *Id.*, ¶¶ 257–311.

### D. The COPE Case Study

COPE was a memecoin created in early 2024. Before August 2025, COPE had attracted little attention. Its developer had promoted the token on social media for approximately seventeen months, but the token had generated little trading activity. Dkt. No. 129, Compl., ¶¶ 258–60. Plaintiffs allege that Leadership selected COPE for promotion because the developer's persistence could be turned into a compelling story about an obscure creator who continued working on an unsuccessful project until the Pump.fun community finally rewarded him. *Id.*, ¶¶ 259–62.

Plaintiffs allege that the story was misleading from the outset. According to the complaint, the developer (who is not identified and is not a party to this lawsuit) had previously launched several versions of COPE. After attracting purchasers, the developer sold his holdings and relaunched the token under a new address. *Id.*, ¶ 263. The Enterprise (exactly who associated with the Enterprise is not alleged) purportedly directed him to delete evidence of those earlier versions so that COPE would appear to have been "a single and continuously unsuccessful

project." *Id.*, ¶ 264. Plaintiffs allege that the developer complied by deleting posts showing the earlier launches. *Id.*, ¶ 265.

The alleged trading activity began before the public campaign. Plaintiffs say that Operations Command distributed COPE's identifying contract address to (unidentified) selected participants, assigned (unidentified) KOLs to promote the token, and provided instructions about when participants could sell. Dkt. No. 129, Compl., ¶ 267. The complaint alleges that, "Each tier acquired COPE before the tier below received the contract address needed to transact." *Id.*, ¶ 268. W-2, a confidential witness whom Plaintiffs describe as a prominent KOL with direct communications with Cohen, allegedly explained that the ordinary practice was for the person launching a token to share it first with an "inner circle," after which the information moved outward through private groups on Telegram, a messaging application, before the public became aware of the token. *Id.*, ¶ 269 & n.4.

By mid-August 2025, Plaintiffs allege, insiders had accumulated COPE through multiple wallets while disguising the concentration of their holdings. *Id.*, ¶ 274. Because those purchases occurred before the promotional campaign addressed to the general public, the alleged insiders acquired their positions while COPE remained near the lower end of its bonding curve. *Id.* Plaintiffs contend that this gave them the supply advantage described above before retail demand emerged. *Id.*, ¶¶ 272–74.

The promotional campaign then began. On August 27, 2025, a Pump.fun KOL known as Orange promoted COPE to his audience. His post stated, "Haven't been excited about a coin in a long time," described COPE as "a real success story" involving "A dev who kept pushing for 17 months," and ended with "Don't $cope later." Dkt. No. 129, Compl., ¶ 287. Plaintiffs allege that the post received approximately 25,900 views and that COPE's price more than doubled within

minutes of the post and related promotional activity. *Id.*, ¶¶ 287–88. Over the next twenty-four hours, its market capitalization allegedly increased by approximately 489 percent, reaching about $17 million. *Id.*, ¶ 289. By the end of August, however, COPE had lost almost all of that value. *Id.*, ¶ 290.

Plaintiffs attribute the decline to the final stage of the alleged scheme. CW-2 described the Enterprise's usual practice as allowing "the community [to] hold supply, pump the price up, then exit quickly," producing "a fast spike followed by a sustained bleed down." Dkt. No. 129, Compl., ¶ 291. One Lead KOL identified as "Mitch" allegedly sold his COPE position relatively early in the price cycle. *Id.*, ¶ 292. Plaintiffs allege that even Mitch's subsequent public account of having sold too soon and "coping" with that decision became part of the promotional story surrounding the token. *Id.*

Promotion continued after COPE's initial surge in value followed by its initial drop in price. On September 4, a social-media account that Plaintiffs allege was paid by Pump.fun published an interview with the developer under the caption, "17-month grind for a memecoin that is pre-bonded is next level dedication." Dkt. No. 129, Compl., ¶¶ 297–98. The official COPE account responded that "it's been a journey full of cope and resilience of trenching 17 months with just a dream." *Id.*, ¶ 300. Plaintiffs contend that these posts reinforced the narrative the campaign was designed to create, namely that an ordinary developer had persisted for seventeen months before the community spontaneously discovered his token. *Id.*, ¶¶ 296–300.

Plaintiffs offer COPE as their principal illustration of the alleged scheme in operation. In their telling, selected participants acquired the token before public promotion, coordinated publicity generated retail demand, and then sold into the demand they had created. *See id.*, ¶¶ 257–307. Plaintiffs further allege that a visible success story like COPE encouraged other users to

continue trading on Pump.fun in the hope of identifying the next token to experience a similar rise. *Id.*, ¶¶ 304–10.

None of the named Plaintiffs is alleged to have purchased COPE. Okafor's and Aguilar's identified transactions ended months before the August 2025 COPE campaign, and the complaint does not allege when Carnahan traded. *Id.*, ¶¶ 65–67, 258, 274–90; Dkt. No. 129-10, at 48.

### E. The Named Plaintiffs and Their Transactions

The three named Plaintiffs traded in only a small fraction of the millions of tokens available through Pump.fun. Michael Okafor purchased and sold multiple Pump.fun tokens, including GRIFFAIN, in the United States between March 2024 and January 2025. Dkt. No. 129, Compl., ¶ 65. He alleges that the tokens he purchased "collapsed within days or weeks of issuance" and that he suffered approximately $242,076.74 in financial losses. *Id.* Okafor also paid transaction and bundling fees for priority blockspace in an effort to have his transactions processed more quickly. *Id.*

Diego Aguilar purchased and sold several tokens created on Pump.fun, including First Convicted Raccoon ("FRED"), FWOG, and GRIFFAIN. *Id.*, ¶ 66. The complaint alleges that he suffered losses on those transactions, but does not state the amount of his losses. *Id.* Kendall Carnahan purchased and sold PNUT and other Pump.fun tokens in the United States and likewise alleges that he suffered financial losses. *Id.*, ¶ 67.

Plaintiffs allege three principal forms of economic injury arising from these transactions.

*First,* they allege trading losses. Plaintiffs say that insider pre-positioning, coordinated promotion, and managed selling caused them to purchase tokens at inflated prices, after which the tokens declined in value. Dkt. No. 129, Compl., ¶¶ 532–33; Dkt. No. 149, RICO Case Statement, ¶ 104.

*Second,* they allege fees paid on transactions they would not otherwise have made. Pump.fun allegedly collected a one-percent fee on every purchase and sale. Dkt. No. 129, Compl., ¶¶ 70, 105, 319, 533. Plaintiffs also allege that users paid priority and bundling fees to obtain faster execution, and that Okafor paid such fees for priority blockspace. Dkt. No. 149, RICO Case Statement, ¶¶ 105–06.

*Third,* Plaintiffs allege execution losses. They claim that Pump.fun's "pay-to-win" execution environment allowed users and bots willing to pay higher priority fees to move ahead in the processing queue, causing other traders to receive inferior fills and suffer slippage. *Id.*, ¶ 107.

Plaintiffs allege that they would not have traded on Pump.fun, or would not have traded on the same terms, had they known about the insider advantages described above. Dkt. No. 129, Compl., ¶¶ 319, 533; Dkt. No. 149, RICO Case Statement, ¶ 108.

Plaintiffs seek to represent a class of persons who purchased tokens through Pump.fun between March 1, 2024 and the filing of the complaint and suffered an out-of-pocket loss. *Id.*, ¶¶ 516–17. They also seek to represent a narrower subclass consisting of purchasers of twenty tokens that Plaintiffs contend were unregistered securities. *Id.*, ¶ 518.

These twenty tokens form the basis of Plaintiffs' Securities Act claims, which are considerably narrower than their RICO claims. Plaintiffs allege that promotional materials associated with these tokens described ongoing development, including applications, services, integrations, and staking features, and that those statements encouraged purchasers to expect that the tokens would increase in value. Dkt. No. 129, Compl., ¶¶ 496–502, 612. Plaintiffs contend that the offers and sales therefore involved "investment contracts" within the meaning of the Securities Act.

### F. The Twenty Pump Tokens

Although Pump.fun allegedly launched more than eleven million tokens, Plaintiffs expressly disclaim any contention that all of them were securities. Dkt. No. 129, Compl., ¶ 496. They instead identify twenty tokens that they contend were promoted as having real-world uses and values tied to the future success of particular projects. *Id.*, ¶ 497. According to Plaintiffs, purchasers were encouraged to acquire these tokens before the associated projects had been completed, in the expectation (or hope) that future development would increase the value of their holdings. *Id.*, ¶ 612. Plaintiffs refer to these twenty tokens as the "Pump Tokens." *See id.*, ¶ 518.

The projects associated with the Pump Tokens varied considerably. For example, StakeCoin was described as "integrating Real World Assets with blockchain to bridge TraFi and DeFi," with a roadmap that contemplated the tokenization of real-estate deeds. *Id.*, ¶ 613. QuStream was promoted as a new blockchain using "patented post-quantum encryption" and allegedly promised future rewards to users who staked their tokens to help validate transactions. *Id.*, ¶ 614. DeepCore AI was associated with a proposed marketplace for artificial-intelligence agents in which token holders could stake their tokens to earn rewards from future transactions. *Id.*, ¶ 616. Other Pump Tokens were associated with proposed metaverses, artificial-intelligence platforms, private-aviation ventures, and systems for tokenizing real-world assets. *Id.*, ¶¶ 618–29.

The twenty tokens were not parts of a single project and are not alleged to have been marketed together. What they had in common, according to Plaintiffs, was the manner in which they were sold and the nature of the representations accompanying their sale. Each was purchased with SOL through Pump.fun, and each token had its own bonding-curve contract. When purchasers bought a particular token, their SOL went into the bonding-curve contract for that token; when holders later sold, the contract returned the SOL to them. Dkt. No. 129, Compl.,

¶¶ 612(a)–(b), 634. Thus, FRED purchasers transacted through the FRED bonding curve, GRIFFAIN purchasers through the GRIFFAIN bonding curve, and so on.

Plaintiffs characterize the SOL held in each token-specific bonding curve as "pooled" because purchases and sales by participants in that particular token affected the price generated by the curve. *Id.*, ¶ 612(b). Plaintiffs separately allege that each of the twenty tokens was promoted in connection with some anticipated future work on the project associated with that token, such as building an application, launching a service, completing an integration, or operating a staking system. *Id.*, ¶¶ 612(c)–(d). In Plaintiffs' formulation, purchasers "were not buying completed products" but were instead investing in "projects that had yet to be built." *Id.*

Two of the twenty tokens are particularly relevant because the named Plaintiffs actually purchased them. The First Convicted Raccoon token, or FRED, allegedly promised purchasers "222,222× upside" and displayed a five-step "Road-Map" that culminated in listings on centralized cryptocurrency exchanges and the sale of branded merchandise. *Id.*, ¶ 630. Plaintiffs allege that FRED's prospects depended on the promoter's securing those listings and continuing to market the token. *Id.* Aguilar purchased and sold FRED on multiple occasions in November and December 2024. *Id.*, ¶ 66; Dkt. No. 129-10, at 48.

GRIFFAIN was marketed as "AI-driven trading in meme form." Dkt. No. 129, Compl., ¶ 631. The promotional materials allegedly advertised an increase from "0 → $10 M in 24 h" and contemplated staking rewards of 300 percent APY. *Id.* Plaintiffs allege that the promoter controlled the smart-contract code governing those rewards. *Id.* Both Aguilar and Okafor allege that they purchased GRIFFAIN. *Id.*, ¶¶ 65–66. Aguilar's transaction records reflect several purchases and sales of GRIFFAIN in December 2024. Dkt. No. 129-10, at 48.

None of the named Plaintiffs alleges that he purchased any of the other eighteen Pump Tokens. Carnahan does not allege that he purchased any of the twenty. Dkt. No. 129, Compl., ¶ 67. Although Aguilar also purchased a token called FWOG, *id.*, ¶ 66, FWOG is not among the twenty tokens that the complaint identifies as securities. *Id.*, ¶ 497. Plaintiffs nevertheless seek to represent a subclass consisting of everyone who purchased any of the twenty Pump Tokens. *Id.*, ¶ 518.

Plaintiffs allege that none of these twenty offerings was registered with the Securities and Exchange Commission. *Id.*, ¶¶ 606–07, 636–37. They contend that Baton is responsible for those unregistered sales because Pump.fun allegedly executed each token launch, established its economic structure, and transferred the resulting tokens to purchasers through the platform. *Id.*, ¶¶ 608, 638–40. Count III seeks relief against Baton under Sections 5 and 12(a)(1) of the Securities Act, and Count IV seeks to hold Cohen, Kerler, and Tweedale liable for these violations of the federal securities laws as Baton's controlling persons. *Id.*, ¶¶ 603–11, 642–51.

**G. Procedural History**

On January 30, 2025, Diego Aguilar sued Baton Corporation Ltd. d/b/a Pump.fun and its co-founders Alon Cohen, Dylan Kerler, and Noah Tweedale, alleging that they offered and sold unregistered securities through Pump.fun. Dkt. No. 1. On June 25, 2025, the Court consolidated this action with *Carnahan v. Baton Corporation Ltd.*, No. 25-cv-490. Dkt. No. 32.

Plaintiffs amended their complaint on July 23, 2025, adding the Solana Defendants and Jito Labs, Inc., the Jito Foundation, Lucas Bruder, and Brian Smith, and expanding the case to include RICO claims. Dkt. No. 34. The Jito defendants, Bruder, and Smith were later voluntarily dismissed. Dkt. No. 108.

In September 2025, Plaintiffs sought leave to amend once again after a confidential informant provided counsel with nearly 5,000 internal chat messages involving, among others, Pump.fun personnel and Solana Labs engineers. Dkt. Nos. 102–04. On December 9, 2025, the Court granted leave to amend, concluding that Plaintiffs should be permitted to incorporate the newly obtained material in an attempt to particularize their existing allegations. *Aguilar v. Baton Corp. Ltd.*, 2025 WL 3523133, at *5–6 (S.D.N.Y. Dec. 9, 2025).

Plaintiffs submitted the second amended complaint on January 8, 2026. Dkt. No. 129. Following a conference on January 13, the Court directed Plaintiffs to provide an amended RICO Case Statement specifying the alleged misconduct and basis for RICO liability as to each Defendant. Plaintiffs did so on January 23, 2026. Dkt. No. 149. The RICO Case Statement confirms that Plaintiffs proceed under 18 U.S.C. §§ 1962(c) and (d) and expressly incorporates the allegations of the complaint. Dkt. No. 149, RCS, ¶¶ 1–3.

The pending motions to dismiss followed.

## II. LEGAL STANDARD

### A. Rule 12(b)(2)

On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the plaintiff bears the burden of establishing jurisdiction. Where, as here, the Court decides the motion without an evidentiary hearing, Plaintiffs "need only make a *prima facie* showing of personal jurisdiction over the defendant[s]." *Sullivan v. UBS AG*, 149 F.4th 206, 217 (2d Cir. 2025) (quoting *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)). The Court "construe[s] the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." *Id.* (quoting *Chloe*, 616 F.3d at 163). Specific personal jurisdiction ordinarily must be established

"with respect to each claim asserted." *Id.* (quoting *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 83 (2d Cir. 2018)).

