UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

OMAR HURLOCK and ANUJ MEHTA, on behalf of themselves and all others similarly situated,

Plaintiffs,

-against-

KELSIER LABS, LLC, d/b/a KELSIER VENTURES, HAYDEN MARK DAVIS, GIDEON DAVIS, CHARLES THOMAS DAVIS, METEORA, *an unincorporated association*, and BENJAMIN CHOW,

Defendants.

Case No. 1:25-cv-03891 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

Before the Court are three motions to dismiss and Plaintiffs' motion for leave to file a second amended complaint. Plaintiffs Omar Hurlock's ("Plaintiff Hurlock" or "Hurlock") and Anuj Mehta's ("Plaintiff Mehta" or "Mehta" and, together with Hurlock, "Plaintiffs") Amended Class Action Complaint ("Am. Compl." or the "Amended Complaint") alleges fraud; conspiracy to defraud; violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962(c)-(d); violations of the New York General Business Law ("N.Y. GBL"), N.Y. Gen. Bus. Law §§ 349-350; and unjust enrichment against all Defendants. Defendants Kelsier Labs, LLC ("Defendant Kelsier" or "Kelsier"), Hayden Mark Davis ("Defendant Hayden" or "Hayden"), Gideon Davis ("Defendant Gideon" or "Gideon"), and Charles Thomas Davis ("Defendant Thomas" or "Thomas" and, together with Kelsier, Hayden, and Gideon, the "Kelsier Defendants") moved to dismiss Plaintiffs' Amended Complaint under Federal Rules of Civil Procedure ("Rule") 9(b), 12(b)(6), and 12(b)(2). Defendant Benjamin Chow ("Defendant Chow" or "Chow") moved to dismiss Plaintiffs' Amended Complaint under Rule 12(b)(6). Intervenor

Plaintiff Dynamic Labs Limited ("Intervenor Plaintiff Dynamic Labs" or "Dynamic Labs") moved to dismiss Plaintiffs' Amended Complaint against Defendant Meteora ("Defendant Meteora" or "Meteora" and, together with the Kelsier Defendants and Chow, "Defendants") under Rules 9(b) and 12(b)(6).

For the following reasons, the Court GRANTS the Kelsier Defendants' motion to dismiss, GRANTS Defendant Chow's motion to dismiss, and GRANTS Intervenor Plaintiff Dynamic Labs's motion to dismiss claims against Meteora. The Court also DENIES Plaintiffs' motion for leave to file a second amended complaint.

## BACKGROUND

### I. Factual Background

The following facts are drawn from the Amended Complaint and the documents it incorporates by reference; they are taken as true for purposes of these motions. *See Costin v. Glens Falls Hosp.*, 103 F.4th 946, 952 (2d Cir. 2024). On a Rule 12(b)(6) motion, a court is generally limited to the "facts stated on the face of the complaint," as well as "documents appended to the complaint or incorporated in the complaint by reference," "matters of which judicial notice may be taken," and documents "'integral' to the complaint." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (first quoting *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016); and then quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)). "Where a document is referenced in a complaint, 'the documents control and this Court need not accept as true the allegations in the . . . complaint.'" *Tongue v. Sanofi*, 816 F.3d 199, 206 n.6 (2d Cir. 2016) (quoting *Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000)).

**A. The Parties**

Plaintiffs Hurlock and Mehta are purchasers of memecoins. Am. Compl. ¶¶ 37-38. Mehta is a resident of Arlington, Virginia, *id.* ¶ 37, and Hurlock is a resident of Brooklyn, New York, *id.* ¶ 38. Kelsier is a family-run venture capital firm incorporated under Texas law in 2021. *Id.* ¶ 41. Hayden, Gideon, and Thomas are founders of Kelsier. *Id.* ¶¶ 42-44. Hayden is Kelsier's CEO, *id.* ¶ 42, and Thomas is the Chairman, *id.* ¶ 44. Defendant Chow is a co-founder and the former CEO of Meteora. *Id.* ¶¶ 40, 116, 118.

As alleged by Plaintiffs, Defendant Meteora is an unincorporated association whose members include, but are not limited to, Defendant Chow and non-parties Ming Yeow, Zhen Hoe Yong, Siong Ong, Raccoon Labs, Block Raccoon, Dynamic Labs, and Dynamic Labs, Ltd. *Id.* ¶¶ 39, 52. According to Meteora's Terms of Service, "Meteora is a distributed set of specially-developed smart contracts . . . deployed on the Solana blockchain or such other compatible blockchain network, as the case may be . . . which allows any user to trade digital asset pairs directly in a peer-to-peer manner via Liquidity Pools." Terms of Service, *Meteora Docs*, https://docs.meteora.ag/resources/legal/terms-of-service (last visited Sept. 24, 2026).[1] According to these terms, Meteora's "sole role is the deployment of the Smart Contracts" and these contracts "simply comprise a set of autonomous blockchain-based smart contracts deployed on the relevant Blockchain Network, operated directly by users calling functions on it . . . . There is no further control by or interaction with" Meteora, which "solely functions as a provider of technical tools for users, and is not offering any sort of securities product or regulated service nor does it hold any user assets on custody." *Id.*

[1] The Meteora website and various "docs.meteora.ag" pages are incorporated by reference in the Amended Complaint. *See, e.g.*, Am. Compl. ¶¶ 51 n.7, 127 n.34, 130 n.37.

**B. Relevant Cryptocurrency Context**

Memecoins are cryptocurrencies inspired by internet memes, jokes, or pop culture. Am. Compl. ¶ 83. Unlike "established cryptocurrencies . . . which have clear use cases and established ecosystems, memecoins often emerge as viral sensations, gaining popularity through online communities, celebrity endorsements, and promotional campaigns." *Id.* Memecoins are created, purchased, and sold exclusively online. *Id.* Retail investors discover and acquire information about memecoins online, *id.* ¶ 98, primarily (i) from crypto leaders, investors, analysts, and promoters on X; (ii) from online groups of investors; (iii) by receiving new tokens via promotional "airdrop"; or (iv) from a token screening service, *id.* ¶ 99.

A "smart contract" is a computer program run on a particular blockchain that enforces the terms of an agreed transaction by automatically executing when the relevant conditions are met. *Id.* ¶ 79. Smart contracts can be either "immutable," meaning their code cannot be changed once they are deployed on the blockchain, or "upgradeable," which can be changed. *Id.* When a smart contract is deployed on the Solana blockchain, where the transactions at issue in this action were executed and recorded, *id.* ¶ 66, the program's deployer specifies an "upgrade authority." *Id.* ¶ 81. Thereafter, that "upgrade authority" can modify the deployed program. *Id.* "Upgrade authority" can be assigned to a single wallet or to a "Multisig," which is a smart contract that usually requires more than one wallet address to "sign" a transaction. *Id.* ¶ 82. Multisigs typically require signatures from the majority of a limited number of authorized signatories in order to approve a transaction. *Id.* The "upgrade authority" for all relevant Meteora programs is a 4-of-7 multisig. *Id.* ¶ 132. As relevant here, these Meteora programs include: Dynamic Automatic Market Maker Pools Program ("Dynamic AMM"), Dynamic Liquidity Market-Maker ("DLMM"), and the M3M3 Program. *Id.* ¶ 130.

### C. The M3M3 Platform and $M3M3

In late 2024, according to Plaintiffs, memecoin investing was "a race to dump." *Id.* ¶ 158. Increasingly skeptical memecoin investors no longer saw any value in holding onto their investments and instead would attempt to profit at the earliest opportunity after launch. *Id.* To solve this problem, Chow and Meteora began to develop the M3M3 Platform that would reward investors for holding their memecoin investments rather than selling them. *Id.* ¶¶ 160-61, 166.

On December 4, 2024, Defendants Chow and Meteora launched the M3M3 Platform (or the "Platform"). *Id.* ¶ 166. Upon launch, Meteora announced that the Platform contained a "new stake-to-earn mechanism where top memecoin stakers compete to earn fee rewards from permanently-locked liquidity." *Id.* ¶ 170. If investors "staked," or locked, their memecoins, they would be eligible to receive a portion of the transaction fees generated on the corresponding token launch or liquidity pool. *Id.* ¶ 175. The M3M3 Platform was intended to transform memecoins from player-versus-player ("PvP") to player-pump-player ("PPP"). *Id.* ¶¶ 171, 174, 181. In other words, the M3M3 Platform was intended to encourage investors to invest and lock their tokens, as opposed to selling them, thereby creating a mutually beneficial competition dynamic and stabilized market price. *Id.* ¶ 175.

In connection with launching the Platform, Defendants announced the launch of the $M3M3 token. *Id.* ¶ 176. $M3M3 was intended to test the M3M3 Platform and bring together the stable memecoin investment community. *Id.* Within hours of Meteora's announcements, user @WEAREM3M3_ posted on X that the revenue stream for $M3M3 stakers already exceeded $3 million. *Id.* ¶ 177. Defendants represented that there was "over $4.5 million in rewards" and "more than $200,000 [distributed] daily to the top stakers." *Id.* ¶ 178.

Defendants' $M3M3 memecoin promotional campaign allegedly emphasized four distinctions between $M3M3 and other memecoins. *Id.* ¶ 187. Specifically, Defendants

emphasized: (i) its status as the "debut" asset on the M3M3 Platform; (ii) investors' ongoing entitlement to revenue generated on Meteora; (iii) "the central involvement of Defendant Chow, a highly-respected and trusted leader in the Solana ecosystem, and his seeming exclusive responsibility for the project;" and (iv) $M3M3's launch on Meteora, "a purportedly sophisticated, reliable[,] and transparent provider in the Solana ecosystem." *Id.*

### D. The Alleged $M3M3 Fraud

#### *1. Planning for Launch*

In planning for the launch of $M3M3, Meteora and the Kelsier Defendants communicated in a Telegram group chat and created and developed confidential planning documents, including Google documents titled "M3M3 Token Launch Organizer" and "M3M3 Calcs Template." *Id.* ¶ 201. The M3M3 Calcs Template was created and owned by Chow. *Id.* ¶ 202. In sharing the link to the document in the Telegram group, Chow stated:

> hey here's a sheet i [sic] did to play with some numbers on m3m3 config. will [sic] be helpful to know what % of token in circulating that can stake and make some guesses to how much will stake. In general it seems a high # of stakers in leaderboard (500?) and a 21 day reward distribution might be a good starting point. What's interesting is that if there are lots of SOL rewards, staking will get more and more attractive as price goes down and we might get ppl who decide to stake more or buy+stake to get more SOL rewards.

*Id.* The M3M3 Token Launch Organizer was created and owned by "Thomas" — who Plaintiffs believe is Defendant Thomas. *Id.* ¶ 206. As of July 30, 2025, the M3M3 Token Launch Organizer required a viewer to be "part of Kelsier Capital to see this document's view history." *Id.*

Meteora and the Kelsier Defendants also collaborated by phone. *Id.* ¶ 207. During one planning call for the $M3M3 launch, Chow stated, "no one will play the game if they see, like 90% of the supply already locked up." *Id.* Hayden responded, "agreed." *Id.* Chow then stated, "I don't know what percentage is actually going to be available for the public to buy, but if you

say — I am going to make up some numbers — let's just say 5% is going to be available at the end of the day, and 1 or 2% decides to stake, then you just need to match that 1 or 2%." *Id.* ¶ 208.

As part of the agreement to launch and promote the M3M3 Platform and subsequent memecoins, *id.* ¶ 163, the Kelsier Defendants agreed to "invest" approximately $2 million to fund the $M3M3 launch, *id.* ¶ 164. The Kelsier Defendants thereafter deposited 42 SOL (approximately $5,826 USD at the time) to the $M3M3 launch pool. *Id.* ¶¶ 194, 214.

*2. $M3M3 Launch and Purchases by Insider Wallets*

On December 4, 2024, at 11:38:04 a.m., Defendants used the $M3M3 Mint Wallet (the wallet used to mint the coins) to mint one billion $M3M3 Tokens. *Id.* ¶¶ 87, 210. At 11:51:00 a.m., Defendants used the same wallet to create a Memecoin launch pool on Meteora's Dynamic AMM program, which contained the total supply of $M3M3 tokens for launch (the "$M3M3 Launch Pool"). *Id.* ¶¶ 194, 211. The $M3M3 Launch Pool is controlled by the Meteora (M3M3) Vault Authority Program as administrator and operator. *Id.* ¶ 212. The $M3M3 Mint Wallet transferred 900 million $M3M3 Tokens to the $M3M3 Launch Pool, thereby holding back 10% of the $M3M3 Token supply for the launch team. *Id.* ¶¶ 194, 213. According to Plaintiffs, this practice signaled to the general memecoin investment community that the launch team would not snipe its own token launch. *Id.* ¶ 213. In the corresponding Token account, Defendants assigned "Freeze Authority" to the $M3M3 Mint Wallet. *Id.* ¶ 210.

Upon announcement of the launch of $M3M3, Defendants used the $M3M3 Mint Wallet to surreptitiously and temporarily freeze the $M3M3 Token account associated with the Launch Pool, thereby effectively preventing all trading. *Id.* ¶¶ 195, 215. Defendants then executed a series of "rapid-fire sales" to the wallets funded by the Kelsier Defendants (the "Insider Wallets"). *Id.* ¶¶ 197, 216. Each sale was sandwiched between jointly executed "thaw" and

"refreeze" instructions. *Id.* ¶¶ 197, 216. Using this method, and within approximately twenty minutes, Defendants took an additional 85.2% of the total $M3M3 Token supply from the "otherwise covertly frozen" Launch Pool. *Id.* ¶ 219. As a result, the total market capitalization was inflated to approximately $5 million, *id.*, and only approximately 5% of the tokens were available for legitimate sales to the public, *id.* ¶ 196.

Shortly thereafter, the Launch Pool was "unfrozen," and the Insider Wallets began to systematically dump $M3M3 Tokens in multiple, small "sell" transactions. *Id.* ¶ 221; *see also id.* ¶ 199. Between December 5 and 6, 2024, the Insider Wallets "executed coordinated sales, dumping hundreds of thousands of dollars' worth" of tokens into the market, with one Insider Wallet liquidating approximately $222,000 within the first 40 minutes of public trading. *Id.* ¶ 226. This activity caused a sudden, sharp drop in the token price that "left non-insider investors with substantial losses." *Id.* ¶ 221. Plaintiffs allege that Defendants transferred funds through multiple cryptocurrency wallets, *id.* ¶ 240, and used blockchain mixers — services specifically designed to anonymize transactions and disrupt transparent tracking of token proceeds — to hide the profits they extracted from $M3M3 investors, *id.* ¶ 241. $M3M3 Token prices spiked by over one million percent to above $0.12 within approximately one day. *Id.* ¶ 223. On December 6, 2024, the Token's fully diluted market capitalization briefly exceeded $150 million. *Id.* Eventually, $M3M3's price collapsed by over 90%, falling from $0.15 to as low as $0.01 to $0.02. *Id.* ¶ 226.

*3. Post-Launch Statements and $M3M3 Value*

Following the crash of $M3M3, Meteora issued public assurances on December 6 and 7, 2024 promising to "pay back stakers in full." *Id.* ¶ 228. Meteora claimed that over $3 million in rewards had been allocated to stabilize the Token price and "reaffirmed the promise" of $4.5 million in rewards and $200,000 daily distributions. *Id.* Between December 8 and 10, 2024,

$M3M3 experienced a partial rebound, trading between $0.10 and $0.15. *Id.* ¶ 229. During this period, centralized exchanges XT.com and BingX listed $M3M3, driving renewed interest. *Id.* Following the BingX listing, on December 10, 2024, $M3M3 saw a 76% single-day price increase, closing around $0.12. *Id.* On or about December 12, 2024, Meteora launched a trading competition promising $15,000 in token-based rewards to the top 25 traders by volume, which temporarily increased trading activity. *Id.* ¶ 230.

Defendants made other statements regarding the M3M3 Platform and $M3M3 token after launch. On December 15, 2024, Chow posted on X that "[w]e've now seen a few successful M3M3 launches." *Id.* ¶ 181. Chow stated, "One of the most exciting things I am seeing is the amount of interest there is in projects that want to airdrop the $M3M3 community and the demand for more $M3M3 airdrops for other communities. I believe this can be the foundation for M3M3 to be the PPP community for all memecoins." *Id.*; *see also id.* ¶ 231. On January 28, 2025, Chow announced on X that Meteora received a grant from the @WEAREM3M3_ team and provided the account address for the wallet that would receive and hold the grant. *Id.* ¶ 232.

On January 31, 2025, Meteora reported that approximately $800,000 in SOL rewards had been distributed to top stakers, in addition to restaked $M3M3 Tokens, which disproportionately benefited large holders and insiders who had staked early. *Id.* ¶ 234. In early February 2025, $M3M3 experienced a short-lived price spike. *Id.* ¶ 235. However, the price quickly collapsed again. *Id.* By March 2025, $M3M3 had fallen to its all-time low of approximately $0.003. *Id.* ¶ 236. $M3M3 had lost over 98% of its peak value, with little remaining liquidity and minimal daily trading volume. *Id.* Most investors were unable to recover even a fraction of their initial investments. *Id.*

**E. Plaintiff Mehta's $M3M3 Loss**

Plaintiff Mehta received $M3M3 tokens when they were airdropped to his wallet on December 4, 2024. *Id.* ¶ 37. On December 5, 2024, Mehta first purchased $M3M3 tokens. *Id.* For approximately two and a half months thereafter, Mehta made additional purchases and staked transactions in $M3M3. *Id.* On February 17 and 18, 2025, Mehta sold his entire $M3M3 investment and suffered net losses of approximately $19,164. *Id.* To make his purchases, Plaintiff Mehta used a wallet that transacted through user interfaces provided by Phantom or Jupiter. *Id.*

**F. The Viva La Libertad Project and $LIBRA Launch**

*1. The Viva La Libertad Project*

On July 16, in October, and on November 21, 2024, Defendant Hayden traveled to Argentina to meet with representatives of Argentinian President Javier Milei. *Id.* ¶¶ 243-47. According to a statement later issued by the Office of the President of Argentina, President Milei met with "representatives of KIP Protocol in Argentina" on October 19, 2024, and was "informed of the company's intention to develop a project called 'Viva la Libertad' to finance private ventures in the Argentine Republic using blockchain technology." *Id.* ¶ 244. During this trip, Hayden reportedly told others that "he had 'control' over Milei and could broker deals." *Id.* ¶ 245. Hayden also offered to "deliver a meeting with Mr. Milei and a partnership with the Argentine government in exchange for roughly $90 million in cryptocurrencies over 27 months." *Id.* Following the November visit, Hayden toasted with champagne at the Four Seasons in Buenos Aires, telling others that he had just signed a deal with President Milei. *Id.* ¶ 247.

In December 2024, Hayden sent private text messages asserting that "we can also have Milei tweet and meet in person and do promo," that Hayden "control[s]" him, and that Hayden "send[s] $$ to his [President Milei's] sister and he signs whatever I say and does what I want."

*Id.* ¶ 248. On January 30, 2025, Hayden again met with President Milei. *Id.* ¶ 249. Following the meeting, President Milei posted a photo of himself with Hayden on X, reporting that he had a "very interesting conversation" with Hayden regarding the impact and applications of blockchain technology and artificial intelligence in the country. *Id.* ¶ 249; *see also id.* ¶ 250. Chow responded to the post stating, "What changing the world looks like [fire emoji]." *Id.* ¶ 250. Kelsier reposted President Milei's post, adding, "A big step in our vision to ensure the next generation of technology and finance reach the masses. We are proud to advise @JMilei on executing this goal in Argentina and continue changing the world for the better. VIVA LA LIBERTAD." *Id.* ¶ 251.