**B. Rule 12(b)(6)**

To survive a motion under Rule 12(b)(6), a complaint must contain sufficient factual matter to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible when the pleaded facts allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts well-pleaded factual allegations as true and draws reasonable inferences in Plaintiffs' favor, but it need not accept "legal conclusions couched as factual allegations." *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017).

**C. Rule 9(b)**

The wire-fraud allegations that form part of Plaintiffs' RICO claims are subject to the heightened pleading requirements of Rule 9(b). *See Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008). Under that Rule, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). A plaintiff alleging fraudulent statements ordinarily must "specify the statements that the plaintiff contends were fraudulent," identify the speaker, state where and when the statements were made, and explain why they were fraudulent. *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000).

Rule 9(b) does not, however, require Plaintiffs to plead a defendant's state of mind with the same particularity. "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Even so, Plaintiffs must allege facts that provide a sufficient basis for the inference of fraudulent intent required by the underlying offense. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 176–77 (2d Cir. 2015).

## III. DISCUSSION

### A. Plaintiffs' Securities Act Claims

Counts III and IV arise under the Securities Act of 1933. Count III alleges that Baton violated Sections 5 and 12(a)(1) by offering and selling through Pump.fun twenty tokens that Plaintiffs contend were unregistered securities. Count IV seeks to hold Cohen, Kerler, and Tweedale liable under Section 15 as persons who controlled Baton in making those sales. Dkt. No. 129, Compl., ¶¶ 603–49.

Before considering whether Plaintiffs have adequately alleged a violation of the Securities Act, the Court must ascertain whether it has personal jurisdiction over Baton and the Baton Officers on these claims.

It does.

1. <u>Personal Jurisdiction</u>

Plaintiffs served Baton and the Baton Officers in England. For the individual Defendants, Rule 4(f)(1) permits service abroad "by any internationally agreed means of service that is reasonably calculated to give notice," including means authorized by the Hague Convention; Rule 4(h)(2) incorporates Rule 4(f) for service on a foreign corporation. Plaintiffs relied on Article 10(c) of the Hague Convention and retained English counsel and a licensed process server to effect service. Dkt. No. 19. The Baton Defendants do not challenge the sufficiency of that service.

The Securities Act gives that service jurisdictional effect. Section 22 provides that process may be served in any district of which a defendant is an inhabitant "or wherever the defendant may be found." 15 U.S.C. § 77v(a). Rule 4(k)(1)(C), in turn, provides that service establishes personal jurisdiction "when authorized by a federal statute." Fed. R. Civ. P. 4(k)(1)(C). Section 22 permits worldwide service, so a defendant properly served abroad is subject to personal jurisdiction to the

extent permitted by the Due Process Clause of the Fifth Amendment. *Orient Plus Int'l Ltd. v. Baosheng Media Grp. Holdings Ltd.*, 808 F. Supp. 3d 609, 614–15 (S.D.N.Y. 2025); *see Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1340 (2d Cir. 1972).

That constitutional inquiry changed substantially after *Fuld v. Palestine Liberation Organization*, 606 U.S. 1 (2025). The Supreme Court "decline[d] to import the Fourteenth Amendment minimum contacts standard into the Fifth Amendment," explaining that the Fifth Amendment permits "a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." *Id.* at 15–16. *Fuld* did not define the outer boundary of that authority, but it sustained the statute before it because jurisdiction was tied to conduct bearing "a meaningful relationship to the United States." *Id.* at 23.

Applying *Fuld* to the Securities Act, my colleague Judge Rochon held that the exercise of personal jurisdiction over foreign directors comported with the Fifth Amendment because their alleged Securities Act violations bore a "meaningful relationship" to the United States and the exercise of jurisdiction was not unreasonable or unfair. *Orient Plus*, 808 F. Supp. 3d at 618–25. She reasoned, in particular, that the defendants' alleged failure to discharge obligations imposed by the Securities Act in connection with securities offered on an American exchange directly implicated "American interests" and supplied the requisite nexus to the United States. *Id.* at 622–24.

Plaintiffs have made the necessary showing as to Baton. They allege that Baton offered and sold the Pump Tokens through Pump.fun. Dkt. No. 129, Compl., ¶¶ 638–40. Okafor, a United States resident, allegedly purchased GRIFFAIN in the United States. *Id.* ¶ 65. Plaintiffs further allege that Baton permitted United States users to transact on Pump.fun and marketed Pump.fun tokens to audiences in this country. *Id.* ¶¶ 83, 90, 147, 203–04. Count III therefore includes an

alleged sale by Baton in the United States of what Plaintiffs contend was an unregistered security. Whether GRIFFAIN was in fact a security and whether Baton was its statutory seller are merits questions; they do not go to the issue of jurisdiction. The conduct giving rise to the claim bears a sufficient relationship to the United States for purposes of conferring personal jurisdiction over Baton, alleged to be the offering Defendant.

The allegations concerning Cohen, Kerler, and Tweedale are sufficient as well. Count IV seeks to hold them liable as the persons who controlled Baton in making the challenged sales. Plaintiffs allege that Cohen controlled Baton's business, marketing, and promotion; Tweedale controlled the product design and user-facing mechanics through which purchases occurred; and Kerler controlled the technical architecture of the token-launch and sale mechanism. *Id.* ¶¶ 645–48. The alleged conduct over which they exercised control therefore includes the United States sales on which Plaintiffs' Securities Act claims are based. Whether those allegations ultimately establish control-person liability is a merits question, not a jurisdictional one.

Finally, assuming that *Fuld* leaves room for a separate inquiry into "the reasonableness of the assertion of jurisdiction in the particular case," 606 U.S. at 23, exercising jurisdiction here is reasonable. Congress expressly authorized worldwide service in Securities Act cases. That legislative judgment carries substantial weight, and the federal interest is especially strong because these claims arise under "the federal securities laws, an area of strong federal concern that falls at the center of Congress' commerce power." *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 104 F. Supp. 2d 279, 286 (S.D.N.Y. 2000) (Kaplan, J.). Baton and the Baton Officers reside in England, but nothing in the record suggests that defending this action in the United States would make litigation "so gravely difficult and inconvenient" as to render jurisdiction unreasonable or unfair. *Fuld*, 606 U.S. at 25 (citation omitted).

Plaintiffs have, therefore, made the required *prima facie* showing of personal jurisdiction over Baton on Count III and over Cohen, Kerler, and Tweedale on Count IV.

2. Plaintiffs Lack Class Standing to Pursue Claims Relating to the Eighteen Pump Tokens They Did Not Purchase

A named plaintiff can in some circumstances represent purchasers of securities that he did not personally purchase. But he must plausibly allege both that he personally suffered an injury from the defendant's challenged conduct and that the conduct causing his injury "implicates the same set of concerns" as the conduct alleged to have injured the absent class members. *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012). The latter requirement is satisfied when "the proof contemplated for all of the claims would be sufficiently similar," such that proving the defendant's misconduct as to the named plaintiff "would tend to prove" its misconduct as to the other claims. *Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chicago v. Bank of N.Y. Mellon*, 775 F.3d 154, 161–62 (2d Cir. 2014).

The named Plaintiffs satisfy that standard only as to the tokens known as FRED and GRIFFAIN. Aguilar alleges that he purchased both tokens, and Okafor alleges that he purchased GRIFFAIN. Dkt. No. 129, Compl., ¶¶ 65–66. Carnahan purchased PNUT, but PNUT is not among the twenty tokens on which Count III is based. *Id.*, ¶¶ 67, 497. No named Plaintiff is alleged to have purchased any of the other eighteen Pump Tokens.

The complaint itself demonstrates why claims involving those eighteen tokens do not implicate the same set of concerns as the named Plaintiffs' claims about FRED and GRIFFAIN. Plaintiffs do not allege that the twenty tokens were marketed as part of a single project, or were promoted through a common set of promises. Rather, each token ostensibly represented an interest in a different scheme. StakeCoin allegedly contemplated tokenizing real-estate deeds; QuStream

promised a quantum-resistant blockchain and staking rewards; BunkerCoin concerned shelters in Germany and The Gambia; DeepCore AI purportedly involved an artificial-intelligence marketplace; and AgentPy allegedly concerned software connecting AI agents to Solana applications. *Id.*, ¶¶ 613–17. The allegations about the other tokens are similarly project-specific. *Id.*, ¶¶ 618–31.

These differences matter. Whether a transaction constitutes an investment contract depends on the economic arrangement surrounding the particular offer. Proof that FRED purchasers were shown a five-step "Road-Map" culminating in exchange listings and merchandise has nothing to do with the promises or representations made to purchasers of StakeCoin, or to the efforts that allegedly would determine StakeCoin's value. *Id.*, ¶ 630. Likewise, proof that GRIFFAIN was promoted with staking rewards of 300 percent APY would not have anything to do with what, if any, similar arrangements were offered to purchasers of QuStream, DeepCore AI, or the other tokens. *Id.*, ¶ 631. The claims involving each separate meme coin would thus "turn on very different proof." *NECA*, 693 F.3d at 163.

The fact that all twenty tokens were launched through Pump.fun does not overcome that problem. Pump.fun supplied promoters with a platform and trading mechanism. But Plaintiffs' Securities Act theory depends on the circumstances surrounding the offer of each particular token. Litigating whether FRED and GRIFFAIN satisfy *Howey* would not establish whether the other eighteen tokens do.

Plaintiffs therefore lack class standing to pursue Count III except as to the tokens they actually purchased: FRED and GRIFFAIN.

3. <u>The Offers and Sales of FRED and GRIFFAIN Do Not Plausibly Involve Investment Contracts Because Plaintiffs Fail to Plead a Common Enterprise Under *Howey*</u>

The Securities Act defines a "security" to include an "investment contract." 15 U.S.C. § 77b(a)(1). Under *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99 (1946), an investment contract is a "contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." The Second Circuit accordingly asks whether there is "(i) an investment of money (ii) in a common enterprise (iii) with profits to be derived solely from the efforts of others." *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994).

Plaintiffs adequately allege an investment of money: purchasers exchanged SOL, an asset of value, for FRED and GRIFFAIN. Dkt. No. 129, Compl., ¶¶ 500, 612(a). The question is whether either or both of those transactions involved an investment in a common enterprise whose profits were to be derived solely from the efforts of others. Plaintiffs principally rely on horizontal commonality, though they also argue that strict vertical commonality exists. The Second Circuit recognizes horizontal commonality as a basis for finding a common enterprise, and has left open whether strict vertical commonality, standing alone, satisfies *Howey*. *Revak*, 18 F.3d at 87–88.

The Court concludes that Plaintiffs' complaint fails to plead a common enterprise under either theory.

**a. Horizontal Commonality**

In this Circuit, horizontal commonality requires "the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits." *Revak*, 18 F.3d at 87. The point of the pooling is that "[h]orizontal commonality ties the fortunes of each investor in a pool of investors to the success of the overall venture." *Id.* The Second Circuit applied that principle in *Revak* by holding that no common

enterprise existed where individual condominium purchasers could "make profits or sustain losses independent of the fortunes of other purchasers." *Id.* at 88.

Plaintiffs argue that Pump.fun's bonding curve created the pool required by *Howey*. When a purchaser bought FRED or GRIFFAIN, SOL went into a token-specific bonding-curve contract (*i.e.*, a contract specific to that single token) and the purchaser received tokens. When a holder sold, he was paid out SOL, representing a return on his "investment." Dkt. No. 129, Compl., ¶¶ 612(b), 634. As more people purchased a particular token, its price moved upward along the curve (which is to say, it increased), while every sale moved the price downward (it decreased). *Id.* ¶¶ 501, 612(b). Thus, the SOL contributed by purchasers of a particular token was held in the same smart contract, and one participant's trading affected the price available to others.

But the fact that assets occupy a common pool is not enough to create an investment contract. *Revak* requires that the pooling tie the investors' fortunes to one another through the success or failure of some underlying venture. 18 F.3d at 87. The complaint does not allege that the SOL placed in the FRED or GRIFFAIN bonding curves was put to use in, or otherwise tied to, some common undertaking whose success or failure would determine the fortunes of purchasers *as a group*. That is what must be alleged in order to successfully plead that a meme coin is an "investment contract," and hence a security. And that is precisely the allegation that is missing here.

The underlying theory of Plaintiffs' case illustrates why these transactions do not plausibly involve a common enterprise. A purchaser exchanged SOL for tokens and could later exchange those tokens back for whatever amount of SOL the curve dictated at that moment. Any individual "investor's" gain depended on whether he sold after additional demand had moved the price above what he paid to buy his tokens. Each individual investor made the decision when to sell. The

investors' fortunes thus did not rise and fall together on the basis of the success of the overall venture; there was certainly no possibility of any "pro rata distribution of profits." An early purchaser could sell at a profit after others purchase the same token, while later purchasers who paid a higher price to enter the market could (and Plaintiffs allege, did) lose money if and when demand for that token declined. One participant's favorable outcome did not depend on the success of an enterprise that also benefited every other token owner. As a matter of fact, Plaintiffs allege that Defendants themselves purchased early, pumped up the price, and then got out before the price fell. That is the antithesis of the shared fortunes characteristic of a common venture, usually in combination with a pro rata distribution of profits, that is needed to create horizontal commonality.

Of course, it is possible to have horizontal commonality even though investors buy and sell at different times and so realize different returns. Purchasers of shares of stock do exactly that. But their different entry and exit points do not mean that the value of their holdings is untethered from the fortunes of some underlying enterprise. The complaint here identifies no comparable underlying venture, funded by the purchases of the tokens, the success or failure of which drove the fortunes of FRED or GRIFFAIN purchasers *as a group*. The only thing that tied these purchasers together was that they all traded on the same trading platform. Mere economic interaction among traders is not the same thing as their participating in a common profit-seeking enterprise.

The recent decision in *In re Celsius Network LLC*, 668 B.R. 722, 749 (Bankr. S.D.N.Y. 2025), is useful to illustrate this point. There, the plaintiff pointed to assets placed in a Curve Polygon cryptocurrency liquidity pool. Judge Glenn nevertheless found horizontal commonality inadequately pleaded because the complaint did not allege that "the financial success of

participants in the pool was dependent on the success of others." *Id.* Put otherwise, the existence of a cryptocurrency pool did not itself establish the relationship among participants that *Revak* requires.

There are, of course, digital-asset cases in which courts have found horizontal commonality to exist. But all of them involved some identifiable underlying venture that the digital assets were used to fund. In *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 353 (S.D.N.Y. 2019), purchasers' funds "were pooled together to facilitate the launch of the ATB Blockchain, the success of which, in turn, would increase the value" of their coins. In *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 178 (S.D.N.Y. 2020), purchaser funds financed development of the Kin ecosystem, and "[t]he success of the ecosystem drove demand for Kin and thus dictated investors' profits." And in *SEC v. Telegram Group Inc.*, 448 F. Supp. 3d 352, 369–70 (S.D.N.Y. 2020), the purchasers held an identical instrument whose value was "entirely dependent on the success or failure of the TON Blockchain."