On February 14, 2025, the domain "www.vivialalibertadproject.com" was purchased and used to publish the Viva La Libertad Project website (the "VLL Website"). *Id.* ¶ 253. The bottom of the VLL Website provides, "Private Initiative project Developed by KIP Network Inc © 2025." *Id.* ¶ 256. The VLL Website described $LIBRA as a "Token with a Purpose," "designed to strengthen the Argentine economy from the ground up by supporting entrepreneurship and innovation." *Id.* ¶ 257. The website also presented a pie chart of how the $LIBRA token supply would be allocated, *id.* ¶ 258 — 50% would be allocated to "Argentina Growth," 30% to "Liquidity" (*i.e.*, available for sale to investors, *id.* ¶ 262), and 20% reserved for the "Treasury," *id.* ¶¶ 258-59. The 20% reserve signaled to investors that the launch team would not "secretly acquire additional token supply using insider information . . . or . . . snip[e] their own token launch." *Id.* ¶ 261. The VLL Website did not provide any detail regarding the intended use of the "Argentina Growth" tokens. *Id.* ¶ 263.

*2. $LIBRA Launch and President Milei Posts*

Defendants used the Meteora DLMM Program to create the $LIBRA launch pool (the "$LIBRA/USDC Pool"). *Id.* ¶¶ 253, 266. The $LIBRA/USDC Pool was funded by a specific

wallet, "LIBRA Wallet 1," and the $LIBRA sent directly to the Pool was "locked." *Id.* ¶ 266. Two $LIBRA:SOL liquidity pools were also created: "$LIBRA/SOL Pool-1" and "$LIBRA/SOL Pool-2" (and, together with the $LIBRA/USDC Pool, the "$LIBRA Pools"). *Id.* ¶ 267.

On February 14, 2025, at approximately 4:37 p.m., Defendants launched $LIBRA. *Id.* ¶¶ 253, 264. Approximately one minute later, one billion $LIBRA Tokens were minted. *Id.* ¶ 264. At approximately 4:38 p.m., LIBRA Wallet 1 executed a single transaction of two transfers: (i) 200,000,000 $LIBRA Tokens, or 20% of the token supply, was sent to the $LIBRA Treasury Address and (ii) 500,000,000 $LIBRA, or 50% of the supply, was sent to an intermediate address. *Id.* ¶ 265. At approximately 6:35 p.m., the intermediate address transferred the entire 50% supply to the Argentina Growth address. *Id.*

At approximately 5:01 p.m., 23 minutes after $LIBRA was minted, Argentinian President Javier Milei posted a public statement of support on X. *Id.* ¶ 268. His post, in part, read "[t]he world wants to invest in Argentina" and provided a link to the VLL Website and the Token Address for $LIBRA, which is the information investors needed to purchase it. *Id.* (alteration in original). In response to his announcement, investor interest, trading volume, and price surged. *Id.* ¶ 269.

At approximately 10:36 p.m., Julian Peh, CEO and founder of the KIP Protocol, *id.* ¶ 244, posted a message on X at the express instruction of an associate of Hayden, who provided the content, *id.* ¶ 271. The post acknowledged the launch of the Viva la Libertad project and the $LIBRA token. *Id.* The post then provided, "To address all questions: we would like to clarify that this is a private enterprise project, President Milei was not and is not involved in the development of this project, as he has mentioned himself. This is an entirely private enterprise." *Id.* Two minutes later, at 10:38 p.m., President Milei deleted his earlier endorsement and posted

a retraction on X, stating that he was "not aware of the details of the project and after having become aware of it [he] decided not to continue spreading the word." *Id.* ¶ 272.

**G. The Alleged $LIBRA Fraud**

Beginning three minutes after launch, and over the course of 107 minutes, from about 4:40 p.m. to about 6:27 p.m., LIBRA Wallet 1 received a total of 13,060,482 USDC from the $LIBRA/USDC Pool. *Id.* ¶ 279. This same LIBRA Wallet also sent $LIBRA to a series of intermediary wallets that transferred $LIBRA to, and received $LIBRA and USDC from, the $LIBRA/USDC Pool. *Id.* ¶ 280. Between February 14 and 16, 2025, these intermediary wallets executed a series of transactions that cumulatively extracted a total of 44,593,888 USDC from the $LIBRA/USDC Pool and sent those assets to another specific wallet, "LIBRA Wallet 2." *Id.* ¶ 281.

A similar pattern occurred in the LIBRA:SOL liquidity pools. *Id.* ¶ 282. There, LIBRA Wallet 1 also funded a series of intermediary wallets, which in turn transacted directly and indirectly with $LIBRA/SOL Pool-1 and $LIBRA/SOL Pool-2. *Id.* On February 14 and 15, 2025, these SOL intermediary wallets executed a series of transactions that cumulatively extracted significant quantities of SOL and sent it to three principal receiving wallets: "69,275.9 SOL to SOL Wallet 1; 148,343.02 SOL to SOL Wallet 2; and 32,045.7 SOL to SOL Wallet 3." *Id.* ¶ 283. Transactions reflect funds flowing from investors into the pool and then extracted via intermediate wallets, totaling over 100 SOL in net outflows within the first hour of launch. *Id.* ¶ 285. The average duration of positions was under 10 minutes, with the majority closed within seconds of creation, indicating rapid extraction rather than genuine liquidity provision according to Plaintiffs. *Id.* ¶ 291.

In contrast to the "locked" $LIBRA that LIBRA Wallet 1 sent to the $LIBRA/USDC Pool, none of the $LIBRA deposited in the $LIBRA Pools by the intermediary wallets were

locked. *Id.* ¶ 292. This structure mimicked an important indicator to investors, namely that the $LIBRA launch was not a rug pull because it looked like liquidity was locked. *Id.* However, the extraction was conducted using different wallets. *Id.*

**H. $LIBRA Post-Launch Statements**

According to Plaintiffs, $LIBRA was an instant and high-profile scandal. *Id.* ¶ 293. Defendants made a number of statements after launch and provided apologies and explanations, disclaimed fault, and implicated others. *Id.* ¶ 294. Specifically, on February 15, 2025, at 7:05 p.m., Kelsier posted on X two statements from Hayden: (i) a video statement from Hayden and (ii) a press release from Hayden titled "Libra Token Launch: Addressing Recent Developments." *Id.* ¶ 296. In the press release, Hayden stated: "Regarding my role, I was responsible for ensuring liquidity for the project and still maintain control over all associated fees and treasury funds." *Id.* ¶ 297. Hayden also stated:

> It is crucial to recognize that memecoin investments are driven by trust and endorsement. When Milei and his team deleted their posts, investors who had purchased the token based on their trust in his endorsement felt betrayed. This led to a wave of panic selling, further exacerbating the situation. The sudden loss of confidence had a catastrophic impace [sic] on the token's market stability.

*Id.* In the video statement, Hayden asserted that he had "managed to round up" "every single dollar that's been collected, or from fees or farming, or liquidated" and that it was his "intention . . . to inject everything back into the libra chart" within "the next 24 to 48 hours." *Id.* ¶ 298. He also invited alternative suggestions: "I am open if there is a different plan that benefits all of you more, for anybody, especially any crypto leaders that have a structural plan." *Id.* Finally, Hayden also publicly named others that had "benefited from [$LIBRA] on the fee side," including Meteora, and publicly "call[ed] on" them to "do the same thing." *Id.* ¶ 299 (alterations in original).

Defendant Chow also subsequently made statements regarding $M3M3 and $LIBRA. On February 16, 2025, at 11:18 p.m., Chow published a purported explanation of "Meteora and my involvement in $LIBRA" on X. *Id.* ¶ 300. Specifically, he stated:

> Meteora's DLMM and Dynamic AMM is a complex permissionless system with an incredible number of configuration options for teams looking to launch with it. There are various ways to lock liquidity, assign custody, design liquidity curves, and different ways to combat snipers including using our Alpha Vault. I often personally provide tech support for launches to help teams navigate the product. Mistakes can seriously impact a launch and it's important to Meteora to help teams by configuring the product correctly.

*Id.* Chow also stated that launch time and "token/pool address" are provided "to me and an on-call engineer or two," although only "a few minutes before an actual launch, if at all." *Id.* ¶ 301. Chow further explained the particular circumstances presented by high-profile memecoin launches:

> When non-crypto natives (e.g. celebrities, politicians, etc.) want to launch a token, they typically need to hire a "deployer" and/or market-maker, which is a service we do not provide. These deployer teams are typically experts in using Meteora's SDK or CLI and can design more sophisticated launches, as our tech allows for tons of customization. In the past, if a project did not have those resources, they would often ask me for deployer and/or market-making referrals.

*Id.* ¶ 303. With respect to $M3M3, Chow stated:

> When we launched our new memecoin AMM platform in December 2024, I asked Hayden and Kelsier Ventures if they would be interested in launching a token on the M3M3 platform in order to provide an initial case study on how it worked. And, while they deployed and launched M3M3 on their own, post-launch we decided on a new set of tokenomics and facilitated a grant for the Meteora community as well as to establish a long-term foundation for M3M3.

*Id.* ¶ 304. And with respect to $LIBRA, Chow stated:

> For, although we were made aware of the possibility of it several weeks ago by Hayden, we had no involvement in the project at all beyond providing IT support, including commenting on the liquidity curve and helping verify the token's authenticity after the token was publicly launched.

*Id.* ¶ 305. Regarding his relationship with Hayden, Chow stated, "I fucked up because I enabled the guy. I should not have enabled him." *Id.* ¶ 313. On February 16, 2025, Chow posted on X that he "referred" a "handful of other projects that had inquired with us about deployer firms" to the Kelsier Defendants. *Id.* ¶ 319.

**I. Plaintiff Hurlock's $LIBRA Loss**

Plaintiff Hurlock purchased and sold $LIBRA tokens on February 14, 2025. *Id.* ¶ 38. Hurlock transacted through user interfaces provided by Phantom or Bullx, from Brooklyn, New York. *Id.* As a result of these transactions, Hurlock lost approximately 0.302 "wSOL." *Id.* "wSOL" is a form of cryptocurrency and refers to wrapped Solana. *Id.* ¶ 38 n.3. Plaintiffs do not allege how much this wSOL was worth in USD at the time.

**II. Procedural History**

Plaintiff Hurlock commenced this putative class action against Defendants Kelsier Ventures, KIP Protocol, Hayden, Gideon, Meteora, Thomas, Julian Peh, and Chow (collectively, the "Initial Defendants") in the New York Supreme Court for the County of New York on March 17, 2025. Dkt. 1-1. On May 9, 2025, the Initial Defendants timely removed the case to this Court. Dkt. 1. On July 9, 2025, Hayden moved to dismiss Hurlock's complaint for lack of personal jurisdiction. *See* Dkts. 86-87. On July 30, 2025, Plaintiff Hurlock amended his complaint, adding Plaintiff Mehta and replacing some of the Initial Defendants to reflect the current Defendants. *See* Dkt. 115. Because of this amendment, on August 19, 2025, the Court denied Hayden's initial motion to dismiss as moot. *See* Dkt. 138.

On September 29, 2025, the Kelsier Defendants moved to dismiss the Amended Complaint. Dkts. 170, 171, 172, 173; Dkt. 174 ("Kelsier Br."). The same day, Defendant Chow moved to dismiss the Amended Complaint. Dkt. 175; Dkt. 176 ("Chow Br."). Also on September 29, 2025, Dynamic Labs moved to intervene in the action, Dkts. 180-82, and filed its

proposed brief in support of its motion to dismiss, Dkt. 182-3. On October 14, 2025, Plaintiffs opposed Dynamic Labs's motion to intervene. Dkt. 198. On October 28, 2025, Plaintiffs opposed Dynamic Labs's motion to dismiss, Dkt. 213 ("Pls. Opp. to DLL"), the Kelsier Defendants' motion to dismiss, Dkt. 214 ("Pls. Opp. to Kelsier"), and Chow's motion to dismiss, Dkt. 215 ("Pls. Opp. to Chow"). On October 31, 2025, the Court granted Dynamic Labs's motion to intervene. Dkt. 221. That same day, Dynamic Labs moved to dismiss Plaintiffs' Amended Complaint. Dkt. 222; Dkt. 223 ("DLL Br."); Dkt. 224. On November 18, 2025, all Defendants, and Intervenor Plaintiff Dynamic Labs, filed their replies. Dkt. 238 ("Chow Reply"); Dkt. 239 ("Kelsier Reply"); Dkt. 240 ("DLL Reply & SAC Opp."). On September 15, 2026, Plaintiffs filed a letter notifying the Court of supplemental authority bearing on their claims. Dkt. 271. On September 18, 2026, the Kelsier Defendants responded to this letter. Dkt. 273.

On October 21, 2025, Plaintiffs filed their motion for leave to file a second amended complaint. Dkt. 203; Dkt. 204 ("Pls. SAC Br."); Dkt. 205 ("Burwick Decl."); Dkt. 205-1 ("Proposed SAC"). On November 4, 2025, Chow filed his opposition. Dkt. 228 ("Chow SAC Opp."); Dkt. 229. On November 18, 2025, the Kelsier Defendants opposed Plaintiffs' motion, Dkt. 241 ("Kelsier SAC Opp."), as did Dynamic Labs, DLL Reply & SAC Opp. Plaintiffs filed their reply on November 25, 2025. Dkt. 258 ("Pls. SAC Reply"). The motions are fully briefed.

## LEGAL STANDARDS

### I. Rule 12(b)(2)

"[T]o survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." *Edwardo v. Roman Cath. Bishop*, 66 F.4th 69, 73 (2d Cir. 2023) (quoting *Eades v. Kennedy, PC L. Offs.*, 799 F.3d 161, 167-68 (2d Cir. 2015)); *see also Troma Ent., Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 217 (2d Cir. 2013) ("A plaintiff

bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010))). The manner of this showing "varies depending on the procedural posture of the litigation." *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990). "Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball*, 902 F.2d at 197). The court "accept[s] as true all factual claims in the complaint and draw[s] all reasonable inferences in the plaintiff's favor." *Fat Brands Inc. v. Ramjeet*, 75 F.4th 118, 125 (2d Cir. 2023) (quoting *Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013) (per curiam)). But where a "conclusory allegation . . . is contradicted by" a properly considered document, "the document controls and the allegation is not accepted as true." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011) (per curiam); *accord Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

"In general, three requirements must be satisfied before a district court may lawfully exercise personal jurisdiction over a party: (1) 'the plaintiff's service of process upon the defendant must have been procedurally proper'; (2) 'there must be a statutory basis for personal jurisdiction that renders such service of process effective'; and (3) 'the exercise of personal jurisdiction must comport with constitutional due process principles.'" *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 40 F.4th 56, 68-69 (2d Cir. 2022) (quoting *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 327 (2d Cir. 2016)). District courts deciding 12(b)(2) motions typically collapse those requirements into a two-part analysis. *See, e.g.*, *O'Reilly v. TP ICAP Glob. Mkts. Ams. LLC*, No. 24-cv-05913 (KPF), 2025 WL 2773284, at *6 (S.D.N.Y. Sept. 29, 2025) ("A district court deciding a motion to dismiss for lack of personal

jurisdiction engages in a two-part analysis."); *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (same). "First, the court must establish whether there is 'a statutory basis for exercising personal jurisdiction.'" *In re Tether & Bitfinex Crypto Asset Litig.*, 576 F. Supp. 3d 55, 86 (S.D.N.Y. 2021) (alteration adopted) (italicization omitted) (quoting *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 128 (2d Cir. 2013)). "In making this determination, the court 'applies the forum state's personal jurisdiction rules' unless a federal statute 'specifically provides for national service of process.'" *Corley v. Vance*, No. 15-cv-01800 (KPF), 2019 WL 3841939, at *4 (S.D.N.Y. Aug. 15, 2019) (alteration adopted) (quoting *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997)). If there is a statutory basis, then "the second step is to analyze whether personal jurisdiction comports with the Due Process Clause of the United States Constitution." *Chloe*, 616 F.3d at 164; *accord Murray Eng'g P.C. v. Remke*, No. 17-cv-06267 (KPF), 2018 WL 3773991, at *3 (S.D.N.Y. Aug. 9, 2018).

**II. Rule 12(b)(6)**

To survive a motion to dismiss under Rule 12(b)(6), a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). The Court accepts as true all non-conclusory allegations of fact and "draw[s] all reasonable inferences in the [nonmovant]'s favor." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72 (2d Cir. 2021) (en banc) (quoting *Austin v. Town of Farmington*, 826 F.3d 622, 625 (2d Cir. 2016)). But the Court need not "accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "[T]he court's task is to assess the legal feasibility of the [allegations]; it is not to assess the weight of the evidence that might be offered on either side." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020).

### III. Rule 9(b)

On a Rule 12(b)(6) motion, "pleadings are typically subject to [Rule] 8," which "requir[es] a 'short and plain statement of the claim.'" *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019) (quoting Fed. R. Civ. P. 8(a)(2)). "This is understood to require 'more than an unadorned, the[-]defendant-unlawfully-harmed-me accusation' but does not require 'detailed factual allegations.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). However, "[c]laims sounding in fraud must satisfy the heightened pleading standards of [Rule] 9(b)." *Olson v. Major League Baseball*, 29 F.4th 59, 71 (2d Cir. 2022). Rule 9(b) states that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "One of the primary objectives of Rule 9(b)'s particularity requirement is to ensure that defendants receive 'fair notice of a plaintiff's claim, to enable preparation of a defense.'" *MacNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89, 99 (2d Cir. 2023) (alterations adopted) (quoting *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987)).

## DISCUSSION

### I. Claims Against Meteora

As a threshold matter, Intervenor Plaintiff Dynamic Labs argues that the claims against Defendant Meteora should be dismissed because Meteora is not legally capable of being sued. DLL Br. at 1-3, 8-16. Specifically, Dynamic Labs contends that Meteora is a software, not an unincorporated association or a partnership. *Id.* at 2, 8-14. And even if Meteora was an unincorporated association, Dynamic Labs argues, Plaintiffs' state law claims are barred by the *Martin* rule and the RICO claims are foreclosed by New York law. *Id.* at 2-3, 14-16.

Plaintiffs respond that Meteora is not a software but qualifies as a partnership or an unincorporated association. Pls. Opp. to DLL at 5, 12-14. Plaintiffs also contend that Meteora

has the capacity to be sued for federal RICO claims under Rule 17(b). *Id.* at 14. Finally, Plaintiffs argue that the *Martin* rule does not bar Meteora from liability because the association's members ratified the fraudulent acts, *id.* at 14-17, and Meteora is a "person" subject to suit under RICO, *id.* at 18-19.

Because "[l]egal existence is a jurisdictional issue[,] [a]nd a party lacking legal existence 'lack[s] standing to sue' or be sued," the Court begins with these arguments. *United States ex rel. Gordon v. Shiel Med. Lab'y*, No. 16-cv-01090 (NGG) (TAM), 2025 WL 949432, at *8 (E.D.N.Y. Mar. 29, 2025) (citation omitted) (third alteration in original) (quoting *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 384 (2d Cir. 2021)); *see also* Fed. R. Civ. P. 17(b) (providing that "for all other parties" not an individual or corporation, "[c]apacity to sue or be sued is determined . . . by the law of the state where the court is located" except that partnerships or unincorporated associations with no such capacity may be sued "to enforce a substantive right existing under the United States Constitution or laws").