Nothing comparable is alleged here. The complaint does not allege that the SOL that "investors" paid for FRED or GRIFFAIN tokens was used to build projects associated with those tokens or otherwise finance an undertaking whose success would increase the value of every purchaser's holdings on a pro rata basis. That is the fundamental difference between the scheme alleged here and the arrangements in the cases in which courts found horizontal commonality.

Plaintiffs point to the fact that the token promoters allegedly promised to perform various promotional activities, and argue that this establishes that the "common venture" of investing in the meme coins would succeed or fail due to the efforts of third parties. But this does not solve their problem. Promoter activities by themselves do not establish horizontal commonality. The activities of a promoter impact *Howey*'s separate requirement that purchasers expect profits from

the efforts of others. But in *Revak* the Second Circuit specifically warned against depending on the efforts of a promoter to supply the common-enterprise requirement as well. Otherwise the two *Howey* inquiries are "effectively merged into a single inquiry." *Revak*, 18 F.3d at 88.

Whatever efforts FRED's or GRIFFAIN's promoters allegedly promised to undertake, the complaint does not allege that purchasers' SOL was pooled into or otherwise committed to fund some common undertaking, the outcome of which tied the fortunes of all purchasers together, whether on a pro rata basis or otherwise.

The fact that Baton collected a one-percent transaction fee in connection with every meme coin purchase also does not establish horizontal commonality. The fee was compensation to Baton when a transaction occurred; it was separate from the SOL held in each token's bonding curve. An allegation that Baton used fee revenue to develop Pump.fun generally does not tie FRED or GRIFFAIN purchasers to an undertaking whose success determined their returns.

In short, Plaintiffs have not plausibly alleged horizontal commonality.

**b. Strict Vertical Commonality**

Plaintiffs also contend that a common enterprise existed because Baton's financial fortunes were linked to those of FRED and GRIFFAIN purchasers. This relationship between the fortunes of an investor and the fortunes of the promoter is referred to as strict vertical commonality. *Revak*, 18 F.3d at 87–88.

The Second Circuit has left open whether strict vertical commonality, standing alone, can satisfy *Howey*'s common enterprise requirement. *Id.* at 88. This Court, however, has held vertical commonality to be sufficient where "the fortunes of plaintiff and defendants are linked so that they rise and fall together." *In re J.P. Jeanneret Associates, Inc.*, 769 F. Supp. 2d 340, 359–60 (S.D.N.Y. 2011).

*Jeanneret* illustrates what that means. The investment manager there received, among other compensation, a performance fee equal to twenty percent of profits above a specified return. If the investments did not generate sufficient profits, the manager did not receive that fee. The Court therefore explained, "Unlike a stockbroker, who collects a fee for every consummated transaction, JPJA's financial compensation was linked to the fortunes of the investors in the Direct Class." *Id.* at 360.

It is easy to see that Baton falls on the stockbroker side of the *Jeanneret* distinction, not on the investment manager side. Plaintiffs allege that Pump.fun received a one percent fee whenever a user bought or sold a token. Dkt. No. 129, Compl., ¶¶ 70, 105, 505. Baton earned its fee regardless of whether the purchaser ultimately made money. Baton could continue earning transaction fees while a token's price was falling and its holders were losing money. Baton's compensation therefore did not rise and fall with the fortunes of FRED or GRIFFAIN purchasers. Plaintiffs have not pleaded strict vertical commonality.

Plaintiffs have thus failed to plead a common enterprise under either horizontal or strict vertical commonality. Because a common enterprise is a necessary element of an investment contract, the alleged offers and sales of FRED and GRIFFAIN do not plausibly involve investment contracts under *Howey*. Baton's motion to dismiss Count III is therefore GRANTED with prejudice insofar as Count III concerns FRED and GRIFFAIN. It is GRANTED without prejudice as to the other eighteen Pump Tokens, on the ground that the Plaintiffs in this case lack class standing to pursue claims relating to those tokens.

4. <u>Plaintiffs' Section 15 Claim Against the Baton Officers</u>

Count IV seeks to hold Cohen, Kerler, and Tweedale liable under § 15 of the Securities Act as persons who controlled Baton. Dkt. No. 129, Compl., ¶¶ 642–49. Section 15 imposes

liability on a person who "controls any person liable under section 77k or 77l" of the Securities Act. 15 U.S.C. § 77o(a). A § 15 claim is therefore "necessarily predicated on a primary violation of securities law." *Rombach v. Chang*, 355 F.3d 164, 177–78 (2d Cir. 2004).

As to FRED and GRIFFAIN, Plaintiffs have not pleaded the necessary primary violation. As explained above, these offers and sales do not plausibly involve investment contracts because Plaintiffs have not alleged the common enterprise required by *Howey*. There can therefore be no derivative liability under § 15 arising from those transactions. *See Rombach*, 355 F.3d at 178 ("Because we have already determined that the district court properly dismissed the primary securities claims . . . , these secondary claims must also be dismissed."). The Court need not decide whether Cohen, Kerler, or Tweedale exercised sufficient control over Baton.

Count IV is therefore DISMISSED WITH PREJUDICE insofar as it concerns the FRED and GRIFFAIN meme tokens. For the same reasons as Count III, it is DISMISSED without prejudice as to the other eighteen Pump Tokens.

### B. Plaintiffs' RICO Claims

Counts I and II assert claims under RICO. Count I alleges that Defendants violated 18 U.S.C. § 1962(c) by conducting the affairs of the alleged Enterprise through a pattern of wire fraud, illegal gambling, and unlicensed money transmission. Count II alleges a conspiracy to violate § 1962(c). Dkt. No. 129, Compl., ¶¶ 535–602.

The Solana Defendants do not challenge the court's personal jurisdiction over them on the RICO claims. Baton and its three officers, however, do. Because a court lacking personal jurisdiction over a defendant "lacks power to dismiss a complaint for failure to state a claim" against that defendant, *Northwell Health, Inc. v. Grp. Hospitalization & Med. Servs., Inc.*, 2026 WL 2035965, at *6 (2d Cir. July 15, 2026) (quoting *Arrowsmith v. United Press Int'l*, 320 F.2d

219, 221 (2d Cir. 1963)), the Court must first decide whether it can exercise personal jurisdiction over these four Defendants on the civil RICO claims.

1. The Court Has Personal Jurisdiction over Baton and the Baton Officers on Counts I and II Under Rule 4(k)(2)

RICO's service provision does not authorize the service effected on Baton or the Baton Officers in England.

Section 1965(a) permits a civil RICO action to be brought in a district in which a defendant "resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(a). Section 1965(b) then provides that, when "the ends of justice require," other parties residing in another district may be summoned and that process "may be served in any judicial district of the United States." *Id.*, § 1965(b). The provisions must be "read together." *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 71 (2d Cir. 1998).

The Court will assume that one of the Solana Defendants could serve as an anchor for purposes of § 1965(a). But § 1965(b) does not authorize service on Baton or its officers in England. They reside outside the United States, and process was not served on them in any "judicial district of the United States." 18 U.S.C. § 1965(b). As the court in *Elsevier, Inc. v. Grossman*, 77 F. Supp. 3d 331, 343 (S.D.N.Y. 2015), explains, a court proceeding under § 1965(b) can reach defendants "residing in any other district," but "not foreign defendants."

However, Rule 4(k)(2) provides an independent basis for asserting personal jurisdiction over foreign defendants in federal-question cases. Under that Rule, service establishes personal jurisdiction if "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction" and "exercising jurisdiction is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2); *Porina v. Marward Shipping Co.*, 521 F.3d 122, 127 (2d Cir. 2008). The District of Columbia Circuit recently proceeded to Rule 4(k)(2) after concluding, in a civil

RICO case, that RICO's own jurisdictional provision did not give that court personal jurisdiction over foreign corporate defendants. *See Gligorov v. Nation of Brunei*, 2026 WL 2276372, at *7 (D.C. Cir. Aug. 7, 2026). Although the court ultimately concluded that exercising jurisdiction under Rule 4(k)(2) would not comport with the Fifth Amendment on the particular facts before it,[3] *id.* at *5–8, its analysis confirms that Rule 4(k)(2) provides a basis for jurisdiction when RICO's own provision does not.

Unlike in *Gligorov*, the requirements of Rule 4(k)(2) are satisfied here. Counts I and II arise under federal law, and Baton and the Baton Officers were properly served in England pursuant to the Hague Convention. The Baton Defendants contend that they are not subject to personal jurisdiction in New York, and none identifies another State in which this action could proceed. That is enough. As the Seventh Circuit explained in *ISI International, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001), "[a] defendant who wants to preclude use of Rule 4(k)(2) has only to name some other state in which the suit could proceed." The D.C. Circuit has adopted the same approach. *Mwani v. bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005) (holding that courts need not "traipse through the 50 states, asking whether each could entertain

[3] The jurisdictional facts in *Gligorov* were markedly different. The plaintiff was a Slovenian national whose asserted injuries arose principally from foreign business relationships, and "virtually all" of the corporate defendants' alleged RICO conduct occurred overseas. *Gligorov*, 2026 WL 2276372, at *8–9. The court therefore found no meaningful United States sovereign interest in adjudicating the dispute. *Id.* As to two defendants, the only alleged United States connection was that unidentified representatives attended "at least one" meeting at a California hotel; and although the third defendant operated hotels in California, the alleged scheme concerned injury to a foreign plaintiff's overseas business and bore little relationship to that domestic presence. *Id.* at *8–10. Here, by contrast, Carnahan and Okafor allegedly transacted and suffered their surviving injuries in the United States, and Baton allegedly permitted United States users to transact on Pump.fun and directed token promotions to purchasers in this country.

the suit" (citation omitted)); *see also Gligorov*, 2026 WL 2276372, at *7 n.2. None of the Baton Defendants has identified such a State.[4]

The remaining question is whether exercising jurisdiction is consistent with the Fifth Amendment. In *Porina*, the Second Circuit asked whether a foreign defendant had sufficient suit-related contacts "with the United States in general, rather than with New York in particular," and whether exercising jurisdiction was reasonable. 521 F.3d at 127–28. The Supreme Court has since "decline[d] to import the Fourteenth Amendment minimum contacts standard into the Fifth Amendment." *Fuld v. Palestine Liberation Organization*, 606 U.S. 1, 15–16 (2025). The Court need not decide precisely how *Fuld* affects the traditional Rule 4(k)(2) analysis, because Plaintiffs' allegations satisfy the more demanding framework applied in *Porina* and, in any event, establish the "meaningful relationship to the United States" discussed in *Fuld*. *Id.* at 23.

As to Baton, Plaintiffs allege that Baton deliberately permitted United States users to transact on Pump.fun, retained promoters to market Pump.fun tokens to purchasers in the United States, and collected a one-percent fee on every transaction conducted through its platform. Dkt. No. 129, Compl., ¶¶ 70, 83, 90, 105, 147, 203–04. Okafor and Carnahan themselves allegedly purchased and sold Pump.fun tokens in the United States. *Id.*, ¶¶ 65, 67. And Counts I and II arise directly from those U.S. transactions. Plaintiffs allege that they were induced to trade by the fraudulent scheme and thereby incurred transaction fees and other losses. *Id.*, ¶¶ 319, 532–33. These are purposeful, suit-related contacts with the United States.

The allegations are sufficient as to the individual Baton Officers as well. Cohen allegedly directed Pump.fun's marketing and token campaigns and personally made the "fair launch" and

[4] Plaintiffs did not invoke Rule 4(k)(2) by name, but that does not prevent the Court from applying the Rule to the jurisdictional facts already before it. *See ISI International*, 256 F.3d at 551 ("Federal courts are entitled to apply the right body of law, whether the parties name it or not.").

"even playing field" representations at the heart of the alleged fraud. *Id.*, ¶¶ 375–79, 548. Tweedale allegedly coordinated platform operations and KOL management, including promotional arrangements used to induce retail participation. *Id.*, ¶ 550. And Kerler allegedly directed the technical architecture and execution systems through which Pump.fun transactions – including transactions by United States users – were carried out. *Id.*, ¶¶ 231–32, 549. Plaintiffs thus allege that each officer personally directed a component of the conduct underlying the RICO claims against a platform deliberately operating in the United States. At the pleading stage, that is sufficient.

Finally, exercising jurisdiction is reasonable. The claims concern allegedly fraudulent transactions conducted with users in the United States under a federal statute; named Plaintiffs themselves allegedly transacted here; and nothing before the Court suggests that requiring these Defendants to litigate in the United States would impose a constitutionally unreasonable burden.

Plaintiffs have therefore made the required *prima facie* showing of personal jurisdiction over Baton, Cohen, Kerler, and Tweedale on Counts I and II. This allows the Court to proceed to analyze the merits of the RICO allegations as against all Defendants that have appeared – not just the Solana Defendants.

2. <u>Count I – RICO</u>

Section 1962(c) makes it unlawful for a person associated with an enterprise affecting interstate or foreign commerce "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). A private plaintiff must also establish that he was "injured in his business or property by reason of" the RICO violation. *Id.* § 1964(c). Thus, a civil RICO plaintiff must plead both a violation of § 1962 and

an injury to business or property caused by that violation. *See DeFalco v. Bernas*, 244 F.3d 286, 305–06 (2d Cir. 2001).

Plaintiffs allege four forms of racketeering activity: (1) wire fraud in violation of 18 U.S.C. § 1343; (2) operation of an illegal gambling business in violation of § 1955; (3) New York gambling offenses alleged to qualify under § 1961(1)(A); and (4) operation of an unlicensed money-transmitting business in violation of § 1960. Dkt. No. 129, Compl., ¶ 555.

**a. Enterprise and Participation in Its Affairs**

Plaintiffs adequately plead an association-in-fact enterprise consisting, at a minimum, of Baton, its founders, and the Lead KOL promoters. An association-in-fact enterprise requires "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). Where the alleged enterprise is organized around fraud, its members must "share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (quoting *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir. 2004)).

The complaint alleges considerably more than a collection of persons who happened to do business with one another. Baton and its founders allegedly controlled token campaigns and access to early token information. Lead KOLs (who are not identified, but whose existence is pleaded) allegedly received token addresses through private channels, acquired positions before public promotion, coordinated the timing and content of promotions, concealed their compensation and pre-positioning, and then sold into the retail demand those promotions generated. Dkt. No. 129, Compl., ¶¶ 536–43, 554. Plaintiffs further allege that those relationships were maintained through KOL agreements, controlled access to token information, and aligned financial incentives, and that

the same method was used repeatedly beginning in 2024. *Id.* ¶¶ 540–43. Taken as true, these allegations plausibly describe a group of persons working together over time for the common purpose of profiting from the allegedly fraudulent promotional scheme.