**A. Meteora Is Not an Unincorporated Association**

Dynamic Labs first argues that Meteora is a software and therefore has no legal existence and cannot be sued. DLL Br. at 2, 8-9; DLL Reply & SAC Opp. at 2. Plaintiffs concede that Meteora is "a leading memecoin launch platform." Am. Compl. ¶ 115; *see id.* ¶ 111 (referring to "platforms like Meteora"); *id.* ¶ 182 (referring to "Meteora's reputation as a trustworthy Protocol and a desirable memecoin launch platform."); *see also id.* ¶¶ 184, 334, 349, 364. However, they contend that Meteora is a suable entity because "Meteora, the association, is a coordinated business enterprise run by and for a number of actors, not an autonomous piece of software" given that "Meteora has a CEO (Defendant Chow), a 'team' that funds operations and holds offsites, a governance body that votes on fees, and holds itself out to the public as an operating company." Pls. Opp. to DLL at 13 (citing Am. Compl. ¶¶ 40, 132-33, 381). Plaintiffs plead that

the Meteora association members are "individuals or entities that direct and control the development, deployment, and operation of Meteora programs on the Solana blockchain." Am. Compl. ¶ 39. These individuals or entities "include, but are not limited to, Defendant Chow, and non-parties Ming Yeow, Zhen Hoe Yong, Siong Ong, Raccoon Labs, Block Raccoon, Dynamic Labs, and [Dynamic Labs, Ltd.]." *Id.* For the following reasons, the Court finds that Plaintiffs have not sufficiently pleaded that Meteora is an unincorporated association under New York law, for the New York state claims, or under federal law, for the RICO claims.

Under New York law, an unincorporated association is defined as "[a]ny partnership, or other company of persons, which has a president or treasurer." N.Y. Gen. Ass'ns Law § 13 (McKinney 2026). "Specifically, two or more persons must be associated to create such an unincorporated association." *Farrell v. United States Olympic & Paralympic Comm.*, 567 F. Supp. 3d 378, 390 (N.D.N.Y. 2021). "Under New York law, an action against an unincorporated association can be brought only 'against the president or treasurer.'" *La Russo v. St. George's Univ. Sch. of Med.*, 747 F.3d 90, 95 (2d Cir. 2014) (quoting N.Y. Gen. Ass'ns Law § 13); *see also* N.Y. C.P.L.R. § 1025 (McKinney 2026) ("[A]ctions may be brought by or against the president or treasurer of an unincorporated association on behalf of the association in accordance with the provisions of the general associations law."); *accord Farrell*, 567 F. Supp. at 391 ("[P]ursuant to New York law, such an unincorporated association may be sued as long as the action is against the president[ or] treasurer[.]"); *see, e.g.*, *Fairfield Lease Corp. v. Empire Emps. Sunshine Club*, 345 N.Y.S.2d 305, 308 (N.Y. Dist. Ct. 1973) (finding that the "fatal defect in the plaintiff's contention" was the failure to file the case against the president of the unincorporated association); *League of Mut. Taxi Owners v. United Constr. Workers, Loc. 35*, 90 N.Y.S.2d 288, 288-89 (N.Y. Sup. Ct. 1949) (finding "no jurisdiction has been acquired over the moving

defendants" because there was no service on the unincorporated association's president or treasurer).

Rule 17(b)(3)(A) provides that "a partnership or other unincorporated association . . . may be sued in its common name to enforce a substantive right under the United States Constitution or laws." Fed. R. Civ. P. 17(b)(3)(A). In such cases, "the determination of what constitutes an 'unincorporated association' is a question of federal law." *In re Inclusive Access Course Materials Antitrust Litig.*, No. 20-mdl-02946 (DLC), 2021 WL 2419528, at *18 (S.D.N.Y. June 14, 2021) (quoting *Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 820 (9th Cir. 1996)); *see also Goldenberg v. Indel, Inc.*, 741 F. Supp. 2d 618, 628 (D.N.J. 2010) ("However, federal law, not state law, determines whether a group is an unincorporated association for the purposes of 17(b)(3)(A)."). "Federal courts have generally defined an unincorporated association as 'a voluntary group of persons, without a charter, formed by mutual consent for the purpose of promoting a common objective.'" *Inclusive Access*, 2021 WL 2419528, at *18 (quoting *Yost*, 92 F.3d at 820); *accord In re Magnetic Audiotape Antitrust Litig.*, No. 99-cv-01580 (LMM), 2000 WL 1855119, at *1 (S.D.N.Y. Dec. 19, 2000); *Goldenberg*, 741 F. Supp. 2d at 628. Further, "the federal law definition of an unincorporated association does not encompass an unincorporated division of a corporation." *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 77 F. Supp. 2d 71, 77 (D.D.C. 1999), *aff'd sub nom. E.E.O.C. v. St. Francis Xavier Sch.*, 254 F.3d 315 (D.C. Cir. 2000); *accord In Febrianti v. NYC Health & Hosps.*, No. 23-cv-06175 (JLR), 2025 WL 240563, at *1 (S.D.N.Y. Jan. 17, 2025) (dismissing claims against NYPD because it "is an organizational subdivision of the City of New York, and as such, 'lacks independent legal existence and is therefore not a suable entity'" (quoting *Jenkins v. City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007))).

As required under New York law, Plaintiffs do not bring suit against Meteora's president or treasurer; those roles are not even alleged. *See La Russo*, 747 F.3d at 95 ("Under New York law, an action against an unincorporated association can be brought only 'against the president or treasurer.'" (quoting N.Y. Gen. Ass'ns Law § 13)); N.Y. C.P.L.R. § 1025 (McKinney 2026). With respect to the federal claims, while Plaintiffs have alleged a group of individuals and entities that make up the Meteora association (including Chow, Ming Yeow, Zhen Hoe Yong, Siong Ong, Raccoon Labs, Block Raccoon, and Dynamic Labs), *see* Am. Compl. ¶ 39, they do not allege how that wide range of individuals and entities voluntarily associated with each other and mutually consented for the purpose of promoting a common objective.

Plaintiffs' argument that Meteora qualifies as an unincorporated association because they have pleaded concrete indicia of joint control, pooled labor, and a fraudulent profit-making objective is not persuasive. Pls. Opp. to DLL at 13. As for joint control, Plaintiffs argue that Meteora's "seven-member authority functions like a board, making joint decisions on core business matters." *Id.* (citing Am. Compl. ¶¶ 132, 381); *see also id.* at 6 (citing Am. Compl. ¶¶ 132-33, 381). But Plaintiffs' factual allegations in their Amended Complaint do not support this assertion. Plaintiffs point to Meteora's upgrade authority that allows it to modify program code deployed on Solana, Am. Compl. ¶ 81, by "a 4-of-7 multisig," *id.* ¶ 132. That Meteora code can be updated by a majority of the authorized wallet holders is not "analogizable to a 7-member Board of Directors." *Id.* ¶ 133. Nor does this software modification process demonstrate that the purported association "possesses a clear governance structure," Pls. Opp. to DLL at 6, and Plaintiffs do not plead any other facts supporting a governance structure that is akin to a Board of Directors making joint decisions on core business matters.

As for pooled labor, Plaintiffs contend that the "'Meteora team' collaborates to build and operate the business, as evidenced by public statements and job postings." *Id.* at 13. Plaintiffs'

allegations that Meteora used social media to announce the M3M3 Platform and $M3M3 Token, *see, e.g.*, Am. Compl. ¶¶ 165, 172, 174-76, say nothing of how the supposed members of the association collaborated for the purpose of promoting a common objective. Similarly, a job posting for a Developer Relations Engineer for Meteora, *id.* ¶ 33; Dkt. 115-7, does not plausibly allege joint coordination among members of the alleged association.

Finally, Plaintiffs argue that the Meteora "enterprise was formed for the express purpose of profiting from fraudulent token launches and collecting transaction fees." Pls. Opp. to DLL at 13 (citing Am. Compl. ¶¶ 163-64, 378-79). In support of this argument, Plaintiffs cite to allegations in the Amended Complaint concerning the alleged *RICO enterprise,* which consists of "the Meteora Defendants and the Kelsier Defendants." Am. Compl. ¶ 163; *see also id.* ¶¶ 378-79. But allegations regarding a RICO enterprise between the Meteora Defendants and the Kelsier Defendants do not address whether Plaintiffs have sufficiently pleaded that Meteora, a subset of that purported enterprise, was an unincorporated association, let alone one whose collective objective was to profit from fraudulent token launches.

Thus, Plaintiffs have not sufficiently pleaded that Meteora is an unincorporated association capable of being sued under New York or federal law.

**B. Meteora Is Not a Partnership**

Plaintiffs' alternative argument that Meteora is a suable entity because it is a partnership, *see* Pls. Opp. to DLL at 13-14, is similarly unpersuasive.[2] To determine the existence of a partnership, the Court must first apply New York law before turning to Rule 17(b)(3)(A). *See Fund Liquidation Holdings*, 991 F.3d at 386 ("[F]ederal law sets the ground rule that a plaintiff . . . partnership must have legal existence to have constitutional standing. Whether a

[2] Perhaps acknowledging the weaknesses in their argument, Plaintiffs have abandoned this theory in their Proposed Second Amended Complaint. *See generally* Proposed SAC.

particular . . . partnership satisfies that requirement, however, turns on an examination of state law."); *D'Ippolito v. Cities Serv. Co.*, 374 F.2d 643, 647 (2d Cir. 1967) (providing that "New York law is applicable under Fed. R. Civ. P. 17(b)" to determine the existence of a partnership); *Koons v. Kaiser*, 91 F. Supp. 511, 516 (S.D.N.Y. 1950) ("Rule 17(b) of the Federal Rules of Civil Procedure requires an examination of the law of the state to ascertain whether a partnership is a legal entity[.]"); *Joscar Co. v. Consol. Sun Ray, Inc.*, 212 F. Supp. 634, 636 (E.D.N.Y. 1963) ("Rule 17(b) . . . require[s] an examination of the state law to ascertain capacity to sue."). Under New York law, "[a] partnership is an association of two or more persons to carry on as co-owners a business for profit." N.Y. P'ship Law § 10(1) (McKinney 2026). "Two or more persons conducting a business as a partnership may sue or be sued in the partnership name." N.Y. C.P.L.R. § 1025 (McKinney 2026). The party "pleading the existence of a partnership has the burden of proving its existence." *N. Am. Knitting Mills, Inc. v. Int'l Women's Apparel, Inc.*, No. 99-cv-04643 (LAP), 2000 WL 1290608, at *2 (S.D.N.Y. Sept. 12, 2000) (quoting *Cent. Nat'l Bank, Canajoharie v. Purdy*, 671 N.Y.S.2d 866, 868 (N.Y. App. Div. 1998)). To plead the existence of a partnership, Plaintiffs must allege "(1) the parties' sharing of profits and losses; (2) the parties' joint control and management of the business; (3) the contribution by each party of property, financial resources, effort, skill, or knowledge to the business; and (4) the parties' intention to be partners." *Kidz Cloz, Inc. v. Officially For Kids, Inc.*, 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004) (citing *N. Am. Knitting*, 2000 WL 1290608, at *2).

As with the unincorporated association, the only references to a partnership in the Amended Complaint refer to the alleged RICO enterprise between Chow, Meteora, and the Kelsier Defendants. *See* Am. Compl. ¶¶ 2, 163-64, 168-69, 333, 372-73, 400. With respect to a *Meteora* partnership, Plaintiffs do not plausibly allege any of the required elements.

First, Plaintiffs have failed to allege that the purported members of Meteora shared profits and losses. "It is axiomatic that the essential elements of a partnership must include an agreement between the principals to share losses as well as profits." *Kidz Cloz*, 320 F. Supp. 2d at 172 (quoting *Kosower v. Gutowitz*, No. 00-cv-09011 (JGK), 2001 WL 1488440, at *6 (S.D.N.Y. Nov. 21, 2001)). The only references to "losses" in the Amended Complaint pertain to the alleged losses of Plaintiffs and investors, and the only references to "profit" or "revenue" that are tied to Meteora's purported members, separate from the alleged RICO enterprise, are:

- Meteora obtained profit from the various liquidity pools it hosts, Am. Compl. ¶ 324, and from trading fee revenues, *id.* ¶ 325.
- Chow "ha[s] a claim on a portion of [non-party] DLL's revenues, including a portion of any DLL revenues from trading fees received from Meteora user transactions." *Id.* ¶ 40 (alterations in original) (quoting Dkt. 54 ("Chow Decl.") ¶ 3).
- Non-party Block Raccoon receives revenues generated on non-party Jupiter platforms. *Id.* ¶ 50.
- Non-party Jupiter's products and programs "generate substantial revenue." *Id.* ¶ 122.

These allegations do not support a plausible inference that the members of the supposed Meteora partnership shared in profits and losses. Plaintiffs' allegations of a Meteora-Kelsier RICO enterprise that shared ongoing revenues, *id.* ¶¶ 383, 386, do not address whether *Meteora* shared profits and losses among its members for purposes of creating a partnership.

Plaintiffs' only argument with respect to joint control is that the purported members had upgrade authority for all Meteora Programs via the Meteora Multisig wallet. *Id.* ¶¶ 132-33. For the reasons stated above, Section I.A, *supra*, this does not sufficiently plead joint control and

management of the overall partnership. Plaintiffs also do not allege the contributions of each party to the partnership in terms of property, financial resources, effort, skill, or knowledge. Finally, Plaintiffs do not allege the parties' intention to be partners. The only references to agreements regarding Meteora that are not explicitly tied to the broader alleged RICO enterprise are that unspecified Defendants were "bound by informal agreements," Am. Compl. ¶ 16, and that Chow "continues to control and direct 'Meteora' activities through his ownership interests in, and agreements with other members of Meteora and Jupiter," *id.* ¶ 40. This conclusory pleading is not sufficient.

For the above reasons, and because "it is well settled that 'calling an organization a partnership does not make it one,'" *N. Am. Knitting*, 2000 WL 1290608, at *2 (quoting *Kyle v. Ford*, 584 N.Y.S.2d 698, 699 (N.Y. App. Div. 1992)), Plaintiffs have not pleaded the existence of a Meteora partnership capable of being sued.

* * *

Because Plaintiffs have not pleaded that Meteora is capable of being sued, the Court will grant Dynamic Labs's motion to dismiss all claims against Meteora without considering Dynamic Labs's remaining arguments. *See* DLL Br. at 14-28; DLL Reply & SAC Opp. at 4-12; Pls. Opp. to DLL at 14-26.

## II. Racketeer Influenced and Corrupt Organizations Act ("RICO") Claim (Count IV)

The Court will now move on to evaluate Plaintiffs' claims against the remaining defendants, the Kelsier Defendants and Chow, addressing the motions to dismiss the federal claims under RICO first.

In Count IV, Plaintiffs allege a RICO claim against the Kelsier Defendants and Defendant Chow under 18 U.S.C. § 1962(c) based on wire fraud. *See* Am. Compl. ¶ 387 ("Defendants engaged in a pattern of racketeering activity by devising a scheme to defraud retail

investors in Solana-based digital assets out of money or property and by repeatedly using the interstate wires in furtherance of that scheme . . . in violation of 18 U.S.C. § 1343"); *see also id.* ¶¶ 376-96. Section 1962(c) provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). As relevant here, the RICO statute defines "racketeering activity" as "any act which is indictable under any of the following provisions of title 18, United States Code," including Section 1343 wire fraud. 18 U.S.C. § 1961(1)(B). Section 1343 criminalizes the use of interstate wires for "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343.

To establish a substantive RICO violation under Section 1962(c) through a pattern of racketeering activity, "a plaintiff must show that he was injured by defendants' (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Lateral Recovery LLC v. Funderz.net, LLC*, No. 22-cv-02170 (JLR), 2024 WL 216533, at *7 (S.D.N.Y. Jan. 19, 2024) (quoting *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999)). The Kelsier Defendants and Chow argue that the RICO claim should be dismissed because Plaintiffs have not alleged a sufficient predicate act of racketeering activity, a pattern, or the required enterprise. *See* Kelsier Br. at 31-40; Chow Br. at 27-30. Chow also argues that Plaintiffs do not allege a RICO injury. *See* Chow Br. at 26. The Court will first address the alleged pattern of racketeering activity and because it finds no pattern alleged, it need not consider the remaining arguments.

**A. Pattern of Racketeering Activity**

Plaintiffs fail to allege the continuity required to plead a pattern of racketeering activity. To plead a RICO pattern, a plaintiff must allege "at least two predicate acts" and must show (1) "that the predicate acts are related" and (2) that the acts "amount to, or pose a threat of, continuing criminal activity." *GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 465 (2d Cir. 1995) (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). The latter, "'continuity' requirement can be satisfied either by showing a 'closed-ended' pattern — a series of related predicate acts extending over a substantial period of time — or by demonstrating an 'open-ended' pattern of racketeering activity that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (citation omitted); *accord Cofacredit*, 187 F.3d at 242. "In analyzing the issue of continuity, assuming arguendo that the alleged predicate acts constituting the pattern were adequately pleaded, we evaluate the RICO allegations with respect to each defendant individually." *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 180 (2d Cir. 2004). Plaintiffs have not demonstrated either a closed- or open-ended pattern of racketeering activity.

*1. Closed-Ended Continuity*

"Closed-ended continuity is demonstrated by predicate acts that 'amount to continued criminal activity,' by a particular defendant. To satisfy closed-ended continuity, the plaintiff must prove 'a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months . . . do not satisfy this requirement.'" *Cofacredit*, 187 F.3d at 242 (omission in original) (quoting *H.J.*, 492 U.S. at 242). Since the Supreme Court in *H.J.* held that continuity is required to plead a pattern of racketeering, *see H.J.*, 492 U.S. at 241-43, the Second Circuit "has never held a period of less than two years to constitute a 'substantial

period of time,'" *Cofacredit*, 187 F.3d at 242 (citation omitted); *accord Spool*, 520 F.3d at 184 (although this Circuit has "not viewed two years as a bright-line requirement, it will be rare that conduct persisting for a shorter period of time establishes closed-ended continuity").

Here, the alleged enterprise operated from at least October 2024 through the filing of the complaint on March 17, 2025. Pls. Opp. to Chow at 22; Dkt. 1-1 at 2. Six months is not sufficient to demonstrate a "substantial period of time." *Spool*, 520 F.3d at 184; *Three Crown Ltd. P'ship v. Caxton Corp.*, 817 F. Supp. 1033, 1044 (S.D.N.Y. 1993) ("Six months is inadequate to establish closed-ended continuity."); *New York Transp., Inc. v. Naples Transp., Inc.*, 116 F. Supp. 2d 382, 388 (E.D.N.Y. 2000) ("The six- to seven-month period described in the complaint fails to meet the temporal test for continuity set forth in *H.J. Inc.*" (citing *H.J.*, 492 U.S. at 242)); *First Cap.*, 385 F.3d at 182 (holding alleged predicate acts that "span barely seven months, do not extend over a sufficiently long period of time to satisfy the requirements of closed-ended continuity"); *see also Spool*, 520 F.3d at 184 (holding "sixteen-month period of time is insufficient to establish closed-ended continuity"); *Aguilar v. Baton Corp.*, No. 25-cv-00880 (CM), 2026 WL 2568764, at *35 (S.D.N.Y. Aug. 31, 2026) (finding period of alleged racketeering activity of seventeen months "d[id] not establish closed-ended continuity"); *GICC*, 67 F.3d at 468 (collecting cases in which periods between one and two years were held not to establish closed-ended continuity).

Plaintiffs acknowledge that the Second Circuit often looks for periods exceeding two years but argue that closed-ended continuity has been pleaded given that the alleged fraud "involved two separate, complex schemes affecting hundreds of thousands of potential victims," and that these "schemes required months of planning, sophisticated technical implementation, and coordinated execution by multiple participants." Pls. Opp. to Kelsier at 24. Thus, Plaintiffs argue, the "level of complexity and the repeated nature of the fraud support a finding of closed-

ended continuity." *Id.* (citing *United States v. Minicone*, 960 F.2d 1099 (2d Cir. 1992), *as amended on reh'g in part* (Apr. 13, 1992)). As a threshold matter, Plaintiffs' reliance on *Minicone* is misplaced. Unlike here, in *Minicone*, the court affirmed RICO convictions where defendants engaged in a seventeen-year-long pattern of racketeering, including through fencing stolen property, extortion, collection of unlawful debts, unlawful gambling, and a murder that was committed as part of the defendants' "long-term association with the enterprise and was performed for the purpose of enriching the enterprise's members and consolidating its power." 960 F.2d at 1107; *see also id.* at 1103, 1106-08.