The allegations concerning the Solana Defendants are another matter. As discussed below, Plaintiffs do not plausibly allege that anyone associated with Solana knew about the concealed pre-positioning and coordinated exits that made the alleged "fair launch" representations fraudulent, so the Court will be dismissing the Solana Defendants from the RICO counts. But their exclusion from the alleged association in fact does not mean that the remaining defendants (including the John Doe KOL Defendants) are not an association in fact. In *Cruz*, the Second Circuit first excluded participants who were not plausibly alleged to "share a common purpose to engage in a particular fraudulent course of conduct," and then considered whether the remaining members constituted an enterprise for RICO purposes. 720 F.3d at 120–21 (citation omitted). Here, the remaining allegations concerning Baton, its founders, and the Lead KOLs plausibly describe an association in fact.

The association in fact consisting of Baton, its three officers, and the Lead KOL Defendants also satisfies RICO's distinctness requirement. While Baton, a corporation, cannot be deemed a member of an association in fact merely by associating with "its own employees or agents carrying on the regular affairs of the defendant." *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994); *see U1it4less, Inc. v. FedEx Corp.*, 871 F.3d 199, 205–06 (2d Cir. 2017), that rule "does not foreclose the possibility of a corporate entity being held liable . . . where it associates with others to form an enterprise that is sufficiently distinct from itself." *U1it4less*, 871 F.3d at 206 (quoting *Riverwoods*, 30 F.3d at 344). That is what Plaintiffs allege here. The Lead KOLs allegedly did not merely advertise Pump.fun for Baton. They allegedly

received advance token information, acquired their own positions at lower prices, concealed those economic interests from the people to whom they promoted the tokens, and sold their positions when demand increased. Dkt. No. 129, Compl., ¶¶ 203–05, 540–41, 554. On these allegations, the KOLs were participants with economic interests and roles of their own in the alleged scheme, not simply Baton acting through its employees or agents. At the pleading stage, the alleged Enterprise is therefore sufficiently distinct from Baton itself.

And as for the three individual Baton Defendants, "The corporate owner/employee, a natural person, is distinct from the corporation itself." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001). The alleged Enterprise is therefore sufficiently distinct from each of them.

Plaintiffs have also adequately pleaded that Baton and its three founders participated in the operation or management of the Enterprise. Section 1962(c) requires that a defendant have "some part in directing" the enterprise's affairs. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). Baton allegedly operated the platform through which the campaigns and transactions occurred. Cohen allegedly directed platform strategy and token campaigns and controlled access to promotional opportunities; Tweedale allegedly coordinated platform operations and KOL management; and Kerler allegedly directed the technical integration and execution systems on which the alleged trading scheme depended. Dkt. No. 149, RICO Case Statement ¶¶ 5, 7, 10, 12. These are allegations of direction of the Enterprise's core activities, not merely the provision of services to it.

Whether each individual Defendant knowingly committed the requisite predicate acts is a separate question, to which the Court now turns.

**b. Racketeering Activity**

**i. Wire Fraud**

Plaintiffs identify Pump.fun's representations that its token launches were "fair" and offered users an "even playing field" as the principal deception underlying the alleged scheme. Dkt. No. 129, Compl., ¶¶ 375–79, 560, 562. They allege that those representations were false because selected KOLs and other insiders received advance information, acquired positions before public promotion, concealed their compensation and coordination, and sold into the demand generated by later retail purchases. *Id.* ¶¶ 164–205, 560.

Wire fraud requires "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *Williams v. Affinion Group, LLC*, 889 F.3d 116, 124 (2d Cir. 2018). The fraudulent scheme must involve a material misrepresentation or omission, and allegations of wire fraud are subject to Rule 9(b). *Id.* at 124–25. But "the mail or wire communications themselves need not contain a false statement." *Id.* at 125. The wire need only be used in furtherance of the fraudulent scheme. *Id.*; *see also United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016) ("The gravamen of the offense is the scheme to defraud." (citation omitted)).

Much of the alleged scheme was conducted electronically. Plaintiffs allege that Enterprise participants used Pump.fun's website and application, social-media posts and videos, Telegram and Discord communications, direct messages, and "on-chain transaction routing and settlement across a globally distributed validator network." Dkt. No. 129, Compl., ¶ 561; Dkt. No. 149, RICO Case Statement ¶¶ 55–56. Plaintiffs must still plead an adequately particularized fraudulent scheme, fraudulent intent, and a use of the wires in furtherance of that scheme that is attributable to each particular Defendant. Where a plaintiff relies on wire fraud to supply the requisite predicate acts, those acts must be pleaded defendant by defendant and with the particularity required by Rule 9(b). *See Sullivan v. UBS AG,* 149 F.4th 206, 221–22 (2d Cir. 2025). In *Sullivan*,

where wire fraud supplied the alleged pattern, the Second Circuit required at least two wire-fraud predicates "'as to each individual defendant' with particularity." *Id.* at 222 (quoting *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001)).

Wire fraud also requires pleading fraudulent intent. "Essential to a scheme to defraud is fraudulent intent." *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021) (quoting *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994)). Although Rule 9(b) permits intent to be alleged generally, the pleaded facts must "give rise to a strong inference of fraudulent intent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006).

***Baton and Cohen.*** Plaintiffs plead predicate acts of wire fraud against Cohen with sufficient specificity. The RICO Case Statement identifies the speaker, statement, medium, date, asserted falsity, and basis for scienter for three separate representations made by Cohen on behalf of Pump.fun. Dkt. No. 149, RICO Case Statement ¶¶ 51–53. On September 25, 2024, Cohen retweeted a direct message in which he described Pump.fun as an "unruggable fair launch platform." *Id.* ¶ 51. On October 4, 2024, he posted that "pump fun is as much of an even playing field as it gets IMO." *Id.* ¶ 52. And on October 12, 2024, he posted that "retail's already up massively because it's so easy for them to get involved and the playing field is as fair as ever." *Id.* ¶ 53. All three statements were made on X/Twitter and were publicly available.

These statements are sufficiently concrete to be actionable at the pleading stage. In context, describing Pump.fun as a "fair launch" platform and an "even playing field" did not merely express Cohen's subjective enthusiasm for the platform. Plaintiffs allege that those descriptions communicated something factual about the manner in which tokens were launched – namely, that there were no favored participants who might have some undisclosed advance access over other members of the investing public. Plaintiffs allege that precisely the opposite was the case: insiders

allegedly received token addresses before public promotion, acquired supply at the lowest points on the bonding curve, spread holdings across multiple wallets, obtained priority execution, and coordinated their exits before ordinary retail purchasers. Dkt. No. 149, RICO Case Statement ¶¶ 51(e), 52(e); Dkt. No. 129, Compl., ¶ 560. Whether these allegations can ultimately be proved is beside the point. If they are true, the representations that the launch was "fair" and the playing field "even" could be found by a trier of fact to be materially misleading.

The allegations also support fraudulent intent as to Cohen. Plaintiffs allege that Cohen himself directed Pump.fun's platform strategy and token campaigns and "control[led] early token-address distribution and access to promotional opportunities in the KOL network. " Dkt. No. 149, RICO Case Statement, ¶ 7. If Cohen was personally controlling the advance access that allegedly advantaged selected promoters, he necessarily knew facts inconsistent with his representations that the platform afforded retail participants an "even playing field." That is enough at the pleading stage to support the required inference of fraudulent intent.

Cohen made the three particularized statements over X/Twitter. Plaintiffs additionally allege that the alleged scheme depended on electronic promotion and solicitation, private Telegram and Discord coordination, and the subsequent on-chain purchases and sales through which insiders allegedly monetized the retail demand generated by the promotions. Dkt. No. 129, Compl., ¶¶ 561–62.

Plaintiffs therefore adequately plead at least two acts of wire fraud by Cohen.

The same predicates can be attributed to Baton. Plaintiffs allege that Cohen made the statements on behalf of Pump.fun, while acting as its CEO; that the alleged misrepresentations concerned the manner in which Baton operated its own platform; and that Baton directly benefited because every transaction induced through the scheme generated its automatic one-percent fee.

Dkt. No. 129, Compl., ¶¶ 70, 105; Dkt. No. 149, RICO Case Statement ¶¶ 4–7, 51–53. Courts in this Circuit "generally do not impose vicarious liability under RICO unless the corporate . . . defendant is a central figure in the RICO scheme." *Bd. of Managers of Trump Tower at City Ctr. Condo. v. Palazzolo*, 346 F. Supp. 3d 432, 459 (S.D.N.Y. 2018) (citation omitted). Baton is alleged to be just that. On the allegations pleaded, Cohen's wire-fraud predicates are attributable to Baton.

***Tweedale.*** It is true that Plaintiffs do not identify any public "fair launch" statement made by Tweedale. But that is not dispositive, because the use of the wires in furtherance of a fraud need not itself contain the misrepresentation. *Williams*, 889 F.3d at 125. The relevant question is whether Plaintiffs plausibly allege that Tweedale knew about the alleged deception and knowingly used the wires to further it.

They did. Plaintiffs allege that Tweedale coordinated Pump.fun's KOL management. Dkt. No. 149, RICO Case Statement, ¶ 12. More importantly, the complaint makes clear that Pump.fun's KOL agreements allegedly required promoters to make posts "organically utilizing the pump fun app" while prohibiting them from disclosing the existence of those agreements. Dkt. No. 129, Compl., ¶¶ 203–04. And the complaint reproduces a series of Telegram messages from April 6, 2024 involving Cohen and Tweedale concerning a TikTok promoter who had purchased more tokens during the pre-positioning phase of a campaign than Leadership had authorized him to acquire. *Id.* ¶¶ 209–11 & Figs. 15–17. According to the complaint, Cohen instructed Tweedale to "size him down" – to reduce the promoter's permitted early position. *Id.* ¶¶ 210–11.

Taken as true, these allegations plausibly allege that he participated through electronic communications in administering the very system of preferential pre-positioning that Plaintiffs say was concealed from retail traders while Pump.fun represented its launches as fair. The April 6 exchange is identified by date, participants, medium, and subject matter, and the complaint

reproduces the underlying messages. It therefore does not leave the Court or Tweedale "guessing as to the details" of the wire activity attributed to him. *Sullivan*, 149 F.4th at 222. And because the exchange allegedly consisted of multiple Telegram transmissions made in furtherance of the same scheme, Plaintiffs have adequately pleaded the requisite wire-fraud predicates against Tweedale. Whether these predicates form a RICO pattern, and whether they caused a cognizable RICO injury, are separate questions.

***Kerler.*** Kerler, Pump.fun's Chief Technology Officer, performed technical work on the platform. But Plaintiffs allege that he did more than that. The RICO Case Statement contends that he developed and maintained execution metrics "used for insider-first execution," including measuring transaction "land rate," and that he integrated and optimized "priority pathways relied upon by insiders." Dkt. No. 149, RICO Case Statement, ¶ 10. Kerler allegedly implemented tools to measure and optimize "preferred participants' execution 'land rate'" and integrated "priority pathways essential to insider-first execution." Dkt. No. 129, Compl., ¶ 549.

Taken as true, these allegations support the required inference of fraudulent intent. Kerler was Pump.fun's co-founder and Chief Technology Officer, and Plaintiffs allege that the execution mechanism he directed was designed specifically to improve the execution of favored insiders. If that is true, it is reasonable at the pleading stage to infer that Kerler knew why he was building and optimizing "priority pathways relied upon by insiders" – and knew that favored participants were receiving the sort of undisclosed execution advantage that was inconsistent with Pump.fun's representation that retail traders enjoyed an "even playing field." That inference may ultimately prove incorrect. But Plaintiffs are entitled to the benefit of the inference on a motion to dismiss.

Plaintiffs also identify a particularized use of the wires attributable to Kerler. The complaint reproduces an April 6, 2024 Pump Team communication from Kerler concerning

execution performance and infrastructure specifications. Dkt. No. 129, Compl. ¶ 234 & Fig. 23. The communication is identified by speaker, date, medium, and subject matter. The wire itself does not contain the false representation, but, as discussed above, that is not necessary; it is enough that the wire was used in furtherance of the fraudulent scheme. *Williams*, 889 F.3d at 125. Because Kerler allegedly developed the execution mechanism used to obtain "insider-first execution," the complaint plausibly alleges that Kerler furthered the allegedly fraudulent scheme.

The April 6 communication supplies one adequately pleaded wire-fraud predicate. Plaintiffs do not identify a second Kerler-specific wire with particularity. But § 1961(5) requires two acts of racketeering activity, not two acts of wire fraud. As discussed below, Plaintiffs also adequately plead that Kerler participated in an unlicensed money-transmitting business in violation of § 1960. *See infra* Section III(B)(2)(b)(iii). Together, the April 6 wire-fraud act and the § 1960 violation supply the two predicate acts required by § 1961(5). Whether these acts are sufficiently related and continuous to constitute a pattern is addressed below.

***The Solana Defendants.*** Plaintiffs allege substantial technical and commercial cooperation between Pump.fun and the Solana ecosystem, but they do not plead facts plausibly showing that any Solana Defendant knew about the deception that makes the alleged scheme fraudulent.

Plaintiffs allege that Solana Labs maintained the blockchain infrastructure on which Pump.fun operated, implemented network updates that alleviated congestion affecting Pump.fun, and provided Pump.fun developers with technical assistance. Dkt. No. 129, Compl., ¶¶ 225, 230–45. They also point to public statements by Solana executives. Yakovenko allegedly took credit for Pump.fun's success and offered to help other companies "scale their revenue" as Pump.fun had; he later publicly endorsed Pump.fun as a platform with mainstream potential. *Id.* ¶¶ 227, 278.

Gokal publicly celebrated Pump.fun's July 2025 token sale, posting, "where else can you raise $400m in 13 minutes?" *Id.* ¶ 228.

Although these allegations plausibly show that Solana Labs knew Pump.fun was a highly active memecoin platform and an important source of activity on the Solana network, they do not show that Solana Labs knew that Pump.fun was allegedly giving favored promoters advance token information, allowing them to pre-position before retail promotion, or assisting their exits while representing the launches as fair.

The allegations against the Solana Foundation and the individual Solana Defendants fare no better. Plaintiffs point to statements comparing Pump.fun or memecoin trading to gambling or casino-like activity, Solana's economic interest in greater transaction volume, and statements by Federa and Liu concerning foreign-foundation structures and favorable tax or regulatory treatment. Dkt. No. 149, RICO Case Statement ¶¶ 18, 20, 22, 24, 26, 28.

Knowing that Pump.fun facilitated highly speculative or casino-like trading is not the same thing as knowing that Pump.fun was lying about the fairness of its launches. Nor is the Solana Defendants' economic interest in Pump.fun's success probative of fraudulent intent without facts connecting that interest to the alleged deception. Securities-fraud cases make the common-sense point that an ordinary desire to increase corporate revenue or maintain a profitable business does not, standing alone, support an inference of fraud. *See Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268–70 (2d Cir. 1996); *Rombach v. Chang*, 355 F.3d 164, 177 (2d Cir. 2004). An ordinary commercial motive becomes evidence of fraudulent intent only when facts connect that motive to the fraud alleged. No such facts are pleaded against the Solana Defendants.