It is true that courts do consider "other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes . . . in determining whether closed-ended continuity exists," *First Cap.*, 385 F.3d at 181 (quoting *DeFalco v. Bernas*, 244 F.3d 286, 321 (2d Cir. 2001)), but these considerations are generally relevant primarily where "the period[] of time over which the alleged racketeering acts [took place] borders on 'substantial,'" *Kurins v. Silverman*, No. 08-cv-06886 (LTS) (GWG), 2009 WL 321011, at *4 (S.D.N.Y. Feb. 10, 2009), *as amended* (Feb. 13, 2009) (quoting *Fresh Meadow Food Servs., LLC v. RB 175 Corp.*, 282 F. App'x 94, 99 (2d Cir. 2008) (summary order)). *See, e.g.*, *First Cap.*, 385 F.3d at 182 (analyzing continuity where alleged predicate acts "span barely seven months" without considering factors); *GICC*, 67 F.3d at 467 (considering factors where the alleged pattern of racketeering lasted for a period of eleven months); *Deem v. Lockheed Corp.*, No. 87-cv-07017 (JMC), 1991 WL 196171, at *9-10 (S.D.N.Y. Sept. 25, 1991) (analyzing additional factors where alleged pattern "spanned approximately thirteen months"); *China Tr. Bank of N.Y. v. Standard Chartered Bank, PLC*, 981 F. Supp. 282, 287-88 (S.D.N.Y. 1997) (same, for period of eleven months); *Cont'l Realty Corp. v. J.C. Penney Co.*, 729 F. Supp. 1452, 1454-55 (S.D.N.Y. 1990) (same, for "over a period of more than one year"); *Caravella v.*

*Hearthwood Homes Inc.*, No. 05-cv-01529, 2007 WL 2886507, at *8-9 (N.D.N.Y. Sept. 27, 2007) (same, for fourteen months); *Mathon v. Marine Midland Bank, N.A.*, 875 F. Supp. 986, 998-99 (E.D.N.Y. 1995) (same, for "fourteen to fifteen months"); *In re MTC Elec. Techs. S'holder Litig.*, 74 F. Supp. 2d 276, 286-87 (E.D.N.Y. 1999) (same, for "a fifteen-month period"); *Casio Comput. Co. v. Sayo*, No. 98-cv-03772 (WK), 2000 WL 1877516, at *12 (S.D.N.Y. Oct. 13, 2000) (same, for sixteen months); *Fresh Meadow*, 282 F. App'x at 99 (finding factors "less critical" where the alleged racketeering activity spanned a period of "nearly three and one-half years"). Here, the alleged six months of racketeering activity does not border on substantial and thus the Court need not analyze these factors. Even considering these factors, however, the Court finds that Plaintiffs have not pleaded closed-ended continuity.

The complexity of the scheme alleged disfavors closed-ended continuity. While the Court accepts as true that the $M3M3 and $LIBRA "schemes required months of planning, sophisticated technical implementation, and coordinated execution," Pls. Opp. to Kelsier at 24, at base, Plaintiffs allege two schemes to defraud investors and concede that "[t]he central technique Defendants employed was deceptively simple: simulate fairness, induce investment, and control the backend," Am. Compl. ¶ 5. Two standalone schemes to induce investment are insufficient, and this factor therefore disfavors closed-ended continuity. *See Mead v. Schaub*, 757 F. Supp. 319, 323 (S.D.N.Y. 1991) ("Although the alleged scheme to defraud Mead may have required a number of steps over a determinate period of time, nevertheless because of its terminable nature and single goal it does not meet the requirement of continuity."); *Chester Park View, LLC v. Schlesinger*, No. 23-cv-05432 (CS), 2024 WL 2785140, at *10 (S.D.N.Y. May 29, 2024) ("Plaintiffs allege a single scheme among four defendants to deprive them of a single property through similar predicate acts of wire fraud. This is not enough to establish closed-ended continuity."); *Morrow v. Black*, 742 F. Supp. 1199, 1201 n.2, 1207-08 (E.D.N.Y. 1990) (finding

continuity where "defendants engaged in one scheme after another" and complaint pleaded six schemes).

The number of participants allegedly involved in the scheme also disfavors closed-ended continuity. Plaintiffs have alleged that Defendants Chow, Hayden, Thomas, Gideon, and Kelsier participated in the scheme. *See* Am. Compl. ¶¶ 1-2, 40-44. Such a small number of participants weighs against closed-ended continuity. *See, e.g.*, *Cont'l Realty Corp.*, 729 F. Supp. at 1455 (finding failure to plead closed-ended scheme where there was "one group of perpetrators (the [four d]efendants)"); *New York Transp.*, 116 F. Supp. 2d at 384-85, 389 (finding failure to plead closed-ended scheme where five defendants was a "small number" of participants); *contra In re MTC Elec. Techs.*, 74 F. Supp. 2d at 277, 286-87 (finding closed-ended continuity pleaded where number of participants included seven defendants).

Finally, Plaintiffs do not, and cannot, argue that the nature and variety of acts support a finding of closed-ended continuity. "Where the predicate acts committed in furtherance of the goal of the scheme are inherently unlawful, such as murder or obstruction of justice, a shorter period of time suffices to establish continuity, because the 'threat of continuity [is] adequately established by the nature of the activity.'" *Skylon Corp. v. Guilford Mills, Inc.*, No. 93-cv-05581 (LAP), 1997 WL 88894, at *6 (S.D.N.Y. Mar. 3, 1997) (alteration in original) (quoting *United States v. Aulicino*, 44 F.3d 1102, 1111 (2d Cir. 1995)). "Conversely, where the predicate acts alleged are not inherently unlawful, courts will usually require a longer span of time to satisfy the continuity requirement." *Id.* Because Plaintiffs allege "verbal and written misrepresentations . . . constituting wire . . . fraud," *id.*, the Court finds none of these acts are inherently unlawful, and therefore this factor disfavors a finding of closed-ended continuity.

Even if the Court were to accept Plaintiffs' contention that the number of victims is substantial[3] and that Defendants engaged in multiple predicate acts of wire fraud including publishing false and misleading promotions and communications online, as well as executing blockchain transactions, Am. Compl. ¶ 388, the other four factors decidedly disfavor a finding of closed-ended continuity in light of the short overall time period of the activity. Having weighed the factors, the Court finds that Plaintiffs have not pleaded closed-ended continuity. As the Second Circuit stated in *One World, LLC v. Onoufriadis*, here, "[t]he alleged scheme was a focused and cohesive effort by a handful of people, using corporations they controlled, to obtain money . . . over a period of far less than two years, under the false pretense that the money was being invested in legitimate business ventures." No. 21-374-cv, 2021 WL 4452070, at *2 (2d Cir. Sept. 29, 2021) (summary order) (alteration in original) (citation omitted). Thus, "this was not a complex, multi-faceted scheme justifying a departure from the two-year benchmark." *Id.* Therefore, Plaintiffs have not pleaded closed-ended continuity.

2. *Open-Ended Continuity*

Plaintiffs have also not plausibly pleaded open-ended continuity. "To satisfy open-ended continuity, the plaintiff need not show that the predicates extended over a substantial period of time but must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacredit*, 187 F.3d at 242 (citing *H.J.*, 492 U.S. at 242-43). In this assessment, "the nature of the RICO enterprise and of the predicate acts

[3] Importantly, however, some courts have found that a single group of victims counts as one victim in analyzing closed-ended continuity. *See, e.g.*, *Schnell v. Conseco, Inc.*, 43 F. Supp. 2d 438, 446 (S.D.N.Y. 1999) (finding shareholders to be a "single class of victims" for closed-ended continuity); *Bernstein v. Misk*, 948 F. Supp. 228, 238 (E.D.N.Y. 1997) (holding closed-ended continuity not established where alleged activity involved "only one major perpetrator who focused his activity *on one group of purchasers* in a single, non-complex scheme to obtain financing for a purchase of property and then default on the loan." (emphasis added)).

are relevant." *Id.* "Where the enterprise is engaged *primarily* in racketeering activity, and the predicate acts are inherently unlawful, there is a threat of continued criminal activity, and thus open-ended continuity." *Id.* at 242-43 (emphasis added). "However, where the enterprise primarily conducts a legitimate business, there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Id.* at 243.

Plaintiffs do not adequately allege that the Kelsier Defendants and Defendant Chow, as members of the alleged RICO enterprise, were engaged *primarily* in racketeering activity, as opposed to legitimate business activities. Plaintiffs argue that the alleged RICO enterprise was "designed specifically for serial token-launch schemes" with a "repeatable business model," Pls. Opp. to Kelsier at 24-25; *see also* Pls. Opp. to Chow at 22-23, and therefore the "threat of continued criminal activity is inherent in the enterprise's structure and purpose," Pls. Opp. to Chow at 23. But Plaintiffs' own allegations demonstrate that Defendants are, or work for, legitimate businesses. For example, Plaintiffs allege that Defendant Kelsier Labs "is a family-run venture capital firm incorporated under Texas law" that "catalyzes Web3 innovation through a combination of 'go-to-market expertise' and 'targeted investments.'" Am. Compl. ¶ 41. Hayden, Gideon, and Thomas are founders of Kelsier, *id.* ¶¶ 42-44; Hayden is Kelsier's CEO, *id.* ¶ 42; and Thomas is the Chairman, *id.* ¶ 44. Plaintiffs also allege that Defendant Chow is a co-founder and the former CEO of Meteora. *Id.* ¶¶ 40, 116, 118. Plaintiffs incorporate Meteora's website by reference, *id.* ¶ 39, which demonstrates that Meteora "build[s] liquidity pools [f]or Liquidity Providers, Launchpads, and Launches," and hosts a number of tokens, *see* https://www.meteora.ag. Plaintiffs conclusorily allege that wire fraud was, and continues to be, Defendants' regular way of doing business. *See* Am. Compl. ¶¶ 392, 395. But the Amended

Complaint does not provide any facts that support this conclusion, nor does it provide allegations specific to each Defendant, as required.[4] *See First Cap.*, 385 F.3d at 180.

The nature of wire fraud also does not imply a threat of continued criminal activity. "[I]n cases where the acts of the defendant or the enterprise were inherently unlawful, such as murder or obstruction of justice, and were in pursuit of inherently unlawful goals, such as narcotics trafficking or embezzlement," courts have found continuity adequately established "by the nature of the activity." *Aulicino*, 44 F.3d at 1111. "In contrast, in cases concerning alleged racketeering activity in furtherance of endeavors that are not inherently unlawful, such as frauds in the sale of property," courts have generally "found no threat of continuing criminal activity arising from conduct." *Id.*; *accord Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 407-08 (S.D.N.Y. 2013). Wire fraud, as a predicate act, is not inherently unlawful for purposes of this analysis. *See Kalimantano*, 939 F. Supp. 2d at 408 ("[F]raudulent practices in the marketing of luxury watches do not imply a threat of continuing criminal activity over time."); *see also Econ. Opportunity Comm'n of Nassau Cnty. v. Cnty. of Nassau, Inc.*, 47 F. Supp. 2d 353, 363, 366-67 (E.D.N.Y. 1999) (finding that mail fraud, wire fraud, and Hobbs Act predicates are not inherently unlawful).

Plaintiffs' remaining arguments likewise fail. Plaintiffs contend that Defendant Chow's statement that he referred "a 'handful of other projects' to the Kelsier Defendants[] indicat[es] a continuous pipeline of potential future schemes." Pls. Opp. to Kelsier at 25 (quoting Am. Compl. ¶ 319). But these vague allegations do not plausibly allege a threat of continued criminal activity. Plaintiffs' remaining assertion that "[b]ut for public exposure, the enterprise would

[4] The supplemental authority provided in Plaintiffs' September 15, 2026 letter to the Court does not alter the Court's analysis. *See* Dkt. 271. In *Aguil*ar, the court found that open-ended continuity had been adequately alleged. 2026 WL 2568764, at *35-36. But the plaintiffs there, unlike here, provided particularized fraudulent acts as to each defendant. *Id.*

have continued executing similar frauds indefinitely," Pls. Opp. to Chow at 22-23 (citing Am. Compl. ¶¶ 379, 395), is not persuasive because Plaintiffs cite only to their conclusory allegations that the enterprise had a "purpose to systematically defraud retail cryptocurrency investors" and "Defendants' predicate acts were and continue to be Defendants' regular way of doing business," Am. Compl. ¶¶ 379, 395. Further, because this assertion acknowledges that the enterprise has ceased its activity, this also cuts against allegations that the enterprise's activities will continue. *See Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 138 (E.D.N.Y. 2010) (finding failure to allege open-ended continuity where plaintiff acknowledges that the alleged pattern of racketeering activity by defendants "would have continued to date were it not for the fact that they were caught and indicted shortly after the plaintiff filed his complaint" (citation omitted)). Plaintiffs thus do not plausibly plead facts sufficient to support open-ended continuity.

* * *

Because Plaintiffs have not pleaded the continuity required to plead a pattern of racketeering activity, they fail to plead a RICO claim. *See Stratavest Ltd. v. Rogers*, No. 94-cv-09305 (RWS), 1996 WL 306364, at *8 (S.D.N.Y. June 7, 1996), *as amended* (June 25, 1996) ("[F]ailure to adequately allege continuity, and thus a RICO pattern, is fatal to [a] RICO claim."). Therefore, the Court need not address the parties' other arguments, and Count IV is dismissed as to the Kelsier Defendants and Defendant Chow.

**III. RICO Conspiracy (Count V)**

In Count V, Plaintiffs allege that the Kelsier Defendants and Defendant Chow conspired to violate RICO under 18 U.S.C. § 1962(d). *See* Am. Compl. ¶¶ 397-407. To plead a RICO conspiracy, a plaintiff must demonstrate that the alleged co-conspirators "knew about and agreed to facilitate" a pattern of racketeering activity. *Baisch v. Gallina*, 346 F.3d 366, 377 (2d Cir. 2003) (quoting *Salinas v. United States*, 522 U.S. 52, 66 (1997)); *accord Black v. Ganieva*, 619

F. Supp. 3d 309, 329, 348 (S.D.N.Y. 2022), *aff'd*, No. 22-1524-cv, 2023 WL 2317173 (2d Cir. Mar. 2, 2023) (summary order). A plaintiff must establish "(1) an agreement to join the conspiracy; (2) the acts of each co-conspirator in furtherance of the conspiracy; [and] (3) that the co-conspirator knowingly participated in the same." *Valenti v. Penn Mut. Life Ins.*, 850 F. Supp. 2d 445, 450-51 (S.D.N.Y. 2012) (quoting *Nasik Breeding & Rsch. Farm Ltd. v. Merck & Co.*, 165 F. Supp. 2d 514, 541 (S.D.N.Y. 2001)).

Where a plaintiff has not sufficiently pleaded a substantive RICO claim under § 1962(c), the RICO conspiracy claim fails as a matter of law. *See Bayshore Cap. Advisors, LLC v. Creative Wealth Media Fin. Corp.*, 667 F. Supp. 3d 83, 137 (S.D.N.Y. 2023); *accord Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996) ("Any claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient." (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993))), *vacated on other grounds*, 525 U.S. 128 (1998). Because Plaintiffs have failed to state a substantive RICO claim, *see* Section II *supra*, they also fail to state a claim for a conspiracy to violate RICO under 18 U.S.C. § 1962(d). *See Murrey v. Minc*, No. 21-cv-00320 (AT) (JLC), 2022 WL 1910127, at *4 (S.D.N.Y. June 3, 2022) ("Because [p]laintiff has failed to allege any predicate acts, he has failed to state a RICO claim as well as a claim for RICO conspiracy."); *Zamora v. FIT Int'l Grp.*, 834 F. App'x 622, 626 (2d Cir. 2020) (summary order) ("Plaintiffs' failure to state a claim for a substantive RICO violation is fatal to their RICO conspiracy claim under § 1962(d), given that Plaintiffs rely on the same factual predicate to plead both the substantive RICO violation and the conspiracy claim against JPMorgan."); *First Cap.*, 385 F.3d at 164 ("[B]ecause Plaintiffs' RICO conspiracy claims are entirely dependent on their substantive RICO claims, we also concur in the District Court's dismissal of the RICO conspiracy claims."); *Discon*, 93 F.3d at 1064 ("Since we have held that

the prior claims do not state a cause of action for substantive violations of RICO, the present claim does not set forth a conspiracy to commit such violations."); *Paul Hobbs Imports Inc. v. Verity Wines LLC*, No. 21-cv-10597 (JPC), 2023 WL 374120, at *13 (S.D.N.Y. Jan. 24, 2023) ("[S]ince the [c]omplaint does not predicate its subsection 1962(d) count on an agreement to engage in any conduct other than the acts alleged to violate subsection 1962(c), the [c]ourt's dismissal of the substantive count requires dismissal of the conspiracy count as well."); *Black*, 619 F. Supp. 3d at 348-49 (holding failure to plead RICO conspiracy where allegations "are entirely derivative" of its failed substantive RICO claim). Therefore, the Court dismisses Count V against the Kelsier Defendants and Defendant Chow.

**IV. Common Law Fraud (Counts I and II) against Defendant Chow**

The Court next turns to the state law claims against Defendant Chow and first addresses Plaintiff's common law fraud claims in Counts I and II regarding $M3M3 and $LIBRA, respectively. *See* Am. Compl. ¶¶ 345-69. "To state a claim for fraud under New York law, a plaintiff must allege (1) a material misrepresentation or omission of fact; (2) which the defendant knew to be false; (3) which the defendant made with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 402 (2d Cir. 2015); *accord Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 106 N.E.3d 1176, 1182 (N.Y. 2018). A claim of fraudulent concealment or omission requires a plaintiff to also demonstrate "that the defendant had a duty to disclose material information." *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 213 (S.D.N.Y. 2007); *see also Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995). This duty can arise "where one party has made a partial or ambiguous statement" or "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken

knowledge." *Manhattan Motorcars*, 244 F.R.D. at 213 (alteration adopted) (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

Despite the heightened pleading standards of Rule 9(b) required for claims of fraud, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). However, a plaintiff must "'provide some minimal factual basis for conclusory allegations of scienter that give rise to a strong inference' of fraudulent intent." *Powers v. Brit. Vita, P.L.C.*, 57 F.3d 176, 184 (2d Cir. 1995) (quoting *Polycast Tech. Corp. v. Uniroyal, Inc.*, 728 F. Supp. 926, 935 (S.D.N.Y. 1989)); *accord Conn. Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir. 1987). "A strong inference of fraudulent intent 'must be more than merely "reasonable" or "permissible" — it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Conopco, Inc. v. Wein*, No. 05-cv-09899 (RJH) (THK), 2007 WL 9818902, at *6 (S.D.N.Y. Aug. 31, 2007) (omission adopted) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007)). "[T]o establish scienter for [a] fraud claim, the plaintiffs must either (1) identify circumstances indicating conscious or reckless behavior by the defendants, or (2) allege facts showing a motive for committing fraud and a clear opportunity for doing so." *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 813 (2d Cir. 1996).