Plaintiffs therefore adequately plead the requisite wire-fraud predicates against Baton, Cohen, and Tweedale, and one wire-fraud predicate against Kerler. They do not adequately plead

wire fraud against any of the Solana Defendants. Whether those predicates satisfy RICO's pattern requirement is addressed below.

**ii. Gambling**

Plaintiffs' asserted gambling predicates fail as against all moving Defendants, for a fundamental reason: The transactions alleged in the complaint are not "gambling" within the meaning of New York law.[5]

New York Penal Law § 225.00(2) provides that a person gambles when he "stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome." N.Y. Penal Law § 225.00(2). Thus, the statute contemplates something of value being placed at risk on an identified outcome, with the bettor receiving something of value if that outcome occurs.

A simple wager on a horse race illustrates the point. A bettor places money on a particular horse to win the Belmont Stakes. If the horse wins, the bettor receives whatever the payout is (which depends on the amount of the wager and the prevailing odds); if the horse loses, the bettor loses his stake. The bettor's right to receive money thus depends on the occurrence of the identified future event on which he wagered – whether the chosen horse wins the race.

Speculative investments all are inherently uncertain, but that uncertainty does not make all speculative investments "gambling" under New York law. *Liss v. Manuel*, 296 N.Y.S.2d 627

---

[5] Plaintiffs allege generally that the purported gambling business violated "the laws of states in which it was conducted, including New York." Dkt. No. 129, Compl., ¶ 570. But they identify no non-New York gambling statute in the second amended complaint, and the Court-ordered RICO Case Statement identifies only New York Penal Law §§ 225.00(2), 225.05, and 225.10 as the relevant state gambling provisions. Dkt. No. 149, RICO Case Statement, ¶ 41(a). The Court therefore addresses the only state-law gambling predicates that Plaintiffs have actually pleaded and identified.

(N.Y. City Civ. Ct. 1968), is instructive. There, the plaintiff purchased stock after the defendant supplied supposedly valuable information about the stock, guaranteed the plaintiff against losses, and agreed to take half of any profit. *Id.* at 629–30. The investment went badly; trading was ultimately suspended and the shares became worthless. *Id.* at 630. The defendant argued that the agreement was an unlawful wager because the parties' gain or loss depended on the uncertain future price of the stock. *Id.* at 630–31.

The court rejected that argument. Although the stock market is "notoriously volatile," it observed, "Chancy, yes. A gamble in the legal sense rather than the vernacular, no." *Id.* at 631. "Risk, then, is not the element which makes the transaction a gamble." *Id.* What matters is what happens to the money placed at risk:

> If a sum of money is put up merely to abide a contingent event, at which time the event will determine to whom the money shall go, the transaction is clearly a wager. If, on the other hand, the money is used in the speculative enterprise, the reward of success is deemed a return on investment.

*Id.* at 631–32. The stock purchase was, therefore, an investment – even though its value depended on the occurrence of uncertain future events and the investor ultimately lost everything.

The Appellate Division, First Department's decision in *Matter of Muidallap Corp. v. State Liquor Authority*, 532 N.Y.S.2d 1 (1st Dep't 1988), likewise demonstrates that the statutory elements matter, rather than the degree to which an activity resembles gambling in ordinary speech. Guests at an "Atlantic City Night" played baccarat, blackjack, craps, and wheels of fortune for prizes. *Id.* at 2. But the guests had paid for admission to an evening that included a film screening, dinner, and an open bar; the chips used at the casino games cost them nothing. *Id.* The First Department therefore annulled the agency determination that gambling had occurred, because the participants had not staked or risked something of value on the outcome of games of chance. *Id.* at 2–3.

Here, Plaintiffs allege that a Pump.fun purchaser "staked SOL on whether they could sell before demand disappeared." Dkt. No. 149, RICO Case Statement, ¶ 64. This description does not change the nature of the transaction alleged in the complaint. A purchaser exchanged SOL for a token; he received the token immediately. He owned the token. If the purchaser later sold the token, he transferred that asset back and received in exchange the sales price, measured as the amount of SOL dictated by the bonding curve at that time. Dkt. No. 129, Compl., ¶ 634. The amount received was the consideration for his relinquishing ownership of the token. It was not a prize or a payout that became due because some specified contingent event occurred.

Nor does the initial purchase create an agreement under which Pump.fun promises the purchaser something of value if "subsequent buyers" arrive before "demand disappear[s]." Later purchases might cause the token's price to increase, just as later selling might cause it to decrease. But these events affect what the asset is worth at the moment when its holder chooses to sell. They do not determine whether the holder becomes entitled to payment under a wager.[6]

Put otherwise, the purchase of some asset does not become a wager merely because its resale value depends on uncertain future demand. If it did, purchases of volatile stocks, commodities, collectibles, and other speculative assets would become gambling whenever a purchaser bought hoping that another purchaser would later pay more. *Liss* rejected precisely that equation of economic speculation with illegal wagering. 296 N.Y.S.2d at 631–32.

[6] The Court holds only that the purchase of an asset does not become a wager merely because the asset's resale value depends on uncertain future demand. Here, the purchaser exchanges SOL for a token and receives that token immediately; no payment is promised upon the occurrence of a specified future event. The Court does not address a contract under which the parties' rights to payment are themselves determined by the occurrence or nonoccurrence of an identified future event. Whether such a contract constitutes gambling under § 225.00(2) presents an entirely different question, one that is not presently before the Court.

Plaintiffs' repeated references to Pump.fun as a "casino," and Defendants' own comparisons of memecoin trading to gambling, do not alter the analysis. Whether a transaction constitutes gambling under Penal Law § 225.00(2) turns on the statutory elements, not on the vocabulary used to describe it.

The absence of a New York gambling violation defeats Plaintiffs' reliance on 18 U.S.C. § 1955 to establish a predicate act. Section 1955 criminalizes operating an "illegal gambling business," which must, among other things, be "a violation of the law of a State or political subdivision in which it is conducted." 18 U.S.C. § 1955(b)(1)(i). As the Second Circuit explains, the statute proscribes running a gambling business that "(1) operates in violation of the law of the state in which the business is conducted; (2) is conducted by five people or more; and (3) is either in operation for more than thirty days or earns more than $2,000 in one day." *United States v. DiCristina*, 726 F.3d 92, 99 (2d Cir. 2013).

The complaint alleges generally that the purported gambling business violated "the laws of states in which it was conducted, including New York," Dkt. No. 129, Compl., ¶ 570, but Plaintiffs identify no non-New York gambling statute that was ostensibly violated. And when ordered to identify the state statutes invoked as predicates or elements of their RICO claim, Plaintiffs identified only New York Penal Law §§ 225.00(2), 225.05, and 225.10. Dkt. No. 149, RICO Case Statement ¶ 41(a). Because the transactions described do not constitute gambling under New York law, Plaintiffs have not pleaded the state-law illegality required by § 1955.

Plaintiffs' reliance on New York gambling offenses to create RICO predicates under § 1961(1)(A) fares no better. Per § 1961(1)(A), certain acts involving gambling become predicate acts only when they are "chargeable under State law and punishable by imprisonment for *more than one year*." 18 U.S.C. § 1961(1)(A) (emphasis added).

Promoting gambling in the second degree under Penal Law § 225.05 does not meet that threshold. It is a class A misdemeanor. N.Y. Penal Law § 225.05. Under current New York law, the maximum sentence for a class A misdemeanor is 364 days. *Id.* § 70.15(1). Penal Law § 70.15(1-a) expressly provides that references to "one year" or "365 days" as the maximum allowable term of imprisonment for a misdemeanor are to be interpreted as 364 days. A violation of § 225.05 therefore is not punishable by imprisonment for "*more than one year*" and cannot qualify as racketeering activity under § 1961(1)(A).

Promoting gambling in the first degree under § 225.10 is a class E felony and so can carry a sentence exceeding one year. N.Y. Penal Law §§ 225.10, 70.00(2)(e). But Plaintiffs have not plausibly alleged that Pump.fun's business qualifies as such an offense. Section 225.10 requires a person knowingly to advance or profit from unlawful gambling activity and additionally either (1) engage in bookmaking by accepting more than five bets totaling more than $5,000 in one day, or (2) engage in specified conduct involving a lottery or policy scheme. N.Y. Penal Law § 225.10; *see People v. Giordano*, 87 N.Y.2d 441, 447–48 (1995). Plaintiffs contend that Pump.fun's business constituted bookmaking.

But they are wrong about that. "Bookmaking" means "advancing *gambling activity* by *unlawfully* accepting bets from members of the public as a business . . . upon the outcomes of future contingent events." N.Y. Penal Law § 225.00(9). Illegal bookmaking involves accepting bets that are illegal under some other section of the Penal Law. As we have seen, the purchase and sale of memecoins, chancy though it be, is not the placing of a bet in violation of any section of New York's Penal Law. It is not unlawful gambling activity.

The numerical and monetary thresholds in § 225.10 determine whether and when the taking of bets rises to the level of a felony; they do not transform transactions that are not bets into bets,

for the purposes of finding bookmaking. Plaintiffs' allegation that Pump.fun processed more than five token transactions worth more than $5,000 gets them nowhere. Unless those transactions were bets in the first place, their number and value are irrelevant.

The complaint alleges no lottery or policy scheme, so § 225.10's second alternative is also inapplicable.

Accordingly, neither § 1955 nor any of the New York gambling offenses identified by Plaintiffs supplies a predicate act of racketeering against any moving Defendant.

**iii. Unlicensed Money Transmission**

Plaintiffs' final asserted RICO predicate is operation of an unlicensed money-transmitting business in violation of 18 U.S.C. § 1960.

Section 1960 makes it a crime knowingly to "conduct[], control[], manage[], supervise[], direct[], or own[] all or part of an unlicensed money transmitting business." 18 U.S.C. § 1960(a). The statute defines "money transmitting" to include "transferring funds on behalf of the public by any and all means." *Id.*, § 1960(b)(2). As Judge Nathan explained in *United States v. Murgio*, 209 F. Supp. 3d 698, 706 (S.D.N.Y. 2016), a business must "a) transfer, on behalf of the public, b) funds," and satisfy one of the statutory conditions that makes the business unlicensed. Cryptocurrency can constitute the "funds" being transferred. *Id.* at 707–10; *United States v. Faiella*, 39 F. Supp. 3d 544, 545–46 (S.D.N.Y. 2014).

The Second Circuit recently confirmed the breadth of that definition in *United States v. Goklu*, 173 F.4th 16, 24–27 (2d Cir. 2026). Section 1960 reaches a business that accepts funds or value from one person and transmits funds or corresponding value to another person or location "by any means." *Id.* at 24–25. Thus, a business exchanging Bitcoin for cash was engaged in money transmission because it accepted Bitcoin from a customer and returned its value in cash,

even though there was no separate third-party recipient. *Id.* at 25–26. As the Court of Appeals emphasized, the statute reaches transfers accomplished "by any and all means." *Id.* at 26 (quoting 18 U.S.C. § 1960(b)(2)).

The allegations against the Solana Defendants do not fall within that definition. Plaintiffs allege that Solana Labs and the Solana Foundation "provided and maintained the blockchain infrastructure through which money transmission occurred," and that the individual Solana Defendants directed or supported the development of that infrastructure. Dkt. No. 129, Compl., ¶ 588(b)–(c). But the only conduct alleged to constitute money transmission by those Defendants is their provision and maintenance of the network through which Pump.fun operated. The governing regulation excludes from the definition of a money transmitter a person that only "[p]rovides the delivery, communication, or network access services used by a money transmitter to support money transmission services." 31 C.F.R. § 1010.100(ff)(5)(ii)(A). Consistent with that exclusion, FinCEN has explained that a software developer "is not a money transmitter for the mere act of creating the application"; the developer becomes a money transmitter only if it uses or deploys the application to engage in money transmission. Fin. Crimes Enf't Network, U.S. Dep't of the Treasury, FIN-2019-G001, *Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies* 27 (May 9, 2019).

Plaintiffs' assertion that each Solana Defendant "conducted" or "directed" the unlicensed money-transmitting business merely repeats the statutory language. The facts alleged do not show that any Solana Defendant accepted or exchanged customer value, operated Pump.fun's smart contracts, or controlled the mechanism through which Pump.fun received SOL and returned tokens or SOL. These allegations describe only the provision of network infrastructure and technical support, not the operation of Pump.fun's money-transmitting business.

*Faiella* and *Murgio* illustrate the distinction. In *Faiella*, the defendant "received cash deposits from his customers and then, after exchanging them for Bitcoins, transferred those funds to the customers' accounts on Silk Road." 39 F. Supp. 3d at 546. *Murgio* likewise involved a Bitcoin exchange alleged to accept and transmit customer funds as part of its own business. 209 F. Supp. 3d at 706–12. No comparable conduct is alleged against any Solana Defendant. Plaintiffs therefore have not adequately pleaded a § 1960 predicate against them.

As to Baton, however, Plaintiffs allege that Pump.fun operated an ongoing exchange through its bonding-curve contracts. A purchaser sent SOL to a Pump.fun smart contract and received tokens; a seller sent tokens to the contract and received SOL. Dkt. No. 129, Compl., ¶¶ 578–83, 634. Pump.fun allegedly conducted those transactions repeatedly and charged a one-percent fee on each. *Id.* ¶¶ 70, 105.

At this stage, these allegations plausibly describe money transmission under *Goklu*. The Court of Appeals explained, "By accepting bitcoin and transmitting cash, [Goklu] engaged in the transfer of funds 'by any . . . means,' as contemplated by 18 U.S.C. § 1960." 173 F.4th at 26. Pump.fun's smart contracts likewise allegedly accepted one form of value and transmitted another as part of an exchange operated for a fee. *See* 31 C.F.R. § 1010.100(ff)(5)(i)(A). Plaintiffs further allege that Baton failed to register the business with FinCEN as required by 31 U.S.C. § 5330 and 31 C.F.R. § 1022.380. Dkt. No. 129, Compl., ¶ 583. They have therefore plausibly alleged that Baton operated a money-transmitting business that was "unlicensed" under § 1960(b)(1)(B). The Court need not decide whether Pump.fun also required a New York license under § 1960(b)(1)(A).

Plaintiffs also adequately plead that Cohen, Kerler, and Tweedale participated in conducting that business. Section 1960 reaches "[w]hoever knowingly conducts, controls, manages, supervises, directs, or owns all or part" of an unlicensed money-transmitting business.

18 U.S.C. § 1960(a). *United States v. Banki*, 685 F.3d 99, 115–16 (2d Cir. 2012) accordingly distinguished a "mere customer or beneficiary" from an "intermediary" who knowingly facilitated a transfer.