"To state a claim based on recklessness, plaintiffs may either specifically allege defendants' knowledge of facts or access to information contradicting defendants' public statements, or allege that defendants failed to check information that they had a duty to monitor." *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 426 (S.D.N.Y. 2014) (citing *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 574

(S.D.N.Y. 2012)). But "it is well-settled that 'fraud by hindsight' is not a cognizable theory of relief; 'fraud is always obvious in retrospect, but it is not reckless to lack clairvoyance.'" *Id.* (quoting *Longtop*, 910 F. Supp. 2d at 579).

Courts usually find "clear opportunity" to commit fraud "when the defendant is already well positioned to carry out the fraudulent transaction, such as when he possesses the necessary trust and authority." *Powers*, 57 F.3d at 185; *see, e.g.*, *Turkish v. Kasenetz*, 27 F.3d 23, 28 (2d Cir. 1994) (defendants' position as fiduciaries of plaintiff's trust provided clear opportunity to commit fraud); *Jaquith v. Newhard*, No. 91-cv-07503 (PKL), 1993 WL 127212, at *1, *7 (S.D.N.Y. Apr. 20, 1993) (defendant's position as company's president provided clear opportunity to misrepresent its value to induce plaintiff's loan). Motive entails "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994). "In looking for a sufficient allegation of motive, [courts] assume that the defendant is acting in his or her informed economic self-interest." *Id.* "Although the desire to enhance income may motivate a person to commit fraud, allegations that a defendant stands to gain economically from fraud" are insufficient to plead motive. *ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P.*, 957 F. Supp. 1308, 1327 (S.D.N.Y. 1997) (citing *Shields*, 25 F.3d at 1130).

For the following reasons, Plaintiffs fail to "identify circumstances indicating conscious or reckless behavior" as to Defendant Chow or "allege facts showing [Chow had] a motive for committing fraud and a clear opportunity for doing so," *San Leandro*, 75 F.3d at 813.

**A. Conscious or Reckless Behavior**

Plaintiffs raise several arguments in support of their argument that Chow was engaged in conscious or reckless behavior. First, Plaintiffs argue that Chow's statement to the Kelsier Defendants during a $M3M3 launch planning call where he said that "no one will play the game

if they see, like 90% of the supply already locked up," Am. Compl. ¶ 207, "demonstrates Defendant Chow's understanding that deception was essential to the scheme's success," Pls. Opp. to Chow at 18. Second, Plaintiffs argue that Chow's post-fraud statement that he "fucked up because [he] enabled [Hayden]" and that he "should not have enabled him," Am. Compl. ¶ 313, demonstrates Chow's awareness that he had facilitated wrongdoing, *see* Pls. Opp. to Chow at 18. Plaintiffs also point to Chow's creation of the M3M3 Calcs Template and argue that he "specifically designed it to model and optimize the extraction scheme and create a psychological trap for investors," which demonstrates fraudulent intent. Pls. Opp. to Chow at 18 (citing Am. Compl. ¶¶ 201-04). Plaintiffs next argue that Chow failed to monitor or prevent the misuse of the platform, despite being CEO and having technical control over its operations. *Id.* at 19. Finally, Plaintiffs contend that "the magnitude of the fraud supports a strong inference of scienter." *Id.* The Court does not agree and will address Plaintiffs' contentions in turn.

Chow's "accurate[]" statement during the $M3M3 launch planning call with the Kelsier Defendants that "no one will play the game if they see, like 90% of the supply already locked up," Am. Compl. ¶ 207, is equally consistent with legitimate support of a token launch and therefore does not support a strong inference of scienter. "An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct," which is why this inference "must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Plaintiffs do not explain how this statement demonstrates "Chow's understanding that deception was essential to the scheme's success," Pls. Opp. to Chow at 18, as opposed to the equally plausible inference that this statement is a concededly accurate statement regarding the size of the liquidity pool available to investors that Chow made as part of his role

in providing technical support to the $M3M3 launch. Thus, this statement does not indicate conscious or reckless behavior.

Chow's statement made after the alleged fraud that he enabled Hayden also does not support a finding that Chow had the requisite scienter for fraud. "[I]n the Second Circuit, facts occurring after an alleged misstatement are not probative of fraudulent intent at the time the statement was made." *ASH Grp. of Fla., Inc. v. Flora Growth Corp.*, No. 24-cv-03300 (ALC), 2025 WL 934845, at *7 (S.D.N.Y. Mar. 27, 2025) (citing *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993)). However, actions taken after an alleged fraud occurred "can be circumstantial evidence that the defendant had acted with the requisite state of mind," such as when that person takes "steps to cover up a misdeed." *S.E.C. v. Lucent Techs., Inc.*, 363 F. Supp. 2d 708, 717 (D.N.J. 2005). Chow's hindsight recognition that *others* may have been engaged in wrongdoing does not provide a plausible inference that he knew *he* was facilitating wrongdoing *at the time* of the $M3M3 launch, or was reckless in that regard. And since "it is not reckless to lack clairvoyance," *Special Situations*, 33 F. Supp. 3d at 426 (quoting *Longtop*, 910 F. Supp. 2d at 579), this fact does not support an inference of scienter.

Next, Plaintiffs point to Chow's creation of the M3M3 Calcs Template. Am. Compl. ¶ 402; *see also* Pls. Opp. to Chow at 18 (citing Am. Compl. ¶¶ 201-04). But they have not alleged facts that support a plausible inference that the M3M3 Calcs Template was designed to create and facilitate a fraud.[5] The document is entirely consistent with a legitimate token launch because it provides "sophisticated calculations modeling $M3M3 token circulation percentages, staking participation rates, reward distributions, and price dynamics." Am. Compl. ¶ 203. That a document "model[s] the $M3M3 token's economic mechanics" does not, without more, mean

[5] The M3M3 Calcs Template is not attached to the Amended Complaint, but it is attached to the Proposed SAC, which the Court will address in Section IX.B.3, *infra*.

that it "demonstrates Defendant Chow's premeditated plan" to "optimize the extraction scheme." *Id.* ¶¶ 203-04. Plaintiffs' argument that "[o]ne does not create detailed models for 'extracting' funds from 'trapped' investors without fraudulent intent," Pls. Opp. to Chow at 18, simply draws from their conclusory language in the Amended Complaint in characterizing Chow's intent as fraudulent, *see* Am. Compl. ¶¶ 203-04, rather than presenting any facts demonstrating how the document actually evidences such intent. *See Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004) ("[A] 'pleading technique [that] couple[s] a factual statement with a conclusory allegation of fraudulent intent' is insufficient to 'support the inference that the defendants acted recklessly or with fraudulent intent.'" (second and third alterations in original) (quoting *Shields*, 25 F.3d at 1129)).

The Court further rejects Plaintiffs' argument that Chow's failure "to monitor or prevent the misuse of the platform despite his position as CEO and his technical control over its operations" also supports a strong inference of scienter. Pls. Opp. to Chow at 19. Plaintiffs do not cite to any allegations in their Amended Complaint in support of this argument. *See id.* Moreover, "the failure to conduct due diligence or monitoring as promised, without more, does not support an inference that the defendants acted with scienter." *Prickett v. N.Y. Life Ins. Co.*, 896 F. Supp. 2d 236, 247 (S.D.N.Y. 2012) (citing *S. Cherry St., LLC v. Hennessee Grp.*, 573 F.3d 98, 113-14 (2d Cir. 2009)).

Finally, Plaintiffs' contention that "the magnitude of the fraud supports a strong inference of scienter," Pls. Opp. to Chow at 19, is also insufficient to find Chow possessed the requisite scienter to commit fraud. First, this argument is not specific to Chow. *See In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009) (providing that where a case involves multiple defendants, a plaintiff "must plead circumstances providing a factual basis for scienter for each defendant" (citing *Devaney v. Chester*, 813 F.2d 566, 568 (2d Cir. 1987))).

Plaintiffs do not explain "why [Chow] 'should have known' of the fraud." *Id.* (citation omitted). But even crediting the inference that Chow should have known of the fraud because of his technical involvement with Meteora, "the size of the fraud alone does not create an inference of scienter." *In re WorldCom, Inc. Sec. Litig.*, No. 02-cv-03288 (DLC), 2003 WL 21488087, at *7 (S.D.N.Y. June 25, 2003); *see also Okla. L. Enf't Ret. Sys. v. Telefonaktiebolaget LM Ericsson*, No. 18-cv-03021 (JMF), 2020 WL 127546, at *7 (S.D.N.Y. Jan. 10, 2020) ("[W]hile certainly a relevant factor, it is well established that the size of the fraud alone does not create an inference of scienter." (quoting *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 596 (S.D.N.Y. 2011))); *Valdes v. Kandi Techs. Grp.*, No. 20-cv-06042 (LDH) (AYS), 2024 WL 1348697, at *8-9 (E.D.N.Y. Mar. 29, 2024) (holding that the size and importance of transactions do not provide an inference of scienter because plaintiffs "failed to plead independent facts supporting a strong inference of scienter").

For all of these reasons, the Amended Complaint does not plausibly allege scienter based on Chow's conscious or reckless behavior.

**B. Motive and Opportunity**

With respect to motive and opportunity to commit fraud, Plaintiffs argue that "Chow personally benefitted from the fraud through his ownership interest in Meteora and his claim on trading fees generated by the fraudulent transactions," Pls. Opp. to Chow at 18-19 (citing Am. Compl. ¶ 40), and that Chow had an opportunity to commit fraud given his role at Meteora. Specifically, Plaintiffs contend that he created "hidden control mechanisms while publicly representing [Meteora] as decentralized," *id.* at 19, and he had "complete access to information about the platform's true nature and the fraudulent schemes being executed through it," *id.* (citing Am. Compl. ¶¶ 201-05, 207-08, 300-01, 313). These arguments also fail.

While Chow may have had the opportunity to commit fraud given he was purportedly the CEO of Meteora at the time of the alleged conduct and was involved with technical aspects of the platform, *see In re Fairway Grp. Holding Corp. Sec. Litig.*, No. 14-cv-00950 (LAK) (AJP), 2015 WL 249508, at *14 (S.D.N.Y. Jan. 20, 2015) ("The opportunity to commit fraud may be assumed when the defendant is a corporation or corporate officer or director."); *In re Guilford Mills, Inc. Sec. Litig.*, No. 98-cv-07739 (CLB), 1999 WL 33248953, at *4 (S.D.N.Y. July 21, 1999) (providing it was uncontested that as CEO and General Manager defendant had the opportunity to commit fraud), Plaintiffs must "demonstrate *both* motive and opportunity to commit fraud," *San Leandro*, 75 F.3d at 813 (emphasis added). The only motive alleged is Chow's motive to reap profits; that motive, standing alone, is not enough to demonstrate fraudulent intent. "[P]rofit motive does not provide the requisite inference of fraudulent intent," including when that profit comes in the form of transaction fees. *Adelphia Recovery Tr. v. Bank of Am., N.A.*, 624 F. Supp. 2d 292, 329 (S.D.N.Y. 2009) (first citing *Mazzaro de Abreu v. Bank of Am. Corp.*, 525 F. Supp. 2d 381, 389 (S.D.N.Y. 2007); and then citing *Fisher v. Offerman & Co.*, No. 95-cv-02566 (JGK), 1996 WL 563141, at *7 (S.D.N.Y. Oct. 2, 1996)), *reconsidered in part on other grounds*, 2009 WL 1676077 (S.D.N.Y. June 16, 2009). "Any corporation would be motivated to make a profit . . . or to finance the successful launch of a promising product. Similarly, corporate executives are generally motivated to maximize bonus compensation. These allegations do not support an inference of scienter." *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 216 (S.D.N.Y. 2008); *see also Rombach*, 355 F.3d at 177 ("Action taken to 'maintain the appearance of corporate profitability, or of the success of an investment . . . does not entail concrete benefits' sufficient to demonstrate motive." (omission in original) (quoting *Chill v. Gen. Elec. Co.,* 101 F.3d 263, 268 (2d Cir. 1996))); *see also Acito v. IMCERA Grp.*, 47 F.3d 47, 54

(2d Cir. 1995) (holding "that the existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter").

Therefore, because Plaintiffs have not pleaded motive, the Amended Complaint does not support an inference of fraudulent intent as to Chow, and Plaintiffs' substantive fraud claims against Chow fail. Thus, Counts I and II are dismissed against Defendant Chow.

## V. Conspiracy to Defraud (Count III) against Defendant Chow

In Count III, Plaintiffs allege that Defendant Chow engaged in a conspiracy to defraud investors. *See* Am. Compl. ¶¶ 370-75. To establish a conspiracy, a plaintiff "must demonstrate the underlying tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a common purpose or plan; and, (4) resulting damage or injury." *Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 257 (S.D.N.Y. 2011) (quoting *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 759 F. Supp. 2d 363, 286 (S.D.N.Y. 2010)). "A claim of conspiracy 'cannot stand alone' and must be dismissed if the underlying independent tort has not been adequately pleaded." *Filler v. Hanvit Bank*, 156 F. App'x 413, 418 (2d Cir. 2005) (summary order) (quoting *Romano v. Romano*, 767 N.Y.S.2d 841, 842 (N.Y. App. Div. 2003)); *see also Romano*, 767 N.Y.S.2d at 842 ("[A] cause of action sounding in civil conspiracy cannot stand alone, but stands or falls with the underlying tort."); *Inspired Cap., LLC v. Conde Nast*, 803 F. App'x 436, 440-41 (2d Cir. 2020) (summary order) (holding that because the complaint "failed to allege fraud, it could not state a claim for either aiding and abetting fraud or fraud conspiracy, as both causes of action require an underlying fraud to be alleged"); *Sokol v. Addison*, 742 N.Y.S.2d 311, 312 (N.Y. App. Div. 2002) (dismissing conspiracy to defraud claim because the underlying fraud claim was dismissed). Plaintiffs have not pleaded that Chow engaged in a conspiracy to defraud because they have not sufficiently pleaded that Chow

committed common law fraud. *See* Section IV, *supra*. Thus, Count III is dismissed against Defendant Chow.

## VI. New York General Business Law §§ 349 and 350 (Counts VI and VII) against Defendant Chow

Defendant Chow next moves to dismiss Plaintiffs' claim in Counts VI and VII that Chow engaged in deceptive acts and practices and in false advertising in his joint promotion, offering, and sale of $M3M3 and $LIBRA. *See* Am. Compl. ¶¶ 411, 422; *see also id.* ¶¶ 408-31; Chow Br. at 22-24. Section 349 of the N.Y. GBL prohibits "[u]nfair, deceptive, or abusive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a) (McKinney 2026). Section 350 of the N.Y. GBL prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state." *Id.* § 350. To state a claim under N.Y. GBL Sections 349 and 350, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct, that is (2) materially misleading, and that (3) the plaintiff 'suffered injury as a result of the allegedly deceptive act or practice.'" *Plavin v. Grp. Health Inc.*, 146 N.E.3d 1164, 1168 (N.Y. 2020) (quoting *Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675, 675 (N.Y. 2012)). Plaintiffs' GBL claims with respect to the $M3M3 transactions fail because Plaintiff has not plausibly alleged New York consumer-oriented conduct, and their claims with respect to the $LIBRA transactions fail because Plaintiffs do not plausibly plead that Defendant Chow engaged in materially misleading conduct.

### A. Plaintiffs Have Not Alleged Consumer-Oriented Conduct in New York with Respect to Mehta's $M3M3 Transactions

Plaintiffs have failed to allege New York consumer-oriented conduct with respect to Mehta's $M3M3 transactions. The "consumer-oriented" element "is liberally construed," such that "[a] defendant engages in 'consumer-oriented' activity if [its] actions cause any 'consumer

injury or harm to the public interest.'" *Reyes v. Upfield US Inc.*, 694 F. Supp. 3d 408, 419 (S.D.N.Y. 2023) (quoting *New York v. Feldman*, 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2002)). "To state a claim under either section, '[t]he transaction in which the consumer is deceived must occur in New York.'" *English v. Danone N. Am. Pub. Benefit Corp.*, 678 F. Supp. 3d 529, 536 (S.D.N.Y. 2023) (alteration in original) (quoting *Goshen v. Mut. Life Ins. Co. of N.Y.*, 774 N.E.2d 1190, 1195 (N.Y. 2002)). "This test 'does not turn on the residency of the parties,' or on where the defendant allegedly 'hatch[ed] a scheme' to deceive consumers." *Id.* (alteration in original) (quoting *Goshen*, 774 N.E.2d at 1195-96). Rather, the analysis focuses on "the location of the transaction, and in particular the strength of New York's connection to the allegedly deceptive transaction." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 122 (2d Cir. 2013) (citing *Goshen*, 774 N.E.2d at 1196).

Mehta received $M3M3 tokens when they were airdropped to his wallet on December 4, 2024. Am. Compl. ¶ 37. On December 5, 2024, he first purchased $M3M3 tokens and, for approximately two and a half months thereafter, Mehta made additional purchases and staked transactions in $M3M3. *Id.* On February 17 and 18, 2025, Mehta sold his entire $M3M3 investment and suffered net losses of approximately $19,164. *Id.* To make his purchases, Plaintiff Mehta used a wallet that transacted through user interfaces provided by Phantom or Jupiter. *Id.*

Plaintiff Mehta's $M3M3 transactions do not constitute New York consumer-oriented conduct under N.Y. GBL Sections 349 and 350. Mehta is a resident of Virginia. *Id.* Because Mehta's residency does not determine whether the transactions are consumer oriented, *see English*, 678 F. Supp. at 536, the Court must analyze "the location of the transaction, and in particular the strength of New York's connection to the allegedly deceptive transaction," *Cruz*, 720 F.3d at 122. In conducting this analysis, courts in this Circuit have considered: where

customer payments are processed; where the defendant gets paid or maintains a bank account; the location of defendant's office if some interaction with that office is required in connection with customer transactions; where customer communications are sent to and from; where defendant operates a website; where acts of an alleged conspiracy occur; and what law governs disputes according to consumer agreements and terms of use. *See, e.g.*, *id.* at 123-24; *Cline v. TouchTunes Music Corp.*, 211 F. Supp. 3d 628, 633-34 (S.D.N.Y. 2016); *Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151, 168 (S.D.N.Y. 2014); *Barron v. Helbiz Inc.*, No. 20-cv-04703 (LLS), 2023 WL 5672640, at *8 (S.D.N.Y. Sept. 1, 2023); *Balfour-Browne v. Eden Fine Art NY Inc.*, No. 25-cv-01142 (MMG), 2026 WL 2607718, at *4 (S.D.N.Y. Sept. 3, 2026).[6]

Here, Plaintiffs' allegations with respect to the connections between Mehta's $M3M3 purchases and New York are sparse and do not plausibly plead New York consumer-oriented conduct. Plaintiffs fail to plead facts regarding the transactions that address many of the considerations that courts use, including the location of Mehta's purchases. *See generally* Am. Compl. Instead, Plaintiffs allege that Chow "operated and controlled [the unincorporated association] Meteora" from New York and that "Meteora conducts business and ongoing activities" in New York and throughout the United States. *Id.* ¶ 39. Plaintiffs cite Meteora's website but do not allege where this website is operated and controlled. *See id.* While Meteora, an insufficiently alleged unincorporated association, *see* Section I, *supra*, is alleged to be operated and controlled from New York, none of the other non-party entities that interface with consumer transactions are based in New York. *See* Am. Compl. ¶ 49 (Raccoon Labs Pte. Ltd. is

[6] In their supplemental submission, Plaintiffs direct the Court to *Balfour-Browne*, 2026 WL 2607718, as establishing support for an "in . . . state" transaction over an out-of-state plaintiff. *See* Dkt. 271 at 3 (citation omitted). This case does not change the Court's analysis. The *Balfour-Browne* court found this requirement satisfied, in part, because, unlike here, deceptive advertisements emanated from New York and transactions were consummated through "a New York-based marketplace." 2026 WL 2607718, at *4.

an entity incorporated under Singaporean law); *id.* ¶ 51 (Dynamic Labs, Inc. is a Delaware corporation); *id.* ¶ 52 (Dynamic Labs, Ltd. is an entity incorporated in the British Virgin Islands). Further, the Meteora and Jupiter websites provide that the laws of the British Virgin Islands and Panama, respectively, govern customers' terms of use. *See* Terms of Service § 14, *Meteora Docs*, https://docs.meteora.ag/resources/legal/terms-of-service (last visited Sept. 24, 2026);[7] Terms of Use, *Jupiter Docs*, https://developers.jup.ag/docs/legal/terms-of-use (last visited Sept. 24, 2026).[8]

Plaintiffs argue that there is a territorial nexus to New York for Mehta's purchases of $M3M3 because Defendant Chow, as "a central architect of the fraudulent scheme," resided in New York and "controlled" Meteora operations from this District. Pls. Opp. to Chow at 25. Indeed, Plaintiffs' only specific allegations as to Mehta's transactions are that he: (i) "purchased $M3M3 based on Defendant Chow's endorsement and his seemingly central involvement in and responsibility for $M3M3," Am. Compl. ¶ 107; (ii) "purchased additional $M3M3 tokens based on Defendants' false representations about the M3M3 Platform and $M3M3's legitimacy," *id.* ¶ 333; and (iii) "relied on Defendant Chow's reputation and Meteora's purported trustworthiness," *id.* This is not enough, and Plaintiffs' reliance on *Barron v. Helbiz Inc.* does not cure this deficiency. *See* Pls. Opp. to Chow at 25 (citing *Barron*, 2023 WL 5672640, at *8). In *Barron*, the plaintiff "allege[d] that [d]efendants sent out deceptive communications from websites registered to New York-based addresses, held marketing events in New York to (fraudulently) promote their coin, and administered the ICO website in the state[] and perpetrated other aspects of their conspiracy from within New York." 2023 WL 5672640, at *8. Unlike in

---

[7] The Meteora website is incorporated by reference in the Amended Complaint. *See* Am. Compl. ¶ 39.