On Plaintiffs' allegations, the three officers were active, participating "intermediaries." Cohen, Pump.fun's CEO, allegedly directed platform strategy and token campaigns. Dkt. No. 149, RICO Case Statement, ¶ 7. Kerler, its Chief Technology Officer, allegedly developed and maintained the technical architecture and execution pathways through which Pump.fun transactions were processed. *Id.*, ¶¶ 9–10. Tweedale, its Chief Product Officer, allegedly coordinated platform operations. *Id.*, ¶ 12. The complaint further alleges that the Pump.fun Defendants "designed, implemented, and operated the money transmission platform" and "received and transmitted cryptocurrency through its smart contracts and infrastructure." Dkt. No. 129, Compl., ¶ 588(a). At the pleading stage, these allegations plausibly show that Cohen, Kerler, and Tweedale each knowingly conducted, managed, supervised, or directed at least part of the money-transmitting business.

Accordingly, Plaintiffs have adequately pleaded racketeering activity under § 1960 against Baton, Cohen, Kerler, and Tweedale. They have not adequately pleaded a § 1960 predicate against Solana Labs, the Solana Foundation, Yakovenko, Gokal, Albert, Federa, or Liu.

3. Plaintiffs Adequately Plead Proximate Cause as to Execution Losses and Transaction Fees

Plaintiffs have adequately pleaded wire-fraud predicates and a § 1960 unlicensed-money-transmission predicate against Baton, Cohen, Kerler, and Tweedale. But identifying racketeering activity is not the end of the inquiry. A private RICO plaintiff must also have been "injured in his business or property by reason of" the alleged RICO violation. 18 U.S.C. § 1964(c).

A RICO plaintiff must show “some direct relation between the injury asserted and the injurious conduct alleged.” *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992). The requirement serves, among other things, to avoid damages inquiries in which a court must separate the effect of the alleged racketeering from “other, independent, factors.” *Id.* at 269.

For a § 1962(c) claim, moreover, “the compensable injury flowing from a [RICO] violation . . . necessarily is the harm caused by [the] predicate acts.” *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985)). The “central question” is whether “the alleged violation led directly to the plaintiff’s injuries.” *Id.* at 461. *Anza* rejected a claim for lost sales where determining how much of the plaintiff’s loss resulted from the fraud would require a “complex assessment,” explaining that RICO proximate cause is meant to prevent such “intricate, uncertain inquiries” from overrunning the litigation. *Id.* at 459–60. The Second Circuit applies that rule even at the pleading stage. *See Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 142–45 (2d Cir. 2018).

Not every predicate act comprising an alleged pattern must independently inflict a separate compensable injury. The Second Circuit has explained that the causation requirement can be satisfied where the plaintiff’s injury was “proximately caused by a pattern of racketeering activity . . . or by individual RICO predicate acts.” *Baisch v. Gallina*, 346 F.3d 366, 373 (2d Cir. 2003) (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 122–23 (2d Cir. 2003)). Thus, if an adequately pleaded act of wire fraud directly caused Plaintiffs to lose property, the fact that another predicate forming part of the same alleged pattern did not independently cause an additional injury does not prevent that latter offense from being considered in determining whether a pattern of racketeering activity has been alleged.

Plaintiffs advance three theories of injury.

*First,* they allege that they suffered trading losses – specifically, that insider pre-positioning, deceptive promotion, and managed exits by insiders caused them to purchase tokens at inflated prices and lose money when those prices declined. Dkt. No. 129, Compl., ¶¶ 313–18, 590(a).

*Second,* they allege that they suffered execution losses – "inferior fills" and "slippage" – because favored traders and bots obtained priority for their transactions over Plaintiffs. Dkt. No. 149, RICO Case Statement, ¶ 107.

*Third,* they allege that they would not have traded on Pump.fun at all had they known the truth about the allegedly rigged "fair launch" system, and so would not have paid the one-percent transaction fees Baton collected on those trades. Dkt. No. 129, Compl., ¶¶ 319–20, 533, 590(b), (d); Dkt. No. 149, RICO Case Statement, ¶¶ 105, 108, 115–16.

The trading-loss theory fails to satisfy RICO's directness requirement. The execution-loss and transaction-fee theories, however, do satisfy that requirement.

**a. Trading Losses**

Plaintiffs' § 1960 unlicensed-money-transmission theory does not account for the alleged inflation and subsequent collapse of token prices; operating the same money-transmitting mechanism with every required registration would not have changed the pre-positioning, promotion, purchases, or sales that allegedly moved those prices. The predicate activity alleged to have caused Plaintiffs' trading losses is, therefore, wire fraud, and only wire fraud. The alleged wire fraud includes not only the public misrepresentations about "fair launches," but also electronic communications that were used to further the alleged scheme, including Tweedale's April 6 Telegram communications concerning a promoter's pre-positioned token allocation. *See*

*supra* Section III(B)(2)(b)(i). The question is whether the allegedly fraudulent scheme carried out through those uses of the wires led directly to Plaintiffs' trading losses.

They did not.

Pump.fun's bonding curve changed a token's price as users bought and sold. Plaintiffs allege that the wire-fraud scheme both induced retail demand through deceptive "fair launch" representations and used electronic communications to administer preferential pre-positioning by insiders. But neither aspect of the alleged scheme determined the loss ultimately suffered by Aguilar, Carnahan, or Okafor. Individual traders still decided whether, when, and how much to purchase; those purchases moved the token upward along the bonding curve; other holders decided whether and when to sell. The named Plaintiffs and other "outsiders" ultimately realized a gain or loss depending on when their own trades occurred.

The bonding curve dictated how a trade affected price, but it did not dictate whether that trade would occur, who would make it, how much would be purchased, or when holders would sell. Determining what portion of a named Plaintiff's loss resulted from the alleged fraudulent misrepresentations would, therefore, require reconstructing a counterfactual trading history, including how much demand would have existed absent the alleged deception, which users still would have traded, when those trades would have occurred, how those trades would have moved the curve, and when the particular Plaintiff would have entered and exited.

This is precisely the sort of inquiry *Anza* forecloses. There, the alleged fraud enabled a competitor to reduce its prices and take business from the plaintiff. Yet the Supreme Court held proximate cause lacking because "[b]usinesses lose and gain customers for many reasons," and determining what portion of the lost sales resulted from the defendant's conduct would require a "complex assessment." 547 U.S. at 459.

*In re Tether & Bitfinex Crypto Asset Litigation*, 576 F. Supp. 3d 55 (S.D.N.Y. 2021), is particularly on point. The plaintiffs alleged that defendants issued unbacked USDT and used it to purchase cryptocurrencies, thereby creating artificial price floors and the appearance of organic demand. Judge Failla held that RICO proximate cause was lacking because the plaintiffs' losses depended on "the decisions of independent market participants to purchase cryptocommodities" and because the relationship between the alleged racketeering and price inflation was "intricate, uncertain, and contingent on numerous independent decisions made by other market participants, subject to other market forces." *Id.* at 121–22.

Plaintiffs argue that *Tether* is distinguishable because Pump.fun was a "closed system" governed by a bonding curve. Dkt. No. 183-1 at 33–35. But the relevant causal feature is the same. The curve mechanically translated purchases and sales into price movements; it did not eliminate the independent decisions by individual traders that caused those purchases and sales to occur. A trader still decided whether to buy, when to buy, how much to buy, and when to sell.

Indeed, Plaintiffs' own allegations demonstrate that participation in the allegedly rigged system did not automatically produce a loss. They allege that approximately sixty percent of the relevant wallets ended net negative. Dkt. No. 129, Compl., ¶ 322. That necessarily means that approximately forty percent did not. Not everyone lost money on his trading; whether a particular trader profited or lost therefore depended materially on when that trader bought and sold and on the transactions that occurred in between his purchase and his sale.

It is true that Plaintiffs allege that insiders bought early and were among the first to sell. This allegation helps explain how Plaintiffs say the pump-and-dump worked: insiders established positions before public promotion, later retail purchases by unsuspecting non-insiders drove the price upward, and once insiders sold into that demand, the price fell. But it does not solve the

proximate-cause problem. The fact that insiders sold first is not the wire-fraud predicate. And Plaintiffs still must show that the pleaded acts of wire fraud led directly to the losses suffered by Aguilar, Carnahan, and Okafor.

They have not done so. Even if insider sales contributed to the eventual decline in a token's price, the amount of any named Plaintiff's loss still depended on the specific timing of the purchases and sales that moved the bonding curve and on when that particular Plaintiff entered and exited the market. Plaintiffs do not allege that only favored insiders made money on their trades, while every outsider lost money. Determining what loss was caused by the alleged fraud would therefore still require the counterfactual market reconstruction described above.

*Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008), is illustrative. There, false certifications allowed defendants to obtain extra positions in a zero-sum allocation of tax liens. The fraud therefore necessarily deprived legitimate bidders of liens they otherwise would have received. *Id.* at 642–44, 658. As *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 14 (2010), later described the causal relationship, it was "straightforward": "[E]ach time a fraud-induced bid was awarded, a particular legitimate bidder was necessarily passed over."

Nothing comparable occurs here. Neither a public misrepresentation nor an internal wire used to further the alleged pre-positioning scheme necessarily produced a corresponding loss for a particular Pump.fun trader. Even assuming that the April Telegram communications helped favored participants obtain early positions, whether any named Plaintiff later lost money, and how much, depended on the purchases and sales that followed and on where that Plaintiff entered and exited the market.

Plaintiffs respond that those subsequent trades do not break the causal chain because inducing them was the very purpose of the fraud. Dkt. No. 183-1 at 33–35. But intended harm is

not necessarily direct harm. In *Anza*, the alleged fraud was designed to permit the defendant to lower prices and obtain a competitive advantage over the plaintiff. The Supreme Court nevertheless held that the RICO violation had not "led directly" to the plaintiff's lost sales. 547 U.S. at 460–61.

And *Hemi Group* rejects the effort to solve a causation problem by defining the "scheme" broadly enough to encompass all of the intervening conduct. There, the City characterized the violation as a "systematic scheme to defraud the City of tax revenue." 559 U.S. at 13. The Supreme Court responded that a plaintiff cannot evade proximate cause "merely by alleging that the fraudulent scheme embraced all those indirectly harmed by the alleged conduct"; otherwise proximate cause would become "a mere pleading rule." *Id.* The Court instead focused on whether "the conduct directly causing the harm was distinct from the conduct giving rise to the fraud." *Id.* at 11.

Plaintiffs' trading-loss theory fails for the same reason. The alleged wire fraud may have affected demand, but Plaintiffs' realized losses depended on subsequent purchases and sales by numerous market participants. The asserted connection is therefore too indirect to satisfy § 1964(c).

**b. Execution Losses**

The execution-loss theory presents a materially different causal chain. Plaintiffs allege that they suffered "inferior fills, slippage, and related value losses" because Pump.fun's priority-execution environment advantaged insiders over retail participants. Dkt. No. 149, RICO Case Statement, ¶ 107. The complaint further alleges that Kerler implemented tooling to measure and optimize "preferred participants' execution 'land rate'" and integrated "priority pathways essential to insider-first execution." Dkt. No. 129, Compl., ¶ 549; *see also* Dkt. No. 149, RICO Case Statement, ¶ 10.

Taking these allegations as true, Plaintiffs adequately plead a direct relationship between Kerler's alleged act of wire fraud and the asserted injury. The mechanism he allegedly developed determined transaction priority. Transaction ordering was therefore the means by which the alleged fraud produced inferior fills. Unlike the trading-loss theory, the claimed execution injury did not depend on how independent market participants later reacted to the fraud.

Although users generally could pay priority fees, Plaintiffs allege that Kerler developed distinct execution pathways specifically for "preferred participants" and "insider-first execution," and that those pathways caused Plaintiffs inferior fills and slippage. Dkt. No. 129, Compl., ¶ 549; Dkt. No. 149, RICO Case Statement, ¶¶ 10, 107. At this stage, the Court accepts these allegations as true. Whether Plaintiffs can substantiate and quantify the alleged execution losses is a question for a later stage of litigation.

The § 1960 money transmission predicate did not cause these losses. Plaintiffs do not allege that Pump.fun's failure to obtain the required federal registration affected transaction order or execution price; the same execution system could have operated even if Baton had been registered.

Plaintiffs therefore adequately allege that Kerler's wire-fraud predicate directly caused a cognizable RICO injury in the form of execution losses.

#### c. Transaction Fees

Plaintiffs allege that Pump.fun represented its token launches as "fair" and offered traders an "even playing field"; that those representations induced them to trade on Pump.fun; that they would not have made those transactions had they known about the alleged insider advantages; and that Baton automatically collected a one-percent fee when each transaction occurred. Dkt. No. 129, Compl., ¶¶ 319–20, 375–84, 533; Dkt. No. 149, RICO Case Statement, ¶¶ 105, 108, 115–16.

Taking these allegations as true, the causal chain is straightforward. If the alleged fraud caused a Plaintiff to enter a transaction that he otherwise would not have made, the fee followed directly from that transaction. No intervening market reaction had to determine whether the fee would be incurred, and calculating the alleged injury does not require reconstructing the token's counterfactual market price. The claimed loss is simply the fee charged on the allegedly fraud-induced transaction.

This is materially different from the trading-loss theory. *See supra* Section III(B)(3)(a). The latter requires determining how numerous independent purchases and sales would have unfolded in a hypothetical market without the alleged fraud. The injury derived from paying the transaction fee requires no such reconstruction. Plaintiffs allege that, but for the deception, the transaction would not have occurred at all. When the fraud-induced transaction occurred, the one-percent fee was automatically charged.

It is of no moment that Baton received the fee while Cohen and Tweedale did not personally pocket it. Section 1964(c) asks whether a Defendant's RICO violation caused injury to Plaintiffs' business or property – not whether the Defendant personally received the property that Plaintiffs lost. *See Baisch*, 346 F.3d at 373. And *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 649, 658 (2008), confirms that a plaintiff asserting injury from a wire-fraud scheme need not himself have received or relied upon the fraudulent communication, as long as the fraud directly caused his injury.

Plaintiffs have alleged that direct relationship as to Baton, Cohen, and Tweedale. As discussed above, Plaintiffs adequately plead wire fraud against each of them, and allege that the deceptive "fair launch" scheme caused Plaintiffs to transact and thereby incur Baton's automatic fee. These allegations are sufficient at the pleading stage to satisfy § 1964(c).

However, the § 1960 unlicensed money transmission predicate did not proximately cause any transaction fee loss. Plaintiffs do not allege that they paid Baton's transaction fee because Pump.fun was unregistered. Had Baton operated precisely the same platform, charged precisely the same fee, and possessed every registration required by law, Plaintiffs would have incurred the same fee on any transaction they chose to make. *Cf. Empire Merchants*, 902 F.3d at 138, 142–45.

To summarize, Plaintiffs have not adequately pleaded that any Solana Defendant committed a predicate act of racketeering activity. Count I is therefore dismissed as to Solana Labs, the Solana Foundation, Yakovenko, Gokal, Albert, Federa, and Liu.