[8] The Jupiter website is incorporated by reference in the Amended Complaint. *See id.* ¶ 45.

*Barron*, here, there are no allegations of marketing events in New York or that New York-based websites were sending out deceptive communications. Further, Plaintiffs have not stated a claim for conspiracy to defraud against Chow, *see* Section V, *supra*, further distinguishing the allegations from that of *Barron*, *see* 2023 WL 5672640, at *10. Therefore, Plaintiffs have not alleged New York consumer-oriented conduct with respect to Mehta's $M3M3 transactions and Plaintiffs fail to state a claim against Defendant Chow under the N.Y. GBL for the alleged $M3M3 scheme. Thus, the Court dismisses Count VI against Defendant Chow.

### B. Plaintiffs Fail to Plead Materially Misleading Conduct by Chow with Respect to the $LIBRA Tokens

Even if Plaintiffs pleaded New York consumer-oriented conduct with respect to Hurlock's purchase of $LIBRA tokens because Hurlock, a resident of Brooklyn, New York, transacted through user interfaces "provided by Phantom or Bullx, from Brooklyn, New York." Am. Compl. ¶ 38. Plaintiffs nonetheless fail to state a claim under N.Y. GBL Sections 349 and 350 because they fail to plausibly allege that Chow engaged in materially misleading conduct in connection with Hurlock's $LIBRA transactions.

"[T]he New York Court of Appeals has adopted an objective definition of 'misleading,' under which the alleged act must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'" *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (quoting *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007)); *see also Schlessinger v. Valspar Corp.*, 991 N.E.2d 190, 193 (N.Y. 2013) ("Section 349 does not grant a private remedy for every improper or illegal business practice, but only for conduct that tends to deceive consumers."). Plaintiffs argue that Chow's materially deceptive conduct included "false representations about decentralization, concealment of insider control, fabricated endorsements, and hidden manipulation mechanisms." Pls. Opp. to Chow at 24. However, Plaintiffs' specific

allegations regarding Chow's involvement in the alleged $LIBRA fraud are that: (i) he replied to President Milei's post on X describing his conversation with Hayden, stating "What changing the world looks like [fire emoji]," Am. Compl. ¶¶ 249-50; (ii) that the "technical sophistication of the scheme suggests that Defendant Chow's role was not, as he has publicly asserted, limited to technical 'support,' but also included technical design," *id.* ¶ 286; (iii) $LIBRA followed the "same blueprint" as $M3M3, *id.* ¶ 13; and (iv) Chow later stated that "[f]or [$LIBRA], although we [Meteora] were made aware of the possibility of it several weeks ago by Hayden, we had no involvement in the project at all beyond providing IT support, including commenting on the liquidity curve and helping verify the token's authenticity after the token was publicly launched," *id.* ¶ 305; *see also* benchow.sol (@hellochow), Status update, X (Feb. 16, 2025, 11:18 PM), https://x.com/hellochow/status/1891341548115149190 (last visited Sept. 24, 2026). None of these allegations plausibly suggest that Chow engaged in materially misleading conduct in connection with consumers' $LIBRA transactions.

Beginning with Chow's comment on President Milei's post that this is "What changing the world looks like [fire emoji]," Am. Compl. ¶ 250, Plaintiffs do not allege that this statement was materially misleading or false. *See generally id.* Thus, this comment does not support a claim under N.Y. GBL § 349 or § 350. *See Bildstein v. MasterCard Int'l Inc.*, 329 F. Supp. 2d 410, 414 (S.D.N.Y. 2004) (finding that because complaint "contains no allegation regarding materiality, it is insufficient to state a claim under Section 349"); *Moses v. Citicorp Mortg. Inc.*, 982 F. Supp. 897, 903 (E.D.N.Y. 1997) ("Conclusory allegations have been held to be insufficient to state a claim under section 349."); *Polvay v. FCTI, Inc.*, 713 F. Supp. 3d 1, 9 (S.D.N.Y. 2024) ("[M]ateriality is an element of a claim under Section 349 and 350.").

The remaining allegations regarding the technical sophistication of the $LIBRA scheme or its similarities with $M3M3 and Chow's statement *after* the revelation of the $LIBRA fraud

do not plausibly allege materially misleading conduct or statements that could have impacted consumer transactions under N.Y. GBL § 349 or § 350. Conduct that consumers would not know, or did not know, about until after they made their purchases, cannot be materially misleading or false. *See Yodice v. Touro Coll. & Univ. Sys.*, 767 F. Supp. 3d 86, 95 (S.D.N.Y. 2025) ("A 'material' statement is one bearing on a consumer's choice to participate in a transaction." (quoting *McCracken v. Verisma Sys., Inc.*, 91 F.4th 600, 608 (2d Cir. 2024))); *West v. Sambazon, Inc.*, 750 F. Supp. 3d 356, 369 (S.D.N.Y. 2024) ("GBL §§ 349 and 350 claims cannot succeed if the plaintiff did not see the alleged misrepresentations before purchasing the product." (collecting cases)); *N. State Autobahn, Inc. v. Progressive Ins. Grp. Co.*, 953 N.Y.S.2d 96, 102 (N.Y. App. Div. 2012) ("The requirement that the consumer-oriented conduct be materially misleading limits the availability of section 349(a) to cases where the deception pertains to an issue that may bear on a consumer's decision to participate in a particular transaction."); *Timber Hill Enters., LLC v. Alta Equip. Co.*, No. 26-cv-00002, 2026 WL 1346622, at *4 (N.D.N.Y. May 14, 2026) ("Without factual allegations supporting a plausible inference that defendant concealed a known defect from consumers as part of a broader, consumer-oriented practice, this isolated, post-sale statement does not constitute materially deceptive conduct under § 349.").

Thus, because Plaintiffs have failed to allege how Chow engaged in materially misleading conduct in connection with Hurlock's $LIBRA transactions, the Court dismisses Count VII against Defendant Chow.

## VII. Unjust Enrichment (Counts VIII and IX) against Defendant Chow

Finally, in Counts VIII and IX, Plaintiffs allege that Defendant Chow has been unjustly enriched by profiting from "the misconduct alleged [in the Amended Complaint], as it enabled [him] to sell $M3M3 [and $LIBRA] at artificially inflated market prices, and to receive

excessive transaction fees from Meteora protocols." Am. Compl. ¶¶ 434, 440 (brackets omitted); *see also id.* ¶¶ 432-43. To state a claim for unjust enrichment, a plaintiff must plead "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the [defendant] to retain what is sought to be recovered." *McCracken*, 91 F.4th at 608 (quoting *Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012)). "Because an unjust-enrichment claim 'is not available where it simply duplicates, or replaces, a conventional contract or tort claim,' courts may dismiss duplicative unjust-enrichment claims at the pleading stage." *Velez v. Lasko Prods., LLC*, 706 F. Supp. 3d 444, 463 (S.D.N.Y. 2023) (citation omitted) (first quoting *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012); and then citing *Yookel, Inc. v. U.S. Steel Corp.*, No. 22-655-cv, 2023 WL 3033512, at *2 (2d Cir. Apr. 21, 2023) (summary order)); *Kelly v. Beliv LLC*, 640 F. Supp. 3d 286, 305 (S.D.N.Y. 2022) (collecting cases). The doctrine of unjust enrichment "is a narrow one; it is 'not a catchall cause of action to be used when others fail.'" *E.J. Brooks Co. v. Cambridge Sec. Seals*, 105 N.E.3d 301, 312 (N.Y. 2018) (quoting *Corsello*, 967 N.E.2d at 1185).

Because Plaintiffs' unjust enrichment claim against Defendant Chow is based on the fraudulent conduct alleged in their other claims, it is duplicative of those claims. Therefore, the Court dismisses Counts VIII and IX against Defendant Chow.

## VIII. Personal Jurisdiction Over the Kelsier Defendants for State Law Claims

The Kelsier Defendants next move to dismiss for lack of personal jurisdiction under Rule 12(b)(2) in the event that the Court dismisses Counts IV and V, *see* Kelsier Br. at 53-60, as well as for failure to state a claim under Rule 12(b)(6), *see id.* at 43-53. "When a defendant moves to dismiss under Rules 12(b)(2) and 12(b)(6), the court must resolve the Rule 12(b)(2) motion first." *Suarez v. Cal. Nat. Living, Inc.*, No. 17-cv-09847 (VB), 2019 WL 1046662, at *3 (S.D.N.Y. Mar. 5, 2019); *accord Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir.

1963). Because the Court finds that it lacks personal jurisdiction over the Kelsier Defendants, it need not reach their motion to dismiss the state law claims under Rule 12(b)(6).

"A district court deciding a motion to dismiss for lack of personal jurisdiction engages in a two-part analysis." *O'Reilly*, 2025 WL 2773284, at *6. "First, the court must establish whether there is 'a statutory basis for exercising personal jurisdiction.'" *In re Tether*, 576 F. Supp. 3d at 86 (alteration adopted) (italicization omitted) (quoting *Marvel Characters*, 726 F.3d at 128). "In making this determination, the court 'applies the forum state's personal jurisdiction rules' unless a federal statute 'specifically provides for national service of process.'" *Corley*, 2019 WL 3841939, at *4 (alteration adopted) (quoting *PDK Labs*, 103 F.3d at 1108). "If the long-arm statute permits personal jurisdiction, the second step is to analyze whether personal jurisdiction comports with the Due Process Clause of the United States Constitution." *Chloe*, 616 F.3d at 164; *accord Murray*, 2018 WL 3773991, at *3. "The due process analysis consists of two prongs: the minimum contacts inquiry and the reasonableness inquiry." *GE Renewables N. Am., LLC v. SFK USA Inc.*, No. 23-cv-09274 (PKC), 2025 WL 437890, at *4 (S.D.N.Y. Feb. 7, 2025). "[A]nalysis of minimum contacts requires 'evaluation of the quality and nature of the defendant's contacts with the forum state under a totality of the circumstances test.'" *Kumar v. Opera Sols. OPCO, LLC*, No. 20-cv-06824 (GHW), 2021 WL 4442832, at *10 (S.D.N.Y. Sept. 28, 2021) (alterations adopted) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013)). "[O]nce minimum contacts are established, a court considers those contacts 'in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice.'" *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018) (quoting *Licci*, 732 F.3d at 170). If the Court concludes that it has jurisdiction, it may then turn to the merits. *See Cavanaugh v. Northwell Health, Inc.*, No. 21-cv-01381 (EK) (ARL), 2025 WL 904314, at *5 (E.D.N.Y. Mar. 24, 2025) ("Having

concluded that there is no jurisdictional impediment to doing so, the Court now proceeds to the merits.”).

Plaintiffs invoke four bases for personal jurisdiction over the Kelsier Defendants: (i) 18 U.S.C. § 1965; (ii) Rule 4(k)(2); (iii) New York's long-arm statute, N.Y. C.P.L.R. § 302(a); and (iv) a conspiracy theory of jurisdiction. Am. Compl. ¶¶ 32-35; *see also* Pls. Opp. to Kelsier at 32-35 (relying on conspiracy theory of N.Y. C.P.L.R. § 302(a) and Rule 4(k)(2)). “To allege personal jurisdiction over a defendant, group pleading is not permitted. Instead, the plaintiff is required to establish personal jurisdiction separately over each defendant.” *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 135 (S.D.N.Y. 2021). Further, a “plaintiff must establish the court's jurisdiction with respect to *each* claim asserted.” *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004). “In deciding a motion to dismiss for lack of personal jurisdiction, it is proper for a court to rely on affidavits to establish jurisdictional facts.” *Ariel Mar. Grp., Inc. v. Pellerin Milnor Corp.*, No. 88-cv-06447 (PKL), 1989 WL 31665, at *2 n.4 (S.D.N.Y. Mar. 29, 1989); *accord Gosain v. State Bank of India*, 689 F. Supp. 2d 571, 578 (S.D.N.Y. 2010) (citing *Ariel*, 1989 WL 31665, at *2 n.4), *aff'd in part, vacated in part on other grounds, remanded*, 414 F. App'x 311 (2d Cir. 2011) (summary order). As discussed below, Plaintiffs have not demonstrated the existence of personal jurisdiction as to the Kelsier Defendants.

**A. 18 U.S.C. § 1965 and Rule 4(k)(2)**

Plaintiffs first allege the Court has jurisdiction over the Kelsier Defendants based on their RICO claims under 18 U.S.C. § 1965.[9] Am. Compl. ¶ 32. Plaintiffs state, in the alternative, that this Court has personal jurisdiction pursuant to Rule 4(k)(2) of the Federal Rules of Civil

[9] Plaintiffs' jurisdictional allegations as to Meteora are not addressed given the Court's dismissal of Meteora. *See* Section I, *supra*.

Procedure. Am. Compl. ¶ 34. Section 1965 defines the rules for venue and process for RICO claims as relevant for personal jurisdiction assessments. *See* 18 U.S.C. § 1965. Rule 4(k)(2) provides that, for claims that arise under federal law, "serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant" if "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction" and "exercising jurisdiction is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2). Because Plaintiffs fail to state a claim under RICO, the only federal claim alleged, *see* Sections II and III, *supra*, neither the RICO statute, nor the federal rule provide a basis for personal jurisdiction over the Kelsier Defendants.

**B. C.P.L.R. § 302(a)**

Plaintiffs also rely upon New York's long-arm statute to assert personal jurisdiction. *See* Am. Compl. ¶ 33. New York's long-arm statute provides that:

> As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent: 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or 2. commits a tortious act within the state . . . ; or 3. commits a tortious act without the state causing injury to person or property within the state . . . , if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce[.]

N.Y. C.P.L.R. § 302(a) (McKinney 2026). Because Plaintiffs do not specify which provision of Section 302(a) they rely upon, the Court will review each provision in turn, beginning with the latter provisions.

*1. C.P.L.R. § 302(a)(4)*

"[A] court may exercise personal jurisdiction over any non-domiciliary" who "owns, uses or possesses any real property situated within the state." N.Y. C.P.L.R. § 302(a)(4). None of the

Kelsier Defendants is alleged to own, use, or possess property in New York. *See generally* Am. Compl. And the Kelsier Defendants affirmatively provide that they do not own any such property. *See* Dkt. 43-1 ("Hayden Decl.") ¶ 4; Dkt. 174-1 ("Thomas Decl.") ¶ 8; Dkt. 174-2 ("Gideon Decl.") ¶ 8. Therefore, the Court does not have personal jurisdiction over the Kelsier Defendants under N.Y. C.P.L.R. § 302(a)(4).

*2. C.P.L.R. § 302(a)(2) and C.P.L.R. § 302(a)(3)*

A court may exercise personal jurisdiction over any non-domiciliary who either commits a tortious act in the state, N.Y. C.P.L.R. § 302(a)(2) (McKinney 2026), or who, having committed a tortious act while not in the state, caused injury to person or property in the state if the non-domiciliary "(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce," *id.* § 302(a)(3).

None of the Kelsier Defendants are alleged to have committed a tortious act while they were in the state of New York, *see generally* Am. Compl., for purposes of personal jurisdiction under Section 302(a)(2). *See Bensusan Rest. Corp. v. King*, 126 F.3d 25, 28 (2d Cir. 1997) ("CPLR § 302(a)(2) reaches only tortious acts performed by a defendant who was physically present in New York when he performed the wrongful act."). As for C.P.L.R. § 302(a)(3), Plaintiffs also do not allege that the Kelsier Defendants regularly engaged in business in New York or would reasonably expect their acts to have consequences in New York for purposes of N.Y. C.P.L.R. § 302(a)(3). *See generally* Am. Compl.; Pls. Opp. to Kelsier. Because Plaintiffs "bear[] the burden of demonstrating personal jurisdiction over a person or entity against whom

[they] seek[] to bring suit," *Troma Ent.*, 729 F.3d at 217 (quoting *Penguin Grp.*, 609 F.3d at 34), they have not established personal jurisdiction under Sections 302(a)(2) or 302(a)(3).

*3. C.P.L.R. § 302(a)(1)*

Finally, "[t]o establish personal jurisdiction under [S]ection 302(a)(1), two requirements must be met: (1) [t]he defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity." *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006) (citing *McGowan v. Smith*, 419 N.E.2d 321, 323 (N.Y. 1981)); *accord Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007). "The overriding criterion necessary to establish a transaction of business is some act by which the defendant purposefully avails itself of the privilege of conducting activities within New York." *Northwell Health, Inc. v. Grp. Hospitalization & Med. Servs., Inc.*, 183 F.4th 78, 92 (2d Cir. 2026) (alteration adopted) (quoting *Ehrenfeld v. Bin Mahfouz*, 881 N.E.2d 830, 834 (N.Y. 2007)). "Purposeful activities are those with which a defendant, through volitional acts, avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Eades*, 799 F.3d at 168 (quoting *Fischbarg v. Doucet*, 880 N.E.2d 22, 26 (N.Y. 2007)). And "a claim 'arises from'" such activities "when there is 'some articulable nexus between the business transacted and the cause of action sued upon,' or when 'there is a substantial relationship between the transaction and the claim asserted.'" *Sole Resort*, 450 F.3d at 103 (citation omitted) (alteration adopted) (first quoting *McGowan*, 419 N.E.2d at 323; and then quoting *Kreutter v. McFadden Oil Corp.*, 522 N.E.2d 40, 43 (N.Y. 1988)).

Plaintiffs do not sufficiently allege that the Kelsier Defendants transacted or purposefully availed themselves of the privilege of conducting activities in New York. The entirety of Plaintiffs' jurisdictional allegations as to the Kelsier Defendants in the Amended Complaint are as follows:

> The Kelsier Defendants purposefully directed their activities toward New York and U.S. markets by: (i) partnering with New York-based Defendant Chow; (ii) funding manipulation schemes targeting U.S. investors; (iii) utilizing U.S.-based social media platforms and cryptocurrency exchanges; (iv) executing blockchain transactions processed substantially through U.S.-based validators and infrastructure; and (v) creating and disseminating promotional materials specifically designed to attract U.S. retail investors.