Plaintiffs have, however, adequately pleaded predicate acts and a directly caused RICO injury as to each of the four Baton Defendants. Two questions remain: whether the surviving claims involve a permissible domestic application of RICO, and whether the adequately pleaded racketeering activity constitutes a pattern within the meaning of § 1962(c).

4. The Surviving RICO Claims Are Sufficiently Domestic Except as to Aguilar

Defendants also argue that Plaintiffs' RICO claims are impermissibly extraterritorial.

RICO's substantive provisions apply extraterritorially only to the extent that the underlying predicate statutes do. *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325, 339–46 (2016). Because the wire-fraud statute does not apply extraterritorially, wire fraud involves sufficient domestic conduct when "(1) the defendant used domestic . . . wires in furtherance of a scheme to defraud, and (2) the use of . . . wires was a core component of the scheme to defraud." *Sullivan v. UBS AG*, 149 F.4th 206, 221 (2d Cir. 2025) (quoting *Bascuñán v. Elsaca*, 927 F.3d 108, 122 (2d Cir. 2019)).

The Baton Defendants' location in England does not make the alleged wire fraud non-domestic. Section 1343 focuses on "the use of the . . . wires in furtherance of a scheme to defraud," not on where the defendant was located or where the scheme was devised. *Bascuñán*, 927 F.3d at

122–23; *see United States v. Napout*, 963 F.3d 163, 179–81 (2d Cir. 2020). In *Bascuñán*, the Second Circuit expressly rejected a rule that would effectively immunize offshore fraudsters, explaining that the mail and wire fraud statutes "do not give way simply because the alleged fraudster was located outside the United States." 927 F.3d at 123. Other Courts of Appeals have applied the same rule to wire transmissions that originated abroad but reached the United States. *See United States v. Hussain*, 972 F.3d 1138, 1145 (9th Cir. 2020) (calls between the United Kingdom and California, emails originating or terminating in California, and press releases distributed from England to California); *United States v. Elbaz*, 52 F.4th 593, 604 (4th Cir. 2022) (holding that a transmission occurs both where it originates and where it is received, and that transmissions received by victims in Maryland were domestic).

What is more, the domestic use of the wires need not contain the fraudulent representation. As discussed above, "the mail or wire communications themselves need not contain a false statement"; a wire constitutes part of the offense if it is used in furtherance of the fraudulent scheme. *Williams v. Affinion Group, LLC*, 889 F.3d 116, 125 (2d Cir. 2018). And a defendant causes such a use when use of the wires will follow in the ordinary course or can reasonably be foreseen. *United States v. Reifler*, 446 F.3d 65, 96 (2d Cir. 2006). Thus, a representation may originate in England but the offense involves domestic wire use because communications are received, or transactions used to execute the scheme occur, in the United States.

Section 1964(c) separately requires a civil RICO plaintiff to allege a domestic injury to business or property. *RJR Nabisco*, 579 U.S. at 354. Whether an injury is domestic is "a context-specific inquiry that turns largely on the particular facts alleged in a complaint." *Yegiazaryan v. Smagin*, 599 U.S. 533, 543 (2023) (citation omitted). Courts consider "the nature of the alleged

injury, the racketeering activity that directly caused it, and the injurious aims and effects of that activity." *Id.* at 544.

Plaintiffs adequately plead domestic use of the wires. Pump.fun allegedly retained KOLs to promote selected tokens "to retail purchasers in the United States, including New York," while concealing their compensation, coordination, and pre-positioning. Dkt. No. 129, Compl. ¶ 83. The RICO Case Statement similarly alleges that the predicate acts targeted retail users, "including New York consumers," through Pump.fun's website and application, social-media communications, Telegram and Discord, direct messages, and on-chain transaction routing. Dkt. No. 149, RICO Case Statement, ¶¶ 39, 55. Okafor and Carnahan further allege that, after being induced by representations concerning fair launches, they entered Pump.fun transactions in the United States that were executed electronically and generated Baton's one-percent fee. Dkt. No. 129, Compl., ¶¶ 65, 67, 70, 105, 561; Dkt. No. 149, RICO Case Statement, ¶¶ 33, 35. These transactions were domestic uses of the wires integral to the alleged scheme.

*Sullivan* confirms that these allegations are sufficient. There, although the alleged Euribor manipulation occurred abroad, the defendants entered domestic transactions with United States counterparties that required trade confirmations over United States wires. Because those transactions enabled the defendants to profit from the alleged manipulation, the Second Circuit held that the domestic wire use was "essential, rather than merely incidental, to the scheme to defraud." 149 F.4th at 221 (quoting *Bascuñán*, 927 F.3d at 122). The same is alleged here. United States users were induced to enter electronic transactions from which the alleged scheme generated revenue. The Court therefore relies on these domestic transactions.

The domestic-wire inquiry is specific to each Baton Defendant. Cohen allegedly made the fair-launch and even-playing-field representations that Plaintiffs say induced U.S. retail

participation. Tweedale allegedly coordinated the KOL and pre-positioning system whose promotions were directed in part to U.S. purchasers. Dkt. No. 129, Compl. ¶¶ 83, 203–04, 209–11; Dkt. No. 149, RICO Case Statement, ¶ 12. The Court does not treat Tweedale's April 6 Telegram exchange as domestic simply because it occurred over the Internet; rather, Plaintiffs allege that the KOL system he administered generated promotional wires directed to U.S. purchasers and the resulting U.S. transactions. Kerler's technical work in England likewise is not itself the domestic wire use, but Plaintiffs allege that the priority pathways he designed and optimized were used when transactions were electronically routed and executed through Pump.fun, including transactions initiated in the United States. *See supra* Section III(B)(2)(b)(i). On the facts alleged, these downstream uses of the wires were reasonably foreseeable. *See Reifler*, 446 F.3d at 96.

The § 1960 unlicensed money transmission predicate is also domestic. Plaintiffs proceed under § 1960(b)(1)(B), which covers a money-transmitting business that fails to comply with federal registration requirements. *See United States v. Goklu*, 173 F.4th 16, 23–25 (2d Cir. 2026). The implementing regulations define a money-services business to include a person "wherever located" that does business "wholly or in substantial part within the United States," 31 C.F.R. § 1010.100(ff), and expressly require registration by a "foreign-located person doing business . . . in the United States as a money services business," *id.* § 1022.380(a)(2). Plaintiffs allege that Baton repeatedly processed transactions initiated by U.S. users and that Cohen, Kerler, and Tweedale knowingly participated in conducting that business. These allegations describe a domestic application of a federal registration requirement.

The Court therefore turns to the separate question of whether each named Plaintiff has alleged a domestic injury under § 1964(c). Okafor and Carnahan have; Aguilar has not.

Okafor and Carnahan plead sufficient facts that tend to demonstrate domestic injury. Both allegedly purchased and sold Pump.fun tokens in the United States, and the injuries that survive the Court's proximate-cause analysis arose directly from those transactions. Dkt. No. 129, Compl., ¶¶ 65, 67. The RICO Case Statement further alleges that each was induced to enter those U.S. transactions by misrepresentations and omissions concerning fair launches and equal access. Dkt. No. 149, RICO Case Statement, ¶¶ 33, 35. Both allegedly transacted in the United States, and their surviving injuries were incurred through those domestic transactions. Taken together with the alleged direction of the scheme toward U.S. retail purchasers, these circumstances sufficiently ground their injuries in the United States. *See Yegiazaryan*, 599 U.S. at 543–45.

Aguilar does not plead comparable facts. The complaint alleges that he purchased and sold several Pump.fun tokens and was damaged, but does not allege that he transacted in the United States. Dkt. No. 129, Compl. ¶ 66. The RICO Case Statement does not allege where he resided, where he received allegedly fraudulent representations, where he transacted, or where his injury arose. Dkt. No. 149, RICO Case Statement, ¶ 34. The Court cannot infer from those allegations that his injury arose in the United States. Aguilar therefore has not adequately pleaded the domestic injury that § 1964(c) requires.

Accordingly, Defendants' foreign residence does not require dismissal of Counts I or II as asserted by Okafor and Carnahan against the Baton Defendants. Aguilar's individual RICO claims against the moving Defendants are, however, DISMISSED for failure to plead a domestic injury as required by § 1964(c).

5. <u>Plaintiffs Adequately Plead a Pattern of Racketeering Activity Against Baton, Cohen, Kerler, and Tweedale</u>

A "pattern of racketeering activity" requires at least two related predicate acts that "amount to or pose a threat of continued criminal activity." 18 U.S.C. § 1961(5); *H.J. Inc. v. Northwestern*

*Bell Telephone Co.*, 492 U.S. 229, 239 (1989). Continuity may be closed-ended – a series of related predicates extending over a substantial period – or open-ended – a threat of continued racketeering activity. *Id.* at 241–42.

In this case, the relatedness requirement is satisfied. Plaintiffs allege that the wire-fraud predicates furthered different components of the same alleged scheme. Deceptive "fair launch" promotion induced retail participation, while the insider-first execution mechanism allegedly gave favored participants an undisclosed advantage when the resulting trades were processed. The § 1960 violation arose from those same transactions conducted through Pump.fun. Dkt. No. 149, RICO Case Statement, ¶¶ 62–65, 107–08. The alleged predicates involved the same platform, participants, victims, and objective: generating and profiting from Pump.fun trading activity. They therefore share "purposes, results, participants, victims, or methods of commission." *H.J. Inc.*, 492 U.S. at 240.

Plaintiffs' allegations do not establish closed-ended continuity. The relevant period is "the time during which RICO predicate activity occurred, not the time during which the underlying scheme operated." *Spool v. World Child International Adoption Agency*, 520 F.3d 178, 184 (2d Cir. 2008); *see DeFalco v. Bernas*, 244 F.3d 286, 321 (2d Cir. 2001). Even accepting the pleaded predicate activity as extending from the April 2024 communications through the COPE-related activity in August and September 2025, the period is only about seventeen months. The Second Circuit has "never held a period of less than two years to constitute a 'substantial period of time.'" *DeFalco*, 244 F.3d at 321; *see Spool*, 520 F.3d at 184–85.

Plaintiffs cannot extend that period by pointing to Cohen's alleged "3,000+ cold DMs" or to unidentified communications on Pump.fun's website, social media, Telegram, and Discord. Dkt. No. 149, RICO Case Statement, ¶¶ 55–56. Wire-fraud predicates must identify the contents

of the communications, the participants, when and where the communications occurred, and why they were fraudulent. *Spool*, 520 F.3d at 185 (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993)). Generalized references to thousands of communications that are neither dated nor identified by content do not plead additional wire-fraud predicates or extend the period of predicate activity.

Open-ended continuity, by contrast, requires a threat of continued racketeering activity; it does not require predicates extending over a substantial period. *DeFalco*, 244 F.3d at 323. Where, as here, the enterprise is not inherently unlawful, that threat may be shown by allegations that the predicate acts were "the regular way of operating that business" or that the nature of the predicates otherwise implies continued criminal activity. *Id.* (quoting *Cofacrèdit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 243 (2d Cir. 1999)).

Plaintiffs adequately allege such a threat. Pump.fun allegedly marketed its launches repeatedly as "fair," with "no presales," "no insider allocations," and "rug-pull proof launches." Dkt. No. 129, Compl., ¶¶ 375–76. Cohen himself made the three particularized "fair launch" and "even playing field" statements discussed above in September and October 2024. *Id.*, ¶¶ 377–79; Dkt. No. 149, RICO Case Statement, ¶¶ 51–53.

At the same time, Pump.fun allegedly maintained recurring KOL arrangements designed to make paid promotion appear independent and organic. The KOL agreements required repeated promotional activity, including a promotional Twitter thread and a separate post each week, while prohibiting disclosure of the arrangement. Dkt. No. 129, Compl., ¶¶ 203–04. Plaintiffs further allege that the same basic sequence – advance information and early acquisition, coordinated promotion, and selling into resulting retail demand – was used across multiple token campaigns beginning in 2024. *Id.* ¶¶ 542–43; Dkt. No. 149, RICO Case Statement, ¶¶ 60–63, 71.

The COPE allegations provide a detailed example of that same alleged practice continuing into 2025. Selected participants allegedly acquired COPE before the public campaign; KOLs were assigned to promote it; promotion began in August 2025; and the campaign continued into September. Dkt. No. 129, Compl., ¶¶ 267–300. The COPE allegations thus place the same alleged "playbook" in operation many months after Cohen's September and October 2024 representations.

The alleged § 1960 violation also supports open-ended continuity, because Plaintiffs allege that Pump.fun routinely processed customer transactions without being federally registered, as required. Dkt. No. 129, Compl., ¶¶ 578–88; Dkt. No. 149, RICO Case Statement, ¶¶ 65, 87–88. Nothing about that alleged violation had a natural endpoint. Pump.fun continued launching tokens and processing trades, so the conduct could continue for as long as the business continued.

The allegations are sufficient as to Baton. Baton allegedly operated the platform, made the recurring fairness representations through its website and CEO, entered the KOL arrangements, conducted repeated token campaigns, processed the resulting trades, and earned a fee on every transaction. Plaintiffs thus allege that the racketeering activity was part of the way Baton generated trading volume and revenue, not an isolated fraud with a fixed endpoint.

The allegations are also sufficient as to Cohen. They identify three particularized fraudulent statements in September and October 2024, allege that he controlled early token-address distribution and access to promotional opportunities, and allege that he continued participating in token promotion during the COPE campaign in August 2025. Dkt. No. 149, RICO Case Statement, ¶¶ 7, 51–54, 56. These allegations place his wire-fraud activity within an ongoing promotional system rather than a completed, one-time act of deception. *Cf. DeFalco*, 244 F.3d at 323–24 (discussing *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521 (2d Cir. 1994)).

I reach the same conclusion as to Kerler. As discussed above, Plaintiffs adequately plead one particularized wire-fraud act against him and separately plead his participation in Pump.fun's § 1960 violation. *See supra* Sections III(B)(2)(b)(i), (iii). The alleged wire concerned an execution mechanism embedded in Pump.fun's continuing operations, while the alleged unlicensed money-transmitting business continued whenever Pump.fun customers transacted. Both predicates involved Kerler's alleged role in operating the same platform and processing the same transactions, and both could continue for as long as Pump.fun operated in the same manner. Plaintiffs therefore adequately plead relatedness and open-ended continuity as to Kerler.

Finally, the same is true of Tweedale. His particularized wire-fraud predicates arise from the April 6, 2024 Telegram exchange concerning the size of a promoter's early token position. But Plaintiffs also allege that Tweedale coordinated Pump.fun's KOL management and platform operations, Dkt. No. 149, RICO Case Statement, ¶ 12, and that Pump.fun used standardized KOL agreements requiring recurring promotion to appear "organic," Dkt. No. 129, Compl., ¶¶ 203–04. The April exchange is therefore alleged as part of an ongoing system of KOL management and pre-positioning, not as an isolated event. His alleged participation in Pump.fun's continuing § 1960 violation provides an additional basis for finding a threat of continued racketeering activity.