Am. Compl. ¶ 60; *see also* Pls. Opp. to Kelsier at 34.

As a threshold matter, these jurisdictional allegations as to the Kelsier Defendants independently fail because they do not "establish personal jurisdiction separately over each defendant" as required. *In re Aegean Marine*, 529 F. Supp. 3d at 135 (citing *Famular*, 2017 WL 2470844, at *2) ("To allege personal jurisdiction over a defendant, group pleading is not permitted. Instead, the plaintiff is required to establish personal jurisdiction separately over each defendant" for "each claim asserted."). Group pleading aside, Plaintiffs have not established personal jurisdiction over the Kelsier Defendants under N.Y. C.P.L.R. § 302(a)(1).

Plaintiffs do not allege that the Kelsier Defendants transacted or conducted activities in *New York* as opposed to the broader United States. First, Plaintiffs' claim that the Kelsier Defendants utilized U.S.-based social media platforms is insufficient to show purposeful availment in New York. Am. Compl. ¶ 60. "Promoting events through a website or other social media platform (e.g., Facebook) has been held insufficient to confer jurisdiction under § 302(a)(1)." *RLP Ventures LLC v. All Hands Instruction NFP*, No. 18-cv-03988 (RWS), 2019 WL 1316030, at *4 (S.D.N.Y. Mar. 22, 2019); *see also DH Servs., LLC v. Positive Impact, Inc.*, No. 12-cv-06153 (RA), 2014 WL 496875, at *5-6 (S.D.N.Y. Feb. 5, 2014) (holding that advertisements for fundraising events posted on Facebook did not constitute "transacting business" and therefore did not provide personal jurisdiction); *Gilbert v. Indeed, Inc.*, 513 F. Supp. 3d 374, 414 (S.D.N.Y. 2021) ("The mere invitation to connect through a social media platform cannot, by itself, confer personal jurisdiction over a defendant because an invitation

alone does not represent 'purposeful availment' of 'the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958))). Second, allegations of the use of nationwide validators, cryptocurrency exchanges, and infrastructure or a nationwide market of investors are also insufficient to establish personal jurisdiction in New York because they do not demonstrate how any of the Kelsier Defendants "purposefully avail[ed themselves] of the privilege of conducting activities within New York." *Northwell Health*, 183 F.4th at 92 (quoting *Ehrenfeld*, 881 N.E.2d at 834); *cf. Asahi Metal Indus. Co. v. Superior Ct.*, 480 U.S. 102, 112 (1987) ("The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State."); *Mercer v. Rampart Hotel Ventures, LLC*, No. 19-cv-03551 (PAE), 2020 WL 882007, at *6 (S.D.N.Y. Feb. 24, 2020) (holding that "national web presence, without more, does not support the exercise of personal jurisdiction under § 302(a)(1)"). Finally, Plaintiffs' allegation that the Kelsier Defendants created and disseminated promotional materials designed to attract U.S. investors also fails to provide a basis for personal jurisdiction because "advertisements in national publications are not sufficient to provide personal jurisdiction under Section 302(a)(1)." *Coll. Essay Optimizer, LLC v. Edswell, Inc.*, No. 14-cv-08586 (LAK), 2015 WL 5729681, at *7 (S.D.N.Y. Sept. 30, 2015) (citation omitted); *see also Epstein v. Univ. of the S. Pac.*, No. 14-cv-06012 (AT), 2015 WL 4002344, at *4 (S.D.N.Y. June 19, 2015) (applying this rule to an advertisement on a website).

In response to the Kelsier Defendants' arguments regarding New York's long-arm statute, Plaintiffs do not engage with any arguments regarding C.P.L.R. § 302 and instead argue that "the most powerful basis for jurisdiction in this case" is the "conspiracy theory of jurisdiction." Pls. Opp. to Kelsier at 32. Specifically, Plaintiffs argue that "[b]y knowingly and purposefully conspiring with a New York resident, Defendant Chow, who directed the

enterprise's core technical operations from within New York, the Kelsier Defendants purposefully availed themselves of this forum and are subject to jurisdiction here." *Id.* The Court does not agree.

While the Second Circuit recognizes a conspiracy theory of jurisdiction, this basis is not "a stand-alone theory of personal jurisdiction, divorced from any statutory basis." *Rudersdal v. Harris*, No. 18-cv-11072 (GHW) (RWL), 2021 WL 2209042, at *16 (S.D.N.Y. Feb. 27, 2021), *report and recommendation adopted as modified*, 2022 WL 263568 (S.D.N.Y. Jan. 28, 2022); *see also Marvel Characters*, 726 F.3d at 128 ("A district court must have a statutory basis for exercising personal jurisdiction."). Rather, "[t]o establish conspiracy-based personal jurisdiction pursuant to New York's long-arm statute, a plaintiff must — after making a *prima facie* showing of a conspiracy — plausibly allege," *id.*, "(1) that the out-of-state co-conspirator had an awareness of the effects of the activity in New York, (2) that the New York co-conspirators' activity was for the benefit of the out-of-state conspirators, and (3) that the co-conspirators in New York acted at the behest of or on behalf of, or under the control of the out-of-state conspirators." *PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*, 530 F. Supp. 3d 301, 324 (S.D.N.Y. 2021) (quoting *Laborers Loc. 17 Health & Benefit Fund v. Philip Morris, Inc.*, 26 F. Supp. 2d 593, 602 (S.D.N.Y. 1998)); *see also Charles Schwab*, 883 F.3d at 87 ("The plaintiff must allege that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state."); *Berkshire Bank*, 2022 WL 569819, at *3.

Plaintiffs have not established personal jurisdiction over the Kelsier Defendants under a conspiracy theory of jurisdiction because Plaintiffs have not plausibly pleaded a conspiracy that includes Defendant Chow, who is the alleged connection to New York, given that all claims

against Chow (including conspiracy) have now been dismissed. *See* Sections II-VII, *supra*; *see also Sullivan v. UBS AG*, 149 F. 4th 206, 218-19 (2d Cir. 2025) (rejecting conspiracy-based theory of personal jurisdiction where plaintiff failed to allege that New York traders were part of the conspiracy with European defendants and had committed overt acts for purposes of accomplishing the objectives of the conspiracy); *PharmacyChecker.com, LLC v. Nat'l Ass'n of Boards of Pharmacy,* 530 F. Supp. at 324-25 (finding no conspiracy theory personal jurisdiction over defendant, in part, because plaintiff did not allege defendant's "one employee in New York, or its accreditation of pharmacies and mental health providers in New York furthered the conspiracy"); *In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d 219, 239(S.D.N.Y. 2019) (holding plaintiffs did "not me[e]t their burden of establishing conspiracy jurisdiction" where "they have failed to show that any [d]efendants' alleged co-conspirators committed a tort in New York"); *Drake v. Lab'y Corp. of Am. Holdings*, No. 02-cv-01924 (FB) (RML), 2007 WL 776818, at *11 (E.D.N.Y. Mar. 13, 2007) (holding no conspiracy theory jurisdiction where plaintiff did "not allege that any of the defendants committed a tort in New York" because it is the "acts committed in New York by the co-conspirator" that "may subject the out-of-state defendant to personal jurisdiction in New York"), *aff'd*, 417 F. App'x 84 (2d Cir. 2011) (summary order); *Grosser v. Commodity Exch., Inc.*, 639 F. Supp. 1293, 1308-09 (S.D.N.Y. 1986) (finding no conspiracy jurisdiction where plaintiff alleged no facts showing a conspiracy that included "others who engaged in tortious activity in New York pursuant to the conspiracy"), *aff'd sub nom. Grosser v. Commodity Exch.*, 859 F.2d 148 (2d Cir. 1988).

Thus, the Court lacks personal jurisdiction over the Kelsier Defendants under a conspiracy theory of jurisdiction.

* * *

Because the Court finds that it does not have personal jurisdiction over the Kelsier Defendants, it will grant their motion to dismiss the remaining state law claims under Rule 12(b)(2).

## IX. Plaintiffs' Motion for Leave to File a Second Amended Complaint

On October 21, 2025, Plaintiffs requested leave to file a second amended complaint. *See* Dkt. 203; Pls. SAC Br.; Burwick Decl.; Proposed SAC. All Defendants have opposed this request. *See* Chow SAC Opp.; Kelsier SAC Opp.; DLL Reply & SAC Opp. Plaintiffs filed their reply brief on November 25, 2025. *See* Pls. SAC Reply. For the following reasons, the Court denies Plaintiffs' request for leave to file a second amended complaint.

### A. Legal Standard

Rule 15(a)(2) provides that, once amendment as of right is no longer available, "a party may amend its pleading only with the opposing party's written consent or the court's leave," and directs the Court to "freely give [such] leave when justice so requires." Fed. R. Civ. P. 15(a)(2); *see Foman v. Davis*, 371 U.S. 178, 182 (1962) (advising that Rule 15(a)(2)'s "mandate is to be heeded"). The Supreme Court has identified grounds that may justify denial, including "undue delay, bad faith or dilatory motive," "repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party," and "futility of amendment." *Foman*, 371 U.S. at 182. The Second Circuit has similarly instructed that "it is within the sound discretion of the district court to . . . deny leave to amend for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 447 (2d Cir. 2019) (omission adopted) (quoting *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018)).[10]

---

[10] Rule 16(b)'s more demanding good-cause standard "governs a motion to amend filed after the deadline a district court has set for amending the pleadings." *Parker v. Columbia Pictures*

**B. Analysis**

The Proposed SAC sets forth additional allegations with respect to the claims in the Amended Complaint. It also adds three new tokens — $MELANIA, $ENRON, and $TRUST. *See* Proposed SAC ¶¶ 263-309 ($MELANIA), 310-39 ($ENRON), 340-61 ($TRUST). The Proposed SAC adds a new plaintiff, John Winslow ("Plaintiff Winslow" or "Winslow"), who purchased $MELANIA and $LIBRA tokens. *See id.* ¶ 28. It also adds three new sets of defendants: Ng Ming Yeow ("Defendant Yeow" or "Yeow"), Defendant Dynamic Labs Limited ("Defendant Dynamic Labs Limited" or "DLL"), and "Doe Defendants 1-20" ("Doe Defendants"). *See id.* ¶¶ 31, 36-37. The Proposed SAC also reorganizes its claims to consolidate the counts to cover all tokens and to add a new claim of unjust enrichment against DLL. *See id.* ¶¶ 380-458. Finally, the Proposed SAC attaches the M3M3 Calcs Template and M3M3 Token Launch Organizer documents, *see id.* at 117-18 (Appendix I - M3M3 Calcs Template); *id.* at 127-32 (Appendix N - M3M3 Token Launch Organizer), as well as redacted text messages that are alleged to be between a confidential informant and Defendant Hayden, *see id.* at 137-51 (Appendix Q).

Defendants argue that Plaintiffs should be denied leave to amend and file the Proposed SAC because the claims are futile. *See* Chow SAC Opp. at 11-23; DLL Reply & SAC Opp. at 11-12; Kelsier SAC Opp. at 8-20. The Kelsier Defendants and Defendant Chow further argue that the request is made in bad faith. *See* Chow SAC Opp. at 24-27; Kelsier SAC Opp. at 20-22. Finally, the Kelsier Defendants argue that the request is prejudicial to them. *See* Kelsier SAC

---

*Indus.*, 204 F.3d 326, 340 (2d Cir. 2000); Fed. R. Civ. P. 16(b)(4) (providing that a scheduling order "may be modified only for good cause and with the judge's consent"). A case management plan and Rule 16 scheduling order have not yet been issued in this case. Therefore, as Defendants acknowledge, Kelsier SAC Opp. at 4 n.3, Plaintiffs' motion is governed by Rule 15(a)(2).

Opp. at 5-7. The Court agrees that Plaintiffs' Proposed SAC is futile and accordingly need not reach the other arguments raised.

"A proposed amendment is futile," and therefore should be denied, when "it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." *Morales v. N.Y. Univ.*, 585 F. Supp. 3d 610, 613 (S.D.N.Y. 2022) (quoting *Long v. Parry*, 679 F. App'x 60, 63 (2d Cir. 2017) (summary order)). And, as discussed earlier, "[c]laims sounding in fraud must satisfy the heightened pleading standards of [Rule] 9(b)." *Olson*, 29 F.4th at 71.

The Proposed SAC proposes a number of changes, but none of these amendments cure the pleading deficiencies in the Amended Complaint. *See Pettaway v. Nat'l Recovery Sols., LLC*, 955 F.3d 299, 303 (2d Cir. 2020) (in the context of a motion to dismiss, "the district court has the option of either denying the pending motion as moot or evaluating the motion in light of the facts alleged in the amended complaint"). Nor does the Proposed SAC allege non-futile new claims.

*1. Failure to Allege Meteora is an Unincorporated Association*

In the Proposed SAC, Plaintiffs abandon the claim that Meteora is a partnership under New York law and further still fail to plead facts that support a finding that Defendant Meteora is a suable unincorporated association. The Proposed SAC alleges that "Defendant Meteora is sued here as an *unincorporated association* of human operators led by Chow, which exploited the Meteora brand, infrastructure, and code base to run a pump-and-dump operation." Proposed SAC ¶ 4. However, the Proposed SAC does not provide who, beyond Defendant Chow and unspecified "associates" and "human operators," comprise the alleged unincorporated association. *Id.* ¶ 169 (describing association as "Chow and his associates"); *id.* ¶ 29 (alleging that Meteora "is a coordinated human-run enterprise that developed, marketed, and operated token-launch infrastructure on Solana to carry out the scheme alleged herein, including control

over liquidity pools, fee routing, and upgrade authority"); *id.* ¶ 168(c) ("Defendant Meteora, however, is not code. It is an unincorporated association of human operators led by Benjamin Chow, who directed the development, deployment, and use of that code for fraudulent purposes."). The Proposed SAC continues to fail to plausibly allege that the Meteora unincorporated association consists of "a voluntary group of persons, without a charter, formed by mutual consent for the purpose of promoting a common objective." *Inclusive Access*, 2021 WL 2419528, at *18 (citation omitted). Therefore, the claims in the Proposed SAC against Meteora are futile.

2. *Continued Failure to Allege RICO Pattern*

Despite proposing the addition of three new tokens, the Proposed SAC does not cure the Amended Complaint's failure to plead the continuity required to plead a pattern of racketeering activity. With respect to closed-ended continuity, *see* Section II.A.1, *supra*, the Proposed SAC only extends the overall timeframe of alleged racketeering by one month. The Proposed SAC does not allege any dates for the token launches of $MELANIA or $ENRON. *See* Proposed SAC ¶¶ 263-339. With respect to $TRUST, the Proposed SAC alleges that the token was launched in April 2025. *Id.* ¶ 340. Since the initial complaint was filed on March 17, 2025, the time period is only expanded by one month. For all of the reasons already discussed, a period of seven months is not sufficient for a closed-ended pattern of racketeering. *See* Section II.A.1, *supra*.

With respect to open-ended continuity, the Proposed SAC does not allege new facts to plausibly plead either that (1) the Kelsier Defendants and Defendant Chow, as members of the alleged RICO enterprise, were engaged *primarily* in racketeering activity, as opposed to legitimate business activities, or (2) that the predicate acts of wire fraud were the Kelsier Defendants' and Chow's regular way of operating their businesses. That the alleged RICO

enterprise "rebranded certain platforms" and "continued to attract new users" does not support a plausible inference of continuity because these actions are consistent with running a legitimate business. Proposed SAC ¶ 431. Thus, the Proposed SAC fails to cure Plaintiffs' deficiencies as to the continuity required for a pattern of racketeering activity. *See* Section II.A.2, *supra*. And, as discussed, where there is no substantive RICO claim pleaded, no RICO conspiracy claim may lie. *See* Section III, *supra*; *see, e.g.*, *Discon*, 93 F.3d at 1064 ("Any claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient." (quoting *Lightning Lube*, 4 F.3d at 1191)); *Zamora*, 834 F. App'x at 626 ("Plaintiffs' failure to state a claim for a substantive RICO violation is fatal to their RICO conspiracy claim under § 1962(d)[.]").

Therefore, the Proposed SAC's allegations continue to fail to state a RICO or RICO conspiracy claim.

*3. Failure to Allege that Chow Acted with Requisite Scienter for Fraud Claims*

The Proposed SAC next does not cure the Amended Complaint's failure to plead scienter as to Defendant Chow for its fraud claims. Most of the Proposed SAC's allegations as to scienter are the same as the Amended Complaint. *See* Proposed SAC ¶¶ 396-400. The only new nonconclusory facts alleged pertain to the content of the M3M3 Calcs Template and the M3M3 Token Launch Organizer and the text messages between Defendant Hayden and the confidential informant. But these new facts are insufficient to plausibly plead scienter as to Chow.

Nothing in the M3M3 Calcs Template or the M3M3 Token Launch Organizer supports a plausible inference that Chow acted with scienter to commit fraud. The Court agrees with Defendant Chow that the content of the M3M3 Calcs Template "shows staking calculations, tokenomics information, and liquidity metrics," which is entirely consistent with Chow's role in providing technical assistance to the Kelsier Defendants in using the Meteora software to launch

the $M3M3 token. Chow SAC Opp. at 5. Plaintiffs' conclusory assertions that this document demonstrates how Chow "engineered $M3M3's launch to benefit a handful of insiders," Proposed SAC ¶ 397; "detailed this extraction plan," *id.*; and "model[ed] how insiders could exploit the token's economics," *id.* ¶ 412(b), do not alter this conclusion. Plaintiffs' arguments regarding the M3M3 Token Launch Organizer fare no better. Plaintiffs allege that Thomas created this document, *id.* ¶ 127, not Chow, and the only allegations about its contents are that it "outlines the marketing-side playbook, including task lists, publication schedules, and narrative messaging for the $M3M3 token," *id.*, which does not support an inference of fraudulent intent. Contrary to Plaintiffs' characterizations, these documents do not outline the mechanics of a fraud, nor do they support a plausible allegation of a conspiracy. *See id.* ¶ 437(c).

The new text messages between Defendant Hayden and the confidential informant also do not support a plausible inference that Chow acted with the requisite scienter. Plaintiffs allege that Hayden "made multiple admissions revealing the inner workings of the enterprise and explicitly identifying Chow as its leader." *Id.* ¶¶ 112-13. But Hayden's messages do not support this characterization. *See id.* at 137-51 (Appendix Q). Specifically, Hayden's statement that he followed Chow's instructions with respect to launching tokens, *id.* at 150 ("I only did like 15 [tokens] and just followed Ben's [Chow's] instructions and then got better."), does not support Plaintiffs' characterization that Chow "directed both the technical and operational components of the fraud" and therefore was "the orchestrator of a serial token-launch operation," *id.* ¶¶ 114-15. That Chow provided Hayden with instructions on how to launch a token is equally consistent with Chow's technical management of Meteora and therefore does not allege a compelling inference of fraudulent intent. *See Tellabs*, 551 U.S. at 314 (requiring an inference of fraudulent intent "must be cogent and at least as compelling as any opposing inference"). Thus, the

Proposed SAC continues to fail to plead scienter as to Defendant Chow and amendment of the fraud claims is therefore futile.

#### *4. Failure to Cure New York General Business Law Claims*

The Proposed SAC likewise does not cure the Amended Complaint's failure to state a claim for violations of New York's General Business Law against Defendant Chow. First, the $M3M3, $ENRON, and $TRUST tokens are not alleged to have any territorial nexus to New York, *see* Section VI, *supra*. Because none of the Plaintiffs are alleged to have purchased any of the three coins in New York, the purchases cannot be "transaction[s] in which the consumer is deceived . . . in New York." *English*, 678 F. Supp. 3d at 536 (quoting *Goshen*, 774 N.E.2d at 1195). Second, the Proposed SAC continues to fail to allege any materially misleading statements by Chow. Therefore, the Proposed SAC fails to plead a N.Y. GBL claim against Defendant Chow, rendering amendment futile.