Plaintiffs have therefore adequately pleaded relatedness and open-ended continuity as to Baton, Cohen, Kerler, and Tweedale. Together with the enterprise, participation, predicate-act, and injury allegations discussed above, that is sufficient to state a claim under § 1962(c). The motions to dismiss Count I are therefore DENIED as to the claims asserted by Carnahan and Okafor against Baton, Cohen, Kerler, and Tweedale.

6. <u>Count II – RICO Conspiracy</u>

Count II alleges that Defendants conspired to violate § 1962(c), in violation of 18 U.S.C. § 1962(d). A RICO conspirator need not personally commit two predicate acts or satisfy the operation-or-management requirement applicable under § 1962(c). He must "intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense," but it is enough that he "adopt the goal of furthering or facilitating the criminal endeavor." *Salinas v. United States*, 522 U.S. 52, 65 (1997). In a civil case, the plaintiff must allege that the defendant "knew about and agreed to facilitate the scheme." *Baisch*, 346 F.3d at 377.

The agreement must itself be plausibly pleaded. A RICO conspiracy complaint must "allege specifically such an agreement" and provide "some factual basis for a finding of a conscious agreement among the defendants." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25, 26 n.4 (2d Cir. 1990). The question is whether each Defendant knew of the racketeering endeavor and agreed to further it.

Plaintiffs adequately plead that Baton, Cohen, Kerler, and Tweedale joined an agreement involving themselves and the Lead KOL Does. Baton allegedly retained outside KOLs under agreements that required recurring promotion to appear "organic" while prohibiting disclosure of the arrangement. Dkt. No. 129, Compl., ¶¶ 203–04. Cohen allegedly controlled early token-address distribution and access to promotional opportunities. Dkt. No. 149, RICO Case Statement, ¶ 7. The April 6, 2024 Telegram exchange discussed above alleges that Cohen instructed Tweedale to "size him down" after a promoter acquired more tokens before a campaign than he had been authorized to hold. Dkt. No. 129, Compl., ¶¶ 209–11 & Figs. 15–17. Tweedale, in turn, allegedly coordinated Pump.fun's KOL management. Dkt. No. 149, RICO Case Statement, ¶ 12. Kerler allegedly developed and optimized execution metrics "used for insider-first execution" and "priority pathways relied upon by insiders." *Id.*, ¶ 10; *see also* Dkt. No. 129, Compl., ¶ 549.

Taken together, these allegations support a plausible inference that each of the four Baton Defendants knew of and agreed to facilitate the alleged racketeering endeavor. These allegations plausibly describe coordinated participation in different parts of the same alleged scheme to advantage insiders while presenting Pump.fun to retail traders as an even playing field. At the pleading stage, that is sufficient to allege agreement under § 1962(d).

The Lead KOL Does remain unidentified and unserved. Their alleged receipt of advance information, acquisition of early positions, and undisclosed promotional arrangements with Baton support the inference that Baton, Cohen, and Tweedale agreed with outside participants to carry out the alleged scheme. Dkt. No. 149, RICO Case Statement, ¶¶ 30–32.

For substantially the reasons already discussed, the conspiracy claim against the Solana Defendants fails *a fortiori*. *See supra* Section III(B)(2). The alleged technical and commercial cooperation with Pump.fun does not plausibly show that any Solana Defendant knew of the concealed KOL arrangements, pre-positioning, or false fair-launch representations, much less consciously agreed to facilitate that scheme. *See Hecht*, 897 F.2d at 26 n.4.

Plaintiffs have also adequately pleaded injury from the conspiracy. An agreement alone causes no compensable RICO injury. *See Hecht*, 897 F.2d at 24; *Beck v. Prupis*, 529 U.S. 494, 505–07 (2000). But Plaintiffs allege that wire-fraud acts committed in furtherance of the conspiracy directly caused cognizable injuries. The deceptive "fair launch" scheme allegedly induced Plaintiffs to transact and thereby incur Baton's one-percent fee, while Kerler's alleged execution-related wire fraud directly caused inferior fills and slippage. *See supra* Sections III(B)(3)(b)–(c). These alleged injuries resulted from predicate acts undertaken in furtherance of the same alleged racketeering endeavor and are sufficient at the pleading stage to satisfy § 1964(c).

Accordingly, the motions to dismiss Count II are DENIED as to the claims asserted by Carnahan and Okafor against Baton, Cohen, Kerler, and Tweedale and GRANTED as to the Solana Defendants. Aguilar's Count II claim against the moving Defendants has already been dismissed for failure to plead a domestic RICO injury. *See supra* Section III(B)(4).

### C. Plaintiffs' Unjust Enrichment Claim

Finally, Count V alleges that Defendants were unjustly enriched by retaining "platform fees, profits, and token allocations" generated at Plaintiffs' expense through "deceptive and unlawful conduct." Dkt. No. 129, Compl., ¶¶ 650–53.

The Court has supplemental subject-matter jurisdiction over Count V. Section 1367(a) provides that, where a district court has original jurisdiction over an action, it "shall have supplemental jurisdiction" over claims that "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). Count V arises from the same Pump.fun transactions and alleged misconduct as Plaintiffs' federal RICO claims. And because Counts I and II survive against Baton, Cohen, Kerler, and Tweedale, the Court has not "dismissed all claims over which it has original jurisdiction." *Id.*, § 1367(c)(3). Count V raises no novel or complex issue of New York law, will not substantially predominate over the surviving RICO claims, and presents no exceptional circumstance or other compelling reason to decline jurisdiction. 28 U.S.C. § 1367(c)(1), (2), (4).

Personal jurisdiction is a separate matter. The Court nevertheless has pendent personal jurisdiction over the moving Defendants on Count V. As explained above, Rule 4(k)(2) supplies personal jurisdiction over Baton and the Baton Officers on the RICO claims. The Solana Defendants did not challenge personal jurisdiction over them on those claims. Count V derives from the same alleged scheme and the same transactions.

The Second Circuit allows a court to exercise pendent personal jurisdiction over related claims that "derive from a common nucleus of operative fact" with a claim over which personal jurisdiction exists. *Sullivan*, 149 F.4th at 225 (quoting *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir. 1993)). The doctrine is discretionary and turns on "considerations of judicial economy, convenience[,] and fairness to litigants." *Id.* at 226.

These considerations favor exercising jurisdiction here. Count V is fully briefed and rests on the same transactions, alleged deception, fees, and claimed benefits already at issue in the federal claims. Deciding it requires no separate jurisdictional discovery and imposes no meaningful additional burden on Defendants.[7]

The Court therefore reaches the merits of Count V as to all moving Defendants.

1. <u>Governing Law</u>

To state a claim for unjust enrichment under New York law, a plaintiff must allege "that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (2012) (quoting *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011)). Privity is unnecessary, but the plaintiff must allege a relationship with the defendant that is not "too attenuated." *Id.* at 516–18.

Unjust enrichment has a limited role under New York law. It "is not a catchall cause of action to be used when others fail." *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012).

[7] The RICO claims against the Solana Defendants are dismissed on the merits, but that does not deprive the Court of authority to exercise pendent personal jurisdiction over Count V. As the Second Circuit has explained, "pendent personal jurisdiction is a discretionary doctrine." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 88 (2d Cir. 2018). The Court exercises that discretion here. Count V arises from the same nucleus of operative fact as the RICO claims, is fully briefed, and can be resolved without additional jurisdictional discovery. Judicial economy, convenience, and fairness therefore favor deciding it now.

Rather, it is available in "unusual situations" where circumstances create an equitable obligation running from the defendant to the plaintiff, and "is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Id.* Most importantly here, where the alleged enrichment arises from wrongdoing that affords a basis for some other claim, "[t]o the extent that these claims succeed, the unjust enrichment claim is duplicative; if plaintiffs' other claims are defective, an unjust enrichment claim cannot remedy the defects." *Id.* at 791.

2. <u>Baton</u>

Plaintiffs adequately allege that Baton received a benefit directly from them. They allege that Pump.fun charged a one-percent fee on every purchase and sale and that fees were collected from "every transaction Plaintiffs executed." Dkt. No. 129, Compl., ¶¶ 337–39. So attenuation is not the problem.

*Corsello* requires dismissal because Plaintiffs seek to recover in Count V the same one-percent transaction fees based on the same alleged deception underlying their RICO claim. If that claim succeeds, Count V is duplicative; if it fails, unjust enrichment cannot remedy the defect. 18 N.Y.3d at 790–91. Plaintiffs identify no other independent basis for restitution.

Count V is therefore DISMISSED as to Baton.

3. <u>Cohen, Kerler, and Tweedale</u>

Count V fails against the Baton Officers for an additional and more basic reason. Plaintiffs do not plausibly allege that any of them personally received a benefit at a named Plaintiff's expense.

Plaintiffs rely principally on the allegation that "Pump.fun's founders and insiders moved over $700 million in profits off-chain." Dkt. No. 129, Compl., ¶ 339. Their opposition similarly

argues that the officers "personally moved over $700 million off-chain." Dkt. No. 183-1 at 46. But moving corporate proceeds is not the same thing as personally receiving or retaining them.

The complaint does not allege that Cohen, Kerler, or Tweedale personally received or retained any portion of the $700 million, or that any transaction fee paid by a named Plaintiff went to one of them rather than Baton. Plaintiffs therefore do not plausibly allege that any officer was enriched at Plaintiffs' expense. *See Barlow v. Skroupa*, 221 A.D.3d 482, 484 (1st Dep't 2023) (dismissing unjust-enrichment claim against individual defendants because "the complaint asserts no nonconclusory facts suggesting that they were enriched at plaintiffs' expense").

Count V is therefore DISMISSED as to Cohen, Kerler, and Tweedale.

4. <u>The Solana Defendants</u>

Plaintiffs identify two alleged benefits: (1) transaction fees generated on the Solana network, and (2) appreciation in the value of SOL held by the Solana Defendants. Dkt. No. 129, Compl. ¶¶ 340–48.

The first theory fails because the complaint alleges that network fees are distributed to validators and does not allege that any network fee paid by Aguilar, Carnahan, or Okafor was received by any Solana Defendant. *Id.*, ¶ 237.

The SOL-appreciation theory is even more attenuated. Plaintiffs allege that their trades contributed to aggregate network activity, that greater activity increased demand for SOL, and that greater demand raised the value of SOL held by the Solana Defendants. That chain does not plausibly allege that any Solana Defendant received a benefit at a named Plaintiff's expense. *See Georgia Malone*, 19 N.Y.3d at 516–18.

Count V is therefore DISMISSED as to Solana Labs, the Solana Foundation, Yakovenko, Gokal, Albert, Federa, and Liu.

## Conclusion

For the foregoing reasons, Defendants' motions to dismiss are GRANTED IN PART and DENIED IN PART.

Counts I and II, for substantive RICO and RICO conspiracy under 18 U.S.C. §§ 1962(c) and (d), remain pending only as asserted by Kendall Carnahan and Michael Okafor against Baton Corporation Ltd., Alon Cohen, Dylan Kerler, and Noah Tweedale. All claims asserted by Diego Aguilar against the moving Defendants, and all claims asserted against Solana Labs, Inc., the Solana Foundation, Anatoly Yakovenko, Raj Gokal, Dan Albert, Austin Federa, and Lily Liu, are DISMISSED.

Count III, asserting violations of Sections 5 and 12(a)(1) of the Securities Act, and Count IV, asserting control-person liability under Section 15, are DISMISSED as to FRED and GRIFFAIN under Rule 12(b)(6) and as to the other eighteen Pump Tokens for lack of class standing. Count V, for unjust enrichment, is DISMISSED under Rule 12(b)(6) as to every moving Defendant. All dismissals under Rule 12(b)(6) are with prejudice.[8]

The complaint also names Lead KOL Doe Defendants 1–25. Dkt. No. 129. None has been identified or served, and they are not before the Court on the motions decided today.

Federal Rule of Civil Procedure 4(m) provides that, if a defendant is not served within 90 days after the complaint is filed, the Court – "on motion or on its own after notice to the plaintiff"

[8] Plaintiffs have not sought leave to amend, and "no court can be said to have erred in failing to grant a request that was not made." *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011). Plaintiffs have already amended twice, most recently after obtaining nearly 5,000 internal chat messages that they represented would "substantially strengthen the claims and provide greater clarity to the operative facts." Dkt. No. 103 at 10. The resulting second amended complaint contains 653 numbered allegations, and Plaintiffs thereafter filed a 47-page amended RICO Case Statement specifying the basis for liability as to each Defendant. Dkt. Nos. 129, 149. In these circumstances, the Court declines to grant leave to amend *sua sponte*.

– must either dismiss the action against that defendant without prejudice or order that service be made within a specified time. Fed. R. Civ. P. 4(m). If the plaintiff shows good cause, an extension is mandatory; even absent good cause, the Court has discretion to extend the time for service. *Zapata v. City of New York*, 502 F.3d 192, 196–97 (2d Cir. 2007). A court may not dismiss *sua sponte* under Rule 4(m) without first giving the plaintiff notice and an opportunity to show good cause for the failure to effect service. *Meilleur v. Strong*, 682 F.3d 56, 61 (2d Cir. 2012).

This lawsuit commenced on January 30, 2025. Dkt. No. 1. A second amended complaint was filed on January 8, 2026. More than a year and a half has passed since the lawsuit began; more than seven months have passed since the second amended complaint was filed. Plaintiffs have neither identified nor served any of the twenty-five Lead KOL Doe Defendants. Nor have they sought any extension of time to do so from the Court.

Plaintiffs are therefore **ORDERED TO SHOW CAUSE, on or before September 10, 2026**, why the claims against Lead KOL Doe Defendants 1–25 should not be dismissed for failure to identify and serve them. Plaintiffs' submission shall not exceed five pages and must: (1) identify any Lead KOL Doe Defendant whose identity Plaintiffs have ascertained; (2) describe the efforts undertaken to identify and serve the Doe Defendants in the past year and a half; (3) identify any discovery Plaintiffs contend is necessary to ascertain their identities and explain why leave to take such discovery was not previously sought; and (4) state whether any Doe Defendant is believed to be located outside the United States and, if so, the basis for that belief and any efforts undertaken to effect service abroad. *See* Fed. R. Civ. P. 4(m) (excluding service in a foreign country under Rule 4(f) from the 90-day period); *USHA (India), Ltd. v. Honeywell International, Inc.*, 421 F.3d 129, 133–34 (2d Cir. 2005).

If Plaintiffs fail to respond by September 10, 2026, the claims against Lead KOL Doe Defendants 1–25 will be dismissed pursuant to Rule 4(m).

The Clerk of Court is directed to terminate the motions at Dkt. Nos. 165, 167, and 169.

This constitutes the decision and order of the Court. It is a written decision.

Dated: August 31, 2026

U.S.D.J.