#### *5. Unjust Enrichment Claim Remains Duplicative*

In the Proposed SAC and motion for leave to amend, Plaintiffs continue to fail to explain how their claim for unjust enrichment is not duplicative of their other causes of action against Chow. *See Green v. Covidien LP*, No. 18-cv-02939 (PGG), 2019 WL 4142480, at *9 (S.D.N.Y. Aug. 30, 2019) ("Although a plaintiff 'may plead unjust enrichment in the alternative to her other claims,' the unjust enrichment claim will not survive a motion to dismiss where the plaintiff 'fails to explain how it is not merely duplicative of her other causes of action.'" (alterations adopted) (quoting *Tyman v. Pfizer, Inc.*, No. 16-cv-06941 (LTS) (BCM), 2017 WL 6988936, at *20 (S.D.N.Y. Dec. 27, 2017), *report and recommendation adopted*, 2018 WL 481890 (S.D.N.Y. Jan. 18, 2018))). That Plaintiffs now state that this claim is pleaded in the alternative, *see* Proposed SAC ¶ 446, does not alter this requirement, *see Brower v. Colgate-Palmolive Co.*, No. 25-cv-03348 (JPO), 2026 WL 1831253, at *12 (S.D.N.Y. June 25, 2026)

("'[E]ven pleaded in the alternative,' unjust enrichment claims will be dismissed if 'plaintiffs fail to explain how their unjust enrichment claim is not merely duplicative of their other causes of action.'" (quoting *Nelson v. MillerCoors, LLC*, 246 F. Supp. 3d 666, 679 (E.D.N.Y. 2017))).

*6. The Court Lacks Personal Jurisdiction over the Kelsier Defendants*

Finally, the Proposed SAC does not adequately plead facts that cure the lack of personal jurisdiction over the Kelsier Defendants. The Proposed SAC offers largely the same jurisdictional bases for the Kelsier Defendants as the Amended Complaint. *See* Proposed SAC ¶¶ 20-24.

Given that amendment of the RICO claim is futile, personal jurisdiction under 18 U.S.C. § 1965 continues to be lacking. *See Vice v. Nat'l Collegiate Student Loan Tr. 2004-1*, No. 23-cv-06287 (PGG) (BCM), 2026 WL 867096, at *17 (S.D.N.Y. Mar. 30, 2026) ("Where a plaintiff does not state a plausible RICO claim, 18 U.S.C. § 1965(b) does not authorize a court to exercise jurisdiction over non-domiciliary defendants."); *Reich v. Lopez*, 38 F. Supp. 3d 436, 453 (S.D.N.Y. 2014) ("Since the Court has dismissed [p]laintiffs' RICO claims, [p]laintiffs cannot rely upon 18 U.S.C. § 1965(b) to establish personal jurisdiction over each of the defendants."), *aff'd*, 858 F.3d 55 (2d Cir. 2017). As for the New York claims, the Proposed SAC disavows C.P.L.R. § 302(a)(4) as a basis for personal jurisdiction and instead alleges that the Kelsier Defendants (1) have "sufficient minimum contacts with New York arising from the alleged scheme, such that exercising jurisdiction comports with New York's long-arm statute and due process," Proposed SAC ¶ 20; (2) "purposefully directed their fraudulent token marketing and sales efforts toward New York (and U.S. investors) in close coordination with Chow," *id.* ¶ 21; (3) "purposefully availed themselves of the privilege of conducting activities" in New York through their utilization of "interstate and foreign wires, internet communications, decentralized exchange infrastructure, and other crypto-financial tools to perpetrate" the interstate and

international fraud, *id.* ¶ 24; and (4) are covered under the co-conspirator jurisdiction theory, *id.* ¶ 23. But beyond simply conclusorily adding "New York" in their jurisdictional allegations, Plaintiffs have not offered any new facts that the Defendants targeted or marketed to New York specifically. For all of the reasons already discussed, *see* Section VIII, *supra*, the Proposed SAC continues to fail to make a *prima facie* showing of personal jurisdiction as to the Kelsier Defendants under the N.Y. C.P.L.R. long-arm statute.

*7. Claims Against Yeow*

As for the new Defendant Yeow, the Proposed SAC's allegations regarding Defendant Yeow are limited to his assistance in technical operations and assertions that he lied to the public and the Court. Specifically, Plaintiffs plead that Yeow is a "co-founder of Meteora and Jupiter," Proposed SAC ¶¶ 6, 31, and Jupiter's CEO, *id.* ¶ 31, who, via Jupiter, "led development and integration and ensured routing of retail trades into enterprise-controlled pools," *id.*, which provided "legitimacy," *id.* ¶ 39; *see also id.* ¶ 104; *id.* ¶ 8 (providing that "Chow and Yeow handled the technical operations"). In explaining the alleged layers of the RICO scheme, the Proposed SAC alleges that the Jupiter exchange/service provided support to "Chow and the Meteora Defendants." *See id.* ¶¶ 424-25; *see also id.* ¶ 421 (alleging that RICO enterprise consists of "the Meteora Defendants (Benjamin Chow and Meteora's affiliated entities) . . . along with other collaborators and facilitators including non-parties Ming 'Meow' Yeow[ and] Jupiter"). Finally, Plaintiffs generally allege that Yeow and others have misrepresented information to the public and the Court, including by denying control and claiming that Chow was merely a "developer," Meteora was "just software," and that Defendant Kelsier "knew nothing" about insider sniping. *Id.* ¶ 109.

None of these allegations state a claim for fraud, conspiracy to defraud, violations of N.Y. GBL Sections 349 and 350, or unjust enrichment. The Proposed SAC is entirely devoid of

allegations as to Yeow's scienter, material misconduct, or how Yeow was unjustly enriched. Thus, the addition of allegations against Defendant Yeow as to Counts I, II, V, and VI in the Proposed SAC is futile.

*8. Claims Against Doe Defendants 1-20*

The Proposed SAC next attempts to bring claims against the "Doe Defendants 1-20," who are described as "promoters, Key Opinion Leaders ('KOLs'), trading entities, and shell companies that received or routed funds, whose identities are presently unknown." *Id.* ¶ 37. Plaintiffs state that they "will amend to add them when identified." *Id.*

The Proposed SAC does not allege any facts about the shell companies or trading entities. As for the unnamed promoters and KOLs, Plaintiffs allege only that the promoters and KOLs (1) were not disclosed, *see id.* ¶ 10; (2) were paid, *see id.* ¶¶ 15, 61, 125, 333; (3) were managed and paid by Defendants, specifically Hayden and the Kelsier Defendants, *see id.* ¶¶ 32, 60, 101, 104, 125, 223, 236, 268, 320; and (4) worked on multiple token launches, *see id.* ¶¶ 62, 81, 343, 354. Plaintiffs further allege that these promoters and KOLs pushed various, and allegedly false, narratives across online platforms to stimulate "organic enthusiasm" and get investors to purchase the tokens. *See id.* ¶¶ 60, 63-65, 123-25, 236, 268, 343, 383-84. But the only specific statements that are alleged to be false and deceptive are those made by *other Defendants*, through these KOLs, specifically that:

- [there would be] "Fair/transparent launch[es]," . . . "decentralized" control (e.g., $M3M3 December 2024 launch materials)[,] . . . "locked liquidity," "staking yields," and "real-time rewards."
- $LIBRA was a "Viva La Libertad" development initiative for Argentina, promoted at launch with an apparent official endorsement and a distribution pie-chart implying only 20% team allocation.
- $MELANIA was "official" and protected by "vesting[."]
- $ENRON promised "corporate transparency[."]
- $TRUST promised "community-first," "no central control," and "long-term discipline."

*Id.* ¶ 384.

These allegations are insufficient to state a claim for a number of reasons. As a threshold matter, because Plaintiffs fail to provide *any* details regarding which Defendants are alleged to have said which statements, "it is entirely unclear which entity [or person] is alleged to have done what. This sort of vague allegation that 'fails to distinguish among Defendants' [is] deficient under Rule 9(b)." *Kirschner as Tr. of Millennium Lender Claim Tr. v. J.P. Morgan Chase Bank, N.A.*, No. 17-cv-06334 (PGG) (SLC), 2020 WL 9815174, at *18 (S.D.N.Y. Dec. 1, 2020) (quoting *Lehman v. Garfinkle*, No. 08-cv-09385 (SHS), 2009 WL 2973207, at *9 (S.D.N.Y. Sept. 16, 2009)), *report and recommendation adopted*, 2021 WL 4499084 (S.D.N.Y. Sept. 30, 2021), *aff'd*, No. 21-2726-cv, 2023 WL 5439495 (2d Cir. Aug. 24, 2023) (summary order). Plaintiffs have also failed to allege how any individual Doe Defendant violated N.Y. GBL Sections 349 and 350 because Plaintiffs do not allege facts demonstrating "New York's connection to the allegedly deceptive transaction[s]" required to demonstrate consumer-oriented conduct. *Cruz*, 720 F.3d at 122; *see* Section VI, *supra*. That the promoters and KOLs worked on multiple token launches, *see* Proposed SAC ¶¶ 62, 81, 343, 354, does not cure Plaintiffs' deficiency in pleading a pattern for purposes of RICO or a RICO conspiracy or plausibly allege that the activity of the promoters or KOLs is an ongoing threat. *See* Sections II.A and IX.B.2, *supra*. There can also be no RICO conspiracy claim because there is no substantive RICO claim pleaded. *See* Sections III and IX.B.2, *supra*. With respect to the remaining state law claims, Plaintiffs have not pleaded a claim for fraud because they have not alleged any facts that any of the Doe Defendants had the requisite fraudulent intent when promoting any of the alleged tokens. *See* Section IV, *supra*. Accordingly, Plaintiffs have also not pleaded that any of the Doe Defendants were engaged in a conspiracy to defraud. *See* Section V, *supra*. Finally, the Proposed SAC does not allege how each Doe Defendant was unjustly enriched. Thus, Plaintiffs'

allegations against the Doe Defendants would not survive a motion to dismiss, and the proposed amendment is futile.

*9. Claims Against DLL*

Finally, the Proposed SAC fails to state a claim against new Defendant Dynamic Labs Limited such that amendment would be futile. DLL is a British Virgin Islands corporation that is the developer and purported intellectual-property owner of the Meteora decentralized finance protocol. Proposed SAC ¶ 36. Plaintiffs allege that DLL "collected and retained protocol fees generated through the Meteora protocol's liquidity pools despite knowledge or willful blindness of the underlying fraud conducted through the Meteora platform." *Id.*; *see also id.* ¶ 362. Specifically, Plaintiffs allege that each token launch orchestrated by Defendants generated transaction fees through Meteora's DLMM smart contracts, which were then automatically routed to DLL-controlled protocol wallets, allowing DLL not only to profit from every trade executed during the scheme, *id.* ¶¶ 362-63, but also to enable the scheme's continuation, *id.* ¶ 366. As a result, Plaintiffs allege that "DLL was aware — or at minimum willfully blind — that these fees were derived from fraud, given the irregular fee volume, anomalous trading patterns, and public reports tying Meteora's launches to market manipulation." *Id.* ¶ 364; *see also id.* ¶ 365; *id.* ¶ 455 ("DLL was aware, or should have been aware, that the fees it retained were generated through manipulated trading activity and investor deception."). In this way, Plaintiffs allege that DLL was part of the RICO enterprise. *See id.* ¶¶ 421, 425.

Such allegations do not cure Plaintiffs' pleading deficiency of a pattern for purposes of RICO or a RICO conspiracy. *See* Sections II.A and III, *supra*. With respect to the remaining state law claims, Plaintiffs have not pleaded a claim for fraud under New York law because they have not alleged any facts that DLL engaged in any material misrepresentations or omissions of fact, which it knew to be false, that were made with intent to defraud, upon which the Plaintiffs

reasonably relied, and which caused injury to the Plaintiffs. *See Fin. Guar.*, 783 F.3d at 402. Plaintiffs have also not pleaded that DLL was engaged in a conspiracy to defraud. *See* Section V, *supra*. Similarly, Plaintiffs have failed to allege how DLL violated N.Y. GBL Sections 349 and 350, including by failing to allege facts that DLL has engaged in materially misleading consumer-oriented conduct that resulted in an injury of either Plaintiff. *See* Section VI, *supra*; *see also Plavin*, 146 N.E.3d at 1168. Count VI, which alleges unjust enrichment as to all Defendants, and seems to also include DLL, simply duplicates Plaintiffs' other claims and therefore is also futile. *See* Section VII, *supra*.

Finally, Plaintiffs' addition of a separate claim of unjust enrichment against DLL (Count VII) is also futile. *See* Proposed SAC ¶¶ 452-58. The doctrine of unjust enrichment "is a narrow one; it is 'not a catchall cause of action to be used when others fail.'" *E.J. Brooks*, 105 N.E.3d at 312 (quoting *Corsello*, 967 N.E.2d at 1185). "It is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff. Typical cases are those in which the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled." *Corsello*, 967 N.E.2d at 1185. To state a claim for unjust enrichment, a plaintiff must plead "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the [defendant] to retain what is sought to be recovered." *McCracken*, 91 F.4th at 608 (quoting *Rieder*, 973 N.E.2d at 746). "With regard to the third element, 'courts look to see if a benefit has been conferred on the defendant under mistake of fact or law, if the benefit still remains with the defendant, if there has been otherwise a change of position by the defendant, and whether the defendant's conduct was tortious or fraudulent.'" *Yodice*, 767 F. Supp. 3d at 94 (quoting *Columbia Mem. Hosp. v. Hinds*, 192 N.E.3d 1128, 1137 (N.Y. 2022)). "The mere fact that a benefit is bestowed on a defendant is insufficient. When

assessing considerations of equity and justice, courts generally consider, among other things, 'whether the defendant's conduct was tortious or fraudulent.'" *Hassan v. Fordham Univ.*, 515 F. Supp. 3d 77, 93 (S.D.N.Y. 2021) (citation omitted) (quoting *Clark v. Daby*, 751 N.Y.S.2d 622, 624 (N.Y. App. Div. 2002)), *opinion amended and superseded in part,* 533 F. Supp. 3d 164 (S.D.N.Y. 2021); *accord Espejo v. Cornell Univ.*, 523 F. Supp. 3d 228, 242 (N.D.N.Y. 2021), *on reconsideration sub nom. Faber v. Cornell Univ.*, No. 20-cv-00467, 2021 WL 4950287 (N.D.N.Y. Oct. 25, 2021).

Plaintiffs allege that, as "the developer and fee beneficiary of the Meteora protocol, DLL derived substantial financial benefits from the token launches orchestrated by the other Defendants." Proposed SAC ¶ 453. Specifically, Plaintiffs allege that DLL "collected and retained protocol fees generated through the Meteora protocol's liquidity pools," *id.* ¶ 36, and that "DLL was aware — or at minimum willfully blind — that these fees were derived from fraud, given the irregular fee volume, anomalous trading patterns, and public reports tying Meteora's launches to market manipulation," *id.* ¶ 364. *See also id.* ¶¶ 362, 365; *id.* ¶ 455 ("DLL was aware, or should have been aware, that the fees it retained were generated through manipulated trading activity and investor deception."). As a result, Plaintiffs contend, DLL was unjustly enriched by Plaintiffs' and class members' investments. *Id.* ¶ 454.

Plaintiffs fail to state a claim for unjust enrichment because they have not alleged facts from which one could plausibly infer that it is against equity and good conscience to permit DLL to retain the transaction fees. *See McCracken*, 91 F.4th at 608. While Plaintiffs have alleged that DLL received a benefit, *see id.* ¶ 453, benefit alone is insufficient, *see Hassan*, 515 F. Supp. 3d at 93. Plaintiffs have not alleged that DLL received the transaction fees mistakenly, so the Court looks to whether the Proposed SAC plausibly alleges that DLL's conduct was tortious or fraudulent. *See Yodice*, 767 F. Supp. 3d at 94 (providing that courts are to consider these factors

when analyzing the third element of an unjust enrichment claim). It does not. According to the Proposed SAC, that DLL was aware, should have been aware, or was willfully blind to fraud occurring through Meteora's token launches, *see* Proposed SAC ¶¶ 364, 455, amounts to an allegation that *other* actors were engaged in fraudulent activity, not DLL. Plaintiffs have not plausibly alleged that DLL was engaged in tortious or fraudulent conduct. Further, where a third party has obtained fees because of a plaintiff's transaction, courts have held that unjust enrichment claims cannot stand without additional allegations of tortious or fraudulent behavior, or unjust results. *See, e.g.*, *Olson*, 29 F.4th at 65, 67-68, 86-87 (affirming dismissal of unjust enrichment claim where plaintiffs failed to allege the portion of online fantasy baseball contest entrance fees provided to defendant was unjust); *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 339 (2d Cir. 2011) (affirming dismissal of unjust enrichment claim where allegations are that "sophisticated investor[] failed to apprise itself" of the riskiness of an investment); *see also Clark*, 751 N.Y.S.2d at 624 (affirming dismissal of unjust enrichment claim where plaintiffs made calculated risk in effectuating transaction and "any benefit to defendant was purely incidental").

Thus, because Plaintiffs have not alleged facts that DLL's conduct was tortious or fraudulent, they fail to state a claim of unjust enrichment as to DLL, thereby making the proposed amendment futile. *See Hassan*, 533 F. Supp. 3d at 169-70 (denying leave to amend for unjust enrichment claim where plaintiff did not allege facts that "rise to the level of tortious or fraudulent conduct"); *Amable v. New Sch.*, No. 20-cv-03811 (KMK), 2022 WL 1443352, at *11 n.8 (S.D.N.Y. May 6, 2022) (providing that plaintiff's claims for unjust enrichment would fail on the merits because no allegations of tortious or fraudulent conduct (citing *Hassan*, 515 F. Supp. 3d at 93)); *Espejo*, 523 F. Supp. 3d at 242 (dismissing unjust enrichment claims where plaintiff did not allege how refusal to refund tuition and fees and offer only partial refunds of room and

board was tortious or fraudulent); *Aubrey v. New Sch.*, 624 F. Supp. 3d 403, 424 n.10 (S.D.N.Y. 2022) (noting that unjust enrichment claim also fails because plaintiffs failed to allege any facts that rise to the level of tortious or fraudulent conduct).

* * *

In sum, because all of the amendments in Plaintiffs' Proposed SAC are futile, Plaintiffs' motion for leave to file a second amended complaint is denied. *See Foman*, 371 U.S. at 182.

**CONCLUSION**

For all the foregoing reasons, the Kelsier Defendants' motion to dismiss Counts IV and V for failure to state a claim under Rule 12(b)(6) is GRANTED. The Kelsier Defendants' motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) is GRANTED as to all other Counts. Defendant Chow's motion to dismiss all Counts for failure to state a claim under Rule 12(b)(6) is GRANTED, and Intervenor Plaintiff Dynamic Labs's motion to dismiss all Counts for failure to state a claim against Meteora under Rule 12(b)(6) is GRANTED. The Court DENIES Plaintiffs' motion for leave to file a second amended complaint, and therefore the Amended Complaint is dismissed with prejudice.

The Clerk of Court is respectfully directed to terminate the motions at Dkts. 170, 171, 172, 173, 175, 203, and 222, and CLOSE the case.

Dated: September 29, 2026
New York, New York

SO ORDERED.

Jennifer Rochon

JENNIFER L. ROCHON
United States District Judge